Luc A. Despins, Esq.
James T. Grogan, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                  :
**In re:**                                        :        **Chapter 11**
                                                  :
**FAIRPOINT COMMUNICATIONS, INC.,** *et al.*,:    **Case No. 09-16335 (____)**
                                                  :
            **Debtors.**                          :        **(Jointly Administered)**
                                                  :
------------------------------------------------------------x

<u>**DECLARATION OF ALFRED C. GIAMMARINO PURSUANT TO**
**RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE**
**SOUTHERN DISTRICT OF NEW YORK IN SUPPORT OF FIRST-DAY MOTIONS**</u>

    I, Alfred C. Giammarino, declare, pursuant to section 1746 of title 28 of the

United States Code, that:

<u>**PERSONAL BACKGROUND**</u>

    1.  I am Executive Vice President and Chief Financial Officer of FairPoint

Communications, Inc. ("<u>FairPoint Communications</u>") and each of its direct and indirect

subsidiaries (collectively, "<u>FairPoint</u>" or the "<u>Company</u>"). In that capacity, I am familiar with

FairPoint's day-to-day operations, businesses, and financial affairs.

    2.  As Executive Vice President and Chief Financial Officer of FairPoint, I

am responsible for all financial aspects of FairPoint's business, including, financial reporting

and internal controls, financial planning, taxation, investor relations, treasury and risk management. Additionally, I have over thirty-three years' experience in finance and management positions including more than twenty years in the telecommunications industry. Before joining FairPoint in September 2008, I served as Sensus Metering Systems' ("Sensus") Chief Financial Officer from December 2007 to May 2008 and, subsequent to that, as a Senior Financial Consultant for Sensus. From May 2004 until September 2007, I served as Executive Vice President and Chief Financial Officer of Stratos Global Corporation, a publicly traded satellite communications company. From June 2000 to December 2003, I was Senior Vice President and Chief Financial Officer of the international and information services group of Verizon Communications, Inc. ("Verizon"). Before my tenure at Verizon, I was Senior Vice President of Finance and Planning at GTE Corporation from 1998 to 2000.

3.     I began my career as an auditor at Arthur Andersen and graduated from St. John's University in New York with a BS in Accounting. I am certified as a Public Accountant in New York. Currently, I am based in FairPoint's corporate headquarters in Charlotte, North Carolina.

## PRELIMINARY STATEMENT

4.     FairPoint is a leading provider of communications services to residential and business customers in rural and small urban communities located in eighteen states. FairPoint operates the seventh largest local telephone company in the United States, based on the number of access lines, with approximately 1.7 million access line equivalents (including voice access lines and high-speed data lines, which include digital subscriber lines, or DSL, wireless broadband and cable modem) in service as of June 30, 2009.

5.	Headquartered in Charlotte, North Carolina, FairPoint Communications is the direct or indirect parent company of each of the other debtors in these chapter 11 cases. FairPoint Communications was founded in 1991 and currently owns and operates thirty-three local exchange carriers ("LECs") located throughout the United States. Many of these local telephone companies have served their communities for more than 75 years. Through its LECs, FairPoint Communications offers its customers a broad array of services including, but not limited to, local telephone services, long distance services, data and internet services, cable television and video services in certain markets, enhanced telephone services, billing and collection services, and telephone directory services.

6.	In March 2008, FairPoint Communications completed the acquisition from Verizon of its wire-line operations in the Northern New England region (collectively, the "NNE Operations"). In connection with this acquisition, FairPoint Communications entered into a $2.03 billion secured credit facility and also issued $551 million in senior unsecured notes.

7.	Since the acquisition of the NNE Operations, FairPoint has faced significant short- and long-term challenges, including, among other things (a) integrating the NNE Operations and business into FairPoint which increased FairPoint's size, as measured by access lines and revenues, approximately fivefold, (b) keeping pace with competition from bundled offerings by cable companies, as well as the use of alternative technologies, which are eroding FairPoint's traditional base of wireline voice customers, (c) monitoring, repairing and upgrading the legacy telecommunications network in the NNE Operations acquired from Verizon, while simultaneously building a new state-of-the-art next generation IP based network, and (d) overcoming the difficulty of transitioning certain back-office functions from

Verizon's integrated systems to newly created FairPoint systems, which occurred in January 2009 (hereinafter, the "<u>Cutover</u>").

8.    These challenges have been made even more difficult by deteriorating market conditions.  Although LECs were the only source of voice communications for many years, more recently LECs, including LECs operated by FairPoint, have experienced a decline in the number of access lines in service, primarily due to increased competition from wireless carriers, cable television operators who offer voice services, and internet service providers who offer voice over internet protocol ("<u>VoIP</u>") services.  Moreover, these competitive challenges were exacerbated by the recent turmoil in the financial markets, which has significantly limited available capital and resulted in a significant decline in the domestic economy in the past year. The economic decline has reduced consumer spending and contributed to an increase in the rate of decline in access lines and an increase in overdue accounts receivable balances from customers.  Additionally, as a result of the Cutover, FairPoint incurred higher than anticipated incremental costs and was required to devote significant resources, including management time and attention, to resolving these problems. As a result of the combined impact of each of these developments, FairPoint has been unable to attain the performance levels it projected at the time of the acquisition of the NNE Operations from Verizon.

9.    During 2008, legacy FairPoint operations experienced an 8.5% decline in the number of voice access lines, while its newly acquired NNE Operations experienced a 12.3% decline during the same period.  FairPoint's revenue has declined from $344.7 million in the second quarter of 2008 (the first quarter following the acquisition of the NNE Operations) to $299.6 million in the same quarter of 2009, which represents a 13.1% decline.

10.     FairPoint comes before this Court because of a significant need to de-leverage its balance sheet and to reduce its cost structure.  Although FairPoint is, by all accounts, heading in the right direction as a functioning business, the approximately $2.7 billion of funded debt FairPoint carries as a result of the Verizon transaction, including accrued and unpaid interest and amounts owed under interest rate swap agreements, is not sustainable.  Recognizing the need to de-leverage its balance sheet, FairPoint has initiated lengthy, arms-length negotiations with key noteholder constituencies and with its secured lenders over the past few months.

11.     In an effort to address these issues, the current management team has worked diligently over the past year to expand and improve the product offerings, diversify and grow revenues, increase operational efficiency and operating cash flows, and reduce debt obligations through, among other things, (a) investing $85 million in the build out of a new next generation IP based network, (b) suspending common stock dividends, and (c) the completion of an exchange offer for the notes issued in connection with the acquisition of the NNE Operations, thereby reducing the Company's cash interest expense for the quarters ending June 30, 2009 and September 30, 2009 and maintaining compliance with financial covenants contained in FairPoint's credit facility for the measurement period ended June 30, 2009. Despite significant success from these endeavors, FairPoint remains highly leveraged, with substantial annual capital expenditure requirements and interest costs, and portions of its extant debt obligations maturing on a quarterly basis.  This capital structure is not sustainable, particularly with the impact of the current recession in the United States, continued high capital expenditure requirements to remain competitive in the telecommunications market, virtually no access to capital markets, high levels of unemployment, and reduced disposable income and

consumer spending. As a result, FairPoint, with the assistance of its advisors, began to explore capital structure restructuring alternatives, including refinancing options, recapitalizations, and a potential chapter 11 filing.

12.     Commencing in July and culminating in October 2009, the Company worked diligently first with its noteholders and then with its secured lenders to obtain a sustainable solution to the Company's leverage problems. Through these negotiations FairPoint has reached an agreement with a steering committee of its prepetition secured lenders regarding the framework for a comprehensive balance sheet restructuring that will result in the conversion of more than $1.7 billion of debt into equity. FairPoint has analyzed all plausible alternatives and has determined that it is in the best interests of all stakeholders to consummate such a restructuring pursuant to chapter 11 of the Bankruptcy Code. A reorganization under chapter 11 represents the most effective and efficient way to de-lever FairPoint's balance sheet to an appropriate level and to "right-size" its cost structure,[1] enabling the Company to achieve profitability on a long-term basis. FairPoint is confident that the completion of its restructuring efforts will allow the Company to focus its resources on the operation of its businesses, will result in an appropriate capital structure for the Company that will significantly strengthen its financial condition and liquidity and position FairPoint to compete more effectively in a dynamic marketplace. Given FairPoint's core strengths - which include a diversified geographic base, an experienced workforce, and extensive network equipment and facilities - FairPoint's management is confident that, with the aid of chapter 11, FairPoint can achieve its

---

[1]     The Company has commenced discussions with representatives of the Company's labor unions over possible changes to their collective bargaining agreements to reduce operating costs. At this preliminary stage the Company is not seeking any relief from the Court with respect to such matters.

long-term goal of becoming the preferred communications provider for businesses and residential customers throughout the markets the Company serves.

13.     FairPoint has approximately $46 million in unencumbered cash, and an additional $2.8 million in restricted cash.  However, in order to ensure that it remains able to meet its administrative and operational obligations and to provide its trade vendors with assurances that FairPoint will have more than enough liquidity to pay them for post-petition purchases or services, FairPoint is seeking authority to enter into a senior secured debtor in possession revolving credit facility with certain of its prepetition secured lenders providing for extensions of credit in an aggregate principal amount not to exceed $75 million, with a letter of credit subfacility in an aggregate amount of $30 million, subject to certain conditions.

14.     Concurrently with the filing of these chapter 11 cases FairPoint has filed certain motions and other pleadings (the "First Day Pleadings").  I am authorized by FairPoint to submit this Declaration on FairPoint's behalf in support of the First Day Pleadings.  The First Day Pleadings are intended to enable FairPoint to operate effectively and efficiently during these chapter 11 cases (the "Bankruptcy Cases"), as well as to avoid certain adverse consequences that otherwise might result from the commencement of these Bankruptcy Cases.  Among other things, the First Day Pleadings seek relief aimed at maintaining the confidence of FairPoint's various stakeholders and vendors, as well as the morale of FairPoint's employees.  Gaining and retaining the support of these key constituencies is absolutely critical to FairPoint's efforts to reorganize successfully.  I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, FairPoint's businesses and (b) maximize and preserve the value of FairPoint's chapter 11 estates.

15.     To familiarize the Court with FairPoint and the relief it seeks in the first days of these cases, I have organized this declaration as follows:  Sections I through III of this Declaration provide an overview of FairPoint's businesses and organizational structure, the capital structure, and the circumstances giving rise to the commencement of these chapter 11 cases.  Section IV affirms and incorporates the facts that support the relief requested in the First Day Pleadings, including the immediate and irreparable harm that would result if FairPoint were unable to implement immediately certain of the relief sought in the First Day Pleadings. Section V lists the schedules of information required by Local Bankruptcy Rule 1007-2.

## I.

## FAIRPOINT'S BUSINESSES

### Overview

16.     FairPoint Communications was founded as MJD Communications Inc. in 1991.  From its inception, FairPoint Communications was established for the purpose of acquiring and operating local telephone companies in rural markets.  Today, FairPoint Communications is a publicly held corporation whose stock is traded on the New York Stock Exchange under the ticker symbol FRP.  FairPoint has approximately 4,140 employees, including approximately 2,700 who are represented by labor unions.  For the year ended December 31, 2008, FairPoint had revenues of approximately $1.274 billion on a consolidated basis.  As of June 30, 2009, FairPoint's unaudited consolidated financial statements reflected assets with a book value totaling approximately $3.236 billion and liabilities totaling approximately $3.234 billion.

17.     As of December 31, 2008, approximately 65% of the Company's access lines served residential customers, 27% served business customers and 8% served wholesale

customers. The table below illustrates how FairPoint's access lines were dispersed among the various states it serves as of June 30, 2009:

| State | Access Line Equivalent |
|-------|----------------------|
| Maine | 589,104 |
| New Hampshire | 519,098 |
| Vermont | 321,156 |
| Florida | 52,343 |
| New York | 49,624 |
| Washington | 44,149 |
| Missouri | 14,414 |
| Ohio | 13,386 |
| Virginia | 8,497 |
| Kansas | 7,119 |
| Illinois | 7,083 |
| Idaho | 6,698 |
| Pennsylvania | 6,419 |
| Oklahoma | 4,192 |
| Colorado | 3,819 |
| Other States | 3,271 |
| **Total** | **1,650,372** |

18.    As the local telephone company for approximately 1.7 million residential and business customers, FairPoint offers its customers a broad array of services including, but not limited to, the following:

- Local Telephone Services:  FairPoint offers traditional local telephone services to "end user" residential and business customers.

- Long Distance Services:  FairPoint offers switched and dedicated long distance services to their retail customers under resale agreements with other national telecommunications carriers.  FairPoint also sells wholesale long distance services to other telecommunications carriers.

- Wholesale Communications Services:  FairPoint sells communications services to competitor local exchange carriers who then resell such services to local businesses and residential customers.

- Data and Internet Services:  FairPoint offers broadband internet access via DSL technology, dedicated T-1 connections, internet dial-up, high speed cable modem

and wireless broadband.  FairPoint also offers related internet services to its customers, including internet protocol address registration, basic website design and hosting, domain name services, and web-based email services.

- Cable TV and Video:  In certain markets, FairPoint provides video services to customers by reselling DirecTV content and providing cable and IPTV video-over-DSL distribution channels.

- Enhanced Telephone Services:  FairPoint sells enhanced telephone services to customers, such as call waiting, call forwarding and transferring, three-way calling, automatic callback, call hold, caller name and number identification, voice mail, teleconferencing, video conferencing, store-and-forward fax, follow-me numbers, Centrex services and direct inward dial lines.

- Billing and Collection Services:  As a LEC, FairPoint frequently acts as the primary billing and collection party for its customers' telephone usage, including amounts owed to other telecommunications carriers for long distance services.  Long distance carriers purchase such billing and collection services from FairPoint.

- Directory Services:  FairPoint, through contracts with directory services companies, publishes telephone directories for its customers in a majority of the locations in which it operates LECs.  These directories provide white page listings, yellow page listings and community information listings.

19.     In addition to the services FairPoint provides in its various markets, it participates actively in philanthropic affairs in the communities in which it has a presence.  For example, FairPoint supports ongoing digital literacy initiatives and invests in community broadband applications as part of its commitment to assist in raising the levels of information and technology literacy in the communities it serves.  FairPoint views its community focus as an integral component of its drive to become a leading provider of communications services.

**The Verizon Transaction**

20.     On January 15, 2007, FairPoint Communications entered into an agreement with Verizon and Northern New England Spinco Inc. ("Spinco"), a subsidiary of Verizon, pursuant to which FairPoint committed to purchase and assume Verizon's landline operations in Maine, New Hampshire and Vermont.  In order to consummate the transaction,

Verizon, Spinco and FairPoint Communications developed a plan of merger pursuant to which Verizon agreed to contribute specified assets and liabilities of the local exchange businesses of Verizon New England in Maine, New Hampshire and Vermont to Spinco. Verizon also agreed to contribute the related long distance and internet service provider businesses in those states to subsidiaries of Spinco, which subsequently would merge with and into FairPoint Communications, with FairPoint Communications remaining as the surviving entity.

21.     After extensive federal and state regulatory review and approval, on March 31, 2008, the Company completed the merger with Spinco and the Company acquired Verizon's LEC businesses in Maine, New Hampshire and Vermont. In connection with the merger, the Company and Spinco entered into a $2.03 million credit facility with certain lenders and agents party thereto and also issued $551 million in aggregate principal amount of 13⅛% Senior Notes due 2018, which were assumed by the Company in the merger. In consideration of the merger, Verizon received a $1.16 billion cash payment from Spinco and an additional $551 million in cash from the proceeds of the issuance of such senior notes. Verizon's stockholders received approximately 54 million shares of FairPoint Communications' common stock, representing approximately 60.2% of the equity ownership interests in FairPoint at that time, as a consequence of the transaction.

**Regulatory Regimes**

22.     The Company is subject to regulation primarily by federal and state governmental agencies. At the federal level, the Federal Communications Commission (the "FCC") generally exercises jurisdiction over the facilities and services of communications common carriers, such as the Company, to the extent those facilities are used to provide, originate or terminate interstate or international communications. Public utility commissions

("PUCs") are the state regulatory commissions that generally exercise jurisdiction over common carriers' facilities and services to the extent those facilities are used to provide, originate or terminate intrastate communications.

23.     Certain of these regulatory regimes affect FairPoint's revenues (positively and negatively) because they impose price caps or they subsidize high-cost operations in rural areas of the United States where FairPoint primarily operates. For example, the FCC regulates the prices FairPoint's LECs charge to long distance carriers for the use of their network to originate and terminate interstate calls. As a result of the FCC's price cap regulations, limits are imposed on FairPoint's interstate rates without regard to its costs or revenues. The FCC adjusts such limits annually based on certain formulae but generally allows FairPoint and similar companies to adjust rates within those limits. By contrast, FairPoint is the beneficiary of federal support payments from the Universal Service Fund, which are intended to bolster the Company's revenues in rural and other high-cost markets. Payments from the Universal Service Fund accounted for less than 3% of FairPoint's total revenue for the year ended December 31, 2008. FairPoint also receives support under the FCC's Interstate Access Support and Interstate Carrier Common Line Support programs.

**Corporate Structure**

24.     The organizational chart attached hereto as Exhibit A generally depicts FairPoint's corporate structure.

**Investment Practices**

25.     As more fully described in FairPoint's motion seeking authority to continue the use of its existing cash management system (the "Cash Management Motion"), FairPoint invests any excess cash in accounts managed by Fidelity Investments (the "Fidelity

12

Investment Account"). Information regarding the Fidelity Investment Account is annexed as Exhibit E to the Cash Management Motion. FairPoint's investments currently consist solely of the Fidelity U.S. Government Portfolio that invests at least 80% of its assets in U.S. Treasury obligations or U.S. Government obligations (either issued or guaranteed by the U.S. Treasury or the U.S. Government) or U.S. government securities issued by entities that are chartered or sponsored by Congress but whose subsidiaries are neither issued or guaranteed by the U.S. Treasury.

## II.

## FAIRPOINT'S CAPITAL STRUCTURE

### Overview

26.     As of the Petition Date, FairPoint had approximately $2.7 billion of total funded debt outstanding, including approximately $2.0 billion owed under the Credit Facility, and $575 million in senior unsecured notes, including capitalized interest, and approximately $88 million owed under interest rate swap agreements, including accrued interest. The Company estimates that under its existing debt structure, it would have incurred more than $200 million in interest costs during 2009, of which $106 million was incurred during the first half of this year. In addition, the Company currently has approximately $53 million in general trade obligations.

### Senior Secured Credit Facility

27.     On March 31, 2008, immediately prior to the Verizon merger, FairPoint and Spinco entered into a $2.03 billion credit facility (the "Credit Facility") consisting of a revolver in an aggregate principal amount of $200 million, a term loan A facility in an aggregate principal amount of $500 million, a term loan B facility in the aggregate principal

amount of $1.13 billion (together with the term loan A facility, the "<u>Term Loans</u>") and a delayed draw term loan in an aggregate principal amount of $200 million. Spinco drew $1.16 billion under the Term Loans immediately prior to its spin-off from Verizon, the proceeds of which were paid to Verizon. FairPoint then drew $470 million under the Term Loans and $5.5 million under the delayed draw term loan concurrently with the closing of the merger. Since the merger closed, FairPoint has drawn the remaining $194.5 million under the delayed draw term loan.

28.　　On October 5, 2008, the administrative agent under the Credit Facility, Lehman Commercial Paper, Inc. ("<u>LCPI</u>"), filed a petition for relief under chapter 11 of the Bankruptcy Code in this Court. LCPI accounted for approximately thirty percent of the loan commitments under the $200 million revolver. On January 21, 2009, FairPoint entered into an amendment to the Credit Facility under which the administrative agent resigned and was replaced by Bank of America, N.A., as administrative agent. LCPI's undrawn loan commitments under the revolver, totaling $29.7 million, were terminated and are no longer available to FairPoint. As a result, the available funds under the revolver were permanently reduced to an aggregate principal amount of $170.3 million.

29.　　The revolver has a swingline subfacility in the amount of $10 million and a letter of credit subfacility in the amount of $30 million, which allows for issuances of standby letters of credit by FairPoint.

30.　　The Credit Facility also permits FairPoint to enter into interest rate and currency exchange swaps and similar arrangements with the lenders under the Credit Facility and/or their affiliates. As a result, FairPoint entered into various interest rate swap agreements (the "<u>Swap Agreements</u>") in order to limit the variability of its interest payments and to shield

itself from interest rate cash flow risk. As a result of the Swap Agreements, approximately 78% of FairPoint's interest payments were effectively calculated at fixed rates, averaging 7.4%, rather than variable rates as of December 31, 2008. Under the terms of the Swap Agreements, the company makes a payment if the variable rate is below the fixed rate, or it receives a payment if the variable rate is above the fixed rate. Because of the precipitous decline in short-term interest rates resulting from the current economic downturn, as of the Petition Date, the fair market value of these swaps is a net liability of approximately $88.0 million, including unpaid amounts due on September 30, 2009. The obligations under these swap agreements are *pari pasu* with the obligations under the Credit Facility.

31.     As of June 30, 2009, FairPoint had borrowed $150 million under the revolver and letters of credit had been issued for $17.9 million. Accordingly, as of June 30, 2009, the remaining amount available under the revolver was $2.4 million. The Company also had pending commitments for additional letters of credit totaling $1.5 million as of June 30, 2009.

32.     The term loan B facility and the delayed draw term loan would have matured in March 2015 and the revolver and the term loan A facility would have matured in March 2014.

33.     The Credit Facility is guaranteed, jointly and severally, by all existing and subsequently acquired or organized wholly owned first-tier domestic subsidiaries of FairPoint that are holding companies. No guarantee is required of a subsidiary that is an operating company, including all of FairPoint's LECs. The NNE Operations (Northern New England Telephone Operations LLC, Telephone Operating Company of Vermont LLC and Enhanced Communications of Northern New England Inc.) are regulated operating subsidiaries

and, therefore, are not guarantors under the Credit Facility. The Credit Facility is secured by, among other things, a first priority perfected security interest in all of the stock, equity interests, promissory notes, partnership interests and membership interests owned by FairPoint Communications.

**Senior Notes**

34.     As noted above, on March 31, 2008, Spinco issued notes in the aggregate principal amount of $551 million, which have a maturity date of April 1, 2018 and are not redeemable at the Company's option prior to April 1, 2013 (the "Old Notes"). The Company assumed all obligations under the Old Notes as part of the merger. Interest on the Old Notes was payable semi-annually in cash on April 1 and October 1 of each year. The Old Notes bear interest at a fixed rate of 13.125%, resulting in annual interest costs of approximately $72 million, and principal is due at maturity. Because the Old Notes were issued at a discount on the date of their distribution, the Old Notes had a carrying value of $539.8 million (principal amount at maturity of $551 million less a discount of $11.2 million).

35.     On July 29, 2009, the Company successfully consummated an Exchange Offer (the "Exchange Offer") for certain of the Old Notes. Pursuant to the Exchange Offer, $439.6 million in aggregate principal amount of the Old Notes (which amount was equal to approximately 83% of the then-outstanding Old Notes) were exchanged for new notes in the aggregate principal amount of $439.6 million (the "New Notes," and together with the Old Notes, the "Notes"). In addition, pursuant to the terms of the Exchange Offer, an additional $18.9 million in aggregate principal amount of New Notes were issued to noteholders who tendered their Old Notes in the Exchange Offer as payment for accrued and unpaid interest on the exchanged Old Notes up to, but not including, the settlement date of the Exchange Offer.

In tandem with the Exchange Offer, FairPoint solicited consents from holders of the Notes for certain amendments to the Indenture to eliminate or amend substantially all of its restrictive covenants and modify a number of the events of default and certain other provisions previously contained in the Indenture.

36.     The New Notes have a maturity date of April 2, 2018, and bear interest at a fixed rate of 13⅛%, payable in cash, except that the New Notes bore interest at a rate of 17% for the period from July 29, 2009 through and including September 30, 2009 (the "Initial Interest Payment Period").  In addition, the Company was permitted to pay the interest payable on the New Notes for the Initial Interest Payment Period in the form of cash, by capitalizing such interest and adding it to the principal amount of the Notes or a combination of both cash and such capitalization of interest, at the Company's option.

37.     In connection with the Exchange Offer and the corresponding consent solicitation, the Company also paid a cash consent fee of $1.6 million in the aggregate to holders of Old Notes who validly delivered consents in such consent solicitation and did not revoke their consents prior to a specified early consent deadline.  The Exchange Offer, in turn, resulted in cash savings of $28.8 million.

**III.**

**EVENTS LEADING TO THE CHAPTER 11 CASES**

38.     Since acquiring the NNE Operations from Verizon in 2008, the Company has faced a number of challenges which, taken together, have had a negative impact on its overall financial performance.  One of the primary challenges facing the Company is that it has not been able to attain the performance projections made at the time it acquired the NNE Operations.  The inability to achieve these financial performance projections has made it

impossible for the Company to service the approximately $2.7 billion in debt obligations. Interest costs on FairPoint's significant debt has absorbed a large portion of its operating cash flow, thereby imposing limitations on FairPoint's ability to construct its next generation, IP based network which will enable it to offer a new suite of IP-based services and implement its strategic business plan – which are necessary steps to reverse the current downward trend of FairPoint's operating cash flows. Further, the recent turmoil in the financial markets, coupled with FairPoint's deteriorating financial performance, has limited FairPoint's ability to attract potential investors or refinance debt. The significant general economic decline in the United States has reduced consumer spending and contributed to an increased rate of decline in access lines and overdue accounts receivable balances from customers. Additionally, operational difficulties and the resulting higher than anticipated incremental costs incurred as a result of the Cutover have further exacerbated FairPoint's difficulties. Finally, the regulatory regimes under which the Company operates limit its flexibility in addressing these problems. These factors are discussed in greater detail below.

## Cutover

39.     During 2007, 2008, and into January 2009, FairPoint developed and deployed new systems, processes and personnel to operate the business FairPoint had purchased from Verizon in Maine, New Hampshire and Vermont.

40.     The transition of the NNE Operations from operating subsidiaries of Verizon to subsidiaries of FairPoint had an adverse effect on FairPoint's business operations. Pursuant to the terms of the acquisition agreement, Verizon was to remain responsible for critical functions such as internal information technology, customer care, order management, broadband help desk support, E-911 services, network monitoring, billing and collection, and

supply chain systems between the March 31, 2008 closing date and Cutover. During this period, the NNE Operations were operated under a transition services agreement, pursuant to which Verizon was paid approximately $15 million per month in return for the services set forth above. FairPoint engaged Capgemini U.S. LLC ("Capgemini") to build a back-office infrastructure to allow FairPoint to migrate off of Verizon's systems. FairPoint extended the original Cutover date of September 2008 several times leading up to the final date of January 2009.

41.     Following Cutover, FairPoint experienced increased processing time by customer service representatives for new orders, increased processing time for customer invoices, and an inability to execute automated collection treatment efforts. These issues negatively impacted customer satisfaction and resulted in large increases in customer call volumes into FairPoint's customer-service centers. While many of these issues were anticipated, the magnitude of the difficulties experienced were beyond FairPoint's expectations.

42.     In the first half of 2009, FairPoint incurred $28.0 million of incremental expenses in order to operate its business, including third-party contractor costs and internal labor costs in the form of overtime pay. The Cutover also required significant staff and senior management attention. In addition, FairPoint expected to continue to incur a modest amount of incremental costs during the third quarter of 2009 as it continued toward completion of its efforts.

43.     To date, FairPoint has resolved many of the issues it faced, but it has been required to devote significant financial resources and employee time to resolving those issues. This has lessened FairPoint's ability to implement its business plan, improve customer satisfaction, and compete effectively in the marketplace.

44.     On October 9, 2009, the Company entered into a Settlement Agreement and Release (the "Settlement Agreement") with Capgemini U.S. LLC ("Capgemini"). The invoiced amounts and deferred amounts totaled approximately $49.8 million under various contracts between Capgemini and the Company. Pursuant to the Settlement Agreement, Capgemini agreed to continue to provide services to the Company in exchange for the Company paying Capgemini ongoing fees plus $30 million of the total $49.8 million, with the Company paying $15 million upon execution of the Settlement Agreement and an additional $15 million on December 31, 2009. The Settlement Agreement also allows Capgemini to, among other things, assert an allowed unsecured claim against FairPoint Communications (to which FairPoint will not object) for the remaining balance of approximately $19.8 million if the Company seeks relief under chapter 11 of the Bankruptcy Code. The Company also agreed to assume certain contracts with Capgemini if the Company seeks relief under chapter 11 of the Bankruptcy Code. FairPoint anticipates that it will be able to continue to work with Capgemini to further improve the Company's performance.

**Increased Regulatory Burdens**

45.     To obtain state-level approval of the Spinco merger, FairPoint was required to submit to an array of mandates issued by the regulatory authorities in Maine, New Hampshire and Vermont. As a result of these regulatory requirements, FairPoint, among other things, must meet certain prescribed minimum service levels, must increase the availability of Broadband in each of the three states within certain prescribed time frames and must make substantial minimum capital investments in those three states during the first three years following the closing of the Spinco merger, or face significant financial penalties. As a result of the Cutover issues previously described, FairPoint faces the potential for significant

financial penalties (in excess of $20 million) in Maine, New Hampshire and Vermont for failure to meet certain service quality measures in the months immediately following the Cutover. FairPoint also suffers a competitive disadvantage because its competitors, who are not LECs, do not face the same regulatory constraints and requirements. Further, due to various contracts and other agreements inherited from Verizon, FairPoint is unable to raise rates for specified periods of time, even for certain services that are not regulated by the state PUCs.

**Market Conditions**

46.     FairPoint's financial well-being has also been hurt by the current economic downturn and continued aggressive competition, particularly in the Northern New England markets it serves. The Company's consolidated revenues decreased $45.1 million to $299.6 million in the second quarter of 2009 compared to 2008. Revenues in each of FairPoint's business lines have been impacted by the weak economy, which has caused a decrease in discretionary consumer spending and, correspondingly, an increase in access line losses for FairPoint. As a result of these and other factors, FairPoint experienced a net loss for the second quarter of 2009 of $17.8 million as compared to net income of $23.1 million for the same quarter of 2008.

47.     A portion of these losses can also be attributed to the vigorous and growing competition in the communications and technology industries. For example, in most of FairPoint's service areas, it faces competition from wireless telephone technology, especially in the small urban markets that the Company serves. FairPoint also faces competition from new market entrants that offer close substitutes for the traditional telephone services that

FairPoint offers, including cable television operators and competitive local exchange carriers that maintain their own facilities or lease services at wholesale rates.

48.     Cable companies also compete with FairPoint with respect to high-speed data and local and long distance voice services. Further, newer technologies such as VoIP, which provide competitors with a cost advantage because VoIP can be sold to end users at a lower price than traditional telephone services, also pose competitive challenges to FairPoint. Finally, internet services – comprised of online access services and online content services – are highly competitive and are likely to become even more so. As a result of the increasingly competitive marketplace in which FairPoint operates, over the last several years the Company has experienced decreasing revenues and a decline in customers. Many of FairPoint's direct regional competitors, including other local cable and internet providers, took advantage of both the lengthy approval period for the Verizon merger as well as the delayed Cutover and operating issues experienced as a consequence of Cutover by offering aggressive pricing on bundled packages of services and claiming to offer more reliable service.

49.     The bankruptcy of LCPI further hurt FairPoint's liquidity. During September 2008, due to the extreme uncertainty in the financial markets and the risk associated with LCPI, FairPoint drew the remaining $100 million available under its $200 million delayed draw loans, as well as $100 million under its revolving credit facility. These draw-downs resulted in additional and unanticipated interest costs as these funds were not immediately needed for operating purposes. In addition, as more fully described above, in January 2009, FairPoint entered into an amendment to the Credit Facility under which LCPI resigned as administrative agent. LCPI's undrawn loan commitments under the revolver, totaling $29.7 million, were terminated and were no longer available to FairPoint.

## Initial Out of Court Restructuring Initiatives

50.     Although the Company was able to successfully consummate the Exchange Offer and, as a result, was able to maintain compliance with the financial covenants contained in the Credit Facility for the measurement period ended June 30, 2009, the Exchange Offer did not provide a sufficient reduction in the Company's cash interest expense to prevent a potential breach of the interest coverage ratio maintenance covenant in the Credit Facility for the measurement period ended September 30, 2009.  In addition, the Company anticipated that it would be in breach of the leverage ratio maintenance covenant in the Credit Facility as early as the measurement period ended September 30, 2009. Such breaches would have permitted the lenders under the Credit Facility to accelerate the maturity of the loans outstanding thereunder, seek foreclosure upon any collateral securing such loans and terminate any remaining commitments to lend to the Company.  If the lenders under the Credit Facility had exercised such remedies, the Company did not believe that it could refinance the Credit Facility on reasonable terms, or at all, in the then prevailing lending environment.

51.     In order to address these issues, the Company developed an out-of-court restructuring plan (the "Restructuring Plan") with the assistance of Rothschild Inc. ("Rothschild"), the financial advisor the Company retained to assist with its efforts to restructure its capital structure.  The Restructuring Plan related to all of the Company's outstanding Notes and was generally designed to (i) reduce the Company's indebtedness and interest expense, (ii) improve the Company's liquidity and financial and operational flexibility in order to allow it to compete more effectively and maximize enterprise value and (iii) help the Company maintain compliance with the maintenance covenants in the Credit Facility.  In particular, the Restructuring Plan contemplated, among other things, that the holders of Notes

would be tendered in exchange for shares of Convertible Preferred Stock in FairPoint Communications.  The Restructuring Plan was conditioned on acceptance by 95% of the outstanding Notes, which was the threshold necessary to sufficiently reduce leverage for purposes of the maintenance covenants in the Credit Facility as well as for liquidity purposes.

52.     This effort, however, was unsuccessful for two primary reasons: (1) following lengthy negotiations with substantial holders of Notes it became apparent that the minimum tender thresholds could not be met; and (2) that the holders of the Notes were unwilling to lend an additional $25 million in funds that would have been necessary to effectively carry out the Restructuring Plan.

53.     Following these unsuccessful negotiations, the Company entered into discussions with the secured lenders under the Credit Facility.  On September 25, 2009, FairPoint entered into a forbearance agreement (the "Forbearance Agreement") with lenders holding approximately 68% of the loans and commitments outstanding under the Credit Facility (the "Forbearing Lenders").  The Forbearance Agreement permitted FairPoint to forgo certain principal and interest payments, due on September 30, 2009, under its Credit Facility.  Further, the Forbearing Lenders agreed to forbear from accelerating the maturity of the loans outstanding under the Credit Facility and from exercising any other remedies thereunder until October 30, 2009 if FairPoint failed to meet certain interest coverage ratio and leverage ratio covenants contained in the Credit Facility for the period ended September 30, 2009.

54.     In addition, on September 25, 2009, FairPoint entered into a forbearance agreement (the "Wachovia Forbearance Agreement") with Wachovia Bank, N.A. ("Wachovia") relating to the ISDA Master Agreement, dated as of December 12, 2000, as amended and restated as of February 1, 2008 (the "Wachovia Swap Agreement").  Pursuant to the Wachovia

Forbearance Agreement, Wachovia agreed to not exercise any of its rights or remedies under the Wachovia Swap Agreement if the Company does not make a payment that is due under the Wachovia Swap Agreement on September 30, 2009 until October 30, 2009. Wachovia also agreed to forgo payments under certain of its interest rate swap agreements, totaling approximately $51.4 million, including unpaid amounts due on September 30, 2009

55.     Finally, on September 25, 2009, FairPoint entered into a forbearance agreement (the "Morgan Stanley Forbearance Agreement") with Morgan Stanley Capital Services Inc. ("Morgan Stanley") relating to the ISDA Master Agreement, dated as of February 1, 2005 (the "Morgan Stanley Swap Agreement"). Pursuant to the Morgan Stanley Forbearance Agreement, Morgan Stanley agreed to not to exercise any of its rights or remedies under the Morgan Stanley Swap Agreement if the Company does not make a payment that is due under the Morgan Swap Agreement on September 30, 2009 until October 30, 2009.

**The Plan Term Sheet and Debtor In Possession Financing**

56.     Following the execution of the forbearance agreements described above, FairPoint engaged in extensive negotiations with a steering committee of its prepetition secured lenders (the "Steering Committee") regarding a recapitalization of the FairPoint's significant indebtedness. Subsequently, FairPoint and the Steering Committee reached agreement on a term sheet (the "Plan Term Sheet", annexed hereto as Exhibit B), which sets forth the terms of a reorganization plan that will significantly delever FairPoint's balance sheet, including the conversion of approximately $1.7 billion of debt to equity. Evidencing their support of the Plan Term Sheet, the members of the Steering Committee have executed a plan support agreement (the "PSA", substantially in the form annexed hereto as Exhibit C) by which the members of the Steering Committee have agreed to support a plan of reorganization that

substantially embodies the terms contained in the Plan Term Sheet. In addition, other secured

lenders under the Credit Facility have executed the PSA as of October 25, 2009. In total,

holders of in excess of 50% (inclusive of the members of the Steering Committee) of

FairPoint's outstanding secured debt under the Credit Facility have executed the PSA.

57. The Plan Term Sheet generally provides the following:[2]

- certain members of the Steering Committee have agreed to provide a senior secured debtor-in-possession revolving credit facility providing for extensions of credit in an aggregate principal amount not to exceed $75,000,000, with a letter of credit subfacility in an aggregate amount of $30,000,000, subject to certain conditions (the "DIP Facility");

- each holder of a claim arising under the Credit Facility shall receive the following in full satisfaction of such claim: (i) its *pro rata* share of $1 billion in new term loans; (ii) its *pro rata* share of 98% of the common stock (the "New Common Stock") to be issued by reorganized FairPoint Communications, subject to certain conditions; and (iii) its *pro rata* share of cash upon emergence in an amount equal to all cash of FairPoint in excess of $40 million after taking into account all cash payments required to be paid under FairPoint's chapter 11 plan;

- (i) if the class of general unsecured claims (including the holders of the senior notes) votes to accept FairPoint's chapter 11 plan, such claimants shall receive their *pro rata* share of (A) 2% of the newly issued New Common Stock, subject to certain conditions; and (B) warrants to purchase up to 5% of the New Common Stock, subject to certain terms and conditions; or (ii) if the class of general unsecured claims votes to reject the chapter 11 plan, such claimants shall not receive any distributions under the Plan; and

- holders of FairPoint Communications' common stock will receive no recovery.

Moreover, the Plan Term Sheet provides for exit financing upon FairPoint's emergence from

bankruptcy. The Plan Term Sheet contemplates that the DIP Facility will, subject to certain

---

[2]    This summary of certain material terms of the Plan Term Sheet does not include a description of all of the terms, conditions and other provisions of the Plan Term Sheet, including, among other things, certain provisions regarding the implementation of a key employee incentive program which has not yet been considered by FairPoint Communications' board. FairPoint is not seeking any relief with respect to a key employee incentive program at this time, but will do so at a later date after any such program is approved by its board.

conditions, roll into such a revolving credit exit facility with an aggregate principal amount of $75.0 million.

58.     Following careful consideration of all alternatives, FairPoint has determined that implementation of the reorganization pursuant to terms set forth in the Plan Term Sheet through the commencement of chapter 11 cases is the best way to maximize the value of FairPoint's businesses.  FairPoint anticipates that, within the forty-five (45) day period following the commencement of its chapter 11 cases, it will file a proposed plan of reorganization to implement the terms of the Plan Term Sheet.  Implementing such reorganization is a significant step in effectuating FairPoint's turnaround and will enable FairPoint to emerge as a healthy, viable enterprise.

59.     Accordingly, as contemplated under the Plan Term Sheet, on the date hereof FairPoint Communications and substantially all of its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Using the tools of chapter 11, and pursuant to the terms of the Plan Term Sheet, FairPoint intends to deleverage its capital structure, "right-size" its cost structure, and obtain financial flexibility and additional breathing room to operate.  Further, with FairPoint's continued investment in next generation technology, FairPoint will be able to better contend with its competitors.  In sum, FairPoint believes that these chapter 11 cases will assist the Company in its efforts to re-emerge as an increasingly efficient and financially viable business.

## IV.

## FACTS RELEVANT TO FIRST DAY PLEADINGS

60.     Together with the filing of these chapter 11 cases, FairPoint also filed certain motions and pleadings (the "First Day Pleadings"), which request various types of

27

relief.  Generally, the First Day Pleadings have been designed to meet FairPoint's goals of:
(a) continuing its operations as debtors in possession with as little disruption and loss of
productivity as possible; (b) maintaining the confidence and support of their customers,
employees, vendors, suppliers, and service providers during FairPoint's reorganization process;
and (c) establishing procedures for the smooth and efficient administration of these Bankruptcy
Cases.

61.     I have reviewed each of the First Day Pleadings filed contemporaneously
herewith (including the exhibits thereto and supporting memoranda) and, to the best of my
knowledge, information and belief, the facts recited therein are true and correct and are hereby
incorporated by reference.  It is my belief that the relief sought in each of the First Day
Pleadings is essential to FairPoint's ability to achieve a successful reorganization.

## V.

## INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

62.     Local Bankruptcy Rule 1007-2 requires certain information related to
FairPoint, which is set forth below.

63.     In accordance with Local Bankruptcy Rule 1007-2(a)(3), and to the best
of my knowledge, information, and belief, Stroock & Stroock & Lavan LLP, 180 Maiden Lane,
New York, NY 10038, Attn: Kristopher M. Hansen, Esq., act as attorneys to the *ad hoc*
committee of FairPoint's senior noteholders.

64.     In accordance with Local Bankruptcy Rule 1007-2(a)(4), <u>Schedule 1</u>
hereto is a list of the names, addresses, and, where available, telephone numbers of the
creditors holding the 50 largest unsecured claims (excluding insiders) against FairPoint.  Such
list includes the amount of the claim, the nature of the claim and, if appropriate, an indication

of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated in Schedule 1 regarding, among other things, the actual validity of any such claims.

65.     In accordance with Local Bankruptcy Rule 1007-2(a)(5), Schedule 2 is a list of the names and addresses of the creditors holding the five largest secured claims against FairPoint, as well as the names and addresses for the holders of record of such secured claims. Such list includes the amount of the claim, an estimate of the value of the collateral, and whether the claim or lien is disputed, subject, however, to the reservations of rights stated in Schedule 2.

66.     In accordance with Local Bankruptcy Rule 1007-2(a)(6), Schedule 3 hereto provides a summary of FairPoint's assets and liabilities.

67.     In accordance with Local Bankruptcy Rule 1007-2(a)(7), Schedule 4 hereto provides a summary of FairPoint's issued securities that are publicly held.

68.     In accordance with Local Bankruptcy Rule 1007-2(a)(8), Schedule 5 hereto is a list of property not in FairPoint's possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

69.     In accordance with Local Bankruptcy Rule 1007-2(a)(9), Schedule 6 hereto is a list of the premises owned, leased, or held under other arrangement, from which FairPoint operates its businesses.

70.     In accordance with Local Bankruptcy Rule 1007-2(a)(10), Schedule 7 hereto provides the location of FairPoint's substantial assets, and the location of their books

and records. To the best of my knowledge, information, and belief, FairPoint does not hold any assets outside the territorial limits of the United States that are of more than *de minimis* value.

71.     In accordance with Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 8</u> hereto is a list of litigation commenced against FairPoint.

72.     In accordance with Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 9</u> hereto contains the names of the individuals who comprise FairPoint's existing senior management, their tenure with FairPoint, and a brief summary of their relevant responsibilities and experience.

73.     FairPoint intends to continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

74.     In accordance with Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), Schedule 10 hereto is the estimated amount of the payroll to employees of FairPoint and amounts to be paid to FairPoint's officers, directors, and stockholders for services for the 30-day period following the commencement of FairPoint's chapter 11 cases.

75.     In accordance with Local Bankruptcy Rule 1007-2(b)(3), Schedule 11 hereto contains the estimated cash receipts and disbursements and net cash gain or loss for the 30-day period following the commencement of FairPoint's chapter 11 cases.

## <u>CONCLUSION</u>

76.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

77.     Accordingly, I respectfully request that the Court grant all relief requested in the first day pleadings and such other and further relief as may be just.

Dated: October 26, 2009        On behalf of FairPoint
       New York, New York

                                  By:  /s/ Alfred C. Giammarino
                                      Alfred C. Giammarino
                                      Executive Vice President and Chief
                                      Financial Officer of FairPoint
                                      Communications, Inc.

# EXHIBIT A

## CORPORATE STRUCTURE CHART OF DEBTOR ENTITIES

### FairPoint Post-Merger Organizational Chart (All Subsidiaries)



Borrower under Credit Facility and Issuer of the 13 1/8% Notes
Guarantee and Pledge of Common Stock under Credit Agreement
Pledge of Common Stock Only under Credit Agreement
Entities that are not Pledged under Credit Agreement
* Certificated limited liability company interest will be held pursuant to a deposit agreement.

**PLAN TERM SHEET**

---

## FAIRPOINT COMMUNICATIONS, INC. AND AFFILIATES

## CHAPTER 11 PLAN TERM SHEET

---

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF FAIRPOINT COMMUNICATIONS, INC. OR ITS SUBSIDIARIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET MAY NOT BE DISTRIBUTED WITHOUT THE EXPRESS WRITTEN CONSENT OF FAIRPOINT COMMUNICATIONS, INC. THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

        1. **Summary of Transaction.** This term sheet (this "Term Sheet") describes a proposed restructuring (the "Restructuring") for FairPoint Communications, Inc. ("FairPoint Communications"), and each of its direct and indirect subsidiaries (collectively, "FairPoint" or the "Company") pursuant to a joint plan of reorganization (the "Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Plan would be filed in connection with FairPoint's contemplated chapter 11 cases. Subject to the satisfaction or waiver of the conditions described below, the Restructuring described herein is supported by the steering committee of lenders (the "Steering Committee Lenders")[1] party to the Credit Agreement dated as of March 31, 2008 (as amended, the "Credit Agreement") among FairPoint Communications, Northern New England Spinco Inc. ("Spinco"), Bank of America, N.A., as administrative agent (in such capacity, the "Agent"),[2] the Steering Committee Lenders and the other lenders party thereto (collectively, the "Lenders"), and certain other parties thereto. This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the Plan and the related definitive documentation governing the Restructuring. The term "Consenting Lenders" as used herein shall mean collectively the Steering Committee Lenders and any other Lenders that, with the Company's consent, subsequently become party to that certain Plan Support Agreement, dated as of October 25, 2009 (the "PSA"). The term "Effective Date" as used herein shall mean the date on which the definitive documents for the Plan become effective in accordance with their terms.

---

[1]      The Steering Committee Lenders are Bank of America, N.A., Angelo Gordon & Co., Paulson & Co., Inc., Lehman Brothers Holdings, Inc., CoBank, ACB and Wachovia Bank, N.A., each in their individual capacity and not in any other capacity

[2]      On January 21, 2009, FairPoint entered into an amendment to the Credit Agreement under which Lehman Commercial Paper Inc. resigned, as administrative agent and collateral agent, and was replaced by Bank of America, N.A., as administrative agent and collateral agent.

2. **Commencement of Chapter 11 Cases**

(a) ***Chapter 11 Cases.*** FairPoint shall file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code on or before October 31, 2009 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

(b) ***Chapter 11 Plan and Disclosure Statement.*** Within forty-five (45) days after the Petition Date (the "<u>Plan Deadline</u>"), FairPoint shall file the Plan and the disclosure statement for the Plan (the "<u>Disclosure Statement</u>").

3. **Chapter 11 Financing.** Certain of the Steering Committee Lenders have agreed to provide a senior secured debtor-in-possession revolving credit facility (the "<u>DIP Facility</u>") substantially on terms set forth in a term sheet annexed as Exhibit C to the PSA (the "<u>DIP Term Sheet</u>") providing for extensions of credit in an aggregate principal amount not to exceed $75,000,000, with a letter of credit subfacility in an aggregate amount of $30,000,000, subject to certain conditions, including the receipt of credit approvals and the approval of the Bankruptcy Court. Letters of credit issued and outstanding under the Credit Agreement as of the Petition Date may be replaced, at the Company's option, by letters of credit issued under the DIP Facility.

4. **Adequate Protection.** In connection with the approval of the DIP Facility, the Company shall seek to grant the Lenders adequate protection in the form of replacement liens and superpriority claims as set forth in the DIP Term Sheet. FairPoint has advised the Consenting Lenders that the Company does not intend to pay interest under the Credit Agreement to the Lenders during the Company's chapter 11 cases.

5. **Reorganized Company Capital Structure.**

(a) ***New Revolver.*** On the Effective Date of the Plan all borrowings and other extensions of credit under the DIP Facility will roll into a revolving credit exit facility (the "<u>New Revolving Facility</u>"). The terms of the New Revolving Facility shall be set forth in a separate term sheet, and shall include the following material terms:

- 5 year maturity
- Interest at LIBOR + 4.5 %, with no LIBOR floor
- Letter of credit sub-limit of $30 million
- Covenants, reps and warranties and events of default as may be mutually agreed to by the Agent, the Steering Committee Lenders and the Company.

(b) ***New Term Loan.*** On the Effective Date, reorganized FairPoint Communications shall enter into a new $1 billion secured term loan agreement (the "<u>New Term Loan</u>"), which shall be guaranteed by those subsidiaries of FairPoint Communications that have guaranteed repayment of the DIP Facility. The New Term Loan shall include the following material terms:

- The New Term Loan shall be secured by the same collateral as the collateral which secures the DIP Facility
- 5 year maturity
- Interest at LIBOR + 4.50%, with a LIBOR floor of 2.00%
- No upfront fee
- Mandatory prepayment at par, upon certain conditions to be determined
- Optional prepayment at anytime at par
- Amortization Schedule – Year 1: 1% annually, Year 2: 1% annually, Year 3: 5% annually, Year 4: 15% annually, and Year 5: 15% (5% per quarter for the first 3 quarters) with 63% bullet payment in 4th quarter.
- Amortization occurs quarterly commencing upon the first full quarter after the Company emerges from the chapter 11 cases.
- If the Company's consolidated leverage ratio is above 2.0x at the end of the fiscal year, the Company shall be subject to a sweep of 75% of its Excess Cash Flow (to be defined in a manner reasonably satisfactory to the Steering Committee Lenders) based upon an annual test and paid in the subsequent quarter with the first test occurring for fiscal year 2010 and payable in fiscal 2011. If the Company's consolidated leverage ratio is below 2.0x at the end of the fiscal year, such sweep shall be reduced to 50% of the Company's Excess Cash Flow.
- Any sweep of the Company's Excess Cash Flow by the Lenders shall be applied *pro rata* against obligations in accordance with the Amortization Schedule.
- If the Company's consolidated total leverage ratio is below 2.0x at the end of the fiscal year, the Company shall be permitted to pay dividends with its share of Excess Cash Flow.
- Financial covenants will only include interest coverage and leverage ratio tests. Such tests will first occur in the first full quarter following the Effective Date (as calculated in each case in accordance with Schedule 1 hereto).
- Usual and customary affirmative and negative covenants as may be mutually agreed to by the Agent, the Steering Committee Lenders and the Company.

**(c)** *New Common Stock*. Reorganized FairPoint Communications shall issue a single class of common stock (the "New Common Stock") on the Effective Date of the Plan, which stock shall be deemed fully paid and non-assessable. All New Common Stock issued will be subject to dilution upon the exercise of warrants, options and/or the granting of restricted stock in connection with the Long Term Incentive Plan (as defined below) and the Unsecured Warrants (as defined below).

**(d)** *Options / Restricted Stock / Warrants.* There shall be reserved sufficient shares of New Common Stock to provide for the issuance of securities pursuant to the Long Term Incentive Plan (as defined below), any Unsecured Common Stock (as defined below) and any Unsecured Warrants (as defined below).

6.      **Plan Distributions/Treatment.**

(a)  ***Credit Agreement Claims***:  All claims arising under the Credit Agreement and all documents and agreements related thereto (including, without limitation, swap obligations secured ratably therewith, collectively the "Credit Agreement Claims") shall be deemed allowed in an amount equal to principal plus interest and all other amounts due under the Credit Agreement.  On the Effective Date, each holder of a Credit Agreement Claim shall receive the following, in full and complete satisfaction of such holder's Credit Agreement Claim:

(i)     its *pro rata* share of the New Term Loan;

(ii)    its *pro rata* share of 98% of newly issued New Common Stock, subject to the issuance of securities pursuant to the Long-Term Incentive Plan, the Unsecured Common Stock and the Unsecured Warrants, as the case may be; *provided, however,* that if the class of FairPoint Communications Unsecured Claims does not accept the Plan, each holder of a Credit Agreement Claim shall receive its *pro rata* share of 100% of newly issued New Common Stock, subject to the securities to be issued under the Long-Term Incentive Plan; and

(iii)   its *pro rata* share of cash in an amount equal to all cash of the Company on the Effective Date in excess of $40 million after taking into account all cash payments required to be paid under the Plan on or after the Effective Date, including, but not limited to, amounts required to be paid to satisfy allowed administrative expenses, allowed claims, payments due under the KEIP (as defined below), and cure payments for assumed executory contracts.

(b)  ***FairPoint Communications Unsecured Claims***:  On the Effective Date, each holder of an allowed unsecured claim against FairPoint Communications (collectively, "FairPoint Communications Unsecured Claims"), including but not limited to holders of claims arising under (a) the 13⅛% Senior Notes due April 1, 2018, and (b) the 13⅛% Senior Notes due April 2, 2018 ((a) and (b) collectively, the "Senior Notes"), shall receive the following, in full and complete satisfaction of such FairPoint Communications Unsecured Claims:

(i)     If the class of FairPoint Communications Unsecured Claims votes to accept the Plan, each holder of an allowed FairPoint Communications Unsecured Claim shall receive its *pro rata* share of (A) 2% of the newly issued New Common Stock (the "Unsecured Common Stock"), subject to the issuance of securities pursuant to the Long-Term Incentive Plan, and the Unsecured Warrants, and (B) warrants to purchase up to 5% of the New Common Stock, which warrants shall have a seven-year term and be exercisable at a strike price equal to a $2.25 billion total enterprise value (the "Unsecured Warrants"), subject to the securities issued pursuant to the Long-Term Incentive Plan; or

(ii)    If the class of FairPoint Communications Unsecured Claims votes to reject the Plan, holders of FairPoint Communications Unsecured

Claims shall not receive any distributions under the Plan on account of their claims.

**(c)** ***Capgemini Agreements***.  Each Consenting Lender acknowledges that the Company will seek to assume the agreements with Capgemini (as such agreements have been modified pursuant to that certain Settlement Agreement and Release, dated as of October 9, 2009) and waives any objection thereto.

**(d)** ***NNE Operating Companies Unsecured Claims***: The allowance of unsecured claims and the treatment of unsecured claims against FairPoint Logistics, Inc., Northern New England Telephone Operations LLC, Telephone Operating Company of Vermont LLC, and/or Enhanced Communications of Northern New England Inc. (collectively, the "<u>NNE Operating Companies</u>"), including any claims held by state public utility commissions relating to the NNE Operating Companies' alleged failure to satisfy certain service quality indicators, shall be determined at a later date on terms reasonably satisfactory to the Steering Committee Lenders and the Company.

**(e)** ***"Legacy" Companies Unsecured Claims***:  On the Effective Date or as soon thereafter as is practicable, each holder of an allowed unsecured claim against any subsidiary of FairPoint Communications that is not an NNE Operating Company (collectively, "<u>Legacy Unsecured Claims</u>") shall, in the reorganized Company's sole discretion, either (i) be paid in full in cash, or (ii) receive a 24-month note payable after the Effective Date in the principal amount of such allowed Legacy Unsecured Claim, with interest accruing at 5% per annum, in full and complete satisfaction of such allowed Legacy Unsecured Claim.

**(f)** ***Convenience Claims***:  For purposes of the Plan, the term "<u>Convenience Claim</u>" shall include any FairPoint Communications Unsecured Claims that are (i) allowed in an amount of ten-thousand ($10,000) dollars or less or (ii) allowed in an amount greater than ten-thousand ($10,000) dollars but which are reduced to ten-thousand ($10,000) dollars by an irrevocable written election of the holders of such claims.  On the Effective Date or as soon thereafter as is practicable, each holder of an allowed Convenience Claim shall be paid in full in cash.

**(g)** ***Other Distributions.***

(i)     Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code, shall receive payment in full (in cash) of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and FairPoint.

(ii)    Allowed secured tax claims and allowed other secured claims shall be unimpaired.

(iii)   Intercompany claims will be (at the election of FairPoint Communications or the entity holding such claim, in consultation with the Steering Committee Lenders) (1) released, waived and discharged

as of the Effective Date, (2) contributed to the capital of the obligor corporation, (3) dividended or (4) remain unimpaired.

(iv)    Claims subject to section 510(b) of the Bankruptcy Code shall not receive or retain any interest or property under the Plan on account of such claims.

(v)    Holders of existing equity interests in FairPoint Communications shall not receive or retain any interest or property under the Plan on account of such interests.

7.    **Other Plan Provisions/Means for Implementation.**

(a)    ***Board of Directors of Reorganized FairPoint Communications.*** Reorganized FairPoint Communications shall have a nine-person board of directors (the "Board"), initially seven of whom shall be nominated by the Steering Committee Lenders (it being understood that the Steering Committee Lenders will consider residents of New England among the candidates for certain of the Board seats), one of whom shall be the CEO and one of whom shall be nominated by the holders of Senior Notes if the class of FairPoint Communications Unsecured Claims votes to accept the Plan. If such class of unsecured claims does not accept the Plan, then the Steering Committee Lenders shall have the right to nominate eight persons to the Board. Directors shall have a three-year term and shall be classified so as to ensure that approximately one third of the directors stand for election each year unless otherwise decided by the Steering Committee Lenders in consultation with the Company. The Steering Committee Lenders shall have the option to reduce the initial number of Board members they are entitled to nominate to five members, it being understood that the overall size of the Board shall be reduced commensurately. At least a majority of the directors serving on the Board shall be independent in accordance with the New York Stock Exchange listing manual rules.

(b)    ***Assumption of Senior Management Agreements.*** The Consenting Lenders will not object to the Company's assumption of the existing executive agreements with David L. Hauser, Peter G. Nixon, Alfred C. Giammarino, Shirley J. Linn, Jeffrey Allen, and Susan L. Sowell, and acknowledge that the Company intends to assume such agreements in accordance with their terms on the Effective Date.

(c)    ***Long Term Incentive Plan.*** The Reorganized Company shall implement a management incentive plan for senior management and selected employees of the Company, providing incentive compensation in the form of stock options and/or restricted stock in the Reorganized Company, on a fully diluted basis (the "Long-Term Incentive Plan"). The Long-Term Incentive Plan shall be effective as of the Effective Date and shall be on the terms set forth on Schedule 2 hereto.

**(d)**  **_KEIP._**  The Consenting Lenders have agreed to support a key employee incentive plan on the terms set forth on Schedule 3 hereto (the "KEIP").  The Company's board of directors will consider approval of the KEIP at its November 9, 2009 board meeting and may require that certain modifications to the KEIP be made at that time.  The Company agrees that any such modifications shall not increase the compensation set forth in, or improve (from the point of view of the employees subject to the KEIP) the terms of, the KEIP set forth on Schedule 3.

**(e)**  **_Releases, Indemnification and D&O Insurance._**  Effective as of the date the Plan is confirmed, but subject to the occurrence of the Effective Date, and in consideration of the services of (a) the present and former directors, officers, members, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives of or to the Company who acted in such capacities after the Petition Date; (b) the Agent and its affiliates and the other Lenders and their affiliates, and each of their respective directors, officers, affiliates, agents, partners, members, representatives, employees, financial advisors, restructuring advisors, attorneys and representatives who acted in such capacities after the Petition Date (the parties set forth in subsections (a) and (b), being the "Released Parties"), the Company, their respective chapter 11 estates and the reorganized Company and all holders of claims that accept the Plan shall release, waive and discharge unconditionally and forever each of the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with or relating to FairPoint Communications or any of its direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of the Company's chapter 11 cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided that* the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or gross negligence of any Released Party.  In addition, the reorganized Company shall assume all existing indemnification obligations of the Company in favor of the directors of the Company who held such position on June 1, 2009, and the officers of the Company listed on Schedule 4  (whether in the Company's bylaws, contracts or otherwise).  The reorganized Company's indemnification obligation to such individuals shall be limited in the aggregate to $20 million.

**(f)**  **_Injunction._**  From and after the Effective Date, all entities shall be permanently enjoined from commencing or continuing in any manner against the Company or the reorganized Company, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Plan or the order confirming the Plan.

Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all entities shall be precluded from asserting against the Company, the debtors in possession, the Company's chapter 11 estates, the reorganized Company, the Agent and its affiliates and the other Lenders and their affiliates, any of their successors and assigns, and each of their respective current and former officers, directors, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives (each of the foregoing in its individual capacity as such), and their assets and properties, any other claims or equity interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature relating to the Company that occurred before the Effective Date.

The rights afforded in the Plan and the treatment of all claims and equity interests therein shall be in exchange for and in complete satisfaction of claims and equity interests of any nature whatsoever, including, without limitation, any interest accrued on claims from and after the Petition Date, against the Company or any of their assets, properties or estates. On the Effective Date, all such claims against, and equity interests in the Company shall be fully released and discharged. All entities shall be precluded from asserting against the Company, the Company's estates, the reorganized Company, each of their respective successors and assigns, and each of their assets and properties, any other claims or equity interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

(g) **_Rothschild Engagement_**.  The Agent has been provided with a copy of the letter agreement, dated May 12, 2009, whereby the Company engaged Rothschild, Inc. as financial advisor and investment banker (the "Rothschild Agreement").  Each of the Consenting Lenders acknowledges the terms of the Rothschild Agreement and waives any objection thereto.

(h) **_Charter; Bylaws_**. The charter and bylaws of each of the Debtors shall have been restated in a manner consistent with section 1123(a)(6) of the Bankruptcy Code.

(i) **_Tax Issues_**. The terms of the Plan and the Restructuring contemplated by this Term Sheet shall be structured to preserve favorable tax attributes of the Company to the extent reasonably practicable. The Company shall consult with the Steering Committee Lenders on tax issues and matters of tax structure relating to the Plan and the restructuring contemplated by this Term Sheet, and such matters shall be reasonably acceptable to the Steering Committee Lenders.

(j) **_Registration Rights, Securities Listing, and Shareholder Rights._**

On the Effective Date, reorganized FairPoint Communications will enter into a registration rights agreement (the "Registration Rights Agreement") with each holder of greater than 10% of the New Common Stock.  Holders of New Common Stock entitled to demand such registrations shall be entitled to request an aggregate of two such registrations (or such provisions that the Postconfirmation board adopts); *provided that*, no such rights shall be demanded prior to the expiration of 180 days from the Effective Date.

Moreover, if any holder who is otherwise eligible to exercise rights under the Registration Rights Agreement becomes the holder of less than 7.5% of the New Common Stock, such holder's rights under the Registration Rights Agreement shall terminate. A form of the Registration Rights Agreement, including a form of shelf registration agreement if necessary, will be included in a supplement to the Plan.

Reorganized FairPoint Communications will use its reasonable best efforts to obtain a listing for the New Common Stock on one of the following national securities exchanges: New York Stock Exchange, NASDAQ, Russell or any other comparable exchange.

(k) *Section 1145 Exemption*. The issuance of all securities under the Plan will be exempt from SEC registration under section 1145 of the Bankruptcy Code.

8. **Conditions Precedent.** The Plan shall include customary conditions to the Effective Date, including that:

(i) the Bankruptcy Court shall have entered an order confirming the Plan which has become final, or if not final, shall not be stayed;

(ii) the terms of the Plan and Disclosure Statement shall be reasonably satisfactory to the Consenting Lenders;

(iii) the treatment of inter-company claims and the assumption of post-reorganization operating contracts to be reasonably satisfactory to the Consenting Lenders; and

(iv) the Steering Committee Lenders' obligations to support the Plan shall be null and void unless, prior to the Plan Deadline, the Company's unions for the NNE Operating Companies agree to a minimum of $30 million in annualized cost reductions, which savings shall be ratified by such unions during the chapter 11 cases and implemented upon the Effective Date.

9. **Definitive Documentation.** FairPoint and the Consenting Lenders will negotiate in good faith to complete the documentation for the Plan consistent with the terms hereof, including, without limitation, all documents to consummate the Plan. FairPoint and the Steering Committee Lenders agree that the terms of the New Revolving Facility and the New Term Loan shall be in substantially final form prior to the commencement of the hearing on the Disclosure Statement.

## <u>Schedule 1</u>

**Financial Covenant Tests**

# FairPoint Communications Chapter 11 Plan Term Sheet
## Schedule 1:  Term Loan Covenants

**Term Loan Financial Covenants**

| $000,000s | LTM 4Q10 | LTM 1Q11 | LTM 2Q11 | LTM 3Q11 | LTM 4Q11 | LTM 1Q12 | LTM 2Q12 | LTM 3Q12 | LTM 4Q12 | LTM 1Q13 | LTM 2Q13 | LTM 3Q13 | LTM 4Q13 | 2014 - 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Debt / EBITDAR** | | | | | | | | | | | | | | |
| Covenant | 4.25x | 4.00x | 4.00x | 3.75x | 3.75x | 3.25x | 3.25x | 3.25x | 3.25x | 3.00x | 3.00x | 3.00x | 3.00x | 2.75x |
| Company Plan | 2.74x | 2.48x | 2.32x | 2.21x | 2.13x | 1.86x | 1.83x | 1.78x | 1.73x | 1.60x | 1.56x | 1.48x | 1.41x | |
| % Cushion | 55% | 62% | 73% | 70% | 76% | 75% | 78% | 82% | 88% | 88% | 92% | 102% | 113% | |
| **Sr. Debt / EBITDAR** | | | | | | | | | | | | | | |
| Covenant | 3.75x | 3.50x | 3.50x | 3.25x | 3.25x | 2.75x | 2.75x | 2.75x | 2.75x | 2.50x | 2.50x | 2.50x | 2.50x | 2.25x |
| Company Plan | 2.74x | 2.48x | 2.32x | 2.21x | 2.13x | 1.86x | 1.83x | 1.78x | 1.73x | 1.60x | 1.56x | 1.48x | 1.41x | |
| % Cushion | 37% | 41% | 51% | 47% | 52% | 48% | 50% | 54% | 59% | 57% | 60% | 69% | 77% | |
| **EBITDAR / Total Interest** | | | | | | | | | | | | | | |
| Covenant | 3.75x | 4.00x | 4.00x | 4.00x | 4.00x | 4.25x | 4.25x | 4.25x | 4.25x | 4.50x | 4.50x | 4.50x | 4.50x | 4.50x |
| Company Plan | 5.51x | 5.86x | 6.30x | 6.56x | 6.69x | 6.64x | 6.70x | 6.77x | 6.91x | 7.14x | 7.24x | 7.34x | 7.53x | |
| % Cushion | 32% | 32% | 36% | 39% | 40% | 36% | 37% | 37% | 38% | 37% | 38% | 39% | 40% | |

**Schedule 2**

**Long Term Incentive Plan Terms**

**FairPoint Communications Chapter 11 Plan Term Sheet**
**Schedule 2: Long Term Incentive Plan**

- 1.625% in Restricted Stock to be granted at exit, vesting ¼ at exit and ¼ at each yearly anniversary to the top 25-30 executives, with allocations TBD by CEO and the new Board. To the extent that the CEO makes himself available to serve as a board member beyond the termination of his contract, such availability shall constitute service for purposes of vesting.

- Additional Restricted Stock up to a total of 4% of the Company (including 1.625% to 1.75% at exit) to be available to the Board for future grants.

- 2.75% in Options struck at the higher of an enterprise value of $1.875 billion[1] and the weighted average trading price for the first 30 days upon emergence (second metric included to address potential tax issues) to be distributed to the top 75-80 executives (or more at new Board discretion in consultation with the CEO). 0.25% in Options to be distributed to the new Board at Exit, struck at the higher of an enterprise value of $1.875 billion[1] and the weighted average trading price for the first 30 days upon emergence (second metric included to address potential tax issues). Vesting schedule will be the same as with Restricted Stock.

- 0.125% of Restricted Stock plus up to an additional 0.5% in Options (each the same as the Restricted Stock and Options described above) will be available to the new Board for distribution at Exit. These additional grants are in the new Board's sole discretion, in consultation with the CEO, and are intended for distribution to that group of executives who had a qualitative impact, in the Board's view, on an efficient and expeditious bankruptcy proceeding.

- Additional Options up to 6% of the shares of the Company (including the 3%-3.5% granted at Exit) to be available to the Board for future grants. All future options would be issued at the money at the time of the grant.

- Those receiving a grant at Exit, for either Restricted Stock, Options, or both, would not be eligible for an additional grant until December 31, 2012; provided, however, that the new Board may authorize additional grants prior to that date for new hires or to incentivize officers who receive promotions or are assigned expanded responsibilities.

- All employees must be employed at the time of any grant or vesting in order to receive such grant or vesting. Any voluntary termination or termination with cause prior to a grant or vest date will resort in the forfeiture of such employee to receive such grant or vesting (except as in respect of the CEO as set forth above).

- Restricted Stock and Options vest with change in control or termination without cause.

- Options have a tenor of 10 years from grant date.

---

[1] Or such lower amount as may be agreed upon during the pendency of the Chapter 11 case by the Company and each of the Steering Committee members.

## <u>Schedule 3</u>

**The KEIP has not been approved by the board of directors of FairPoint and accordingly the schedule has been intentionally omitted.**

## **Schedule 4**

**List of Officers**

Alfred C. Giammarino
Brian M. Lippold
D. Brett Ellis
David L. Hauser
Gary C. Garvey
James K. Weigert
Jeffrey W. Allen
Lisa R. Hood
Michael S. Brown
Peter G. Nixon
Rose B. Cummings
Shirley J. Linn
Susan L. Sowell
Thomas E. Griffin
Vicky L. Weatherwax

<u>**EXHIBIT C**</u>

**PLAN SUPPORT AGREEMENT**

      **THIS PLAN SUPPORT AGREEMENT** (including the Term Sheet (as defined below) this "<u>Agreement</u>") is made and entered into as of October 25, 2009 by and among (i) the parties signatory hereto which are Pre-Petition Lenders (as defined below) (each such party, together with any Additional Lender Party (as defined below) or Transferee Lender (as defined below) that becomes a party hereto in accordance with the terms hereof, being referred to herein as a "<u>Consenting Lender</u>", and collectively as the "<u>Consenting Lenders</u>"), (ii) FairPoint Communications, Inc., a Delaware corporation ("<u>FairPoint</u>") and (iii) each of the Subsidiaries of FairPoint (collectively with FairPoint, the "<u>Company</u>").  Each of the foregoing  is referred to herein as a "<u>Party</u>" and collectively, the "<u>Parties</u>".

<u>**RECITALS**</u>

      **WHEREAS**, FairPoint has entered into that certain Credit Agreement, dated as of March 31, 2008 (as modified, amended or supplemented through the Effective Date (as defined below), the "<u>Pre-Petition Credit Agreement</u>"; capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Pre-Petition Credit Agreement), among FairPoint, the financial institutions from time to time party thereto (including the Consenting Lenders)(the "<u>Pre-Petition Lenders</u>"), Bank of America, N.A., as Administrative Agent (in such capacity, the "<u>Administrative Agent</u>") and the other Persons party thereto;

      **WHEREAS**, the Company and the Consenting Lenders wish to reorganize and recapitalize FairPoint and its Subsidiaries (the "<u>Restructuring</u>") in accordance with a proposed chapter 11 plan of reorganization (the "<u>Plan</u>"), the terms and conditions of which are set forth in the term sheet attached hereto as Exhibit "A" (the "<u>Term Sheet</u>");

      **WHEREAS**, in order to implement, expedite and consummate the Restructuring in accordance with the Plan, the Company intends to file petitions commencing (the date of commencement being the "<u>Petition Date</u>") voluntary reorganization cases (the "<u>Bankruptcy Cases</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

      **WHEREAS**, the Company intends to file the Plan within 45 days after the Petition Date, and to seek Bankruptcy Court approval of the Plan;

      **WHEREAS**, the Company intends to use its commercially reasonable efforts to obtain Bankruptcy Court approval of the Plan in accordance with the Bankruptcy Code and on terms consistent with this Agreement and each Consenting Lender intends to use commercially reasonable efforts to cooperate in that regard; and

      **NOW, THEREFORE**, in consideration of the promises and mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto covenant and agree as follows:

<u>**AGREEMENT**</u>

**Section 1.** <u>**Agreement Effective Date**</u>. This Agreement shall become effective and binding on each Party upon the execution by, and receipt by the Administrative Agent of, signature pages signed by the Company and the Consenting Lenders (the date of such receipt of signature pages, the "<u>Effective Date</u>").

**Section 2.** <u>**Term Sheet**</u>. The substantive terms and conditions of the Plan are set forth in the Term Sheet. The Plan shall embody the terms contained in, and shall be consistent with, the Term Sheet, and shall only be amended, modified or supplemented from time to time by written approval of each of the Parties.

**Section 3.** <u>**Commitments Regarding the Restructuring.**</u>

3.01. <u>Commitment of Each of the Parties</u>.

(a) <u>Agreement to Support the Restructuring and Plan</u>. Each of the Parties agrees that it shall use its commercially reasonable efforts and shall negotiate in good faith the definitive agreements and other documents necessary to effectuate the consummation of the Plan.

(b) <u>Agreement to Support and Vote</u>. As long as no Agreement Termination Event (as defined below) shall have occurred, each Party agrees that, subject to the terms of this Agreement, it shall take such steps as reasonably necessary to support and achieve approval of the confirmation of the Plan (for the avoidance of doubt, it being understood and agreed by the Parties that the "Plan" as used in this Section 3.01(b) shall include any amendments or modifications to the Plan solely to the extent such amendments or modifications have been consented to in writing by the Requisite Consenting Lenders (as defined below) in their sole discretion), including:

(i) when solicited with a disclosure statement approved by the Bankruptcy Court, the timely voting of (or causing the timely voting of) its claims arising with respect to the Pre-Petition Credit Agreement ("<u>Claims</u>"), to accept the Plan;

(ii) consenting to the treatment of its Claims as set forth in the Plan;

(iii) not changing, revoking or withdrawing (or causing to be changed, revoked or withdrawn) such vote; and

(iv) voting against and in no way otherwise agreeing to, consenting to or providing any support to any other plan of reorganization other than the Plan.

(c) <u>Agreement Not to Interfere</u>. For the avoidance of doubt, each Party also agrees that, as long as no Agreement Termination Event (as defined below) shall have occurred, (i) it will not object to, delay, postpone or take any other action to interfere, directly or indirectly, in any material respect with the approval, acceptance or implementation of the Plan, (ii) directly or indirectly solicit, propose, file or vote for any plan of reorganization of the Company other than the Plan or (iii) take any other action, including but not limited to, initiating any legal proceeding, that is materially inconsistent with, or that would prevent or delay consummation of, the Plan.

**Section 4.**     **Representations, Warranties, and Covenants**. Each of the Parties represents, warrants, and covenants to each other Party, as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

4.01.   <u>Enforceability</u>. It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditor's rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

4.02.   <u>No Consent or Approval</u>. Except as expressly provided in this Agreement or in the Bankruptcy Code (including the consent of the Bankruptcy Court), no consent or approval is required by any other Person or entity in order for it to carry out the Restructuring in accordance with the Plan and perform its respective obligations under this Agreement.

4.03.   <u>Power and Authority</u>. It has all requisite power and authority to enter into this Agreement and, subject to necessary Bankruptcy Court approval, to carry out the Restructuring in accordance with the Plan and perform its respective obligations under this Agreement.

4.04.   <u>Authorization</u>. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part. The Company further represents and warrants that its board of directors has approved by all requisite action all of the terms of the Plan set forth in the Term Sheet.

4.05.   <u>No Conflict</u>. The execution, delivery and performance by it of this Agreement does not and shall not (a) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational document) or (b) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents).

4.06.   <u>Ownership by Parties</u>.

(a)     Each Consenting Lender represents and warrants as to itself only, severally and not jointly with any other Consenting Lender, to each of the other Parties hereto that, as of the date such Party executes this Agreement, (i) such Consenting Lender either (A) is the sole legal and beneficial owner of the aggregate principal amount of Claims set forth on its signature page, in each case free and clear of all claims, liens, and encumbrances, other than ordinary course pledges and/or swaps, or (B) has investment or voting discretion or control with respect to discretionary accounts for the holders or beneficial owners of the aggregate principal amount of Claims set forth on its signature page and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement and (ii) such Consenting Lender has full power and authority to vote on and consent to all matters concerning such Claims and to exchange, assign, and transfer such Claims.

(b)     <u>Restrictions on Transfers</u>. Each Consenting Lender party hereto agrees that it shall not sell, transfer, hypothecate or assign (each, a "<u>Transfer</u>") any of its Claims or any right or interest (voting or otherwise) therein; <u>provided</u>, <u>however</u>, that any Consenting Lender may (i) freely Transfer any of its Post-Effective Date Claims (as defined below) to any Person without such Post-

Effective Date Claims being or becoming subject to this Agreement and (ii) Transfer any of its Claims that are not Post-Effective Date Claims (so long as such Transfer is not otherwise prohibited by any order of the Bankruptcy Court), to an entity (each, a "<u>Transferee Lender</u>") that agrees in writing, in the form attached hereto as <u>Exhibit B</u> (a "<u>Transferee Joinder</u>"), to be bound by the terms of this Agreement. Subject to the terms and conditions of any order of the Bankruptcy Court, each Consenting Lender agrees to provide FairPoint and the Administrative Agent with a copy of any Transferee Joinder executed by such Party. Any Consenting Lender that Transfers its Claims to its Affiliate pursuant to a Transferee Joinder shall remain liable for breach of this Agreement by such Affiliate.

(c) <u>Additional Interests</u>. Nothing herein should be construed to restrict a Consenting Lender's right to acquire Claims after the Effective Date. To the extent any Consenting Lender acquires any Claims after the Effective Date, each such Consenting Lender agrees that such Claims shall be automatically treated consistent with this Agreement and that such Consenting Lender shall be bound by and subject to this Agreement with respect to such acquired Claims; <u>provided</u>, that from and after the Effective Date any Consenting Lender may (i) acquire Claims that are not then subject to the terms of this Agreement (i.e such Claims being acquired are not owned by a Consenting Lender on the date of this Agreement) (such claims, the "<u>Post-Effective Date Claims</u>") and (ii) sell or assign any Post-Effective Date Claims without such Post-Effective Date Claims being or becoming subject to this Agreement; <u>provided</u> <u>further</u>, that during the time that any Post-Effective Date Claim is owned by a Consenting Lender, such Consenting Lender shall not take any action in respect of such Post-Effective Date Claim that is inconsistent with this Agreement and shall treat such Post- Effective Date Claim in accordance with this Agreement (other than the ability to sell or assign the same free of the provisions of this Agreement), including voting such Post-Effective Date Claim to accept the Plan if on the date which is seven (7) days prior to the expiration of the solicitation period for the Plan, such Consenting Lender still owns such Post-Effective Date Claim on such date.

(d) <u>Additional Lender Parties</u>. Any Pre-Petition Lender may, at any time after the Effective Date, become a party to this Agreement as a Consenting Lender (any such Pre-Petition Lender, an "<u>Additional Lender Party</u>") by executing a joinder agreement in the form attached as <u>Exhibit C</u> hereto (an "<u>Additional Lender Joinder</u>"), pursuant to which such Additional Lender Party will agree to be bound by the terms of this Agreement as a Consenting Lender hereunder.

**Section 5.** **Termination Events.**

5.01. <u>Consenting Lender Termination Events</u>. This Agreement and the obligations hereunder shall be terminated, unless waived by the Requisite Consenting Lenders, upon the occurrence of any of the following events (each, a "<u>Consenting Lender Termination Event</u>"):

(a) at 5:00 P.M. Eastern Time on October 30, 2009 if the Petition Date has not occurred on or before such date;

(b) at 5:00 P.M. Eastern Time on the 45th day after the Petition Date if the Plan containing the terms set forth in the Term Sheet has not been filed by the Company with the Bankruptcy Court on or before such date (the date of the filing of the Plan with the Bankruptcy Court being referred to herein as the "<u>Plan Filing Date</u>");

(c)     at 5:00 P.M. Eastern Time on the 150th day after the Plan Filing Date if the Plan has not been confirmed by an order (the "Confirmation Order") of the Bankruptcy Court on or before such date (the date of entry of the Confirmation Order by the Bankruptcy Court being referred to herein as the "Plan Confirmation Date");

(d)     at 5:00 P.M. Eastern Time on the 120th day after the Plan Confirmation Date, unless on or before such date (x) the Confirmation Order shall not have been stayed, reversed, vacated or otherwise modified (unless otherwise consented to in writing by the Requisite Consenting Lenders); there shall be no appeal or petition for rehearing or certiorari pending in respect of the Confirmation Order and the time to appeal and file any such petition shall have lapsed and (y) substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan shall have occurred (the date on which the items in clauses (x) and (y) occur being referred to herein as the "Plan Consummation Date");

(e)     the Bankruptcy Court shall have entered an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or an examiner with expanded powers to operate and manage the Company's business;

(f)     the Bankruptcy Court shall have entered an order dismissing any of the Bankruptcy Cases or an order pursuant to the Bankruptcy Code converting any of the Bankruptcy Cases to a case or cases under Chapter 7 of the Bankruptcy Code;

(g)     the filing by the Company of any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Plan, and such motion or pleading is not withdrawn within five (5) business days of notice thereof by any Consenting Lender to FairPoint (or, in the case of a motion that has already been approved by the Bankruptcy Court at the time FairPoint is provided with such notice by a Consenting Lender, such motion not is stayed, reversed or vacated within five (5) business days of such notice);

(h)     the Company files, proposes or otherwise supports, or fails to actively oppose any (x) plan of reorganization containing terms different than those contained in the Term Sheet or (y) amendment or modification to the Plan containing any terms that are inconsistent with the Term Sheet unless such amendment or modification is otherwise consented to in writing by the Requisite Consenting Lenders in their sole discretion;

(i)     on or after the date hereof, the Company engages in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than (x) the commencement of the Cases, (y) the incurrence of indebtedness in respect of debtor-in-possession financing on the terms set forth in Exhibit D hereto or (z) dispositions of assets with an aggregate fair market value not in excess of $5,000,000 for all such dispositions;

(j)     an extraordinary event occurs that is not contemplated in the Company's business plan provided to the Consenting Lenders prior to the date hereof, and such event has a material adverse effect on the business, assets, financial condition or prospects of the Company;

(k)     the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement and such breach

shall continue unremedied by the Company for a period of five (5) business days after notice thereof has been given by a Consenting Lender to FairPoint;

(l) the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan and such inconsistent relief is not dismissed, vacated or modified to be consistent with this Agreement and the Plan within (5) business days after notice thereof has been given by a Consenting Lender to FairPoint; or

(m) there shall occur any of the following events after the date hereof: (x) the revocation or removal of the operating license of FairPoint or any of its Subsidiaries by the PUC or the FCC in a state where the Company has material operations or conducts a material amount of business or (y) the entry of any order or the taking of any other action by the PUC or the FCC that materially impairs the ability of the Company to operate its business in the manner in which it operates on the date hereof, and in the case of each clauses (x) and (y), such action by the PUC or the FCC is not stayed, reversed or vacated within fifteen (15) days after the occurrence thereof.

The Company hereby acknowledges and agrees that the termination of this Agreement and the obligations hereunder as a result of a Consenting Lender Termination Event, and any notice provided by any Consenting Lender to FairPoint pursuant any of the provisions of this Section 5.01, will not violate the automatic stay.

5.02. Company Termination Events. This Agreement and the obligations hereunder shall be terminated, unless waived by the Company, upon the occurrence of any of the following events (each a "Company Termination Event"; and together with the Consenting Lender Termination Events, each an "Agreement Termination Event" and collectively, the "Agreement Termination Events") by the giving of written notice thereof to the Consenting Lenders:

(a) if any of the covenants of the Consenting Lenders in this Agreement is materially breached by any Consenting Lender, and such breach (x) is not cured within five (5) business days after receipt of written notice from FairPoint to the Consenting Lenders of such breach and (y) has a material adverse effect on the Company or its ability to consummate the Plan in accordance with the terms of the Term Sheet;

(b) the board of directors of the Company has determined in good faith, after consultation with legal counsel, that the taking of any action under this Agreement would be inconsistent with its applicable fiduciary obligations;

(c) if the Bankruptcy Court enters an order denying the confirmation of the Plan; and

(d) at 5:00 P.M. Eastern Time on the 180th day after the Plan Filing Date if the Plan Confirmation Date has not occurred on or prior to such date; provided, that a Company Termination Date shall not be deemed to have occurred under this clause (d) unless the Company has used its best efforts to cause the Plan Confirmation Date to occur on or prior to such date.

5.03. Effect of Agreement Termination Event. Upon the occurrence of an Agreement Termination Event, (i) this Agreement shall be of no further force and effect and each Party hereto

shall be released from its commitments, undertakings and agreements under or related to this Agreement and the Plan and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, (ii) any and all consents tendered by the Parties prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring, this Agreement, the Plan or otherwise, and (iii) if Bankruptcy Court permission shall be required for a Party to change or withdraw (or cause to be changed or withdrawn) its vote in favor of the Plan, no Party to this Agreement shall oppose any attempt by such Party to change or withdraw (or cause to be changed or withdrawn) such vote.

**Section 6.    Miscellaneous.**

6.01.    <u>Complete Agreement</u>.  This Agreement is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto, to the maximum extent they relate in any way to the subject matter hereof.  No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

6.02.    <u>Admissibility of this Agreement</u>.  Each of Parties hereby agrees that this Agreement, the Term Sheet and all documents, agreements and negotiations relating thereto shall not, pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, be admissible into evidence or constitute an admission or agreement in any proceeding involving a Party, other than a proceeding to enforce the terms of this Agreement and/or support the confirmation of the Plan.

6.03.    <u>Several, Not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

6.04.    <u>Parties, Succession and Assignment</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors, assigns, heirs, executors, administrators and representatives.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other Person or entity except as otherwise contemplated herein.  Nothing in this Agreement, express or implied, shall give to any Person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement.

6.05.    <u>No Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns as expressly set forth in this Agreement.

6.06.    <u>Specific Performance</u>.  Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement may cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the sole event of any breach the other Parties shall be entitled to seek the remedy of specific performance or injunctive relief to enforce such covenants and agreements.

6.07.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

6.08.  Interpretation.  This Agreement is the product of negotiations between the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

6.09.  Counterparts.  This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Delivery of an executed copy of this Agreement shall be deemed to be a certification by each Person executing this Agreement on behalf of a Party that such Person and Party has been duly authorized and empowered to execute and deliver this Agreement and each other Party may rely on such certification.  Delivery of any executed signature page of this Agreement by telecopier, facsimile or electronic mail shall be as effective as delivery of a manually executed signature page of this Agreement.

6.10.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate, as applicable, the intent of this Agreement.

6.11.  Amendments and Waivers.  No amendment of any term or provision of this Agreement or the Plan shall be valid unless the same shall be in writing and signed by the Company and the Requisite Consenting Lenders.  No waiver of any term or provision of this Agreement or of the Plan or of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Requisite Consenting Lenders (except in the case of a Company Termination Event, the waiver of which shall be in a writing signed by the Company), nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.  The failure of any Party to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party with its obligations hereunder shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.  As used in this Agreement, (a) "Requisite Consenting Lenders" shall mean (x) at all times prior to the date (the "Threshold Date") on which the aggregate amount of Claims owned and/or controlled by Consenting Lenders (other than Steering Committee Lenders (as defined below)) is greater than or equal to twenty percent (20%) of the aggregate amount of Claims owned and/or controlled by all Prepetition Lenders, all of the Steering Committee Lenders and (y) at all times on and after the Threshold Date, (i) in the case of a Material Amendment/Waiver (as defined below), all of the Consenting Lenders, (ii) in the case of any amendment or waiver of any of the provisions of the Plan set forth in Section 8(iv) of the Term Sheet, all of the Steering Committee Lenders and (iii) in the case of any other amendment or waiver of any term or provision of this Agreement or the Plan, all of the

Steering Committee Lenders and the Majority Non-Steering Committee Consenting Lenders (as defined below); (b) "Material Amendment/Waiver" shall mean any amendment or waiver of (i) any term or provision of this Agreement or the Plan, the effect of which is to modify the form of, or decrease the amount or percentage of, the recovery (or any component thereof) to be paid, issued or distributed to the Pre-Petition Lenders (or any one of them) pursuant to the terms of the Plan set forth in the Term Sheet, (ii) any term or provision of this Agreement or the Plan (other than any of the provisions of the Plan set forth in Section 8(iv) of the Term Sheet), the effect of which is to modify the form of, or increase the amount or percentage of, the recovery (or any component thereof) to be paid, issued or distributed to any Person(s) (other than the Pre-Petition Lenders) pursuant to the terms of the Plan set forth in the Term Sheet, (iii) any of the terms or provisions of clauses (a) – (d) of Section 5.01 of this Agreement, the effect of which is to extend any of the time periods specified therein for a period of greater than fifteen (15) days, (iv) any of the provisions of this Section 6.11 or (v) any of the other material terms or provisions of this Agreement or the Plan (other than any of the provisions of the Plan set forth in Section 8(iv) of the Term Sheet); (c) "Steering Committee Lenders" shall mean those Pre-Petition Lenders that are members of the steering committee formed in connection with the Pre-Petition Credit Agreement; and (d) "Majority Non-Steering Committee Consenting Lenders" shall mean Consenting Lenders (other than Steering Committee Lenders) holding more than fifty percent (50%) of the aggregate amount of Claims held by those Consenting Lenders that are not Steering Committee Lenders.

6.12.  Notices.  All notices hereunder shall be in writing and delivered by facsimile, e-mail, courier or registered or certified mail (return receipt requested) to the address, facsimile number or e-mail address (or at such other address, facsimile number or e-mail address as shall be specified by like notice) set forth on the signature page for such Party.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter; and any notice, if transmitted by e-mail shall be deemed given upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next business day for the recipient,

6.13.  Waiver.  If the Plan is not consummated, or following the occurrence of an Agreement Termination Event or the termination of this Agreement, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.

6.14.  Construction.  Except where the context otherwise requires, words importing the masculine gender shall include the feminine and the neutral, if appropriate, words importing the singular number shall include the plural number and vice versa.

6.15.  Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction the remaining terms and provisions hereof.

6.16.  <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof and shall not affect in any way the meaning or interpretation of this Agreement.

6.17.  <u>Incorporation of Schedules and Exhibits</u>.  The exhibits and schedules attached hereto and identified in this Agreement are incorporated herein by reference and made a part hereof.

6.18.  **<u>WAIVER OF TRIAL BY JURY</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING.**

6.19.  <u>Submission to Jurisdiction</u>.  By its execution and delivery of this Agreement, subject to the commencement of the Bankruptcy Cases, each of the Parties hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby.  Each Party irrevocably waives, to the fullest extent permitted by applicable laws, any objection it may have now or hereafter to the venue of any action, suit or proceeding brought in such court or to the convenience of the forum.

6.20.  **<u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

6.21.  <u>Fees and Expenses</u>.  The Company agrees to pay all reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel) of the Administrative Agent and each Consenting Lender holding more than 10% of the Claims incurred in connection with this Agreement, the Term Sheet, the Plan, the Restructuring and the transactions contemplated thereby.

[SIGNATURE PAGES AND EXHIBITS INTENTIONALLY OMITTED]

## LOCAL BANKRUPTCY RULE 1007-2 SCHEDULES

# SCHEDULE 1

## 50 LARGEST UNSECURED CREDITORS (EXCLUDING INSIDERS)[1]

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the fifty largest unsecured claims,[2] on a consolidated basis, excluding claims of insiders within the meaning of 11 U.S.C. § 101 of FairPoint Communications, Inc. and its affiliated debtors (collectively, "<u>FairPoint</u>").

| | NAME OF CREDITOR | COMPLETE MAILING ADDRESS OF CREDITOR INCLUDING ZIP CODE AND PHONE NUMBER, FAX AND E-MAIL (IF KNOWN) | TYPE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | NATURE OF CLAIM (CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF) | AMOUNT OF CLAIM (IF SECURED VALUE OF SECURITY) | ENTITIES LIABLE ON DEBT (IF KNOWN) |
|---|---|---|---|---|---|---|
| 1. | U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE | ATTN: RICK ROKOSCH U.S. BANK NATIONAL ASSOCIATION 60 LIVINGSTON AVE EP-MN-WS3C ST. PAUL, MN 55107-2292 | SENIOR NOTES | | $574,636,995 | FAIRPOINT COMMUNICATIONS, INC. |
| 2. | CAPGEMINI | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 6400 SHAFER COURT ROSEMONT, IL 60018 P: 847-384-6100 F: 847-384-0500 | TRADE DEBT | | $19,795,980.00 | FAIRPOINT COMMUNICATIONS, INC. |
| 3. | NATIONAL EXCHANGE CARRIERS ASSOCIATION | ATTN: CAROL A. BRENNAN 6400 S. FIDDLERS GREEN CIRCLE #1300 GREENWOOD VILLAGE, CO 80111 P: 303-893-4402 CBRENNA@NECA.ORG | TRADE DEBT | | $5,765,088.00 | TELEPHONE OPERATING ENTITIES |
| 4. | VERIZON BUSINESS NETWORK SERVICES, INC. | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT P.O. BOX 981820 EL PASO, TX 79998 P: 800-555-8879 F: 309-820-7044 | TRADE DEBT | | $2,035,398.86 | TELEPHONE OPERATING ENTITIES |
| 5. | OCCAM NETWORKS INC | ATTN: JEFF BEER 2805 MONTCLARE CT AURORA, IL 60504 P: 805-692-2989 F: 805-692-2999 JBEER@OCCAMNETWORKS.COM | TRADE DEBT | | $1,932,956.48 | FAIRPOINT COMMUNICATIONS, INC. |
| 6. | BYERS ENGINEERING CO | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 6285 BARFIELD RD ATLANTA, GA 0328-4303 P: 404-843-1000 F: 404-843-2000 | TRADE DEBT | | $1,721,037.47 | FAIRPOINT COMMUNICATIONS, INC. |

---

[1] The information contained herein shall not constitute an admission of liability by, nor is it binding on, FairPoint. All claims are subject to customary offsets, rebates, discounts, reconciliations, credit, and adjustments, none of which are reflected on this Schedule 1.

[2] The amounts outstanding for bond indebtedness represent the face amounts of the bonds as of the Petition Date and do not include unpaid interest. The amounts outstanding for trade indebtedness represent estimated amounts as of the Petition Date.

| NAME OF CREDITOR | COMPLETE MAILING ADDRESS OF CREDITOR INCLUDING ZIP CODE AND PHONE NUMBER, FAX AND E-MAIL (IF KNOWN) | TYPE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | NATURE OF CLAIM (CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF) | AMOUNT OF CLAIM (IF SECURED VALUE OF SECURITY) | ENTITIES LIABLE ON DEBT (IF KNOWN) |
|---|---|---|---|---|---|
| 7. POWER & TELEPHONE SUPPLY CO | ATTN: DALE STEVENSON 2673 YALE AVENUE MEMPHIS, TN 38112 P: 901-866-3097 F: 336-249-7475 DALE.STEVENSON@PTSUPPLY.COM | TRADE DEBT | | $1,403,020.00 | FAIRPOINT COMMUNICATIONS, INC. |
| 8. COMMUNICATIONS DATA GROUP, INC | ATTN: MIKE RUNYON 102 S. DUNCAN RD CHAMPAIGN, IL 61822 P: 217-355-7106 F: 217-351-6994 MIKER@CDG.WS | TRADE DEBT | | $858,420.86 | FAIRPOINT COMMUNICATIONS, INC. |
| 9. ZAMPELL BUILDING SERVICES | ATTN: JAMES ZAMPELL 3 STANLEY TUCKER DRIVE NEWBURYPORT, MA 01950 P: 978-499-5137 F: 978-499-7137 JAMES.ZAMPELL@ZAMPELL.COM | TRADE DEBT | | $798,671.30 | FAIRPOINT COMMUNICATIONS, INC. |
| 10. VOLT DELTA RESOURCES LLC | ATTN: TIM MOORE 560 LEXINGTON AVE, 14TH FLOOR NEW YORK, NY 10022 P: 212-785-8864 TIMMORE@VOLTDELTA.COM | TRADE DEBT | | $791,104.66 | FAIRPOINT COMMUNICATIONS, INC. |
| 11. TELENETWORK PARTNERS LTD | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 350 BARNES ST, SUITE 105 SAN MARCOS, TX 78666 P: 800-580-3355 | TRADE DEBT | | $785,765.09 | FAIRPOINT COMMUNICATIONS, INC. |
| 12. GLACIAL ENERGY OF NEW ENGLAND | ATTN: GRAIG JOYCE 24 ROUTE 6A, SUITES 1 AND 2 SANDWICH, MA 02563 P: 781-325-2858 F: 508-437-0291 GRAIG.JOYCE@GLACIALENERGY.COM | TRADE DEBT | | $736,368.00 | FAIRPOINT COMMUNICATIONS, INC. |
| 13. ALCATEL - LUCENT USA INC | ATTN: GARY MILEWSKI 600-700 MOUNTAIN AVENUE MURRAY HILL, NJ 07974 P: 978-346-9339 GMILEWSKI@ALCATEL-LUCENT.COM | TRADE DEBT | | $608,843.78 | FAIRPOINT COMMUNICATIONS, INC. |
| 14. CRC COMMUNICATIONS OF MAINE INC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 56 CAMPUS DR NEW GLOUCESTER, ME 04260 P: 207-688-8811 | TRADE DEBT | | $582,192.13 | FAIRPOINT COMMUNICATIONS, INC. |
| 15. HEWLETT-PACKARD CO | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 3000 HANOVER STREET PALO ALTO, CA 94304 P: 650-857-1501 F: 650-857-5518 | TRADE DEBT | | $526,832.46 | FAIRPOINT COMMUNICATIONS, INC. |

| NAME OF CREDITOR | COMPLETE MAILING ADDRESS OF CREDITOR INCLUDING ZIP CODE AND PHONE NUMBER, FAX AND E-MAIL (IF KNOWN) | TYPE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | NATURE OF CLAIM (CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF) | AMOUNT OF CLAIM (IF SECURED VALUE OF SECURITY) | ENTITIES LIABLE ON DEBT (IF KNOWN) |
|---|---|---|---|---|---|
| 16. ON TARGET UTILITY SERVICES | ATTN: MIKE FALLONA, GENERAL MANAGER – OWNER 617 WATER ST GARDINER, ME 04345 P: 207-588-4516 MFALLONA@ONTARGETSERVICES.COM | TRADE DEBT | | $522,577.68 | FAIRPOINT COMMUNICATIONS, INC. |
| 17. VERIZON WIRELESS MESSAGING SERVICES, LLC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT KIM PICCOLI 99 EAST RIVER DR 9TH FLOOR EAST HARTFORD, CT 06108 P: 800-555-8879 F: 309-820-7044 | TRADE DEBT | | $498,981.07 | FAIRPOINT COMMUNICATIONS, INC., VERIZON/FAIRPOINT, NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC; TELEPHONE OPERATING COMPANY OF VERMONT LLC; ENHANCED COMMUNICATIONS OF NORTHERN NEW ENGLAND INC & TELEPHONE OPERATING ENTITIES |
| 18. NEW HAMPSHIRE ELECTRIC COOP | ATTN: LEGAL OFFICER/BANKRUPTCY DEPARTMENT 579 TENNEY MOUNTAIN HIGHWAY PLYMOUTH, NH 03264-3154 P: 800-698-2007 F: 603-536-8687 | TRADE DEBT | | $417,714.17 | NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC |
| 19. MCFARLAND CASCADE FOR-TEK | ATTN: JOHN SMALL 1400 IRON HORSE PARK 1640 E. MARC AVE NORTH BILLERICA, MA 01862 P: 800-566-8425 F: 978-667-8978 JOHNSM@LDM.COM | TRADE DEBT | | $351,266.62 | NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC AND TELEPHONE OPERATING COMPANY OF VERMONT LLC |
| 20. WISOR TELECOM | 300 PROFESSIONAL DR GAITHERSBURG, MD 20879 P: 301-417-9401 | TRADE DEBT | | $349,625.00 | FAIRPOINT COMMUNICATIONS, INC. |
| 21. MAINE PRINTING CO | ATTN: RYAN JACKSON 2275 CONGRESS ST PORTLAND, ME 04102 P: 207-774-6116 X 3322 RJACKSON@MPXONLINE.COM | TRADE DEBT | | $321,813.71 | FAIRPOINT COMMUNICATIONS, INC. AND ITS PRESENT AND FUTURE SUBSIDIARIES |
| 22. VERISIGN INC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT PO BOX 2909 OLYMPIA, WA 98507 | TRADE DEBT | | $294,000.00 | CHINA TELEPHONE COMPANY, MAINE TELEPHONE COMPANY, NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC, NORTHLAND TELEPHONE COMPANY OF MAINE, INC. SIDNEY TELEPHONE COMPANY, STANDISH TELEPHONE COMPANY |
| 23. SHIELDS ENVIRONMENTAL INC | ATTN: TONI GIBBS 4150 CHURCH ST SANFORD, FL 32771 P: 407-708-1869 TONI.GIBBS@SHIELDS-E.US | TRADE DEBT | | $291,889.00 | FAIRPOINT COMMUNICATIONS, INC. |

| NAME OF CREDITOR | | COMPLETE MAILING ADDRESS OF CREDITOR INCLUDING ZIP CODE AND PHONE NUMBER, FAX AND E-MAIL (IF KNOWN) | TYPE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | NATURE OF CLAIM (CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF) | AMOUNT OF CLAIM (IF SECURED VALUE OF SECURITY) | ENTITIES LIABLE ON DEBT (IF KNOWN) |
|---|---|---|---|---|---|---|
| 24. | VITAL ECONOMY INC | ATTN: FRANK KNOT<br>PO BOX 314<br>RIDERWOOD, MD 21139<br>P: 410-321-1484<br>F: 410-321-9553 | TRADE DEBT | | $251,218.17 | FAIRPOINT COMMUNICATIONS, INC. |
| 25. | NCO FINANCIAL SYSTEMS INC | ATTENTION: JOSHUA GINDIN, EVP<br>507 PRUDENTIAL ROAD<br>HORSHAM, PA 19044<br>P: 800-220-2274; 215-441-3000<br>F: 866-269-8669; 215-441-3931 | TRADE DEBT | | $225,886.55 | FAIRPOINT COMMUNICATIONS, INC. |
| 26. | KANSYS INC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT<br>910 W FRONTIER LANE<br>OLATHE, KS 66061<br>P: 913-780-5291; 800-981-6491 | TRADE DEBT | | $219,999.59 | FAIRPOINT COMMUNICATIONS, INC. |
| 27. | LOGICA NORTH AMERICA INC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT<br>10375 RICHMOND AVENUE<br>SUITE 1000<br>HOUSTON, TX 77042<br>P: 713-954-7000<br>F: 713-954-7380 | TRADE DEBT | | $192,000.00 | FAIRPOINT COMMUNICATIONS, INC. |
| 28. | NORTEL NETWORKS INC | ATTN: RICHARD ROYAL<br>3985 COLLECTION CENTER DR<br>CHICAGO, IL 60693<br>P: 919-848-7987<br>RROYAL@NORTEL.COM | TRADE DEBT | | $176,666.00 | FAIRPOINT COMMUNICATIONS, INC. |
| 29. | NYSEG | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT<br>1387 DRYDEN ROAD<br>ITHACA, NY 14850<br>P: 800-600-2275 | TRADE DEBT | | $174,396.39 | CHAUTAUQUA & ERIE COMMUNICATIONS INC. |
| 30. | PROFESSIONAL TELECONCEPTS INC | ATTN: TIM RYAN, NORTHEAST REGIONAL MANAGER<br>5132 STATE HWY 12<br>NORWICH, NY 13815<br>P: 607-316-3004<br>F: 888-329-7845<br>TIM.RYAN@PRO-TEL.COM | TRADE DEBT | | $167,261.83 | FAIRPOINT LOGISTICS |
| 31. | FISC SOLUTIONS | ATTN: CAROL SABASTEANSKI<br>168 LISBON ST<br>LEWISTON, ME 04243<br>P: 888-433-4924<br>F: 207-777-6026<br>CSABASTEANSKI@FISCSOLUTIONS.COM | TRADE DEBT | | $152,242.32 | FAIRPOINT COMMUNICATIONS, INC. |
| 32. | METLIFE | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT<br>1 TOWER SQUARE<br>HARTFORD, CT 06183-6074<br>P: 800-638-5433 | TRADE DEBT | | $148,333.15 | FAIRPOINT COMMUNICATIONS, INC. |
| 33. | MEDCO HEALTH SOLUTIONS | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT<br>100 PARSONS POND DR<br>FRANKLIN LAKES, NJ 07417<br>P: 800-251-7690 | TRADE DEBT | | $147,206.90 | FAIRPOINT COMMUNICATIONS, INC. |

| NAME OF CREDITOR | COMPLETE MAILING ADDRESS OF CREDITOR INCLUDING ZIP CODE AND PHONE NUMBER, FAX AND E-MAIL (IF KNOWN) | TYPE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | NATURE OF CLAIM (CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF) | AMOUNT OF CLAIM (IF SECURED VALUE OF SECURITY) | ENTITIES LIABLE ON DEBT (IF KNOWN) |
|---|---|---|---|---|---|
| 34. FUJITSU NETWORK COMMUNICATIONS | ATTN: DAVID ZEBUHR 2801 TELECOM PKWY RICHARDSON, TX 75082-3599 P: 603-429-2674 F: 972-479-6900 DAVID.ZEBUHR@US.FUJITSU.COM | TRADE DEBT | | $142,473.80 | FAIRPOINT COMMUNICATIONS, INC. |
| 35. ANTHEM BLUE CROSS BLUE SHIELD | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 3000 GOFFS FALLS RD MANCHESTER, NH 03111 P: 603-695-7000 | TRADE DEBT | | $136,430.86 | FAIRPOINT COMMUNICATIONS, INC. |
| 36. RON COMEAU & SONS INC | ATTN: RON COMEAU 584 MAIN ST BOX 8 LEWISTON, ME 04240 P: 207-782-8423 | TRADE DEBT | | $131,131.00 | NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC D/B/A FAIRPOINT COMMUNICATIONS-NNE |
| 37. DIVERSIFIED INVESTMENT ADVISOR | ATTN: LEGAL OFFICER/BANKRUPTCY DEPARTMENT 4 MANHATTANVILLE RD PURCHASE, NY 10577 P: 877-348-3365 | TRADE DEBT | | $124,014.02 | FAIRPOINT COMMUNICATIONS, INC. |
| 38. RADIALPOINT | ATTN: LEGAL OFFICER/BANKRUPTCY DEPARTMENT 2050 BLEURY MONTREAL QC H3A2J5 P: 1-866-286-2636 F: 514-286-0558 | TRADE DEBT | | $119,190.00 | FAIRPOINT COMMUNICATIONS, INC. |
| 39. ZACHAU CONSTRUCTION INC | ATTN: JEFF ZACHAU 1185 U.S. ROUTE 1 P.O. BOX J FREEPORT, ME 04032 P: 207-865-9925 F: 207-865-9926 JEFF@ZACHAUCONSTRUCTION.COM | TRADE DEBT | | $117,027.90 | NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC D/B/A FAIRPOINT COMMUNICATIONS |
| 40. ISPN | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 14303 W 95TH ST LENEXA, KS 66215 P: 913-859-9500 F: 913-859-9805 | TRADE DEBT | | $110,423.50 | FAIRPOINT COMMUNICATIONS, INC. |
| 41. AMERICAN CABLE ASSEMBLIES INC | ATTN: CHARLES MCCARTHY 21 WILBRAHAM ST PALMER, MA 01069 P:413-283-2515 F: 413-283-2517 CMCARTHY@AMERICANCABLEASSEMBLIES.COM | TRADE DEBT | | $104,071.31 | FAIRPOINT COMMUNICATIONS, INC. |

| NAME OF CREDITOR | COMPLETE MAILING ADDRESS OF CREDITOR INCLUDING ZIP CODE AND PHONE NUMBER, FAX AND E-MAIL (IF KNOWN) | TYPE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | NATURE OF CLAIM (CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF) | AMOUNT OF CLAIM (IF SECURED VALUE OF SECURITY) | ENTITIES LIABLE ON DEBT (IF KNOWN) |
|---|---|---|---|---|---|
| 42. NOKIA SIEMENS NETWORKS USA LLC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 396 RINEHART ROAD LAKE MARY, FL 32746 P: 407-942-5000 | TRADE DEBT | | $104,048.75 | GTC, INC., FAIRPOINT VERMONT, INC., NORTHLAND TELEPHONE COMPANY OF ME, INC., STANDISH TELEPHONE COMPANY, FAIRPOINT COMMUNICATIONS MISSOURI, INC. EXOP OF MISSOURI, INC. (FAIRPOINT COMMUNICATIONS AND IT PRESENT AND FUTURE SUBSIDIARIES |
| 43. UNITED HEALTHCARE INSURANCE CO | ATTN: LEGAL OFFICER/BANKRUPTCY DEPARTMENT 450 COLUMBUS BLVD HARTFORD, CT 06103 P: 860-702-5000 | TRADE DEBT | | $102,409.25 | FAIRPOINT COMMUNICATIONS, INC. |
| 44. BUTLER AMERICA LLC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 3820 STATE ST CHARLOTTE, NC 28265 P: 203-926-2700 | TRADE DEBT | | $102,220.80 | FAIRPOINT COMMUNICATIONS, INC. |
| 45. GENESYS TELECOMMUNICATIONS LABORATORIES INC | ATTN: JOHN HAMILTON 2001 JUNIPERO SERRA BLVD DALY CITY, CA 94014 P: 770-962-8267 F: 419-821-2451 JHAMILTO@GENESYSLAB.COM | TRADE DEBT | | $100,035.44 | FAIRPOINT COMMUNICATIONS, INC. |
| 46. UNISYS CORP | ATTN: RICK FANCIULLACCI UNISYS WAY BLUE BELL, PA 19424 P: 215-986-3423 F: 585-321-6434 | TRADE DEBT | | $95,091.80 | FAIRPOINT COMMUNICATIONS, INC. |
| 47. NEONOVA NETWORK SERVICES INC | ATTN: SHAUN MURPHY-V.P. MARKETING 1000 PERIMETER PARK DRIVE, SUITE K MORRISVILLE, NC 27560 P: 919-460-3330 F: 919-460-0426 SMURPHY@NEONOVA.NET | TRADE DEBT | | $93,709.17 | FAIRPOINT COMMUNICATIONS, INC. |
| 48. PAIR GAIN COMMUNICATIONS INC | ATTN: CORPORATE OFFICER/AUTHORIZED AGENT 6260 S BAY RD CICERO, NY 13039 P: 315-698-4411 F: 315-698-4488 | TRADE DEBT | | $87,951.60 | FAIRPOINT COMMUNICATIONS, INC. |
| 49. MARTIN DAWES ANALYTICS | ATTN: ROBERT M. WILLIS, CPA 321 SUMMER STREET, 5TH FLOOR BOSTON, MA 02210 P: 617-345 5422 X-234 F: 617-345-5475 BWILLIS@MDA-DATA.COM | TRADE DEBT | | $85,719.24 | FAIRPOINT COMMUNICATIONS, INC. |

| NAME OF CREDITOR | COMPLETE MAILING ADDRESS OF CREDITOR INCLUDING ZIP CODE AND PHONE NUMBER, FAX AND E-MAIL (IF KNOWN) | TYPE OF CLAIM (TRADE DEBT, BANK LOAN, GOVERNMENT CONTRACT, ETC.) | NATURE OF CLAIM (CONTINGENT, UNLIQUIDATED, DISPUTED OR SUBJECT TO SET-OFF) | AMOUNT OF CLAIM (IF SECURED VALUE OF SECURITY) | ENTITIES LIABLE ON DEBT (IF KNOWN) |
|---|---|---|---|---|---|
| 50. JOHN STAURULAKIS, INCORPORATED | ATTN: MANNY STAURULAKIS, PRESIDENT 7852 WALKER DR. SUITE 200 GREENBELT, MD 20770 P: 301-459-7590 MSTAURULAKIS@JSITEL.COM | TRADE DEBT | | $81,327.95 | TELEPHONE OPERATING ENTITIES |
| **TOTAL** | | | | **$619,719,028.63** | |

## SCHEDULE 2

## SECURED CLAIMS

      Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists FairPoint's five largest secured claims on a consolidated basis.[1]

| CREDITOR | ADDRESS | AMOUNT OF CLAIM | TYPE OF COLLATERAL | ESTIMATED VALUE OF COLLATERAL | DISPUTED |
|---|---|---|---|---|---|
| BANK OF AMERICA, N.A., AS AGENT | ATTN: MARIA BULIN, SYLVIA JACOBO, ANTONIKIA THOMAS, 901 MAIN STREET 14TH FLOOR DALLAS, TX | $2,048,578,615[2] | STOCK PLEDGE | UNDETERMINED | NO |

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, FairPoint.

[2]    This amount represents the aggregate amount owed under FairPoint's prepetition Credit Facility.

## SCHEDULE 3

## CONSOLIDATED ASSETS AND LIABILITIES OF FAIRPOINT[1]

| | June30, 2009 | December 31, 2008 |
|---|---|---|
| | (Unaudited) | |
| **Assets** | | |
| Current assets: | | |
| Cash | $80,964 | $ 70,325 |
| Restricted cash | 1,981 | 8,144 |
| Accounts receivable, net | 190,551 | 173,589 |
| Materials and supplies | 36,871 | 38,694 |
| Other | 30,268 | 28,747 |
| Deferred income tax, net | 29,241 | 31,418 |
| **Total current assets** | **369,876** | **350,917** |
| Property, plant and equipment, net | 1,996,335 | 2,013,515 |
| Intangibles assets, net | 223,105 | 234,481 |
| Prepaid pension asset | 9,741 | 8,708 |
| Debt issue costs, net | 23,617 | 26,047 |
| Restricted cash | 1,378 | 60,359 |
| Other assets | 16,432 | 21,094 |
| Goodwill | 595,120 | 619,372 |
| **Total assets** | **$3,235,604** | **$ 3,334,493** |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Current portion of long term debt | $45,000 | $ 45,000 |
| Current portion of capital lease obligations | 2,046 | 2,231 |
| Accounts payable | 158,863 | 147,778 |
| Dividends payable | — | 23,008 |
| Accrued interest payable in cash | 3,834 | 18,844 |
| Interest rate swaps | 43,438 | 41,274 |
| Other non-operating accrued liability | — | 19,000 |
| Other accrued liabilities | 68,234 | 70,887 |
| **Total current liabilities** | **321,415** | **368,022** |
| Long term liabilities: | | |
| Capital lease obligations | 6,584 | 7,522 |
| Accrued pension obligation | 49,507 | 46,801 |
| Employee benefit obligations | 239,152 | 225,840 |
| Deferred income taxes117,184 | 154,757 | |
| Unamortized investment tax credits | 5,068 | 5,339 |
| Accrued interest payable in kind | 14,423 | — |
| Other long term liabilities | 18,006 | 35,492 |
| Long term debt, net of current portion | 2,443,647 | 2,425,253 |
| Interest rate swap agreements | 19,386 | 41,681 |
| **Total long-term liabilities** | **2,912,957** | **2,942,685** |
| Stockholders' equity: | | |
| Common stock, $0.01 par value, 200,000,000 shares authorized; 89,496,847 and 88,995,572 shares issued and outstanding at June 30, 2009 and December 31, 2008, respectively | 895 | 890 |
| Additional paid-in capital | 736,469 | 735,719 |
| Retained earnings (deficit) | (604,914) | (578,319 ) |
| Accumulated other comprehensive loss | (131,218) | (134,504 ) |
| Total stockholders' equity | 1,232 | 23,786 |
| **Total liabilities and stockholders' equity** | **$3,235,604** | **$ 3,334,493** |

---

[1]     The data contained in this Schedule 3 is derived from FairPoint's Form 10-Q for the three-month period ending June 30, 2009. All figures, except share data, are in thousands.

## SCHEDULE 4

### PUBLICLY HELD SECURITIES

Pursuant to Local bankruptcy Rule 1007-2(a)(7)m the following lists the number and classes of shares of stock, debentures, and other securities of FairPoint that are publicly held ("Securities") and the number of holders thereof. The Securities held by FairPoint's directors and officers are listed separately.

### COMMON STOCK

| TYPE OF SECURITY | NUMBER OF SHARES OR AMOUNT | APPROXIMATE NUMBER OF RECORD HOLDERS | DATE |
|---|---|---|---|
| COMMON STOCK | 90,020,657 | UNDETERMINED | AS OF JULY 31, 2009 |

### NOTES

| TYPE OF SECURITY | NUMBER OF SHARES OR AMOUNT | APPROXIMATE NUMBER OF RECORD HOLDERS | DATE |
|---|---|---|---|
| 13.125% SENIOR NOTES DUE ON APRIL 1, 2018 | $91,517,000 AGGREGATE PRINCIPAL AMOUNT | UNDETERMINED | AS OF JULY 31, 2009 |
| 13.125% SENIOR NOTES DUE ON APRIL 2, 2018 | $458,478,661 AGGREGATE PRINCIPAL AMOUNT | UNDETERMINED | AS OF JULY 31, 2009 |

### COMMON STOCK HELD BY FAIRPOINT'S OFFICERS AND DIRECTORS

| OFFICER OR DIRECTOR | COMMON STOCK | STOCK OPTIONS | DATE |
|---|---|---|---|
| ALFRED C. GIAMMARINO | 50,000 | --- | AS OF 9/30/2009 |
| JANE E. NEWMAN | 1,000 | --- | AS OF 9/30/2009 |
| CLAUDE LILLY | 2,500 | --- | AS OF 9/30/2009 |
| DAVID L. HAUSER | 13,300 | 1,600,000 | AS OF 9/30/2009 |
| GARY C. GARVEY | 180,666 | --- | AS OF 9/30/2009 |
| JEFFREY ALLEN | 24,293 | --- | AS OF 9/30/2009 |

| OFFICER OR DIRECTOR | COMMON STOCK | STOCK OPTIONS | DATE |
|---|---|---|---|
| LISA R. HOOD | 41,439 | 15,424 | AS OF 9/30/2009 |
| MICHAEL TUTTLE | 250 | --- | AS OF 9/30/2009 |
| PETER G. NIXON | 108,643 | 32,205 | AS OF 9/30/2009 |
| ROBERT LILIEN | --- | --- | AS OF 9/30/2009 |
| SHIRLEY J. LINN | 131,072 | 23,421 | AS OF 9/30/2009 |
| THOMAS E. GRIFFIN | 8,046 | 1,454 | AS OF 9/30/2009 |
| THOMAS GILBANE | 10,000 | --- | AS OF 9/30/2009 |

**SCHEDULE 5**

**PROPERTY NOT IN FAIRPOINT'S POSSESSION**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following summary lists FairPoint's property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.[1]

| TYPE OF PROPERTY | VALUE OF PROPERTY | PERSON OR ENTITY IN POSSESSION | ADDRESS & CONTACT INFORMATION |
|---|---|---|---|
| 100% OF THE EQUITY INTERESTS OF CERTAIN FAIRPOINT SUBSIDIARIES[2] | UNKNOWN | BANK OF AMERICA, N.A., AS COLLATERAL AGENT | 901 MAIN STREET, 14TH FLOOR DALLAS, TX 75202 ATTENTION: SHELLEY BLOOM TELEPHONE: 214-209-4103 FACSIMILE: 214-290-9462 |
| SURETY BOND - CONTRACTOR'S LICENSE BOND | $12,000 | STATE OF WASHINGTON | DEPARTMENT OF LABOR AND INDUSTRIES 7273 LINDERSON WAY SW TURNWATER, WA 98501-5414 |
| SURETY BOND - RIGHT-OF-WAY BOND | $25,000 | PIERCE CO. PUBLIC WORKS UTILITIES, TACOMA, WA | PUBLIC WORKS DEPARTMENT 2702 SOUTH 42ND STREET, SUITE 201 TACOMA, WA 98409 |

---

[1] In addition to the properties listed on this Schedule 5, in the ordinary course of business, property of FairPoint is likely to be in the possession of various other persons, including maintenance and repair service providers, common carriers, facility providers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors and agents. Through these arrangements, FairPoint's ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would not be practical.

[2] The following entities' equity interests are pledged to, and are in the custody of, Bank of America, N.A., as administrative agent, pursuant to a certain Pledge Agreement dated March 31, 2008 in connection with the Credit Facility:

Bentleyville Communications Corporation; Berkshire Telephone Corporation; Big Sandy Telecom, Inc.; Bluestem Telephone Company; Chautauqua and Erie Telephone Corporation; China Telephone Company; Chouteau Telephone Company; Columbine Telecom Company; Comerco, Inc.; Commtel Communications Inc.; Community Service Telephone Co.; C-R Communications, Inc.; C-R Long Distance, Inc.; C-R Telephone Company; El Paso Long Distance Company; Ellensburg Telephone Company; Enhanced Communications of Northern New England Inc.; ExOp of Missouri, Inc.; FairPoint Broadband, Inc.; FairPoint Carrier Services, Inc.; FairPoint Communications Missouri, Inc.; FairPoint Communications Solutions Corp. – New York; FairPoint Communications Solutions Corp. – Virginia; FairPoint Logistics, Inc.; FairPoint Vermont, Inc.; Fremont Telcom Co.; GTC Communications, Inc.; GTC, Inc.; Maine Telephone Company; Marianna and Scenery Hill Telephone Company; MJD Services Corp.; MJD Ventures, Inc.; Northland Telephone Company of Maine, Inc.; Odin Telephone Exchange, Inc.; Peoples Mutual Telephone Company; Ravenswood Communications, Inc.; S T Computer Resources, Inc.; S T Enterprises, Ltd.; Sidney Telephone Company; ST Long Distance, Inc.; St. Joe Communications, Inc.; Standish Telephone Company; Sunflower Telephone Company, Inc.; Taconic Telephone Corp.; Telephone Service Company; The Columbus Grove Telephone Company; The El Paso Telephone Company; The Germantown Independent Telephone Company; The Orwell Telephone Company; UI Communications, Inc.; UI Long Distance, Inc.; UI Telecom, Inc.; Unite Communications Systems, Inc.; Utilities, Inc.; Yates City Telephone Company; YCOM Networks, Inc.

| TYPE OF PROPERTY | VALUE OF PROPERTY | PERSON OR ENTITY IN POSSESSION | ADDRESS & CONTACT INFORMATION |
|---|---|---|---|
| SURETY BOND - CONTRACTOR'S LICENSE BOND | $4,000 | STATE OF WASHINGTON | WASHINGTON STATE DEPT. OF LABOR AND INDUSTRIES 7273 LINDERSON WAY SW TURNWATER, WA 98501-5414 |
| SURETY BOND - LICENSE/PERMIT BOND | $15,000 | THURSTON CO. DEVELOPMENT SERVICES, WA | DEVELOPMENT SERVICES 2000 LAKERIDGE DR, SW OLYMPIA, WA 98502 |
| SURETY BOND - LICENSE/PERMIT BOND | $10,000 | TOWN OF BEDFORD, NH | PUBLIC WORKS DEPARTMENT 24 NORTH AMHERST ROAD BEDFORD, NH 03110 |
| SURETY BOND - PUBLIC SERVICE BOARD SURETY BOND | $ 57,000 | STATE OF VERMONT | 58 EAST STATE STREET MONTPELIER, VT 05633 |
| SURETY BOND - EXCAVATION PERMIT BOND | $10,000 | TOWN OF LONDONDERRY, NH | ATTN:  JANUSZ CZYZOWSKI 50 NASHUA ROAD LONDONDERRY, NH  03053 |
| SURETY BOND - EXCAVATION PERMIT BOND | $10,000 | CITY OF DOVER | ATTN:  FINANCE DEPT 288 CENTRAL AVE DOVER, NH  03820 |
| SURETY BOND - BLANKET STREET OPENING PERMIT BOND | $5,000 | CITY OF AUBURN, ME | ATTN:  ENGINEERING DEPT 60 COURT STREET AUBURN, ME  04210 |
| SURETY BOND - BLANKET STREET OPENING PERMIT BOND | $50,000 | CITY OF CONCORD, NH | ATTN:  MIKE BROAS, CHIEF CONSTRUCTION INSPECTOR 41 GREEN STREET CONCORD, NH  03301 |
| SURETY BOND - EXCAVATION PERMIT BOND | $10,000 | TOWN OF HAMPTON, NH | DEPT OF PUBLIC WORKS 100 WINNACUNNET ROAD HAMPTON, NH  03842 |
| SURETY BOND - EXCAVATION PERMIT BOND | $15,000 | CITY OF KENNEBUNKPORT, MA | ATTN:  TOWN MANAGER LARRY MEAD PO BOX 566 KENNEBUNKPORT, ME  04046 |
| SURETY BOND - PERMIT BOND | $10,000 | CITY OF SOUTH PORTLAND, ME | DEPT OF PUBLIC WORKS PO BOX 9422 SOUTH PORTLAND, ME  04116 |
| SURETY BOND - STREET OPENINGS PERMIT BOND | $2,500 | TOWN OF ESSEX, VT | 81 MAIN STREET ESSEX JUNCTION, VT  05452 |
| SURETY BOND - EXCAVATION PERMIT BOND | $25,000 | CITY OF NASHUA, NH | PUBLIC WORKS DIVISION 15 RIVERSIDE STREET NASHUA, NH  03061 |

| TYPE OF PROPERTY | VALUE OF PROPERTY | PERSON OR ENTITY IN POSSESSION | ADDRESS & CONTACT INFORMATION |
|---|---|---|---|
| SURETY BOND - EXCAVATION PERMIT BOND | $3,000 | TOWN OF HUDSON | 2 CONSTITUTION DRIVE HUDSON, NH  03051 |
| SURETY BOND - EXCAVATION PERMIT BOND | $10,000 | TOWN OF EXETER, NH | ATTN:  RUSSELL DEAN 10 FRONT STREET EXETER, NH  03833 |
| SURETY BOND - EXCAVATION PERMIT BOND | $25,000 | TOWN OF WINDSOR, VT | PO BOX 47 / 29 UNION STREET WINDSOR, VT  05086 |
| SURETY BOND - PERMIT BOND FOR RIGHT OF WAY WORK | $10,000 | TOWN OF CONWAY, NH | ATTN:  PAUL DEGLIANGELI 1634 EAST MAIN STREET CENTER CONWAY, NH  03813 |
| SURETY BOND - EXCAVATION PERMIT BOND | $10,000 | CITY OF MANCHESTER, NH | ATTN:  RECORDS DEPT 227 MAPLE STREET MANCHESTER, NH  03103 |
| SURETY BOND - PERMIT BOND | $10,000 | TOWN OF SCARBOROUGH, ME | ATTN:  PUBLIC WORKS 20 WASHINGTON AVENUE SCARBOROUGH, ME  04074 |
| SURETY BOND - PERMIT BOND | $10,000 | TOWN OF HANOVER, NH | ATTN:  PUBLIC WORKS DEPT PO BOX 483 / 194 LEBANON STREET HANOVER, NH  03755 |
| SURETY BOND - PERMIT BOND FOR RIGHT OF WAY WORK | $10,000 | TOWN OF SOUTH BURLINGTON, VT | DEPT OF PUBLIC WORKS 645 PINE STREET, SUITE A SOUTH BURLINGTON, VT 05401 |
| SURETY BOND - PERMIT BOND | $10,000 | VILLAGE OF WOODSTOCK, VT | PO BOX 488 WOODSTOCK, VT  05091 |
| SURETY BOND - EXCAVATION PERMIT BOND | $10,000 | TOWN OF DERRY, NH | ATTN:  PUBLIC WORKS DEPT 14 MANNING STREET DERRY, NH  03038 |
| SURETY BOND - LANDSCAPING PERMIT BOND | $12,000 | TOWN OF STOWE, VT | ATTN: LINDA KELLY PO BOX 730 STOWE, VT  05672 |
| SURETY BOND - LANDSCAPING PERMIT BOND | $2,500 | CITY OF SOUTH BURLINGTON, VT | ATTN:  PUBLIC WORKS DEPT 575 DORSET STREET SOUTH BURLINGTON, VT  05403 |
| SURETY BOND - TOLL PAYMENT BOND | $25,000 | MAINE TURNPIKE AUTHORITY | SPEARS CORNER ROAD GARDINER, ME  04345 |
| SURETY BOND - PERMIT FOR STREET OPENING | $10,000 | TOWN OF BARRE | DEPT OF PUBLIC WORKS PO BOX 116 / 129 WEBSTERVILLE ROAD WEBSTERVILLE, VT  05678 |
| SURETY BOND - EXCAVATION PERMIT | $10,000 | TOWN OF SEABROOK | ATTN: JO-ANN PAGE PO BOX 456 / 43 RAILROAD AVE SEABROOK, NH  03874 |

| TYPE OF PROPERTY | VALUE OF PROPERTY | PERSON OR ENTITY IN POSSESSION | ADDRESS & CONTACT INFORMATION |
|---|---|---|---|
| SURETY BOND - EXCAVATION PERMIT | $15,000 | CITY OF ROCHESTER | ATTN: TOM WILLIS, DEPT. OF PUBLIC WORKS<br>45 OLD DOVER RD.<br>ROCHESTER, NH  03867 |
| SURETY BOND - EXCAVATION PERMIT | $4,000 | CITY OF BIDDEFORD | 371 HILL STREET<br>BIDDEFORD, ME  04005 |
| SURETY BOND - EXCAVATION PERMIT | $10,000 | STATE OF NH, DEPARTMENT OF TRANSPORTATION BUREAU OF TURNPIKES | ATTN:  ANDREW O'SULLIVAN<br>36 HACKETT HILL ROAD<br>HOOKSETT, NH  03106 |
| SURETY BOND - UTILITY DEPOSIT BOND | $10,000 | WOODFORD CO., IL | 1ST FLOOR COURTHOUSE<br>115 NORTH MAIN STREET, SUITE 103<br>EUREKA, IL 61530 |
| LAND USE PERMIT BOND | $100,000 | VA DEPT. OF TRANSPORTATION | 19281 US HIGHWAY 29/P.O. BOX309<br>CHATHAM, VA 24531 |
| SURETY BOND - MAINTENANCE BOND | $5,000 | AL DEPT. OF TRANSPORTATION | ATTN: LARRY SAUNDERS, ALABAMA DOT<br>P.O. BOX 322<br>ANDALUSIA, AL 36420 |
| SURETY BOND - LOST INSTRUMENT BOND | $76,000 | GERMANTOWN INDEPENDENT TELEPHONE COMPANY | 36 PLUM STREET<br>GERMANTOWN, OH 45327 |
| SURETY BOND - LOST INSTRUMENT BOND | $83,600 | GERMANTOWN INDEPENDENT TELEPHONE COMPANY | 36 PLUM STREET<br>GERMANTOWN, OH 45327 |
| SURETY BOND - LOST INSTRUMENT BOND | $83,600 | GERMANTOWN INDEPENDENT TELEPHONE COMPANY | 36 PLUM STREET<br>GERMANTOWN, OH 45327 |
| SURETY BOND - LOST INSTRUMENT BOND | $54,720 | GERMANTOWN INDEPENDENT TELEPHONE COMPANY | 36 PLUM STREET<br>GERMANTOWN, OH 45327 |
| SURETY BOND - RIGHT-OF-WAY BOND | $50,000 | MIAMI COUNTY, KS PUBLIC WORKS UTILITY | 201 SOUTH PEARL, SUITE 203<br>PAOLA, KS 66071 |
| SURETY BOND - POLE ATTACHMENT BOND | $7,720 | NIAGARA MOHAWK POWER | 300 ERIE BLVD. WEST<br>SYRACUSE, NY 13202 |
| SURETY BOND - BLANKET - RIGHT-OF-WAY BOND | $10,000 | CITY OF ELLENSBURG PUBLIC WORKS DEPT.. WA | PUBLIC UTILITIES WORKS<br>501 NORTH ANDERSON STREET<br>ELLENSBURG, WA 98926 |

| TYPE OF PROPERTY | VALUE OF PROPERTY | PERSON OR ENTITY IN POSSESSION | ADDRESS & CONTACT INFORMATION |
|---|---|---|---|
| SURETY BOND - RIGHT-OF-WAY BOND | $20,000 | JOHNSON COUNTY, MO | ATTN: GILBERT POWERS, COUNTY CLERK<br>335 E NORTH STREET<br>WARRENSBURG, MO 64093 |
| SURETY BOND - RIGHT-OF-WAY PERMIT BOND | $2,500 | STATE OF KANSAS | DWIGHT D. EISENHOWER STATE OFFICE BUILDING<br>700 S.W. HARRISON STREET<br>TOPEKA, KS 66603-3754 |
| SURETY BOND - RIGHT-OF-WAY PERMIT BOND | $1,000 | MO DEPT. OF TRANSPORTATION | 303 NORTH JEFFERSON<br>KEARNY, MO 64060 |
| SURETY BOND - RIGHT-OF-WAY BOND | $5,000 | CASS CO. ROAD & BRIDGE, MO | 305 NORTH MAIN TERRANCE<br>HARRISONVILLE, MO 64701-1758 |
| SURETY BOND - SUBDIVISION BOND | $1,000 | CITY OF GARDEN CITY, MO | CITY OF GARDEN CITY<br>107 NORTH 3RD STREET/P.O. BOX 20<br>GARDEN CITY, MO 64747 |
| SURETY BOND - RIGHT-OF-WAY BOND | $5,000 | MO DEPT. OF TRANSPORTATION | CENTRAL OFFICE<br>105 WEST CAPITOL/P.O. BOX 270<br>JEFFERSON CITY, MO 65102-0270 |
| SURETY BOND - LICENSE & PERMIT BOND | $5,000 | STATE OF WASHINGTON | DEPARTMENT OF PUBLIC WORKS<br>P.O. BOX 48319<br>OLYMPIA, WA 98504-3029 |
| SURETY BOND - CONTRACTOR'S LICENSE BOND | $12,000 | STATE OF WASHINGTON | DEPARTMENT OF PUBLIC WORKS<br>P.O. BOX 48319<br>OLYMPIA, WA 98504-3029 |
| SURETY BOND - ELECTRICAL CONTRACTOR'S LICENSE BOND | $4,000 | DEPT. OF LABOR & INDUSTRIES ELECTRICAL PROGRAM | WASHINGTON STATE DEPT. OF LABOR AND INDUSTRIES<br>7273 LINDERSON WAY SW<br>TURNWATER, WA 98501-5414 |
| SURETY BOND - LICENSE FOR COLLECTING MONEY BOND | $2,500 | STATE OF FL | FLORIDA PUBLIC SERVICE COMMISSION<br>2540 SHUMARD OAK BLVD.<br>TALLAHASSEE, FL 32399-0850 |
| SURETY BOND - POLE ATTACHMENT BOND | $10,000 | CENTRAL ILLINOIS PUBLIC SERVICE | 607 E. ADAMS STREET<br>SPRINGFIELD, IL 62739 |
| SURETY BOND - POLE ATTACHMENT BOND | $2,340 | VERIZON | 158 STATE STREET<br>ALBANY, NY 12207 |
| SURETY BOND - PERMIT BOND | $10,000 | TOWN OF KENNEBUNK, ME | ATTN: ETHELYN MARTHIA<br>1 SUMMER STREET<br>KENNEBUNK, ME 04043 |

| TYPE OF PROPERTY | VALUE OF PROPERTY | PERSON OR ENTITY IN POSSESSION | ADDRESS & CONTACT INFORMATION |
|---|---|---|---|
| SURETY BOND - PERFORMANCE BOND | $1,000,000 | STATE OF NEW HAMPSHIRE | ATTN: MARK WHITTEMORE, ROOM 250 JOM BUILDING 7 HAZEN DRIVE CONCORD, NH 03302 |
| SURETY BOND – RIGHT OF WAY | $4,000 | NEW YORK STATE DEPT. OF TRANSPORTATION | NEW YORK STATE DEPARTMENT OF TRANSPORTATION, REGION 8 PERMIT OFFICE 4 BURNETT BLVD. POUGHKEEPSIE, NY 12601 |
| SURETY BOND - EXCAVATION PERMIT | $5,000 | CITY OF LEBANON | PUBLIC WORKS DEPARTMENT 20 SPENCER STREET LEBANON, NH 03766 |
| SURETY BOND - RIGHT-OF-WAY BOND | $2,000 | STATE OF NY, TRAFFIC & SAFETY | ATTN: PUBLIC TRANSPORTATION SAFETY BOARD 50 WOLF ROAD, POD 53 ALBANY, NY 12232 |

## SCHEDULE 6

### FAIRPOINT'S PROPERTY

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which FairPoint operates its businesses.[1]  In addition to the properties listed below, FairPoint owns, leases, and/or possesses various switching facilities, collocation facilities, networking stations, central offices, easements, rights of way, towers, warehouses and/or similar sites and facilities necessary to its business operations throughout the United States.

### OWNED PROPERTIES

| DEBTOR | LOCATION OF PROPERTY |
|---|---|
| BENTLEYVILLE COMMUNICATIONS CORPORATION | 608 MAIN STREET BENTLEYVILLE, PA 15314 |
| BERKSHIRE TELEPHONE CORPORATION | 19 BROAD STREET KINDERHOOK, NY 12106 |
| CHAUTAUQUA AND ERIE TELEPHONE CORPORATION. | 30 MAIN STREET WESTFIELD, NY 14787 |
| COMMUNITY SERVICE TELEPHONE CO. | 117 MAIN STREET WINTHROP, ME 04364 |
| ELLENSBURG TELEPHONE COMPANY | 305 NORTH RUBY STREET ELLENSBURG, WA 98928 |
| EXOP OF MISSOURI, INC. | 303 NORTH JEFFERSON KEARNEY, MO 64060 |
| GTC , INC. | 115 WEST DREW STREET PERRY, FL. 32347 |
| GTC, INC. | 1262 FIFTH STREET FLORALA, AL 36442 |
| GTC, INC. | 502 CECIL G. COSTIN SR. BLVD. PORT ST. JOE, FL 32456 |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC | 770 ELM STREET MANCHESTER, NH 03101 |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC | 59 PARK STREET BANGOR, ME 04401 |
| NORTHLAND TELEPHONE COMPANY OF MAINE, INC. | 627 ROUTE 3 SOUTH CHINA, ME 04926 |
| NORTHLAND TELEPHONE COMPANY OF MAINE, INC. | 19 WEST MAIN STREET FORT KENT, ME 04743 |
| SUNFLOWER TELEPHONE COMPANY, INC. | 908 FRONTVIEW DODGE CITY, KS 67801 |
| THE COLOMBUS GROVE TELEPHONE | 112 WEST SYCAMORE STREET |

---

[1]     The classification of the contractual agreements listed herein as real property leases or leased property is not binding upon FairPoint.

| DEBTOR | LOCATION OF PROPERTY |
|---|---|
| COMPANY | COLUMBUS GROVE, OH 45830 |
| THE GERMANTOWN INDEPENDENT TELEPHONE COMPANY | 36 NORTH PLUM STREET GERMANTOWN, OH 45327 |
| YCOM NETWORKS, INC. | 106 2ND STREET SE YELM, WA 98597 |

**LEASED PROPERTIES**

| DEBTOR | LOCATION OF PROPERTY |
|---|---|
| EXOP OF MISSOURI, INC. | 1211 HIGHWAY 62 PLATTE CITY, MO 64079 |
| FAIRPOINT COMMUNICATIONS, INC. | 521 EAST MOREHEAD STREET SUITE 500 CHARLOTTE, NC 28202 |
| FREMONT TELCOM CO. | 110 EAST MAIN STREET ST. ANTHONY, ID 83445 |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC | 1 DAVIS FARM ROAD PORTLAND, ME 04103 |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC. | 900 ELM STREET MANCHESTER, NH 03101 |
| TELEPHONE OPERATING COMPANY OF VERMONT LLC | 800 HINESBURG ROAD SOUTH BURLINGTON, VT 06403 |
| UTILITIES, INC. | 155 GANNETT DRIVE SOUTH PORTLAND, ME 04106 |

# SCHEDULE 7

## LOCATION OF FAIRPOINT'S ASSETS, BOOKS AND RECORDS

Pursuant to Local bankruptcy Rule 1007-2(a)(10), the following lists the locations of FairPoint's substantial assets and the location of their books and records.

## LOCATION OF FAIRPOINT'S SUBSTANTIAL ASSETS

FairPoint has assets located in the states of Maine, New Hampshire, Vermont, Florida, New York, Washington, Missouri, Ohio, Virginia, Kansas, Illinois, Idaho, Pennsylvania, Oklahoma, Colorado, Massachusetts, Georgia, Alabama and North Carolina.

## FAIRPOINT'S BOOKS AND RECORDS

FairPoint's books and records are primarily maintained at the following locations:

| |
|---|
| 521 EAST MOREHEAD STREET, SUITE 500<br>CHARLOTTE, NC 28202 |
| 155 GANNETT DRIVE<br>SOUTH PORTLAND ME 04106 |
| 908 WEST FRONTVIEW STREET<br>DODGE CITY, KS 67801 |
| 770 ELM STREET<br>MANCHESTER, NH 03101 |
| 59 PARK STREET<br>BANGOR, ME 04401 |

# SCHEDULE 8

## LITIGATION COMMENCED AGAINST FAIRPOINT

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following is a list of the nature and status of each action or proceeding against FairPoint or its properties where a judgment against FairPoint or a seizure of its property may be imminent.

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| ABLETT V. FAIRPOINT COMMUNICATIONS<br><br>NEW HAMPSHIRE SUPERIOR COURT, STRAFFORD COUNTY - 219-2009-CV-00139 | CLAIM FOR CREDIT INJURY | PENDING |
| ADNIL SERVICES V. FAIRPOINT<br><br>MAINE DISTRICT COURT (SMALL CLAIMS) - SC-09-287 | SERVICE DISPUTE | PENDING |
| ANN CASTELLEZ – IBEW LOCAL 2320<br><br>AMERICAN ARBITRATION ASSOCIATION # 11 300 01231 09 | LABOR DISPUTE | PENDING |
| BIDDEFORD INTERNET CORPORATION D/B/A GREAT WORKS INTERNET V. FAIRPOINT COMMUNICATIONS, INC.<br><br>MAINE PUBLIC UTILITIES - 2008-248 | BILLING DISPUTE | PENDING |
| BIDDEFORD INTERNET CORPORATION V. NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC<br><br>U.S. DISTRICT COURT (D. ME) 2:09-CV-00468 | SERVICE DISPUTE | |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| CALEIDOSCOPE COMMUNICATIONS CORP. V. FAIRPOINT COMMUNICATIONS, INC.<br><br>U.S. DISTRICT COURT, VERMONT - 1:08-CV-279 | CONTRACT ACTION / MISREPRESENTATION | PENDING |
| CATHLEEN ADAMS TERMINATION – IBEW, LOCAL 2327<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 00910 08 | LABOR DISPUTE | PENDING |
| CATHLEEN ADAMS V. NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC<br>UNITED STATES DISTRICT COURT MAINE -08-CV 296 | EEOC CLAIM | PENDING |
| CITY OF CONCORD V. NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC<br><br>STATE OF NEW HAMPSHIRE, MERRIMACK SUPERIOR COURT - 08-E-0252 | DISPUTE OVER COST OF MOVING UTILITIES | PENDING |
| CONTRACTING OUT BARGAINED FOR WORK – IBEW, LOCAL 2327 (MAINE)<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 00357 09 | LABOR DISPUTE | PENDING |
| CONTRACTING OUT BARGAINED FOR WORK – IBEW, LOCAL 2327 (MAINE)<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 00358 09 | LABOR DISPUTE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| CONTRACTING OUT BARGAINED FOR WORK – IBEW, LOCAL 2327 (MAINE)<br><br>AMERICAN ARBITRATION ASSOCIATION#11 300 00359 09 | LABOR DISPUTE | PENDING |
| CONTRACTING OUT BARGAINED FOR WORK IN NH CENTRAL OFFICES – IBEW LOCAL 2320, 1280-07, 23638-840<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 01280 07 | LABOR DISPUTE | PENDING |
| DANA REED – IBEW LOCAL 2320 (NH)<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 01048 08 | LABOR DISPUTE | PENDING |
| DIANA PROKOCIMER V. FAIRPOINT COMMUNICATIONS<br><br>NEW HAMPSHIRE COMMISSION FOR HUMAN RIGHTS - EEOC CHARGE #523-2009-01096 | EMPLOYMENT DISPUTE | PENDING |
| FINEST PAINTING LLC V. FAIRPOINT COMMUNICATIONS<br><br>PORTSMOUTH DISTRICT COURT, ROCKINGHAM COUNTY, NH DISTRICT CT. - 09-CV-023 | SERVICE DISPUTE | PENDING |
| FRED BROWN – IBEW LOCAL 2327<br><br>AMERICAN ARBITRATION ASSOCIATION# 11300 00025 09 | LABOR DISPUTE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| FREEDOM RING COMMUNICATIONS LLC (BAYRING)<br><br>NEW HAMPSHIRE PUBLIC UTILITIES - 09-039 | SERVICE DISPUTE | PENDING |
| GAY V. DUBE, ET AL.<br><br>YORK COUNTY (MAINE) SUPERIOR COURT - AP-06-47 | EASEMENT DISPUTE – FAIRPOINT IS A NOMINAL DEFENDANT | PENDING |
| INESTA HUNTER<br><br>NEW HAMPSHIRE COMMISSION FOR HUMAN RIGHTS<br>EEOC CHARGE #16D-2009-00151/FEPA CHARGE #ESC(H)(R)0147-09 | EMPLOYMENT DISPUTE | PENDING |
| ISIDORO M. FLORES V. FAIRPOINT COMMUNICATIONS, INC.<br><br>NEW HAMPSHIRE COMMISSION FOR HUMAN RIGHTS - FEPA CHARGE EA 0210-09, EEOC CHARGE #160-2009-00237 | EMPLOYMENT DISPUTE | PENDING |
| KAREN PULKKIEN V. FAIRPOINT COMMUNICATIONS, INC. AND VERIZON NEW ENGLAND, INC.<br><br>MAINE FEDERAL DISTRICT COURT | EMPLOYMENT DISPUTE | PENDING |
| KIMBERLY TALBOT – IBEW, LOCAL 2327 (MAINE)<br><br>AMERICAN ARBITRATION ASSOCIATION#11 300 01355 09<br>GRIEVANCE # S02-13-08 | LABOR DISPUTE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| MANAGEMENT NOT ALLOWING DAY-AT-A-TIME VACATIONS – IBEW LOCAL 2320<br><br>AMERICAN ARBITRATION ASSOCIATION# 11 300 01318 09<br>GRIEVANCE # FP 09-01 | LABOR DISPUTE | PENDING |
| MICHAEL POTO, IBEW LOCAL 2327<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 00403 02 | LABOR DISPUTE | PENDING |
| MICHAEL POTO<br><br>MAINE HUMAN RIGHTS COMMISSION. DOCKET NO. E09 | LABOR DISPUTE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. CITY OF CLAREMONT<br><br>SUPERIOR COURT, STATE OF NEW HAMPSHIRE, COUNTY OF SULLIVAN - 07-E-0058 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. CITY OF CONCORD<br><br>STATE OF NEW HAMPSHIRE SUPERIOR COURT, COUNTY OF MERRIMACK - 00-E-0151 (LEAD CASE) CONSOLIDATED WITH 01-E-0324; 02-E-0255; 03-E-0292; 04-E-0320; 05-E-0347; 06-E-0280; 07-E-0352; 08-E-0300 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. CITY OF DOVER<br><br>STATE OF NEW HAMPSHIRE SUPERIOR COURT, | PROPERTY TAX ABATEMENT CASE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| STAFFORD COUNTY - 08-E-0221; 07-E-1085; 06-E-0151 | | |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. CITY OF LEBANON<br><br>STATE OF NEW HAMPSHIRE, GRAFTON SUPERIOR COURT - 08-E-0211 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF CONWAY<br><br>STATE OF NEW HAMPSHIRE SUPERIOR COURT, CARROLL COUNTY - 08-E-0104; 07-E-0147; 06-E-0105; 05-E-0106; 04-E-1027; 03-E-0100; 02-E-0096; 01-E-0159; 01-E-0079 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF HINSDALE<br><br>STATE OF NEW HAMPSHIRE SUPERIOR COURT, CHESIRE COUNTY - 06-E-0117; 07-E-0158; 08-E-0137 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF HUDSON<br><br>STATE OF NEW HAMPSHIRE SUPERIOR COURT, HILLSBOROUGH COUNTY - 01-E-0387; 02-E-0297; 03-E-0285; 05-E-0291; 06-E-0152; 06-E-0270; 07-E-0315; 08-E-0334 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF KINGSTON<br><br>STATE OF NEW HAMPSHIRE SUPERIOR COURT, ROCKINGHAM COUNTY - 08-E-0435 | PROPERTY TAX ABATEMENT CASE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF PLAISTOW<br><br>STATE OF NEW HAMPSHIRE, ROCKINGHAM SUPERIOR COURT - 08-E-0436 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF RAYMOND<br><br>STATE OF NEW HAMPSHIRE, ROCKINGHAM SUPERIOR COURT - 07-E-0433; 08-E-0437 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF SALEM<br><br>STATE OF NEW HAMPSHIRE, ROCKINGHAM SUPERIOR COURT - 07-E-0434; 08-E-439 | PROPERTY TAX ABATEMENT CASE | PENDING |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC V. TOWN OF SEABROOK<br><br>STATE OF NEW HAMPSHIRE SUPERIOR COURT - 06-E-0458; 07-E-431; 08-E-434 | PROPERTY TAX ABATEMENT CASE | PENDING |
| ONE COMMUNICATIONS CORP. V. JP MORGAN SBIC LLC<br><br>SECOND CIRCUIT COURT OF APPEALS - NO. 09-1815-CV | BILLING DISPUTE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| PACITA DIVASTA AS EXECUTRIX OF THE ESTATE OF PAUL DIVASTA V NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC ET AL.<br><br>STATE OF NEW HAMPSHIRE, ROCKINGHAM SUPERIOR COURT - 08-C-744 | TORT CLAIM | PENDING |
| PAGE V. FAIRPOINT COMMUNICATIONS<br><br>KEENE (NH) SUPERIOR COURT | SERVICE DISPUTE | PENDING |
| PALMER DEVELOPMENT CORP. V. FAIRPOINT COMMUNICATIONS, INC.<br><br>MAINE DISTRICT STATE COURT – SOUTH PARIS, ME – SMALL CLAIMS | SERVICE DISPUTE | PENDING |
| PERRY E. PARKER V. FAIRPOINT COMMUNICATIONS<br><br>VERMONT PUBLIC SERVICE BOARD - PSB DOCKET NO. 7354 | VERMONT PUBLIC SERVICE BOARD PROCEEDING | PENDING |
| POSTED PAY RATE CHANGED AFTER JOB AWARDED – IBEW LOCAL 2326<br><br>AMERICAN ARBITRATION ASSOCIATION # 11 300 01166 09 | LABOR DISPUTE | PENDING |
| RACK AND STACK<br><br>AMERICAN ARBITRATION ASSOCIATION# 11 300 01317 09<br>GRIEVANCE # 07-23 | LABOR DISPUTE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| RENANDER V. FAIRPOINT<br><br>CUMBERLAND COUNTY DISTRICT COURT - SC-2009-617 | SERVICE DISPUTE | PENDING |
| RICHARD WALLINGFORD - IBEW, LOCAL 2327 (MAINE)<br><br>AMERICAN ARBITRATION ASSOCIATION# 11 300 01189 09<br>GRIEVANCE # P03-03-08 | LABOR DISPUTE | PENDING |
| SEAN JENKS – IBEW LOCAL 2320 (NH)<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 01047 08 | LABOR DISPUTE | PENDING |
| STOCKHOLDER REPRESENTATIVE COMMITTEE V. ONE COMMUNICATIONS CORP. ET AL.,<br>DOCKET NO. 1:07-CV-05440-LTS (LEAD CASE: 1:07-CV-03905-LTS)<br><br>UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | BILLING DISPUTE | PENDING |
| STOCKHOLDER REPRESENTATIVE COMMITTEE V. ONE COMMUNICATIONS CORP. ET AL.<br><br>SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK - INDEX NO. 601421-07 | BILLING DISPUTE | PENDING |
| STOCKHOLDER REPRESENTATIVE COMMITTEE, ON BEHALF OF CERTAIN FORMER STOCKHOLDERS OF | BILLING DISPUTE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| LIGHTSHIP HOLDING, INC. V. ONE COMMUNICATIONS CORP.<br><br>SECOND CIRCUIT COURT OF APPEALS - 09-2324-CV | | |
| SYNERGENT ET AL V. NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC<br>MAINE PUBLIC UTILITIES COMMISSION - 2009 – 289 | SERVICE DISPUTE | PENDING |
| TECHNICIAN TRAVEL TREATMENT – IBEW LOCAL 2320 (NH)<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 00234 09 | LABOR DISPUTE | PENDING |
| THE NATIONAL EXCHANGE CARRIER ASSOCIATION, INC. V. DEUTSCHE BANK, N.A., ET AL.<br><br>SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, MORRIS COUNTY - MRS-L-2617-07 | ACTION ARISES OUT OF THE SALE OF CLAIMS | PENDING |
| THOMASINA HOWARD<br><br>NEW HAMPSHIRE COMMISSION FOR HUMAN RIGHTS<br>ES(H)(R)0002-09/16D-2008-00321 | EMPLOYMENT ACTION | PENDING |
| TODD GARDNER<br><br>AMERICAN ARBITRATION ASSOCIATION# 11 300 00948 09 | LABOR DISPUTE | PENDING |

| ACTION OR PROCEEDING | NATURE OF ACTION | STATUS OF ACTION |
|---|---|---|
| VIOLATION OF BUS DUCT AGREEMENT – IBEW LOCAL 2327<br><br>AMERICAN ARBITRATION ASSOCIATION#11 300 02260 07 | LABOR DISPUTE | PENDING |
| WENDY KILE V. FAIRPOINT COMMUNICATIONS<br><br>UNITED STATES DISTRICT COURT, DISTRICT OF MAINE - CIVIL ACTION NO. 09-CV-15 | EEOC CLAIM | PENDING |
| ZACHARY WEISLEDGER, IBEW LOCAL 2327 (MAINE)<br><br>AMERICAN ARBITRATION ASSOCIATION #11 300 00024 09 | LABOR DISPUTE | PENDING |
| ZANTOW V. FAIRPOINT<br><br>MAINE DISTRICT COURT | COMMERCIAL DISPUTE | PENDING |
| PALMER DEVELOPMENT CORP. V. FAIRPOINT COMMUNICATIONS, INC.<br><br>MAINE DISTRICT STATE COURT – SOUTH PARIS, ME (SMALL CLAIMS) | SERVICE DISPUTE | PENDING |

# SCHEDULE 9

# FAIRPOINT'S SENIOR MANAGEMENT[1]

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise FairPoint's existing senior management, a description of their tenure with FairPoint and a brief summary of their relevant responsibilities and experience.

| NAME / POSITION | EXPERIENCE / RESPONSIBILITIES |
|---|---|
| DAVID L. HAUSER - *CHAIRMAN AND CHIEF EXECUTIVE OFFICER* | DAVID HAUSER JOINED FAIRPOINT AS CHIEF EXECUTIVE OFFICER AND CHAIRMAN IN JULY 2009 AFTER RETIRING AS GROUP EXECUTIVE AND CHIEF FINANCIAL OFFICER FROM DUKE ENERGY. HE BEGAN HIS 35-YEAR CAREER WITH DUKE IN 1973, WORKING FOR 20 YEARS IN VARIOUS ACCOUNTING POSITIONS, INCLUDING CONTROLLER. IN 1993 HE WAS NAMED VICE PRESIDENT OF PROCUREMENT SERVICES AND MATERIALS AND WAS PROMOTED INTO ROLES OF INCREASING RESPONSIBILITY INCLUDING SENIOR VICE PRESIDENT OF GLOBAL ASSET DEVELOPMENT AND TREASURER UNTIL HIS APPOINTMENT AS CHIEF FINANCIAL OFFICER IN 2003. MR. HAUSER HOLDS A BACHELOR OF ARTS DEGREE IN BUSINESS ADMINISTRATION FROM FURMAN UNIVERSITY IN SOUTH CAROLINA AND A MASTER OF BUSINESS ADMINISTRATION DEGREE FROM THE UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE. PRIOR TO HIS CURRENT ROLE AS CHAIRMAN, HAUSER SERVED ON FAIRPOINT'S BOARD OF DIRECTORS. HE IS A MEMBER OF THE BOARD FOR ENPRO INDUSTRIES, INC., AND A MEMBER OF THE BOARDS OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE, FURMAN UNIVERSITY AND THE NORTH CAROLINA BLUMENTHAL PERFORMING ARTS CENTER. HE IS ALSO A MEMBER OF THE BUSINESS ADVISORY COUNCIL FOR THE UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE AND THE NORTH CAROLINA ASSOCIATION OF CERTIFIED PUBLIC ACCOUNTANTS. |

---

[1] To meet the requirements of this Schedule 9, FairPoint has provided herein an overly inclusive list of their employees and, therefore, the characterization of "Senior Management" shall not be binding not considered an admission for any purpose.

| NAME / POSITION | EXPERIENCE / RESPONSIBILITIES |
|---|---|
| PETER G. NIXON – *PRESIDENT* | IN JULY 2007, MR. NIXON WAS APPOINTED AS FAIRPOINT'S PRESIDENT. PRIOR TO ASSUMING THIS ROLE, MR. NIXON HAD SERVED AS CHIEF OPERATING OFFICER SINCE NOVEMBER 2002. PREVIOUSLY, MR. NIXON WAS FAIRPOINT'S SENIOR VICE PRESIDENT OF CORPORATE DEVELOPMENT FROM FEBRUARY 2002 TO NOVEMBER 2002 AND PRESIDENT OF FAIRPOINT'S TELECOM GROUP FROM APRIL 2001 TO FEBRUARY 2002.  PRIOR TO THIS, MR. NIXON SERVED AS PRESIDENT OF FAIRPOINT'S EASTERN REGION TELECOM GROUP FROM JUNE 1999 TO APRIL 2001 AND PRESIDENT OF CHAUTAUQUA AND ERIE TELEPHONE CORPORATION (REFERRED TO AS C&E) FROM JULY 1997, WHEN FAIRPOINT ACQUIRED C&E, TO JUNE 1999.  FROM APRIL 1, 1989 TO JUNE 1997, MR. NIXON SERVED AS EXECUTIVE VICE PRESIDENT OF C&E.  FROM APRIL 1, 1978 TO MARCH 31, 1989, MR. NIXON SERVED AS VICE PRESIDENT OF OPERATIONS FOR C&E. MR. NIXON HAS SERVED AS THE PAST CHAIRMAN OF THE NEW YORK STATE TELECOMMUNICATIONS ASSOCIATION FROM JUNE 1996 TO JUNE 1998. |
| ALFRED C. GIAMMARINO - *EXECUTIVE VP  AND CHIEF FINANCIAL OFFICER* | IN SEPTEMBER 2008, MR. GIAMMARINO WAS APPOINTED AS FAIRPOINT'S EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER. PREVIOUSLY, MR. GIAMMARINO WAS EMPLOYED BY SENSUS METERING SYSTEMS, WHERE HE SERVED AS CHIEF FINANCIAL OFFICER FROM DECEMBER 2007 TO MAY 2008 AND AS A SENIOR FINANCIAL CONSULTANT FOR JULY AND AUGUST 2008.  BEFORE THAT, MR. GIAMMARINO WAS EMPLOYED AS EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF STRATOS GLOBAL CORPORATION FROM MAY 2004 TO SEPTEMBER 2007.  PRIOR TO THAT, MR. GIAMMARINO WAS EMPLOYED BY VERIZON COMMUNICATIONS INC., WHERE HE SERVED AS SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF VERIZON'S INTERNATIONAL AND INFORMATION SERVICES GROUP FROM JUNE 2000 TO DECEMBER 2003, AND WITH GTE CORPORATION, WHERE HE WAS SENIOR VICE PRESIDENT OF FINANCE AND PLANNING FROM 1998 TO 2000.  MR. GIAMMARINO IS CERTIFIED AS A PUBLIC ACCOUNTANT IN NEW YORK. |

| NAME / POSITION | EXPERIENCE / RESPONSIBILITIES |
|---|---|
| SHIRLEY J. LINN - *EXECUTIVE VP, SECRETARY AND GENERAL COUNSEL* | IN MARCH 2006, MS. LINN WAS APPOINTED AS FAIRPOINT'S EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL AND SECRETARY. PREVIOUSLY, MS. LINN SERVED AS FAIRPOINT'S SENIOR VICE PRESIDENT, GENERAL COUNSEL AND SECRETARY FROM SEPTEMBER 2004 TO MARCH 2006. MS. LINN HAS SERVED AS FAIRPOINT'S GENERAL COUNSEL SINCE OCTOBER 2000, VICE PRESIDENT SINCE OCTOBER 2000, AND SECRETARY SINCE DECEMBER 2000. PRIOR TO JOINING FAIRPOINT, MS. LINN WAS A PARTNER, FROM 1984 TO 2000, IN THE CHARLOTTE, NORTH CAROLINA LAW FIRM OF UNDERWOOD KINSEY WARREN & TUCKER, P.A., WHERE SHE SPECIALIZED IN GENERAL BUSINESS MATTERS, PARTICULARLY MERGERS AND ACQUISITIONS. |
| LISA R. HOOD - *SENIOR VP AND CORPORATE CONTROLLER* | IN FEBRUARY 2008, MS. HOOD WAS APPOINTED AS FAIRPOINT'S SENIOR VICE PRESIDENT AND CONTROLLER. IN ADDITION, MS. HOOD SERVED AS FAIRPOINT'S INTERIM CHIEF FINANCIAL OFFICER DURING THE PERIOD BETWEEN AUGUST 15, 2008, AND SEPTEMBER 2, 2008. PRIOR TO HER APPOINTMENT AS SENIOR VICE PRESIDENT AND CONTROLLER, MS. HOOD SERVED AS FAIRPOINT'S CHIEF OPERATING OFFICER – FAIRPOINT TELECOM GROUP FROM APRIL 2007 TO FEBRUARY 2008. MS. HOOD ALSO SERVED AS FAIRPOINT'S SENIOR VICE PRESIDENT AND CONTROLLER FROM JULY 2004 TO MARCH 2007 AND AS FAIRPOINT'S VICE PRESIDENT AND CONTROLLER FROM DECEMBER 1993 TO JULY 2004. PRIOR TO JOINING FAIRPOINT, MS. HOOD WAS EMPLOYED BY A LOCAL PUBLIC ACCOUNTING FIRM IN KANSAS FROM 1988 TO 1993. MS. HOOD IS CERTIFIED AS A PUBLIC ACCOUNTANT IN KANSAS. |

## SCHEDULE 10

## FAIRPOINT'S PAYROLL

   Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following summary provides the estimated amount of weekly payroll to FairPoint's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial consultants retained by FairPoint, for the thirty (30) day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **PAYMENTS TO EMPLOYEES (NOT INCLUDING OFFICERS, DIRECTORS AND STOCKHOLDERS)** | $5,999,573 (WEEKLY) |
| **PAYMENTS TO OFFICERS AND DIRECTORS** | $234,885 (30 DAYS) |
| **PAYMENTS TO STOCKHOLDERS** | NONE |
| **PAYMENTS TO FINANCIAL CONSULTANTS** | NONE |

## SCHEDULE 11

### CASH RECEIPTS AND DISBURSEMENTS, NET CASH GAIN OR LOSS, UNPAID OBLIGATIONS AND RECEIVABLES

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the thirty (30) day period following the filing of the chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **ESTIMATED CASH RECEIPTS** | $94,474,157 |
| **ESTIMATED CASH DISBURSEMENTS** | $67,051,321 |
| **ESTIMATED NET CASH GAIN OR LOSS** | $27,422,836 |
| **ESTIMATED OBLIGATIONS EXPECTED TO ACCRUE BUT REMAIN UNPAID (OTHER THAN PROFESSIONAL FEES)** | $11,037,973 (PROJECTED A/P AS OF 11/30/09) |
| **ESTIMATED RECEIVABLES EXPECTED TO ACCRUE BUT REMAIN UNPAID** | $95,201,908 (PROJECTED REVENUE FOR NOVEMBER 2009) |