Luc A. Despins, Esq.
James T. Grogan, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **FAIRPOINT COMMUNICATIONS, INC.,** *et al.*, | : | **Case No. 09-_____ (____)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

----------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTORS TO (I) OBTAIN POSTPETITION FINANCING
PURSUANT TO BANKRUPTCY CODE SECTION 364; (II) GRANT
PRIMING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO BANKRUPTCY
CODE SECTIONS 364(c) AND (d); (III) PROVIDE ADEQUATE PROTECTION
TO PREPETITION SECURED LENDERS PURSUANT TO BANKRUPTCY
CODE SECTIONS 361, 362, 363, AND 364 AND (IV) TO SCHEDULE
<u>FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

FairPoint Communications, Inc. ("<u>FairPoint Communications</u>") and its affiliated debtors,

as debtors-in-possession (collectively, "<u>FairPoint</u>"), respectfully represent:

## BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-1 CONCISE STATEMENT[1]

**THE DIP CREDIT AGREEMENT IS NOT ANNEXED HERETO BUT WILL BE FILED WITH THE BANKRUPTCY COURT BY NO LATER THAN 6:00 P.M. (EDT) ON OCTOBER 26, 2009. ATTACHED AS <u>EXHIBIT A</u> TO THIS MOTION IS A SENIOR SECURED DEBTOR-IN-POSSESSION REVOLVING CREDIT FACILITY TERM SHEET (THE "<u>DIP TERM SHEET</u>") WHICH SETS FORTH THE RELEVANT TERMS OF THE DIP FINANCING.**

1.     By this motion (the "<u>Motion</u>"), FairPoint requests entry of interim and final orders (the "<u>DIP Orders</u>") granting authorization to (i) obtain postpetition financing pursuant to section 364 of title 11, United States Code (the "<u>Bankruptcy Code</u>"); (ii) grant priming liens and superpriority claims pursuant to section 364 (c) and (d) of the Bankruptcy Code; (iii) provide adequate protection to prepetition secured lenders pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code (collectively, the "<u>DIP Financing</u>"); and (iv) schedule a final hearing (the "<u>Final Hearing</u>") pursuant to Fed. R. Bankr. P. 4001. Pending the Final Hearing, the DIP Financing will be implemented on an interim basis pursuant to the Senior Secured Debtor-In-Possession Revolving Credit Facility (the "<u>DIP Agreement</u>"), between FairPoint Communications and FairPoint Logistics, Inc., as borrowers (the "<u>Borrowers</u>"), and (i) each subsidiary of FairPoint Communications (the "<u>Subsidiary Guarantors</u>") that guaranteed the obligations of FairPoint Communications under the Prepetition Credit Agreement (as defined herein); and (ii) each of the other subsidiaries of FairPoint Communications that is not subject to regulation by a state public utility (the subsidiaries referenced in the foregoing clauses (i) and (ii) are collectively referred to herein as the "<u>Guarantors</u>"), as debtors and debtors-in-possession, and Bank of America ("<u>BoA</u>"), as administrative agent (the "<u>DIP Agent</u>") for the lenders party to the

---

[1] Capitalized terms used in this Concise Statement have the meanings ascribed to them in the DIP Agreement, unless otherwise defined herein.

DIP Revolving Facility (as defined herein) (collectively, the "DIP Lenders").  A copy of the proposed interim order (the "Interim Order") regarding the DIP Financing is attached as Exhibit B.

2.        Perhaps the most remarkable aspect of the proposed DIP Financing is what it does not provide for.  Indeed, the Proposed DIP Financing does not include any of the following:

a)        a cross collateralization provision that converts prepetition debt to administrative expense (or higher) status;

b)        a provision requiring FairPoint to pay accrued or current interest payments due under the Prepetition Credit Agreement as part of the adequate protection provided to the lenders under such agreement (the "Prepetition Secured Lenders");

c)        provisions which give the Prepetition Secured Lenders control over key issues in these cases, such as the filing of a plan of reorganization satisfactory to the Prepetition Secured Lenders; or

d)        a provision limiting FairPoint's use of borrowings under the DIP Financing to items contained in the budget.

3.        Material provisions of the DIP Financing are set out at the following sections of the DIP Term Sheet and/or the Interim Order:

a)        Borrowing Limits.  The DIP Lenders agree to make revolving loans (the "DIP Revolving Facility") available to the Borrower in an aggregate amount not to exceed $75,000,000 (the "Maximum Amount"), with a letter of credit subfacility in an aggregate amount of $30,000,000.  Availability under the DIP Revolving Facility shall (a) prior to the entry of a final DIP order (the "Final Order") be in an amount not to exceed $20,000,000; and (b) upon entry of the Final Order, be in an amount not to exceed the Maximum Amount.  DIP Term Sheet, DIP Credit Facilities, p. 2; Interim Order, ¶ 6(a).

b)        Interest Rate.  At the Borrower's option, at either (i) the Eurodollar Rate plus 4.50% or (ii) the Base Rate plus 3.50%.  For the purposes of the DIP Agreement, the term "Base Rate" means the greatest of (a) the rate of interest announced by BoA from time to time as its prime rate, (b) the Federal Funds Rate for such day, plus 0.50%, or (c) the Eurodollar Rate plus 1.00%.  Upon the occurrence and during the continuance of an Event of Default, at the election of the DIP Agent or non-defaulting DIP Lenders holding more than a

majority of the commitments thereunder (the "<u>Majority DIP Lenders</u>"), all obligations under the DIP Revolving Facility shall bear interest at a rate of 2.00% above the otherwise applicable rate. DIP Term Sheet, Interest Rate, p. 7.

c)    <u>Maturity</u>. Borrowings and other extensions of credit under the DIP Revolving Facility shall mature, be repayable in full, and the DIP Revolving Facility shall terminate on such date that is the earliest to occur of (i) the effective date of the confirmed Plan, (ii) nine (9) months after the Petition Date (which date may, at the request of the Borrowers and subject to the prior written consent of the Majority DIP Lenders, be extended by three (3) months (provided that the DIP Credit Parties shall not be required to pay any fee in connection with any such three (3) month extension)), and (iii) the date on which obligations under the DIP Revolving Facility are accelerated following the occurrence of an Event of Default. Upon the satisfaction of customary conditions precedent reasonably satisfactory to FairPoint and the DIP Lenders, all borrowings and other extensions of credit under the DIP Revolving Facility will roll into a revolving credit exit facility on terms reasonably satisfactory to the Debtors and the DIP Lenders providing such revolving credit exit facility. DIP Term Sheet, Maturity Date, p. 3.

d)    <u>Events of Default</u>. Events of default ("<u>Events of Default</u>") include provisions relating to: (i) the appointment of a trustee or examiner with expanded powers, or dismissal or conversion of any of the Cases; (ii) confirmation of any plan of reorganization or liquidation in any of the Cases other than the Plan; (iii) filing of a Chapter 11 plan of reorganization or liquidation by a person or entity other than FairPoint that does not require the payment in full, on the effective date thereof, of all extensions of credit under the DIP Revolving Facility (or, in the case of the letters of credit, cash collateralization of such letters of credit to the extent of 105% of the aggregate face amount thereof); (iv) FairPoint's failure to file the Plan as and when required under the terms of the DIP Agreement; (v) failure to obtain entry of a confirmation order from the Bankruptcy Court with respect to such plan by July 31, 2010; (vi) amendment (other than as consented by the DIP Agent and the requisite DIP Lenders) or stay of either of the Financing Orders or reversal, modification, or vacation of either of the Financing Orders, whether on appeal or otherwise; (vii) the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the DIP Collateral without the DIP Lenders' consent or any Debtor[2] seeking any financing under Section 364(d) of the Bankruptcy Code secured by any DIP Collateral that does not require the payment in full of all extensions of credit

---

[2] For the purposes hereof, "Debtors" shall mean, collectively, the DIP Credit Parties and each other subsidiary of a Borrower that is a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code.

under the DIP Revolving Facility (or, in the case of the letters of credit, such collateralization of such letters of credit to the extent of 105% of the aggregate face amount thereof); (viii) the challenge of a Debtor of (1) the validity, extent, perfection, or priority of any Liens of the Prepetition Agent with respect to any of the DIP Collateral or (2) the validity or enforceability of any of the Obligations (as defined in the Prepetition Credit Agreement); (ix) any Person holding a Lien upon any pre-petition or post-petition assets of any Debtor being granted relief from the automatic stay with respect to any DIP Collateral or any other asset of a Debtor where the aggregate value of the property subject to all such orders is greater than $10,000,000; or (x) Debtors and their Subsidiaries' cessation of all or any material part of their business operations (other than in any connection with a sale of assets consented to by the requisite DIP Lenders). DIP Term Sheet, Events of Default, p. 9; Interim Order, ¶ 17(b).

e) <u>Liens</u>. All Obligations of the DIP Credit Parties to the DIP Agent and the DIP Lenders shall be secured by (i) a perfected first-priority lien on all now owned or hereafter acquired assets of the DIP Credit Parties that are not subject to valid, perfected and non-avoidable liens as of the Petition Date, provided, however, that such lien and security interest shall not include, FCC Licenses and PUC (as such term is defined herein) to the extent that any DIP Credit Party is prohibited from granting a lien and security interest therein pursuant to applicable law, but such lien and security interest shall include, to the maximum extent permitted by law, all rights incident or appurtenant to the FCC licenses and the PUC (as defined herein) authorizations and the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of the FCC licenses and the PUC (as defined herein) authorizations (collectively, the "<u>First Lien Collateral</u>"); provided, further, that the First Lien Collateral shall not be subject to Causes of Action but, subject to the entry of the Final Order, the First Lien Collateral shall include any proceeds or property recovered in respect of any Causes of Action; and (ii) a perfected junior lien on all property of the DIP Credit Parties that is subject to valid, perfected and non-avoidable liens as of the Petition Date or to liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b); (iii) first-priority, senior priming perfected liens all assets that constitute collateral under the Prepetition Credit Agreement. DIP Term Sheet, Priority and Liens, Collateral, pp. 3-5; Interim Order, ¶ 8.

f) <u>Fees</u>. The Debtors will pay the following fees: (i) an unused line fee in the amount of 0.50% per annum, payable monthly in arrears based on the average daily unused portion of the DIP Revolving Facility; (ii) customary letter of credit fees, including a fee on each letter of credit payable monthly in arrears at a per annum rate of 4.50% (which fee will be adjusted upwards by 200 basis points during any period that an Event of Default has occurred and is

continuing); (iii) an Upfront Fee to the DIP Agent for the account of each DIP Lender in an amount equal to 2.0% of the Maximum Amount; and (iv) fees to Banc of America Securities LLC and BoA pursuant to that certain engagement letter between and among FairPoint, Banc of America LLC and BoA, dated October 2009. DIP Term Sheet, Unused Line Fee, p. 6, Letter of Credit Fees, pp. 6-7, Other Fees, p. 7; Interim Order, ¶¶ 6(b), 6(b)(iii), 14(c).

4.      The provisions described in Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out at the following sections of the DIP Term Sheet and the Interim Order:

(i)      ***Grant of priority or a lien on property of the estate***.  DIP Term Sheet, Priority and Liens; Collateral, pp. 3-5; Interim Order ¶¶ 7, 8.

(ii)     ***Adequate protection or priority for a claim that arose before the commencement of the case***.  DIP Term Sheet, Adequate Protection, pp. 5-6; Interim Order, ¶ 14.

(iii)    ***Waiver or modification of the automatic stay***.  DIP Term Sheet, Remedies, pp. 9-10; Interim Order, ¶ 10.

(iv)     ***Waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request use of cash collateral, or request authority to obtain credit***.  DIP Term Sheet, Events of Default, p. 9; Interim Order, ¶ 6(b)(iv).

(v)      ***Establishment of deadlines for filing a plan, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order***.  DIP Term Sheet, Events of Default, p. 9; Interim Order, ¶ 6(b)(iv).

(vi)     ***Indemnification of any entity***.  DIP Term Sheet, Indemnity, pp. 12-13; Interim Order, ¶ 21.

(vii)    ***Release, waiver or limitation on rights under Section 506(c).***  DIP Term Sheet, Financing Orders, pp. 11-12; Interim Order, ¶ 11.

(viii)   ***Liens granted on claims arising under Chapter 5***.  DIP Term Sheet, Priority and Liens; Collateral, pp. 3-5; Interim Order, ¶ 8(a).

5.     In addition, the provisions described in Rule 4001-2(a) of the Local Bankruptcy Rules, to the extent applicable, are set out in the following sections of the DIP Term Sheet and the Interim Order:

(i)     ***Material conditions to closing and borrowing, including budget provisions.***  DIP Term Sheet, Budget, p. 3, Conditions Precedent, pp. 10-11; Interim Order, ¶¶ 3, 6(b).

(ii)     ***Pricing and economic terms, including letter of credit fees, commitment fees, any other fees, and the treatment of costs and expenses of the lender, any agent for the lender, and their respective professionals***.  DIP Term Sheet, Unused Line Fee, p. 6, Letter of Credit Fees, pp. 6-7, Other Fees, p. 7; Interim Order, ¶ 14(c).

(iii)     ***Any effect on existing liens of the granting of collateral or adequate protection provided to the lender and any priority or superpriority provisions***.  DIP Term Sheet, Priority and Liens, Collateral, pp. 3-5; Interim Order, ¶¶ 7, 8.

(iv)     ***Any carve-out from liens or superpriorities.***  DIP Term Sheet, Priority and Liens; Collateral, pp. 3-4; Interim Order, ¶ 7(b).

(v)     ***Any provision that would limit the Court's power or discretion in a material way, or would interfere with the exercise of the fiduciary duties, or restrict the rights and powers, of the trustee, debtor-in-possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code, or any fiduciary of the estate, in connection with the operation, financing, use or sale of the business or property of the estate, but excluding any agreement to repay postpetition financing in connection with a plan or to waive any right to incur liens that prime or are <u>pari passu</u> with liens granted under § 364</u>***.  DIP Term Sheet, Purpose/Use of Proceeds, pp. 2-3; Interim Order ¶ 20.

(vi)     ***Any limitation on the lender's obligation to fund certain activities of the trustee, debtor-in-possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code***.  DIP Term Sheet, Purpose/Use of Proceeds, pp. 2-3; Interim Order ¶ 20.

(vii) ***Termination or default provisions, including events of default, any effect of termination or default on the automatic stay or the lender's ability to enforce remedies, any cross-default provision, and any terms that provide that the use of cash collateral or the availability of credit will cease on (i) the filing of a challenge to the lender's prepetition lien or the lender's prepetition claim based on the lender's prepetition conduct; (ii) entry of an order granting relief from the automatic stay other than an order granting relief from the stay with respect to material assets; (iii) the grant of a change of venue with respect to the case or any adversary proceeding; (iv) management changes or the departure, from the debtor, of any identified employees; (v) the expiration of a specified time for filing a plan; or (vi) the making of a motion by a party in interest seeking any relief (as distinct from an order granting such relief).*** DIP Term Sheet, Events of Default, p. 8; Interim Order ¶ 10.

## JURISDICTION

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### General

7.      On the date hereof (the "Petition Date"), FairPoint commenced voluntary cases under chapter 11 of the Bankruptcy Code in this Court.  FairPoint continues to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      FairPoint has requested that its chapter 11 cases be consolidated for procedural purposes only and jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

**FairPoint's Businesses**

9.     FairPoint is a leading provider of communications services to residential and business customers in rural and small urban communities located in eighteen states. FairPoint operates the seventh largest local telephone company in the United States, based on the number of access lines, with approximately 1.7 million access line equivalents (including voice access lines and high speed data lines, which include digital subscriber lines, or DSL, wireless broadband and cable modem) in service as of June 30, 2009.

10.     FairPoint Communications is the direct or indirect parent company of each of the other debtors in these chapter 11 cases. FairPoint Communications was founded in 1991 and currently owns and operates thirty-three local exchange carriers ("LECs") located throughout the United States. Many of these local telephone companies have served their communities for more than 75 years. Through its LECs, FairPoint Communications offers its customers a broad array of services including, but not limited to, local telephone services, long distance services, data and Internet services, cable television and video services in certain markets, enhanced telephone services, billing and collection services, and telephone directory services.

11.     As of the date hereof, FairPoint has approximately 4,140 employees, including approximately 2,700 who are represented by labor unions. For the year ended December 31, 2008, FairPoint had revenues of approximately $1.3 billion on a consolidated basis. As of June 30, 2009, FairPoint's unaudited consolidated financial statements reflected assets with a book value totaling approximately $3.236 billion and liabilities totaling approximately $3.234 billion.

**The Verizon Transaction**

12.     On January 15, 2007, FairPoint Communications entered into an agreement with Verizon and Northern New England Spinco Inc. ("Spinco"), a subsidiary of Verizon, pursuant to

which FairPoint committed to purchase and assume Verizon's landline operations in the Northern New England region (collectively, the "NNE Operations"). After extensive federal and state regulatory review and approval, on March 31, 2008, FairPoint completed the merger with Spinco and the Company acquired the NNE Operations.

**Prepetition Funding of the Debtors' Operations**

**A.    The Prepetition Credit Agreement**

13.    In order to consummate the Verizon Merger, FairPoint entered into that certain Credit Agreement, dated as of March 31, 2008 (as amended, the "Prepetition Credit Agreement"), among FairPoint Communications, the Prepetition Secured Lenders, BoA, as administrative agent, and the other parties thereto. The Prepetition Credit Agreement provided for a $2.03 billion credit facility consisting of a revolver in an aggregate principal amount of $200 million, a term loan A facility in an aggregate principal amount of $500 million, a term loan B facility in the aggregate principal amount of $1.13 billion (together with the term loan A facility, the "Term Loans") and a delayed draw term loan in an aggregate principal amount of $200 million. Spinco drew approximately $1.16 billion under the Term Loans immediately prior to its spin-off from Verizon, the proceeds of which were paid to Verizon. FairPoint then drew approximately $470 million under the Term Loans and approximately $5.5 million under the delayed draw term loan concurrently with the closing of the merger. Since the merger closed, FairPoint has drawn the remaining $194.5 million under the delayed draw term loan.

14.    On October 5, 2008, the administrative agent under the Prepetition Credit Agreement, Lehman Commercial Paper, Inc. ("LCPI"), filed a petition for relief under chapter 11 of the Bankruptcy Code in this Court. Prior to its bankruptcy filing, LCPI initially had a remaining unfunded revolving commitment of approximately $60 million under the Prepetition

Credit Agreement. On January 21, 2009, FairPoint entered into an amendment to the Prepetition Credit Agreement under which the administrative agent resigned and was replaced by BoA, as administrative agent. At the time when LCPI filed for bankruptcy, FairPoint had drawn approximately $30 million of the total approximately $60 million remaining commitment. Pursuant to that certain First Amendment to the Prepetition Credit Agreement, dated January 21, 2009, the amount drawn by FairPoint was converted into a tranche loan with a bullet maturity (the "LCPI Loan"), and FairPoint effectively lost approximately $60 million from the total amount available under the revolver component of the Prepetition Credit Agreement. The LCPI Loan will mature on the same date as the prepetition revolver.

15. The revolver has a swingline subfacility in the amount of approximately $10 million and a letter of credit subfacility in the amount of approximately $30 million, which allows for issuances of letters of credit by FairPoint.

16. The Prepetition Credit Agreement also requires FairPoint to enter into interest rate and currency exchange swaps and similar arrangements with the lenders under the Prepetition Credit Agreement and/or their affiliates. As a result, FairPoint entered into various interest rate swap agreements (the "Swap Agreements") in order to limit the variability of its interest payments and to shield itself from interest rate cash flow risk. In an effort to fix a rate for a portion of its outstanding term debt, approximately 78% of FairPoint's interest payments were effectively calculated at fixed rates rather than variable rates as of December 31, 2008. Under the terms of the Swap Agreements, FairPoint makes a payment if the variable rate is below the fixed rate, or it receives a payment if the variable rate is above the fixed rate. Because of the precipitous decline in short-term interest rates resulting from the current economic downturn, as of the Petition Date, the fair market value of these swaps is a net liability of approximately $88

million, including unpaid amounts due on September 30, 2009. The payment obligations under these swap agreements are pari passu with the payment obligations under the Prepetition Credit Agreement.

17.     As of June 30, 2009, FairPoint had borrowed approximately $150 million under the revolver. including outstanding amounts under LCPI's revolver commitment, and letters of credit had been issued for approximately $17.9 million. Accordingly, as of June 30, 2009, the remaining amount available under the revolver was approximately $2.4 million. The Company also had pending commitments for additional letters of credit totaling approximately $1.5 million as of June 30, 2009.

18.     The term loan B facility and the delayed draw term loan will mature in March 2015 and the revolver, LPCI Loan, and the term loan A facility will mature in March 2014. The Term Loans and the delayed draw term loan are repayable in quarterly installments with minimum principal amortization of $45 million in 2009 and $45 million in 2010.

19.     The Prepetition Credit Agreement was guaranteed, jointly and severally, by all existing and subsequently acquired or organized wholly owned first-tier domestic subsidiaries of FairPoint that are holding companies. No guarantee was required of a subsidiary that is an operating company, including all of FairPoint's LECs. The NNE Operations (Northern New England Telephone Operations LLC, Telephone Operating Company of Vermont LLC and Enhanced Communications of Northern New England Inc.) are regulated operating subsidiaries and, therefore, were not guarantors under the Prepetition Credit Agreement. The Prepetition Credit Agreement was secured by, among other things, a first priority perfected security interest in all of the stock, equity interests, promissory notes, partnership interests and membership

interests owned by FairPoint Communications and certain of its subsidiaries, subject to certain enumerated carve-outs.

<b><u>Debtors' Proposed Postpetition DIP Agreements</u></b>

**A.      Need for Postpetition Financing**

20.      As explained more fully in the Declaration of Alfred C. Giammarino Pursuant to Rule 1007.2 of the Local Bankruptcy Rules For the Southern District of New York in Support of First-Day Motions, dated October 26, 2009, and filed simultaneously herewith (the "<u>First Day Declaration</u>"), since acquiring the NNE Operations from Verizon in 2008, FairPoint has faced a number of challenges which, taken together, have had a negative impact on its overall financial performance.  One of the primary challenges facing the Company is that it has yet to attain the performance projections made at the time it acquired the NNE Operations.  These financial performance problems have made it difficult for FairPoint to service the approximately $2.7 billion in funded debt obligations under, <u>inter</u> <u>alia</u>, the Prepetition Credit Agreement.  Interest costs on FairPoint's significant debt impose limitations on FairPoint's ability to create and offer new products and implement its strategic business plan, which are necessary steps to reverse the current downward trend of FairPoint's operating cash flows.  Further, the recent turmoil in the equity and credit markets has limited FairPoint's ability to attract potential investors or refinance debt.  Consumer spending has also deteriorated.

21.      As a result, FairPoint, with the assistance of its advisors, began to explore capital structure restructuring alternatives, including refinancing options, recapitalizations, and a potential chapter 11 filing.  After significant analysis and negotiations, FairPoint determined that a chapter 11 filing was in the best interest of its creditors.  To ensure that it could meet its obligations in the event that certain outstanding letters of credit are drawn upon, and to

demonstrate adequate liquidity to its vendors and customers, thus inspiring confidence to continue their respective business relationships with FairPoint, FairPoint determined, with the assistance of their financial advisors, Rothschild, Inc. ("Rothschild") that it requires postpetition financing as described herein.

**B.      Prepetition Efforts To Find Sources of DIP Financing and the DIP Agreement**

22.      Prior to the Petition Date, FairPoint and Rothschild surveyed various sources of postpetition financing.  To that end, and as further detailed in the Declaration of Neil A. Augustine in Support of the Motion, dated October 26, 2009 and annexed hereto as Exhibit C, Rothschild contacted seventeen (17) potential lenders in addition to FairPoint's existing senior lenders.  Of the potential lenders contacted, six (6) expressed potential interest, executed non-disclosure agreements, were provided with diligence materials sufficient to prepare debtor-in-possession financing proposals.  As of October 23, 2009, two (2) lenders submitted proposals regarding postpetition debtor-in-possession financing.  However, FairPoint and Rothschild determined that the terms of the DIP Financing proposed herein are superior to the terms under the proposals received by the two (2) potential lenders because borrowing from another postpetition lender or lending group that required security senior to the Prepetition Secured Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied.  Moreover, given the rapidly deteriorating general economic conditions and poor financial climate, FairPoint realized that sources of new capital, if available at all, were significantly more expensive than obtaining postpetition financing from the DIP Lenders.  FairPoint found that the pricing and fee structure of any alternative proposal would be, in the aggregate, less favorable than that offered by the DIP Lenders.

23.     Because FairPoint and its subsidiaries are regulated entities, they are limited under applicable state law in their ability to pledge assets to potential lenders.  Although FairPoint believes that federal bankruptcy law pre-empts applicable, but contrary, state law, FairPoint also believes that granting a new lien to potential postpetition secured creditors on regulated but unencumbered assets may create a significant dispute with certain public utility commissions (the "PUCs") as the liens of the Prepetition Secured Lenders were limited to primary liens upon only unregulated assets (pursuant to PUC regulations).

24.     In view of these circumstances, the DIP Lenders, who, as stated above, are also certain of the Prepetition Secured Lenders, were willing to extend postpetition financing on the terms and conditions described herein and thus prime their own prepetition interest without requiring liens on regulated assets.  Ultimately, FairPoint concluded that the DIP Agreement proposed by the DIP Lenders is desirable because, among other things, the DIP Agreement permits the Debtors to secure the postpetition financing required for their reorganization without having to prime the Prepetition Lenders through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code have been satisfied.

25.     In conjunction with the postpetition financing described herein, FairPoint has also obtained the Prepetition Secured Lenders' agreement on a term sheet which sets forth the terms of a restructuring under a plan or reorganization (the "Plan Term Sheet").  FairPoint anticipates filing a proposed plan of reorganization and disclosure statement implementing the Plan Term Sheet within forty-five (45) days after the Petition Date.

26.     The DIP Lenders, certain of whom are also Prepetition Secured Lenders, were willing to extend postpetition financing on the terms and conditions described herein and thus prime their own prepetition security interests.  Ultimately, FairPoint concluded that the DIP

Agreement proposed by the DIP Lenders is desirable because, among other things, the DIP Agreement permits FairPoint to secure the postpetition financing required for their reorganization without having to grant a lien on regulated assets.

27.     Additional information regarding FairPoint's business, capital structure, and the circumstances leading to this chapter 11 filing is set forth in the First Day Declaration.

## C.     Implementation of the DIP Agreement

28.     FairPoint and the DIP Lenders engaged in extensive, arms' length negotiations with respect to the terms and conditions of the proposed DIP Revolving Facility. These negotiations culminated in agreement upon the proposed financing, including the form of the DIP Agreement. Significantly, the DIP Agreement (as indicated in the DIP Term Sheet) allows FairPoint to draw immediately on a $20 million commitment from the DIP Lenders, pending this Court's entry of the Final DIP Order. This commitment will ensure that FairPoint will be able to meet all of their administrative obligations during the early stages of these chapter 11 cases as well as demonstrate adequate liquidity and instill confidence among its vendors and customers. Upon entry of the Final Order, FairPoint will be permitted to draw upon the DIP Revolving Facility in an aggregate amount not to exceed the Maximum Amount, with a letter of credit subfacility in an aggregate amount of $30 million.

29.     FairPoint and the DIP Lenders have agreed upon a budget (the "Budget"), annexed as Exhibit B to the Interim Order, projecting cash flow for thirteen weeks (the "Budget Period"). On a monthly basis, FairPoint will provide to the DIP Lenders an updated budget for the Budget Period in substantially the same format as the previous budget. At any time that either (i) the aggregate amount outstanding under the DIP Revolving Facility will be $25 million or more (exclusive of letters of credit) or (ii) the Budget, or any update to the Budget required to

be delivered by the Borrowers, forecasts that the aggregate amount outstanding under the DIP Revolving Facility will be $25 million or more (exclusive of letters of credit) at any time during the period covered by the Budget or such update, FairPoint will provide the DIP Agent and the DIP Lenders with weekly updates to the Budget. FairPoint believes that the Budget is achievable and will allow FairPoint to operate without the accrual of unpaid administrative expenses.

30. Because the DIP Agreement will contain all of the material terms and conditions for the financing described here, FairPoint and the DIP Lenders anticipate that they will be able to close on the DIP Agreement no later than five (5) days after entry of the Interim Order. FairPoint will file the Final DIP Agreement with the Court in advance of the Final Hearing.

**D. Adequate Protection for the Prepetition Secured Lenders**

31. The Prepetition Secured Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral under the DIP Revolving Facility to the extent that there is a diminution in the value of such collateral from and after the Petition Date. As adequate protection for any such diminution in value, BoA, on behalf of the Prepetition Secured Lenders, shall be granted the following:

- effective and perfected as of the date of entry of the Interim Order and without the necessity of the extension of the mortgages, security agreements, pledge agreements, financing statements or other agreements, (i) a valid, perfected, replacement security interest in and lien on the collateral upon which there exists liens granted pursuant to the Prepetition Credit Agreement (the "Existing Primed Liens"); and (ii) a valid, perfected security interest in and lien on all of the DIP Collateral (together, the "Adequate Protection Liens"), subject and subordinate only to (x) the Carve-Out (as such term is defined in the DIP Agreement) and (y) the liens securing the DIP Revolving Facility, which Adequate Protection Liens shall rank in the same relative priority and right as do the respective Existing Primed Liens (and any security interests granted with respect thereto) as of the Petition Date;

- a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (the "Adequate Protection Claims"), subject and subordinate only to (x) the Carve-Out (as such term is defined in the DIP Agreement) and (y) the Superpriority Claims (as such term is defined in the DIP Agreement) held by the DIP Agent and the DIP Lenders under the DIP Revolving Facility. Except for the Superpriority Claims (as such term is defined in the DIP Agreement) and the DIP Lenders, no claims shall be permitted with priority pari passu with or senior to the Adequate Protection Claims;

- current cash payments of all fees and all reasonable professional fees and expenses, in each case, payable to the BoA, as administrative agent, under the Prepetition Credit Agreement, promptly upon receipt of invoices therefore; and

- copies of all financial statements (including, without limitation, the monthly financial statements and cash forecasts referred to in the DIP Agreement) furnished to the DIP Agent, the DIP Lenders and the Financial Advisor (as such term is defined in the DIP Agreement).

32. The foregoing claims are to be granted and the payments are to be made to BoA, as administrative agent under the Prepetition Credit Agreement, for the purpose of, among other things, protecting BoA's and the Prepetition Secured Lenders' claims, obligations, and collateral interests from the potential depreciation and deterioration of such collateral. Notably, FairPoint will not be required to accrue or pay interest payments due under the Prepetition Credit Agreement as part of the adequate protection provided to such lenders.

**RELIEF REQUESTED**

33. FairPoint requests that the Court authorize the Borrowers and the Guarantors, as debtors and debtors-in-possession, to obtain senior secured, super-priority, postpetition financing up to an aggregate principal amount of $75 million, with a letter of credit subfacility in an aggregate amount of $30 million, pursuant to the DIP Revolving Facility, from the DIP Lenders

pursuant to the terms of this Motion, the DIP Orders, the DIP Agreement, and the Final DIP Agreement.

34.     The proposed financing will be provided by certain of the Prepetition Secured Lenders.  It will be senior to all obligations under the Prepetition Credit Agreement.  As such, the liens created under the DIP Revolving Facility are, <u>inter</u> <u>alia</u>, priming liens with respect to liens currently held by the Prepetition Secured Lenders.

35.     Pending the entry of the Final Order, FairPoint requests that the Court authorize it, on an interim basis, (i) to borrow up to $20 million from the DIP Revolving Facility, (ii) to grant to the DIP Lenders the liens and superpriority claims described herein, (iii) to provide adequate protection in favor of BoA, as administrative agent under the Prepetition Credit Agreement, as described herein and in the Interim Order, (iv) approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof and (v) schedule the Final Hearing.

## BASIS FOR REQUESTED RELIEF

### The DIP Revolving Facility Should Be Authorized

36.     Approval of the DIP Agreement will provide FairPoint with immediate and ongoing access to borrowing availability to ensure payment of their current and ongoing operating expenses, including postpetition wages, salaries, and utility and vendor costs.  Without authorization to enter into the DIP Revolving Facility, FairPoint may experience deterioration in customer and/or vendor confidence as such constituencies may harbor doubt with respect to FairPoint's liquidity and ability to emerge from those Chapter 11 cases as a viable enterprise. The credit provided under the DIP Revolving Facility will help enable FairPoint to demonstrate to the public its ability to provide uninterrupted service to its customers, pay its employees, and

operate its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estates for the benefit of all parties in interest. The availability of credit under the DIP Revolving Facility will instill confidence in FairPoint's creditors, customers and vendors which, in turn, will enable and encourage them to continue their relationships with FairPoint. Thus, the implementation of the DIP Agreement will promote a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative.

37. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. FairPoint's proposes to provide, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

38. FairPoint's goal of a successful reorganization can be achieved only if FairPoint is immediately authorized to borrow up to $20 million under the DIP Revolving Facility and to use such proceeds to demonstrate adequate liquidity to its creditors, customers, vendors and parties in interest. FairPoint has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). FairPoint has not been able to obtain postpetition financing or other financial

accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

39.     FairPoint negotiated with the DIP Lenders extensively and at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

40.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

41.     As further described herein, FairPoint's regulated assets are subject to regulatory restrictions under applicable state law.  As such, FairPoint may face opposition from various

regulatory bodies if it attempts to grant security interests against regulated assets in connection with any proposed postpetition secured financing. On the other hand, FairPoint could not procure postpetition financing which did not seek to prime the existing Prepetition Secured Lenders' liens. FairPoint submits that the circumstances of these cases require FairPoint to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Revolving Facility reflects the exercise of their sound business judgment.

42.    The terms and conditions of the DIP Revolving Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Revolving Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Proposed Adequate Protection Should Be Authorized

43.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor-in-possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production Credit Assoc. and Federal Land Bank, 104 B.R. 824 (E.D. Mich. 1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

44.     The Prepetition Secured Lenders have agreed to FairPoint's entry into the DIP Agreement in consideration for the adequate protection provided to them under the DIP Agreement.  Moreover, the replacement liens, cash payments and other protections offered to the Prepetition Secured Lenders will sufficiently protect their interest in any collateral taken as security under the Prepetition Credit Agreement.  Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

## The Automatic Stay Should Be Modified on a Limited Basis

45.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit FairPoint to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an event of default and after five business days' notice thereof, all rights and remedies under the DIP Agreement; and (iii) implement the terms of the proposed interim and final orders.

46.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in FairPoint's business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

47.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited

hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a FairPoint requests that the Court conduct an expedited preliminary hearing on this motion and (a) authorize FairPoint to borrow up to $20 million under the DIP Revolving Facility on an interim basis, pending entry of a final order, in order to (i) maintain, finance and ensure the ongoing operations of FairPoint, and (ii) avoid immediate and irreparable harm and prejudice to FairPoint's estates and all parties in interest and (b) schedule a hearing to consider entry of a final order.

48.     The availability of interim loans under the DIP Revolving Facility will provide necessary assurance to FairPoint's vendors, employees, and customers of FairPoint's ability to meet its near-term obligations.  Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of FairPoint's business, to the detriment of all parties in interest.  Furthermore, the lack of an interim facility may result in accelerated cash demands on FairPoint.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of FairPoint and facilitating their reorganization efforts.

## **NOTICE**

49.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  FairPoint has provided notice of this Motion by either electronic mail, facsimile or overnight mail to: (a) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, NY 10004, Attn: Andrew D. Velez-Rivera; (b) the creditors holding the five largest secured claims against FairPoint's estates (on a consolidated basis); (c) the creditors holding the 50 largest unsecured claims against FairPoint's estates (on a consolidated basis); (d) Kaye Scholer LLP, 425 Park Avenue, New York NY 10022, Attn: Margot B. Schonholtz, Esq.

and Mark F. Liscio, Esq., attorneys to Bank of America, N.A. as administrative agent for FairPoint's prepetition secured lenders; (e) U.S. Bank National Association, 60 Livingston Avenue, EP-MN-WS3C, St. Paul, MN 55107, Attn: Rick Prokosch, indenture trustee for FairPoint's senior noteholders; (f) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Kristopher M. Hansen, Esq., attorneys to the *ad hoc* committee of FairPoint's senior noteholders; (g) the United States Attorney for the Southern District of New York, 86 Chambers Street, New York, NY 10007, Attn: Preet Bharara, Esq.; (h) the Internal Revenue Service, 290 Broadway, New York, NY 10007, Attn: District And Regional Directors; (i) the Securities and Exchange Commission, 233 Broadway, New York, NY 10279 (j) the Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554; and (k) Cohen, Weiss and Simon LLP, 330 West 42nd Street, 25th Floor, New York, NY. 10036-6976, attorneys to the International Brotherhood of Electrical Workers, AFL-CIO, CLC and the Communications Workers of America, Attn: Bruce H. Simon.

50.     No previous request for the relief sought herein has been made by FairPoint to this or any other court.

**WHEREFORE**, FairPoint respectfully requests entry of the attached order granting the

relief sought herein and granting such other and further relief as is just.

Dated: October 26, 2009
      New York, New York

                      /s/ Luc A. Despins
                      Luc A. Despins, Esq.
                      James T. Grogan, Esq.
                      PAUL, HASTINGS, JANOFSKY & WALKER
                      LLP
                      Park Avenue Tower
                      75 E. 55th Street, First Floor
                      New York, NY 10022
                      Telephone:  (212) 318-6000
                      Facsimile:  (212) 319-4090

                      *Proposed Counsel to the Debtors*
                      *and Debtors-in-Possession*

# EXHIBIT A

## DIP TERM SHEET

**FOR DISCUSSION PURPOSES ONLY**
**PRIVILEGED AND CONFIDENTIAL**
**NOT AN OFFER TO ENTER INTO A CONTRACT**

# FAIRPOINT COMMUNICATIONS, INC.
## Outline of Terms and Conditions for Senior Secured
## Debtor-In-Possession Revolving Credit Facility

*The following Summary of Terms and Conditions (this "Term Sheet") is intended for discussion purposes only. This document is neither an expressed nor implied commitment by Bank of America, N.A., or any other Person to provide any financing or assist in providing the financing described herein, which commitment, if any, shall only be as set forth in a separate commitment letter or other applicable agreement.*

| | |
|---|---|
| **Borrowers:** | FairPoint Communications, Inc. ("FairPoint Communications") and FairPoint Logistics, Inc. (together with FairPoint Communications, the "Borrowers") Each Borrower will be a debtor and debtor-in-possession in a case (such cases, collectively, the "Borrowers' Cases") commenced voluntarily under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). |
| **Guarantors:** | The obligations of the Borrowers shall be unconditionally guaranteed, on a joint and several basis, by (i) each subsidiary of FairPoint Communications (the "Subsidiary Guarantors") that guaranteed the obligations of FairPoint Communications under the Credit Agreement, dated as of March 31, 2008 (as amended, the "Prepetition Credit Agreement")[1], among FairPoint Communications, the lenders party thereto (the "Prepetition Lenders"), Bank of America, N.A., as administrative agent (in such capacity, the "Prepetition Agent") and the other Persons party thereto and (ii) each of the other subsidiaries of FairPoint Communications that is not subject to regulation by a state public utility commission (the subsidiaries referenced in the foregoing clauses (i) and (ii) are collectively referred to herein as the "Guarantors"; the Guarantors and the Borrowers shall be referred to herein collectively as the "DIP Credit Parties"). Each Guarantor will be a debtor and debtor-in-possession in a case (such cases, collectively, the "Guarantors' Cases"; the Guarantors' Cases and the Borrowers' Cases are collectively referred to herein as the "DIP Credit Parties' Cases") pending under chapter 11 of the Bankruptcy Code. For the purposes hereof, "Debtors" shall mean, collectively, the DIP Credit Parties and each other subsidiary of a Borrower that is a debtor and debtor-in-possession in a case (such cases, including, without limitation, the DIP Credit Parties' Cases, collectively, the "Cases") pending under chapter 11 of the Bankruptcy Code. |
| **Administrative Agent:** | Bank of America, N.A. ("Bank of America"), in its capacity as administrative agent (in such capacity, the "DIP Agent"). |

---

[1]      Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Prepetition Credit Agreement.

| | |
|---|---|
| **Sole Arranger:** | Banc of America Securities LLC |
| **Lenders:** | Certain of the Prepetition Lenders (collectively, the "<u>DIP Lenders</u>"). |
| **Petition Date:** | The date of commencement of the Cases by the Debtors, which shall be no later than October 31, 2009 (the "<u>Petition Date</u>"). |
| **Closing Date:** | The closing date in respect of the DIP Revolving Facility (as defined below) (the "<u>Closing Date</u>"), which shall be no later than 5 days following the entry of the Interim Order (as defined below). |
| **DIP Credit Facilities:** | A senior secured debtor-in-possession revolving credit facility (the "<u>DIP Revolving Facility</u>") providing for extensions of credit in an aggregate amount not to exceed $75,000,000 (the "<u>Maximum Amount</u>"), with a letter of credit subfacility in an aggregate amount of $30,000,000. Letters of credit issued and outstanding under the Prepetition Credit Agreement as of the Petition Date (each such letter of credit being a "<u>Prepetition Letter of Credit</u>") may, at the Borrowers' option, be replaced by letters of credit issued under the DIP Revolving Facility (and any such replaced Prepetition Letter of Credit shall be cancelled)). As set forth in this Term Sheet, the DIP Revolving Facility will be provided on a "super-priority" basis and secured by liens on the assets of the DIP Credit Parties as described below under the heading "Priority and Liens; Collateral". |
| **Availability:** | Subject to all of the terms and conditions hereof, upon the entry of an order (the "<u>Interim Order</u>") by the Bankruptcy Court in form and substance satisfactory to the DIP Agent and the DIP Lenders, availability under the DIP Revolving Facility shall (a) prior to the entry of the Final Order (defined below) be in an amount not to exceed $20,000,000 and (b) upon entry of the Final Order, be in an amount not to exceed the Maximum Amount. Amounts available under the DIP Revolving Facility may be borrowed, repaid and re-borrowed. |
| **Purpose/Use of Proceeds:** | Proceeds of loans under the DIP Revolving Facility may be used by Borrowers in the Cases solely for (i) general working capital purposes; (ii) paying amounts owed to the DIP Agent and the DIP Lenders from time to time under the DIP Revolving Facility; (iii) paying reasonable professional fees and expenses payable to the Prepetition Agent under the Prepetition Credit Agreement; (iv) issuing letters of credit in the ordinary course of business (including letters of credit issued, at the Borrowers' request, to replace Prepetition Letters of Credit); (v) paying cure amounts (including, without limitation, settlement or cure payments to Capgemini, U.S., LLC); <u>provided</u>, that the aggregate of any such cure amounts (other than the settlement or cure payments to Capgemini, U.S., LLC) shall be reasonably acceptable to the DIP Agent and the DIP Lenders; and (vi) paying fees and expenses of Professionals (as defined below), subject to the Carve Out (as defined below), to the extent such Professional fees and expenses are approved by final order of the Bankruptcy Court and, to the extent applicable, consistent with the engagement letters of such Professionals in effect on |

the date hereof. In no event shall any proceeds of the extensions of credit under the DIP Revolving Facility be used to challenge or contest any of the Liens or claims of the Prepetition Agent, the Prepetition Lenders, the DIP Agent or the DIP Lenders.

"Professionals" means the professionals retained by the DIP Credit Parties and any statutory committee appointed in the Cases and approved by the Bankruptcy Court (the "Committee").

**Budget:**

The Borrowers will provide the DIP Agent and the DIP Lenders with a budget (as amended or modified from time to time, the "Budget"), in the form attached as Exhibit A hereto, that shall set forth in reasonable detail receipts and disbursements of the Debtors on a weekly basis for the 13-week period following the Petition Date. At any time that either (i) the aggregate amount outstanding under the DIP Revolving Facility is $25,000,000 or more (exclusive of letters of credit) or (ii) the Budget, or any update to the Budget required to be delivered by the Borrowers hereunder, forecasts that the aggregate amount outstanding under the DIP Revolving Facility will be $25,000,000 or more (exclusive of letters of credit) at any time during the period covered by the Budget or such update, the Borrowers will provide the DIP Agent and the DIP Lenders with weekly updates to the Budget (by no later than the third business day of each week). At all other times, the Borrowers will provide the DIP Agent and the DIP Lenders with monthly updates to the Budget within three business days after the previous month end.

**Maturity Date:**

Borrowings and other extensions of credit under the DIP Revolving Facility shall mature, be repayable in full, and the DIP Revolving Facility shall terminate on such date (the "Maturity Date") that is the earliest to occur of (i) the effective date of a confirmed Plan (as defined below), (ii) nine (9) months after the Petition Date (which date may, at the request of the Borrowers and subject to the prior written consent of the Majority DIP Lenders (as defined below), be extended by three (3) months (provided that the DIP Credit Parties shall not be required to pay a fee in connection with any such three (3) month extension)) and (iii) the date on which the obligations under the DIP Revolving Facility are accelerated following the occurrence of an Event of Default. Upon the satisfaction of customary conditions precedent reasonably satisfactory to the Debtors and the DIP Lenders, all borrowings and other extensions of credit under the DIP Revolving Facility will roll into a revolving credit exit facility on terms reasonably satisfactory to the Debtors and the DIP Lenders providing such revolving credit exit facility.

**Priority and Liens; Collateral:**

Subject to the Carve-Out (as defined below), all Obligations of the DIP Credit Parties to the DIP Agent and the DIP Lenders, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall:

- pursuant to Bankruptcy Code section 364(c)(1), be joint and several claims with priority in payment over any and all administrative expenses of the kinds specified or ordered

pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the "Superpriority Claims"), which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Credit Parties and all proceeds thereof, including, without limitation, subject to the entry of the Final Order (as defined below), all proceeds or other amounts received in respect of the DIP Credit Parties' claims and causes of action arising under state or federal law under chapter 5 of the Bankruptcy Code (collectively, the "Causes of Action");

- pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first-priority lien on all now owned or hereafter acquired assets and property of the DIP Credit Parties and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, documents, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the DIP Credit Parties) that are not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases; provided, however that such lien and security interest shall not include FCC licenses and PUC authorizations to the extent (but only to the extent) that any DIP Credit Party is prohibited from granting a lien and security interest therein pursuant to applicable law, but such lien and security interest shall include, to the maximum extent permitted by law, all rights incident or appurtenant to the FCC licenses and PUC authorizations and the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of the FCC licenses and the PUC authorizations (collectively, the "First Lien Collateral"); provided, further that the First Lien Collateral shall not include the Causes of Action but, subject to the entry of the Final Order, the First Lien Collateral shall include any proceeds or property recovered in respect of any Causes of Action; and

- pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior lien on all property of the DIP Credit Parties (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, documents, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant

and equipment of the DIP Credit Parties) that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, other than as set forth below (collectively, the "Second Lien Collateral", and together with the First Lien Collateral, the "DIP Collateral"); and

- pursuant to Bankruptcy Code section 364(d)(1), be secured by a first-priority, senior priming perfected lien on, and security interest in, all assets that are subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement, in each case, to the extent that such liens were granted pursuant to the Prepetition Credit Agreement (collectively, the "Existing Primed Liens").

The aforementioned Superpriority Claims and liens of the DIP Agent and the DIP Lenders and the Adequate Protection Claims and Adequate Protection Liens (each as defined below) shall be subject only to (1) in the event of the occurrence and during the continuance of an Event of Default (as defined below), the payment of allowed and unpaid fees and disbursements of Professionals after the date of such Event of Default (and regardless of when such fees and expenses become allowed by order of the Bankruptcy Court), in an aggregate amount not in excess of $7,500,000 (plus all unpaid professional fees and expenses allowed by the Bankruptcy Court that were incurred prior to the occurrence of such Event of Default (regardless of when allowed by the Bankruptcy Court)) and (2) the payment of fees pursuant to 28 U.S.C. § 1930 ((1) and (2), together, the "Carve-Out"). Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the DIP Credit Parties shall be permitted to pay compensation and reimbursement of fees and expenses allowed and payable under Bankruptcy Code sections 328, 330 and 331, as the same may be due and payable, and the same shall not reduce the Carve-Out. No portion of the Carve-Out or proceeds of the DIP Revolving Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any liens or claims of the Prepetition Agent, the Prepetition Lenders, the DIP Agent or the DIP Lenders, or the initiation or prosecution of any claim or action against any of the foregoing or their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof.

**Adequate Protection:**    The Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted the following as adequate protection:

- effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements

or other agreements, (i) a valid, perfected replacement security interest in and lien on the collateral to which they hold Existing Primed Liens and (ii) a valid, perfected security interest in and lien on all of the DIP Collateral (together, the "Adequate Protection Liens"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Revolving Facility, which Adequate Protection Liens shall rank in the same relative priority and right as do the respective Existing Primed Liens (and any security interests granted with respect thereto) as of the Petition Date;

- a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (together, the "Adequate Protection Claims"), subject and subordinate only to (x) the Carve-Out and (y) the Superpriority Claims held by the DIP Agent and the DIP Lenders under the DIP Revolving Facility. Except for the Superpriority Claims held by the DIP Agent and the DIP Lenders, no claims shall be permitted with priority *pari passu* with or senior to the Adequate Protection Claims;

- current cash payments of all fees and all reasonable professional fees and expenses, in each case, payable to the Prepetition Agent under the Prepetition Credit Agreement, promptly upon receipt of invoices therefor; and

- copies of all financial statements (including, without limitation, the monthly financial statements and cash forecasts referred to herein) furnished to the DIP Agent, the DIP Lenders and the Financial Advisor (as defined below).

**363 Sales:** Other than the sale or other disposition of assets having an aggregate value of less than $5,000,000, no sale of assets of any Debtor under Section 363 of the Bankruptcy Code, outside the ordinary course of business, will be authorized without the DIP Agent's and the requisite DIP Lenders' consent, unless the proceeds of such sale or other disposition will be sufficient to pay all of the advances under the DIP Revolving Facility in full (and to cash collateralize in a manner satisfactory to the DIP Agent, all letters of credit outstanding under the DIP Revolving Facility). Nothing herein will affect the right, if any, of the Prepetition Agent or the Prepetition Lenders to give, or withhold, its consent to any proposed sale or other disposition.

**Unused Line Fee:** An unused line fee in the amount of 0.50% per annum, payable monthly in arrears based on the average daily unused portion of the DIP Revolving Facility, which fee will be deemed fully earned and non-refundable when due and payable. The unused line fee will be calculated for actual days elapsed in a 360-day year.

**Letter of Credit Fees:** Customary fees for the issuance of letters of credit under the DIP Revolving Facility, including a fee on each letter of credit payable

monthly in arrears at a per annum rate of 4.50% (the foregoing fee will be adjusted upwards by 200 basis points during any period that an Event of Default has occurred and is continuing), and a fronting fee equal to 0.25% per annum multiplied by the face amount of each letter of credit, payable monthly in arrears. Such fees will be calculated for actual days elapsed in a 360-day year.

**Other Fees:**

The Borrowers agree to pay to the DIP Agent for the account of each DIP Lender an upfront fee (the "Upfront Fee") in an amount equal to 2.00% of the Maximum Amount. The Upfront Fee shall be fully earned on the date the Interim Order is entered and shall be payable in two installments as follows: (1) $400,000 shall be due and payable on the date the Interim Order is entered and (2) the remainder of the Upfront Fee shall be payable in full on the date the Final Order is entered.

The Borrowers agree to pay to the DIP Agent, for its own account, an agency fee in an amount set forth in a separate fee letter.

**Interest Rate:**

At the Borrowers' option, at either (i) the Eurodollar Rate plus 4.50% or (ii) the Base Rate (as defined below) plus 3.50%. Upon the occurrence and during the continuance of an Event of Default, at the election of the DIP Agent or non-defaulting DIP Lenders holding more than a majority of the commitments thereunder (the "Majority DIP Lenders"), all obligations under the DIP Revolving Facility shall bear interest at a rate of 2.00% above the otherwise applicable rate. "Base Rate" shall mean the greatest of (a) the rate of interest announced by Bank of America from time to time as its prime rate, (b) the Federal Funds Rate for such day, plus 0.50%, or (c) the Eurodollar Rate plus 1.00%.

**Funding Protection:**

Customary for transactions of this type and reasonably acceptable to the DIP Agent and the DIP Lenders, including breakage costs, gross-up for withholding (subject to customary qualifications), compensation for increased costs and compliance with any change in regulatory restrictions.

**Representations and Warranties:**

The documentation evidencing the DIP Revolving Facility (the "DIP Loan Documents") will include such representations and warranties that are substantially similar to the equivalent provisions in the Prepetition Credit Agreement and that are acceptable to the DIP Agent and the DIP Lenders, with such changes as may be required to reflect the pendency of the Cases, including, without limitation, continued effectiveness of orders of the Bankruptcy Court, including the Interim Order and the Final Order, as applicable; full disclosure and accuracy of the Budget; and other related matters.

**Covenants:**

The DIP Loan Documents will include such affirmative and negative covenants that are substantially similar to the equivalent provisions in the Prepetition Credit Agreement and that are acceptable to the DIP Agent and the DIP Lenders, with such changes as may be required to reflect the pendency of the Cases, including, without limitation,

(a) other than for a purpose (and subject to the limitations) described under "Purpose/Use of Proceeds" above, prohibiting the use of funds for disbursements outside of the ordinary course of business (for the avoidance of doubt, the Debtors may not use funds to (i) pay any PUC fines, charges or other payments arising prior to the Petition Date or (ii) pay any management bonuses except those explicitly provided for in the "KEIP" referred to in the "Term Sheet" annexed to the Plan Support Agreement (as defined below)), (b) providing the DIP Lenders with the same types of information required to be provided to the Prepetition Lenders under the Prepetition Credit Agreement, (c) providing the DIP Lenders with (i) monthly financial statements within thirty (30) days after the previous month-end (or, in the case of the monthly financial statements for December 2009, within forty-five (45) after December 31, 2009), (ii) the "Daily Operations Dashboard" in substantially the form currently delivered to the Financial Advisor (as defined below) on a bi-weekly basis, by no later than the third business day of every other week (commencing with the first such day following the Closing Date) and (iii) variance reports (in the same format as the Budget) showing actual cash receipts and disbursements for the immediately preceding week(s), noting therein all variances, on a line-item basis, from values set forth for such period in the Budget (and updates thereto), which variance reports will be provided on a weekly basis if the Borrowers are required to update the Budget weekly as described above (by no later than the third business day of each week); otherwise such variance reports shall be provided on a bi-weekly basis, by no later than the third business day of every other week (in either case, commencing with the first such day following the Closing Date), (d) cooperating generally with FTI Consulting, Inc. (the "Financial Advisor") and the DIP Agent's legal professionals and allowing the Financial Advisor full access to the Borrowers' premises, books, and records upon reasonable notice and during normal business hours, (e) conducting a conference call on the first Tuesday of every month or as soon as practicable thereafter (commencing with the first such Tuesday following the Petition Date) with the DIP Agent, the DIP Lenders, the Financial Advisor and the "Consenting Lenders" party to the Plan Support Agreement (as defined below), for the purpose of discussing, *inter alia*, the most recently delivered financial statements, the Debtors' financial performance, operations, current trends and other material events, (f) not permitting capital expenditures for each period set forth on Exhibit B hereto to exceed the amount set forth on Exhibit B for such period, (g) maintaining EBITDAR (as defined on Exhibit C) for each period set forth on Exhibit C of not less than the amount set forth on Exhibit C for such period and (h) within three (3) Business Days after the occurrence thereof, notifying the DIP Agent if any third party expresses an interest either formally or informally in acquiring all or any substantial part of the Borrowers' business, the distribution of such information by the DIP Agent may be subject to certain confidentiality arrangements as are appropriate and may be reasonably agreed upon.

| **Events of Default:** | The DIP Loan Documents will include events of default that are substantially similar to the equivalent provisions in the Prepetition Credit Agreement and that are reasonably acceptable to the DIP Agent and the DIP Lenders, with such changes as may be required to reflect the pendency of the Cases (subject to grace, notice and cure periods to be agreed) (each, an "Event of Default"), including, without limitation, the appointment of a trustee or examiner with expanded powers, or dismissal or conversion to Chapter 7 of any of the Cases; confirmation of any plan of reorganization or liquidation in any of the Cases other than the Plan (defined below); filing of a Chapter 11 plan of reorganization or liquidation by a person or entity other than Debtors that does not require the payment in full, on the effective date thereof, of all extensions of credit under the DIP Revolving Facility (or, in the case of letters of credit, cash collateralization of such letters of credit to the extent of 105% of the aggregate face amount thereof); Debtors' failure to file the Plan as and when required by the terms set forth below; failure to obtain entry of a confirmation order from the Bankruptcy Court with respect to such Plan by July 31, 2010; amendment (other than as consented to by DIP Agent and the requisite DIP Lenders) or stay of either of the Financing Orders (described below) or reversal, modification, or vacation of either of the Financing Orders, whether on appeal or otherwise; the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the DIP Collateral without DIP Lenders' consent or any Debtor seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the DIP Collateral that does not require the payment in full of all extensions of credit under the DIP Revolving Facility (or, in the case of letters of credit, such collateralization of such letters of credit to the extent of 105% of the aggregate face amount thereof); the challenge by a Debtor of (i) the validity, extent, perfection, or priority of any Liens of the Prepetition Agent with respect to any of the DIP Collateral or (ii) the validity or enforceability of any of the Obligations (as defined in the Prepetition Credit Agreement); any Person holding a Lien upon any pre-petition or post-petition assets of any Debtor being granted relief from the automatic stay with respect to any DIP Collateral or any other asset of a Debtor where the aggregate value of the property subject to all such orders is greater than $10,000,000; or Debtors' and their Subsidiaries' cessation of all or any material part of their business operations (other than in connection with a sale of assets consented to by the requisite DIP Lenders). |
| --- | --- |
| **Remedies:** | Customary remedies, including, without limitation, the right (after providing five business days' prior notice to the Borrowers, the Committee (if any) and the U.S. Trustee) to realize on all DIP Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies hereunder with respect to the DIP Credit Parties, and under the Interim Order and the Final Order, and with respect to the |

DIP Collateral.

**Chapter 11 Plan:**       The Debtors shall (i) prepare a plan of reorganization and a disclosure statement, which shall, among other things require the payment in full, on the effective date thereof, of all extensions of credit under the DIP Revolving Facility (or, in the case of letters of credit, cash collateralization of such letters of credit to the extent of 105% of the aggregate face amount thereof) (such plan of reorganization, the "Plan") and (ii) file the Plan with the Bankruptcy Court within forty-five (45) days after the Petition Date.

**Conditions Precedent:**       (a)       The conditions precedent to the obligation of the DIP Lenders to make extensions of credit under the DIP Revolving Facility will be customary and appropriate for financings of this type and acceptable to the DIP Agent and the DIP Lenders, including, without limitation, the execution and delivery by FairPoint Communications and the Debtors of a Plan Support Agreement (the "Plan Support Agreement") in form and substance satisfactory to the "Consenting Lenders" party thereto and the commencement of the Cases by the Debtors on or before October 31, 2009 and the following:

(i)       DIP Agent's and DIP Lender's review of and reasonable satisfaction with the Budget (it being agreed that the Budget delivered on or about October 19, 2009 is satisfactory);

(ii)       Execution and delivery by all parties of definitive DIP Loan Documents, in form and substance satisfactory to the DIP Agent and the DIP Lenders;

(iii)       The absence of any Default or Event of Default under any of the DIP Loan Documents;

(iv)       DIP Agent's receipt of favorable legal opinions of Borrowers' and Guarantors' counsel as to such matters as may be reasonably required by DIP Agent;

(v)       The Bankruptcy Court's entry of the Interim Order, as described below;

(vi)       DIP Agent's and DIP Lenders' review of and reasonable satisfaction with all "first day orders";

(vii)       DIP Agent's receipt of satisfactory evidence that there are no Liens on or claims to any of the DIP Collateral as of the Petition Date other than Liens that are Permitted Liens under the Prepetition Loan Agreement;

(viii)       Borrowers shall have paid to DIP Agent and the DIP Lenders all fees and expenses payable to DIP Agent and the DIP Lenders on the Closing Date pursuant to any of the DIP Loan Documents and the

transactions contemplated thereby;

(ix)     DIP Agent shall have received evidence, in form, scope and substance, reasonably satisfactory to DIP Agent, of all insurance coverage as required by the DIP Loan Documents;

(x)     All proceedings taken in connection with the execution of the DIP Loan Documents and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related to the DIP Revolving Facility) shall be reasonably satisfactory in form, scope, and substance to the DIP Agent and DIP Lenders;

(xi)     All representations and warranties made by the DIP Credit Parties under the DIP Loan Documents shall be true and correct in all material respects on and as of the date of each extension of credit under the DIP Revolving Facility, except to the extent such representations or warranties relate solely to an earlier date (in which case, they shall be true and correct in all material respects as of such earlier date); and

(xii)     Receipt of a notice of borrowing, or to the extent letters of credit are available, a letter of credit application from the Borrowers. The request for and acceptance of each extension of credit by the Borrowers shall constitute a representation and warranty that the conditions to each extension of credit shall have been satisfied.

(b)     The following shall be the conditions precedent with respect to all extensions of credit under the DIP Revolving Facility:

(i)     The Bankruptcy Court's entry of the Interim Order or the Final Order, as applicable, within the time periods set forth below;

(ii)     No Default or Event of Default under the DIP Loan Documents shall exist;

(iii)     The representations and warranties contained in the DIP Loan Documents shall be true and correct in all material respects on and as of the date of each extension of credit thereunder as though made on and as of such date, except to the extent such representations or warranties relate solely to an earlier date (in which case, they shall be true and correct in all material respects as of such earlier date); and

(iv)     Receipt of a notice of borrowing, or to the extent letters of credit are available, a letter of credit application from the Borrowers. The request for and acceptance of each extension of credit by the Borrowers shall constitute a representation and warranty that the conditions to each extension of credit shall have been satisfied.

**Financing Orders:**     A condition precedent to the DIP Lenders' extension of credit under the DIP Facility will be the entry of an interim financing order in form and substance satisfactory to the DIP Agent and the DIP Lenders (the

"Interim Order") by the Bankruptcy Court (which must occur no later than seven (7) business days after the Petition Date), following proper notice and hearing thereon, which is in all respects satisfactory to the DIP Agent and the DIP Lenders and which, among other things, approves the form and substance of the definitive DIP Loan Documents evidencing the DIP Revolving Facility; approves Borrowers' stipulation of the validity, extent, amount, perfection, priority, enforceability, and non-avoidability of the Prepetition Agent's and Prepetition Lenders' claims and Liens; grants adequate protection (as hereinabove provided) for the benefit of the Prepetition Agent and Prepetition Lenders; authorizes the DIP Agent to enforce its Liens and loan documents upon the occurrence and during the continuance of Events of Default, upon the giving of at least five days notice to the Borrowers and their counsel, the U.S. Trustee and counsel for any Committee; contains a Carve Out for Professional fees and expenses on terms and conditions described herein; confers Section 364(c)(1) priority status on all extensions of credit under the DIP Revolving Facility and provides for the securing of all such extensions of credit by a Lien on all DIP Collateral having the priority provided herein; finds that the DIP Agent and DIP Lenders have acted in good faith in connection with the proposed financing and is entitled to the benefits of Section 364(e) of the Bankruptcy Code; provides that the Liens granted to the DIP Agent under the DIP Loan Documents and pursuant to the Interim Order are deemed perfected without the necessity of the filing for record of any documents, notices, or other filings (but the DIP Credit Parties agree to execute and deliver to DIP Agent, and to authorize DIP Agent to file, any such documents); and contains such other terms and conditions as DIP Agent shall reasonably request or find acceptable. The final financing order (the "Final Order") shall be entered, in form and substance satisfactory to DIP Agent and DIP Lenders, not later than 45 days after the entry of the Interim Order, shall contain provisions substantially the same as those in the Interim Order, and shall provide that all pre-petition Liens of Prepetition Agent and Prepetition Lenders shall be deemed finally allowed and approved as legal, valid, binding and enforceable Liens that are not subject to any equitable subordination, defense, or avoidance and the pre-petition claims of Prepetition Agent and Prepetition Lenders shall be deemed allowed as claims that are not subject to offset, equitable subordination, reduction, counterclaim, or defense, in each case if the same are not challenged by the commencement of appropriate proceedings by an interested party having standing to do so on the sooner to occur of 60 days after the entry of the Final Order or confirmation of a plan of reorganization or liquidation in any of the Cases. The Final Order shall also proscribe any surcharge on the collateral subject to the Prepetition Agent's Liens and the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise.

| | |
|---|---|
| **Governing Law:** | New York, except as governed by the Bankruptcy Code. |
| **Indemnity:** | The DIP Credit Parties shall indemnify, pay and hold harmless the DIP Agent and the DIP Lenders (and their respective directors, officers, |

employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party and except to the extent resulting from claims between or among any DIP Lenders (other than the DIP Agent) in their capacity as such).

**Expenses:**

The Borrowers shall pay (a) all reasonable out-of-pocket expenses of the DIP Agent associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendments or waivers with respect thereto (including the reasonable fees, disbursements and other charges of counsel and the Financial Advisor) and (b) all reasonable out-of-pocket expenses of the DIP Agent and the DIP Lenders (including the fees, disbursements and other charges of counsel and the Financial Advisor) in connection with the enforcement of the DIP Loan Documents; provided, that the Borrowers' obligation to pay the fees, disbursements and other charges of counsel to the DIP Lenders (but not the DIP Agent) shall be limited to one outside counsel, currently Wachtell, Lipton, Rosen & Katz for Angelo Gordon.

**Counsel to DIP Agent:**

Kaye Scholer LLP

**Counsel to Debtors:**

Paul, Hastings, Janofsky & Walker LLP

**Budget**

**FairPoint Communications, Inc.**
**13 Week Cash Forecast**
**Summary- Terms**

| Forecast/Actual | F | F | F | F | F | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | 1 | 2 | 3 | 4 | 5 | | | | | | | | |
| Week Ending | 10/30/2009 | 11/6/2009 | 11/13/2009 | 11/20/2009 | 11/27/2009 | 12/4/2009 | 12/11/2009 | 12/18/2009 | 12/25/2009 | 1/1/2010 | 1/8/2010 | 1/15/2010 | 1/22/2010 |
| **Beginning Cash Balance** | $49,920,540 | $59,278,719 | $64,146,492 | $69,928,110 | $77,343,478 | $72,639,761 | $68,099,418 | $70,615,620 | $69,843,866 | $57,404,888 | $57,920,832 | | $43,461,754 |
| **Receipts** | | | | | | | | | | | | | |
| NNE | $17,232,423 | $18,851,878 | $18,120,613 | $17,401,649 | $14,501,281 | $16,006,386 | $17,168,095 | | $16,450,841 | $12,874,571 | $20,026,932 | $19,795,755 | $13,930,346 |
| Telecom | $4,571,746 | $5,149,552 | $5,381,493 | $4,750,433 | $4,152,482 | $4,743,275 | $4,545,038 | | $3,755,003 | $3,557,495 | $5,610,069 | $5,415,065 | $3,910,004 |
| EarthLink | $850,309 | $877,008 | $3,151,308 | $3,875,265 | $3,182,178 | $3,178,617 | $3,109,817 | | $3,134,738 | $831,020 | $423,377 | $406,100 | $387,224 |
| **Total Cash Receipts** | $22,654,088 | $24,717,328 | $24,728,447 | $22,384,547 | $18,855,218 | $18,339,094 | $22,070,897 | $21,139,838 | | $17,470,868 | $26,610,416 | | $18,288,133 |
| **COGS** | | | | | | | | | | | | | |
| NNE | $826,674 | $2,308,512 | $974,635 | $831,508 | $804,906 | $308,210 | $2,697,871 | $803,139 | $3,506,910 | $2,176,219 | $407,402 | | $43,458,889 |
| Telecom | $424,063 | $556,583 | $556,583 | $556,583 | $733,847 | $595,794 | $984,817 | $880,063 | $753,723 | $1,100,074 | $467,902 | | $235,206 |
| **Total COGS** | | | $3,463,095 | | $1,487,941 | $1,538,763 | $1,933,945 | $3,681,679 | $1,774,121 | $4,280,404 | $1,355,592 | $3,335,793 | $1,278,865 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Employee Expenses | $9,369,010 | $6,746,487 | $8,434,003 | $7,079,925 | $10,894,134 | $7,087,765 | $6,838,876 | $7,501,789 | $8,982,433 | $7,703,209 | $8,951,823 | $7,779,380 | $43,466,889 |
| Building Related Expenses | | $3,496,703 | $3,547,505 | $1,879,410 | $1,099,475 | $419,885 | $1,848,469 | $2,329,382 | $771,850 | $721,650 | $3,362,782 | $3,848,415 | $3,182,158 |
| Cash Taxes | | $971,507 | $994,020 | $994,020 | $152,315 | $335,784 | $1,035,818 | $3294 | $165,655 | $374,071 | $3842,721 | $3269,465 | $3154,634 |
| CapEx-NNE | | $50 | $50 | $50 | $2,002,135 | | | $3900,528 | $18,002,139 | $18,002,139 | | | |
| Operating Taxes | | $50 | $50 | | | $4,760,000 | | $50 | $50 | | $4,675,000 | $987,079 | $13,050,346 |
| Restructuring | $1,449,387 | $5,300,000 | $50 | $564,500 | $193,780 | $721,774 | $50 | $351,913 | $3,319,864 | $3,712,121 | $787,079 | $710,174 | $710,174 |
| Contracted Services | | $807,197 | $587,803 | $600,027 | $524,790 | $751,272 | $804,618 | $600,993 | $648,435 | $155,792 | $700,016 | $855,369 | $301,800 |
| Network Expenses | | $703,665 | $834,115 | $165,189 | $383,303 | $200,808 | $200,837 | $3,204,114 | $1,009,846 | $345,344 | $345,344 | $429,492 | $429,492 |
| Marketing Expenses | | $120,835 | $493,169 | $218,550 | $383,300 | $383,300 | $300,395 | $300,395 | $298,227 | $271,265 | $433,281 | $433,281 | $311,441 |
| Motor Vehicle | | $192,061 | $306,919 | $306,919 | $324,796 | $333,712 | $307,608 | $307,608 | $240,458 | $222,915 | $517,744 | $514,133 | $243,041 |
| Computer | | $918,877 | $920,834 | $520,694 | $603,283 | $209,506 | $209,506 | $328,660 | $84,169,704 | $96,169,704 | $314,133 | $314,133 | $243,041 |
| Customer Service | | $244,492 | $517,385 | $517,385 | $323,823 | $511,317 | $384,300 | $71,779 | $403,912 | $61,382 | $63,157 | $121,288 | $500,239 |
| Non-Recurring | | $31,801 | $32,442 | $32,442 | $392,381 | $407,809 | $397,809 | $397,765 | $54,656 | $82,354 | $82,255 | $121,288 | $500,239 |
| Insurance/Restructuring Legal Expenses | | $382,045 | $3106,269 | $3106,269 | $3118,859 | $398,528 | $3107,959 | $3102,953 | $103,205 | $3305,905 | $547,302 | $327,302 | $121,288 |
| Pass Through | | $641,692 | $547,000 | $532,000 | $537,555 | $543,318 | $543,318 | $329,455 | $529,455 | $529,455 | $547,302 | $531,907 | $635,020 |
| Other Expenses | $793,751 | $701,644 | $781,844 | $781,844 | $600,315 | $703,152 | $688,529 | $688,529 | $550,823 | $550,823 | $791,000 | $635,020 | $411,281 |
| **Total Operating Disbursements** | $11,507,148 | $16,316,142 | $12,419,116 | $11,497,378 | $16,021,622 | $16,782,441 | $13,439,869 | $13,494,387 | $14,230,719 | $40,282,019 | $16,226,120 | $12,635,797 | $12,896,087 |
| NNE Vendor Deposits | $833,930 | $833,930 | $833,930 | $833,930 | | | | | | | | | |
| Cash Collateral - Surety Program | $597,500 | $597,500 | $597,500 | $597,500 | | | | | | | | | |
| LC Collateral | | | | | | | | | | | | | |
| AP Catch-Up | | | | | | | | | | | | | |
| Critical Vendor Payments | | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 |
| Bankruptcy Related Disbursements | $1,201,430 | $2,647,584 | $2,647,584 | $2,647,584 | $3,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 |
| DIP Interest Expense/Fees | $519,301 | | | | $2,097,007 | $2,805,402 | $2,805,402 | $2,244,322 | $2,507,004 | $2,507,404 | $2,507,404 | | $3,005,803 |
| Bank Interest | $519,301 | | | | $255,108 | $304,087 | $304,087 | $315,171 | $351,141 | $351,782 | $352,782 | | $352,782 |
| Bond Interest | | | | | $2,382,718 | $1,300,089 | $1,300,089 | $2,080,071 | $2,820,160 | $2,620,166 | $2,640,166 | | $2,298,133 |
| Swap Payment | | | | | $50 | $50 | $50 | $50 | | | | | |
| **Total Interest Payments** | $519,301 | | | | $118,301 | $1,100,000 | $50 | | | | | | |
| CapEx- NNE | | | | | | | | | | | | | |
| CapEx- Telecom | | | | | | | | | | $118,301 | | | |
| **Total CapEx** | | | | | | | | | | | | | |
| Check Clearings | $518,301 | | | | $118,301 | $1,100,000 | | | | $118,301 | | | |
| **Ending Cash Balance** | $59,278,719 | $64,146,492 | $69,928,110 | $77,343,478 | $72,639,761 | $68,099,418 | $70,615,620 | $69,843,866 | $57,404,888 | $57,920,832 | $37,920,832 | $43,461,754 | $43,698,889 |
| **Change in Cash** | $9,358,079 | $4,868,774 | $5,779,617 | $7,418,367 | ($4,713,716) | ($4,670,343) | $2,656,111 | ($771,672) | ($12,438,888) | ($32,261,880) | $2,777,246 | $5,541,901 | $235,236 |

## Maximum Capital Expenditures

| Period | Maximum Capital Expenditures |
|---|---|
| November 1, 2009 - November 30, 2009 | $29,250,000 |
| November 1, 2009 - December 31, 2009 | $48,500,000 |
| November 1, 2009 - January 31, 2010 | $66,352,000 |
| November 1, 2009 - February 28, 2010 | $83,794,000 |
| November 1, 2009 - March 31, 2010 | $101,236,000 |
| November 1, 2009 - April 30, 2010 | $118,677,000 |
| November 1, 2009 - May 31, 2010 | $136,119,000 |
| November 1, 2009 - June 30, 2010 | $153,561,000 |
| November 1, 2009 - July 31, 2010 | $169,336,000 |
| November 1, 2009 - August 31, 2010 | $185,111,000 |
| November 1, 2009 - September 30, 2010 | $200,886,000 |
| November 1, 2009 - October 31, 2010 | $216,661,000 |

<u>Exhibit C</u>

<u>Minimum EBITDAR</u>[1]

| Period | Minimum EBITDAR |
|---|---|
| November 1, 2009 - November 30, 2009 | $16,191,000 |
| November 1, 2009 - December 31, 2009 | $24,403,000 |
| November 1, 2009 - January 31, 2010 | $45,609,000 |
| November 1, 2009 - February 28, 2010 | $70,163,000 |
| November 1, 2009 - March 31, 2010 | $90,459,000 |
| November 1, 2009 - April 30, 2010 | $111,399,000 |
| November 1, 2009 - May 31, 2010 | $136,644,000 |
| November 1, 2009 - June 30, 2010 | $159,992,000 |
| November 1, 2009 - July 31, 2010 | $186,104,000 |
| November 1, 2009 - August 31, 2010 | $215,671,000 |
| November 1, 2009 - September 30, 2010 | $244,190,000 |
| November 1, 2009 - October 31, 2010 | $274,586,000 |

[1] To be defined in the DIP Loan Documents.

# EXHIBIT B

## PROPOSED INTERIM DIP ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------- x
                                       :

**In re:**                              :

                                       :        **Chapter 11**

**FAIRPOINT COMMUNICATIONS, INC.,** *et al.*,    :

                                       :        **Case No. 09-_____ (___)**

             **Debtors.**                     :

                                       :        **(Joint Administration Requested)**

                                       :
---------------------------------------------------------- x

**INTERIM ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING DEBTORS TO USE PREPETITION COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (IV) SCHEDULING FINAL HEARING**

Upon the motion, dated October 26, 2009 (the "Motion"), of FairPoint Communications, Inc. ("FairPoint Communications") and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "Debtors" or "FairPoint") in the above-captioned cases (the "Cases") for interim and final orders under sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the local bankruptcy rules for the Southern District of New York (the "Local Bankruptcy Rules"), seeking:

(a)       authorization (i) for FairPoint Communications and FairPoint Logistics, Inc. (together with FairPoint Communications, the "Borrowers") to obtain up to $75,000,000 in principal amount of postpetition financing, with a subfacility for the issuance of letters of credit in the amount of $30,000,000 (collectively, the "DIP Financing"), all on the terms and conditions set forth in this Interim Order and the Debtor-in-Possession Credit Agreement, dated as of

October [__], 2009 (substantially in the form attached to this Interim Order as <u>Exhibit A</u>, and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Agreement</u>"; together with all agreements, documents, instruments and/or amendments delivered in connection therewith, including the Budget annexed hereto as <u>Exhibit B</u>, the "<u>DIP Documents</u>"), among the Borrowers, Bank of America, N.A. ("<u>BofA</u>"), as administrative agent (in such capacity, the "<u>DIP Agent</u>") for itself and a syndicate of other financial institutions (together with the DIP Agent and the issuing bank for the letters of credit, the "<u>DIP Lenders</u>"), (ii) for each of the debtors in these Cases identified as guarantors on Schedule 1 hereto (collectively, the "<u>Guarantors</u>"; the Guarantors and the Borrowers shall be referred to herein collectively as the "<u>DIP Credit Parties</u>") to guarantee the Borrowers' obligations in respect of the DIP Financing, (iii) for each of the debtors in these Cases identified as pledgors on Schedule 2 hereto (collectively, the "<u>Pledgors</u>") to pledge certain equity interests as collateral security for the DIP Credit Parties' obligations in respect of the DIP Financing, and (iv) for each of the debtors in these Cases identified as grantors on Schedule 3 hereto to grant liens upon certain assets as collateral security (the "<u>Grantors</u>") for the DIP Credit Parties' obligations in respect of the DIP Financing;

(b)      authorization for the DIP Credit Parties and the Pledgors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)  authorization for the Debtors to (i) use the Prepetition Collateral (as defined in paragraph 3(d) below) pursuant to sections 105, 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, and (ii) provide adequate protection to the lenders (collectively, the "<u>Prepetition Secured Lenders</u>" and, together with the Prepetition

Administrative Agent (as defined below), any Letter of Credit Issuer, and any Lender, or its Affiliate (as defined in the Prepetition Credit Agreement) that are owed Obligations under any Credit Document or any Hedging Agreement (as each such term is defined in the Prepetition Credit Agreement) (the "Prepetition Secured Parties") pursuant to the Credit Agreement, dated as of March 31, 2008 (as heretofore amended, restated, modified or supplemented from time to time, the "Prepetition Credit Agreement"; together with all other documentation executed and delivered in connection with any of the foregoing, the "Prepetition Loan Documents"), among FairPoint Communications, as the borrower, FairPoint Broadband, Inc., MJD Ventures, Inc., MJD Services Corp., S T Enterprises, Ltd., FairPoint Carrier Services Inc., and FairPoint Logistics, Inc., as guarantors, BofA, as administrative agent (in such capacity, the "Prepetition Administrative Agent") Morgan Stanley Senior Funding, Inc., as syndication agent, the Prepetition Secured Lenders, and Deutsche Bank Securities Inc., as co-documentation agents, Banc of America Securities LLC and Morgan Stanley Senior Funding, Inc., as joint lead arranger, and Banc of America Securities LLC, Morgan Stanley Senior Funding, Inc., Deutsche Bank Securities Inc. and Wachovia Capital Markets, LLC, as joint book running managers; and

(d)     to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order") (i) authorizing the Borrowers, on an interim basis, to borrow and obtain letters of credit under this Interim Order and the DIP Agreement up to $20,000,000, (ii) authorizing the Debtors to use the Prepetition Collateral and (iii) granting adequate protection to the Prepetition Secured Parties; and

(e)     to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on the Motion to be held before this Court to consider entry of a final order (the "Final

Order") authorizing and approving, on a final basis, the transactions described in the foregoing clauses (a) through (d) pursuant to the Final Order;

The Interim Hearing having been held by the Court on October __, 2009 to consider the relief sought in the Motion, and upon the record of the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.    *Petition Date/Disposition/Jurisdiction*.    On October 26, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. The Cases are currently jointly administered. The Motion is granted in accordance with the terms of this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c) and (d) and the Local Bankruptcy Rules.

2.    *Notice*.  Notice of the Motion, the relief requested therein and the relief sought at the Interim Hearing was served by the Debtors by either electronic mail, facsimile or overnight mail to: (a) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, NY 10004, Attn: Andrew D. Velez-Rivera; (b) the creditors holding the five largest secured claims against FairPoint's estates (on a consolidated basis); (c) the creditors holding the 50 largest unsecured claims against FairPoint's estates (on a consolidated basis); (d)

Kaye Scholer LLP, 425 Park Avenue, New York NY 10022, Attn: Margot B. Schonholtz, Esq. and Mark F. Liscio, Esq., attorneys to Bank of America, N.A. as administrative agent for FairPoint's prepetition secured lenders; (e) U.S. Bank National Association, 60 Livingston Avenue, EP-MN-WS3C, St. Paul, MN 55107, Attn: Rick Prokosch, indenture trustee for FairPoint's senior noteholders; (f) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Kristopher M. Hansen, Esq., attorneys to the *ad hoc* committee of FairPoint's senior noteholders; (g) the United States Attorney for the Southern District of New York, 86 Chambers Street, New York, NY 10007, Attn: Preet Bharara, Esq.; (h) the Internal Revenue Service, 290 Broadway, New York, NY 10007, Attn: District And Regional Directors; (i) the Securities and Exchange Commission, 233 Broadway, New York, NY 10279 (j) the Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554; and (k) Cohen, Weiss and Simon LLP, 330 West 42nd Street, 25th Floor, New York, NY. 10036-6976, attorneys to the International Brotherhood of Electrical Workers, AFL-CIO, CLC and the Communications Workers of America, Attn: Bruce H. Simon.

3. *Budget*. The Debtors and the DIP Lenders have agreed upon a form of budget (the "Budget"), annexed hereto Exhibit B, projecting cash flow for thirteen weeks (the "Budget Period"). On a monthly basis, the Debtors will provide to the DIP Lenders an updated Budget for the Budget Period in substantially the same format as the previous budget.

4. *Debtors' Stipulations*. Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph 18 below) the Debtors admit, stipulate, and agree that:

        (a) as of the Petition Date, FairPoint Communications and the debtors that are Guarantors (as defined in the Prepetition Loan Documents; together with FairPoint

Communications as the borrower under the Prepetition Credit Agreement, the "Prepetition Credit Parties") were justly and lawfully indebted and liable, without defense, counterclaim or offset of any kind, to (i) the RF Lenders (as defined in the Prepetition Credit Agreement) in an aggregate principal amount believed by the Debtors to be approximately $140,609,000, (ii) the A Term Lenders (as defined in the Prepetition Credit Agreement) in an aggregate principal amount believed by the Debtors to be approximately $497,825,000, (iii) the Initial B Term Lenders and the Delayed-Draw B Term Lenders (as such terms are defined in the Prepetition Credit Agreement) in an aggregate principal amount believed by the Debtors to be approximately $1,327,200,000, (iv) the Letter of Credit Issuer in an aggregate principal amount believed by the Debtors to be approximately $18,192,740, in each case in respect of loans made, letters of credit issued or other financial accommodations made by the Prepetition Secured Parties pursuant to, and in accordance with the terms of, the Prepetition Loan Documents, and (v) holders of Interest Rate Obligations under Secured Interest Rate Agreements (as each such term is defined in the Prepetition Pledge Agreement (as defined below)) in amounts yet to be determined, plus, in each case, accrued and unpaid interest thereon and costs and expenses including, without limitation, attorneys' fees, agent's fees, other professional fees and disbursements and other obligations owing under the Prepetition Loan Documents (collectively, the "Prepetition Indebtedness");

(b)      the Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Prepetition Credit Parties, enforceable in accordance with its terms, and no portion of the Prepetition Indebtedness or any payments made to the Prepetition Secured Lenders or applied to the obligations owing under the Prepetition Loan

Documents prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(c)      each Debtor hereby forever waives and releases any and all Claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against each of the Prepetition Secured Parties, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law; and

(d)      pursuant to a certain (i) Pledge Agreement dated as of March 31, 2008 (as heretofore amended, restated, modified or supplemented from time to time, the "Prepetition Pledge Agreement"), (ii) Subsidiary Guaranty dated as of March 31, 2008, (iii) Deposit Agreement dated as of March 31, 2008, (iv) Intercompany Subordination Agreement dated as of March 31, 2008, (v) Amendment, Waiver, Resignation and Appointment Agreement dated as of January 21, 2009, and (vi) Acknowledgment and Ratification Agreement dated as of January 21, 2009 (in each case as heretofore amended, restated, modified, ratified or supplemented from time to time, together with any and all other security agreements, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, assignments or other security documents, the "Prepetition Collateral Documents"), (I) the Prepetition Credit Parties and the Pledgors have granted valid, binding, perfected, enforceable, first priority liens upon and security interests in the property described in the Prepetition Collateral Documents

(collectively, the "Prepetition Collateral") to the Prepetition Administrative Agent for the benefit of the Prepetition Secured Parties, and (II) the Prepetition Administrative Agent's first priority liens upon and security interests in the Prepetition Collateral, for the benefit of the Prepetition Secured Parties, are not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

5.     *Findings Regarding the DIP Financing*.

(a)     Good cause has been shown for the entry of this Interim Order.

(b)     The DIP Credit Parties have an immediate need to obtain the DIP Financing and to use the Prepetition Collateral in order to, among other things, preserve the value of the DIP Credit Parties' businesses, permit the orderly continuation of their businesses and for the other purposes set forth in the DIP Documents. The DIP Credit Parties' use of the proceeds of the DIP Financing and the DIP Credit Parties' and the Pledgors' use of the Prepetition Collateral is necessary to ensure that the DIP Credit Parties' and the Pledgors' have sufficient working capital and liquidity to preserve and maintain the value of their estates.

(c)     The DIP Credit Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The DIP Credit Parties are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the

DIP Documents without the DIP Credit Parties and the Pledgors granting the DIP Liens (as defined in paragraph 7 below) and the Superpriority Claims (as defined in paragraph 6 below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)     The terms of the DIP Documents and the use of the Prepetition Collateral pursuant to this Interim Order and the DIP Agreement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents and the use of the Prepetition Collateral have been the subject of extensive negotiations conducted in good faith and at arms'-length among the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Administrative Agent, and all of the DIP Credit Parties' and the Pledgors' obligations and indebtedness arising under or in connection with the DIP Financing, including without limitation, (i) all loans made to, guaranties issued by and letters of credit issued for the account of, the DIP Credit Parties pursuant to the DIP Agreement and (ii) all other "Obligations" of the DIP Credit Parties under the DIP Documents, this Interim Order or in respect of overdrafts and related liabilities arising from treasury, depository and cash management services, or in connection with any automated clearing house transfers of funds, owing to the DIP Agent or any DIP Lender (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent, the DIP Lenders and their respective affiliates in "good faith", as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section

364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed. The DIP Credit Parties' may experience a significant reduction of the number of customers or vendors willing to do business with them due to a perceived lack of adequate liquidity, thereby significantly reducing the value of the DIP Credit Parties' estates. Consummation of the DIP Financing and the use of the Prepetition Collateral in accordance with this Interim Order and the DIP Documents are in the best interest of the Debtors' estates.

6.     *Authorization of the DIP Financing and the DIP Documents.*

(a)     The DIP Credit Parties and the Pledgors are hereby authorized to enter into the DIP Documents and, in the case of (A) the Borrowers, to borrow thereunder up to an aggregate principal amount of $20,000,000, of which up to $20,000,000 may be used for letters of credit (plus interest, fees and other expenses provided for in the DIP Documents), pending entry of the Final Order, all in accordance with the terms of this Interim Order, the DIP Agreement and the other DIP Documents, and (B) the Guarantors, to guaranty such borrowing, the obligations with respect to any letters of credit and all other DIP Obligations.

(b)     In furtherance of the foregoing and without further approval of this Court, each DIP Credit Party and each Pledgor is authorized and directed to perform all acts and to execute and deliver all instruments and documents and to pay all fees and expenses that the DIP Agent determines to be reasonably required or necessary for the DIP

Credit Parties' and the Pledgors' performance of their obligations under the DIP Documents, including without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the DIP Credit Parties, the Pledgors, the DIP Agent and the requisite DIP Lenders may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) unless such amendments, waivers, consents or other modifications (A) shorten the Maturity Date (as defined in the DIP Agreement) on terms and conditions other than those set forth in the DIP Agreement, (B) increase the Commitments (as defined in the DIP Agreement) or the rate of interest payable on the loans, or (C) change any Event of Default (as defined in the DIP Agreement), add any covenants or amend the covenants therein in any such case to be materially more restrictive; provided, further, that copies of any amendments, waivers, consents or other modifications to or under the DIP Documents shall be provided by the Debtors to counsel to the Committee (as defined in paragraph 6(b) below);

(iii)     the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Documents (including, without limitation the Letter Agreement among the DIP Agent, Banc of America Securities LLC and FairPoint Communications dated October [  ], 2009 (the "Engagement Letter")) and the DIP Documents and costs and expenses as may be due from time to time under the

DIP Documents (including, without limitation, the Engagement Letter), all as provided in the DIP Documents and all of which constitute DIP Obligations; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the DIP Credit Parties and the Pledgors, enforceable against the DIP Credit Parties and the Pledgors in accordance with the terms of this Interim Order and the DIP Documents.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

7.    *Superpriority Claims*.

(a)    Except to the extent expressly set forth in this Interim Order in respect of the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "Superpriority Claims") against each of the DIP Credit Parties with priority over any and all administrative expenses, adequate protection claims and all other claims against each of the DIP Credit Parties, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other

claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Claims (as defined in paragraph 13(a) below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Credit Parties and all proceeds thereof, including, without limitation (subject to entry of the Final Order), all proceeds or other amounts received in respect of the DIP Credit Parties' claims and causes of action arising under state or federal law under sections 502(d), 541, 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code (collectively, the "Causes of Action"), and any proceeds or other amounts received in respect thereof and property received thereby whether by judgment, settlement or otherwise.

(b)     For purposes hereof, the "Carve Out" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930 of title 28 of the United States Code and (ii) after the occurrence and during the continuance of an Event of Default under the DIP Documents, the payment of allowed professional fees and disbursements incurred by the Debtors or the official committee of unsecured creditors appointed in the Cases (the "Committee") in an aggregate amount incurred after the Event of Default not in excess of $7,500,000 (plus all unpaid professional fees and expenses allowed by this Court that were incurred prior to the occurrence of such Event of Default) (regardless of when allowed by this Court)),

provided that (w) no portion of the Carve Out shall be available to pay any such professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation or any threatened litigation against the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, (x) cash or other amounts on deposit in the Letter of Credit Account (as defined in the DIP Agreement) shall not be subject to the Carve Out, (y) so long as an Event of Default shall not have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by this Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code, and (z) nothing in this Interim Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.

8.     *DIP Liens.*  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the DIP Credit Parties or the Pledgors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any Collateral (as defined in this paragraph 7), the following security interests and liens are hereby granted by the DIP Credit Parties and the Pledgors to the DIP Agent, for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), subject only to the Carve Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a) <u>First Lien On Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Agent (for its own benefit and the benefit of the DIP Lenders) is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the DIP Credit Parties, whether existing on or as of the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, enforceable and unavoidable liens or are not subject to valid, enforceable and unavoidable liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "<u>Unencumbered Property</u>"), including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, wherever located, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing; <u>provided</u>, <u>however</u>, that such lien and security interest shall not include FCC licenses and PUC authorizations to the extent (but only to the extent) that any DIP Credit Party is prohibited from granting a lien and security interest therein pursuant to applicable law, but such lien and security interest shall include, to the maximum extent permitted by law, all rights incident or appurtenant to the FCC licenses and the PUC authorizations and the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of the FCC licenses and the PUC authorizations. Subject only to and effective upon entry of the Final Order, the

Unencumbered Property shall include the proceeds of any Causes of Action and any property received or recovered thereby whether by judgment, settlement or otherwise.

(b) <u>Liens Junior To Certain Existing Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Agent (for its own benefit and the benefit of the DIP Lenders) is hereby granted a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the DIP Credit Parties (other than the property described in clauses (a) and (c) of this paragraph 7, as to which the DIP Liens will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected, enforceable and unavoidable liens in existence immediately prior to the Petition Date or to valid, enforceable and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agent and the DIP Lenders are immediately junior only to such valid, perfected and unavoidable liens.

(c) <u>Liens Priming Prepetition Secured Lenders' Liens</u>. Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Agent (for its own benefit and the benefit of the DIP Lenders) is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of the Prepetition Administrative Agent (for the benefit of itself and the Prepetition Secured Parties) (including, without limitation, the Adequate Protection Liens (as defined in paragraph 13(b) below)), but shall not be senior to any valid, perfected, enforceable and

unavoidable security interests in and liens of other parties, if any, on the Prepetition Collateral existing as of the Petition Date or to any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Prepetition Administrative Agent (for the benefit of itself and the other Prepetition Secured Parties) become subject after the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(d) <u>Liens Senior To Certain Other Liens</u>. The DIP Liens and the Adequate Protection Liens shall not be, (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the DIP Credit Parties or the Pledgors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date, including without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the DIP Credit Parties or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code or otherwise.

9. *Protection of DIP Lenders' Rights*. So long as there are any DIP Obligations or the DIP Lenders have any Commitment (as defined in the DIP Agreement), the Prepetition Administrative Agent and the other Prepetition Secured Parties shall take no action to foreclose upon or recover in connection with the liens granted pursuant to the Prepetition Loan Documents, this Interim Order or otherwise exercise remedies against any Collateral of the DIP Credit Parties or the Pledgors without the prior written consent of the DIP Agent.

10. *Remedies after Event of Default*. The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent

and the DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default (as defined in the DIP Agreement), all rights and remedies under the DIP Documents, other than those rights and remedies against the Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default, and the giving of five business days' prior written notice to the Debtors (with a copy to counsel for the Committee and to the United States Trustee for the Southern District of New York), all rights and remedies against the Collateral provided for in the DIP Documents and this Interim Order (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Lender or any affiliate thereof). In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and each of the Debtors hereby waives any right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in this Interim Order or the DIP Documents. In no event shall the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent or any of the other the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Interim Order shall not constitute a waiver of the DIP Agent's or the DIP Lenders' rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Agreement.

11. *Limitation on Charging Expenses Against Collateral*. Subject to and effective upon entry of the Final Order, notwithstanding anything to the contrary contained herein,

except to the extent of the Carve Out, (a) no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition Administrative Agent, as the case may be, (b) no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent or the other Prepetition Secured Parties and (c) nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent or the other Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.   *Payments Free and Clear*.  Any and all payments or proceeds remitted (a) to the DIP Agent on behalf of the DIP Lenders or (b) without prejudice to the right of any other party (but subject to the limitations thereon described in paragraph 18 below), to the Prepetition Administrative Agent on behalf of the Prepetition Secured Parties, in each case, pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

13.   *Use of Prepetition Collateral*.  The DIP Credit Parties and the Pledgors are hereby authorized to use the Prepetition Collateral during the period from the Petition Date through and including the Maturity Date under the DIP Agreement for the same purposes as set forth in and

in accordance with the terms and conditions of this Interim Order and the DIP Documents, provided that, the Prepetition Secured Parties are granted adequate protection as hereinafter set forth.

14. *Adequate Protection.* The Prepetition Administrative Agent and the other Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 363 and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral in an amount equal to the Collateral Diminution (as defined below). As used in this Interim Order "Collateral Diminution" shall mean an amount equal to the diminution of the value of any of the Prepetition Collateral upon which any of the Prepetition Secured Parties have valid, perfected, enforceable and unavoidable liens or security interests from and after the Petition Date for any reason provided for in the Bankruptcy Code, including, without limitation, the priming of the Prepetition Administrative Agent's security interests in and liens on the Prepetition Collateral by the DIP Liens pursuant to the DIP Documents and this Interim Order, the depreciation, sale, loss or use of such Prepetition Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, whether in accordance with the terms and conditions of this Interim Order, the DIP Agreement or otherwise. As adequate protection for any Collateral Diminution, the Prepetition Administrative Agent and the Prepetition Secured Parties are hereby granted the following:

(a) <u>Adequate Protection Claims</u>. Allowed superpriority administrative claims as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, and shall at all times be senior to the rights of the

Debtors, and any successor trustee or any creditor, in the Cases or any subsequent proceedings under the Bankruptcy Code (the "Adequate Protection Claims"), which Adequate Protection Claims shall include any and all adequate protection claims granted to the Prepetition Secured Parties pursuant to this Interim Order and shall have recourse to and be payable from all prepetition and postpetition property of the DIP Credit Parties including, without limitation, the proceeds recovered in respect of Causes of Action. The Adequate Protection Claims shall be subject and subordinate only to (i) the Carve Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations. Except to the extent expressly set forth in this Interim Order or the DIP Agreement, the Prepetition Administrative Agent and the other Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the Commitments have been terminated.

(b)     Adequate Protection Liens.  As security for the payment of the amount of any Collateral Diminution, the Prepetition Administrative Agent (for itself and for the benefit of the Prepetition Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the DIP Credit Parties or the Pledgors of security agreements, pledge agreements, mortgages, financing statements or other agreements) (i) a valid, perfected replacement security interest in and lien on all of the Prepetition Collateral and (ii) a valid, perfected security interest in and lien on all of the Collateral including, without limitation, the proceeds or property recovered in respect of Causes of Action (the "Adequate Protection Liens"), subject and subordinate only to (x) valid, perfected and enforceable prepetition

liens (if any) which are senior to the Prepetition Secured Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (y) the DIP Liens and (z) the Carve Out. The Adequate Protection Liens shall include all security interests and liens granted to the Prepetition Administrative Agent for the benefit of the Prepetition Secured Parties pursuant to this Interim Order.

(c)     Fees And Expenses.  As additional adequate protection, subject to section 506(b) of the Bankruptcy Code, the DIP Credit Parties shall pay indefeasibly in cash:  (i) the fees and all reasonable professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants) payable to or incurred by the Prepetition Administrative Agent under and pursuant to the Prepetition Credit Agreement arising prior to the Petition Date; and (ii) on a current basis, the fees and all reasonable professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) payable to or incurred by the Prepetition Administrative Agent under and pursuant to the Prepetition Credit Agreement arising subsequent to the Petition Date.  The payment of the fees, expenses and disbursements set forth in this paragraph 13(c) of this Interim Order (including professional fees and expenses of Kaye Scholer LLP, FTI Consulting, Inc. and any other professionals or advisors retained by or on behalf of the Prepetition Administrative Agent) shall be made within twenty (20) business days after the receipt by the Debtors, the Committee and the United States Trustee (the "Review Period") of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable privilege or work product doctrines) and without the

necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided, however, that the Debtors, the Committee and the United States Trustee shall preserve their right to dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees; and (ii) the Debtors, the Committee or the United States Trustee files with the Court a motion or other pleading, on at least ten (10) days prior written notice to the Prepetition Administrative Agent of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees.

   (d) <u>Information</u>.  The Debtors shall promptly provide to the Prepetition Administrative Agent copies of any written financial information, periodic reporting or other information that is provided to, or required to be provided to, the DIP Agent, the DIP Lenders or the Financial Advisor (as defined in the DIP Agreement).

 15. *Reservation of Rights of Prepetition Parties*.  Under the circumstances and given that the adequate protection is consistent with the Bankruptcy Code, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant to this Interim Order is without prejudice to the right of the Prepetition Secured Parties to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, provided, however, that any such additional or modified adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Interim Order and the DIP Documents.

16.    *Perfection of DIP Liens and Adequate Protection Liens*.  The DIP Agent and the Prepetition Administrative Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent on behalf of the DIP Lenders, or the Prepetition Administrative Agent on behalf of the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.  The Prepetition Administrative Agent and Prepetition Secured Parties shall not file any such financing statements, mortgages, notices of lien or similar instruments, or otherwise confirm perfection of the security interests and liens granted thereto hereunder, unless the DIP Agent on behalf of the DIP Lenders shall theretofore have done so.  The DIP Credit Parties and the Pledgors shall execute and deliver to the DIP Agent and the Prepetition Administrative Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agent and the Prepetition Administrative Agent may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens and the Adequate Protection Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date. Pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more

parties, or requires the payment of any fees or obligations to any governmental entity, in order for the DIP Credit Parties or any Pledgor to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting the DIP Agent for the benefit of the DIP Lenders a senior security interest in and lien on such interest or the proceeds of any assignment and/or sale thereof by the Borrowers or any Guarantor in favor of the DIP Agent for the benefit of the DIP Lender in accordance with the terms of the DIP Documents.

17. *Preservation of Rights Granted Under the Order*.

(a) No claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order or the DIP Documents to the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent and the other Prepetition Secured Parties, shall be granted or allowed while any portion of the DIP Obligations (or any refinancing thereof), the Commitments or the Adequate Protection Claims remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the DIP Credit Parties' and the Pledgors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b) Unless all DIP Obligations and the Adequate Protection Claims shall have been indefeasibly paid in full in cash, (i) the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Agreement if any of the Debtors seeks, or if there is entered, any modification of this Interim Order without the prior written consent of

the DIP Agent and the Prepetition Administrative Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent or the Prepetition Administrative Agent or (ii) it shall constitute an Event of Default under the DIP Agreement if any order is entered converting or dismissing any of the Cases.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, the Adequate Protection Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and all Adequate Protection Claims shall have been indefeasibly paid in full in cash (and that such Superpriority Claims, Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Claims incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition  Administrative Agent, as applicable, of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP liens or the Adequate Protection Liens.  Notwithstanding any such reversal, stay, modification or vacatur, any DIP Obligations or any Adequate Protection Claims incurred by the DIP

Credit Parties to the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Administrative Agent of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with respect to all DIP Obligations and all Adequate Protection Claims.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Credit Parties and the Pledgors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Claims.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Superpriority

Claims, the Adequate Protection Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations, all Adequate Protection Claims and all Prepetition Indebtedness are indefeasibly paid in full in cash, and the Commitments have been terminated.

18.    *Non-Debtor Guarantees.*    Nothing contained in this Interim Order shall be deemed to terminate, modify or release any obligations of any non-debtor guarantors, if any, to the Prepetition Secured Parties with respect to the Prepetition Indebtedness owed by the Prepetition Credit Parties to the Prepetition Secured Parties.

19.    *Effect of Stipulations on Third Parties.*    The Debtors' admissions, stipulations and releases contained in this Interim Order including, without limitation, paragraph 3 of this Interim Order: (i) shall be binding upon the Debtors for all purposes; and (ii) shall be binding upon all other parties in interest, including any Committee, for all purposes unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than a date that is 60 days (or such later date as has been agreed to by the Prepetition Administrative Agent in its sole discretion) after the appointment of the Committee, (x) challenging the amount, validity, enforceability, priority or extent of the Prepetition Indebtedness or the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral, or (y) otherwise asserting any claims or causes of action against the Prepetition Secured Parties on behalf of the Debtors' estates, and (2) the Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter. If

no such adversary proceeding or contested matter is properly filed as of such dates or the Court does not rule in favor of the plaintiff in any such proceeding: (a) the Debtors' admissions stipulations and releases contained in paragraph 3 of this Interim Order shall be binding on all parties in interest, including the Committee; (b) the obligations of the Prepetition Credit Parties under the Prepetition Loan Documents shall constitute allowed claims for all purposes in these Cases, and any subsequent Chapter 7 case(s); (c) the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral shall be deemed to have been, as of Petition Date, legal, valid, binding, perfected, first priority security interests and liens, not subject to recharacterization, subordination or otherwise avoidable; and (d) the Prepetition Indebtedness and the Prepetition Secured Parties' security interests in and liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto. If any such adversary proceeding or contested matter is properly filed as of such dates, the Debtors' admissions, stipulations and releases contained in paragraph 3 of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) except to the extent that such admissions and releases were expressly challenged in such adversary proceeding or contested matter. Nothing contained in this Interim Order shall vest or confer any person (as defined in the Bankruptcy Code), including the Committee, with standing or authority to pursue or commence any such adversary proceeding or contested matter.

20. *Limitation on Use of DIP Financing Proceeds and Collateral*. The DIP Credit Parties shall use the proceeds of the DIP Financing solely as provided in this Interim Order and in the DIP Documents. Notwithstanding anything herein or in any other order of this Court to

the contrary, no Loans under the DIP Agreement, Collateral, Prepetition Collateral or the Carve Out may be used (a) for professional fees and expenses incurred for any litigation or threatened litigation against any of the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent or any other Prepetition Secured Party or for the purpose of challenging the validity, extent or priority of any claim, lien or security interest held or asserted by the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent or any other Prepetition Secured Party or asserting any defense, claim, counterclaim, or offset with respect to the DIP Obligations or the Prepetition Indebtedness or the security interests in or liens on the Collateral or the Prepetition Collateral, (b) to prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Administrative Agent's assertion, enforcement or realization on the Prepetition Collateral or the Collateral in accordance with the DIP Documents, the Prepetition Loan Documents, this Interim Order (c) to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent or the other Prepetition Secured Parties under this Interim Order or under the DIP Documents or the Prepetition Loan Documents, or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents.

21. *Exculpation.* Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or any DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP

Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the DIP Credit Parties and the Pledgors.

22.     *Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

23.     *Retention of Jurisdiction.*  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

24.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, as the case may be, including all findings herein, shall be binding upon all parties in interest in the Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent and the other Prepetition Secured Parties, any Committee appointed in these cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent, the other Prepetition Secured Parties and the Debtors and their respective successors and assigns, <u>provided</u> that, the DIP Agent, the DIP

Lenders, the Prepetition Administrative Agent and the other Prepetition Secured Parties shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

25. *Limitation of Liability*.  The Debtors shall seek in the Final Order, in addition to the protections offered to the DIP Agent, the Prepetition Administrative Agent and the other Prepetition Secured Parties in this Interim Order, the following provision:  "In determining to make any loan or other extension of credit under the DIP Agreement or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent, the Prepetition Administrative Agent, the DIP Lenders and the Prepetition Secured Parties shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute)."

26. *Master Proof of Claim.*  In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, the Prepetition Administrative Agent is authorized to file in the Debtors' lead chapter 11 case (*In re FairPoint Communications, Inc.* (Case No. 09-_____ (___)) a single, master proof of claim on behalf of the Prepetition Secured Parties on account of any and all of their respective claims arising under the Prepetition Loan Documents and hereunder (the "Master Proof of Claim") against each of the Prepetition Credit Parties and each of the Pledgors.  Upon the filing of the Master Proof of Claim against each of the Prepetition Credit Parties and each of the Pledgors,

the Prepetition Administrative Agent and each Prepetition Secured Party, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against the each of the Prepetition Credit Parties and each of the Pledgors of any type or nature whatsoever with respect to the Prepetition Loan Documents, and the claim of each Prepetition Secured Party (and each of their respective successors and assigns), named in the Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Cases. The Prepetition Administrative Agent shall not be required to amend the Master Proof of Claim to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims. The provisions of this paragraph 25 and the Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or their successors in interest) to vote separately on any plan of reorganization proposed in these Cases. The Prepetition Administrative Agent shall not be required to file with the Master Proof of Claim any instruments, agreements or other documents evidencing the obligations owing by each of the Prepetition Credit Parties and each of the Pledgors to the Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel for the Prepetition Administrative Agent.

27. *No Impact on Certain Contracts or Transactions*. No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 or 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Interim Order.

28.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable <u>nunc</u> <u>pro</u> <u>tunc</u> to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

29.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

30.     *Final Hearing*. The Final Hearing will be held by this Court on [_____, 2009] at __:__ _.m. (prevailing Eastern time).  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Committee.  Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection, which shall be served upon (a) Paul, Hastings, Janofsky & Walker, LLP, Park Avenue Tower, 75 East 55th Street, New York, NY 10022, Attn: Luc Despins, Esq. and James T. Grogan, Esq., attorneys for the Debtors; (b) Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022, Attention:  Margot B. Schonholtz, Esq. and Mark F. Liscio, Esq., Attorneys for the DIP Agent and the Prepetition Agent; and (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District of New York, in each case to allow actual receipt by the foregoing no later than [_____, 2009], at 4:00 p.m. (prevailing Eastern time).

Dated: New York, New York
         October ___, 2009

_____
United States Bankruptcy Judge

## Schedule 1 - Guarantors

Berkshire Cellular, Inc.
Berkshire Net, Inc.
Berkshire New York Access, Inc.
C&E Communications, Ltd.
Comerco, Inc.
C-R Communications, Inc.
C-R Long Distance, Inc.
Commtel Communications, Inc.
El Paso Long Distance Company
Elltel Long Distance Corp.
FairPoint Broadband, Inc.
FairPoint Carrier Services, Inc.
FairPoint Communications Solutions Corp. -- New York
FairPoint Communications Solutions Corp. - Virginia
Fremont Broadband, LLC
Fretel Communications, LLC
Germantown Long Distance Company
GIT-CELL, Inc.
GITCO Sales, Inc.
GTC Communications, Inc.
GTC Finance Corporation
MJD Services Corp.
MJD Ventures, Inc.
Orwell Communications, Inc.
Peoples Mutual Long Distance Company
Peoples Mutual Services Company
Quality One Technologies, Inc.
Ravenswood Communications, Inc.
S T Computer Resources, Inc.
S T Enterprises, Ltd.
Taconic Technology Corp.
Telephone Service Company
UI Communications, Inc.
UI Telecom, Inc.
Unite Communications Systems, Inc.
Utilities, Inc.
Yates City Telephone Company

<u>Schedule 2 - Stock Pledgors</u>

Berkshire Cellular, Inc.
C-R Communications, Inc.
Utilities, Inc.
GTC Communications, Inc.
Comerco, Inc.
Ravenswood Communications, Inc.
Unite Communications Systems, Inc.
FairPoint Broadband, Inc.
MJD Ventures, Inc.
MJD Services Corp.
S T Enterprises, Ltd.
FairPoint Carrier Services, Inc.
FairPoint Logistics, Inc.
FairPoint Communications, Inc.
Enhanced Communications of Northern New England, Inc.
St. Joe Communications, Inc.

## Schedule 3 - Grantors

FairPoint Communications, Inc.
FairPoint Logistics, Inc.
Berkshire Cellular, Inc.
Berkshire Net, Inc.
Berkshire New York Access, Inc.
C&E Communications, Ltd.
Comerco, Inc.
C-R Communications, Inc.
C-R Long Distance, Inc.
Commtel Communications, Inc.
El Paso Long Distance Company
Elltel Long Distance Corp.
FairPoint Broadband, Inc.
FairPoint Carrier Services, Inc.
FairPoint Communications Solutions Corp. -- New York
FairPoint Communications Solutions Corp. - Virginia
Fremont Broadband, LLC
Fretel Communications, LLC
Germantown Long Distance Company
GIT-CELL, Inc.
GITCO Sales, Inc.
GTC Communications, Inc.
GTC Finance Corporation
MJD Services Corp.
MJD Ventures, Inc.
Orwell Communications, Inc.
Peoples Mutual Long Distance Company
Peoples Mutual Services Company
Quality One Technologies, Inc.
Ravenswood Communications, Inc.
S T Computer Resources, Inc.
S T Enterprises, Ltd.
Taconic Technology Corp.
Telephone Service Company
UI Communications, Inc.
UI Telecom, Inc.
Unite Communications Systems, Inc.
Utilities, Inc.
Yates City Telephone Company

**EXHIBIT A TO INTERIM DIP ORDER**

**THE DIP CREDIT AGREEMENT IS NOT ANNEXED HERETO BUT WILL BE FILED WITH THE BANKRUPTCY COURT BY NO LATER THAN 6:00 P.M. (EDT) ON OCTOBER 26, 2009.**

# EXHIBIT B TO INTERIM DIP ORDER

## BUDGET

**FairPoint Communications, Inc.**
**13 Week Cash Forecast**
**Summary- Terms**

| Forecast/Actual | F 1 | F 2 | F 3 | F 4 | F 5 | F 6 | F 7 | F 8 | F 9 | F 10 | F 11 | F 12 | F 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Week Ending | 10/30/2009 | 11/6/2009 | 11/13/2009 | 11/20/2009 | 11/27/2009 | 12/4/2009 | 12/11/2009 | 12/18/2009 | 12/25/2009 | 1/1/2010 | 1/8/2010 | 1/15/2010 | 1/22/2010 |
| **Beginning Cash Balance** | $49,920,640 | $59,278,719 | $64,145,492 | $69,925,110 | $77,243,476 | $72,629,761 | $68,059,418 | $70,615,529 | $59,843,856 | $67,404,988 | $35,143,007 | $37,920,252 | $43,461,754 |
| **Receipts** | | | | | | | | | | | | | |
| NNE | $17,232,423 | $18,851,678 | $18,126,613 | $17,401,549 | $14,501,291 | $16,069,386 | $17,168,095 | $16,450,841 | $13,589,825 | $12,874,571 | $20,520,932 | $19,795,755 | $13,830,346 |
| Cash-NNE | $4,571,746 | $5,149,552 | $6,051,009 | $4,782,423 | $3,981,784 | $2,592,749 | $4,158,275 | $3,741,365 | $3,085,831 | $3,457,656 | $5,416,069 | $5,415,495 | $3,810,904 |
| ESG Initiative | $830,789 | $774,007 | $51,308 | $670,655 | $170,733 | $733,847 | $595,734 | $944,009 | $859,985 | $753,733 | $477,179 | $1,160,574 | $811,503 |
| Total Cash Receipts | $22,634,958 | $24,775,238 | $24,229,414 | $22,834,547 | $18,653,218 | $19,397,094 | $22,075,987 | $21,136,936 | $17,479,656 | $16,683,048 | $26,568,277 | $20,619,410 | $18,028,474 |
| **COGS** | | | | | | | | | | | | | |
| NNE | $0 | $620,674 | $2,926,512 | $814,635 | $931,358 | $804,908 | $938,210 | $2,697,671 | $803,136 | $3,506,870 | $878,414 | $2,175,219 | $467,492 |
| Telecom | $0 | $424,063 | $556,583 | $556,583 | $556,583 | $733,847 | $595,734 | $994,009 | $859,985 | $753,733 | $477,179 | $1,160,574 | $811,503 |
| Total COGS | $0 | $1,044,738 | $3,483,095 | $1,371,218 | $1,487,941 | $1,538,763 | $1,533,945 | $3,681,679 | $1,714,121 | $4,260,404 | $1,355,592 | $3,335,793 | $1,278,985 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Employee Expenses | $9,369,010 | $6,749,487 | $8,634,003 | $7,078,925 | $10,894,134 | $7,087,785 | $8,856,876 | $7,501,799 | $9,982,433 | $7,703,238 | $8,140,982 | $9,081,823 | $7,779,360 |
| Building Related Expenses | | $498,703 | $547,605 | $1,491,416 | $1,809,475 | $819,985 | $808,146 | $1,849,468 | $2,329,362 | $821,830 | $771,880 | $848,415 | $1,815,400 |
| Billing Expenses | | $71,767 | $94,220 | $94,220 | $153,315 | $355,784 | $163,618 | $294,959 | $146,655 | $274,971 | $642,721 | $289,455 | $154,634 |
| Restructuring | | $5,350,000 | | | | $4,750,000 | | | | $18,062,138 | $4,675,000 | | |
| Operating Taxes | $1,448,387 | $507,197 | $507,803 | $544,500 | $193,750 | $98,420 | $721,774 | $990,526 | $341,913 | $3,319,864 | $712,121 | $287,879 | $121,000 |
| Contracted Services | | $792,605 | $834,115 | $600,027 | $824,749 | $751,272 | $804,815 | $663,183 | $600,693 | $548,485 | $1,155,197 | $760,018 | $710,174 |
| Network Expenses | | $105,835 | $463,189 | $1,165,159 | $2,716,559 | $383,300 | $220,810 | $591,637 | $204,104 | $1,609,845 | $245,244 | $885,369 | $301,862 |
| Marketing Expenses | | $192,981 | $308,919 | $308,919 | $324,796 | $330,712 | $307,628 | $320,395 | $298,227 | $266,458 | $271,255 | $433,281 | $429,492 |
| Motor Vehicle | | $195,017 | $200,834 | $13,679 | $503,236 | $209,506 | $230,034 | $23,687 | $71,779 | $503,812 | $222,815 | $168,203 | $17,541 |
| Computer | | $641,123 | $17,385 | $28,697 | $23,923 | $680,018 | $11,317 | $84,800 | $199,214 | $6,188,784 | $67,840 | $314,131 | $243,091 |
| Customer Service | | $81,981 | $2,442 | $2,442 | $52,381 | $52,881 | $57,498 | $67,705 | $54,656 | $92,554 | $81,362 | $502,187 | $50,239 |
| Non-Restructuring Legal Expenses | | $83,245 | $109,259 | $109,259 | $115,838 | $90,040 | $105,946 | $107,959 | $100,233 | $97,408 | $87,309 | $172,858 | $121,288 |
| Insurance | | $341,650 | $47,000 | $57,500 | $32,400 | $37,555 | $43,318 | $53,818 | $29,455 | $29,455 | $42,932 | $86,317 | $51,105 |
| Other Expenses | $739,751 | $761,644 | $761,644 | $761,644 | $609,015 | $703,162 | $688,529 | $688,529 | $550,823 | $550,823 | $791,900 | $791,900 | $633,520 |
| Total Operating Disbursements | $11,557,148 | $16,316,142 | $12,419,118 | $11,497,378 | $18,021,922 | $16,782,441 | $13,438,680 | $13,540,087 | $14,296,178 | $40,292,019 | $16,229,120 | $12,535,797 | $12,889,097 |
| NNE Vendor Deposits | $633,830 | $633,830 | $633,930 | $633,930 | | | | | | | | | |
| Cash Collateral - Surety Program | $567,500 | $567,500 | $567,500 | $567,500 | | | | | | | | | |
| LC Collateral | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| AP Catch-Up | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Critical Vendor Payments | | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 |
| Bankruptcy Related Disbursements | $1,201,430 | $2,547,584 | $2,547,584 | $2,547,584 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 | $1,346,154 |
| DIP Interest Expense/Fees | $518,301 | | | | | | | | | | | | |
| Bank Interest | | | | $118,301 | | | | $118,301 | | $118,301 | $118,301 | | |
| Bond Interest | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Swap Payments | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Interest Payments | $518,301 | | | $118,301 | | | | $118,301 | | $118,301 | $118,301 | | |
| CapEx- NNE | $0 | $0 | $0 | $0 | $2,097,607 | $2,805,402 | $2,805,402 | $2,805,402 | $2,244,322 | $2,667,004 | $2,507,404 | $2,507,404 | $2,005,923 |
| CapEx- Telecom | $0 | $0 | $0 | $0 | $295,109 | $394,687 | $394,687 | $394,687 | $315,749 | $261,146 | $352,762 | $352,762 | $282,209 |
| Total CapEx | $0 | $0 | $0 | $0 | $2,392,716 | $3,200,089 | $3,200,089 | $3,200,089 | $2,560,071 | $2,928,150 | $2,860,166 | $2,860,166 | $2,288,133 |
| Check Clearings | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Ending Cash** | $59,278,719 | $64,145,492 | $69,925,110 | $77,343,476 | $72,629,761 | $68,059,418 | $70,615,529 | $69,843,856 | $67,404,988 | $35,143,007 | $37,920,252 | $43,461,754 | $43,686,989 |
| Change in Cash | $9,358,079 | $4,866,774 | $5,779,617 | $7,418,367 | $(4,713,716) | $(4,570,343) | $2,656,111 | $(771,672) | $(2,438,869) | $(32,261,980) | $2,777,245 | $5,541,501 | $225,236 |

**EXHIBIT C**

**DECLARATION OF NEIL A. AUGUSTINE**

Luc A. Despins, Esq.
James T. Grogan, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | |
|---|---|
| | : **Chapter 11** |
| **In re:** | : |
| | : **Case No. 09-_____  (____)** |
| **FAIRPOINT COMMUNICATIONS, INC.,** *et al.*, | : |
| | : **(Jointly Administered)** |
| **Debtors.** | : |
| | : |

-------------------------------------------------------------x


**DECLARATION OF NEIL A. AUGUSTINE IN SUPPORT OF DEBTORS' MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO (I)
OBTAIN POSTPETITION FINANCING PURSUANT TO BANKRUPTCY CODE
SECTION 364; (II) GRANT PRIMING LIENS AND SUPERPRIORITY CLAIMS
PURSUANT TO BANKRUPTCY CODE SECTIONS 364(c) AND (d); (III) PROVIDE
ADEQUATE PROTECTION TO PREPETITION LENDERS PURSUANT TO
BANKRUPTCY CODE SECTIONS 361, 362, 363, AND 364 AND (IV) TO SCHEDULE A
FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Pursuant to 28 U.S.C. § 1746, Neil A. Augustine declares:

1.       I am over the age of 18 and competent to testify.  I am a Managing Director of the

investment banking firm Rothschild Inc. ("Rothschild"), which has an office located at 1251

Avenue of the Americas, New York, New York 10020.  I submit this declaration in support of the

Motion of FairPoint Communications, Inc. ("FairPoint Communications") and its affiliated

debtors, as debtors-in-possession (collectively, "FairPoint") authorizing FairPoint to (I) obtain

postpetition financing pursuant to § 364 of title 11, United States Code (the "Bankruptcy Code"); (ii) grant priming liens and superpriority claims pursuant to § 364(c) and (d) of the Bankruptcy Code; (III) provide adequate protection to prepetition lenders pursuant to §§ 361, 362, 363 and 364; and (IV) to schedule a final hearing pursuant to Fed. R. Bankr. P. 4001 (the "Motion"). Except as otherwise noted, I have personal knowledge as to all of the information set forth below.

## BACKGROUND AND QUALIFICATIONS

2.      I hold a Bachelor of Arts degree and a Masters of Business Administration from the University of Rochester.  I began my career at Chemical Bank where I was actively involved in advising both debtors and creditors as well as providing debtor-in-possession financing. Thereafter, I became one of the founding members of The Blackstone Group's Restructuring and Reorganization Financial Advisory Department.  After leaving the Blackstone Group, I held positions as the Director of Distressed Debt Research at Lehman Brothers, Inc. and as the Director of Research at Whippoorwill Associates, Inc., a $600 million money management firm specializing in purchasing claims in financially troubled companies.  Prior to joining Rothschild in April 2001, I was the Group Portfolio Manager for the Distressed Debt Group of Morgens, Waterfall, Vintiadis & Company Inc., a New York-based, S.E.C.-registered investment advisor with approximately $1 billion of capital under management.  I have previously served on the boards of United Artists Theatre Company, Safeguard Business Systems, Inc., The Grand Union Company and American Blind and Wallpaper Factory, Inc.

3.      I have more than twenty (20) years experience in investing in and advising distressed companies and their creditors.  I have substantial experience marketing, structuring and evaluating debtor-in-possession financings, secured debt, exit financing, unsecured debt, rights offerings and preferred and common stock.

2

4.      I have been involved in out-of-court and in-court restructurings in the United States, Europe, Canada and Mexico.  The bankruptcy-related matters in which I have testified at deposition and/or at trial include, but are not limited to, cases involving the following debtors: Atlantic Express Transportation Group, New World Pasta Corp., Cable Satisfaction International, Inc., VeraSun Energy, Innovative Communications Corp., Werner Ladder Co., Motor Coach Industries, Milacron Inc., and WestPoint Stevens, Inc.

## ROTHSCHILD'S QUALIFICATIONS

5.      Rothschild is a member of one of the world's leading independent investment banking groups, with more than forty (40) offices in more than thirty (30) countries, including an office located at 1251 Avenue of the Americas, New York, New York 10020.  Rothschild has expertise in domestic and cross-border restructurings, mergers and acquisitions, and other financial advisory services, and with particular experience in providing high-quality financial advisory services to financially troubled companies.  Rothschild is an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors in a variety of industries.  Rothschild is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operating restructurings.  Moreover, Rothschild is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

6.      Rothschild and its professionals have extensive experience working with financially troubled companies from a variety of industries in complex financial restructurings, both out-of-court and in chapter 11 cases.  Rothschild's business reorganization professionals have served as financial and strategic advisors in numerous cases, including, among others:  *In re Sea Launch Co., LLC,* No. 09-12153 (BLS) (Bankr. D. Del. Aug. 8, 2009); *In re Sun-Times*

*Media Group, Inc.,* No. 09-11092 (CSS) (Bankr. D. Del. May 11, 2009); *In re Milacron Inc.*, No. 09-11235 (Bankr. S.D. Ohio March 10, 2009); *In re Tronox Inc.,* No. 09-10156 (ALG) (Bankr. S.D.N.Y. Apr. 7, 2009); *In re PPI Holdings, Inc.,* No. 08-13289 (KG) (Bankr. D. Del. Feb. 4, 2009); *In re Recycled Paper Greetings Inc.*, Case No. 09-10002 (Bankr. D. Del. January 2, 2009); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (Bankr. E.D.VA. November 10, 2008); *In re VeraSun Energy Corporation*, Case No. 08-12606 (Bankr. D. Del. October 31, 2008); *In re Motor Coach Industries International, Inc.*, Case No. 08-12136 (Bankr. D. Del. September 15, 2008); *In re BHM Technologies*, Case No. 08-04413 (Bankr. W.D. Mich. May 19, 2008); *In re Hilex Poly Co. LLC*, Case No. 08-10890 (Bankr. D. Del. May 6, 2008); *In re Werner Holding Co., Inc.,* No. 06-10578 (KJC) (Bankr. D. Del. June 12, 2006); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. November 30, 2005); *In re Solutia Inc.*, Case No. 03-17949 (Bankr. S.D.N.Y. March 11, 2005); *In re International Wire*, Case No. 04-11991 (Bankr. S.D.N.Y. July 1, 2004); *In re WestPoint Stevens, Inc.,* No. 03-13532 (RDD); *In re Viasystems Group, Inc.*, Case No. 02-14867 (Bankr. S.D.N.Y. November 21, 2002); *In re Guilford Mills, Inc.*, Case No. 02-40667 (Bankr. S.D.N.Y. June 26, 2002); *In re James River Coal Company*, Case No. 03-04095 (Bankr. M.D. Tenn. May 23, 2003); *In re Superior TeleCom Inc., et al.*, Case No. 03-10607 (Bankr. D. Del. April 10, 2003); *In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill. December 9, 2002); *In re Mpower Holding Corporation*, Case No. 02-11046 (Bankr. D. Del. April 29, 2002); *In re Thermadyne Holdings Corp.*, Case No. 01-52840 (Bankr. E.D. Miss. April 29, 2002); *In re Special Metals Corp.*, Case No. 02-10335 (Bankr. E.D.KY. March 27, 2002); *In re Federal-Mogul Global, Inc.*, Case No. 01-10578 (Bankr. D. Del. February 5, 2002); *In re Comdisco*, Case No. 01-24795 (Bankr. N.D. Ill. Oct. 23, 2001); *In re The Finova Group*, Case No. 01-00697 (Bankr. D. Del. June 25, 2001); *In re Globe Manufacturing Corp.*, Case No. 01-

70115 (Bankr. N.D. Ala. March 22, 2001); *In re Heartland Steel*, Case No. 01-80081 (S.D. Ind. March 12, 2001); *In re Trans World Airlines, Inc.*, Case No. 01-0056 (Bankr. D. Del. January 26, 2001); *In re Crown Vantage, Inc.*, Case No. 00-41584 (Bankr. N.D. Cal. June 20, 2000); *In re Geneva Steel Holdings Corporation*, Case No. 99-21130 (Bankr. D. Utah May 17, 2000); *In re Service Merchandise*, Case No. 99-02649 (Bankr. M.D. Tenn. May 3, 2000); *In re Key Plastics*, Case No. 00-44478 (Bankr. E.D. Mich. April 26, 2000); *In re Thorn Apple Valley*, Case No. 99-43645 (E.D. Mich. March 23, 1999); *In re Today's Man*, Case No. 96-00117 (Bankr. D. Del. April 17, 1997); *In re Edison Brothers*, Case No. 95-01354 (Bankr. D. Del. April 10, 1996).

7.       Prior to the Petition Date, on May 12, 2009, FairPoint engaged Rothschild to provide general investment banking and financial advice in connection with FairPoint's efforts to pursue an out-of-court restructuring of all or a significant portion of FairPoint's outstanding indebtedness, and to prepare for the commencement of these chapter 11 cases after such effort failed.

8.       In rendering prepetition services to FairPoint in connection with these matters, Rothschild has worked closely with FairPoint's management and other retained professionals and has become well acquainted with FairPoint's business operations, capital structure, key stakeholders, financing documents and other material information.  Rothschild has, among other responsibilities: (a) analyzed FairPoint's current liquidity and projected cash flow; (b) assisted FairPoint in evaluating their restructuring and other strategic alternatives; (c) helped FairPoint prepare for the Chapter 11 proceedings; and (d) as part of the Chapter 11 preparation, conducted a comprehensive process to secure debtor-in-possession financing (the "DIP Financing") for FairPoint on the most competitive terms and conditions available to FairPoint.

9.     With respect to the DIP Financing, Rothschild worked with FairPoint under an accelerated timeframe to identify potential lenders, including FairPoint's prepetition lenders, bondholders, and other third party lenders, willing to lend on a postpetition basis in order to provide adequate liquidity for FairPoint during its Chapter 11 cases.

## EFFORTS TO OBTAIN POSTPETITION FINANCING

10.     Commencing in October 2009, Rothschild approached a number of financial institutions and hedge funds regarding providing postpetition financing to FairPoint. These entities included those that have been active providers of postpetition financing, including FairPoint's existing senior lenders and bondholders. Specifically, in addition to FairPoint's existing senior lenders, Rothschild contacted seventeen (17) potential lenders. Of the potential lenders contacted by Rothschild, six (6) expressed potential interest, executed non-disclosure agreements, and were provided requests for proposals and diligence materials sufficient to prepare debtor-in-possession financing proposals. Of the six (6) parties that expressed interest, three (3) parties declined the transaction subsequent to receiving the request for proposal and diligence material and one (1) party never advised Rothschild of its intentions and failed to submit a timely proposal. As of October 25, 2009, two (2) lenders submitted proposals regarding postpetition debtor-in-possession financing. However, the terms of the proposed DIP Financing are superior to the proposals received by Rothschild from the two lenders who submitted a proposal. Specifically, the terms of those proposals either (1) required priming liens over the existing liens of FairPoint's prepetition secured lenders, which most likely would result in a lengthy and expensive dispute before this Court; (2) provided for economic terms that were less favorable than the proposed DIP Financing; (3) were subject to syndication (*i.e.*, not committed); or (4) required liens upon FairPoint's regulated assets.

11.     Simultaneously with the proposal process detailed above, FairPoint, with the assistance of Rothschild, engaged in extensive and intense negotiations in an attempt to improve the proposal submitted by certain of FairPoint's secured prepetition lenders.  These negotiations took place over a period of approximately ten (10) days, and involved efforts by all involved parties to reach a consensus on the key aspects of any secured postpetition financing. Eventually, these negotiations led to the development of a term sheet, which then evolved into the currently proposed DIP Financing.

**THE TERMS OF THE DIP FINANCING ARE THE BEST
AVAILABLE UNDER CURRENT MARKET CONDITIONS**

12.     The significant terms of the DIP Financing are set forth in the Motion.  In summary, however, the DIP Lenders[1] will provide senior secured, super-priority, postpetition financing up to an aggregate principal amount of $75 million as part of a revolving facility, with a letter of credit subfacility in an aggregate amount of $30 million.  The interest rate on the revolver facility is either (i) the Eurodollar Rate plus 4.50%; or (ii) the Base Rate plus 3.50%.

13.     The DIP Lenders will receive as security for the DIP Facility (i) a perfected first-priority lien on all now owned or hereafter acquired assets of the DIP Credit Parties that is not subject to valid, perfected and non-avoidable liens as of the Petition Date, other than FCC licenses and those assets and property of the DIP Credit Parties in which granting a lien therein would result in a violation of applicable law, and including all proceeds or other amounts received in respect of the DIP Credit Parties' claims and causes of action arising under state or federal law under Chapter 5 of the Bankruptcy Code; (ii) a perfected junior lien on all property of the DIP Credit Parties that is subject to valid, perfected and non-avoidable liens as of the

---

[1] Capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Motion.

Petition Date or to liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b); and (iii) first-priority, senior priming perfected liens all assets that constitute collateral under the Prepetition Credit Agreement. The DIP Facility is subject to a customary carve-out for the payment of professional fees.

14.     Significantly, the proposed DIP Financing <u>does</u> <u>not</u> include any of the following:

    a)    a cross collateralization provision that converts prepetition debt to administrative expense (or higher) status;

    b)    a provision requiring FairPoint to pay accrued or current interest payments due under the Prepetition Credit Agreement as part of the adequate protection provided to the lenders under such agreement (the "<u>Prepetition Secured Lenders</u>");

    c)    provisions which give the Prepetition Secured Lenders control over key issues in these cases, such as the filing of a plan of reorganization satisfactory to the Prepetition Secured Lenders; or

    d)    a provision limiting FairPoint's use of borrowings under the DIP Financing to items contained in a strict budget.

15.     In light of current market conditions and FairPoint's need for liquidity, the terms of the DIP Financing are fair and reasonable.

16.     The proposed DIP Financing is at competitive terms and conditions. In order to submit a viable secured postpetition proposal, a third party would have to contend with the collateral package currently held by FairPoint's secured prepetition lenders and the regulatory dynamics. Furthermore, the third-party proposals for secured postpetition financing sought priming liens against the collateral held by FairPoint's secured prepetition lenders. Indeed, FairPoint's prepetition secured lenders advised Rothschild that they would argue against any postpetition financing proposal that included priming liens against their collateral for lack of adequate protection under § 361 of the Bankruptcy Code. The proposed DIP Financing represents the most favorable financing for FairPoint because it provides the most favorable

economic terms as compared to any other lending proposal reviewed by Rothschild and does not require the imposition of non-consensual priming liens.

17.     Under these circumstances, the terms of the DIP Financing, including interest and fees, are reasonable and the best available under the circumstances.

[SIGNATURE PAGE FOLLOWS]

I hereby declare, pursuant to 28 U.S.C. § 1746, and under the penalty of perjury, that the foregoing is true and correct.

Date: October 26, 2009

**ROTHSCHILD INC.**

By: Neil Augustine
Title: Managing Director