**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                        In re:                    :     Chapter 11
                                                  :
FAIRPOINT COMMUNICATIONS, INC., et al., :         Case No. 09- 16335 (BRL)
                                                  :
                      Debtors.                    :     (Jointly Administered)
                                                  :
                                                  :
                                                  :
------------------------------------------------------------ x
```

**AMENDED DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
75 East 55th Street
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Attorneys for Debtors and
Debtors-in-Possession

Dated: New York, New York
February 8,11, 2010

# DISCLAIMER

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXECUTIVE SUMMARY, ARE ANNEXED TO THE PLAN, AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "RISK FACTORS" SECTION HEREIN BEFORE VOTING FOR OR AGAINST THE PLAN.  ***SEE SECTION VII ("CERTAIN FACTORS TO BE CONSIDERED")***.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF FAIRPOINT COMMUNICATIONS, INC. ("FAIRPOINT COMMUNICATIONS") AND ITS SUBSIDIARIES SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASES OF FAIRPOINT COMMUNICATIONS AND ITS SUBSIDIARIES ("FAIRPOINT"), AND FINANCIAL INFORMATION.  ALTHOUGH FAIRPOINT BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES

ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF FAIRPOINT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. FAIRPOINT IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF FAIRPOINT OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING FAIRPOINT OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST FAIRPOINT. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS.

# EXECUTIVE SUMMARY

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in FairPoint's chapter 11 plan of reorganization. A term used but not defined in this Disclosure Statement or FairPoint's chapter 11 plan of reorganization has the meaning given it in the Bankruptcy Code and/or the Federal Rules of Bankruptcy Procedure.

On October 26, 2009, FairPoint Communications and all of its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The cases are being jointly administered under the caption *In re FairPoint Communications, Inc*., Case No. 09-16335 (BRL) (the "Chapter 11 Cases").

FairPoint commenced the Chapter 11 Cases because of a significant need to de-leverage its balance sheet and to reduce its cost structure. In March 2008, FairPoint Communications completed the acquisition of certain landline operations in Maine, New Hampshire and Vermont (the "NNE Operations") from Verizon Communications Inc. ("Verizon") through a merger (the "Merger") with Northern New England Spinco Inc. ("Spinco"), a subsidiary of Verizon. In connection with the Merger, FairPoint and Spinco entered into a $2.03 billion secured credit facility, as subsequently amended (the "Prepetition Credit Agreement"), and Spinco issued and FairPoint Communications subsequently assumed $551 million aggregate principal amount of 13-1/8% Senior Notes due 2018 (the "Original Senior Notes"). As of the Petition Date, FairPoint had approximately $2.7 billion of indebtedness, including accrued and unpaid interest and amounts owed under interest rate swap agreements, which is not sustainable. FairPoint's financial difficulties have been exacerbated by declining financial performance which can be traced to, among other things, (i) increased competition from alternative voice and data communication providers that has eroded FairPoint's traditional base of wireline voice customers (ii) the recent turmoil in the financial markets, which has significantly limited available capital and resulted in a significant decline in the domestic economy and (iii) difficulties transitioning from Verizon's systems and integrating the NNE Operations acquired in the Merger with FairPoint's historical operations.

In an effort to address these issues, FairPoint's management team worked diligently to expand and improve FairPoint's product offerings, diversify and grow revenues, increase operational efficiency and operating cash flows and reduce debt obligations through, among other things, (i) investing $85 million in the build out of a new next generation Internet protocol based network, (ii) suspending common stock dividends and (iii) completing an exchange offer (the "Exchange Offer") for certain of the Original Senior Notes for new 13-1/8% Senior Notes due 2018 (the "Exchange Offer Senior Notes", and together with the Original Senior Notes, the "Senior Notes"), which allowed FairPoint to reduce its cash interest expense for the quarters ended June 30, 2009 and September 30, 2009 and maintain compliance with financial covenants contained in the Prepetition Credit Agreement for the measurement period ended June 30, 2009.

Despite these actions, FairPoint's balance sheet remained highly leveraged, with substantial annual capital expenditure requirements and interest costs, and portions of the principal amount of the Prepetition Credit Agreement becoming due on a quarterly basis. This

capital structure is not sustainable, particularly after taking into account the impact of (i) the recession in the United States and the associated high levels of unemployment, reduced disposable income and consumer spending, increased business failures and higher than normal uncollected receivables, (ii) the continued significant capital expenditure requirements required for FairPoint to remain competitive in the telecommunications market and imposed by the regulatory orders approving the Merger and (iii) FairPoint's limited access to capital markets. As a result, FairPoint, with the assistance of its advisors, began to explore capital structure restructuring alternatives, including recapitalizations and a potential chapter 11 filing.

Commencing in July 2009 and culminating in October 2009, FairPoint worked diligently, first with the holders of the Senior Notes and then with certain lenders under the Prepetition Credit Agreement, to obtain a sustainable solution to FairPoint's significant leverage. Through negotiations with a steering committee of lenders under the Prepetition Credit Agreement (the "Lender Steering Committee"), FairPoint reached an agreement in October 2009 with the Consenting Lenders (including the Lender Steering Committee), who hold more than 50% of the indebtedness under the Prepetition Credit Agreement on a term sheet (the "Plan Term Sheet") regarding the framework for a comprehensive balance sheet restructuring that would result in the conversion of more than $1.7 billion of FairPoint's indebtedness into equity in FairPoint Communications. Evidencing their support of the Plan Term Sheet, the Consenting Lenders have executed the Plan Support Agreement pursuant to which the Consenting Lenders agreed to support a chapter 11 plan as substantially embodied in the Plan Term Sheet. Thereafter, FairPoint commenced the Chapter 11 Cases on October 26, 2009.

Pursuant to the Plan Term Sheet, FairPoint agreed to file a chapter 11 plan that provided for the reorganization of FairPoint as a going concern. The integral components of the agreement with the Consenting Lenders included (i) $75 million of debtor-in-possession financing, which would provide sufficient liquidity to fund FairPoint during the course of the Chapter 11 Cases and (ii) the conversion of approximately $1.1 billion of the indebtedness under the Prepetition Credit Agreement into equity in Reorganized FairPoint Communications.

Following the Petition Date, the Ad Hoc Committee of Senior Noteholders (as defined herein) raised certain concerns regarding FairPoint's proposed treatment of FairPoint Communications Unsecured Claims under the Plan Term Sheet. In an effort to resolve these concerns, FairPoint, the Lender Steering Committee and the Ad Hoc Committee of Senior Noteholders entered into extensive, arms' length negotiations. These negotiations ultimately resulted in certain changes to the terms contained in the Plan Term Sheet and the formulation of the Plan, annexed hereto as *Exhibit A*.

Under the Plan, Prepetition Credit Agreement Claims (Class 4) (as defined herein) will be satisfied in full, as follows: (i) by a *pro rata* share of New Term Loan in the aggregate principal amount of $1 billion, (ii) by a *pro rata* share of the Cash Payment, (iii) by a *pro rata* share of forty-seven million two hundred ~~seventy five~~forty-one thousand ~~seven~~four hundred ~~eighty five~~ (~~47,275,785~~thirty-six (47,241,436) shares of the New Common Stock in Reorganized FairPoint Communications (subject to dilution) and (iv) by a *pro rata* share of Cash distributable out of the Reserve (as defined herein), *provided, however*, that if the class of FairPoint Communications Unsecured Claims rejects the Plan, each holder of a Prepetition Credit Agreement Claim will receive its *pro rata* share of fifty ~~-~~eight million~~,~~ four hundred eighty ~~-~~four thousand five hundred

eighty -seven (58,484,587) shares of the New Common Stock (subject to dilution), as more fully described in ***Section VI.C.4 ("Summary of Plan of Reorganization—Treatment of Claims and Equity Interests Under the Plan—Allowed Prepetition Credit Agreement Claims (Class 4)")*** of this Disclosure Statement.  FairPoint Communications Unsecured Claims (Class 7) will be satisfied in full under the Plan, as follows: (i) by a *pro rata* share of four million ~~one~~two hundred ~~ninety~~three thousand ~~six~~three hundred fifty ~~one (4,190,651~~ two (4,203,352) shares of the New Common Stock in Reorganized FairPoint Communications (subject to dilution) and (ii) by a *pro rata* share of the New Warrants to purchase up to seven million one hundred ~~forty three~~sixty-four thousand ~~one~~eight hundred ~~fifty six (7,143,156~~four (7,164,804) shares of the New Common Stock, as more fully described in ***Section VI.D.2 ("Summary of Plan of Reorganization—Provisions Regarding New Common Stock and New Warrants Distributed Pursuant to the Plan—New Warrants")*** of this Disclosure Statement; **provided, however, that if the class of FairPoint Communications Unsecured Claims votes to reject the Plan, the members of the Ad Hoc Committee of Senior Noteholders or its counsel objects to the Plan, the members of the Creditors' Committee or its counsel objects to the Plan, or the Indenture Trustee or its counsel objects to the plan, then the holders of FairPoint Communications Unsecured Claims will not receive any Distributions under the Plan on account of their Claims.**  The proposed distributions to other creditors are discussed in ***Section VI.G ("Summary of Plan of Reorganization—Distributions under the Plan")*** of this Disclosure Statement.

In addition, the Plan is the result of extensive negotiations among FairPoint; the Lender Steering Committee; the International Brotherhood of Electrical Workers ("IBEW") and the Communications Workers of America ("CWA" and collectively with the IBEW, the "Unions"); the New Hampshire Public Utility Commission's Staff Advocates (the "Staff Advocates"); the Vermont Department of Public Service (the "DPS"); a representative (the "Maine Representative") appointed by the Maine Public Utilities Commission (the "MPUC"); and the Maine Office of the Public Advocate (the "Maine Public Advocate," and collectively with the Staff Advocates, the DPS, the Maine Representative, the "Regulatory Authorities").  The Plan incorporates and implements various settlements reached with the Unions and the Regulatory Authorities (subject to approval by the applicable state Commission or Board) in order to facilitate FairPoint's successful reorganization.  ***See Section V.F.1 ("Overview of Chapter 11 Cases—Other Material Information—PUC Negotiations") and Section V.F.2 ("Overview of Chapter 11 Cases—Other Material Information—Union Negotiations").***

On February 8, 2010, FairPoint filed its Disclosure Statement for Debtors' Joint Plan of Reorganization with the Bankruptcy Court.  FairPoint's Disclosure Statement for Debtors' Joint Plan of Reorganization is being amended by this Amended Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization (as it may be further amended, the "Disclosure Statement").

THIS EXECUTIVE SUMMARY IS INTENDED SOLELY AS A SUMMARY OF CERTAIN PROVISIONS OF THIS DISCLOSURE STATEMENT.  YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN AND EACH OF THEIR RESPECTIVE EXHIBITS AND SCHEDULES IN THEIR ENTIRETY PRIOR TO MAKING ANY DETERMINATION TO ACCEPT OR REJECT THE PLAN.

FAIRPOINT BELIEVES THAT THE PLAN WILL ENABLE IT TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF FAIRPOINT AND ITS CREDITORS.  FAIRPOINT URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.

## A.      SOLICITATION AND ACCEPTANCE OF PLAN

### 1.      General

This Disclosure Statement is being furnished to holders of Allowed Claims in the Voting Classes (as defined herein) for the purpose of soliciting their votes on the Plan. This Disclosure Statement is also being furnished to certain other creditors and other entities for notice or informational purposes.  The primary purpose of this Disclosure Statement is to provide adequate information to holders of Allowed Claims in the Voting Classes to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

A copy of the Disclosure Statement Approval Order entered by the Bankruptcy Court and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "<u>Notice of the Confirmation Hearing</u>") are also being transmitted with this Disclosure Statement.  The Disclosure Statement Approval Order and the Notice of the Confirmation Hearing set forth in detail the deadlines, procedures and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims and the assumptions for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot which is color-coded for each Class.  Each holder of a Claim within a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Approval Order, the Notice of Confirmation Hearing and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

### 2.      Who Is Entitled to Vote

Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  To be confirmed, the Plan must be accepted by the holders of certain Classes of Claims and the Plan must be confirmed by the Bankruptcy Court.  ***See Section IX ("Voting Requirements") and Section X ("Confirmation of the Plan")***.  Each of Classes 9 and 10 will receive no Distribution or benefits under the Plan, and, therefore, are conclusively deemed to have rejected the Plan, and are not entitled to vote.  FairPoint is seeking acceptances of the Plan from holders of Claims in each of Classes 4, [6]4 and 7 (collectively, the "<u>Voting Classes</u>").  The Claims in all other Classes are unimpaired, and the holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  For a description of the Classes, Claims and Equity Interests and their treatment under the Plan, ***see Section VI.B ("Summary of Plan of Reorganization—Classification of Claims and Equity Interests") and Section VI.C ("Summary of Plan of Reorganization—Treatment of Claims and Equity Interests Under the Plan")***.

## 3. Ballots

If you are entitled to vote to accept or reject the Plan, *see Section IX.B ("Voting Requirements—Holders of Claims Entitled to Vote")*, a Ballot or Ballots, specific to the Claim held, is enclosed for voting on the Plan. If Claims are held in more than one Class and entitled to vote in more than one Class, separate Ballots must be used for each Class of Claims. A separate Ballot must be used for each Claim you hold. ***IN ORDER FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND RECEIVED SO THAT IT IS RECEIVED NO LATER THAN [_____], 2010 AT [ : ] [_].M. (NEW YORK TIME) BY THE VOTING AGENT AS SET FORTH ON THE BALLOT. See Section IX.A ("Voting Requirements—Voting Deadline") and Section IX.D.1 ("Voting Requirements—Voting Procedures—Ballots")***. Persons wishing to change their votes can do so, if they meet the requirements of Bankruptcy Rule 3018(a), by filing a motion with the Bankruptcy Court with sufficient advanced notice so that it can be heard prior to the Confirmation Hearing scheduled for [_____], 2010. Any such application must be filed and served on or before [_____], 2010 at 4:00 p.m. (New York time), in accordance with the procedures set forth in detail in the Disclosure Statement Approval Order.

## 4. Inquiries

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact BMC Group, Inc. by regular mail at 444 North Nash Street, El Segundo, CA 90245, by telephone at 1-888-909-0100 or by electronic mail at fairpoint@bmcgroup.com.

If you wish to obtain an additional copy of the Plan, this Disclosure Statement or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact BMC Group, Inc. by regular mail at 444 North Nash Street, El Segundo, CA 90245, by telephone at 1-888-909-0100 or by electronic mail at fairpoint@bmcgroup.com.

## B. PLAN OF REORGANIZATION

## 1. Overview of Plan

The following is a brief summary of certain material provisions of the Plan. For a more detailed description of the terms of the Plan, *see Section VI ("Summary of Plan of Reorganization")*. These descriptions are qualified in their entirety by the provisions of the Plan.

The Plan reflects a consensual resolution and settlement among FairPoint and the Lender Steering Committee regarding the allocation of assets of FairPoint among the holders of Allowed Claims. The Plan has the support of FairPoint and the Lender Steering Committee. FairPoint's reorganization is premised upon effecting a substantial deleveraging and strengthening of the balance sheet of FairPoint through the conversion of a substantial portion of FairPoint's prepetition indebtedness into New Common Stock on the Effective Date. Under the Plan, and subject to dilution from the securities to be issued under the Long Term Incentive Plan (as defined herein) and the New Warrants, as applicable, the New Common Stock will be distributed

as follows: (a) each holder of an Allowed Class 4 Prepetition Credit Agreement Claim will receive such holder's Ratable Proportion of forty-seven million two hundred ~~seventy-five~~forty-one thousand ~~seven~~four hundred ~~eighty five (47,275,785~~thirty-six (47,241,436) shares of the New Common Stock (provided that if the Class of FairPoint Communications Unsecured Claims rejects the Plan, each such holder will receive its Ratable Proportion of fifty -eight million~~,~~ four hundred eighty -four thousand five hundred eighty -seven (58,484,587) shares of the New Common Stock) and (b) each holder of an Allowed Class 7 FairPoint Communications Unsecured Claim will, if the Class of such holder's votes to accept the Plan, receive its Ratable Proportion of (i) four million ~~one~~two hundred ~~ninety~~three thousand ~~six~~three hundred fifty-~~one (4,190,651~~two (4,203,352) shares of the New Common Stock and (ii) the New Warrants.  ***See Section VI.B ("Summary of Plan of Reorganization—Classification of Claims and Equity Interests") and Section VI.D ("Summary of Plan of Reorganization—Provisions Regarding New Common Stock and New Warrants Distributed Pursuant to the Plan")***.  Each holder of an Allowed Class 4 Prepetition Credit Agreement Claim will also receive such holder's Ratable Proportion of the New Term Loan (in the amount of $1 billion) and the Cash Payment.  Further, at the option of FairPoint, either the Allowed Class 3 Other Secured Claims will be Reinstated and rendered Unimpaired, or each holder of such a Claim will receive Cash in an amount equal to such Claim (or in lieu of Cash, the Collateral securing such Claim).  ***See Section VI.B ("Summary of Plan of Reorganization—Classification of Claims and Equity Interests")***.  Finally, each holder of an Allowed Class 5 Legacy Subsidiary Unsecured Claim or an Allowed Class 6 NNE Subsidiary Unsecured Claim will be paid an amount in Cash equal to 100% of such holder's Claim and each holder of an Allowed Class 8 Convenience Claim will be paid an amount in Cash equal to 100% of such holder's Claim.  ***See Section VI.B ("Summary of Plan of Reorganization—Classification of Claims and Equity Interests")***.  The Plan also contemplates a post-Effective Date revolving credit facility of up to $75 million for FairPoint.  ***See Section VI.F.3 ("Summary of Plan of Reorganization—Means of Implementation of the Plan—New Term Loan and New Revolver")***.

## 2.      Summary of Classification and Treatment under Plan

The following table summarizes the classification and treatment of prepetition Claims and Equity Interests under the Plan.  This classification and treatment for all Classes are described in more detail in ***Section VI.B ("Summary of Plan of Reorganization—Classification of Claims and Equity Interests")***.  Estimated Claim amounts set forth in the following table are based upon FairPoint Communications' books and records.  **There can be no assurance that the actual Claim amounts will not be significantly different from the estimates.**  This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.  Accordingly, this summary is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached as ***Exhibit A*** hereto.

## SUMMARY OF CLASSIFICATION AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

| **Class** | **Type of Claim or Equity Interest** | **Treatment** | **Estimated Aggregate Amount of Allowed Claims** | **Estimated Percentage Recovery of Allowed Claims** |
|---|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired – not entitled to vote; paid in full in Cash on the Distribution Date or such other treatment as agreed upon by a holder of an Allowed Class 1 Other Priority Claim and FairPoint. | $0 | 100% |
| Class 2 | Secured Tax Claims | Unimpaired – not entitled to vote; unless otherwise agreed upon by a holder of an Allowed Class 2 Secured Tax Claim and FairPoint, at FairPoint's option, each such holder will receive on account of such Claim (a) on the Distribution Date, Cash in an amount equal to such Claim or (b) commencing on the applicable Distribution Date, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of FairPoint to prepay the entire amount of such Claim. | $5.7 million | 100% |
| Class 3 | Other Secured Claims | Unimpaired – not entitled to vote; unless otherwise agreed upon by a holder of an Allowed Class 3 Other Secured Claim and FairPoint, at the option of FairPoint, on the Distribution Date (a) each such Claim will be Reinstated and rendered Unimpaired in accordance with | $0 | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | | section 1124(2) of the Bankruptcy Code, (b) each such holder will receive Cash in an amount equal to such Claim or (c) each such holder will receive the Collateral securing such Claim. | | |
| Class 4 | Allowed Prepetition Credit Agreement Claims | Impaired – entitled to vote; each holder of an Allowed Class 4 Prepetition Credit Agreement Claim will receive (a) on the Effective Date, such holder's Ratable Proportion of the New Term Loan, (b) on the Effective Date, such holder's Ratable Proportion of forty-seven million two hundred ~~seventy-five~~forty-one thousand ~~seven~~four hundred ~~eighty-five (47,275,785~~thirty-six (47,241,436) shares of the New Common Stock (*provided* that if the Class of FairPoint Communications Unsecured Claims rejects the Plan, each such holder will receive its Ratable Proportion of fifty -eight million~~,~~ four hundred eighty -four thousand five hundred eighty - seven (58,484,587) shares of the New Common Stock, subject to dilution from the securities to be issued under the Long Term Incentive Plan and the New Warrants), (c) on the Effective Date, such holder's Ratable Proportion of the Cash Payment | $2.1 billion | 87.9%[1] |

---

[1] Based on (i) an assumption that the FairPoint Communications Unsecured Claims (Class 7) votes to accept the Plan and (ii) the midpoint of Reorganized FairPoint's implied total reorganized equity value range set forth in ***Exhibit D*** to this Disclosure Statement. In addition, as noted herein, the estimated recovery percentage for Allowed FairPoint Communications Unsecured Claims will vary depending upon whether Class 7 votes to accept the Plan.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | | and (d) on the applicable Distribution Date, if any, such holder's Ratable Proportion of Cash Distributions out of the Reserve that are no longer required to be reserved for the benefit of anyone other than the holders of Allowed Prepetition Credit Agreement Claims. | | |
| Class 5 | Legacy Subsidiary Unsecured Claims | Unimpaired – not entitled to vote; on the Distribution Date each holder of an Allowed Class 5 Legacy Subsidiary Unsecured Claim will be paid an amount in Cash equal to one hundred percent (100%) of such holder's Claim. | $10.5 million | 100% |
| Class 6 | NNE Subsidiary Unsecured Claims | ~~Each~~Unimpaired – not entitled to vote; on the Distribution Date each holder of an Allowed Class 6 NNE Subsidiary Unsecured Claim will ~~receive a Distribution on terms to be provided and which are reasonably satisfactory to FairPoint and the Lender Steering Committee~~be paid an amount in Cash equal to one hundred percent (100%) of such holder's Claim. | $~~[•]~~12.3 million | ~~[•]~~100% |
| Class 7 | FairPoint | Impaired – entitled to vote; on the | $635.3 | 16.9%[2] |

---

[2]     Based on (i) an assumption that the FairPoint Communications Unsecured Claims (Class 7) votes to accept the Plan and (ii) the midpoint of Reorganized FairPoint's implied total reorganized equity value range set forth in *Exhibit D* to this Disclosure Statement. In addition, as noted herein, the estimated recovery percentage for Allowed FairPoint Communications Unsecured Claims will vary depending upon whether such Class votes to accept the Plan. If the class of FairPoint Communications Unsecured Claims votes to reject the Plan, the members of the Ad Hoc Committee of Senior Noteholders or its counsel objects to the Plan, the members of the Creditors' Committee or its counsel objects to the Plan, or the Indenture Trustee or its

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | Communications Unsecured Claims | Distribution Date each holder of an Allowed Class 7 FairPoint Communications Unsecured Claim will receive (a) if the Class of such Claims votes to accept the Plan, its Ratable Proportion of (i) four million ~~one~~two hundred ~~ninety~~three thousand ~~six~~three hundred fifty ~~one (4,190,651~~ two (4,203,352) shares of the New Common Stock and (ii) the New Warrants or (b) if the Class of such Claims votes to reject the Plan, no Distributions under the Plan. | million | |
| Class 8 | Convenience Claims | Unimpaired – not entitled to vote; on the Distribution Date each holder of an Allowed Class 8 Convenience Claim will be paid an amount in Cash equal to one hundred percent (100%) of such holder's Claim. | $3.3 million | 100% |
| Class 9 | Subordinated Securities Claims | Impaired – deemed to have rejected the Plan and not entitled to vote; a holder of an Allowed Class 9 Subordinated Securities Claim will not receive or retain any interest or property under the Plan on account of such Claim in accordance with section 510(b) of the Bankruptcy Code. | $0 | 0% |
| Class 10 | Subsidiary Equity Interests | Unimpaired – deemed to have accepted the Plan and not entitled to vote; on the Effective Date the Subsidiary Equity Interests will be Reinstated in accordance with section 1124 of the Bankruptcy Code. | N/A | Reinstated |

counsel objects to the plan, then the holders of FairPoint Communications Unsecured Claims will not receive any Distributions under the Plan on account of their Claims.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| Class 11 | Old FairPoint Equity Interests | Impaired – deemed to have rejected the Plan and not entitled to vote; on the Effective Date the certificates evidencing any and all Class 11 Old FairPoint Equity Interests will be cancelled and the holders of any Equity Interests will receive no Distributions under the Plan on account of such Old FairPoint Equity Interests. | N/A | 0% |

## C. DESCRIPTION OF OTHER NECESSARY PROCEDURES

The hearing to determine whether to confirm the Plan has been scheduled to commence on [_____], 2010, at [__:__] [_].m. (New York time) before the Honorable Burton R. Lifland, United States Bankruptcy Judge, in Room 623 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. In addition, except as expressly provided in the Plan, the Plan may be modified pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest. At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code have been satisfied and, if appropriate, will enter an order confirming the Plan. *See Section IX ("Voting Requirements") and Section X ("Confirmation of the Plan")*. Both confirmation and consummation of the Plan are subject to certain conditions, which may either be waived by FairPoint in its discretion, or jointly waived by, as applicable, FairPoint and/or the Lender Steering Committee. *See Section VI.J ("Summary of Plan of Reorganization—Conditions Precedent to the Effective Date")*.

## D. SUMMARY OF POST-CONSUMMATION OPERATIONS OF REORGANIZED COMPANY

Attached hereto as *Exhibit B* is projected financial information that forecasts the financial performance of Reorganized FairPoint through 2013. *See Section VII.D ("Certain Factors To Be Considered—Inherent Uncertainty of the Reorganized Company's Financial Projections")*. These projections are based on the current business plan for Reorganized FairPoint. **ALL CREDITORS ARE ADVISED AND ENCOURAGED TO REVIEW THE PROJECTIONS SET FORTH IN EXHIBIT B IN THEIR ENTIRETY BEFORE VOTING**

**TO ACCEPT OR REJECT THE PLAN.** The ongoing post-Effective Date operations of Reorganized FairPoint will be financed through its business operations and certain exit credit facilities. ***See Section VI.F.3 ("Summary of Plan of Reorganization—Means of Implementation of the Plan—New Term Loan and New Revolver").***

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................... 1

       A.     DEFINITIONS............................................................................... 1

       B.     NOTICE TO HOLDERS OF CLAIMS IN VOTING CLASSES ........................ 2

       C.     SOLICITATION PACKAGE ............................................................... 3

       D.     VOTING PROCEDURES .................................................................. 4

              1.     General Information ............................................................ 4
              2.     Voting on the Plan ............................................................. 4

       E.     CONFIRMATION HEARING .............................................................. 5

II.    OVERVIEW OF FAIRPOINT AND ITS BUSINESS AND CERTAIN KEY
       EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11
       CASES ......................................................................................... 7

       A.     BUSINESS OF FAIRPOINT............................................................... 7

              1.     General.......................................................................... 7
              2.     Corporate Structure ........................................................... 8
              3.     Markets ......................................................................... 8
              4.     Services ......................................................................... 9
              5.     Competition..................................................................... 10
              6.     Regulatory...................................................................... 11
              7.     Legal Proceedings Outside the Bankruptcy Court................................. 12

       B.     CERTAIN KEY EVENTS LEADING TO THE COMMENCEMENT OF
              THE CHAPTER 11 CASES .............................................................. 12

              1.     Overview........................................................................ 12
              2.     Cutover.......................................................................... 13
              3.     Increased Regulatory Burdens ................................................. 14
              4.     Market Conditions ............................................................. 15
              5.     Initial Out of Court Restructuring Initiatives................................. 15
              6.     The Plan Term Sheet........................................................... 17

       C.     OPERATIONS AFTER EMERGENCE FROM CHAPTER 11 ........................ 18

III.   PREPETITION OBLIGATIONS AND CAPITAL STRUCTURE ........................... ~~18~~19

       A.     PREPETITION CREDIT AGREEMENT ........................................... 19

       B.     ORIGINAL SENIOR NOTES AND EXCHANGE OFFER SENIOR
              NOTES.................................................................................. 21

       C.     DERIVATIVE FINANCIAL INSTRUMENTS................................... 22

IV.    CORPORATE GOVERNANCE AND MANAGEMENT (PRE AND POST
       REORGANIZATION)................................................................................ 23

       A.    CURRENT AND POST-REORGANIZATION EXECUTIVE OFFICERS
             OF FAIRPOINT COMMUNICATIONS ............................................. 23

       B.    DIRECTORS OF FAIRPOINT COMMUNICATIONS .................................... 25
             1.    Current Directors of FairPoint Communications.................................. 25
             2.    Reorganized FairPoint Communications' Directors.............................. 26

       C.    EXECUTIVE COMPENSATION ............................................................ 27

       D.    KEY EMPLOYMENT AGREEMENTS...................................................... 28
             1.    Hauser Employment Contract............................................................ 28
             2.    Other Executive Agreements ................................................ 2829

V.     OVERVIEW OF CHAPTER 11 CASES ......................................................... 29

       A.    COMMENCEMENT ............................................................................. 29

       B.    PARTIES IN INTEREST ...................................................................... 29
             1.    Court ................................................................................................ 29
             2.    Advisors to FairPoint ....................................................................... 29
             3.    Advisors to FairPoint's Prepetition Credit Agreement Lenders .......... 2930
             4.    Creditors' Committee and its Advisors................................................ 2930
             5.    The Ad Hoc Committee of FairPoint's Senior Noteholders.................. 30
             6.    The United States Trustee ................................................................. 30

       C.    FIRST DAY ORDERS ........................................................................ 3031
             1.    Joint Administration Motion.............................................................. 31
             2.    Employee Wage and Benefit Motion.................................................. 31
             3.    DIP Financing Motion ..................................................................... 3132
             4.    503(b)(9) and Reclamation Claims Motion ........................................ 32
             5.    Shipping and Mechanics Lien Motion ................................................ 32
             6.    Customer Programs Motion .............................................................. 3233
             7.    NOL Motion..................................................................................... 33
             8.    Cash Management System Motion ...................................................... 33
             9.    Tax Motion...................................................................................... 3334
             10.   Insurance Motion ............................................................................. 34

       D.    CHAPTER 11 FINANCING ................................................................. 3435

       E.    MATERIAL LITIGATION AND RELATED EVENTS ................................. 36

       F.    OTHER MATERIAL INFORMATION...................................................... 36
             1.    PUC Negotiations ............................................................................ 36

2. Union Negotiations ........................................................... ~~43~~45

G. STATEMENTS OF FINANCIAL AFFAIRS AND SCHEDULES OF
ASSETS AND LIABILITIES ............................................................ ~~44~~46

H. FILING DEADLINE FOR PREPETITION CLAIMS .................................. ~~44~~46

VI. SUMMARY OF PLAN OF REORGANIZATION .................................................. ~~45~~47

A. PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY
TAX CLAIMS AND OTHER UNCLASSIFIED CLAIMS ......................... ~~45~~47
1. Administrative Expense Claims ......................................... ~~45~~47
2. Adequate Protection Claims ............................................. ~~45~~47
3. Priority Tax Claims ......................................................... ~~45~~48
4. Professional Compensation and Reimbursement Claims ........... ~~46~~48
5. Intercompany Claims ....................................................... ~~46~~49

B. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................. ~~47~~49

C. TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE
PLAN ........................................................................................ ~~47~~50
1. Other Priority Claims (Class 1) ......................................... ~~47~~50
2. Secured Tax Claims (Class 2) ........................................... ~~48~~50
3. Other Secured Claims (Class 3) ......................................... ~~48~~51
4. Allowed Prepetition Credit Agreement Claims (Class 4) .......... ~~49~~51
5. Legacy Subsidiary Unsecured Claims (Class 5) ..................... ~~50~~53
6. NNE Subsidiary Unsecured Claims (Class 6) ........................ ~~51~~53
7. FairPoint Communications Unsecured Claims (Class 7) ........... ~~51~~54
8. Convenience Claims (Class 8) ........................................... ~~52~~55
9. Subordinated Securities Claims (Class 9) ............................ ~~53~~55
10. Subsidiary Equity Interests (Class 10) ................................ ~~53~~56
11. Old FairPoint Equity Interests (Class 11) ............................ ~~53~~56
12. Limitations on Amounts to Be Distributed to Holders of Allowed
Insured Claims ............................................................... ~~54~~56
13. Special Provision Regarding Unimpaired Claims .................... ~~54~~57

D. PROVISIONS REGARDING NEW COMMON STOCK AND NEW
WARRANTS DISTRIBUTED PURSUANT TO THE PLAN ..................... ~~54~~57
1. New Common Stock ......................................................... ~~54~~57
2. New Warrants ................................................................ ~~55~~58
3. Securities Law Matters .................................................... ~~55~~58

E. IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS AND
EQUITY INTERESTS UNDER THE PLAN; ACCEPTANCE OR
REJECTION OF THE PLAN .............................................................. ~~56~~59
1. Voting of Claims ............................................................. ~~56~~59

|  |  |  |  |
|---|---|---|---|
| | 2. | Acceptance by Unimpaired Classes | 56 59 |
| | 3. | Elimination of Vacant Classes | 57 59 |
| | 4. | Nonconsensual Confirmation | 57 59 |
| | 5. | Revocation of the Plan | 57 60 |
| F. | | MEANS OF IMPLEMENTATION OF THE PLAN | 57 60 |
| | 1. | Settlement | 57 |
| | 1. | Regulatory Settlements | 60 |
| | 2. | Transactions on the Effective Date | 57 60 |
| | 3. | New Term Loan and New Revolver | 58 61 |
| | 4. | Reorganization of FairPoint; Continuation of Businesses | 59 62 |
| | 5. | Reorganized FairPoint's Obligations Under the Plan | 60 63 |
| | 6. | New Organizational Documents | 61 64 |
| | 7. | New Board | 61 64 |
| | 8. | Officers of Reorganized FairPoint | 64 66 |
| | 9. | Operations of FairPoint Between Confirmation and the Effective Date | 64 67 |
| | 10. | Revesting of Assets | 64 67 |
| | 11. | Dissolution of the Creditors' Committee | 64 67 |
| | 12. | Effectuating Documents; Further Transactions | 64 67 |
| | 13. | Preservation of Certain Causes of Action; Defenses | 65 67 |
| | 14. | Cancellation of Existing Securities | 65 68 |
| | 15. | Long Term Incentive Plan | 65 68 |
| | 16. | Success Bonuses | 66 68 |
| | 17. | Indemnification; Directors & Officers Insurance | 66 68 |
| G. | | DISTRIBUTIONS UNDER THE PLAN | 66 69 |
| | 1. | Distributions on Allowed Claims | 66 69 |
| | 2. | Date of Distributions | 66 69 |
| | 3. | Disbursing Agent | 66 69 |
| | 4. | Rights and Powers of Disbursing Agent | 67 69 |
| | 5. | Fees and Expenses of Disbursing Agent | 67 69 |
| | 6. | Delivery of Distributions | 67 70 |
| | 7. | Unclaimed Distributions | 68 71 |
| | 8. | Distribution Record Date | 68 71 |
| | 9. | Manner of Payment | 68 71 |
| | 10. | Time Bar to Cash Payments by Check | 69 71 |
| | 11. | No Fractional Distributions | 69 71 |
| | 12. | Fractional Cents | 69 72 |
| | 13. | Setoffs and Recoupment | 69 72 |
| | 14. | Allocation of Plan Distributions Between Principal and Interest | 69 72 |
| | 15. | Distributions After Effective Date | 70 72 |
| | 16. | Interest on Claims | 70 72 |
| | 17. | No Distribution in Excess of Allowed Amount of Claim | 70 73 |
| | 18. | Ordinary Course Post-Petition Liabilities | 70 73 |
| | 19. | Payment of Taxes on Distributions Received Pursuant to the Plan | 70 73 |

20.  Estimation of Claims................................................................. ~~70~~73
21.  Claims Reserves ....................................................................... ~~71~~73

H.  DISPUTED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ... ~~72~~74

1.  Objections ................................................................................ ~~72~~74
2.  Adjustment to Certain Claims Without a Filed Objection.................. ~~72~~75
3.  No Distributions Pending Allowance ............................................ ~~72~~75
4.  Distributions After Allowance .................................................... ~~72~~75
5.  Resolution of Administrative Expense Claims and Claims................. ~~73~~75
6.  Disallowance of Certain Claims ................................................. ~~73~~75
7.  Indenture Trustee as Claim Holder .............................................. ~~73~~76
8.  Offer of Judgment ..................................................................... ~~73~~76
9.  Amendments to Claims............................................................... ~~73~~76
10.  Claims Paid and Payable by Third Parties ........................................ ~~73~~76

I.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER
THE PLAN ................................................................................... ~~74~~76

1.  Assumption or Rejection of Executory Contracts and Unexpired
Leases...................................................................................... ~~74~~77
2.  Inclusiveness ............................................................................ ~~75~~78
3.  Provisions Related to Cure Payments and Rejection Damages .......... ~~75~~78
4.  Indemnification Obligations ....................................................... ~~77~~79
5.  Insurance Policies ..................................................................... ~~77~~80
6.  Benefit Plans ............................................................................ ~~77~~80
7.  Retiree Benefits......................................................................... ~~77~~80
8.  Amended Collective Bargaining Agreements ..................................... ~~78~~80

J.  CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...................... ~~78~~80

1.  Conditions Precedent to Effectiveness.......................................... ~~78~~80
2.  Waiver of Conditions................................................................. ~~79~~81
3.  Satisfaction of Conditions.......................................................... ~~79~~81

K.  EFFECT OF CONFIRMATION ...................................................... ~~79~~82

1.  Binding Effect .......................................................................... ~~79~~82
2.  Discharge of Claims and Termination of Old FairPoint Equity
Interests................................................................................... ~~79~~82
3.  Discharge of Debtors ................................................................. ~~80~~82
4.  Reservation of Causes of Action/Reservation of Rights.................... ~~80~~83

L.  EXCULPATION; RELEASE; INJUNCTION AND RELATED
PROVISIONS ............................................................................... ~~80~~83

1.  Exculpation .............................................................................. ~~80~~83
2.  Releases.................................................................................... ~~81~~83
3.  Avoidance Actions/Objections ................................................... ~~81~~84
4.  Injunction or Stay...................................................................... ~~82~~84

M.    RETENTION OF JURISDICTION ..................................................... 8285

N.    MISCELLANEOUS PROVISIONS ................................................. 8386

VII.    CERTAIN FACTORS TO BE CONSIDERED ......................................... 8486

A.    GENERAL CONSIDERATIONS ..................................................... 8486

B.    CERTAIN BANKRUPTCY CONSIDERATIONS ......................................... 8487

    1.    Parties-in-Interest May Object to FairPoint's Classification of Claims ........................................................................ 8487
    2.    Failure to Satisfy Vote Requirement .................................... 8487
    3.    Risk of Non-Confirmation of Plan; Feasibility ......................... 8487
    4.    Non-Consensual Confirmation ........................................... 8587
    5.    FairPoint May Object to the Amount of a Claim .......................... 8588
    6.    Risk of Not Receiving Regulatory Approvals ............................ 8588
    7.    Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan .......................................... 8688
    8.    Risk of Liquidation ..................................................... 8688

C.    FACTORS THAT MAY AFFECT THE VALUE OF DISTRIBUTIONS UNDER THE PLAN ................................................................. 8689

    1.    Risks Associated with FairPoint's Business Operations ................... 8689
    2.    Lack of Trading Market for Reorganized FairPoint Communications .......................................................... 8790
    3.    Dividend Policies for Reorganized FairPoint Communications .......... 8790

D.    INHERENT UNCERTAINTY OF THE REORGANIZED COMPANY'S FINANCIAL PROJECTIONS ................................................... 8890

E.    DISCLOSURE STATEMENT DISCLAIMER ............................................. 8891

    1.    Information Contained Herein is for Soliciting Votes ................... 8891
    2.    Disclosure Statement Was Not Approved by the Securities and Exchange Commission or any State Regulatory Authority ............... 8891
    3.    Disclosure Statement May Contain Forward Looking Statements ...... 8891
    4.    No Legal or Tax Advice is Provided to You by this Disclosure Statement ............................................................... 8991
    5.    No Admissions Made ..................................................... 8992
    6.    Failure to Identify Litigation Claims or Projected Objections ........... 8992
    7.    No Waiver of Right to Object or Right to Recover Transfers and Assets ................................................................... 8992
    8.    Information Was Provided by FairPoint and Was Relied upon by FairPoint's Advisors ................................................... 8992
    9.    Potential Exists for Inaccuracies, and FairPoint Has No Duty to Update ................................................................... 9092

      10.    No Representations Outside the Disclosure Statement are Authorized...................................................................... ~~90~~92

    F.    CERTAIN TAX CONSIDERATIONS ..................................................... ~~90~~93

VIII.    RESALE OF SECURITIES RECEIVED UNDER THE PLAN................................ ~~90~~93

IX.    VOTING REQUIREMENTS ....................................................................... ~~92~~94

    A.    VOTING DEADLINE................................................................... ~~93~~95

    B.    HOLDERS OF CLAIMS ENTITLED TO VOTE.......................................... ~~93~~96

    C.    VOTE REQUIRED FOR ACCEPTANCE OF CLASS ................................. ~~94~~97

    D.    VOTING PROCEDURES ............................................................... ~~95~~97

        1.    Ballots ............................................................................ ~~95~~97
        2.    Withdrawal or Change of Votes on Plan ............................. ~~96~~98
        3.    Voting Multiple Claims ..................................................... ~~96~~99

X.    CONFIRMATION OF THE PLAN.............................................................. ~~96~~99

    A.    CONFIRMATION HEARING......................................................... ~~96~~99

    B.    DEADLINE TO OBJECT TO CONFIRMATION ....................................... ~~97~~99

    C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN..................... ~~97~~100

        1.    Requirements of Section 1129(a) of Bankruptcy Code .................. ~~97~~100
        2.    Acceptance by Impaired Classes ........................................ ~~100~~103
        3.    Feasibility........................................................................ ~~100~~103
        4.    Requirements of Section 1129(b) of Bankruptcy Code.................. ~~101~~104

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................... ~~102~~105

    A.    LIQUIDATION UNDER CHAPTER 7 .................................................... ~~102~~105

    B.    ALTERNATIVE PLAN OF REORGANIZATION OR LIQUIDATION.. ~~103~~105

XII.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS............................... ~~103~~106

    A.    INTRODUCTION ...................................................................... ~~103~~106

    B.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO FAIRPOINT................................................................... ~~105~~107

        1.    Cancellation of Debt and Reduction of Tax Attributes .................. ~~105~~107
        2.    Limitation of NOL Carryforwards and Other Tax Attributes.......... ~~106~~108

3.     Alternative Minimum Tax ............................................................... ~~107~~110

C.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO U.S. HOLDERS OF ALLOWED CLAIMS ............................. ~~108~~110

1.     Consequences to U.S. Holders of Prepetition Credit Agreement Claims ........................................................................................ ~~108~~110

2.     Consequences to U.S. Holders of Unsecured Claims ...................... ~~111~~114

3.     Consequences to U.S. Holders of Holding New Common Stock.... ~~113~~116

4.     Consequences to U.S. Holders of Holding the New Term Loan ..... ~~114~~117

5.     Consequences to U.S. Holders of Exercising New Warrants .......... ~~114~~117

D.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO NON-U.S. HOLDERS OF ALLOWED CLAIMS ................... ~~115~~117

1.     Consequences to Non-U.S. Holders of the Exchange..................... ~~115~~117

2.     Consequences to Non-U.S. Holders of Holding the New Term Loan, New Common Stock and/or New Warrants ......................... ~~116~~118

E.     WITHHOLDING AND REPORTING...................................................... ~~117~~120

XIII.     CONCLUSION.................................................................................... ~~118~~120

**TABLE OF EXHIBITS**

| | |
|---|---|
| **Exhibit A** | **PLAN OF REORGANIZATION** |
| **Exhibit B** | **PROJECTIONS** |
| **Exhibit C** | **LIQUIDATION ANALYSIS** |
| **Exhibit D** | **VALUATION ANALYSIS** |
| **Exhibit E** | **NEW TERM LOAN FINANCIAL COVENANTS** |

**AMENDED DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

## I.
## INTRODUCTION

FairPoint submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the ~~Plan~~Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"), which is attached as ***Exhibit A*** to this Disclosure Statement.  FairPoint has not filed any other plan of reorganization in connection with the Chapter 11 Cases.

This Disclosure Statement sets forth specific information regarding FairPoint's pre-bankruptcy history, significant events that have occurred during the Chapter 11 Cases, and the anticipated organizational and capital structure and operations of Reorganized FairPoint after confirmation of the Plan and FairPoint's emergence from chapter 11.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan and certain risk factors associated with the new equity that will be issued under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Impaired Claims must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS, ***PLEASE SEE SECTION VI ("SUMMARY OF PLAN OF REORGANIZATION") AND SECTION VII ("CERTAIN FACTORS TO BE CONSIDERED")***.  SECTIONS II THROUGH V FOLLOWING THIS INTRODUCTION DISCUSS THE BACKGROUND OF FAIRPOINT'S BUSINESS AND THE CHAPTER 11 CASES.

## A.    DEFINITIONS

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  A term used but not defined in this Disclosure Statement or the Plan has the meaning given it in the Bankruptcy Code and/or the Bankruptcy Rules.

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender will include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (e) captions and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (g) any term used in

capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## B.      NOTICE TO HOLDERS OF CLAIMS IN VOTING CLASSES

This Disclosure Statement is being furnished to holders of Allowed Claims in the Voting Classes for the purpose of soliciting their votes on the Plan. This Disclosure Statement is also being furnished to certain other creditors and other entities for notice or informational purposes. The primary purpose of this Disclosure Statement is to provide adequate information to holders of Allowed Claims in the Voting Classes to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

On [_____], 2010, the Bankruptcy Court entered the Disclosure Statement Approval Order approving the Disclosure Statement as containing information of a kind and in sufficient detail to enable holders of Claims in Voting Classes to make an informed judgment about the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AGAINST FAIRPOINT, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN WHEREVER LOCATED.  THUS, IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS AGAINST FAIRPOINT ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

This Disclosure Statement contains important information about the Plan, FairPoint's business and operations, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning FairPoint other than the information contained herein.  Other than as explicitly set forth in this Disclosure Statement, you should not rely on any information relating to FairPoint, its Estates, the value of its properties, the nature of its Liabilities, its creditors' Claims or the value of any securities or instruments issued under the Plan.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

Except with respect to the projected financial information set forth in ***Exhibit B*** hereto with respect to Reorganized FairPoint (the "<u>Projections</u>"), the descriptions of Reorganized FairPoint set forth herein, and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof. Such events may have a material impact on the information contained in this Disclosure Statement. FairPoint does not intend to update the Projections. Further, FairPoint does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY ROTHSCHILD. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY FAIRPOINT, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH <u>IRS CIRCULAR 230</u>, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY FAIRPOINT OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## C.    SOLICITATION PACKAGE

For the holders of Claims in Voting Classes as of the Record Date, accompanying this Disclosure Statement are copies of the following documents (collectively with this Disclosure

Statement, the "Solicitation Package"): (1) the Plan, which is annexed to this Disclosure Statement as **Exhibit A**; (2) a notice to Voting Classes; and (3) for holders of Allowed Claims in the Voting Classes, a Ballot to accept or reject the Plan.

If you did not receive a Ballot in your package and believe that you should have, please contact BMC Group, Inc. by regular mail at 444 North Nash Street, El Segundo, CA 90245, by telephone at 1-888-909-0100 or by electronic mail at fairpoint@bmcgroup.com.

## D.    VOTING PROCEDURES

### 1.    General Information

Under the Bankruptcy Code, certain Classes of creditors are deemed to accept or reject the Plan, and the vote of these Classes will not be solicited.  Thus, if a creditor holds Claims included within a Class that is not impaired under the Plan, under Bankruptcy Code section 1126(f), the creditor is conclusively presumed to have accepted the Plan with respect to such Claims, and its vote of such Claims will not be solicited.  Pursuant to the Bankruptcy Code, a class of claims or interests is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are altered, other than by curing defaults and reinstating maturity.  The Plan provides that the following Classes of Claims are unimpaired: 1, 2, 3, 5, 6, 8 and 10.  Any holder of a Claim in any of these Classes may, however, object to the Plan to contest the Plan's characterization of the creditor's non-impaired status.

The Bankruptcy Code provides that only the holders of Allowed Claims are entitled to vote on the Plan.  A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection and allows the Claim.  Consequently, although holders of Claims subject to a pending objection may receive Ballots, their votes will not be counted unless the Bankruptcy Court (a) prior to the Voting Deadline (as defined herein), rules on the objection and allows the Claim or (b) on proper request under Bankruptcy Rule 3018(a), temporarily allows the Claim in an amount which the Court deems proper for the purpose of voting on the Plan.  As set forth in the Notice of Confirmation Hearing, holders of Claims which are the subject of an objection that has been filed on or before [_____], 2010 must file motions for purposes of having their Claims temporarily allowed for voting purposes on or before [_____], 2010.

### 2.    Voting on the Plan

If a holder of a Claim is classified in a Voting Class under the Plan, such holder's acceptance or rejection of the Plan is important and must be in writing and filed by the Voting Deadline (as defined herein).  If Claims are held in more than one Class and a holder is entitled to vote in more than one Class, separate Ballots must be used for each Class.  A separate Ballot must be used for each Claim.  The holder of more than one Claim classified in a single class of Claims will be entitled to vote each such Claim separately to accept or reject the Plan (despite the fact that such holder may receive only one Ballot for purposes of voting) and each such vote will be counted separately in determining whether the Class within which such Claim is classified has accepted or rejected the Plan.  Accordingly, when you vote, you must use only the Ballot or Ballots sent to you (or copies if necessary) with this Disclosure Statement.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please check the appropriate boxes on the enclosed Ballot to indicate (a) your vote to accept or reject the Plan and (b) to the extent that you hold an Unsecured Claim, whether you elect to have your Unsecured Claim treated as a Convenience Claim in Class 8. **PLEASE COMPLETE AND SIGN YOUR BALLOT(S) (ONLY BALLOTS WITH ORIGINAL SIGNATURES WILL BE ACCEPTED; COPIES OF SIGNATURES WILL NOT BE ACCEPTED) AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS *RECEIVED* BY NO LATER THAN [_____], 2010 AT [__:__] [_].M. (NEW YORK TIME) (THE "VOTING DEADLINE").**

**IF THE FAIRPOINT COMMUNICATIONS UNSECURED CLAIMS (CLASS 7) VOTES TO REJECT THE PLAN, THE MEMBERS OF THE AD HOC COMMITTEE OF SENIOR NOTEHOLDERS OR ITS COUNSEL OBJECTS TO THE PLAN, THE MEMBERS OF THE CREDITORS' COMMITTEE OR ITS COUNSEL OBJECTS TO THE PLAN, OR THE INDENTURE TRUSTEE OR ITS COUNSEL OBJECTS TO THE PLAN, THEN THE HOLDERS OF FAIRPOINT COMMUNICATIONS UNSECURED CLAIMS WILL NOT RECEIVE ANY DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF THEIR CLAIMS.**

IN ORDER FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, AND RECEIVED BEFORE THE VOTING DEADLINE BY THE VOTING AGENT.

If you have any questions about the procedure for voting your Claim or the packet of materials that you received, please contact the Voting Agent at the address indicated above in subsection C herein.

If you wish to obtain an additional copy of the Plan, this Disclosure Statement, the Ballot or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact BMC Group, Inc. by regular mail at 444 North Nash Street, El Segundo, CA 90245, by telephone at 1-888-909-0100 or by electronic mail at fairpoint@bmcgroup.com.

## E.     CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to commence on [_____], 2010 at [__:__] [_].m. (New York Time), or as soon thereafter as counsel may be heard, before the Honorable Burton R. Lifland, United States Bankruptcy Judge, in Room 623 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. **THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND FILED WITH THE CLERK OF THE BANKRUPTCY COURT AND SERVED SO THAT THEY ARE RECEIVED ON OR BEFORE [_____], 2010 AT [__:__] [_].M. (NEW YORK TIME) BY:**

*Counsel for FairPoint:*

Paul, Hastings, Janofsky & Walker LLP
75 East 55th Street New York, New York 10022
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: lucdespins@paulhastings.com
        jamesgrogan@paulhastings.com
Attn:   Luc A. Despins, Esq.
        James T. Grogan, Esq.

*With a copy to:*

FairPoint Communications, Inc.
521 E. Morehead Street, Suite 500
Charlotte, North Carolina
Telephone: (704) 344-8150
Facsimile: (704) 344-1594
Email: ssowell@fairpoint.com
Attn:   Susan L. Sowell, Esq., Vice President and
        Assistant General Counsel

*Counsel for the Administrative Agent for
FairPoint's prepetition secured lenders:*

Kaye Scholer LLP
425 Park Avenue
New York NY 10022
Telephone: (212)
Facsimile: (212)
Email:  mschonholtz@kayescholer.com
        ~~mliscio~~cremona@kayescholer.com
Attn:   Margot B. Schonholtz, Esq.
        Nicholas Cremona, Esq.

Counsel for the Creditors' Committee:

Andrews Kurth LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929
Email: paulsilverstein@andrewskurth.com
jonathanlevine@andrewskurth.com
Attn:   Paul N. Silverstein, Esq.
        Jonathan Levine, Esq.

*United States Trustee:*

The Office of the United States Trustee Region 2
33 Whitehall Street, 21st Floor
New York, NY 10004
Attn:   Andrew D. Velez-Rivera

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE PLAN HAS THE SUPPORT OF FAIRPOINT, AND THE LENDER STEERING COMMITTEE AND THE AD HOC COMMITTEE OF SENIOR NOTEHOLDERS.  IN THE VIEW OF FAIRPOINT, THE TREATMENT OF HOLDERS OF CLAIMS UNDER THE PLAN CONTEMPLATES GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN LIQUIDATION.  ACCORDINGLY, FAIRPOINT BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND, THUS, RECOMMENDS THAT ALL HOLDERS OF IMPAIRED CLAIMS THAT ARE ENTITLED TO CAST BALLOTS VOTE TO ACCEPT THE PLAN.

## II.
## OVERVIEW OF FAIRPOINT AND ITS BUSINESS AND CERTAIN KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.     BUSINESS OF FAIRPOINT

#### 1.     General

FairPoint was founded as MJD Communications, Inc. in 1991.  From its inception, FairPoint was established for the purpose of acquiring and operating local telephone companies in rural markets.  As of September 30, 2009, FairPoint had approximately 4,140 employees, including approximately 2,700 who were represented by labor unions.  For the year ended December 31, 2008, FairPoint had revenues of approximately $1.275 billion on a consolidated basis.  As of September 30, 2009, FairPoint's unaudited consolidated financial statements reflected assets with a book value totaling approximately $3.206 billion and liabilities totaling approximately $3.289 billion.

2.      **Corporate Structure**

The following chart generally depicts FairPoint's corporate structure:



Each of the subsidiaries is a party to the Chapter 11 Cases.

3.      **Markets**

As of September 30, 2009, approximately 64% of FairPoint's access lines served residential customers, 28% served business customers and 8% served wholesale customers. The table below illustrates how FairPoint's access line equivalents were dispersed among the various states it serves as of September 30, 2009:

| State | Access Line Equivalent(1) |
|---|---|
| Maine | 575,807 |
| New Hampshire | 494,888 |
| Vermont | 314,685 |
| Florida | 51,878 |
| New York | 49,241 |
| Washington | 43,861 |
| Missouri | 14,526 |
| Ohio | 13,219 |
| Virginia | 8,516 |
| Kansas | 6,930 |
| Idaho | 6,906 |
| Illinois | 6,562 |
| Pennsylvania | 6,243 |
| Oklahoma | 4,210 |
| Colorado | 3,787 |
| Other States(2) | 3,213 |
| **Total** | **1,604,472** |

(1)  Includes voice access lines and high speed data lines, which include digital subscriber lines, wireless broadband and cable modem.

(2) Includes Massachusetts, Georgia and Alabama.

In addition to the services FairPoint provides in its various markets, it participates actively in philanthropic affairs in the communities in which it has a presence.  For example, FairPoint supports ongoing digital literacy initiatives and invests in community broadband applications as part of its commitment to assist in raising the levels of information and technology literacy in the communities it serves.  FairPoint views its community focus as an integral component of its drive to remain a leading provider of communications services.

**4.    Services**

As the telecommunications provider for approximately 1.6 million residential and business customers, FairPoint offers its customers a broad array of services including, but not limited to, the following:

Local Telephone Services:  FairPoint offers traditional local telephone services to "end user" residential and business customers.

Long Distance Services:  FairPoint offers switched and dedicated long distance services to its retail customers under resale agreements with other national telecommunications carriers.  FairPoint also sells wholesale long distance services to other telecommunications carriers.

Wholesale Communications Services:  FairPoint sells communications services to competitor local exchange carriers who then resell such services to local businesses and residential customers.  FairPoint also sells access services to both wireless and wireline wholesale customers.  These wholesale customers then utilize FairPoint's network to deliver service to their end user customers.

Data and Internet Services:  FairPoint offers broadband internet access via digital subscriber line ("DSL") technology, fiber-to-the-home "FAST" technology, dedicated T-1 connections, internet dial-up, high speed cable modem and wireless broadband.  FairPoint also offers related internet services to its customers, including internet protocol address registration, basic website design and hosting, domain name services and web-based e-mail services.

Cable TV and Video:  In certain markets, FairPoint provides video services to customers by reselling DirecTV content and providing cable and IPTV video-over-DSL distribution channels.

Enhanced Telephone Services:  FairPoint sells enhanced telephone services to customers, such as call waiting, call forwarding and transferring, three-way calling, automatic callback, call hold, caller name and number identification, voice mail, teleconferencing, video conferencing, store-and-forward fax, follow-me numbers, Centrex services and direct inward dial lines.

Billing and Collection Services:  As a local exchange carrier, FairPoint frequently acts as the primary billing and collection party for its customers' telephone usage, including amounts

owed to other telecommunications carriers for long distance services.  Long distance carriers purchase such billing and collection services from FairPoint.

       <u>Directory Services</u>:  FairPoint, through contracts with directory services companies, publishes telephone directories for its customers in a majority of the locations in which it operates local exchange carriers.  These directories provide white page listings, yellow page listings and community information listings.

       **5.**      **Competition**

       The Telecommunications Act of 1996 and other actions taken by the Federal Communications Commission ("<u>FCC</u>") and state regulatory authorities promote competition in the provision of communications services. FairPoint faces robust wireline and/or wireless competition from numerous competitive providers in most of the areas FairPoint serves.

       *Wireline Competition*.  FairPoint also faces competition from new market entrants that provide close substitutes for the traditional telephone services FairPoint provides, such as cable television providers and competitive local exchange carriers. Competitive local exchange carriers either maintain their own facilities or lease services at wholesale rates while cable television companies are entering the communications market by upgrading their networks with fiber optics and installing facilities to provide broadband, voice, video and data communications. Electric utilities could become a competitive threat since they have existing assets and access to low cost capital that could allow them to enter a service area rapidly and accelerate network development.

       *Internet Competition*.  Internet services and other broadband services are also highly competitive, and FairPoint expects that competition will continue to intensify. Internet services, meaning both Internet access (wired and wireless) and on-line content services, are provided primarily by Internet service providers, satellite-based companies, long distance carriers, wireless companies and cable television companies. Many of these companies provide direct access to the Internet and a variety of supporting services to businesses and individuals. In addition, many of these companies, such as Microsoft and Yahoo!, offer on-line content services consisting of access to closed, proprietary information networks. Electric utility companies, utilizing broadband over power lines technology, could offer an additional threat in this area as they look to leverage their embedded assets to enter new lines of business. Cable television operators, among others, have aggressively entered the Internet access business. Satellite companies are also offering broadband access to the Internet, primarily to remote, unserved locations.  Municipalities, public utilities and private business receiving government stimulus funds may also choose to enter the Internet access business.

       *Voice Over Internet Protocol Competition*.  Voice over internet protocol ("<u>VoIP</u>") service is increasingly being embraced by all industry participants. VoIP service involves the routing of voice calls over the public Internet or private IP networks, through packets of data instead of transmitting the calls over the existing public switched telephone network. This routing mechanism may give VoIP service providers a cost advantage, and enable them to offer services to end users at a lower price. While current VoIP applications typically complete calls using incumbent local exchange carrier infrastructure and networks, as VoIP services obtain acceptance and market penetration and technology advances further, a greater number of calls

may be placed without utilizing the public switched telephone network. The proliferation of VoIP, particularly to the extent these calls do not utilize FairPoint's local exchange carriers' networks or are accorded different regulatory treatment, may result in an erosion of FairPoint's customer base and loss of local, long distance and network access revenues.

*Long Distance Competition.* Competition for long distance communications services is robust. Competition in the long distance business is based primarily on price, although service bundling, branding, customer service, billing service and quality play a role in customers' choices.

*Cable Competition.* Cable companies are competing with FairPoint on several fronts: high speed data, voice, video and bundled solutions. Cable high speed data services are generally competitive with FairPoint's services in both pricing and the speed of those services. FairPoint estimates that as of September 30, 2009, a majority of the customers that FairPoint served had access to a cable modem offering. The second area of competition is local and long distance voice services. In addition, the FCC's requirement that telephone companies offer number portability has increased the competition FairPoint faces from cable companies.

*Wireless Competition.* In most of FairPoint's service areas it faces competition from wireless technology and, as technology and economies of scale continue to improve, competition from wireless carriers is expected to continue to increase. In addition, the FCC's requirement that telephone companies offer wireline-to-wireless number portability is expected to increase the competition FairPoint faces from wireless carriers. The NNE Operations' service areas represent both rural and small urban markets and tend to have better wireless coverage than those of the historical operations of FairPoint. Wireless competition is more robust in these service areas.

*Other Competition.* Wireline, wireless, cable and utility companies could form, and in some cases have formed or are in the process of forming, strategic alliances to offer bundled services in FairPoint's service areas. FairPoint may face increased competition from bundled service providers in the future, in particular if applications for certain broadband development funding submitted by certain of these strategic alliances under the American Recovery Act of 2009 are approved.

### 6. Regulatory

In its normal operations apart from the Chapter 11 Cases, FairPoint is subject to regulation primarily by federal and state governmental agencies. At the federal level, the FCC generally exercises jurisdiction over the facilities and services of communications common carriers, such as FairPoint, to the extent those facilities are used to provide, originate or terminate interstate or international communications. Public utility commissions ("PUCs") are the state regulatory commissions that generally exercise jurisdiction over common carriers' facilities and services to the extent those facilities are used to provide, originate or terminate intrastate communications. Certain of these regulatory regimes affect FairPoint's revenues (positively and negatively) because they impose price caps or they subsidize high-cost operations in rural areas of the United States where FairPoint operates. For a discussion of the specific restrictions and other regulations to which FairPoint's business is subject, please refer to "Item 1—Business— Regulatory Environment" in FairPoint Communications' Annual Report on Form 10-K for the

fiscal year ended December 31, 2008, filed with the Securities and Exchange Commission on March 5, 2009. *See Section V.F.1 ("Overview of Chapter 11 Cases—Other Material Information—PUC Negotiations").*

### 7.        Legal Proceedings Outside the Bankruptcy Court

FairPoint is involved in litigation arising in the normal course of business and also in connection with the Chapter 11 Cases. The outcome of this litigation is not expected to have a material impact on FairPoint's financial statements or projections.  In addition, to the extent FairPoint is currently involved in any litigation and/or regulatory proceedings, most of these proceedings have been stayed as a result of the filing of the Chapter 11 Cases.

## B.        CERTAIN KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### 1.        Overview

On January 15, 2007, FairPoint Communications entered into an agreement and plan of merger with Verizon and Spinco pursuant to which FairPoint Communications committed to purchase Verizon's landline operations in Maine, New Hampshire and Vermont.  The transaction required Verizon to contribute specified assets and liabilities of the local exchange businesses of Verizon New England Inc. and other Verizon subsidiaries in Maine, New Hampshire and Vermont to Spinco and the related long distance and internet service provider businesses in those states to subsidiaries of Spinco.  After extensive federal and state regulatory review and approval, on March 31, 2008, Spinco was merged with and into FairPoint Communications, with FairPoint Communications being the surviving entity in the Merger.

In connection with the Merger, FairPoint and Spinco entered into the Prepetition Credit Agreement and Spinco issued and FairPoint Communications subsequently assumed the outstanding Senior Notes.  In consideration of the Merger, Verizon received a $1.16 billion cash payment from Spinco and an additional $551 million in cash from the proceeds of the issuance of Senior Notes.  Verizon's stockholders received approximately 54 million shares of FairPoint Communications' common stock, representing approximately 60.2% of the equity ownership interests in FairPoint Communications at that time.  As a result of the Merger, FairPoint's size, as measured by access lines and revenues, increased approximately five-fold.

Following the acquisition of the NNE Operations, FairPoint faced significant short- and long-term challenges, including, among other things (i) integrating the NNE Operations with pre-Merger FairPoint, (ii) keeping pace with competition from bundled offerings by cable companies, as well as the use of alternative technologies, which are eroding FairPoint's traditional base of wireline voice customers, (iii) monitoring, repairing and upgrading the existing telecommunications network in the NNE Operations, while simultaneously building a new next generation IP based network and (iv) overcoming the difficulty of transitioning certain back-office functions from Verizon's integrated systems to newly created systems of FairPoint, which occurred in January 2009 (hereinafter, the "Cutover").

These challenges were made even more difficult by deteriorating market conditions. Although local exchange carriers were the only source of voice communications for many years,

more recently local exchange carriers, including FairPoint, have experienced a decline in the number of access lines in service, primarily due to increased competition from wireless carriers, cable television operators who offer voice services and internet service providers who offer VoIP services. Moreover, these competitive challenges were exacerbated by the recent turmoil in the financial markets, which has significantly limited available capital and resulted in a significant decline in the domestic economy in the past year. FairPoint believes that the economic decline has reduced consumer spending and contributed to an increase in the rate of decline in access lines and an increase in overdue accounts receivable balances from customers. Additionally, as a result of the Cutover, FairPoint incurred higher than anticipated incremental costs and was required to devote significant resources, including management time and attention, to resolving these problems. Furthermore, the regulatory regimes under which FairPoint operates limit its flexibility in addressing these problems. As a result of the combined impact of each of these developments, FairPoint was unable to attain the performance levels it projected at the time of the acquisition of the NNE Operations.

The inability to achieve the financial performance projections with respect to the NNE Operations made it impossible for FairPoint to service its approximately $2.7 billion in debt obligations. Interest costs on FairPoint's significant debt have absorbed a large portion of its operating cash flow, thereby imposing limitations on FairPoint's ability to construct its next generation IP based network which FairPoint believes will enable it to offer a new suite of IP based services and implement its strategic business plan. FairPoint believes these are necessary steps to reverse the current downward trend of FairPoint's operating cash flows.

2. **Cutover**

During 2007, 2008, and into January 2009, FairPoint developed and deployed new systems, processes and personnel to operate the NNE Operations.

FairPoint believes that the transition of the NNE Operations from operating subsidiaries of Verizon to subsidiaries of FairPoint had an adverse effect on its operations. Pursuant to agreements entered into with Verizon relating to the Merger, Verizon was to remain responsible for critical functions such as internal information technology, customer care, order management, broadband help desk support, E-911 services, network monitoring, billing and collection and supply chain systems from the March 31, 2008 closing date until Cutover was achieved. During this period, the NNE Operations were operated under a transition services agreement, pursuant to which Verizon was paid approximately $15 million per month in return for the services set forth above. In addition, FairPoint Communications engaged Capgemini U.S. LLC ("Capgemini") to build a back-office infrastructure to allow FairPoint to transition from Verizon's systems. FairPoint extended the Cutover date several times until the final Cutover date in January 2009.

Following Cutover, FairPoint experienced increased processing time by customer service representatives for new orders, increased processing time for customer invoices and an inability to execute automated collection treatment efforts. These issues negatively impacted customer satisfaction and resulted in large increases in customer call volumes into FairPoint's customer-service centers and delayed the installation, repairs and upgrades of services. While many of these issues were anticipated, the magnitude of the difficulties experienced was beyond FairPoint's expectations.

In the first nine months of 2009, FairPoint incurred $28.8 million of incremental expenses in order to operate its business, including third-party contractor costs and internal labor costs in the form of overtime pay. The Cutover also required significant staff and senior management attention.

To date, FairPoint has resolved many of the issues it faced, but it has been required to devote significant financial resources and employee time to resolving those issues. This has lessened FairPoint's ability to implement its business plan, improve customer satisfaction and compete effectively in the marketplace.

On October 9, 2009, FairPoint Communications entered into a Settlement Agreement and Release (the "Capgemini Settlement Agreement") with Capgemini. Under various contracts between Capgemini and FairPoint Communications, the invoiced amounts and certain deferred amounts totaled approximately $49.8 million. Pursuant to the Capgemini Settlement Agreement, Capgemini agreed to continue to provide services to FairPoint in exchange for FairPoint paying Capgemini ongoing fees plus $30 million of the total $49.8 million, with FairPoint paying $15 million upon execution of the Capgemini Settlement Agreement and an additional $15 million due on December 31, 2009. The Capgemini Settlement Agreement also allows Capgemini to, among other things, assert an allowed unsecured claim against FairPoint Communications in the Chapter 11 Cases (to which FairPoint Communications will not object) for the remaining balance of approximately $19.8 million. FairPoint also agreed to assume the Capgemini Settlement Agreement and certain contracts with Capgemini. To that end, on November 16, 2009, FairPoint Communications filed its motion for Order, pursuant to Bankruptcy Code Sections 105(a), 363 and 365 and Bankruptcy Rules 6006 and 9019, Authorizing Debtors to Assume Certain Agreements and Settle Certain Related Claims Concerning Capgemini U.S. LLC. FairPoint Communications and Capgemini have adjourned the hearing on such motion to March 3, 2010, and subsequently agreed to delay the payment of $15 million that was originally due on December 31, 2009 until after the Bankruptcy Court's consideration of the motion.

3.      **Increased Regulatory Burdens**

To obtain state-level approval of the Merger, FairPoint entered into stipulations with the regulatory authorities in Maine, New Hampshire and Vermont. As a result of these stipulations, FairPoint, among other things, agreed to provide services according to certain quality measures, increase the availability of broadband service in each of the three states within certain prescribed time frames, and make minimum capital investments in those three states up to five years following the closing of the Merger (as prescribed in the applicable stipulations), or face financial penalties. FairPoint's competitors, who are not local exchange carriers, do not face the same regulatory constraints and requirements. Further, due to various contracts and other agreements inherited from Verizon and because of regulatory orders issued prior to the closing of the Merger, FairPoint was limited in its ability to raise rates for specified periods of time, including rate changes for certain services that are not regulated by the state PUCs. Following the commencement of the Chapter 11 Cases, FairPoint commenced negotiations with representatives of the state PUCs, which ultimately led to the execution of ~~term sheets~~regulatory settlements with representatives of the regulatory authorities in Maine, New Hampshire and Vermont. The regulatory settlements reflected in such term sheets are subject to, among other

14

things, approval of the settlements by the state PUCs. ***See Section V.F.1 ("Overview of Chapter 11 Cases—Other Material Information—PUC Negotiations").***

### 4.    Market Conditions

FairPoint's financial well-being also has been hurt by the current economic downturn and continued aggressive competition, particularly in the Northern New England markets it serves. FairPoint's consolidated revenues decreased by approximately $60.0 million, or 18.3%, to $268.3 million in the third quarter of 2009 compared to the same quarter of 2008. Revenues in each of FairPoint's business lines have also been impacted by the weak economy, which has caused a decrease in discretionary consumer spending and, correspondingly, an increase in access line losses for FairPoint. As a result of these and other factors, FairPoint experienced a net loss in the third quarter of 2009 of approximately $77.3 million and a net loss in the first nine months of 2009 of approximately $103.9 million, as compared to a net loss of approximately $25.1 million in the third quarter of 2008 and net income of approximately $7.5 million in the first nine months of 2008.

A portion of these losses can also be attributed to the vigorous and growing competition in the communications and technology industries. As a result of the increasingly competitive marketplace in which FairPoint operates, over the last several years FairPoint has experienced decreasing revenues and a decline in customers. Many of FairPoint's direct regional competitors, including other local cable and internet providers, took advantage of both the lengthy approval period for the Merger as well as the delayed Cutover and operating issues experienced as a consequence of Cutover by offering aggressive pricing on bundled packages of services and claiming to offer more reliable service. ***See Section II.A.5 ("Overview of FairPoint and its Business and Certain Key Events Leading to the Commencement of the Chapter 11 Cases—Business of FairPoint—Competition")***.

On October 5, 2008, the administrative agent under the Prepetition Credit Agreement, Lehman Commercial Paper Inc. ("LCPI"), filed a petition for relief under chapter 11 of the Bankruptcy Code in this Court, which impacted FairPoint's liquidity. LCPI accounted for approximately thirty percent of the loan commitments under the Revolver (as defined herein). On January 21, 2009, FairPoint Communications entered into an amendment to the Prepetition Credit Agreement under which the administrative agent resigned and was replaced by Bank of America, N.A., as administrative agent. LCPI's undrawn loan commitments under the Revolver, totaling approximately $30.329.7 million, were terminated and are no longer available to FairPoint. As a result, the available funds under the Revolver were permanently reduced to an aggregate principal amount of $169.7 million. In addition, during September 2008, due to the extreme uncertainty in the financial markets and the risk associated with LCPI, FairPoint drew the remaining $100 million available under its $200 million delayed draw term loan, as well as $100 million under its revolving credit facility. These draw-downs resulted in additional and unanticipated interest costs as these funds were not immediately needed for operating purposes.

### 5.    Initial Out of Court Restructuring Initiatives

As a result of the various factors affecting FairPoint's financial performance and operations, FairPoint determined that it may not be in compliance with certain financial

covenants in the Prepetition Credit Agreement for the measurement period ended June 30, 2009. Accordingly, as a first step in a restructuring of its capital structure, FairPoint initiated the Exchange Offer. The Exchange Offer was consummated on July 29, 2009. Pursuant to the Exchange Offer, $439.6 million aggregate principal amount of the Original Senior Notes (which amount was equal to approximately 83% of the then-outstanding Original Senior Notes) was exchanged for $439.6 million aggregate principal amount of Exchange Offer Senior Notes. In addition, pursuant to the terms of the Exchange Offer, an additional $18.9 million aggregate principal amount of Exchange Offer Senior Notes was issued to noteholders who tendered their Original Senior Notes in the Exchange Offer as payment for accrued and unpaid interest on the exchanged Original Senior Notes up to, but not including, the July 29, 2009 settlement date of the Exchange Offer (the "Settlement Date").

The Exchange Offer Senior Notes permitted FairPoint Communications to pay the interest payable on the Exchange Offer Senior Notes for the period from July 29, 2009 through and including September 30, 2009 (the "Initial Interest Payment Period") in the form of cash, by capitalizing such interest and adding it to the principal amount of the Exchange Offer Senior Notes or a combination of both cash and such capitalization of interest, at FairPoint's option. The Exchange Offer resulted in cash savings of approximately $28.8 million for FairPoint.

Although FairPoint was able to successfully consummate the Exchange Offer and, as a result, was able to maintain compliance with the financial covenants contained in the Prepetition Credit Agreement for the measurement period ended June 30, 2009, the Exchange Offer did not provide a sufficient reduction in FairPoint's cash interest expense to prevent a potential breach of the interest coverage ratio maintenance covenant in the Prepetition Credit Agreement for the measurement period ended September 30, 2009. In addition, FairPoint anticipated that it would be in breach of the leverage ratio maintenance covenant in the Prepetition Credit Agreement as early as the measurement period ended September 30, 2009.

Such breaches would have permitted the lenders under the Prepetition Credit Agreement and certain interest rate swap creditors (the "Prepetition Credit Agreement Lenders") to accelerate the maturity of the loans outstanding thereunder, seek foreclosure upon any collateral securing such loans and terminate any remaining commitments to lend to FairPoint. If the Prepetition Credit Agreement Lenders had exercised such remedies, FairPoint did not believe that it could refinance the Prepetition Credit Agreement on reasonable terms, or at all, in the then prevailing lending environment.

In order to address these issues, FairPoint developed an out-of-court restructuring plan (the "Out of Court Restructuring Plan") with the assistance of its financial advisor. The Out of Court Restructuring Plan related to all of FairPoint's outstanding Senior Notes and was generally designed to (i) reduce FairPoint's indebtedness and interest expense, (ii) improve FairPoint's liquidity and financial and operational flexibility in order to allow it to compete more effectively and maximize enterprise value and (iii) help FairPoint maintain compliance with the maintenance covenants in the Prepetition Credit Agreement. In particular, the Out of Court Restructuring Plan contemplated, among other things, that Senior Notes would be tendered in exchange for shares of capital stock in FairPoint. The Out of Court Restructuring Plan was conditioned on acceptance by 95% of the outstanding holders of the Senior Notes, which was, at that time, the minimum threshold determined to be necessary to sufficiently reduce leverage for

purposes of continued compliance with the maintenance covenants in the Prepetition Credit Agreement as well as for liquidity purposes.

This effort, however, was unsuccessful for two primary reasons: (i) following lengthy negotiations with substantial holders of the Senior Notes, it became apparent that the minimum exchange threshold could not be met and (ii) the holders of the Senior Notes were unwilling to lend an additional $25 million in funds that would have been necessary to effectively implement the Out of Court Restructuring Plan.

Following unsuccessful negotiations with the holders of the Senior Notes, FairPoint entered into discussions with certain of the lenders under the Prepetition Credit Agreement. On September 25, 2009, FairPoint Communications and certain of its subsidiaries entered into a forbearance agreement (the "Forbearance Agreement") with lenders holding approximately 65% of the loans and commitments outstanding under the Prepetition Credit Agreement (the "Forbearing Prepetition Credit Agreement Lenders"). The Forbearance Agreement permitted FairPoint to forgo certain principal and interest payments due on September 30, 2009 under the Prepetition Credit Agreement and under its Swap Agreements. Further, subject to no intervening defaults, the Forbearing Prepetition Credit Agreement Lenders agreed to forbear from accelerating the maturity of the loans outstanding under the Prepetition Credit Agreement and from exercising any other remedies thereunder until October 30, 2009 if FairPoint failed to meet certain interest coverage ratio and leverage ratio covenants contained in the Prepetition Credit Agreement for the measurement period ended September 30, 2009.

In addition, on September 25, 2009, FairPoint Communications entered into a forbearance agreement (the "Wachovia Forbearance Agreement") with Wachovia Bank, N.A. ("Wachovia") relating to the Wachovia Swap Agreement. Pursuant to the Wachovia Forbearance Agreement, subject to no intervening defaults, Wachovia agreed until October 30, 2009 not to exercise any of its rights or remedies under the Wachovia Swap Agreement if FairPoint failed to make a payment that was due under the Wachovia Swap Agreement on September 30, 2009.

Finally, on September 25, 2009, FairPoint Communications entered into a forbearance agreement (the "Morgan Stanley Forbearance Agreement") with Morgan Stanley Capital Services Inc. ("Morgan Stanley") relating to the Morgan Stanley Swap Agreement. Pursuant to the Morgan Stanley Forbearance Agreement, subject to no intervening defaults, Morgan Stanley agreed until October 30, 2009 not to exercise any of its rights or remedies under the Morgan Stanley Swap Agreement if FairPoint failed to make a payment that was due under the Morgan Stanley Swap Agreement on September 30, 2009.

**6.        The Plan Term Sheet**

Following the execution of the forbearance agreements described above, FairPoint engaged in extensive negotiations with the Lender Steering Committee regarding a recapitalization of its significant indebtedness. Subsequently, FairPoint and the Lender Steering Committee reached agreement on the Plan Term Sheet, which sets forth the terms of a restructuring plan that will significantly deliver FairPoint's balance sheet, including the conversion of approximately $1.7 billion of debt to equity. Evidencing their support of the Plan

Term Sheet, the members of the Lender Steering Committee have executed the Plan Support Agreement by which the members of the Lender Steering Committee agreed to support the Plan that substantially embodies the terms contained in the Plan Term Sheet. In addition, other secured lenders under the Prepetition Credit Agreement who signed a confidentiality agreement and received non-public information have also executed the Plan Support Agreement as of October 25, 2009. In total, holders of in excess of 50% (inclusive of the members of the Lender Steering Committee) of FairPoint's outstanding secured debt under the Prepetition Credit Agreement have executed the Plan Support Agreement.

Certain terms contained in the Plan Term Sheet, as reflected in the Plan (which is attached hereto as ***Exhibit A***), have been modified ~~by the agreement reached by~~as a result of negotiations among FairPoint, the Lender Steering Committee and the Ad Hoc Committee of Senior Noteholders.

## C.     OPERATIONS AFTER EMERGENCE FROM CHAPTER 11

FairPoint's management team has worked diligently to expand and improve FairPoint's product offerings, diversify and grow revenues, and increase operational efficiency and operating cash flows, and intends to continue to do so. FairPoint plans to invest more than $100 million over the next two years to continue to build out its next generation IP based network.

After the Effective Date of the Plan, FairPoint will have de-levered its balance sheet to an appropriate level for its cost structure, positioning FairPoint to achieve profitability on a long-term basis. FairPoint is confident that the completion of its restructuring efforts will allow FairPoint to focus its resources on the operation of its businesses, will result in an appropriate capital structure for FairPoint that will significantly strengthen its financial condition and liquidity and position FairPoint to compete more effectively in a dynamic marketplace. Given FairPoint's core strengths, which include an experienced workforce and extensive network equipment and facilities, and, with the aid of chapter 11, FairPoint is positioned to achieve its long-term goal of becoming the preferred communications provider for businesses and residential customers throughout the markets FairPoint serves.

Attached hereto as ***Exhibit B*** is projected financial information that forecasts the financial performance of Reorganized FairPoint through 2013. ***See Section VII.D ("Certain Factors To Be Considered—Inherent Uncertainty of the Reorganized Company's Financial Projections").*** These projections are based on the current business plan for Reorganized FairPoint. **ALL CREDITORS ARE ADVISED AND ENCOURAGED TO REVIEW THE PROJECTIONS SET FORTH IN EXHIBIT B IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.** The ongoing post-Effective Date operations of Reorganized FairPoint will be financed through revenues generated by business operations and by certain exit credit facilities. ***VI.F.2 ("Summary of Plan of Reorganization—Means of Implementation of the Plan—New Term Loan and New Revolver")***.

# III.
# PREPETITION OBLIGATIONS AND CAPITAL STRUCTURE

As of the Petition Date, FairPoint had approximately $2.7 billion of total funded debt outstanding, including approximately $2.1 billion of Allowed Prepetition Credit Agreement Claims (consisting of approximately $2 billion owed under the Prepetition Credit Agreement and approximately $98.8 million owed under the Swap Agreements) and approximately $~~568~~575 million in Senior Notes, including accrued interest. FairPoint estimates that under its existing debt structure, it would have incurred more than $200 million in interest costs during 2009, of which $165 million was incurred during the first nine months of this year. In addition, as of the Petition Date, FairPoint had approximately $~~56~~60 million in general trade obligations.

## A.     PREPETITION CREDIT AGREEMENT

On March 31, 2008, immediately prior to the Merger, FairPoint Communications and Spinco entered into the Prepetition Credit Agreement, consisting of (a) a revolver in an aggregate principal amount of $200 million (the "Revolver"), including a swingline sub-facility in the amount of $10 million and a letter of credit sub-facility in the amount of $30 million (the "Letter of Credit Subfacility"); (b) a term loan A facility in an aggregate principal amount of $500 million (the "Term Loan A Facility"); (c) a term loan B facility in the aggregate principal amount of $1.13 billion (the "Term Loan B Facility", and together with the Term Loan A Facility, the "Term Loans") and (d) a delayed draw term loan in an aggregate principal amount of $200 million (the "Delayed Draw Term Loan"). Spinco drew $1.16 billion under the Term Loans immediately prior to its spin-off from Verizon, the proceeds of which were paid to Verizon. FairPoint then drew $470 million under the Term Loans and $5.5 million under the Delayed Draw Term Loan concurrently with the closing of the Merger. Since the Merger closed, FairPoint has drawn the remaining $194.5 million under the Delayed Draw Term Loan. In addition, as of September 30, 2009, FairPoint had borrowed $150.0 million under the Revolver and letters of credit had been issued for $18.2 million. Accordingly, as of September 30, 2009, the remaining amount available under the Revolver was $2.1 million. FairPoint also had pending commitments for additional letters of credit totaling $0.7 million, as of September 30, 2009.

Each of S T Enterprises, Ltd., FairPoint Logistics, Inc., MJD Services Corp., FairPoint Carrier Services, Inc., FairPoint Broadband, Inc. and MJD Ventures, Inc. (collectively, the "Prepetition Guarantors") entered into that certain Subsidiary Guaranty with Bank of America, N.A. (successor in interest to LCPI), as administrative agent, dated as of March 31, 2008 (as amended, restated, modified and supplemented as of the date hereof, the "Prepetition Subsidiary Guaranty"), as required under the terms of the Prepetition Credit Agreement. Pursuant to the Prepetition Subsidiary Guaranty, the Prepetition Guarantors jointly and severally guaranteed the full and prompt payment of all fees, obligations, liabilities and indebtedness of FairPoint Communications owed to the Prepetition Credit Agreement Lenders as more fully described in the Prepetition Subsidiary Guaranty.

Pursuant to the Prepetition Pledge Agreement between the Prepetition Pledgors (as defined herein) and Bank of America, N.A. (successor in interest to LCPI), as collateral agent, all obligations owing by FairPoint Communications and the other Prepetition Credit Agreement Lenders under the Prepetition Credit Agreement, the related credit documents and interest rate

agreements entered into by any of the Prepetition Pledgors with any Prepetition Credit Agreement Lender (or affiliate thereof) ("Prepetition Credit Agreement Claims") are secured by (i) all promissory notes issued by or held by FairPoint Communications, MJD Ventures, Inc., MJD Services Corp., S T Enterprises, Ltd., FairPoint Carrier Services, Inc., FairPoint Broadband, Inc., FairPoint Logistics, Inc., Enhanced Communications of Northern New England Inc., Utilities, Inc., C-R Communications, Inc., Comerco, Inc., GTC Communications, Inc., St. Joe Communications, Inc., Ravenswood Communications, Inc. and Unite Communications Systems, Inc. (collectively, the "Prepetition Pledgors"); (ii) 100% of the equity interests owned or held by each of the Prepetition Pledgors in any domestic or partnership or limited liability company (including, without limitation, in the case of partnerships and limited liability company interests, all rights to profits, distributions and other amounts in respect thereof); (iii) 100% of the non-voting equity interests and 65% of the total voting equity interests owned or held by each Prepetition Pledgor in its foreign subsidiaries, if any; and (iv) all proceeds, if any, of the foregoing, subject to certain qualifications, including applicable regulatory approval prior to enforcement of these rights by the administrative agent under the Prepetition Credit Agreement.

On October 5, 2008, LCPI, the administrative agent under the Prepetition Credit Agreement, filed a petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On January 21, 2009, FairPoint entered into an amendment to the Prepetition Credit Agreement under which the administrative agent resigned and was replaced by Bank of America, N.A., as administrative agent. As a result of the amendment, LCPI's undrawn commitments under the Revolver were terminated and LCPI's existing pro rata share of the drawn Revolver was converted into a new term loan, aggregating approximately $29.7 million (the "LCPI Loans"), which LCPI Loans mature on the maturity date of the Revolver.

As of the Petition Date, the following amounts (excluding accrued interest) were outstanding under the Prepetition Credit Agreement: (a) approximately $29.7 million in aggregate principal amount under the LCPI Loans; (b) approximately $120 million in aggregate principal amount under the Revolver; (c) approximately $492 million in aggregate principal amount under the Term A Facility; (d) approximately $1.3 billion in aggregate principal amount under the Term B Facility; and (e) approximately $18 million in aggregate face amount of undrawn letters of credit issued to third parties for the account of FairPoint under the Letter of Credit Subfacility.

The Term Loan B Facility and the Delayed Draw Term Loan would have matured in March 2015 and the Revolver, the LCPI Loans and the Term Loan A Facility would have matured in March 2014.

Prior to the filing of the Chapter 11 Cases, FairPoint failed to make principal and interest payments due under the Prepetition Credit Agreement on September 30, 2009. The failure to make the principal payment constituted an event of default under the Prepetition Credit Agreement and the failure to make the interest payment constituted an event of default under the Prepetition Credit Agreement after the expiration of a five business day grace period. An event of default under the Prepetition Credit Agreement permits the lenders under the Prepetition Credit Agreement to accelerate the maturity of the loans outstanding thereunder, seek foreclosure upon any collateral securing such loans and terminate any remaining commitments to lend to FairPoint. In addition, the filing of the Chapter 11 Cases constituted an event of default under

the Prepetition Credit Agreement.  FairPoint believes that any efforts to enforce payment obligations under the Prepetition Credit Agreement are stayed as a result of the filing of the Chapter 11 Cases.

**B.       ORIGINAL SENIOR NOTES AND EXCHANGE OFFER SENIOR NOTES**

On March 31, 2008, Spinco issued the Original Senior Notes in the aggregate principal amount of $551 million, which have a maturity date of April 1, 2018 and are not redeemable at FairPoint's option prior to April 1, 2013.  FairPoint Communications assumed all obligations under the Original Senior Notes as part of the Merger.  Interest on the Original Senior Notes is payable semi-annually in cash on April 1 and October 1 of each year.  The Original Senior Notes bear interest at a fixed rate of 13-1/8%, resulting in annual interest costs of approximately $72 million, and principal is due at maturity.  Because the Original Senior Notes were issued at a discount on the date of their distribution, the Original Senior Notes had a carrying value on such date of $539.8 million (principal amount at maturity of $551 million less a discount of $11.2 million).

On July 29, 2009, FairPoint successfully consummated the Exchange Offer for certain of the Original Senior Notes.  Pursuant to the Exchange Offer, $439.6 million in the aggregate principal amount of the Original Senior Notes (which amount was equal to approximately 83% of the then-outstanding Original Senior Notes) was exchanged for $439.6 million aggregate principal amount of Exchange Offer Senior Notes.  In addition, pursuant to the terms of the Exchange Offer, an additional $18.9 million aggregate principal amount of Exchange Offer Senior Notes was issued to holders who tendered their Original Senior Notes in the Exchange Offer as payment for accrued and unpaid interest on the exchanged Original Senior Notes up to, but not including, the Settlement Date.  In tandem with the Exchange Offer, FairPoint solicited consents from holders of the Original Senior Notes for certain amendments to the indenture governing the Original Senior Notes (the "Original Senior Notes Indenture") to eliminate or amend substantially all of its restrictive covenants and modify a number of the events of default and certain other provisions previously contained in the Original Senior Notes Indenture.

The Exchange Offer Senior Notes have a maturity date of April 2, 2018, and bear interest at a fixed rate of 13-1/8%, payable in cash, except that the Exchange Offer Senior Notes bore interest at a rate of 15% for the Initial Interest Payment Period, subject to certain increases upon the occurrence of certain events.  In addition, FairPoint was permitted to pay the interest payable on the Exchange Offer Senior Notes for the Initial Interest Payment Period in the form of cash, by capitalizing such interest and adding it to the principal amount of the Original Senior Notes or a combination of both cash and such capitalization of interest, at FairPoint's option.

In connection with the Exchange Offer and the corresponding consent solicitation, FairPoint also paid a cash consent fee of $1.6 million in the aggregate to holders of Original Senior Notes who validly delivered consents in such consent solicitation and did not revoke their consents prior to a specified early consent deadline.  The Exchange Offer, in turn, resulted in cash savings of $28.8 million from the conversion of certain cash interest to non-cash.

Prior to the filing of the Chapter 11 Cases, FairPoint failed to make the October 1, 2009 interest payment on the Senior Notes.  The failure to make the interest payment on the Senior

Notes constituted an event of default under the Senior Notes upon the expiration of a thirty day grace period. An event of default under the Senior Notes permits the holders of the Senior Notes to accelerate the maturity of the Senior Notes. In addition, the filing of the Chapter 11 Cases constituted an event of default under the Exchange Offer Senior Notes. FairPoint believes that any efforts to enforce payment obligations under the Senior Notes are stayed as a result of the filing of the Chapter 11 Cases.

## C.    DERIVATIVE FINANCIAL INSTRUMENTS

The Prepetition Credit Agreement also requires FairPoint to enter into interest rate swaps or similar arrangements with the lenders under the Prepetition Credit Agreement and/or their affiliates with respect to at least 50% of its borrowings under the Term Loans. As a result, FairPoint Communications entered into the Swap Agreements in order to limit the variability of its interest payments and to shield itself from interest rate cash flow risk. As a result of the Swap Agreements, approximately 77% of FairPoint's interest payments were effectively calculated at fixed rates, averaging 8.9%, rather than variable rates as of September 30, 2009. Under the terms of the Swap Agreements, FairPoint makes a payment if the variable rate is below the fixed rate, or it receives a payment if the variable rate is above the fixed rate.

The occurrence of an event of default under the Prepetition Credit Agreement constituted an event of default under the Swap Agreements. In addition, FairPoint failed to make payments due under the Swap Agreements on September 30, 2009, which failure resulted in an event of default under the Swap Agreements upon the expiration of a three business day grace period. Furthermore, the filing of the Chapter 11 Cases constituted an event of default under the Swap Agreements.

On October 28, 2009, Wachovia delivered a Notice of Amount Due Following Early Termination to FairPoint Communications (the "Wachovia Notice") notifying FairPoint Communications that an "Early Termination Date" had occurred under the Wachovia Swap Agreement and that the outstanding amounts owed to Wachovia under the Wachovia Swap Agreement total approximately $59.2 million on the effective date of the Wachovia Notice. On October 26, 2009, Morgan Stanley delivered a Notice of Event of Default under the Morgan Stanley Swap Agreement to FairPoint Communications, notifying FairPoint Communications that an "Early Termination Date" had occurred. Further, on November 5, 2009, Morgan Stanley delivered a Notice under Pledge Agreement (the "Morgan Stanley Notice") notifying Bank of America, N.A. as administrative agent under the Prepetition Credit Agreement, that the outstanding interest rate obligations owed to Morgan Stanley under the Morgan Stanley Swap Agreement total approximately $39.6 million, plus any additional accrued interest, expenses and fees. Based on the information provided in the Wachovia Notice and the Morgan Stanley Notice, the net liability of FairPoint Communications under the Swap Agreements equals approximately $98.8 million, plus fees, costs and other expenses. The obligations under the Swap Agreements rank *pari passu* with the obligations under the Prepetition Credit Agreement and are secured by the same collateral securing the obligations under the Prepetition Credit Agreement.

# IV.
## CORPORATE GOVERNANCE AND MANAGEMENT (PRE AND POST REORGANIZATION)

**A. CURRENT AND POST-REORGANIZATION EXECUTIVE OFFICERS OF FAIRPOINT COMMUNICATIONS**

The following is a list of FairPoint Communications current executive officers, which executive officers are expected to continue to serve in their current capacities on and after the Effective Date:

**Executive Officers**

| Name | Position |
|---|---|
| David L. Hauser | Chairman of the Board of Directors and Chief Executive Officer |
| Peter G. Nixon | President |
| Alfred C. Giammarino | Executive Vice President and Chief Financial Officer |
| Jeffrey W. Allen | Executive Vice President, Northern New England Operations |
| Shirley J. Linn | Executive Vice President, General Counsel and Secretary |
| Lisa R. Hood | Senior Vice President and Controller |
| Thomas E. Griffin | Vice President and Treasurer |

Selected biographical information for FairPoint Communications' executive officers is set forth below:

*David L. Hauser.* Since July 1, 2009, Mr. Hauser has served as FairPoint Communications' Chairman and Chief Executive Officer. Prior to assuming this role, Mr. Hauser had served as a director of FairPoint Communications since February 2005. Prior to becoming FairPoint Communications' Chairman and Chief Executive Officer, Mr. Hauser served as the Group Executive and Chief Financial Officer of Duke Energy Corporation, where he was employed for 35 years. Mr. Hauser is on the board of directors of Furman University and of Charlotte, North Carolina's Blumenthal Center for the Performing Arts, the board of trustees of University of North Carolina at Charlotte and is past chair of the University of North Carolina at Charlotte Business School Advisory Council. He is also a past board member of the North Carolina Zoological Society and is a member of the North Carolina Association of Certified Public Accountants. Mr. Hauser also serves as a director of Enpro Industries, Inc.

*Peter G. Nixon.* In July 2007, Mr. Nixon was appointed as FairPoint Communications' President. Prior to assuming this role, Mr. Nixon had served as FairPoint Communications' Chief Operating Officer since November 2002. Previously, Mr. Nixon was FairPoint Communications' Senior Vice President of Corporate Development from February 2002 to November 2002 and President of FairPoint Communications' Telecom Group from April 2001 to February 2002. Prior to this, Mr. Nixon served as President of FairPoint Communications' Eastern Region Telecom Group from June 1999 to April 2001 and President of Chautauqua and Erie Telephone Corporation ("C&E"), from July 1997, when FairPoint Communications acquired C&E, to June 1999. From April 1, 1989 to June 1997, Mr. Nixon served as Executive Vice President of C&E. From April 1, 1978 to March 31, 1989, Mr. Nixon served as Vice President of Operations for

C&E. Mr. Nixon has served as the past Chairman of the New York State Telecommunications Association from June 1996 to June 1998.

*Alfred C. Giammarino*.  In September 2008, Mr. Giammarino was appointed as FairPoint Communications' Executive Vice President and Chief Financial Officer. Prior to joining FairPoint Communications, Mr. Giammarino was employed by Sensus Metering Systems, where he served as Chief Financial Officer from December 2007 to May 2008 and as a Senior Financial Consultant for July and August 2008. Previously, Mr. Giammarino was employed as Executive Vice President and Chief Financial Officer of Stratos Global Corporation from May 2004 to September 2007. Prior to that, Mr. Giammarino was employed by Verizon Communications Inc., where he served as Senior Vice President and Chief Financial Officer of Verizon's international and information services group from June 2000 to December 2003, and with GTE Corporation, where he was Senior Vice President of Finance and Planning from 1998 to 2000. Mr. Giammarino is certified as a public accountant in New York.

*Jeffrey W. Allen*.  In July 2009, Mr. Allen was appointed FairPoint Communications' Executive Vice President, Northern New England Operations.  Previously, Mr. Allen served as FairPoint Communications' Executive Vice President, External Relations from May 2008 to July 2009 and Assistant Vice President, Customer Operations from June 2007 to May 2008.  Prior to joining FairPoint Communications, Mr. Allen served as General Manager, Wireless for Datapath, Inc. from December 2005 to June 2007, Chief Executive Officer of Third Rail Americas, Inc. from January 2005 to December 2005, President, Chief Executive Officer and Chairman of the Board of Intellispace, Inc. from June 2001 to June 2004 and Chief Operating Officer of Intellispace, Inc. from April 2000 to June 2001.

*Shirley J. Linn*.  In March 2006, Ms. Linn was appointed as FairPoint Communications' Executive Vice President, General Counsel and Secretary. Previously, Ms. Linn served as FairPoint Communications' Senior Vice President, General Counsel and Secretary from September 2004 to March 2006. Ms. Linn has served as FairPoint Communications' General Counsel since October 2000, FairPoint Communications' Vice President since October 2000, and FairPoint Communications' Secretary since December 2000. Prior to joining FairPoint Communications, Ms. Linn was a partner, from 1984 to 2000, in the Charlotte, North Carolina law firm of Underwood Kinsey Warren & Tucker, P.A., where she specialized in general business matters, particularly mergers and acquisitions.

*Lisa R. Hood*.  In February 2008, Ms. Hood was appointed as FairPoint Communications' Senior Vice President and Controller. In addition, Ms. Hood served as FairPoint Communications' Interim Chief Financial Officer during the period between John Crowley's resignation, effective August 15, 2008, and Mr. Giammarino's appointment as FairPoint Communications' Chief Financial Officer on September 2, 2008. Prior to her appointment as Senior Vice President and Controller, Ms. Hood served as FairPoint Communications' Chief Operating Officer—FairPoint Telecom Group from April 2007 to February 2008. Ms. Hood also served as FairPoint Communications' Senior Vice President and Controller from July 2004 to March 2007 and as FairPoint Communications' Vice President and Controller from December 1993 to July 2004. Prior to joining FairPoint Communications, Ms. Hood was employed by a local public accounting firm in Kansas from 1988 to 1993. Ms. Hood is certified as a public accountant in Kansas.

*Thomas E. Griffin.*  In December 2005, Mr. Griffin was appointed FairPoint Communications' Treasurer, and, in early 2008, was appointed a Vice President. Mr. Griffin joined FairPoint Communications in January 2000 as Assistant Treasurer and served as FairPoint Communications' General Manager of Wireless Broadband operations from December 2003 through March 2005. Previously, Mr. Griffin was employed by Sealand Service, Inc. as Assistant Treasurer from September 1997 to January 2000 where he was responsible for worldwide cash management and as Director of Financial Planning for Europe for Sealand Service, Inc. from September 1995 to September 1997.

## B.    DIRECTORS OF FAIRPOINT COMMUNICATIONS

### 1.        Current Directors of FairPoint Communications

The following is a list of the directors currently serving on FairPoint Communications' board of directors:

**Directors**

| Name | Position |
| --- | --- |
| David L. Hauser | Chairman of the Board of Directors and Chief Executive Officer |
| Thomas F. Gilbane, Jr. | Director |
| Claude C. Lilly | Director |
| Robert S. Lilien | Director |
| Jane E. Newman | Director |
| Michael R. Tuttle | Director |

There are currently three vacancies on FairPoint Communications' board of directors. Selected biographical information for directors of FairPoint Communications who are not executive officers is set forth below:

*Thomas F. Gilbane, Jr.*  In March 2008, Mr. Gilbane was appointed as a director of FairPoint Communications. Mr. Gilbane is the President and Chief Executive Officer of Gilbane Inc., the parent company of Gilbane Building Company and Gilbane Development Company, and the Chairman and Chief Executive Officer of Gilbane Building Company, one of the nation's largest general contractors and construction managers. Mr. Gilbane also serves as a director and audit committee member of Gilbane Inc., and as a director of both Gilbane Building Company and Gilbane Development Company. Prior to assuming his current roles, Mr. Gilbane served as President and Chief Operating Officer of Gilbane Building Company from 1997 to January 2004.

*Claude C. Lilly.*  In February 2005, Dr. Lilly was appointed as a director of FairPoint Communications. Dr. Lilly is currently serving as Dean of the College of Business and Behavioral Science at Clemson University. Previously, Dr. Lilly served as Dean and James J. Harris Chair of Risk Management and Insurance in the Belk College of Business Administration at the University of North Carolina at Charlotte, where he was employed from July 1997 to June 2007. Dr. Lilly has served as Assistant Deputy Insurance Commissioner for the State of Georgia and as a director of several corporations. He currently serves on the audit committee of the Board

of Pensions of the Presbyterian Church and is the Chair of the board of the Charlotte branch of the Federal Reserve Bank of Richmond. Dr. Lilly also currently sits on the board of directors of the Erie Insurance Group, where he serves as the chair of the audit committee and as a member of the investment and strategic planning committees. Dr. Lilly earned the Chartered Property and Casualty Underwriter and Chartered Life Underwriter designations and is a member of numerous professional associations.

*Robert S. Lilien*. In December 2005, Mr. Lilien was appointed as a director of FairPoint Communications. Mr. Lilien is currently a partner in the law firm of Robinson, Bradshaw & Hinson, P.A., located in Charlotte, North Carolina, where he has worked since April 2002, and is also the managing member of Trilogy Capital Partners, LLC, a captive private equity fund with equity provided by a single family group, where he has also worked since April 2002. From 1993 to 2002, he held various positions at Duke Energy Corporation, including Senior Vice President-Duke Ventures for Duke Energy Corporation, Chairman and Chief Executive Officer of Crescent Resources, LLC, Chairman of DukeNet Communications, Inc. and Chairman of Duke Capital Partners, LLC.

*Jane E. Newman*. In August 2007, Ms. Newman was appointed as a director of FairPoint Communications, and was appointed to serve as lead director in October 2007. Ms. Newman previously served as the Interim President of the University of New Hampshire in Durham, New Hampshire from 2006 to June 2007. Prior to assuming this role, Ms. Newman served as the Executive Dean of the John F. Kennedy School of Government at Harvard University, beginning in 2000. Ms. Newman's academic positions also include engagements at the University of New Hampshire as Interim Dean of the Whittemore School of Business and Economics from 1998 to 1999, Dean of Students from 1972 to 1978 and Assistant Dean of Students from 1969 to 1972. She was also previously employed in various capacities by the Exeter Trust Company and Coastal Broadcasting Corporation, and served as a Senior Aide to a President of the United States. Ms. Newman is a director of the Lumina Foundation, Gilbane Inc., Exeter Trust Company and Global Relief Technologies, Inc. She is also the former Chair of the United States Naval Academy Board of Visitors.

*Michael R. Tuttle*. In March 2008, Mr. Tuttle was appointed as a director of FairPoint Communications. Mr. Tuttle has served as the President and Chief Executive Officer of Merchants Bank, a commercial bank with headquarters in Burlington, Vermont, since January 2006. Mr. Tuttle has also served, since January 2007, as the President and Chief Executive Officer and as a director of Merchants Bancshares, Inc., the parent company of Merchants Bank. Prior to assuming his current responsibilities, Mr. Tuttle served as Chief Operating Officer and Senior Lender of Merchants Bank from 1997 through 2005. He also serves on the boards of the Vermont Bar Foundation, United Way of Chittendon County, Vermont and Burlington, Vermont's Flynn Center for the Performing Arts.

## 2. Reorganized FairPoint Communications' Directors

As contemplated by the Plan, Reorganized FairPoint Communications will have a nine person board of directors. Initially, seven of the New Board members will be nominated by the Lender Steering Committee (it being understood that the Lender Steering Committee will consider residents of northern New England among the candidates for certain of the New Board

seats and that at least one of the members of the New Board nominated by the Lender Steering Committee will be a resident of northern New England), one of the New Board members will be Reorganized FairPoint Communications' chief executive officer and one of the New Board members will be nominated by the steering committee of the Ad Hoc Committee of Senior Noteholders (in consultation with the Creditors' Committee and the Ad Hoc Committee of Senior Noteholders), if the class of FairPoint Communications Unsecured Claims votes to accept the Plan; provided, however, that in the event that a member of the New Board has not been nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan by the Plan Supplement filing deadline, then the Persons described therein will lose their right to nominate a member of the New Board and the Lender Steering Committee will have the right to nominate an additional member of the New Board; provided, further, that if the Lender Steering Committee determines not to nominate an additional member of the New Board then the number of directors on the New Board will be reduced to eight and seven of such members of the New Board will be nominated by the Lender Steering Committee. If the class of FairPoint Communications Unsecured Claims does not vote to accept the Plan, then the Lender Steering Committee will have the right to nominate eight New Board members, provided, however, that if the Lender Steering Committee determines not to nominate an additional member of the New Board to replace the individual previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan, then the number of directors on the New Board will be reduced to eight and seven of such members of the New Board will be nominated by the Lender Steering Committee. In addition, the Lender Steering Committee will have the option to reduce the number of members of the New Board they are entitled to nominate in accordance with **Section VI.F.7 ("Summary of Plan of Reorganization—Means of Implementation of the Plan—New Board")** herein. For a more detailed description of the New Board, **see Section VI.F.7 ("Summary of Plan of Reorganization—Means of Implementation of the Plan—New Board")**. The members of the New Board will be identified in the Plan Supplement.

## C.    EXECUTIVE COMPENSATION

FairPoint maintains annual incentive plans under which employees, including FairPoint's management, receive annual cash bonuses, which, for FairPoint's management, are based on performance measures that the compensation committee of the board of directors of FairPoint Communications approves each year.

Pursuant to the Plan, Reorganized FairPoint Communications will establish a new long term incentive plan and an incentive compensation plan. On the Effective Date, in accordance with the Plan, (1) management and other employees will receive (a) Success Bonuses (as defined in the Plan) and/or (b) New Common Stock awards, consisting of restricted shares of New Common Stock and options to purchase New Common Stock, pursuant to the terms of the Long Term Incentive Plan, and (2) members of the New Board will receive options to purchase New Common Stock, pursuant to the terms of the Long Term Incentive Plan. The Success Bonuses will be earned based upon certain performance measures, subject to upward or downward adjustments to reflect the timing of the Effective Date. With respect to the Long Term Incentive Plan, ~~6,269,206~~ if Class 7 accepts the Plan, six million two hundred sixty-nine thousand two hundred six (6,269,206) shares of New Common Stock ~~in Reorganized FairPoint Communications to be issued pursuant to the Plan~~ will be reserved for awards under the Long Term Incentive Plan that are expected to consist of stock options to members of management,

other employees of FairPoint and members of the New Board and restricted stock awards to members of management and other employees of FairPoint.  If Class 7 rejects the Plan, then six million three hundred ninety-four thousand two hundred eleven (6,394,211) shares of New Common Stock will be reserved for issuance pursuant to the Long Term Incentive Plan.  On the Effective Date, ~~management, other employees of FairPoint and members of the New Board will receive grants under the Long Term Incentive Plan consisting of~~ (1) one million ninety-seven thousand one hundred eleven (1,097,111) shares of restricted ~~stock in Reorganized FairPoint Communications~~ New Common Stock (or one million forty-one thousand seven hundred ten (1,041,710) shares of restricted New Common Stock if Class 7 rejects the Plan) will be granted to members of management and other employees of FairPoint ~~and (2)~~ under the Long Term Incentive Plan and (2) two million one hundred ninety-four thousand two hundred twenty-two (2,194,222) options to purchase shares of ~~Reorganized FairPoint Communications~~ New Common Stock (or two million two hundred seventy thousand seven hundred fifty-eight (2,270,758) options to purchase shares of New Common Stock if Class 7 rejects the Plan) will be granted to members of management, other employees of FairPoint and members of the New Board under the Long Term Incentive Plan. These awards will be 25% vested on the Effective Date, and the remainder of these awards will vest in three equal annual installments, commencing on the first anniversary of the Effective Date, with accelerated vesting on a change in control or a termination of an award holder's employment without cause.  In addition, two million nine hundred seventy-seven thousand eight hundred seventy-three (2,977,873) shares of ~~Reorganized FairPoint Communications will be available for future distribution under~~ the ~~Long Term Incentive Plan.~~ New Common Stock will be available for future distribution under the Long Term Incentive Plan if Class 7 accepts the Plan; *provided, however,* that if the aggregate enterprise value of Reorganized FairPoint does not equal or exceed $2.3 billion on or prior to the expiration date of the New Warrants, the aggregate amount of options to purchase New Common Stock that are available for future distribution under the Long Term Incentive Plan will be automatically reduced by six hundred twenty thousand six hundred fifty-one (620,651) shares. In the event that Class 7 rejects the Plan, three million eighty-one thousand seven hundred forty-three (3,081,743) shares of New Common Stock will be available for future distribution under the Long Term Incentive Plan.  Additional information regarding the Success Bonuses and the Long Term Incentive Plan will be provided in the Plan Supplement.

## D.  KEY EMPLOYMENT AGREEMENTS

### 1.  Hauser Employment Contract

As of June 11, 2009, FairPoint Communications and David L. Hauser entered into an employment agreement (the "Hauser Employment Contract") pursuant to which Mr. Hauser became FairPoint Communications' Chairman and Chief Executive Officer for a term commencing July 1, 2009 and ending three years later.  Under the Hauser Employment Contract, FairPoint Communications agreed to pay Mr. Hauser certain compensation including: (a) an annual salary of $800,000 (the "Annual Salary"); (b) an annual performance-based cash bonus of up to 200% of his Annual Salary (the "Annual Bonus"); (c) annual long term incentives ranging from 80% to 400% of his Annual Salary (the "Old Equity Awards"); and (d) an inducement award of stock options, restricted stock and performance units at the time he commenced employment (the "Inducement Award").  The Hauser Employment Contract also provides for severance upon Mr. Hauser's signing of a claims release following termination of his

employment either by FairPoint without cause or by him for good reason. Such severance would consist primarily of (x) two times the sum of his Annual Salary, target Annual Bonus, and a pro rated portion of the value of the Old Equity Awards for the year of his termination; and (y) accelerated vesting of any stock option, restricted stock awards and performance units.

With respect to Mr. Hauser, the Inducement Awards granted to Mr. Hauser under the Hauser Employment Contract will be replaced with restricted stock and options to purchase shares of New Common Stock as provided in the Hauser Employment Contract. Also pursuant to the Hauser Employment Contract, Mr. Hauser will be a participant in the Long Term Incentive Plan.

### 2. Other Executive Agreements

FairPoint Communications has entered into separate letter agreements, dated September 21, 2009 with Jeffrey W. Allen; dated September 3, 2008 with Alfred C. Giammarino; dated March 14, 2007 with Shirley J. Linn; dated March 14, 2007 with Peter G. Nixon; and dated June 2, 2004 with Susan L. Sowell.

# V.
# OVERVIEW OF CHAPTER 11 CASES

## A. COMMENCEMENT

On October 26, 2009, FairPoint Communications and seventy-nine of its affiliates filed voluntary petitions in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code. FairPoint Communications' chapter 11 case bears Case Number 09-16335 (BRL) and is being jointly administered with the Chapter 11 Cases of its affiliated debtors and debtors-in-possession.

## B. PARTIES IN INTEREST

### 1. Court

The Chapter 11 Cases are pending in the Bankruptcy Court before the Honorable Burton R. Lifland, United States Bankruptcy Judge for the Southern District of New York.

### 2. Advisors to FairPoint

FairPoint retained Paul, Hastings, Janofsky & Walker LLP as its general bankruptcy counsel by order dated November 18, 2009.

FairPoint also retained the following additional advisors:

Rothschild Inc. Rothschild Inc. ("Rothschild") as financial advisor and investment banker by order dated January 11, 2010;

Ernst & Young LLP. Ernst & Young LLP as tax service provider and independent auditor by order dated November 18, 2009;

> AlixPartners, LLP.  AlixPartners, LLP as restructuring advisor by order dated November 18, 2009; and

> Quinn Emanuel Urquhart Oliver & Hedges LLP.  Quinn Emanuel Urquhart Oliver & Hedges LLP as the conflicts counsel for bankruptcy matters by order dated December 11, 2009.

### 3.    Advisors to FairPoint's Prepetition Credit Agreement Lenders

Bank of America, N.A., as administrative agent for FairPoint's prepetition secured lenders, is represented by Kaye Scholer LLP and has retained FTI Consulting, Inc. as its financial advisor.

The Prepetition Credit Agreement Lenders are represented by Covington & Burling LLP, as special regulatory counsel, and by Miller Buckfire & Co., LLC as investment banker.

### 4.    Creditors' Committee and its Advisors

On November 10, 2009, the United States Trustee appointed a single committee of unsecured creditors to represent the interests of the unsecured creditors in all eighty of the Chapter 11 Cases.  The current membership of the Creditors' Committee is comprised of U.S. Bank National Association, as Indenture Trustee; the International Brotherhood of Electrical Workers; the National Exchange Carrier Association, Inc.; Occam Networks, Inc.; and J.C. Zampell Construction, Inc.

The Creditors' Committee retained Andrews Kurth LLP as its general bankruptcy counsel by order dated December 2, 2009.

The Creditors' Committee retained Altman Vilandrie & Company as its Operational Consultant in matters related to Capgemini by order dated January 14, 2010.

The Creditors' Committee retained Jeffries & Company, Inc. as its financial advisor by order dated January 14, 2010.

The Creditors' Committee retained Verrill Dana, LLP as its special regulatory counsel by order dated January 14, 2010.

### 5.    The Ad Hoc Committee of FairPoint's Senior Noteholders

Before the Petition Date, an ad hoc committee of the holders of the Senior Notes was formed to negotiate the terms of a restructuring with FairPoint Communications (the "Ad Hoc Committee of Senior Noteholders").  The Ad Hoc Committee of Senior Noteholders is comprised of holders, for themselves and on behalf of certain funds and managed accounts, of the Senior Notes.

The Ad Hoc Committee of Senior Noteholders is represented by Stroock & Stroock & Lavan LLP.  The Ad Hoc Committee of Senior Noteholders has retained Moelis & Company as its financial advisor.

### 6. The United States Trustee

The Office of the United States Trustee has assigned Andrew D. Velez-Rivera to oversee the Chapter 11 Cases.

## C. FIRST DAY ORDERS

Although FairPoint continues to operate as a debtor and debtor-in-possession, certain transactions outside of the ordinary course of business require the Bankruptcy Court's approval, following notice and the opportunity for a hearing in accordance with the Bankruptcy Code and the Bankruptcy Rules. Accordingly, on the Petition Date, FairPoint requested the entry of specific orders from the Bankruptcy Court authorizing FairPoint to pay certain prepetition claims and to continue specific prepetition practices essential to its continued business operations during the pendency of the Chapter 11 Cases. On October 27, 2009 and October 28, 2009, the Bankruptcy Court granted several "first day" orders concerning various matters related to FairPoint's continued business operations. Included in such "first day" orders were the following:

### 1. Joint Administration Motion

On the Petition Date, FairPoint filed its Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion") seeking an order directing the joint administration of the Chapter 11 Cases. The Bankruptcy Court granted the Joint Administration Motion by order dated October 27, 2009. Accordingly, FairPoint's Chapter 11 Cases are jointly administered by the Bankruptcy Court.

### 2. Employee Wage and Benefit Motion

On the Petition Date, FairPoint filed its Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 363 and 507, (i) Authorizing Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs and (ii) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Obligations (the "Employee Wage and Benefit Motion"). In the Employee Wage and Benefit Motion, FairPoint sought an order:

- authorizing, but not requiring, FairPoint, in its sole discretion, to pay prepetition claims, honor obligations and continue programs, in the ordinary course of business, relating to: (i) wage obligations and independent contractor compensation, (ii) expense reimbursements and (iii) employee benefits;

- authorizing FairPoint to withhold all federal, state and local income taxes as required by applicable law, to pay all employment, unemployment, social security and similar taxes, whether withheld from wages or paid directly by FairPoint to governmental authorities, as well as make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, union dues, garnishments and voluntary deductions; and

- directing all financial institutions to receive, honor, process and pay any and all checks

and wire transfers drawn on FairPoint's accounts in satisfaction of such employee obligations.

The Bankruptcy Court granted the Employee Wage and Benefit Motion on an interim basis by order dated October 27, 2009. The Bankruptcy Court granted the Employee Wage and Benefit Motion on a final basis by order dated November 18, 2009.

### 3. DIP Financing Motion

On the Petition Date, FairPoint filed its Motion for Interim and Final Orders to (i) Obtain Postpetition Financing Pursuant to Bankruptcy Code Section 364; (ii) Grant Priming Liens and Superpriority Claims Pursuant to Bankruptcy Code Sections 364(c) and (d); (iii) Provide Adequate Protection to Prepetition Credit Agreement Lenders Pursuant to Bankruptcy Code Sections 361, 362, 363, 364 and (iv) Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Financing Motion"). Additional information regarding the DIP Financing Motion and DIP Financing is set forth in *Section V.C.3 ("Overview of Chapter 11 Cases—First Day Orders—DIP Financing Motion") and Section V.D ("Overview of Chapter 11 Cases—Chapter 11 Financing")* of this Disclosure Statement.

### 4. 503(b)(9) and Reclamation Claims Motion

On the Petition Date, FairPoint filed its Motion for Entry of an Order Establishing Procedures for the Assertion, Resolution and Satisfaction of (i) Bankruptcy Code Section 503(b)(9) and (ii) Reclamation Claims (the "503(b)(9) and Reclamation Claims Motion"). The 503(b)(9) and Reclamation Claims Motion sought an order establishing procedures for the assertion, resolution and satisfaction of (i) any claims arising out of Bankruptcy Code section 503(b)(9) and (ii) any claims arising out of Bankruptcy Code section 546(c). The Bankruptcy Court granted the 503(b)(9) and Reclamation Claims Motion by order dated October 27, 2009. By order of the Bankruptcy Court, all claims arising under Section 503(b)(9) of the Bankruptcy Code were to be filed with and received by BMC Group, Inc., FairPoint's claims agent, no later than January 25, 2010.

### 5. Shipping and Mechanics Lien Motion

On the Petition Date, FairPoint filed its Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a) and 363(b) Authorizing Payment of Certain Prepetition (i) Shipping and Delivery Charges for Goods in Transit and (ii) Mechanic's Lien Charges (the "Shipping and Mechanics Lien Motion") seeking an order:

- authorizing, but not directing, FairPoint to pay prepetition shipping and delivery charges to shippers and warehousemen that FairPoint determines, in the exercise of its business judgment, to be necessary or appropriate to obtain the release of cables, wires, components, materials, parts, certain finished goods, machinery, equipment and other property held or in transit and to satisfy the liens, if any, in respect thereof;

- authorizing FairPoint to pay mechanics and discharge the liens, if any, that such mechanics may have on FairPoint's property; and

- authorizing and directing all banks and other financial institutions on which checks are drawn or electronic funds are transferred with respect to shipping and warehousing charges, or mechanic's lien charges, to receive, process, honor and pay any and all such checks or electronic transfers, whether such checks or transfers were issued before or after the Petition Date, upon the receipt by each such bank of notice of such authorization without further order of the Bankruptcy Court.

The Bankruptcy Court granted the Shipping and Mechanics Lien Motion by order dated October 27, 2009.

### 6. Customer Programs Motion

On the Petition Date, FairPoint filed its Motion for Entry of Interim and Final Orders Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Programs and Practices in the Ordinary Course of Business (the "Customer Programs Motion"). In the Customer Programs Motion, FairPoint sought an order authorizing it to honor certain of its prepetition obligations and pay certain of its prepetition claims arising in the ordinary course of business under its customer practices and programs, which include, but are not limited to, bundled packages, promotional offers, credit adjustments and other marketing programs. The Bankruptcy Court granted the Customer Programs Motion on an interim basis by order dated October 27, 2009. The Bankruptcy Court granted the Customer Programs Motion on a final basis by order dated November 18, 2009.

### 7. NOL Motion

On the Petition Date, FairPoint filed its Motion for Entry of Interim and Final Orders Under Bankruptcy Code Section 105(a) Establishing Notification and Hearing Procedures for Transfers of Common Stock (the "NOL Motion") seeking an order establishing notification and hearing procedures to be satisfied before certain transfers of common stock in FairPoint Communications or of any beneficial ownership thereof are deemed effective and ordering that any purchase, sale or other transfer of common stock in violation of such procedures be void *ab initio*. The Bankruptcy Court granted the NOL Motion on an interim basis by order dated October 27, 2009. The Bankruptcy Court granted the NOL Motion on a final basis by order dated November 18, 2009.

### 8. Cash Management System Motion

On the Petition Date, FairPoint filed its Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 345(b), 363(c) and 364(a) (i) Authorizing Debtors to (A) Continue to Use Existing Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and (ii) Waiving Requirements of Bankruptcy Code Section 345(b) (the "Cash Management System Motion") seeking an order:

- authorizing FairPoint to continue to use, with the same account numbers, all of the bank accounts in its cash management system; authorizing FairPoint to treat such bank accounts for all purposes as accounts of FairPoint as debtors-in-possession;

- authorizing FairPoint to open new debtor-in-possession accounts, if needed; authorizing FairPoint to use all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) and other documents related to the bank accounts existing immediately before the Petition Date, without reference to its status as debtors-in-possession; and

- authorizing FairPoint to maintain its existing investment practices in the ordinary course of business, notwithstanding the provisions of section 345 of the Bankruptcy Code.

The Bankruptcy Court granted the Cash Management System Motion on an interim basis by order dated October 27, 2009. The Bankruptcy Court granted the Cash Management System Motion on a final basis by order dated November 18, 2009.

### 9. Tax Motion

On the Petition Date, FairPoint filed its Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 363(b), 507(a)(8), 541 and 105(a), Authorizing Debtors to Pay Prepetition Taxes and Fees (the "Tax Motion"). In the Tax Motion, FairPoint sought an order: authorizing FairPoint to pay general sales, use and excise taxes in the ordinary course of business that accrued or arose before the Petition Date; and authorizing FairPoint to pay permit, licensing, regulatory and franchise fees that accrued or arose before the Petition Date in the ordinary course of business.

The Bankruptcy Court granted the Tax Motion on an interim basis by order dated October 27, 2009. The Bankruptcy Court granted the Tax Motion on a final basis by order dated November 18, 2009.

### 10. Insurance Motion

On the Petition Date, FairPoint filed its Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 363(b), 503(b), 105(a), Bankruptcy Rules 6003 and 6004 (i) Authorizing Debtors to (a) Continue Workers Compensation Program and Liability, Product, Property and Other Insurance Programs and (b) Pay all Obligations with Respect Thereof and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Insurance Motion"). In the Insurance Motion, FairPoint sought an order:

- authorizing FairPoint to continue, in its sole discretion, its workers' compensation program and its general liability, auto liability, property, professional liability, fiduciary liability, directors' and officers' liability and other insurance programs;

- authorizing FairPoint to pay, in its sole discretion, all undisputed prepetition obligations for insurance programs, including premiums, deductibles and other fees and costs related thereto;

- authorizing and directing the financial institutions with which FairPoint maintains disbursement accounts to receive, honor, process and pay, to the extent of funds on

deposit, any and all checks drawn or electronic fund transfers that FairPoint requests pertaining to insurance programs or insurance obligations; and

- authorizing FairPoint to modify the automatic stay imposed pursuant to section 362 of the Bankruptcy Code for the sole purpose of allowing employees to proceed with claims under the workers' compensation program.

The Bankruptcy Court granted the Insurance Motion on an interim basis by order dated October 27, 2009. The Bankruptcy Court granted the Insurance Motion on a final basis by order dated November 18, 2009.

## D.    CHAPTER 11 FINANCING

On October 26, 2009, FairPoint, as debtor-in-possession, filed its DIP Financing Motion. The DIP Financing Motion requested the Bankruptcy Court's approval to enter into a revolving credit facility in an aggregate principal amount of up to $75 million, of which up to $30 million is also available in the form of one or more letters of credit that may be issued to third parties for the account of FairPoint (the "DIP Financing").

In connection therewith, FairPoint Communications and FairPoint Logistics, Inc. (collectively, the "DIP Borrowers") entered into the DIP Credit Agreement with certain financial institutions and the DIP Agent.  On October 28, 2009, the Bankruptcy Court entered the Interim Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 2002, 4001 and 9014 (i) Authorizing Debtors to Obtain Postpetition Financing, (ii) Authorizing Debtors to Use Prepetition Collateral, (iii) Granting Adequate Protection to Prepetition Secured Parties and (iv) Scheduling Final Hearing (the "Interim DIP Order").  The Interim DIP Order authorized the DIP Borrowers to enter into the DIP Financing and to draw immediately upon the DIP Credit Agreement on an interim basis in an aggregate amount of $20 million.  The obligations of the DIP Borrowers under the DIP Credit Agreement, which became effective by its terms on October 30, 2009, are secured by the assets of the DIP Borrowers and certain of FairPoint Communications' subsidiaries as set forth in the DIP Security Agreement and the DIP Pledge Agreement (each as defined herein).

Pursuant to the Debtor-in-Possession Subsidiary Guaranty, dated October 30, 2009, each of Berkshire Cellular, Inc., Berkshire Net, Inc., Berkshire New York Access, Inc., C & E Communications, Ltd., Comerco, Inc., Commtel Communications Inc., C-R Communications, Inc., C-R Long Distance, Inc., El Paso Long Distance Company, EllTel Long Distance Corp., FairPoint Broadband, Inc., FairPoint Carrier Services, Inc., FairPoint Communications Solutions Corp.--New York, FairPoint Communications Solutions Corp.—Virginia, Fremont Broadband, LLC, Fretel Communications, LLC, Germantown Long Distance Company, GIT-Cell, Inc., GITCO Sales, Inc., GTC Communications, Inc., GTC Finance Corporation, MJD Services Corp., MJD Ventures, Inc., Orwell Communications, Inc., Peoples Mutual Long Distance Company, Peoples Mutual Services Company, Quality One Technologies, Inc., Ravenswood Communications, Inc., S T Computer Resources, Inc., S T Enterprises, Ltd., Taconic Technology Corp., Telephone Service Company, UI Communications, Inc., UI Telecom, Inc., Unite Communications Systems, Inc., Utilities, Inc. and Yates City Telephone Company (collectively,

the "DIP Guarantors") has jointly and severally guaranteed the payment of all fees, obligations, liabilities and indebtedness of the DIP Borrowers under the DIP Financing.

The DIP Borrowers and the DIP Guarantors (collectively, the "DIP Grantors") executed a Debtor-in-Possession Security Agreement (the "DIP Security Agreement"), pursuant to which each DIP Grantor granted to Bank of America, N.A., as collateral agent for the secured parties identified therein (the "DIP Collateral Agent"), a security interest in all of the assets of such DIP Grantor other than (a) the Pledge Agreement Collateral (as defined herein); (b) any causes of action of such DIP Grantor arising under chapter 5 of the Bankruptcy Code; and (c) any FCC licenses and authorizations by state regulatory authorities to the extent that such DIP Grantor is prohibited from granting a lien and security interest therein pursuant to applicable law.

Additionally, each of the DIP Borrowers, MJD Ventures, Inc., MJD Services Corp., S T Enterprises, Ltd., FairPoint Carrier Services, Inc., FairPoint Broadband, Inc., Enhanced Communications of Northern New England Inc., Utilities, Inc., C-R Communications, Inc., Comerco, Inc., GTC Communications, Inc., St. Joe Communications, Inc., Ravenswood Communications, Inc., Unite Communications Systems, Inc. and Berkshire Cellular, Inc. (collectively, the "DIP Pledgors") executed a Debtor-in-Possession Pledge Agreement (the "DIP Pledge Agreement"), pursuant to which each DIP Pledgor pledged to the DIP Collateral Agent, a security interest in 100% of the equity interests and promissory notes owned by such DIP Pledgor and all proceeds arising therefrom, including cash dividends and distributions, subject to certain exceptions and qualifications (the "Pledge Agreement Collateral").

Pursuant to the order of the Bankruptcy Court, the Prepetition Credit Agreement Lenders received protection in the form of: (a) replacement liens in all collateral that secures the Prepetition Credit Agreement Claims and adequate protection liens on all collateral securing the DIP Financing, which liens are junior to the liens of the lenders under the DIP Financing; (b) a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code that is junior to the claims of the lenders under the DIP Financing; and (c) current cash payment of all fees and reasonable professional fees and expenses payable to the administrative agent under the Prepetition Credit Agreement.

FairPoint Communications will request that the Bankruptcy Court enter a final order approving the DIP Financing Motion, pursuant to which the DIP Borrowers are expected to be granted access to the full amount of the DIP Financing, subject to the terms and conditions set forth in the DIP Credit Agreement and the related orders of the Bankruptcy Court.

## E.    MATERIAL LITIGATION AND RELATED EVENTS

FairPoint is involved in litigation arising in the normal course of business and also in connection with the Chapter 11 Cases. The outcome of this litigation is not expected to have a material impact on the terms, conditions or contemplated recoveries under the Plan.

**F.     OTHER MATERIAL INFORMATION**

**1.     PUC Negotiations**

(i)     New Hampshire

After extensive negotiations with the ~~New Hampshire Public Utilities Commission's Staff Advocates (the "~~Staff Advocates~~")~~, FairPoint and the Staff Advocates have agreed to the settlement, which is an exhibit to the Plan (the "New Hampshire Regulatory Settlement").  The New Hampshire Regulatory Settlement, which is subject to the approval of the New Hampshire PUC, provides for, among other things, the following:

**Service Quality Requirements:**

- FairPoint will commit to meet the broadband build out and capital investment requirements and continue operating under the SQI service quality program of the January 23, 2008 Settlement agreement (the "NH 2008 Settlement") among Verizon, FairPoint and the staff of the New Hampshire Public Utilities Commission (the "NHPUC") and Order No. 24,823 in Docket DT 07-011 (the "NH 2008 Order") subject to modifications described in the New Hampshire Regulatory Settlement.

- Service quality penalties for 2009 will be deferred until December 31, 2010.  If FairPoint meets specified service levels on average in five performance areas over the twelve calendar months in 2010, the 2009 penalties will be waived.  If FairPoint meets the service objectives for some but not all of these five performance areas, the penalties will be reduced by 20% for each performance area specified for which FairPoint meets specified service levels on average over the 12 calendar months in 2010.

**Broadband Commitments:**

- FairPoint has agreed to adhere to the broadband coverage commitments prescribed in the NH 2008 Order; however, certain broadband build-out commitments with a deadline of April 1, 2010 are extended to December 31, 2010.

- FairPoint confirmed its commitment to spend a total of at least $56.4 million on its New Hampshire broadband build-out.

- FairPoint will have the option to resell terrestrial (non-satellite) based service providers' broadband service offerings in order to fulfill FairPoint's broadband build out and/or service requirements with respect to the last eight percent (8%) of FairPoint's broadband availability requirements as contained within the NH 2008 Settlement, provided that the services meet or exceed all requirements of the NH 2008 Order, and the resold services are purchased through and serviced by FairPoint.

- Pricing restrictions regarding stand-alone DSL service will terminate on April 1, 2011; provided, however, that FairPoint will continue to honor the "for life" pricing that Verizon had offered to certain customers.

- The first $500,000 of any penalty amounts resulting from any failure to meet broadband commitments will be paid to the New Hampshire Telecommunications Planning and Development Fund. Any penalties above $500,000 will be invested within three years of the date of the penalty as additional expenditures for FairPoint's network, subject to NHPUC approval.

**Expenditure Commitments:**

- FairPoint reconfirmed its commitment to spend $285.4 million in capital expenditures through March 31, 2013, of which $157.6 million has been spent through December 31, 2009 (subject to verification through a reconciliation of FairPoint's New Hampshire capital expenditures to the consolidated capital expenditures in its 2009 consolidated financial statements).

- FairPoint will reduce its $65 million "other expenditure" commitment by $10 million and to reallocate the $10 million to recurring maintenance capital expenditures to be spent on or before March 31, 2013. (This $10 million increases the $285.4 million capital expenditure commitment to $295.4 million.)

- FairPoint may further reduce its $65 million "other expenditure" commitment by any amount exceeding $56.4 million as needed to achieve 95% broadband availability and are actually expended, up to $10.5 million.

- FairPoint may further reduce its $65 million "other expenditure" commitment by $4.5 million of capital expenditures already expended in excess of amounts estimated to develop FairPoint's next generation network.

- FairPoint will have from April 1, 2010 to March 31, 2015 to meet whatever "other expenditure" commitment remains after the preceding reductions, which will be spent on "network enhancing activities."

**Financial Commitments:**

- Certain of the financial conditions of the NH 2008 Settlement and the NH 2008 Order are replaced by the terms of the New Hampshire Regulatory Settlement and are satisfied or rendered moot by the debt reductions resulting from the Plan.

**Management Commitments:**

- FairPoint's New Board will consist of a supermajority of newly appointed independent directors. At least one member of the New Board will reside in northern New England.

- The New Board will appoint a "regulatory sub-committee" that will monitor compliance with the terms of the NH 2008 Order, as modified by the New Hampshire Regulatory Settlement, and all other regulatory matters involving the States of Vermont, New Hampshire and Maine.

- FairPoint will maintain a state president who will provide a senior regulatory presence in New Hampshire and is able to reasonably respond to various future FairPoint-based NHPUC dockets or regulatory issues relating to telecommunications.

- FairPoint has agreed to continue its search for a Chief Information Officer with a goal of having a Chief Information Officer in place by June 30, 2010.

- FairPoint has agreed that any management bonuses will be based on a combination of EBITDAR (EBITDA plus restructuring costs) and service metrics goals and the weighting for each of these categories will be computed and clearly stated for the incentive and bonus plans for each individual and for the FairPoint in total.

**Other:**

- FairPoint will reimburse the State of New Hampshire for its costs and expenses in the Chapter 11 Cases.

- FairPoint will not agree with Maine or Vermont to materially different terms taken as a whole pertaining to the Plan, or, if applicable, to any related approval for a change in control without first offering them to the Staff Advocates.

- During the first two years following the Effective Date of the Plan, FairPoint is barred from paying dividends if FairPoint is in material breach of the New Hampshire Regulatory Settlement.

- FairPoint intends for the New Term Loan and the New Revolver to contain substantially the same material terms and conditions as contained in the Plan. In addition, Northern New England Telephone Operations LLC will not guarantee or otherwise be liable for, nor will any of its assets be mortgaged or pledged (excluding only the membership interests of Telephone Operating Company of Vermont LLC) to secure the obligations of FairPoint under the New Term Loan and the New Revolver.

- In a separate memorandum of understanding, the New Hampshire Office of the Consumer Advocate has agreed not to oppose the New Hampshire Regulatory Settlement.

FairPoint will seek approval of the New Hampshire Regulatory Settlement in connection with the confirmation of the Plan.

The foregoing summary of the New Hampshire Regulatory Settlement is qualified in its entirety by reference to the full text of the New Hampshire Regulatory Settlement which is filed as an exhibit to the Plan.

        (ii)      <u>Vermont</u>

After extensive negotiations with the Vermont Department of Public Service (the "DPS")DPS, FairPoint and the DPS have agreed to the settlement which is an exhibit to the Plan (the "<u>Vermont Regulatory Settlement</u>"). The DPS will use reasonably practicable efforts to

request that the Vermont Public Service Board (the "Vermont Board") approve the terms of the settlement proposed by the Vermont Regulatory Settlement. The Vermont Regulatory Settlement provides for, among other things, the following:

**Service Quality Requirements:**

- In general, all of the service quality programs contained in the January 8, 2008 settlement agreement among Verizon, FairPoint and the DPS (the "VT 2008 Settlement") and the February 15, 2008 Order RE: MODIFIED PROPOSAL IN Docket Number 7270 (the "VT 2008 Order") will remain in place subject to the modifications described in the Vermont Regulatory Settlement.

- Service quality penalties for 2008 and 2009 will be deferred until December 31, 2010. If FairPoint meets specified service objectives on average in ten performance areas over the twelve calendar months in 2010, the 2008 and 2009 penalties will be waived. If FairPoint meets the service objectives for some but not all of these ten performance areas, the penalties will be reduced by 10% for each performance area specified for which FairPoint meets specified service levels on average over the 12 calendar months in 2010.

**Broadband Commitments:**

- FairPoint has agreed to adhere to the broadband milestone penalties prescribed in the 2008 Order; however, the broadband build-out milestone penalties will not be enforced prior to June 30, 2011, provided that FairPoint files a broadband permitting and construction plan with an appropriate regulatory body by May 1, 2010, files all necessary permit applications by October 1, 2010, and undertakes commercially practicable efforts to implement the plan. The broadband permitting and construction plan will at a minimum identify tower sites and set a schedule for permitting and construction.

- FairPoint will undertake to deploy broadband services to 95% of all access lines in those exchanges that have been identified for 100% broadband availability in the VT 2008 Order (the "100% Exchanges") by June 30, 2011. With respect to the remaining 5% of lines in the 100% Exchanges, FairPoint will deploy broadband to any requesting customer using an extended service interval of 90 days from the date of the receipt of the order from the customer, provided such order is made no sooner than June 30, 2011. Failure to meet such requirements will require FairPoint to waive certain service charges.

- FairPoint also will request that the Board authorize FairPoint to use Federal High Cost Universal Service Funds ("USF") for three consecutive years to upgrade plant and infrastructure in the 100% Exchanges, in order to improve FairPoint's service quality and network reliability. If the Board authorizes FairPoint to use the USF, and to the extent permitted by FCC rules, FairPoint will invest the USF in network infrastructure that will support the deployment of broadband services to an additional 5% of access lines on a timeline that varies depending on the date of the Board's authorization.

- FairPoint will have the option to resell terrestrial (non-satellite) based service providers' broadband service offerings in order to fulfill FairPoint's broadband build out and/or

service requirements as contained in the VT 2008 Order, provided that the services meet or exceed all requirements of the VT 2008 Order as modified by the Vermont Regulatory Settlement, and the resold services are purchased through and serviced by FairPoint.

- Penalty amounts resulting from any failure to meet broadband deployment requirements will be managed by FairPoint with funds deposited into an escrow fund, which will reimburse FairPoint for costs incurred for additional network projects completed within 18 months of the date of the penalty, subject to the approval of DPS.

**Capital Investment Commitments:**

- FairPoint will meet the capital investment requirements of the VT 2008 Order.

**Financial Commitments:**

- Certain of the financial conditions of the VT 2008 Settlement and the VT 2008 Order are replaced by the terms of the Vermont Regulatory Settlement and are satisfied or rendered moot by the debt reductions resulting from the Plan.

**Management Commitments:**

- FairPoint's New Board will consist of a supermajority of newly appointed independent directors. At least one member of the New Board will reside in northern New England.

- The New Board will appoint a "regulatory sub-committee" that will monitor compliance with the terms of the VT 2008 Order, as modified by the Vermont Regulatory Settlement, and all other regulatory matters involving the States of Vermont, New Hampshire and Maine.

- FairPoint will maintain a state president who will provide a senior regulatory presence in Vermont and be able to reasonably respond to various future FairPoint-based dockets or regulatory issues relating to telecommunications.

- FairPoint has agreed to continue its search for a Chief Information Officer with a goal of having a Chief Information Officer in place by June 30, 2010.

- FairPoint has agreed that any management bonuses will be based on a combination of EBITDAR (EBITDA plus restructuring costs) and service metrics goals and the weighting for each of these categories will be computed and clearly stated for the incentive and bonus plans for each individual and for the FairPoint in total.

**Other:**

- FairPoint will reimburse the State of Vermont for its costs and expenses in the Chapter 11 Cases.

- FairPoint will not agree with Maine or New Hampshire to materially different terms taken as a whole pertaining to the Plan or, if applicable, to any related approval for a change in control without first offering them to the DPS and/or Vermont Board.

- During the first two years following the Effective Date of the Plan, FairPoint is barred from paying dividends if FairPoint is in material breach of the settlement described on the Vermont Regulatory Settlement.

- Contingent on FairPoint's compliance with the terms of the Vermont Regulatory Settlement and other applicable laws, DPS will request that the proceeding in Docket 7540, regarding revocation or modification of FairPoint's Certificate of Common Good, be terminated and the docket closed.

The Vermont Regulatory Settlement is conditioned on DPS receiving and finding acceptable a business plan demonstrating FairPoint's ability to meet its obligations under the Vermont Regulatory Settlement and its feasibility to operate as a going concern over the long term in a manner consistent with Vermont utility regulation.

FairPoint will seek approval of the settlement described on the Vermont Regulatory Settlement in connection with the confirmation of the Plan.

The foregoing summary of the Vermont Regulatory Settlement is qualified in its entirety by reference to the full text of the Vermont Regulatory Settlement which is filed as an exhibit to the Plan.

       (iii)    <u>Maine</u>

In connection with obtaining the necessary regulatory approvals required to effectuate the Merger, FairPoint entered into stipulations with parties in the various proceedings before the PUC in Maine. These stipulations provide, in part, that if FairPoint's service quality fails to meet certain benchmarks under a Service Quality Index ("<u>SQI</u>"), then FairPoint must provide a billing credit to its customers (the "<u>SQI Payment</u>").

On October 15, 2009, FairPoint filed a request with the ~~Maine PUC~~MPUC, seeking to extend the date for making the initial SQI Payment established by the ~~Maine PUC~~MPUC for the 2008-2009 SQI year. The day after the Petition Date, October 27, 2009, the ~~Maine PUC~~MPUC issued an order denying FairPoint's request to defer the SQI Payment for 2008-2009. The ~~Maine PUC~~MPUC further determined that the full amount of the SQI Payment for the 2008-2009 SQI year was $8,031,511 and that such amount must be paid in twelve monthly installments, beginning in December 2009. The ~~Maine PUC~~MPUC then directed that "within five days after the date of this Order, FairPoint will file rate schedules in compliance with this Order."

On October 30, 2009, and in light of the commencement of these Chapter 11 Cases, FairPoint filed a request with the ~~Maine PUC~~MPUC seeking a 21-day extension for any mandatory filing and appearance requirements or deadlines applicable to any FairPoint utility in Maine that would have occurred during the period from October 26, 2009 through November 23, 2009. After noting the filing of these Chapter 11 Cases and the imposition of the automatic stay

under section 362 of the Bankruptcy Code, FairPoint requested that the ~~Maine PUC~~MPUC stay its SQI filing requirements.  On November 3, 2009, the ~~Maine PUC~~MPUC declined this request and instead directed FairPoint to file requests for extensions of time on a case-by-case basis.

On the same date, and as directed by the ~~Maine PUC~~MPUC's November 3 order, FairPoint filed a specific request for an extension of the deadline to file its SQI schedules.  In that request, FairPoint again cited the Bankruptcy Code's automatic stay.  On November 9, 2009, the ~~Maine PUC~~MPUC Hearing Examiner, under authority delegated by the ~~Maine PUC~~MPUC, denied FairPoint's request, restating that the schedule was due on November 3, 2009 and stating that the schedule should therefore be filed immediately.

On November 25, 2009, the ~~Maine PUC~~MPUC announced via email that it would hold deliberations for consideration of FairPoint's filing of an SQI schedule in a new docket to be opened by the ~~Maine PUC~~MPUC.  Prior to this date, FairPoint had no knowledge and was given no formal notice that the ~~Maine PUC~~MPUC intended to open this docket and to place this item on its agenda.  Later that day, and to enable discussions between FairPoint and ~~Maine PUC~~MPUC representatives to continue in a constructive manner, FairPoint requested that the ~~Maine PUC~~MPUC defer any action at that time.

On November 30, 2009, the ~~Maine PUC~~MPUC met regarding FairPoint's SQI schedule.  The ~~Maine PUC~~MPUC subsequently issued an order requiring FairPoint to begin making the SQI Payment to customers by December 1, 2009.  In addition, the November 30 Order stated that FairPoint should include a statement on each customer bill that the SQI Payment is a "REBATE FOR BELOW-STANDARD SERVICE QUALITY".

On December 2, 2009, FairPoint filed an Emergency Motion in the Bankruptcy Court for an Order Pursuant to Bankruptcy Code Sections 105(a) and 362(a) Compelling the State of Maine Public Utilities Commission to Comply with an October 27, 2009 Stay Order of the Bankruptcy Court (the "Motion to Compel").  In the Motion to Compel, FairPoint requested that the Bankruptcy Court enter an order compelling the ~~Maine PUC~~MPUC to comply with the automatic stay and cease attempts to impose additional penalties upon FairPoint for failure to make the SQI Payment.  On December 3, 2009, the Bankruptcy Court entered an Order to Show Cause setting December 9, 2009, as the hearing date on the Motion to Compel.

Subsequently, FairPoint and the ~~Maine PUC~~MPUC agreed to adjourn the hearing on the Motion to Compel to January 12, 2010.  On January 12, 2010, the Bankruptcy Court adjourned the hearing on the Motion to Compel to February 3, 2010 and directed FairPoint and the ~~Maine PUC~~MPUC to attend mediation.  The parties attended mediation on January 26 and February 1, 2010.  On February 3, 2010, the Bankruptcy Court adjourned the hearing on the Motion to Compel to February 9, ~~2010, and negotiations were ongoing as of the date hereof.~~2010.

~~Although FairPoint's strong preference is to settle all outstanding issues with state public utility commissions and it has entered the New Hampshire Regulatory Settlement and Vermont Regulatory Settlement, to the extent FairPoint is unable to reach a satisfactory resolution of outstanding issues (including issues arising under the orders associated with the approval of the Merger) with the Maine PUC, FairPoint reserves its right to seek a declaratory judgment from the Bankruptcy Court (which declaratory judgment may be contained in the order confirming the~~

43

Plan) to the effect that (i) the obligations of FairPoint under such orders give rise to unsecured prepetition claims which can be discharged pursuant to the Plan, and (ii) the transactions contemplated pursuant to the Plan, including the conversion of debt to equity pursuant to the Plan, need not be approved by the applicable public utility commissions regulating FairPoint's operations because the Bankruptcy Code's plan confirmation provisions pre-empt any state law requiring FairPoint to obtain public utility commission approval of such transactions.

After extensive negotiations with a representative appointed by the MPUC and with the Maine Office of the Public Advocate (together, the "Maine Regulatory Parties"), FairPoint reached agreement with the Maine Regulatory Parties on a settlement which is an exhibit to the Plan (the "Maine Regulatory Settlement"). The Maine Regulatory Settlement, which is subject to the approval of the MPUC, provides for, among other things, the following:

**General:**

- FairPoint will comply with the MPUC's February 1, 2008 Order issued in Docket Nos. 2007-67 and 2005-155, and all stipulations approved thereby (the "2008 Merger Order"), subject to certain exceptions for the reimbursement of claims of third parties, which the Maine Regulatory Parties will recommend remain subject to applicable bankruptcy law, and subject further to certain revisions to the provisions in the 2008 Merger Order regarding, among other things, broadband buildout, capital investment and the SQI program.

**Service Quality:**

- FairPoint and the MPUC agree to submit a joint consent order to the Bankruptcy Court which provides for the implementation of the SQI rebates for the 2008-2009 SQI year starting in March 2010, subject to FairPoint's right to credit such rebates against future service quality rebates that are required to be paid by FairPoint, in the event the Regulatory Settlement is not approved by the MPUC and the Bankruptcy Court subsequently enters an injunction against payment of rebates for the 2008-2009 SQI year.

**Broadband:**

- The deadline for FairPoint's initial 83% broadband buildout requirement will be extended from April 1, 2010 to December 31, 2010. An additional interim broadband buildout requirement of 85% is established with a July 31, 2012 deadline, and the final broadband buildout requirement with a March 31, 2013 deadline, will be reduced from 90% to 87%. However, if FairPoint fails to meet these requirements, FairPoint shall be required to achieve 90% broadband buildout by March 31, 2014. If FairPoint meets the 87% requirement by March 31, 2013, FairPoint will contribute $100,000 to the ConnectME Authority on July 1, 2013. FairPoint also agrees that by March 31, 2013, it will achieve broadband buildout of 82% for lines in UNE Zone 3.

- In meeting its broadband buildout requirements beyond 85%, FairPoint may resell the broadband service offerings of other non-satellite providers in order to meet its buildout

and/or service requirements, provided that the services meet or exceed all requirements of the 2008 Merger Order, the resold services are purchased through and serviced by FairPoint, and the MPUC Staff approves the provider(s). The MPUC Staff's approval may not be unreasonably withheld and if the MPUC Staff does not deny within 30 calendar days FairPoint's request to resell the services of a particular provider, FairPoint's request will be approved automatically.

- The Maine Regulatory Parties will recommend that, effective January 1, 2011, the MPUC rescind the requirement in the 2008 Merger Order that requires FairPoint to price its broadband services at uniform statewide rates, provided that during the subsequent two-year period FairPoint's prices for broadband services do not exceed 120% of the prices of equivalent services provided in FairPoint's "classic" or "legacy" service regions, which are the regions in Maine in which FairPoint provided telephone service prior to the issuance of the 2008 Merger Order.

### Financial:

- The Maine Representative will recommend that the MPUC find that the financial conditions in the 2008 Merger Order are replaced by the terms of the Maine Regulatory Settlement, are satisfied or have been rendered moot by the debt reductions resulting from the Plan. The Maine Regulatory Parties will recommend that the MPUC not impose financial covenants in addition to those imposed in any loan or credit agreements executed by FairPoint in connection with the Plan.

### Management:

- FairPoint's New Board will consist of a supermajority of newly appointed independent directors. At least one member of the New Board will reside in northern New England.

- The New Board will appoint a "regulatory sub-committee" that will monitor compliance with the terms of the 2008 Merger Order, as modified by the Maine Regulatory Settlement, and all other regulatory matters involving the States of Vermont, New Hampshire and Maine.

- FairPoint will continue its search for a Chief Information Officer with a goal of having a Chief Information Officer in place by June 30, 2010.

- FairPoint has agreed that any management bonuses will be based on a combination of EBITDAR (EBITDA plus restructuring costs) and service metrics, and that the weighting for each of these categories will be computed and clearly stated for the incentive and bonus plans for each individual and for FairPoint in total, and that, once established, FairPoint will disclose such service metrics to the Maine Regulatory Parties.

Other:

- FairPoint will reimburse the Maine Regulatory Parties for actual, reasonable costs and expenses in the Chapter 11 Cases.

- FairPoint will not agree with the Staff of the NHPUC, the New Hampshire Office of the Consumer Advocate, or the DPS to materially different terms taken as a whole pertaining to the Plan, or, if applicable, to any related approval for a change in control without also offering them to the Maine Regulatory Parties.

- The Maine Regulatory Parties will file a proposed schedule for the MPUC approval process, which shall provide that approval of the Maine Regulatory Settlement and any change of control will be ripe for MPUC decision within 90 days of the filing by FairPoint of the application for approval.

- FairPoint, the MPUC and Maine Regulatory Parties reserve their legal rights and arguments regarding legal issues related to the jurisdiction of the MPUC and the Bankruptcy Court.

FairPoint expects to seek approval of the Maine Regulatory Settlement in connection with the confirmation of the Plan.

The foregoing summary of the Maine Regulatory Settlement is qualified in its entirety by reference to the full text of the Maine Regulatory Settlement which is filed as an exhibit to the Plan.

## 2. Union Negotiations

Northern New England Telephone Operations LLC and Telephone Operating Company of Vermont LLC d/b/a FairPoint Communications are party to two collective bargaining agreements ("CBAs") with locals of two major unions, the International Brotherhood of Electrical Workers ("IBEW") and the Communications Workers of America ("CWA") (collectively, "Unions"). Prior to the acquisition of the NNE Operations, a number of subsidiaries of FairPoint Communications had a much smaller number of unionized employees and did not have significant liabilities arising under its CBAs. As such, FairPoint has not historically faced large-scale labor issues in the operation of its businesses.

With the acquisition of the NNE Operations, Northern New England Telephone Operations LLC and Telephone Operating Company of Vermont LLC entered into CBAs, which became effective on April 1, 2008 and would have expired by their terms on August 3, 2013. These agreements cover the majority of FairPoint's represented employees in Maine, New Hampshire and Vermont. Approximately 2,000 of these employees are represented by the IBEW and approximately 300 of these employees are represented by the CWA.

FairPoint Communications initiated discussions with the NNE Unions during the summer of 2009 in order to advise them of the financial issues confronting FairPoint Communications and to seek their support and cooperation in making adjustments to the CBAs in order to assist FairPoint Communications in addressing those financial issues. Those discussions continued following the filing of the Chapter 11 Cases, concluding in a 2010 Memorandum of Understanding (the "Labor MOU") signed by the parties on February 1, 2010. The Labor MOU is subject to membership ratification and Bankruptcy Court approval, both of which will be sought promptly. The Labor MOU provides for (1) a one year extension of the term of the CBAs, to August 2, 2014; (2) cancellation of a 3% wage increase previously scheduled for

August 2010, to be replaced by a 3% wage increase in August 2013; (3) elimination of a minimum payment under the corporate profit sharing program and the adoption of the profit sharing methodology applied for FairPoint Communications' non-union employees which provides for a greater level of profit sharing if the Company meets or exceeds its financial objectives and a lower level of profit sharing if FairPoint Communications fails to do so; (4) creation of a joint labor-management committee, the Joint Committee on Operational Effectiveness, which will work with professional facilitators to identify opportunities to achieve a goal of $25 million per year reduction in FairPoint Communications' operating costs; (5) a mutual release of claims by FairPoint Communications and the Unions; and (6) the authorization for FairPoint Communications to pay matching contributions under its 401K plan in stock rather than cash.

## G.   STATEMENTS OF FINANCIAL AFFAIRS AND SCHEDULES OF ASSETS AND LIABILITIES

FairPoint Communications, and each of its affiliated debtors, filed their Statement of Financial Affairs and Schedules of Assets and Liabilities (the "Schedules") on January 29, 2010. The Schedules reflect the assets and liabilities of FairPoint Communications and each of its affiliated debtors.

## H.   FILING DEADLINE FOR PREPETITION CLAIMS

On January 28, 2010, FairPoint filed its Motion for Order Establishing Deadline and Procedures for Filing Proofs of Claim and Approving Manner of Notice Thereof (the "Bar Date Motion") seeking an order: (a) establishing March 18, 2010 at 5:00 p.m. (Eastern Time) as the general deadline for filing proofs of Claims (the "Bar Date") subject to certain enumerated exceptions in the Bankruptcy Court's order granting the Bar Date Motion; (b) approving the proposed form of proofs of claim; and (c) approving proposed procedures for notifying creditors of the Bar Date. The Bankruptcy Court granted the Bar Date Motion by order dated February 4, 2010.

**VI.**
**SUMMARY OF PLAN OF REORGANIZATION**

## A.   PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND OTHER UNCLASSIFIED CLAIMS

### 1.   Administrative Expense Claims

Administrative Expense Claims include any right to payment constituting a cost or expense of administration of the Chapter 11 Cases Allowed under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code (other than Adequate Protection Claims), including, without limitation, (a) any actual and necessary costs and expenses of preserving FairPoint's Estates, (b) any actual and necessary costs and expenses of operating FairPoint's businesses, (c) indebtedness or obligations incurred or assumed by the Debtors-in-Possession during the Chapter 11 Cases, (d) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by FairPoint in the twenty (20) days immediately prior to the Petition Date and sold to FairPoint in the ordinary course of FairPoint's businesses, and (e) any

Professional Fees, whether Allowed before or after the Effective Date. Any fees or charges assessed against the Estates of FairPoint under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and will be paid in accordance with Section 16.7 of the Plan.

Except to the extent that any Person entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing Liabilities incurred in the ordinary course of business by the Debtors-in-Possession will be paid in full and performed by the Debtors-in-Possession or Reorganized FairPoint, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions; *provided, further*, that, except as provided in Section 3.4 of the Plan, if any Administrative ~~Expenses~~Expense Claim, including an ordinary course expense, is not billed or a request for payment is not made within sixty (60) days after the Effective Date, claims for payment of such Administrative Expense Claims will be barred.

**2.      Adequate Protection Claims**

The Adequate Protection Claims of the holders of Prepetition Credit Agreement Claims will be deemed satisfied in full by payments (if any) due and made pursuant to the DIP Order.

**3.      Priority Tax Claims**

Priority Tax Claims include any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Unless otherwise agreed to by the holder of an Allowed Priority Tax Claim and FairPoint or Reorganized FairPoint, as applicable, each holder of an Allowed Priority Tax Claim will receive at the option of FairPoint or Reorganized FairPoint, as applicable, (a) on the Effective Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Allowed Priority Tax Claim, or (b) commencing on the Effective Date, or as soon thereafter as is reasonably practicable, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of FairPoint or Reorganized FairPoint, as applicable, to prepay the entire amount of the Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

**4.      Professional Compensation and Reimbursement Claims**

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date

under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code will (a) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim.  Reorganized FairPoint is authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

For purposes of the Plan, and in consideration of the services of the members of the Ad Hoc Committee of Senior Noteholders, FairPoint will reimburse the members of the Ad Hoc Committee of Senior Noteholders for ~~their professionals'~~ the reasonable fees and expenses of their professionals, Stroock & Stroock & Lavan LLP and Moelis & Company, during the Chapter 11 Cases and up to the Effective Date (without the need to file a proof of Claim ~~of~~or fee application), subject to an aggregate cap of three million five hundred thousand dollars ($3,500,000.00), or such higher number as ~~will~~shall be approved by the Lender Steering Committee, which approval will not be unreasonably withheld or delayed; *provided, however*, if no Distributions are made on account of Class 7 FairPoint Communications Unsecured Claims in accordance with Section 5.7.2(b) of the Plan, then the members of the Ad Hoc Committee of Senior Noteholders will not receive any reimbursement for professionals' fees and expenses.

For purposes of the Plan, and in consideration of the services of the Prepetition Credit Agreement Agent and each Consenting Lender holding greater than ten percent (10%) of the aggregate Prepetition Credit Agreement Claims on the date such Person became a Consenting Lender, FairPoint will reimburse such Persons for their reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel) to the extent that such fees and expenses are incurred in connection with the Plan Support Agreement, the Plan, the Chapter 11 Cases, and the transactions related thereto (without the need to file a proof of Claim or fee application).

## 5. Intercompany Claims

Intercompany Claims include any Claim against any entity included within the definition of "FairPoint" held by any other entity included within the definition of "FairPoint".

At the election of FairPoint or Reorganized FairPoint, as applicable, or any Person holding such Claim, and in consultation with the Lender Steering Committee, Intercompany Claims will be (a) released, waived and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended or (d) remain Unimpaired.

## B. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table (a) designates the Classes of Claims against, and Equity Interests in, FairPoint, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Plan and therefore are deemed to reject the Plan or are entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims

and Equity Interests that are Unimpaired by the Plan and therefore are deemed to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Allowed Prepetition Credit Agreement Claims | Impaired | Yes |
| 5 | Legacy Subsidiary Unsecured Claims | Unimpaired | No (deemed to accept) |
| 6 | NNE Subsidiary Unsecured Claims | ~~To be determined~~Unimpaired | ~~To be determined~~No (deemed to accept) |
| 7 | FairPoint Communications Unsecured Claims | Impaired | Yes |
| 8 | Convenience Claims | Unimpaired | No (deemed to accept) |
| 9 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 10 | Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |
| 11 | Old FairPoint Equity Interests | Impaired | No (deemed to reject) |

## C.  TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

### 1.  Other Priority Claims (Class 1)

(i)  <u>Definition</u>

An Other Priority Claim is a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

(ii)  <u>Impairment and Voting</u>

Class 1 is Unimpaired by the Plan.  Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(iii)  <u>Distributions</u>

Unless otherwise agreed to by the holder of an Allowed Other Priority Claim and FairPoint or Reorganized FairPoint, as applicable, on the applicable Distribution Date, each holder of an Allowed Other Priority Claim will receive Cash in an amount equal to such Allowed Other Priority Claim.

## 2. Secured Tax Claims (Class 2)

### (i) Definition

Secured Tax Claims include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

### (ii) Impairment and Voting

Class 2 is Unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### (iii) Distributions

Unless otherwise agreed to by the holder of an Allowed Secured Tax Claim and FairPoint or Reorganized FairPoint, as applicable, on the applicable Distribution Date, each holder of an Allowed Secured Tax Claim will receive, at the option of FairPoint or Reorganized FairPoint, as applicable, (a) Cash in an amount equal to such Allowed Secured Tax Claim or, (b) commencing on the applicable Distribution Date, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of FairPoint or Reorganized FairPoint, as applicable, to prepay the entire amount of the Allowed Secured Tax Claim.

## 3. Other Secured Claims (Class 3)

### (i) Definition

An Other Secured Claim is any Secured Claim other than a Prepetition Credit Agreement Claim.

### (ii) Impairment and Voting

Class 3 is Unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### (iii) Distributions

Unless otherwise agreed to by the holder of an Allowed Other Secured Claim and FairPoint or Reorganized FairPoint, as applicable, at the option of FairPoint or Reorganized FairPoint, as applicable, (i) on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Other Secured Claim will be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other

Secured Claim will receive Cash in an amount equal to such Allowed Other Secured Claim, on the Distribution Date, or as soon thereafter as is reasonably practicable, or (iii) each holder of an Allowed Other Secured Claim will receive the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on the Distribution Date, or as soon thereafter as is reasonably practicable.

**4.      Allowed Prepetition Credit Agreement Claims (Class 4)**

(i)      <u>Definition</u>

Prepetition Credit Agreement Claims include any Claim held by the Prepetition Credit Agreement Lenders and/or the Prepetition Credit Agreement Agent, and all other Claims against FairPoint arising under the Prepetition Credit Agreement in an amount equal to principal, plus interest (accrued through the Effective Date), and all other amounts due thereunder. Prepetition Credit Agreement Claims are Allowed Claims pursuant to the Plan, and will be satisfied pursuant to the Plan without offset, defense, counterclaim, reduction or credit of any kind whatsoever.

For purposes of the Plan, "Prepetition Credit Agreement" means that certain Credit Agreement, dated as of March 31, 2008, and amended as of January 21, 2009, among FairPoint Communications and Northern New England Spinco Inc., as borrowers, the Lender Steering Committee and the other lenders party thereto, the Prepetition Credit Agreement Agent, and certain other parties thereto, and all amendments, supplements, ancillary agreements (including, but not limited to, any and all notes, letters of credit, pledges, collateral agreements, intercreditor agreements, Swap Agreements and hedging agreements), side letters, financing statements, and other documents related thereto.

(ii)      <u>Impairment and Voting</u>

Class 4 is Impaired by the Plan.  Each holder of an Allowed Prepetition Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(iii)      <u>Distributions</u>

Each holder of an Allowed Prepetition Credit Agreement Claim will receive the following, in full and complete satisfaction of such holder's Allowed Prepetition Credit Agreement Claim:

(1)      on the Effective Date, such holder's Ratable Proportion of the New Term Loan;

(2)      on the Effective Date, such holder's Ratable Proportion of forty-seven million two hundred ~~seventy five~~forty-one thousand ~~seven~~four hundred ~~eighty five (47,275,785~~thirty-six (47,241,436) shares of the New Common Stock; *provided, however*, that if the Class of FairPoint Communications Unsecured Claims rejects the Plan, each holder of an Allowed Prepetition Credit Agreement Claim will receive its Ratable Proportion of fifty -eight million,

four hundred eighty -four thousand five hundred eighty -seven (58,484,587) shares of the New Common Stock, subject to dilution from the securities to be issued under the Long Term Incentive Plan;

(3)     on the Effective Date, such holder's Ratable Proportion of Cash (the "Cash Payment") in an amount equal to all Cash and Cash Equivalents of Reorganized FairPoint on the Effective Date in excess of forty million dollars ($40,000,000.00) minus (1) Cash used to pay or reserved to pay Allowed Unsecured Claims, (2) Cash used to pay or reserved to pay Allowed Administrative Expense Claims, (3) Cash used to pay or reserved to pay Allowed Priority Tax Claims, (4) Cash used to pay or reserved to pay Allowed Other Priority Claims, (5) Cash used to pay or reserved to pay Allowed Secured Tax Claims, (6) Cash used to pay or reserved to pay Allowed Other Secured Claims, (7) subject to Section 3.4 of the Plan, Cash used to pay or reserved to pay the members of the Ad Hoc Committee of Senior Noteholders, the Prepetition Credit Agreement Agent, and each Consenting Lender holding greater than ten percent (10%) of the aggregate Prepetition Credit Agreement Claims on the date such Person became a Consenting Lender for their professionals' fees and expenses, (8) Cash used to pay or reserved to pay obligations pursuant to the Regulatory Settlements, (9) Cash used to pay or reserved to pay Success Bonuses, and (10) Cash used to pay or reserved to pay Cure for executory contracts and unexpired leases that are assumed pursuant to the Plan; *provided, however*, that if the aggregate amount of Tax Claims against FairPoint Communications exceeds six million dollars ($6,000,000), such excess amount (or any portion thereof) will be subtracted from the Cash Payment only if the Lender Steering Committee consents, after consultation with FairPoint, to the payment of such excess amount (or portion thereof) on the Effective Date; and

(4)     on the applicable Distribution Date, if any, such holder's Ratable Proportion of Cash Distributions out of the ~~Reserve~~Reserves that are no longer required to be reserved for the benefit of anyone other than holders of Allowed Prepetition Credit Agreement Claims.

**5.     Legacy Subsidiary Unsecured Claims (Class 5)**

(i)     Definition

Legacy Subsidiary Unsecured Claims include any Unsecured Claim against any Legacy Subsidiary.

For purposes of the Plan, a "Legacy Subsidiary" is any direct or indirect subsidiary of FairPoint Communications that is not an NNE Subsidiary (as defined below).

(ii)    Impairment and Voting

Class 5 is Unimpaired by the Plan. Each holder of an Allowed Legacy Subsidiary Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(iii)    Distributions

On the Distribution Date, each holder of an Allowed Legacy Subsidiary Unsecured Claim will be paid an amount in Cash equal to one hundred percent (100%) of such holder's Allowed Legacy Subsidiary Unsecured Claim, in full and complete satisfaction of such holder's Claim.

**6.      NNE Subsidiary Unsecured Claims (Class 6)**

(i)    Definition

NNE Subsidiary Unsecured Claims include any Unsecured Claim against the NNE Subsidiaries.

For purposes of the Plan, an "NNE Subsidiary" is individually each of and collectively all of, FairPoint Logistics, Inc., Northern New England Telephone Operations LLC, Telephone Operating Company of Vermont LLC, and Enhanced Communications of Northern New England Inc.

(ii)    Impairment and Voting

The treatment of Class 6 is not yet determined.

Class 6 is Unimpaired by the Plan. Each holder of an Allowed NNE Subsidiary Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(iii)    Distributions

On the Distribution Date, each holder of an Allowed NNE Subsidiary Unsecured Claim will be paid an amount in Cash equal to one hundred percent (100%) of such holder's Allowed NNE Subsidiary Unsecured Claim, in full and complete satisfaction of such holder's NNE Subsidiary Unsecured Claim, will receive a Distribution on terms to be provided and which are reasonably satisfactory to FairPoint and the Lender Steering CommitteeClaim.

**7.**     **FairPoint Communications Unsecured Claims (Class 7)**

(i)     Definition

FairPoint Communications Unsecured Claims include any Unsecured Claims against FairPoint Communications, including, but not limited to, Senior Notes Claims.

(ii)     Impairment and Voting

Class 7 is Impaired by the Plan.  Each holder of an Allowed FairPoint Communications Unsecured Claim is entitled to vote to accept or reject the Plan.

(iii)     Distributions

On the Distribution Date, each holder of an Allowed FairPoint Communications Unsecured Claim will receive the following, in full and complete satisfaction of such FairPoint Communications Unsecured Claim:

(1)     if the Class of holders of FairPoint Communications Unsecured Claims votes to accept the Plan, each holder of an Allowed FairPoint Communications Unsecured Claim will receive its Ratable Proportion of (i) four million ~~one~~two hundred ~~ninety~~three thousand ~~six~~three hundred fifty ~~one (4,190,651)~~ two (4,203,352) shares of the New Common Stock and (ii) the New Warrants, in the case of each of clauses (i) and (ii), subject to dilution from the securities to be issued under the Long Term Incentive Plan; or

(2)     if (1) the Class of FairPoint Communications Unsecured Claims votes to reject the Plan, (2) the members of the Ad Hoc Committee of Senior Noteholders or its counsel objects to the Plan, or (3) the members of the Creditors' Committee or its counsel object to the Plan, or (4) the Indenture Trustee or its counsel objects to the Plan, then holders of FairPoint Communications Unsecured Claims will not receive any Distributions under the Plan on account of their Claims.

**8.**     **Convenience Claims (Class 8)**

(i)     Definition

Convenience Claims include any (a) FairPoint Communications Unsecured Claim in an amount equal to ten thousand dollars ($10,000.00) or less, and/or (b) Disputed FairPoint Communications Unsecured Claim that becomes an Allowed Unsecured Claim of ten thousand dollars ($10,000.00) or less with the consent of and in the amount agreed to by FairPoint.

(ii)     Impairment and Voting

Class 8 is Unimpaired by the Plan.  Each holder of an Allowed Convenience Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(iii)    Distributions

On the Distribution Date, each holder of an Allowed Convenience Claim will be paid an amount in Cash equal to one hundred percent (100%) of such holder's Allowed Convenience Claim in full and complete satisfaction, settlement, release, and discharge of and in exchange for such holder's Claim.

**9.      Subordinated Securities Claims (Class 9)**

(i)      Definition

Subordinated Securities Claims include any Claim against FairPoint arising from rescission of a purchase or sale of a Security of FairPoint or an Affiliate of FairPoint, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

(ii)     Impairment and Voting

Class 9 is Impaired by the Plan.  Each holder of a Subordinated Securities Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(iii)    Distributions

Each holder of an Allowed Subordinated Securities Claim will not receive or retain any interest or property under the Plan on account of such Allowed Subordinated Securities Claim.  The treatment of Subordinated Securities Claims under the Plan is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

**10.     Subsidiary Equity Interests (Class 10)**

(i)      Definition

Subsidiary Equity Interests include any instrument evidencing an ownership interest in FairPoint (other than FairPoint Communications), whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.  Each Subsidiary Equity Interest will be deemed Allowed under the Plan.

(ii)     Impairment and Voting

Class 10 is Unimpaired by the Plan.  Each holder of a Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

<ol start="3" type="i">
<li>Distributions</li>
</ol>

       On the Effective Date, the Subsidiary Equity Interests will be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**11.    Old FairPoint Equity Interests (Class 11)**

<ol type="i">
<li>Definition</li>
</ol>

       Old FairPoint Equity Interests include any instrument evidencing an ownership interest in FairPoint Communications, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

<ol start="2" type="i">
<li>Impairment and Voting</li>
</ol>

       Class 11 is Impaired by the Plan. Each holder of an Old FairPoint Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

<ol start="3" type="i">
<li>Distributions</li>
</ol>

       On the Effective Date, the Old FairPoint Equity Interests will be cancelled and the holders of the Old FairPoint Equity Interests will not be entitled to, and will not receive or retain, any property or interest in property on account of such Old FairPoint Equity Interests under the Plan.

**12.    Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

       Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is within FairPoint's self-insured retention. Amounts in excess of the applicable self-insured retention amount will be recoverable only from the available Insurer and FairPoint will be discharged to the extent of any such excess. Nothing in Section 5.12 of the Plan will constitute a waiver of any Causes of Action or Liabilities that any Person may hold against any other Person, including, without limitation, FairPoint's Insurers.

**13.    Special Provision Regarding Unimpaired Claims**

       Except as otherwise explicitly provided in the Plan, nothing herein will be deemed to be a waiver or relinquishment of any rights, counterclaims or defenses that any of FairPoint or Reorganized FairPoint, as applicable, may have, whether at law or in equity, with respect to any Unimpaired Claim.

**D.  PROVISIONS REGARDING NEW COMMON STOCK AND NEW WARRANTS DISTRIBUTED PURSUANT TO THE PLAN**

    **1.  New Common Stock**

        (i)  <u>Authorization</u>

The Amended Certificate of Incorporation of Reorganized FairPoint Communications will authorize the issuance of seventy-five million (75,000,000) shares of New Common Stock. The seventy-five million (75,000,000) shares of New Common Stock that are authorized on the Effective Date will be issued or reserved as follows: (i) in the event that the Class of FairPoint Communications Unsecured Claims accepts the Plan, (1) fifty ~~-~~one million four hundred ~~sixty six~~forty-four thousand ~~four~~seven hundred ~~thirty six (51,466,436~~eighty-eight (51,444,788) shares of New Common Stock, in the aggregate, will be distributed to holders of Allowed Claims under Section 5.4 and Section 5.7 of the Plan and (2) seven million one hundred ~~forty-three~~sixty-four thousand ~~one~~eight hundred ~~fifty six (7,143,156~~four (7,164,804) shares of the New Common Stock will be reserved in connection with the New Warrants; (ii) in the event that the Class of FairPoint Communications Unsecured Claims rejects the Plan, fifty ~~-~~eight million four hundred eighty ~~-~~four thousand five hundred eighty ~~-~~seven (58,484,587) shares of New Common Stock, in the aggregate, will be distributed to holders of Allowed Claims under Section 5.4 of the Plan; ~~and~~ (iii) <u>in the event that the Class of FairPoint Communications Unsecured Claims accepts the Plan,</u> six million two hundred sixty ~~-~~nine thousand two hundred six (6,269,206<u>) shares of New Common Stock will be issued or reserved in connection with the Long Term Incentive Plan; and (iv) in the event that the Class of FairPoint Communications Unsecured Claims rejects the Plan, six million three hundred ninety-four thousand two hundred eleven (6,394,211</u>) shares of New Common Stock will be issued or reserved in connection with the Long Term Incentive Plan.  On the Effective Date, in the event the Class of FairPoint Communications Unsecured Claims ~~rejects~~reject the Plan, holders of Allowed Class 4 Prepetition Credit Agreement Claims will receive, and Reorganized FairPoint Communications will issue, an aggregate of fifty ~~-~~eight million~~,~~ four hundred eighty ~~-~~four thousand five hundred eighty ~~-~~seven (58,484,587) shares of New Common Stock in accordance with Section V of the Plan.  All such shares ~~shall~~will be deemed fully paid and non-assessable.  On the Effective Date, in the event the Class of FairPoint Communications Unsecured Claims accepts the Plan, holders of Allowed Class 4 Prepetition Credit Agreement Claims and holders of Allowed Class 7 FairPoint Communications Unsecured Claims will receive, and Reorganized FairPoint Communications will issue, an aggregate of fifty ~~-~~one million four hundred ~~sixty six~~forty-four thousand ~~four~~seven hundred ~~thirty six (51,466,436~~eighty-eight (51,444,788) shares of New Common Stock in accordance with Section V of the Plan.  All such shares ~~shall~~will be deemed fully paid and non-assessable~~.~~

        (ii)  <u>Par Value</u>

The New Common Stock will have a par value of $0.01 per share.

    **2.  New Warrants**

As provided in and subject to the conditions set forth in the Plan, including Section 5.7.2 of the Plan, Reorganized FairPoint Communications will issue to each holder of an Allowed

Class 7 FairPoint Communications Unsecured Claim, its Ratable Proportion of New Warrants. Such New Warrants allow the holders thereof to purchase seven million one hundred ~~forty-three~~sixty-four thousand ~~one~~eight hundred ~~fifty six (7,143,156~~four (7,164,804) shares of the New Common Stock issued pursuant to Section 6.1 and 6.2 of the Plan, which warrants will have the material terms set forth on ***Exhibit C*** of the Plan and be in substantially the form set forth in the Plan Supplement.

3.      **Securities Law Matters**

(i)      Exemption from Securities Laws

Except as otherwise provided herein, and to the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Common Stock and the New Warrants pursuant to the Plan and any subsequent sales, resales, transfers, or other distributions of such New Common Stock or New Warrants will be exempt from registration under the Securities Act, any other federal or state securities law registration requirements, and all rules and regulations promulgated thereunder.  Any such Securities issued to an "affiliate" of Reorganized FairPoint within the meaning of the Securities Act or any Person Reorganized FairPoint reasonably determines to be an "underwriter", and which does not agree to resell such securities only in "ordinary trading transactions," within the meaning of section 1145(b)(1) of the Bankruptcy Code will be subject to such transfer restrictions and bear such legends as will be appropriate to ensure compliance with the Securities Act.

(ii)      Registration Rights Agreement

On the Effective Date, Reorganized FairPoint Communications will enter into a registration rights agreement (the "Registration Rights Agreement") with each holder of greater than ten percent (10%), on a fully diluted basis, of the New Common Stock on the Effective Date (a "Holder of Registrable Securities").  The Holders of Registrable Securities will be entitled to request an aggregate of two demand registrations; *provided*, that no such registration will be demanded prior to the expiration of the date which is one hundred eighty (180) days following the Effective Date; *provided further*, that in no event will Reorganized FairPoint Communications be obligated to effect more than two (2) demand registrations pursuant to all requests for demand registration.  A form of the Registration Rights Agreement, including a form of shelf registration statement if necessary, will be included in the Plan Supplement.

(iii)      Securities Exchange Listing

Reorganized FairPoint Communications will use its reasonable best efforts to obtain a listing for the New Common Stock on one of the following national securities exchanges:  (a) the New York Stock Exchange, Inc., (b) the Nasdaq Global Stock Market, or (c) any other comparable exchange.

### E. IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN; ACCEPTANCE OR REJECTION OF THE PLAN

#### 1. Voting of Claims

(i) Each holder of an Allowed Claim or the holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a), in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Section IV and Section V of the Plan, will be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other applicable order of the Bankruptcy Court. Any Unimpaired Class of Claims and the Subsidiary Equity Interests will be deemed to have accepted the Plan. Any Class of Claims and the Old FairPoint Equity Interests that will not receive or retain any property on account of such Claims or Equity Interests under the Plan will be deemed to have rejected the Plan.

(ii) Each of Classes 4, [6]4 and 7 is Impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan. In accordance with section 1126(g) of the Bankruptcy Code, each of the Classes 9 and 11 is conclusively deemed to have rejected the Plan.

#### 2. Acceptance by Unimpaired Classes

Each of Classes 1, 2, 3, 5, 6, 8 and 10 is Unimpaired under the Plan and each such Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 3. Elimination of Vacant Classes

Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 will be deemed deleted from the Plan for purposes of voting on or rejection of the Plan, and for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

#### 4. Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote will not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, FairPoint reserves the right to amend the Plan in accordance with Section 16.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to Impaired Classes of Claims that are deemed to reject the Plan, FairPoint will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

5.      **Revocation of the Plan**

Subject to Section 16.5 of the Plan, the Debtors-in-Possession may revoke and withdraw the Plan in its entirety at any time prior to entry of the Confirmation Order.  If the Plan is so revoked or withdrawn, then it will be deemed null and void.

F.      **MEANS OF IMPLEMENTATION OF THE PLAN**

1.      ~~Settlement~~**Regulatory Settlements**

The filing of the Plan constitutes, among other things, a motion by FairPoint pursuant to Bankruptcy Rule 9019 to approve the settlement and comprise set forth in Section 8.1 of the Plan.  As provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the settlements and compromises set forth in the Regulatory Settlements, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims and controversies resolved pursuant to the Regulatory Settlements.  The entry of the Confirmation Order will constitute the Bankruptcy Court's finding and determination that the Regulatory Settlements reflected in the Plan are (i) in the best interest of FairPoint and its Estates, (ii) fair, equitable and reasonable, (iii) made in good faith and (iv) approved by the Bankruptcy Court.  Subject to obtaining the approval of the settlements reflected in the Plan by the Bankruptcy Court, on the Effective Date, Reorganized FairPoint will take all actions necessary or reasonably required to effectuate such settlements.

2.      **Transactions on the Effective Date**

(i)      On the Effective Date, the following will be deemed to have occurred simultaneously:

(1)      the Amended Certificate of Incorporation will be filed with the Secretary of State of the State of Delaware, and the New Organizational Documents will become effective and binding upon Reorganized FairPoint Communications;

(2)      the Old FairPoint Equity Interests will be extinguished;

(3)      Reorganized FairPoint Communications will distribute the Cash Payment, New Common Stock and the New Warrants, if any, and will enter into the New Term Loan; and

(4)      the capital structure of Reorganized FairPoint Communications as set forth in Sections V and VI of the Plan will be in effect.

(ii)      On the Effective Date, the closing of the New Revolver will be deemed to occur immediately after the New Board is in place and the events set forth in Section 8.2(a) of the Plan have occurred.

### 3. New Term Loan and New Revolver

The Plan provides that, upon FairPoint's emergence from chapter 11, holders of Prepetition Credit Agreement Claims will receive, among other things, their Ratable Proportion of a new $1 billion secured term loan agreement, which will be guaranteed by those subsidiaries of FairPoint that have guaranteed repayment of the Debtor-in-Possession Credit Agreement, dated as of October 27, 2009, as amended (the "DIP Credit Agreement"), with certain financial institutions and Bank of America, N.A., as the administrative agent (in such capacity, the "DIP Agent").  The New Term Loan will include the following material terms:

- The New Term Loan will be secured by the same or substantially the same collateral as the collateral which secures the DIP Credit Agreement, except to the extent prohibited by law or regulation.

- 5 year maturity.

- Interest at LIBOR + 4.50%, with a LIBOR floor of 2.00%.

- No upfront fee.

- Mandatory prepayment at par, upon certain conditions to be determined.

- Optional prepayment at anytime at par.

- Amortization Schedule – Year 1: 1% annually, Year 2: 1% annually, Year 3: 5% annually, Year 4: 15% annually and Year 5: 15% (5% per quarter for the first 3 quarters) with 63% bullet payment in 4th quarter.

- Amortization occurs quarterly commencing upon the first full quarter after the Effective Date.

- If FairPoint's consolidated leverage ratio is above 2.0x at the end of the fiscal year, FairPoint will be subject to a sweep of 75% of its Excess Cash Flow based upon an annual test and paid in the subsequent quarter, provided that, with respect to the test occurring for fiscal year 2010, Excess Cash Flow will be calculated for the period from the Effective Date through the end of such fiscal year and, if the sweep described herein is applicable, will be payable in fiscal year 2011.  If FairPoint's consolidated leverage ratio is below 2.0x at the end of the fiscal year, such sweep will be reduced to 50% of FairPoint's Excess Cash Flow, as set forth above.

- Any sweep of FairPoint's Excess Cash Flow by the lenders will be applied *pro rata* against obligations in accordance with the amortization schedule as set forth above.

- If FairPoint's consolidated total leverage ratio is below 2.0x at the end of

the fiscal year, FairPoint will be permitted to pay dividends with its share of Excess Cash Flow, as set forth above.

- Financial covenants will only include interest coverage and leverage ratio tests. Such tests will first occur in the first full quarter following the Effective Date (as calculated in each case in accordance with Schedule 1 of ***Exhibit E*** hereto).

- Usual and customary affirmative and negative covenants as may be mutually agreed to by the agent, the lenders and FairPoint.

In addition, the Plan contemplates that the DIP Credit Agreement will, subject to certain conditions, roll into such a revolving credit exit facility with an aggregate principal amount of $75.0 million with a five year term. If any of the conditions referenced above are not met and, as a result, the DIP Credit Agreement does not convert into the New Revolver, FairPoint intends to obtain a new revolving credit facility. However, there are no assurances that FairPoint would be able to obtain such a revolving credit facility on commercially reasonable terms or at all.

Documents evidencing the New Term Loan and the New Revolver will be filed by FairPoint with the Plan Supplement. In the Confirmation Order, FairPoint will request that the Bankruptcy Court authorize Reorganized FairPoint to execute the same together with other documents as the respective lenders may reasonably require to effectuate the treatment afforded to the parties under such facilities. In accordance with Section 8.2 of the Plan, Reorganized FairPoint's entry into the New Term Loan and New Revolver, and the incurrence of the indebtedness thereunder, on the Effective Date will be authorized without the need for any further corporate action and without any further action by holders of Claims or Old Equity Interests.

**4. Reorganization of FairPoint; Continuation of Businesses**

On and after the Effective Date, Reorganized FairPoint will continue to engage in its respective businesses. Except as otherwise provided in the Plan, FairPoint will continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other legal entity, as the case may be, with all the powers of a corporation, limited liability company, partnership or other legal entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable entity included in the definition of "FairPoint" is incorporated or organized and pursuant to the respective certificate of incorporation and bylaws (or other organizational documents) in effect prior to the Effective Date, except with respect to the New Organizational Documents (or other organizational documents) that are amended by the Plan, the Plan Supplement or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. Notwithstanding the foregoing, on or as of the Effective Date, or as soon as reasonably practicable thereafter, and without the need for any further action, Reorganized FairPoint may: (a) cause any or all of Reorganized FairPoint to be merged into one or more of Reorganized FairPoint, dissolved or otherwise consolidated, (b) cause the transfer of assets between or among Reorganized FairPoint, or (c) engage in any other transaction in furtherance of the Plan.

**5.    Reorganized FairPoint's Obligations Under the Plan**

(i)    From and after the Effective Date, as set forth herein, Reorganized FairPoint will perform the corresponding obligations under the Plan of its predecessor or predecessor-in-interest.  The Plan will be administered and actions will be taken in the name of FairPoint and Reorganized FairPoint through, in accordance with the terms of the Plan, Reorganized FairPoint.

(ii)    From and after the Effective Date, Reorganized FairPoint will, among other things:

(1)    administer the Plan and take all steps and execute all instruments and documents necessary to effectuate the Plan;

(2)    pursue (including, without limitation, prosecuting, enforcing, objecting, litigating, reconciling, settling, abandoning and resolving) all of FairPoint's retained Causes of Action, defenses and counterclaims;

(3)    reconcile Claims and resolve Disputed Claims, and administer the Claims allowance and disallowance processes as set forth in the Plan, including, without limitation, objecting, prosecuting, litigating, reconciling, settling and resolving Claims and Disputed Claims in accordance with the Plan;

(4)    make decisions regarding the retention, engagement, payment and replacement of professionals, employees and consultants;

(5)    administer the Distributions under the Plan, including (i) making Distributions in accordance with the terms of the Plan and (ii) establishing and maintaining the various Reserves;

(6)    exercise such other powers as necessary or prudent to carry out the provisions of the Plan;

(7)    invest any Cash pending Distribution;

(8)    file appropriate tax returns; and

(9)    take such other actions as may be necessary or appropriate to effectuate the Plan.

(iii)    Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by Reorganized FairPoint (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date will be paid in Cash by Reorganized FairPoint in the ordinary course of its respective businesses.

6. **New Organizational Documents**

The New Organizational Documents will be filed as part of the Plan Supplement and will contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent required, to prohibit the issuance of nonvoting equity securities (other than any warrants and/or options) as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the New Organizational Documents, after the Effective Date, as permitted by applicable law. Except as otherwise provided herein, the New Organizational Documents will contain such indemnification provisions applicable to the officers, directors and employees of Reorganized FairPoint Communications and such other Persons as may, in the discretion of the New Board, be appropriate and permitted under applicable law.

7. **New Board**

(i) General

    (1)    On the Effective Date, each member of the existing board of directors of FairPoint Communications will be deemed to have resigned.

    (2)    On the Effective Date, the property, business and affairs of Reorganized FairPoint Communications and the other Reorganized FairPoint entities will become the general responsibility of the New Board. Simple majority rule will govern all actions of the New Board. A list setting forth the identities of the members of the New Board, to the extent available, will be filed as part of the Plan Supplement or otherwise will be identified in a submission to the Bankruptcy Court on or prior to the Effective Date.

(ii) Initial Number of Directors; Initial Composition

    (1)    Reorganized FairPoint Communications will have a New Board, which will initially consist of nine directors.

    (2)    The initial composition of the New Board will be determined as follows:

    (A)    if the holders of the FairPoint Communications Unsecured Claims vote to accept the Plan, then (1) one member of the New Board will be the chief executive officer of Reorganized FairPoint Communications, (2) seven members of the New Board will be nominated by the Lender Steering Committee and (3) one member of the New Board will be nominated by the steering committee of the Ad Hoc Committee of Senior Noteholders (in consultation with the Creditors' Committee and the other members of the Ad Hoc Committee of Senior Noteholders); provided, however, that in the event that a member of the New Board has not been nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan by the Plan Supplement filing deadline, then the Persons described therein will lose their right to nominate a member of the New Board and the Lender Steering Committee will have the right to nominate an additional member of the New Board; provided, further, that if the Lender Steering Committee determines

not to nominate an additional member of the New Board then the number of directors on the New Board will be reduced to eight and seven of such members of the New Board will be nominated by the Lender Steering Committee; or

    (B)  if the holders of the FairPoint Communications Unsecured Claims reject the Plan, then (1) one member of the New Board will be the chief executive officer of Reorganized FairPoint Communications, (2) any person previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan will not be considered for nomination or election to the New Board, and (3) eight members of the New Board will be nominated by the Lender Steering Committee; *provided, however*, that if the Lender Steering Committee determines not to nominate an additional member of the New Board to replace the individual previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan then the number of directors on the New Board will be reduced to eight and seven of such members of the New Board will be nominated by the Lender Steering Committee;

    *provided,* that, in the event of either (A) or (B) above, (1) the Lender Steering Committee will consider residents of northern New England among the candidates considered for nomination to the New Board and (2) at least one of the members of the New Board nominated by the Lender Steering Committee will be a resident of northern New England.

    (iii)  <u>Reduction in Number of Directors</u>

      (1)  The Lender Steering Committee will have the option to reduce the number of members of the New Board they are entitled to nominate pursuant to Section 8.6.2(b)(i) or (b)(ii) of the Plan from seven or eight, respectively, to five.

      (2)  In the event the Lender Steering Committee decides to reduce the number of members of the New Board they are entitled to nominate to five:

    if the holders of the FairPoint Communications Unsecured Claims vote to accept the Plan, then the number of directors serving on the New Board will be reduced from nine to seven and: (1) one member of the New Board will be the chief executive officer of Reorganized FairPoint Communications, (2) five members of the New Board will be nominated by the Lender Steering Committee, and (3) one member of the New Board will be nominated by the steering committee of the Ad Hoc Committee of Senior Noteholders (in consultation with the Creditors' Committee and the other members of the Ad Hoc Committee of Senior Noteholders); <u>provided</u>, <u>however</u>, that in the event that a member of the New Board has not been nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan by the Plan Supplement filing deadline, then the Persons described therein will lose their right to nominate a member of the New Board and the Lender Steering Committee will have the right to nominate an additional member of the New Board; *provided*, further, that if the Lender Steering Committee determines not to nominate an additional member of the New Board then the number of directors on the New Board will be reduced to six; or

if the holders of FairPoint Communications Unsecured Claims vote to reject the Plan, then the number of directors serving on the New Board will be reduced from nine to six and: (1) one member of the New Board will be the chief executive officer of Reorganized FairPoint Communications, (2) any person previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan will not be considered for nomination or election to the New Board, and (3) five members of the New Board will be nominated by the Lender Steering Committee; *provided*, *however*, that if the Lender Steering Committee determines not to nominate an additional member of the New Board to replace the individual previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan then the number of directors on the New Board will be reduced to five and four of such members of the New Board will be nominated by the Lender Steering Committee.

   (iv)  <u>Qualifications of Directors</u>

   A supermajority of the directors initially serving on the New Board (whether pursuant to Section 8.6.2 or 8.6.3 of the Plan) will be Independent Directors.

   (v)  <u>Term of Office</u>

   The New Board will be classified into three classes with approximately one-third of the directors sitting in each such class, unless otherwise determined by the Lender Steering Committee in consultation with FairPoint.  In addition, unless otherwise determined by the Lender Steering Committee in consultation with FairPoint, (i) initially one of the classes will have a one year term, one of the classes will have a two year term and one of the classes will have a three year term, and (ii) the members of each class, other than the initial members of the New Board serving in the two classes that will initially have less than a three year term, will be elected for three year terms.  The initial member of the New Board nominated by the steering committee of the Ad Hoc Committee of Senior Noteholders will be classified in the class of directors standing for election on or after the third anniversary of the Effective Date.

  **8.**  **Officers of Reorganized FairPoint**

   (i)  <u>Generally</u>

   The executive officers of FairPoint immediately prior to the Effective Date will serve as the initial officers of Reorganized FairPoint on and after the Effective Date.  Such officers will serve in accordance with applicable non-bankruptcy law, any employment agreement with Reorganized FairPoint and, as appropriate, the New Organizational Documents or its existing articles of incorporation and bylaws.

   (ii)  <u>Assumption of Executive Agreements</u>

   On the Confirmation Date, and subject to the occurrence of the Effective Date, FairPoint will be deemed to have assumed the Executive Agreements.

9.     **Operations of FairPoint Between Confirmation and the Effective Date**

FairPoint will continue to operate as Debtors-in-Possession during the period from the Confirmation Date through and until the Effective Date.

10.     **Revesting of Assets**

Pursuant to section 1141(b) and (c) of the Bankruptcy Code, except as otherwise provided in the Plan, the property of the Estate and FairPoint will revest in Reorganized FairPoint on the Effective Date of the Plan.  From and after the Effective Date, Reorganized FairPoint may operate its respective businesses and may use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court.  As of the Effective Date, all property of FairPoint and Reorganized FairPoint will be free and clear of all Claims, Liens and interests, except as specifically provided in the Plan or in the Confirmation Order.  Without limiting the foregoing, Reorganized FairPoint may, without application to or approval by the Bankruptcy Court, pay any reasonable fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Reorganized FairPoint may incur after the Effective Date.

11.     **Dissolution of the Creditors' Committee**

On the Effective Date, except as provided below, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from or in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, will terminate, except for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

12.     **Effectuating Documents; Further Transactions**

The chairman of the board of directors, the president, the chief executive officer, the chief financial officer, the executive vice president and general counsel, the controller or any other appropriate officer of FairPoint or Reorganized FairPoint, as the case may be, will be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of FairPoint or Reorganized FairPoint will be authorized to certify or attest to any of the foregoing, if necessary.

13.     **Preservation of Certain Causes of Action; Defenses**

Except as otherwise provided in the Plan, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized FairPoint, as successors-in-interest to FairPoint and its Estates, will retain and may enforce FairPoint's Causes of Action that are property of FairPoint and its Estates (including Avoidance Actions), and Reorganized FairPoint will retain and enforce all defenses and counterclaims to all Claims asserted against FairPoint and its Estates, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Reorganized FairPoint may pursue such Causes of Action, counterclaims and defenses, as appropriate, in accordance with its best interests, as determined by Reorganized FairPoint.

**14.    Cancellation of Existing Securities**

On the Effective Date, except as otherwise provided for herein, (a) all securities, equity interests, notes, bonds, indentures and other instruments or documents evidencing or creating any indebtedness, or obligation of FairPoint, including without limitation, the Prepetition Credit Agreement, the Senior Notes and the Old FairPoint Equity Interests (except such equity interests, notes or other instruments evidencing indebtedness or obligations of FairPoint that are Reinstated under the Plan, including, without limitation, the Subsidiary Equity Interests) will be as against FairPoint and its successors cancelled and extinguished, and (b) the obligations of FairPoint under any agreements, indentures, or certificates of designation governing any securities, equity interests, notes, bonds, indentures and other instruments or documents evidencing or creating any indebtedness, or obligation of FairPoint, including, without limitation, the Prepetition Credit Agreement, the Senior Notes and the Old FairPoint Equity Interests (except such equity interests, notes or other instruments evidencing indebtedness or obligations of FairPoint that are Reinstated under the Plan, including, without limitation, the Subsidiary Equity Interests), as the case may be, will be fully released, terminated, extinguished and discharged; *provided, however*, that the provisions of the Prepetition Credit Agreement governing the relationship between the Prepetition Credit Agreement Agent and the Prepetition Credit Agreement Lenders, including but not limited to those provisions relating to the rights of the Prepetition Credit Agreement Agent to expense reimbursement, indemnification and other similar amounts, will not be affected by and will survive the Plan, entry of the Confirmation Order and the occurrence of the Effective Date.

**15.    Long Term Incentive Plan**

On the Effective Date, Reorganized FairPoint will be deemed to have adopted the Long Term Incentive Plan without any further action by FairPoint, Reorganized FairPoint, Reorganized FairPoint's shareholders or the New Board.

**16.    Success Bonuses**

On the Effective Date, Reorganized FairPoint will be deemed to have adopted and authorized the Success Bonuses without any further action by FairPoint, Reorganized FairPoint, Reorganized FairPoint's shareholders or the New Board.

**17.    Indemnification; Directors & Officers Insurance**

Reorganized FairPoint will assume all existing indemnification obligations of FairPoint in favor of the directors of FairPoint who held such position on June 1, 2009 and thereafter, and the officers of FairPoint listed on ***Exhibit FG*** to the Plan (collectively, the "Indemnified Persons"), and the directors, officers and employees of Reorganized FairPoint on and following the Effective Date (whether such indemnification obligations are in FairPoint's charter, bylaws, contracts or otherwise); provided that Reorganized FairPoint's indemnification obligation to and for the benefit of the Indemnified Persons will be limited in the aggregate to twenty million dollars ($20,000,000.00) with respect to any Claim asserted against such Indemnified Person that

arose prior to the Effective Date.  In addition, following the Effective Date, Reorganized FairPoint will purchase director and officer liability insurance for the directors and officers of Reorganized FairPoint on a going-forward basis (in the form and substance satisfactory to the New Board).  Nothing herein will be deemed to affect any applicable insurance coverage.

## G.  DISTRIBUTIONS UNDER THE PLAN

### 1.  Distributions on Allowed Claims

Distributions with respect to holders of Allowed Claims will only be made on a Distribution Date.  All Allowed Claims held by a single creditor against a single entity within the definition of "FairPoint" will be aggregated and treated as a single Claim against such entity.  At the written request of Reorganized FairPoint or the Disbursing Agent, any creditor holding multiple Allowed Claims will provide to Reorganized FairPoint or the Disbursing Agent, as the case may be, a single address to which any Distributions will be sent.

### 2.  Date of Distributions

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

### 3.  Disbursing Agent

Except as otherwise provided in Sections 9.6.2(a) and 9.6.3 of the Plan, all Distributions under the Plan will be made by Reorganized FairPoint Communications as Disbursing Agent or such other Person designated by Reorganized FairPoint Communications as a Disbursing Agent. No Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties.

### 4.  Rights and Powers of Disbursing Agent

The Disbursing Agent will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.  In furtherance of the rights and powers of the Disbursing Agent, the Disbursing Agent will have no duty or obligation to make Distributions to any holder of an Allowed Claim unless and until such holder executes and delivers, in a form acceptable to the Disbursing Agent, any documents applicable to such Distributions.

### 5.  Fees and Expenses of Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date, including

reasonable fees and expenses of counsel, will be paid in Cash by Reorganized FairPoint without further order of the Bankruptcy Court within twenty (20) days of receipt of an invoice by Reorganized FairPoint.  In the event that Reorganized FairPoint objects to the payment of such invoice for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court will retain jurisdiction to make a determination as to the extent to which the invoice will be paid by Reorganized FairPoint.

6.      **Delivery of Distributions**

(i)      Distributions to Last Known Address

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of FairPoint or its agents, as applicable, unless FairPoint or Reorganized FairPoint have been notified in writing of a change of address by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  Nothing in the Plan will require Reorganized FairPoint to attempt to locate any holder of an Allowed Claim.

(ii)      Distributions to Prepetition Credit Agreement Agent

The Prepetition Credit Agreement Agent will be the Disbursing Agent for the holders of all Prepetition Credit Agreement Claims.  Accordingly, Distributions for the benefit of the holders of Prepetition Credit Agreement Claims will be made to the Prepetition Credit Agreement Agent.  The Prepetition Credit Agreement Agent will, in turn, promptly administer the Distributions to the holders of Allowed Prepetition Credit Agreement Claims, in accordance with the Plan and the Prepetition Credit Agreement.  The issuance and Distribution of the New Common Stock and Cash Payment to the Prepetition Credit Agreement Agent, and the issuance and execution and delivery of the New Term Loan will be deemed a Distribution to the respective holders of Allowed Prepetition Credit Agreement Claims.  Upon delivery of the Distributions required under the Plan as provided in this paragraph, Reorganized FairPoint will be released of all Liability with respect to the delivery of such Distributions.  The Prepetition Credit Agreement Agent will be exculpated by all Persons from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon it as Disbursing Agent under the Plan or any order of the Bankruptcy Court pursuant to or in furtherance of the Plan.  No holder of a Claim or an Equity Interest or other party in interest will have or pursue any Claim or Cause of Action against the Prepetition Credit Agreement Agent for making payments in accordance with the Plan or for implementing provisions of the Plan in its capacity as Disbursing Agent.

(iii)      Distributions to Indenture Trustee

The Indenture Trustee will be the Disbursing Agent for the holders of all Senior Notes Claims.  Accordingly, Distributions for the benefit of the holders of Allowed Senior Notes Claims will be made to the Indenture Trustee.  The Indenture Trustee will, in turn, promptly

administer the Distributions to the holders of such Allowed Senior Notes Claims, in accordance with the Plan and the applicable Indentures. The Indenture Trustee, in its capacity as Disbursing Agent, may transfer any such Distributions through the facilities of DTC or another third-party distribution agent. The issuance and Distribution of the New Common Stock and the New Warrants to the Indenture Trustee will be deemed a Distribution to the respective holders of Allowed Senior Notes Claims. Upon delivery of the Distributions required under the Plan as provided in this paragraph, Reorganized FairPoint will be released of all liability with respect to the delivery of such Distributions.

### 7. Unclaimed Distributions

All Distributions under the Plan that are unclaimed for a period of one (1) year after Distribution thereof will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in Reorganized FairPoint and any entitlement of any holder of any Claims to such Distributions will be extinguished, discharged and forever barred.

### 8. Distribution Record Date

The Claims register will be closed on the Distribution Record Date, and any subsequent transfer of any Claim will be prohibited. FairPoint and Reorganized FairPoint will have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

### 9. Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements; *provided*, *however*, that the Cash payment to the Prepetition Credit Agreement Agent in accordance with Section 9.6.2(a) of the Plan will be made by wire transfer and the Cash Payment made to holders of Allowed Prepetition Credit Agreement Claims in accordance with Section 5.4.2(c) of the Plan will be made by wire transfer.

### 10. Time Bar to Cash Payments by Check

Checks issued by, or on behalf of, FairPoint or Reorganized FairPoint on account of Allowed Claims will be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check will be made in writing directly to Reorganized FairPoint by the holder of the Allowed Claim with respect to which such check originally was issued on or before the later of the first anniversary of (a) the Effective Date and (b) the date on which the Claim at issue became an Allowed Claim. After such dates, all Claims in respect of void checks will be extinguished, discharged and forever barred, and the proceeds of such checks will revest in and become the property of Reorganized FairPoint.

### 11. No Fractional Distributions

No fractional shares of New Common Stock or New Warrants for fractional shares of New Common Stock will be distributed and no Cash will be distributed in lieu of such fractional shares or New Warrants for fractional shares. When any Distribution pursuant to the Plan on

account of an Allowed Claim would otherwise result in the issuance of fractional shares of New Common Stock or New Warrants for fractional shares, the actual Distribution of such fractional shares will be rounded as follows: (a) fractions of one-half (½) or greater will be rounded to the next higher whole number and (b) fractions of less than one-half (½) will be rounded to the next lower whole number, with no further payment therefor. The total number of authorized shares of New Common Stock (including shares of New Common Stock issuable upon the exercise of New Warrants) to be distributed to holders of Allowed Claims will be adjusted as necessary to account for the foregoing rounding.

### 12. Fractional Cents

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down) with half cents or more being rounded up and fractions less than half of a cent being rounded down.

### 13. Setoffs and Recoupment

FairPoint may, but will not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Causes of Action of any nature whatsoever that FairPoint may have against the applicable claimant, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by FairPoint or Reorganized FairPoint of any such Causes of Action they may have against such claimant.

### 14. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 15. Distributions After Effective Date

Distributions made after the Effective Date will be deemed to have been made on the Effective Date.

### 16. Interest on Claims

Except as specifically provided for in the Plan, the Confirmation Order or applicable law, interest will not accrue on Claims, and no holders of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim. Interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Except as expressly provided herein, no Prepetition Claim will be Allowed to the extent that it is for postpetition interest or other similar charges.

### 17. No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim will receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

### 18. Ordinary Course Post-Petition Liabilities

Subject to Section 3.1 of the Plan and except as otherwise specifically provided for in the Plan, holders of Claims against FairPoint (other than Claims for Professional Fees) based on Liabilities incurred after the Petition Date in the ordinary course of FairPoint's businesses will not be required to file any request for payment of such Claims with the Bankruptcy Court. Such Claims will be assumed and paid by Reorganized FairPoint in the ordinary course of business of Reorganized FairPoint, in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to, the transaction underlying such Claims, without any further action by the holders of such Claims.

### 19. Payment of Taxes on Distributions Received Pursuant to the Plan

All Persons that receive Distributions under the Plan will be responsible for reporting and paying, as applicable, taxes on account of such Distributions.

### 20. Estimation of Claims

FairPoint or Reorganized FairPoint, as applicable, may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether FairPoint or Reorganized FairPoint, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, FairPoint or Reorganized FairPoint, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 21. Claims Reserves

On the Effective Date, and after making all Distributions required to be made on the Effective Date under the Plan, Reorganized FairPoint Communications will establish and maintain a separate reserve (each, a "Reserve") for each Class of Claims and Unclassified Claims, which Reserve will be administered by Reorganized FairPoint Communications; *provided, however*, that nothing herein will be deemed to require a Reserve with respect to Tax

Claims against FairPoint Communications.  For the avoidance of doubt, a Reserve will be established for all amounts referred to as "reserved" in clauses (1) through (10) in Section 5.4.2(c) of the Plan other than clauses (3) and (5) of Section 5.4.2(c) of the Plan.  To the extent that Reserves are established and maintained for the benefit of any holder of a Disputed Claim, such Reserves will include an amount of New Common Stock, New Warrants and/or Cash, as the case may be, equal to the Distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the amount of the Disputed Claim, (ii) the amount in which the Disputed Claim will be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, will constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized FairPoint.

All New Common Stock, New Warrants and Cash, as applicable, allocable to a Class of Claims or Unclassified Claims hereunder will be distributed by Reorganized FairPoint to the relevant Reserve on the Effective Date or such later date that Distributions are required to be made on account of Allowed Claims or Allowed Unclassified Claims. Cash held in Reserve will only be invested in Section 345 Securities.  Each Reserve will be closed and extinguished by Reorganized FairPoint Communications upon its determination that all Distributions of New Common Stock, New Warrants and Cash required to be made under the Plan (other than those Distributions required to be made to holders of Allowed Prepetition Credit Agreement Claims pursuant to Section 5.4.2(d) of the Plan) have been made in accordance with the terms of the Plan.  Upon closure of a Reserve, all New Common Stock and New Warrants then held in such Reserve will be subject to re-Distribution to the applicable Class, as appropriate, and all Cash will be distributed pursuant to Section 5.4.2(d) of the Plan, all in accordance with the provisions of Section V of the Plan.

## H.     DISPUTED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

### 1.     Objections

As of and following the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against FairPoint may be interposed and prosecuted only by Reorganized FairPoint.  Such objections and requests for estimation will be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of:  (a) one hundred eighty days (180) after the Effective Date or (b) such later date as may be fixed by the Bankruptcy Court (the "Objection Deadline"); *provided, however*, that with respect to Claims that, as of the Objection Deadline, are subject to a pending claim objection, contested matter, or adversary proceeding (an "Initial Objection") wherein Reorganized FairPoint's objection to such claim is ultimately denied, the Objection Deadline will be extended to the later of sixty (60) days from the date on which (i) the Bankruptcy Court enters an order denying such Initial Objection or (ii) any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection; *provided, further*, that with respect to Claims that (A) are filed (whether as an amended Claim, new Claim, or otherwise) after the Effective Date, and (B) that are not otherwise subject to adjustment, expunction or disallowance pursuant to Sections 10.2, 10.3, 10.5, 10.6 and 10.7 of the Plan, the Objection Deadline will be one hundred eighty

(180) days after the date on which such Claim was filed. Nothing herein will affect FairPoint's or Reorganized FairPoint's ability to amend the Schedules in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 2. Adjustment to Certain Claims Without a Filed Objection

Any Claim that has been settled, paid and satisfied, or amended and superseded, may be adjusted or expunged on the Claims register by Reorganized FairPoint without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, all Claims filed on account of an employee benefit will be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent Reorganized FairPoint elects to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

### 3. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or Distribution provided hereunder will be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

### 4. Distributions After Allowance

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, Distributions (if any) will be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

### 5. Resolution of Administrative Expense Claims and Claims

As of and following the Effective Date, Reorganized FairPoint will have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against FairPoint and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against FairPoint without approval of the Bankruptcy Court.

### 6. Disallowance of Certain Claims

Any Claims held by Persons from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, will be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Persons may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Persons have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to FairPoint by such Person have been turned over or paid to Reorganized FairPoint.

### 7. Indenture Trustee as Claim Holder

Consistent with Bankruptcy Rule 3003(c), Reorganized FairPoint will recognize proofs of Claims timely filed by the Indenture Trustee in respect of any Claims under the Indentures. Accordingly, any Claim arising under the Indentures, proof of which is filed by the registered or beneficial holder of Senior Notes, will be disallowed as duplicative of the Claim of the applicable Indenture Trustee, without any further action of the Bankruptcy Court.

### 8. Offer of Judgment

Reorganized FairPoint is authorized to serve upon a holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 will apply to such offer of judgment. To the extent the holder of a Claim must pay the costs incurred by Reorganized FairPoint after the making of such offer, Reorganized FairPoint is entitled to set off such amounts against the amount of any Distribution to be paid to such holder without any further notice to or action, order, or approval of the Bankruptcy Court.

### 9. Amendments to Claims

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or Reorganized FairPoint and any such new or amended Claim filed without prior authorization will be deemed disallowed in full and expunged without any further action.

### 10. Claims Paid and Payable by Third Parties

A Claim will be disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not FairPoint or Reorganized FairPoint. No Distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to one of FairPoint's Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of FairPoint's Insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged from the Claims register without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

## I. EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN

Section 365 of the Bankruptcy Code provides FairPoint with the power, subject to the approval of the Bankruptcy Court, to assume or reject unexpired leases and executory contracts. If an executory contract is rejected, the non-debtor party to the agreement may file a claim for damages incurred by reason of the rejection. These claims for damages are treated as prepetition, general Unsecured Claims. Rejection of unexpired leases of real property is subject to certain limitations imposed by section 502(b) of the Bankruptcy Code.

As part of its efforts to reduce its operating expenses, FairPoint is engaged in an analysis of its various executory contracts. FairPoint may reject various executory contracts and/or unexpired leases pursuant to orders of the Bankruptcy Court. The Plan provides that FairPoint will assume, as of the Effective Date of the Plan, all executory contracts and unexpired leases that exist between FairPoint and any Person, except for any executory contract or unexpired lease (a) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (c) that is specifically designated as a contract or lease to be rejected on Schedules 11.1(A) and 11.1(B) annexed to the Plan, which schedules will be contained in the Plan Supplement; *provided, however*, that FairPoint reserves the right, on or prior to the Effective Date, to amend Schedules 11.1(A) and 11.1(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be either assumed or rejected, respectively, as provided in such amended schedules, as of the Effective Date. FairPoint will provide notice of any amendments to Schedules 11.1(A) and/or 11.1(B) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedules 11.1(A) or 11.1(B) will not constitute an admission by FairPoint that such document is an executory contract or an unexpired lease or that FairPoint has any liability thereunder.

**1.    Assumption or Rejection of Executory Contracts and Unexpired Leases**

(i)    <u>General</u>

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between FairPoint and any Person will be deemed assumed by FairPoint as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (c) that is specifically designated as a contract or lease to be rejected on Schedules 11.1(A) (executory contracts) or 11.1(B) (unexpired leases), which schedules will be contained in the Plan Supplement; *provided, however*, that FairPoint reserves the right, on or prior to the Effective Date, to amend Schedules 11.1(A) and 11.1(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be either assumed or rejected, respectively, as provided in such amended schedules, as of the Effective Date. FairPoint will provide notice of any amendments to Schedules 11.1(A) and/or 11.1(B) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedules 11.1(A) or 11.1(B) will not constitute an admission by FairPoint that such document is an executory contract or an unexpired lease or that FairPoint has any liability thereunder. For the purpose of the Plan, the various regulatory consent orders to which FairPoint was a party with the MPUC, the VDPS and the NHPUC on the Petition Date will not be deemed to be executory contracts governed by Section XI of the Plan.

## 2. Inclusiveness

Unless otherwise specified on Schedules 11.1(A) or 11.1(B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein will include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and all executory contracts or unexpired leases appurtenant to the premises thereof, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises and any other interests in real estate or rights in rem related to the premises thereof, in each case, without regard to whether such agreement, instrument or other document is listed on Schedules 11.1(A) or 11.1(B) of the Plan Supplement.

## 3. Provisions Related to Cure Payments and Rejection Damages

### (i)    Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions or rejections described in Section 11.3 of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or rejection of such executory contract or unexpired lease, including objecting to the cure amount designated by FairPoint as payable in connection with an assumption, will be deemed to have consented to such assumption or rejection and agreed to the specified Cure amount.

### 1. Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All proofs of Claims arising from the rejection of executory contracts or unexpired leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon FairPoint or Reorganized FairPoint, as applicable, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order and (c) notice of an amendment to the schedule of rejected contracts.

Any Person that is required to file a proof of Claim arising from the rejection of an executory contract or an unexpired lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against FairPoint or Reorganized FairPoint or the Estate and their respective properties, and FairPoint and Reorganized FairPoint and the Estates and their respective properties will be forever discharged from any and all Liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims will, as of the Effective Date, be subject to permanent injunction.

### 2. Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan

### (i) (a)   Any monetary defaults under each executory contract and unexpired lease

to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable.  At least twenty (20) days prior to the Confirmation Hearing, FairPoint will provide notices of proposed assumption and proposed Cure amounts to be sent to applicable third parties, the Lender Steering Committee and the Creditors' Committee.  In the event that FairPoint does not propose a Cure amount to be sent to the applicable third party, the cure amount for such third party's executory contract or unexpired lease will be deemed to be zero dollars ($0.00).  Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related cure amount must be filed, served and actually received by FairPoint at least ten (10) days prior to the Confirmation Hearing.  Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.

(b)     In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of Reorganized FairPoint or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption, unless otherwise agreed between FairPoint or Reorganized FairPoint, as the case may be, and the counter party to such executory contract or unexpired lease.  If any objection to cure is sustained by the Bankruptcy Court, FairPoint, in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

(ii)    Notwithstanding Section 11.3.1(b)(i) of the Plan, to the extent (1) FairPoint is a party to any contract, lease or other agreement providing for the purchase, by a third party, of access to FairPoint's facilities or services, (2) any such agreement constitutes an executory contract or unexpired lease and (3) such agreement (a) has not been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is not subject to a pending motion for reconsideration or appeal of an order authorizing the assumption or rejection of such executory contract or unexpired lease, (c) is not subject to a motion to assume or reject such executory contract or unexpired lease filed on or prior to the Effective Date, or (d) is not identified for rejection on Schedules 11.1(A) or 11.1(B) of the Plan Supplement, then such agreement will be assumed as of the Effective Date by FairPoint, in accordance with the provisions and requirements of sections 365 of the Bankruptcy Code.  No ~~cure~~Cure will be paid and no other form of refund or billing credit will be given in connection with the assumption of such an agreement

### 4. Indemnification Obligations

Except as specifically set forth in Section 8.16 of the Plan, as of the Effective Date, FairPoint and Reorganized FairPoint will have no continuing indemnification obligations under any of its executory contracts.

### 5. Insurance Policies

Unless specifically rejected by order of the Bankruptcy Court, all of FairPoint's Insurance Policies which are executory, if any, and any agreements, documents or instruments relating thereto, will be assumed under the Plan. Nothing contained in Section 11.5 of the Plan will constitute or be deemed a waiver of any Cause of Action that FairPoint or Reorganized FairPoint, as applicable, may hold against any Person, including, without limitation, the Insurer, under any of FairPoint's Insurance Policies.

### 6. Benefit Plans

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, Reorganized FairPoint will continue to honor, in the ordinary course of business, the Benefit Plans of FairPoint, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated.

### 7. Retiree Benefits

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized FairPoint will continue to pay all retiree benefits of FairPoint (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the FairPoint entities had obligated themselves to provide such benefits and subject to the right of Reorganized FairPoint to modify or terminate such retiree benefits in accordance with the terms thereof.

### 8. Amended Collective Bargaining Agreements

On the Effective Date, the collective bargaining agreements by and between Northern New England Telephone Operations LLC and Telephone Operating Company of Vermont LLC (the two companies doing business as FairPoint Communications) and International Brotherhood of Electrical Workers, AFL-CIO Locals 2320, 2326, and 2327 and Communications Workers of America, AFL-CIO will be deemed automatically assumed, as amended by the Labor MOU.

## J. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 1. Conditions Precedent to Effectiveness

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 12.2 of the Plan:

(i)      the terms of the Plan, the Disclosure Statement and the Plan Supplement will be reasonably satisfactory to the Lender Steering Committee;

(ii)      the Bankruptcy Court will have entered the Confirmation Order which will have become a Final Order;

(iii)      the treatment of inter-company claims and the assumption of post-reorganization operating contracts will be reasonably satisfactory to the Lender Steering Committee;

(iv)      the conditions precedent to the effectiveness of the New Revolver will have been satisfied or waived by the parties thereto and Reorganized FairPoint will have access to funding under the New Revolver;

(v)      the conditions precedent to the effectiveness of the New Term Loan will have been satisfied or waived by the parties thereto;

(vi)      all actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable and will be reasonably acceptable to the Lender Steering Committee;

(vii)      all authorizations, consents and regulatory approvals, rulings, letters, no-action letters, opinions or documents, if any, that are necessary to implement the Plan or that are required by FairPoint or applicable law, regulation or order, in connection with the consummation of the Plan will have been obtained and not revoked (including any approvals required by the Regulatory Settlements);

(viii)      the Labor MOU will have been ratified by the applicable union membership; and

(ix)      applicable regulatory approvals from the Federal Communications Commission and from state regulatory authorities in certain states in which it operates, including the approval of the change of control applications and the related ~~regulatory settlements~~ <u>Regulatory Settlements</u>, will have been obtained or FairPoint will have obtained a ruling from the Bankruptcy Court to the effect that the state regulations requiring such regulatory approvals are pre-empted by the Bankruptcy Code.

## 2.      Waiver of Conditions

Each of the conditions precedent in Section 12.1 of the Plan may be waived, in whole or in part, by FairPoint, except with respect to the conditions precedent set forth in Sections 12.1 (a), (b), (c), (e), (f), (g), (h) and (i) of the Plan which will require the consent of the Lender Steering Committee (such consent not to be unreasonably withheld, conditioned or delayed). Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court.

### 3. Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 12.1 of the Plan will have not occurred or otherwise been waived pursuant to Section 12.2 of the Plan, (a) the Confirmation Order will be vacated, (b) FairPoint and all holders of Claims and interests, including any Equity Interests, will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) FairPoint's obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained herein will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against FairPoint or any other Person or to prejudice in any manner the rights of FairPoint or any Person in any further proceedings involving FairPoint.

## K. EFFECT OF CONFIRMATION

### 1. Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, FairPoint and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

### 2. Discharge of Claims and Termination of Old FairPoint Equity Interests

Except as provided in the Plan, the rights afforded in and the payments and Distributions to be made under the Plan will terminate all Old FairPoint Equity Interests and will discharge all existing Liabilities and Claims of any kind, nature or description whatsoever against or in FairPoint or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, on the Effective Date, all existing Claims against FairPoint and Old FairPoint Equity Interests will be, and will be deemed to be, released, terminated, extinguished and discharged, and all holders of such Claims and Old FairPoint Equity Interests will be precluded and enjoined from asserting against Reorganized FairPoint, their successors and assigns and any of their respective assets or properties, any other or further Claim or Old FairPoint Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

### 3. Discharge of Debtors

On the Effective Date, in consideration of the Distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Old FairPoint Equity Interest and any Affiliate of such holder will be deemed to have forever waived, released and discharged FairPoint, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims,

Old FairPoint Equity Interests, rights and Liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Old FairPoint Equity Interest in, FairPoint.

4.      **Reservation of Causes of Action/Reservation of Rights**

Except with respect to the Released Parties, nothing contained in the Plan will be deemed to be a waiver or the relinquishment of any Causes of Action that FairPoint or Reorganized FairPoint, as applicable, may have or may choose to assert against any Person.

**L.      EXCULPATION; RELEASE; INJUNCTION AND RELATED PROVISIONS**

1.      **Exculpation**

For purposes of the Plan, Released Parties will include (a) the current or former directors, officers, employees, Affiliates, agents, accountants, financial advisors, investment bankers, restructuring advisors, attorneys and representatives, and other professionals of or to FairPoint and the Debtors-in-Possession who served or were employed in such capacities after the Petition Date, and each of their respective agents and representatives (b) the Prepetition Credit Agreement Agent, (c) Prepetition Credit Agreement Lenders, (d) the Consenting Lenders, (e) the Lender Steering Committee, (f) the DIP Agent, (g) the DIP Lenders, (h) Bank of America, in its capacity as Disbursing Agent, (i) the members of the Ad Hoc Committee of Senior Noteholders, and (j) for each of (b) through (i), their respective officers, directors, employees, Affiliates, agents, partners, members, representatives, employees, financial advisors, investment bankers, restructuring advisors, attorneys and other professionals; *provided, however*, if no Distributions are made on account of Class 7 FairPoint Communications Unsecured Claims in accordance with Section 5.7.2(b) of the Plan, then clause ~~1.108~~1.109(~~b~~i) of the Plan ~~shall~~will be deemed to be deleted from this definition and the members of the Ad Hoc Committee of Senior Noteholders (and their respective officers, directors, employees, Affiliates, agents, partners, members, representatives, employees, financial advisors, investment bankers, restructuring advisors, attorneys and other professionals) will not be included within this definition of Released Parties.

None of FairPoint, the Debtors-in-Possession, the Reorganized Debtors, and the other Released Parties will have or incur any liability for any Claim, Cause of Action or other assertion of Liability for any act taken or omitted to be taken in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, dissemination, implementation, approval, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided*, *however*, that the foregoing will not affect the Liability of any Person resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, discharges and any other applicable law or rules protecting such Persons from liability.

## 2. Releases

Effective as of the date the Plan is confirmed, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, FairPoint, their respective Estates, Reorganized FairPoint and each Person who, directly or indirectly, has held, holds, or may hold Claims or Old FairPoint Equity Interest will release, waive and discharge unconditionally and forever each of the Released Parties from any and all Claims, Causes of Action and Liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence:  (a) taking place before the Petition Date in connection with or relating to FairPoint; and (b) in connection with, related to, or arising out of FairPoint's Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided*, that the foregoing will not operate as a waiver of or release from any Causes of Action resulting from the willful misconduct of any Released Party; *provided further*, that solely with respect to any Person (other than FairPoint, their respective Estates, or Reorganized FairPoint) who does not vote to accept the Plan or who is not deemed to have accepted the Plan, the release by such Person of any of the Released Parties will be solely to the extent that such Released Party would have a pre-Effective Date indemnification claim against FairPoint; *provided further*, that (i) the foregoing releases will not apply to obligations arising under the Plan, and (ii) the foregoing releases will not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan.

## 3. Avoidance Actions/Objections

Other than any releases granted herein, by the Confirmation Order or by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, Reorganized FairPoint will have the right to prosecute any and all avoidance or equitable subordination actions, recovery Causes of Action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to FairPoint or a Debtor-in-Possession.

## 4. Injunction or Stay

From and after the Effective Date, all Persons will be permanently enjoined from commencing or continuing in any manner against FairPoint or Reorganized FairPoint, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, Liability, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the order confirming the Plan.

Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all Persons will be precluded from asserting against FairPoint, the Debtors-in-Possession, FairPoint's Estates, Reorganized FairPoint, the Released Parties, and their respective assets and properties, any other Claims or Equity Interests in connection with, relating to or arising out of any documents, instruments, or any act or omission, transaction or other activity of any kind or nature relating to FairPoint that occurred before the Effective Date.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein will be in exchange for and in complete satisfaction of all Claims and Equity Interests of any nature whatsoever, including, without limitation, any interest accrued on Claims from and after the Petition Date, against FairPoint or any of their respective assets, properties or Estates. On the Effective Date, all such Claims against, and Equity Interests in FairPoint will be fully released and discharged.

## M.    RETENTION OF JURISDICTION

The Bankruptcy Court will have exclusive jurisdiction of all matters in connection with, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, to:

(i)    hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of ~~cure~~Cure amounts and Claims resulting therefrom;

(ii)    determine any and all adversary proceedings, applications and contested matters;

(iii)    hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(iv)    hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(v)    enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(vi)    issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(vii)    consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(viii)    hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court; *provided, however*, that any dispute arising under or in connection with the New Term Loan and the New Revolver will be determined in accordance with the governing law designated by the applicable documents;

(ix)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by FairPoint), prior to the Effective Date or request by Reorganized

FairPoint after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

        (x)    hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

        (xi)    issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

        (xii)    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

        (xiii)    hear and determine any rights, Claims or Causes of Action held by or accruing to FairPoint pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

        (xiv)    recover all assets of FairPoint and property of FairPoint's Estates, wherever located;

        (xv)    enter a final decree closing the Chapter 11 Cases; and

        (xvi)    hear any other matter not inconsistent with the Bankruptcy Code.

## N.    MISCELLANEOUS PROVISIONS

Section XVI of the Plan provides for certain additional provisions including, but not limited to, effectuating documents and further transactions, withholding and reporting requirements, corporate action, modification of the Plan, revocation or withdrawal of the Plan, the Plan Supplement, payment of statutory fees, exemption from transfer taxes and expedited tax determination.

## VII.
## CERTAIN FACTORS TO BE CONSIDERED

HOLDERS OF ALLOWED CLAIMS IN THE VOTING CLASSES SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR REFERRED TO HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.    GENERAL CONSIDERATIONS

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the various Claims against FairPoint. Reorganization of FairPoint under the proposed Plan also avoids the potentially adverse impact

of a liquidation on employees of FairPoint and on many of its customers, suppliers and trade vendors.

## B.     CERTAIN BANKRUPTCY CONSIDERATIONS

### 1.     Parties-in-Interest May Object to FairPoint's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim in a particular class only if such Claim is substantially similar to the other Claims in such class. FairPoint believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because FairPoint created nine Classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

### 2.     Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, FairPoint intends to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, FairPoint may seek to accomplish an alternative chapter 11 plan of reorganization.  There can be no assurance that the terms of any such alternative chapter 11 plan of reorganization would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 3.     Risk of Non-Confirmation of Plan; Feasibility

Even if all Impaired Classes of Claims accept or are deemed to have accepted the Plan, or, with respect to a Class that rejects or is deemed to reject the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under section 1129(a) and (b) of the Bankruptcy Code.  *See Section X.C. ("Confirmation of the Plan—Requirements for Confirmation of the Plan")*.  Section 1129(a) of the Bankruptcy Code requires, among other things, a demonstration that the confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of FairPoint and that the value of distributions to creditors who vote to reject the Plan not be less than the value of distributions such creditors would receive if FairPoint were liquidated under chapter 7 of the Bankruptcy Code.  *See Section X.C.1 ("Confirmation of the Plan—Requirements for Confirmation of the Plan— Requirements of Section 1129(a) of Bankruptcy Code")*.  Although FairPoint believes that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 4.     Non-Consensual Confirmation

If any Impaired Class of Claims rejects the Plan by the requisite statutory voting thresholds provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, FairPoint may (i) seek confirmation of the Plan from the Bankruptcy Court by employing the "cramdown" procedures set forth in section 1129(b) of the Bankruptcy Code and/or (ii) modify the Plan in accordance with Section 16.4 thereof.  In order to confirm the Plan under section 1129(b), the Bankruptcy Court must determine that, in addition to satisfying all other

requirements for confirmation, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Plan. See ***Section X.C.5 ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(b) of Bankruptcy Code")***.

If the Bankruptcy Court determines that the Plan violates section 1129 of the Bankruptcy Code in any manner, including, but not limited to, the cramdown requirements under section 1129(b) of the Bankruptcy Code, FairPoint reserves the right to amend the Plan in such manner so as to satisfy the requirements of section 1129 of the Bankruptcy Code. Such amendments may include, but are not limited to, the alteration or elimination of Distributions to various Classes.

### 5.     FairPoint May Object to the Amount of a Claim

Except as otherwise provided in the Plan, FairPoint reserves the right to object to the amount of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.     Risk of Not Receiving Regulatory Approvals

Reorganized FairPoint may require regulatory approvals from the FCC and from the state regulatory authorities in certain of the states in which it operates relating to the Plan. FairPoint has initiated discussions with the various regulatory authorities to obtain such regulatory approvals concurrently with its efforts to obtain approval of the Plan, which regulatory approvals could result in a postponement of the Effective Date. FairPoint will use reasonable efforts to obtain necessary regulatory approvals as quickly as possible. However, FairPoint has no control over the timeliness of its receipt of such regulatory approvals and can offer no assurance as to such timing, or as to whether it will, in fact, receive regulatory approvals. To the extent FairPoint does not obtain approval from the state regulatory authorities with respect to the transactions contemplated in the Plan, it reserves the right to seek a ruling from the Bankruptcy Court to the effect that the state regulations requiring such regulatory approvals are pre-empted by the Bankruptcy Code. ***See Section V.F.1 ("Overview of Chapter 11 Cases—Other Material Information—PUC Negotiations")***.

### 7.     Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### 8. Risk of Liquidation

If the Plan is not confirmed and consummated, there can be no assurance that FairPoint's Chapter 11 Cases will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to holders of Claims as the terms of the Plan. If a liquidation or protracted reorganization were to occur, the distributions to holders of Allowed Claims under the Plan would be drastically reduced. FairPoint believes that, in a liquidation under chapter 7, before holders of Allowed Claims received any distributions, additional administrative expenses of a chapter 7 trustee and such trustee's attorneys, accountants and other professionals would cause a substantial diminution in the value of its Estate. In addition, certain additional Claims would arise by reason of the liquidation under chapter 7 and from the rejection of unexpired leases and other executory contracts in connection with the possible cessation of certain of FairPoint's operations.

FairPoint has prepared, with its advisors' assistance, the liquidation analysis as set forth on **Exhibit C** hereto (the "Liquidation Analysis"), which is premised on a hypothetical liquidation in a chapter 7 case. In the analysis, FairPoint has taken into account the nature, status and underlying value of its assets, the ultimate realizable value of its assets, and the extent to which such assets are subject to liens and security interests. Based on this analysis, it is likely that a liquidation of the operations of FairPoint would produce less value for distribution to creditors than that recoverable in each instance under the Plan.

## C. FACTORS THAT MAY AFFECT THE VALUE OF DISTRIBUTIONS UNDER THE PLAN

### 1. Risks Associated with FairPoint's Business Operations

An additional discussion of the risks associated with FairPoint's business operations is set forth in FairPoint Communications' Annual Report on Form 10-K for the fiscal year ended December 31, 2008, filed with the Securities and Exchange Commission on March 5, 2009, as supplemented by FairPoint Communications' Quarterly Reports on Form 10-Q for the quarterly periods ended (i) March 31, 2009, filed with the Securities and Exchange Commission on May 5, 2009, as amended on May 8, 2009, (ii) June 30, 2009, filed with the Securities and Exchange Commission on August 5, 2009 and (iii) September 30, 2009, filed with the Securities and Exchange Commission on November 20, 2009. **See Section VII ("Certain Factors to be Considered")**. Such risks include, without limitation:

- the potential adverse impact of the Chapter 11 Cases on FairPoint's business, including its ability to maintain contracts, trade credit and other customer and vendor relationships;

- the restrictions imposed by agreements governing FairPoint's indebtedness;

- FairPoint's dependence on the delivery of voice and data services over access lines for its revenues;

- FairPoint's continued loss of voice access lines;

- the competitiveness of the communications industry;

- the geographic concentration of FairPoint's business in Maine, New Hampshire and Vermont;

- FairPoint's dependence on third party providers for critical services;

- systems functionality issues that FairPoint has faced since the Cutover;

- the effects of regulation on FairPoint's business by the FCC and state regulatory authorities, including the effects of regulation imposed by federal and state regulators as a result of the Merger;

- the effect of rapid and significant changes in technology on FairPoint's business; and

- FairPoint's dependence on key members of its senior management team.

### 2.    Lack of Trading Market for Reorganized FairPoint Communications

There is no existing trading market for the New Common Stock, nor is it known whether or when one would develop.  Further, there can be no assurance as to the degree of price volatility in any such market.  While the Plan is premised upon an agreed upon assumed reorganization value of FairPoint of $15 per share of the New Common Stock (including any issuance of securities pursuant to the Long Term Incentive Plan and/or New Warrants), such valuation is not an estimate of the price at which the New Common Stock may trade in the market.  FairPoint has never attempted to make any such estimate in connection with the development of the Plan.  No assurance can be given as to the market prices that will prevail following the Effective Date.

### 3.    Dividend Policies for Reorganized FairPoint Communications

Reorganized FairPoint Communications does not anticipate paying any dividends on the New Common Stock in the foreseeable future.  In addition, covenants in the New Revolver and the New Term Loan will restrict the ability of Reorganized FairPoint Communications to pay dividends.  Certain institutional investors may only invest in dividend-paying equity securities or may operate under other restrictions which may prohibit or limit their ability to invest in the New Common Stock.

### D.    INHERENT UNCERTAINTY OF THE REORGANIZED COMPANY'S FINANCIAL PROJECTIONS

The Projections forecast Reorganized FairPoint's operations through the period ending December 31, 2013.  The Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized FairPoint, industry performance, general business and economic conditions, competition, adequate financing and other matters, many of which will be beyond the control of FairPoint, and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the

date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of Reorganized FairPoint's operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of Reorganized FairPoint to pay the obligations owing to certain holders of Claims entitled to Distributions under the Plan. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guarantee, representation or other assurance of the actual results that will occur.

## E.     DISCLOSURE STATEMENT DISCLAIMER

### 1.     Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2.     Disclosure Statement Was Not Approved by the Securities and Exchange Commission or any State Regulatory Authority

Although a copy of this Disclosure Statement was served on the Securities and Exchange Commission, and the Securities and Exchange Commission was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement was not filed with the Securities and Exchange Commission. Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.     Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis attached hereto as *Exhibit C*, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 4.     No Legal or Tax Advice is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim. This Disclosure Statement may not be relied upon for

any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**5.      No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, FairPoint) nor (b) be deemed evidence of the tax or other legal effects of the Plan on FairPoint, holders of Allowed Claims or any other parties in interest.

**6.      Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  FairPoint may seek to investigate Claims and file and prosecute objections to Claims.

**7.      No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of FairPoint to object to that holder's Allowed Claim, or to bring causes of action to recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any Claims or causes of action of FairPoint or its estates are specifically or generally identified herein.

**8.      Information Was Provided by FairPoint and Was Relied upon by FairPoint's Advisors**

Counsel to and other advisors retained by FairPoint have relied upon information provided by FairPoint in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by FairPoint have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**9.      Potential Exists for Inaccuracies, and FairPoint Has No Duty to Update**

FairPoint makes the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While FairPoint has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, FairPoint nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although FairPoint may subsequently update the information in this Disclosure Statement, FairPoint has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 10. No Representations Outside the Disclosure Statement are Authorized

No representations concerning or relating to FairPoint, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement. You should promptly report unauthorized representations or inducements to the counsel to FairPoint, the counsel to the Creditors' Committee and/or the United States Trustee for the Southern District of New York.

## F. CERTAIN TAX CONSIDERATIONS

A summary of certain U.S. federal income tax considerations relevant to the Plan is provided below in *Section XII ("Certain Federal Income Tax Considerations")*.

## VIII.
## RESALE OF SECURITIES RECEIVED UNDER THE PLAN

Under section 1145(a) of the Bankruptcy Code, the issuance of securities to be distributed under the Plan and the subsequent resale of such securities by entities which are not "underwriters" (as defined in section 1145(b) of the Bankruptcy Code) are not subject to the registration requirements of section 5 of the Securities Act. Thus, the securities issued under the Plan may be freely transferred by most recipients following Distribution under the Plan, and all resales and subsequent transactions in such securities are exempt from registration under federal and state securities laws, unless the holder is an "underwriter" with respect to such securities.

Section 1145(b) of the Bankruptcy Code provides, in pertinent part:

(1) Except as provided in paragraph (2) of this subsection and except with respect to ordinary trading transactions of an entity that is not an issuer, an entity is an underwriter under section 2(11) of the Securities Act, if such entity—

(A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;

(B) offers to sell securities offered or sold under the plan for the holders of such securities;

(C) offers to buy securities offered or sold under the plan from the holders of such securities, if such offer to buy is—

(i) with a view to distribution of such securities; and

(ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or

(D)      is an issuer, as used in such section 2(11), with respect to such securities.

(2)      An entity is not an underwriter under Section 2(11) of the Securities Act or under paragraph (1) of this subsection with respect to an agreement that provides only for—

(A)    (i)    the matching or combining of fractional interests in securities offered or sold under the plan into whole interests, or;

(ii)    (the purchase or sale of such fractional interests from or to entities receiving such fractional interests under the plan; or

(B)    the purchase or sale for such entities of such fractional or whole interests as are necessary to adjust for any remaining fractional interests after such matching.

(3)      An entity other than an entity of the kind specified in paragraph (1) of this subsection is not an underwriter under section 2(11) of the Securities Act with respect to any securities offered or sold to such entity in the manner specified in subsection (a)(1) of this section.

To the extent that persons deemed to be "underwriters" receive securities pursuant to the Plan, resales by such entities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. However, entities deemed to be "underwriters" may be able to sell such securities without registration subject to the provisions of Rule 144 promulgated under the Securities Act, which permits the public sale of securities received pursuant to the Plan by persons who would be deemed to be "underwriters" pursuant to section 1145 of the Bankruptcy Code, subject to the availability to the public of current information regarding the issuer and to volume limitations and certain other conditions.

On the Effective Date, Reorganized FairPoint Communications will enter into the Registration Rights Agreement with each holder of greater than 10%, on a fully diluted basis, of the New Common Stock. Each Holder of Registrable Securities will be entitled to request an aggregate of two demand registrations; *provided*, that no such rights will be demanded prior to the expiration of the date which is one hundred eighty (180) days following the Effective Date. Moreover, if any Holder of Registration Securities becomes the holder of less than 7.5% of the New Common Stock, such holder's rights under the Registration Rights Agreement will terminate. A form of the Registration Rights Agreement, including a form of shelf registration agreement if necessary, will be included in the Plan Supplement.

Whether or not any particular entity would be deemed to be an "underwriter" with respect to any security issued under the Plan would depend upon various facts and circumstances applicable to that entity. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, FAIRPOINT MAKES NO REPRESENTATIONS CONCERNING THE ABILITY OF ANY ENTITY TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. FAIRPOINT RECOMMENDS THAT RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT WITH THEIR OWN LEGAL COUNSEL CONCERNING THE LIMITATIONS ON THEIR ABILITY TO DISPOSE OF SUCH SECURITIES.

# IX.
# VOTING REQUIREMENTS

On [_____], 2010, the Bankruptcy Court entered the Disclosure Statement Approval Order that, among other things, approved this Disclosure Statement, set voting procedures and scheduled the Confirmation Hearing. A copy of the Disclosure Statement Approval Order and the Notice of the Confirmation Hearing are enclosed with this Disclosure Statement as part of the Solicitation Package. The Disclosure Statement Approval Order sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines. The Disclosure Statement Approval Order, the Notice of the Confirmation Hearing and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact:

BMC Group, Inc.
444 North Nash Street
El Segundo, CA 90245
Telephone: 1-888-909-0100
Email: fairpoint@bmcgroup.com

If you wish to obtain an additional copy of the Plan, this Disclosure Statement or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact BMC Group, Inc. by regular mail at 444 North Nash Street, El Segundo, CA 90245, by telephone at 1-888-909-0100 or by electronic mail at fairpoint@bmcgroup.com.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of FairPoint concerning the Plan have been adequate and have included information concerning all Distributions made or promised by FairPoint in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law.

In particular, in order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the Plan: (i) has been accepted by the requisite votes of all Impaired Classes unless approval will be sought under section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes, which may be the case under the Plan; (ii) is "feasible," which means that there is a reasonable probability that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all holders of Claims or Equity Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. FairPoint believes that the Plan satisfies all of these conditions.

## A.     VOTING DEADLINE

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims who are entitled to vote on the Plan. There is a separate Ballot designated for

each impaired voting Class in order to facilitate vote tabulation; however, all Ballots are substantially similar in form and substance (except that, as noted below, the Ballots sent to holders of Unsecured Claims will permit them to elect certain treatment of their Claims), and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT APPROVAL ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN [__:__] [_].M. (NEW YORK TIME) ON [_____], 2010, THE VOTING DEADLINE. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.

## B.     HOLDERS OF CLAIMS ENTITLED TO VOTE

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim or interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In general, a holder of a Claim or Equity Interest may vote to accept or reject a plan if (1) the claim or interest is "allowed," which means generally that it is not disputed, contingent or unliquidated and (2) the claim or interest is impaired by a plan.  If the holder of an Impaired Claim or Equity Interest will not receive any distribution under the Plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the Plan and provides that the holder of such Claim or Equity Interest is not entitled to vote.  If the Claim or Equity Interest is not Impaired, the Bankruptcy Code conclusively presumes that the holder of such Claim or Equity Interest has accepted the Plan and provides that the holder is not entitled to vote.

The holder of a Claim against FairPoint that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2) (a) the Claim has been scheduled by FairPoint (and such Claim is not scheduled as disputed, contingent or unliquidated) or (b) the holder had timely filed a proof of Claim pursuant to sections 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3018. Any Claim against FairPoint objected to by FairPoint on or prior to [_____], 2010, will not be counted for any purpose in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met, unless, and to the extent that, a claimant, whose Claim has been objected to, files, on or before [_____], 2010, a motion for temporary allowance for voting purposes under Bankruptcy Rule 3018, and the Bankruptcy Court grants such motion for temporary allowance.

Pursuant to the Bar Date Order, holders of Equity Interests (which interests are based exclusively on the ownership of common or preferred stock in FairPoint, or warrants, options, or

rights to purchase, sell, or subscribe to a security interest in FairPoint) were excused from filing proofs of interest on or before the Bar Date; provided, however, that holders of Equity Interests who wished to assert a Claim against FairPoint that arises out of or relates to the ownership or purchase of an Equity Interest, including Claims arising out of or relating to the sale, issuance or distribution of the Equity Interest, were required to file a proof of Claim on or before the Bar Date, unless another exception set forth in the Bar Date Order applied.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Approval Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

Each of Classes 4, [6]4 and 7 is Impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan. In accordance with section 1126(g) of the Bankruptcy Code, each of Classes 9 and 11 is conclusively deemed to have rejected the Plan and are not entitled to vote. Each of Classes 1, 2, 3, 5, 6, 8 and 10 is Unimpaired under the Plan and holders of Claims in each such Class are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

## C.     VOTE REQUIRED FOR ACCEPTANCE OF CLASS

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Equity Interests vote to accept the Plan, except under certain circumstances. *See Section IX.B ("Voting Requirements—Holders of Claims Entitled to Vote")*. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but, for that purpose, counts only those who actually vote to accept or reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in dollar amount and a majority in number actually voting cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of interests in that class, but for that purpose, counts only those who actually vote to accept or reject the plan. Thus a class of Impaired Equity interests will have voted to accept the plan if two-thirds of the interests actually voted are voted in favor of acceptance. Holders of Equity Interests who fail to vote are not counted as either accepting or rejecting the Plan.

## D.     VOTING PROCEDURES

### 1.     Ballots

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN SHALL BE AN INVALID BALLOT AND SHALL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

ANY BALLOT RECEIVED THAT IS NOT SIGNED OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT SHALL BE AN INVALID BALLOT AND SHALL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

Ballots must be delivered to the Voting Agent, at:

> If by regular mail:
> BMC Group, Inc.
> Attn:  FairPoint Communications, Inc. Ballot Processing
> PO Box 3020
> Chanhassen, MN 55317-3020

> If by messenger or overnight delivery:
> BMC Group, Inc.
> Attn:  FairPoint Communications, Inc. Ballot Processing
> 18750 Lake Drive East
> Chanhassen, MN 55317

its address set forth above, and received by the Voting Deadline.  **THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER**.  If such delivery is by mail, it is recommended that holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to assure timely delivery.

In accordance with Rule 3018(c) of the Bankruptcy Rules, the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these cases. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a Disputed Claim, this amount may not be the amount ultimately Allowed for purposes of Distribution), and the Class to which the Claim has been attributed.

**2.      Withdrawal or Change of Votes on Plan**

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent, so that the Voting Agent receives such notice prior to the Voting Deadline.  Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court.

In order to be valid, a notice of withdrawal must (i) specify the name of the holder who submitted the votes on the Plan to be withdrawn, (ii) contain the description of the Claims to which it relates and (iii) be signed by the holder in the same manner as on the Ballot. FairPoint expressly reserves the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any holder who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change such vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received.

### 3. Voting Multiple Claims

Separate forms of Ballots are provided for voting the various Classes of Claims. Ballot forms may be copied if necessary. Any person who holds Claims in more than one Class is required to vote separately with respect to each Claim. Any person holding multiple Claims within a Class should use a single Ballot to vote such Claims. Please sign and return in accordance with the instructions in this Section D, your Ballot(s). Only Ballots with original signatures will be accepted (Ballots with copied signatures will not be accepted).

## X.
## CONFIRMATION OF THE PLAN

### A. CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing has been scheduled to commence on [_____], 2010 at [__:__] [_].m. (New York time) before the Honorable Burton R. Lifland, United States Bankruptcy Judge, in Room 623 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B. DEADLINE TO OBJECT TO CONFIRMATION

Any objection to the confirmation of the Plan must be made in writing, specify in detail (i) the name and address of the objector, (ii) all grounds for the objection and (iii) the amount of the Claim or number and class of shares of stock of FairPoint held by the objector. Any such objection must be filed with the Bankruptcy Court, with a copy to Judge Lifland's chambers, and served so that it is received by the Bankruptcy Court, chambers, and the following parties on or before [_____], 2010 at [__:__] [_].m. (New York time): Paul, Hastings, Janofsky & Walker LLP, attorneys for FairPoint, 75 East 55th Street, New York, NY 10022, Attn: Luc A. Despins,

Esq. and James T. Grogan, Esq.; (b) FairPoint, c/o FairPoint Communications, Inc., 521 East Morehead Street, Suite 500, Charlotte, NC 28202, Attn: Susan L. Sowell, Esq., Vice President and Assistant General Counsel; (c) Andrews Kurth LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Jonathan Levine and Paul N. Silverstein, attorneys to the official committee of unsecured creditors; (d) the United States Attorney for the Southern District of New York, 86 Chambers Street, New York, NY 10007, Attn: Preet Bharara, Esq.; (e) the Internal Revenue Service, 290 Broadway, New York, NY 10007, Attn: District and Regional Directors; (f) the Securities and Exchange Commission, 233 Broadway, New York, NY 10279 (g) the Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554; (h) Cohen, Weiss and Simon LLP, 330 West 42nd Street, 25th Floor, New York, NY. 10036-6976, Attn: David R. Hock; and (i) Kaye Scholer LLP, 425 Park Avenue, New York NY 10022, Attn: Margot B. Schonholtz, Esq. and Nicholas Cremona, Esq., attorneys to Bank of America, N.A. as administrative agent for FairPoint's prepetition secured lenders.

## C. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

Among the requirements for confirmation of the Plan are that the Plan (i) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) is feasible and (iii) is in the "best interests" of creditors and stockholders that are impaired under the Plan.

### 1. Requirements of Section 1129(a) of Bankruptcy Code

(a) **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1) The Plan complies with the applicable provisions of the Bankruptcy Code.

(2) FairPoint has complied with the applicable provisions of the Bankruptcy Code.

(3) The Plan has been proposed in good faith and not by any means proscribed by law.

(4) Any payment made or promised by FairPoint or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5) FairPoint has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of FairPoint, an affiliate of FairPoint participating in a Plan with FairPoint or a successor to FairPoint under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and FairPoint has disclosed the

identity of any insider that will be employed or retained by FairPoint and the nature of any compensation for such insider.

(6)     Any governmental regulatory commission with jurisdictions, after confirmation of the Plan, over the rates of the debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(7)     With respect to each Class of Claims or Equity Interests, each holder of an Impaired Claim or Impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if FairPoint was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See Section X.C.1.b ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(a) of Bankruptcy Code—Best Interests Test")*.

(8)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

(9)     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

(10)     At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

(11)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of FairPoint or any successor to FairPoint under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See Section X.C.3 ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Feasibility")*.

(12)     The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period FairPoint has obligated it to provide such benefits, if any.

(b)     **Best Interests Test**

As described above, the Bankruptcy Code requires that each holder of an Impaired Claim or Equity Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if FairPoint were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of FairPoint's assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash available would be the sum of the proceeds from the disposition of FairPoint's assets and the Cash held by FairPoint at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation and such additional Administrative Expense Claims and Other Priority Claims that may result from the termination of FairPoint's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

FairPoint's costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by FairPoint during the Chapter 11 Cases and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred, and executory contracts or leases entered into, by FairPoint both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest. FairPoint believes that in a chapter 7 case, holders of Claims and Equity Interests in Classes [——]9 and 11 would receive no distributions of property. Accordingly, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, FairPoint has determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of FairPoint under chapter 7 of the Bankruptcy Code.

Moreover, FairPoint believes that the value of any distributions from the liquidation proceeds to each Class of Allowed Claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of

the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the Claims and prepare for distributions.  In the event litigation were necessary to resolve Claims asserted in the chapter 7 case, the delay could be further prolonged and Administrative Expense Claims further increased.

The Liquidation Analysis (as defined herein) attached as ***Exhibit C*** to this Disclosure Statement is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of FairPoint.  The analysis is based upon a number of significant assumptions which are described.  The Liquidation Analysis does not purport to be a valuation of FairPoint's assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

(c)     **Liquidation Analysis**

The Liquidation Analysis and assumptions are set forth in ***Exhibit C*** to this Disclosure Statement.

2.     **Acceptance by Impaired Classes**

Each of Classes ~~4, [6]~~4 and 7 is impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, each of Classes 9 and 11 is conclusively deemed to have rejected the Plan; and FairPoint intends to seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to these Classes.  ***See Section X.C.5 ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(b) of Bankruptcy Code")***.  In addition, FairPoint reserves the right to seek nonconsensual confirmation of the Plan (without further notice) with respect to any Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan.

3.     **Feasibility**

FairPoint believes that it will be able to perform its obligations under the Plan.  In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of FairPoint, unless such liquidation is proposed in the Plan.

To support its belief in the Plan's feasibility, FairPoint, with the assistance of Rothschild, have prepared the Projections for Reorganized FairPoint for fiscal years 2010 through 2013, as set forth in ***Exhibit B*** attached to this Disclosure Statement.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY ROTHSCHILD.  WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN

ACHIEVED TO DATE AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY FAIRPOINT, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

### 4.    Requirements of Section 1129(b) of Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

- No Unfair Discrimination.  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

- Fair and Equitable Test.  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- Secured Claims.  Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Claims.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- Equity Interests.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

FairPoint believes the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement, notwithstanding that each of Classes 9 and 11 are deemed to reject the Plan, because as to such Classes, there is no class of equal priority receiving

more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

# XI.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of FairPoint for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and Liquidation Analysis are set forth in **Exhibit C**.  FairPoint believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of the (i) increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation, and from the rejection of unexpired leases and executory contracts in connection with the cessation of the operations of FairPoint, (iii) the erosion of the value of FairPoint's assets in the context of an expedited liquidation required under chapter 7 and the "fire sale" atmosphere that would prevail, (iv) the adverse effects on the salability of portions of the business that could result from the possible departure of key employees and the loss of customers and vendors, (v) the cost and expense attributable to the time value of money resulting from what is likely to be a more protracted proceeding and (vi) the application of the rule of absolute priority to distributions in a chapter 7 liquidation.

FairPoint believes that in a chapter 7 case, holders of Claims and Equity Interests in Classes 9 and 11 would receive no distributions of property.  Accordingly, the Plan satisfies the rule of absolute priority.

### B.    ALTERNATIVE PLAN OF REORGANIZATION OR LIQUIDATION

If the Plan is not confirmed, FairPoint (or if FairPoint's exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan of reorganization might involve either a reorganization and continuation of FairPoint's business or an orderly liquidation of its assets under chapter 11.  With respect to an alternative plan, FairPoint has explored various alternatives in connection with the formulation and development of the Plan.  FairPoint believes that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.  In a liquidation under chapter 11, FairPoint's assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7.  Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case.  Although preferable to a chapter 7 liquidation, FairPoint believes that any

alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

# XII.
# CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

## A.    INTRODUCTION

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to FairPoint and to certain U.S. Holders and Non-U.S. Holders (each as defined herein) of Claims, specifically only the Class 4 and Class 7 Claims.  The following summary does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and FairPoint does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

For purposes of this discussion, the term "U.S. Holder" means a holder of a Claim, the New Term Loan, New Common Stock or New Warrants that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" means a holder of a Claim, the New Term Loan, New Common Stock or New Warrants that is, for U.S. federal income tax purposes, (i) a nonresident alien individual, (ii) a non-U.S. corporation or (iii) a non-U.S. estate or non-U.S. trust.  This summary does not address all aspects of U.S. federal income taxes that may be relevant to Non-U.S. Holders in light of their personal circumstances, and does not deal with federal taxes other than the federal income tax or with non-U.S., state, local or other tax considerations.  Special rules, not discussed here, may apply to certain Non-U.S. Holders, including U.S. expatriates, controlled foreign corporations, passive foreign investment companies and corporations that accumulate earnings to avoid U.S. federal income tax.  Such Non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.  In the case of a holder that is classified

as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership that is a holder of a Claim, the New Term Loan, New Common Stock or New Warrants, then you should consult your own tax advisors.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to FairPoint or to certain holders in light of their individual circumstances. This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, Claims, the New Term Loan, New Common Stock or New Warrants, as part of a hedge, straddle, conversion or constructive sale transaction). No aspect of state, local, estate, gift or non-U.S. taxation is addressed. The following discussion assumes that each holder of a Claim or the New Common Stock, New Term Loan and New Warrants, as applicable, holds such instrument as a "capital asset" within the meaning of Section 1221 of the IRC.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE:** TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

B.      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO FAIRPOINT**

1.      **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair

market value of any new consideration (including New Common Stock and New Warrants) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC, though it has not been determined whether FairPoint would make this election. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain Claims will receive a share of the New Common Stock, New Warrants and/or the New Term Loan, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market values of the New Common Stock and the New Warrants on the Effective Date, and the issue price of the New Term Loan. This value cannot be known with certainty until after the Effective Date. Following this reduction, FairPoint expects that, subject to the limitations discussed herein and subject to whether FairPoint decides to reduce first the basis in its depreciable assets, its NOL carryforwards may be eliminated upon emergence from chapter 11, but FairPoint will have other significant tax attributes remaining. Further, FairPoint expects that substantial NOL carryforwards will remain at the level of certain of FairPoint Communications' subsidiaries. However, such NOL carryforwards will be subject to litigation under IRC Section 382, as described below.

### 2. Limitation of NOL Carryforwards and Other Tax Attributes

FairPoint anticipates that Reorganized FairPoint will have significant tax attributes at emergence. The exact amount of such tax attributes that will be available to Reorganized FairPoint at emergence is based on a number of factors and is not possible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by FairPoint in 2009; (b) the fair market value of the New Common Stock, New Warrants, and the issue price of the New Term Loan; and (c) the amount of COD Income incurred by FairPoint in connection with consummation of the Plan. Following consummation of the Plan, FairPoint anticipates that certain built-in gains of FairPoint (*i.e.*, the excess of the fair market value of assets over the tax basis of such assets), if recognized within a five-year period following consummation, may increase the amount subject to the annual limitation under Section 382 of the IRC as a result of an "ownership change" of FairPoint by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs existing at the time of the ownership change ("Pre-Change Losses") that

may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, FairPoint anticipates that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of FairPoint for these purposes, and that FairPoint's use of its Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

(i)    General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4.16% for the month of December 2009). However, as discussed below, FairPoint expects to elect a special rule available under a chapter 11 case to value the stock of FairPoint Communications immediately after the effectiveness of the Plan. The Section 382 Limitation may be increased to the extent that FairPoint recognizes certain built-in gains in its assets during the five-year period following the ownership change, or FairPoint is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may be elected in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change with respect to FairPoint on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit FairPoint's use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(ii)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(1)(5) Exception"). Under the 382(1)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(1)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses would be eliminated in their entirety.

Where the 382(1)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(1)(5) Exception), a second special rule will generally apply (the "382(1)(6) Exception"). When the 382(1)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined immediately before the events giving rise to the change. The 382(1)(6) Exception also differs from the 382(1)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without causing the complete elimination of its Pre-Change Losses.

Due to the limitations imposed by the 382(1)(5) Exception, the uncertainty regarding whether prepetition trading in Claims of FairPoint Communications would allow FairPoint to qualify for it, and the fact that NOL carryforwards would still be subject to reduction to the extent of COD Income, FairPoint does not plan to utilize the 382(l)(5) Exception. However, FairPoint does expect to utilize the 382(l)(6) Exception. Nevertheless, Reorganized FairPoint's use of its Pre-Change Losses after the Effective Date will be subject to the Section 382 Limitation and, therefore, adversely affected by the "ownership change" (within the meaning of Section 382 of the IRC) that will occur upon the Effective Date pursuant to the Plan.

### 3. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change. FairPoint believes it will not have a net unrealized built-in loss in its assets immediately after the ownership change, and therefore may not be impacted by these AMT rules with respect to built-in losses. However, it is uncertain at this time whether other tax items of FairPoint will subject FairPoint to the AMT rules.

**C.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO U.S. HOLDERS OF ALLOWED CLAIMS**

**1.     Consequences to U.S. Holders of Prepetition Credit Agreement Claims**

The following discussion assumes that the obligation underlying each Allowed Prepetition Credit Agreement Claim is properly treated as debt (rather than equity) of FairPoint. Pursuant to the Plan, each holder of an Allowed Prepetition Credit Agreement Claim will receive such holder's *pro rata* share (taking into account the election described in this Disclosure Statement) of the New Term Loan and the New Common Stock (as further described in this Disclosure Statement above) and possibly some amount in Cash.

Whether a U.S. Holder of an Allowed Prepetition Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for the New Term Loan, the New Common Stock, Cash or all three depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Allowed Prepetition Credit Agreement Claim surrendered and the New Term Loan (with respect to receipt of the New Term Loan) are treated as a "security" for the reorganization provisions of the IRC, (b) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition Credit Agreement Claim, (c) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition Credit Agreement Claim and (d) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

(i)     Treatment of a Debt Instrument as a Security

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. Each U.S. Holder of an Allowed Prepetition Credit Agreement Claim should consult with its own tax advisor to determine whether or not the debt underlying such Prepetition Credit Agreement Claim is a security for U.S. federal income tax purposes.

(ii)     Treatment of a U.S. Holder of a Senior Secured Claim if the Exchange of its Claim is Treated as a Reorganization

If a debt instrument constituting a surrendered Allowed Prepetition Credit Agreement Claim and the New Term Loan are each treated as a "security" for U.S. federal income tax purposes, the exchange of a U.S. Holder's Allowed Prepetition Credit Agreement Claim for the

New Term Loan should be treated as a recapitalization, and therefore a reorganization, under the IRC. If a debt instrument constituting a surrendered Allowed Prepetition Credit Agreement Claim is treated as a security for U.S. federal income tax purposes, the exchange of a U.S. Holder's Allowed Prepetition Credit Agreement Claim for the New Common Stock should be treated as a recapitalization, and therefore a reorganization, under the IRC. A U.S. Holder of a surrendered Allowed Prepetition Credit Agreement Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (*i.e.*, property that is not a "security" for U.S. federal income tax purposes, such as Cash, and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received, and (b) ordinary interest income to the extent that the New Term Loan and/or New Common Stock are treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Prepetition Credit Agreement Claim. *See Section XII.C.1.v ("Certain Federal Income Tax Considerations—Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims—Consequences to U.S. Holders of Prepetition Credit Agreement Claims—Accrued Interest")*. In such case, a U.S. Holder's tax basis in its New Term Loan and New Common Stock should be equal to the tax basis of the obligation constituting the Allowed Prepetition Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" received). In addition, a U.S. Holder's holding period for its New Term Loan and New Common Stock should include the holding period for the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim; provided that the tax basis of any New Term Loan or New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such New Term Loan and New Common Stock should not include the holding period of the debt instrument constituting the surrendered Allowed Prepetition Credit Agreement Claim. However, it is not FairPoint's current intention to treat the exchange of Allowed Prepetition Credit Agreement Claims as a tax-deferred reorganization.

        (iii)     Treatment of a U.S. Holder of an Allowed Senior Secured Claim If the Exchange of its Claim is not Treated as a Reorganization

        If a debt instrument constituting a surrendered Allowed Prepetition Credit Agreement Claim is not treated as a "security" for U.S. federal income tax purposes, a U.S. Holder of such a Claim should be treated as exchanging its Allowed Prepetition Credit Agreement Claim for the New Term Loan and/or for the New Common Stock and any Cash received in a fully taxable exchange. A U.S. Holder of an Allowed Prepetition Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the issue price of the New Term Loan and the fair market value of the New Common Stock, in each case that is not allocable to accrued but untaxed interest and any Cash received, and (ii) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim. Such gain or loss should be capital gain or loss, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the instruments constituting the surrendered Allowed Prepetition Credit Agreement Claim were held for more than one year. To the extent that a portion of the New Term Loan and/or New Common Stock or Cash is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary

interest income.  ***See Section XII.C.1.v ("Certain Federal Income Tax Considerations— Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims—Consequences to U.S. Holders of Prepetition Credit Agreement Claims—Accrued Interest")***.  A U.S. Holder's tax basis in the New Term Loan received on the Effective Date should equal its issue price and a U.S. Holder's tax basis in the New Common Stock should equal its fair market value.  A U.S. Holder's holding period for the New Term Loan and New Common Stock received on the Effective Date should begin on the day following the Effective Date.

(iv)     Issue Price of a Debt Instrument

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending 30 days after the Effective Date.  In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders.  The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

(v)     Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by FairPoint.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain U.S. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However,

the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

(vi)     Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

**2.     Consequences to U.S. Holders of Unsecured Claims**

The following discussion assumes that (i) the obligation underlying each Allowed Unsecured Claim is properly treated as debt (rather than equity) of FairPoint and (ii) the holders of Unsecured Claims vote to approve the Plan.  Pursuant to the Plan, each holder of an Unsecured Claim will receive such holder's *pro rata* share of the New Common Stock and New Warrants (as further described in this Disclosure Statement above).

Whether a U.S. Holder of an Allowed Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock or New Warrants depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Allowed Unsecured Claim surrendered is treated as a "security" for the reorganization provisions of the IRC, ***see Section XII.C.1.i ("Certain Federal Income Tax Considerations—Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims—Consequences to U.S. Holders of Prepetition Credit Agreement Claims—Treatment of a Debt Instrument as a Security")***, (b) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Unsecured

Claim, (c) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Unsecured Claim and (d) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

(i)     Treatment of a U.S. Holder of an Allowed Unsecured Claim if the Exchange of its Claim is Treated as a Reorganization

If a debt instrument constituting a surrendered Allowed Unsecured Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of a U.S. Holder's Allowed Unsecured Claim for the New Common Stock and New Warrants should be treated as a recapitalization, and therefore a reorganization, under the IRC. A U.S. Holder of a surrendered Allowed Unsecured Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the market discount rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (i.e., property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received, and (b) ordinary interest income to the extent that the New Common Stock and New Warrants are treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Unsecured Claim. *See Section XII.C.1.v ("Certain Federal Income Tax Considerations—Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims—Consequences to U.S. Holders of Prepetition Credit Agreement Claims—Accrued Interest")*. In such case, a U.S. Holder's tax basis in its New Common Stock and New Warrants should be equal to the tax basis of the obligation constituting the Allowed Unsecured Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" received), and a U.S. Holder's holding period for its New Common Stock and New Warrants should include the holding period for the obligation constituting the surrendered Allowed Unsecured Claim; provided that the tax basis of any New Common Stock and New Warrants treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such New Common Stock and New Warrants should not include the holding period of the debt instrument constituting the surrendered Allowed Unsecured Claim.

(ii)     Treatment of a U.S. Holder of an Allowed Unsecured Claim if the Exchange of its Claim is Not Treated as a Reorganization

If a debt instrument constituting a surrendered Allowed Unsecured Claim is not treated as a "security" for U.S. federal income tax purposes, a U.S. Holder of such a Claim should be treated as exchanging its Allowed Unsecured Claim for the New Common Stock and New Warrants in a fully taxable exchange. A U.S. Holder of an Allowed Unsecured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock and New Warrants received in the exchange that are not allocable to accrued but untaxed interest, *see Section XII.C.1.iv ("Certain Federal Income Tax Considerations—Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims—Consequences to U.S. Holders of Prepetition Credit Agreement Claims—Issue Price of a Debt Instrument")*, and (ii) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Unsecured Claim. Such gain or loss should be

capital gain, subject to the "market discount" rules discussed above, and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Unsecured Claim were held for more than one year.  To the extent that a portion of the New Common Stock or New Warrants is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income.  ***See Section XII.C.1.v ("Certain Federal Income Tax Considerations— Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims—Consequences to U.S. Holders of Prepetition Credit Agreement Claims—Accrued Interest")***.  A U.S. Holder's tax basis in the New Common Stock and New Warrants should equal their fair market value.  A U.S. Holder's holding period for the New Common Stock and New Warrants received on the Effective Date should begin on the day following the Effective Date.

### 3.    Consequences to U.S. Holders of Holding New Common Stock

(i)    Dividends on New Common Stock

Any distributions made on the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized FairPoint Communications as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  Subject to certain exceptions, dividends received by non corporate U.S. Holders prior to 2011 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met.  Under current law, any such dividends received after 2010 will be taxed at the rate applicable to ordinary income.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

The benefit of the dividends-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the IRC, which may require the corporate recipient to reduce its adjusted tax basis in its shares by the amount excluded from income as a result of the dividends-received deduction.  The excess of the excluded amount over adjusted tax basis may be treated as gain.  A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period

as one dividend, or (2) it exceeds 20% of the holder's adjusted tax basis in the stock, treating all dividends having ex dividend dates within a 365-day period as one dividend.

(ii)     Sale, Redemption or Repurchase of New Common Stock

Unless a non-recognition provision applies, subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of the New Common Stock.

**4.      Consequences to U.S. Holders of Holding the New Term Loan**

(i)     Interest on the New Term Loan Interest paid on the New Term Loan will be taxable to a U.S. Holder as ordinary interest income.

(ii)     Sale or Retirement of the New Term Loan

Upon the sale, exchange or retirement of a New Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale, exchange, or retirement and the U.S. Holder's adjusted tax basis in the New Term Loan. For these purposes, the amount realized does not include any amount attributable to accrued interest. Amounts attributable to accrued interest are treated as interest. ***See Section XII.C.1.v ("Certain Federal Income Tax Considerations—Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims—Consequences to U.S. Holders of Prepetition Credit Agreement Claims—Accrued Interest")***. As it is unlikely that the New Term Loan will be issued with market discount, gain or loss realized on the sale, exchange or retirement of a New Term Loan will generally be long-term capital gain or loss if at the time of sale, exchange or retirement such New Term Loan has been held for more than one year. However, see **i**, with respect to surrendered claims that were acquired with market discount and that are exchanged in a tax-free transaction.

**5.      Consequences to U.S. Holders of Exercising New Warrants**

A recipient of New Warrants generally should not recognize taxable gain or loss upon the exercise of such New Warrants. The tax basis in the New Common Stock received upon exercise of the New Warrants should equal the sum of the U.S. Holder's tax basis in the New Warrants and the amount paid for such New Common Stock. The holding period in any New Common Stock received upon the exercise of the New Warrants should commence the day following its acquisition.

**D.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO NON-U.S. HOLDERS OF ALLOWED CLAIMS**

**1.      Consequences to Non-U.S. Holders of the Exchange**

Any gain or interest income realized by a Non-U.S. Holder on the exchange of its Claim generally will be exempt from U.S. federal income or withholding tax, provided that:

•      such Non-U.S. Holder does not own, actually or constructively, 10 percent or

more of the total combined voting power of all classes of the voting stock of FairPoint Communications, is not a controlled foreign corporation related, directly or indirectly, to FairPoint Communications through stock ownership, and is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC;

- the statement requirement set forth in Section 871(h) or Section 881(c) of the IRC has been fulfilled with respect to the beneficial owner, as discussed below;

- such Non-U.S. Holder is not an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; and

- such gain or interest income is not effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

The statement requirement referred to in the preceding paragraph will generally be fulfilled if the beneficial owner of the property or Cash received on the exchange certifies on IRS Form W-8BEN (or such successor form as the IRS designates) under penalties of perjury that it is not a U.S. person and provides its name and address. The Non-U.S. Holder must provide the form to FairPoint or its paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to FairPoint or its paying agent a statement that it has received the form and furnish a copy thereof; provided, that a non-U.S. financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated.

If a Non-U.S. Holder is engaged in a trade or business in the United States, and if any gain or interest income realized on the exchange of its claim is effectively connected with the conduct of such trade or business, the Non-U.S. Holder, although exempt from the withholding tax discussed in the preceding paragraphs, will generally be subject to regular U.S. federal income tax on such gain or interest income in the same manner as if it were a U.S. Holder. In lieu of the certificate described in the preceding paragraph, such a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates), in the manner described above, in order to claim an exemption from withholding tax. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

## 2. Consequences to Non-U.S. Holders of Holding the New Term Loan, New Common Stock and/or New Warrants

This summary assumes that no item of income or gain in respect of the New Term Loan, New Common Stock and New Warrants at any time will be effectively connected with a U.S. trade or business conducted by the Non-U.S. Holder.

(i)    Dividends on New Common Stock

Dividends paid to a Non-U.S. Holder (to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes) generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

To claim the benefit of a tax treaty a Non-U.S. Holder must provide a properly executed IRS Form W-8BEN (or such successor form as the IRS designates), in the manner described above, prior to the payment of the dividends.  A Non-U.S. Holder that is eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund from the IRS of any excess amounts withheld by filing timely an appropriate claim for refund with the IRS.

(ii)    Interest on the New Term Loan

Generally any interest paid to a Non-U.S. Holder of the New Term Loan will not be subject to U.S. federal income tax if the interest qualifies as "portfolio interest." Interest on the New Term Loan generally will qualify as portfolio interest if:

- such Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power of all classes of the voting stock of Reorganized FairPoint Communications, is not a controlled foreign corporation related, directly or indirectly, to Reorganized FairPoint Communications through stock ownership, and is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC; and

- the statement requirement set forth in Section 871(h) or Section 881(c) of the IRC has been fulfilled with respect to the beneficial owner, as discussed above.

The gross amount of payments to a Non-U.S. Holder of interest that does not qualify for the portfolio interest exemption will be subject to U.S. withholding tax at the rate of 30%, unless a U.S. income tax treaty applies to reduce or eliminate such withholding tax.  To claim the benefit of a tax treaty a Non-U.S. Holder must provide a properly executed IRS Form W-8BEN (or such successor form as the IRS designates), in the manner described above, prior to the payment of interest.  A Non-U.S. Holder who is claiming the benefits of a treaty may be required in certain instances to obtain a U.S. taxpayer identification number and to provide certain documentary evidence issued by non-U.S. governmental authorities to prove residence in the non-U.S. country.

(iii)    Gain on Disposition of New Term Loan, New Common Stock and/or New Warrants

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of New Term Loan (other than in respect of accrued but unpaid interest that has not previously been included in such Non-U.S. Holder's gross income, which will instead be treated as interest in the manner described above), New Common Stock or New Warrants, unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

- in the case of a disposition of New Common Stock or New Warrants, Reorganized FairPoint Communications is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

Reorganized FairPoint Communications does not anticipate becoming a "U.S. real property holding corporation" for U.S. federal income tax purposes, but no assurances can be given in this regard.

## E.     WITHHOLDING AND REPORTING

FairPoint will withhold all amounts required by law to be withheld from payments of interest and dividends.  FairPoint will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.  Any amounts withheld under the withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XIII.
## CONCLUSION

FairPoint believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims. Any alternative to confirmation of the Plan, such as liquidation or attempts to confirm another plan of reorganization, would involve significant delays, uncertainty, and substantial additional administrative costs. Moreover, as described above, FairPoint believes that its creditors will receive greater and earlier recoveries under the Plan than those that could be achieved in a liquidation. FOR THESE REASONS, FAIRPOINT URGES ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO ACCEPT AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED WITHIN THE TIME STATED IN THE NOTICE OF CONFIRMATION HEARING AND DISCLOSURE STATEMENT APPROVAL ORDER SERVED WITH THIS DISCLOSURE STATEMENT.

Dated:  New York, New York
February 8, 11, 2010

Respectfully submitted,

**FAIRPOINT COMMUNICATIONS, INC.**
(on behalf of itself and the other Debtors and
Debtors-in-Possession)

By:  /s/ Shirley J. Linn, Esq.                
Name: Shirley J. Linn, Esq.
Title: Executive Vice President and General
            Counsel

PAUL, HASTINGS, JANOFSKY & WALKER
LLP

By:  /s/ Luc A. Despins, Esq.              
Luc A. Despins, Esq.
James T. Grogan, Esq.
75 East 55th Street New York, New York 10022
Telephone:      (212) 318-6000
Facsimile:      (212) 319-4090
Attorneys for Debtors and Debtors-in-Possession