Luc A. Despins, Esq.
James T. Grogan, Esq.
PAUL HASTINGS JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
**In re:**                                 :      **Chapter 11**
                                          :
**FAIRPOINT COMMUNICATIONS, INC.,** *et al.,*: **Case No. 09-16335 (BRL)**
                                          :
           **Debtors.**                    :      **(Jointly Administered)**
                                          :
-------------------------------------------------------------x


**DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**


Dated:    New York, New York
          March 10, 2010

# TABLE OF CONTENTS

**Page**

SECTION I       DEFINITIONS ................................................................................................ 1

1.1     "Ad Hoc Committee of Senior Noteholders" ....................................... 1

1.2     "Adequate Protection Claims" ............................................................. 1

1.3     "Administrative Expense Claim" .......................................................... 1

1.4     "Affiliate" ............................................................................................ 1

1.5     "Allowed" ............................................................................................ 1

1.6     "Amended Bylaws" .............................................................................. 2

1.7     "Amended Certificate of Incorporation" ............................................. 2

1.8     "Avoidance Actions" ........................................................................... 2

1.9     "Ballot" ................................................................................................ 2

1.10    "Bankruptcy Code" .............................................................................. 2

1.11    "Bankruptcy Court" ............................................................................. 2

1.12    "Bankruptcy Rules" ............................................................................. 2

1.13    "Bar Date" ............................................................................................ 2

1.14    "Benefit Plans" ..................................................................................... 2

1.15    "Business Day" ..................................................................................... 3

1.16    "Cash" .................................................................................................. 3

1.17    "Cash Equivalent" ................................................................................ 3

1.18    "Cash Payment" ................................................................................... 3

1.19    "Causes of Action" .............................................................................. 3

1.20    "Chapter 11 Cases" .............................................................................. 4

1.21    "Claim" ................................................................................................ 4

1.22    "Class" ................................................................................................. 4

1.23    "Collateral" .......................................................................................... 4

1.24    "Confirmation Date" ............................................................................ 4

1.25    "Confirmation Hearing" ....................................................................... 4

1.26    "Confirmation Order" .......................................................................... 4

1.27    "Consenting Lenders" .......................................................................... 4

1.28    "Contingent Claim" ............................................................................. 4

1.29    "Convenience Claim" .......................................................................... 4

1.30   "Creditors' Committee" ................................................................... 5

1.31   "Cure" ............................................................................................. 5

1.32   "Debtors-in-Possession" ................................................................ 5

1.33   "DIP Agent" .................................................................................... 5

1.34   "DIP Facility" ................................................................................. 5

1.35   "DIP Lenders" ................................................................................ 5

1.36   "DIP Order" .................................................................................... 5

1.37   "Disallowed" .................................................................................. 5

1.38   "Disbursing Agent" ........................................................................ 5

1.39   "Disclosure Statement" ................................................................. 5

1.40   "Disclosure Statement Approval Date" ......................................... 6

1.41   "Disclosure Statement Approval Order" ........................................ 6

1.42   "Disputed" ...................................................................................... 6

1.43   "Distribution" ................................................................................. 6

1.44   "Distribution Date" ......................................................................... 6

1.45   "Distribution Record Date" ............................................................ 6

1.46   "DTC" ............................................................................................. 6

1.47   "Effective Date" ............................................................................. 6

1.48   "Equity Interest" ............................................................................ 6

1.49   "Estate" .......................................................................................... 6

1.50   "Executive Agreements" ................................................................ 7

1.51   "FairPoint" ..................................................................................... 7

1.52   "FairPoint Communications" ......................................................... 7

1.53   "FairPoint Communications Unsecured Claims" ........................... 7

1.54   "Final Distribution Date" ................................................................ 7

1.55   "Final Order" .................................................................................. 8

1.56   "Holders of Registrable Securities" .............................................. 8

1.57   "Impaired" ...................................................................................... 8

1.58   "Indemnified Persons" ................................................................... 8

1.59   "Indenture Dated March 31, 2008" ............................................... 8

1.60 "Indenture Dated July 29, 2009" ................................................................. 8

1.61 "Indenture Trustee" ...................................................................................... 8

1.62 "Indentures" ................................................................................................ 8

1.63 "Independent Director" ................................................................................ 8

1.64 "Initial Objection" ....................................................................................... 8

1.65 "Insurance Policy" ....................................................................................... 8

1.66 "Insured Claim" ........................................................................................... 9

1.67 "Insurer" ...................................................................................................... 9

1.68 "Intercompany Claims" ............................................................................... 9

1.69 "Labor MOU" .............................................................................................. 9

1.70 "Legacy Subsidiary" .................................................................................... 9

1.71 "Legacy Subsidiary Unsecured Claim" ....................................................... 9

1.72 "Lender Steering Committee" ...................................................................... 9

1.73 "Liabilities" ................................................................................................. 9

1.74 "Lien" ........................................................................................................... 9

1.75 "Litigation Trust" ........................................................................................ 9

1.76 "Litigation Trust Agreement" ...................................................................... 10

1.77 "Litigation Trust Assets" ............................................................................. 10

1.78 "Litigation Trust Board" .............................................................................. 10

1.79 "Litigation Trust Claims" ............................................................................ 10

1.80 "Litigation Trust Funds" .............................................................................. 10

1.81 "Litigation Trust Interests" .......................................................................... 10

1.82 "Litigation Trustee" ..................................................................................... 10

1.83 "Local Bankruptcy Rules" ........................................................................... 10

1.84 "Long Term Incentive Plan" ........................................................................ 10

1.85 "Morgan Stanley Swap Agreement" ............................................................ 10

1.86 "MPUC" ....................................................................................................... 10

1.87 "MPUC Regulatory Settlement" .................................................................. 11

1.88 "New Board" ................................................................................................ 11

1.89 "New Common Stock" ................................................................................. 11

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 1.90 | "New Credit Agreement" | 11 |
| 1.91 | "New Organizational Documents" | 11 |
| 1.92 | "New Revolver" | 11 |
| 1.93 | "New Term Loan" | 11 |
| 1.94 | "New Warrants" | 11 |
| 1.95 | "NHPUC" | 11 |
| 1.96 | "NHPUC Regulatory Settlement" | 11 |
| 1.97 | "NNE Subsidiary" | 12 |
| 1.98 | "NNE Subsidiary Unsecured Claim" | 12 |
| 1.99 | "Objection Deadline" | 12 |
| 1.100 | "Old FairPoint Equity Interests" | 12 |
| 1.101 | "Other Priority Claim" | 12 |
| 1.102 | "Other Secured Claim" | 12 |
| 1.103 | "Person" | 12 |
| 1.104 | "Petition Date" | 12 |
| 1.105 | "Plan" | 12 |
| 1.106 | "Plan Supplement" | 12 |
| 1.107 | "Plan Support Agreement" | 12 |
| 1.108 | "Prepetition Credit Agreement" | 12 |
| 1.109 | "Prepetition Credit Agreement Agent" | 13 |
| 1.110 | "Prepetition Credit Agreement Claim" | 13 |
| 1.111 | "Prepetition Credit Agreement Lender" | 13 |
| 1.112 | "Priority Tax Claim" | 13 |
| 1.113 | "Professional Fees" | 13 |
| 1.114 | "Ratable Proportion" | 13 |
| 1.115 | "Registration Rights Agreement" | 13 |
| 1.116 | "Regulatory Settlements" | 13 |
| 1.117 | "Reinstated" or "Reinstatement" | 13 |
| 1.118 | "Released Parties" | 14 |
| 1.119 | "Reorganized FairPoint" | 14 |

1.120 "Reorganized FairPoint Communications" ................................................................. 14

1.121 "Reserve" ........................................................................................................................ 14

1.122 "Schedules" .................................................................................................................... 14

1.123 "Section 345 Securities" ............................................................................................... 15

1.124 "Secured Claim" ............................................................................................................ 15

1.125 "Secured Tax Claim" .................................................................................................... 15

1.126 "Securities Act" ............................................................................................................. 15

1.127 "Security" ....................................................................................................................... 15

1.128 "Senior Notes" ............................................................................................................... 15

1.129 "Senior Notes Claims" .................................................................................................. 15

1.130 "Subordinated Securities Claim" ................................................................................. 15

1.131 "Subsequent Distribution Date" ................................................................................... 15

1.132 "Subsidiary Equity Interests" ....................................................................................... 15

1.133 "Success Bonuses" ......................................................................................................... 16

1.134 "Swap Agreements" ....................................................................................................... 16

1.135 "Tax Claim" ................................................................................................................... 16

1.136 "U.S. Trustee" ............................................................................................................... 16

1.137 "Unclassified Claim" ..................................................................................................... 16

1.138 "Unimpaired" ................................................................................................................. 16

1.139 "Unliquidated Claim" .................................................................................................... 16

1.140 "Unsecured Claim" ........................................................................................................ 16

1.141 "VDPS" ........................................................................................................................... 16

1.142 "VDPS Regulatory Settlement" ................................................................................... 16

1.143 "Voting Agent" ............................................................................................................... 16

1.144 "Wachovia Swap Agreement" ...................................................................................... 16

SECTION II     INTERPRETATION OF PLAN ................................................................ 17

2.1     Application of Definitions; Rules of Construction; Computation of Time ......... 17

2.2     Relief Sought by Filing the Plan ........................................................................... 17

SECTION III     PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
                       PRIORITY TAX CLAIMS AND OTHER UNCLASSIFIED CLAIMS ...... 17

3.1    Administrative Expense Claims.........................................................17

3.2    Adequate Protection Claims ............................................................18

3.3    Priority Tax Claims.........................................................................18

3.4    Professional Compensation and Reimbursement Claims ...................18

3.5    Intercompany Claims .....................................................................19

SECTION IV        CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .................19

SECTION V         TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER
                  THE PLAN .......................................................................20

5.1    Other Priority Claims (Class 1).......................................................20

5.2    Secured Tax Claims (Class 2)..........................................................20

5.3    Other Secured Claims (Class 3) .......................................................21

5.4    Allowed Prepetition Credit Agreement Claims (Class 4)...................21

5.5    Legacy Subsidiary Unsecured Claims (Class 5)................................23

5.6    NNE Subsidiary Unsecured Claims (Class 6) ...................................23

5.7    FairPoint Communications Unsecured Claims (Class 7).....................24

5.8    Convenience Claims (Class 8) .........................................................25

5.9    Subordinated Securities Claims (Class 9)..........................................25

5.10   Subsidiary Equity Interests (Class 10)..............................................25

5.11   Old FairPoint Equity Interests (Class 11) .........................................25

5.12   Limitations on Amounts to Be Distributed to Holders of Allowed Insured
       Claims .........................................................................................26

5.13   Special Provision Regarding Unimpaired Claims ..............................26

SECTION VI        PROVISIONS REGARDING NEW COMMON STOCK AND NEW
                  WARRANTS DISTRIBUTED PURSUANT TO THE PLAN ....................26

6.1    New Common Stock .......................................................................26

6.2    New Warrants ................................................................................27

6.3    Securities Law Matters ...................................................................27

SECTION VII       IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS AND
                  EQUITY INTERESTS UNDER THE PLAN; ACCEPTANCE OR
                  REJECTION OF THE PLAN ......................................................28

7.1    Voting of Claims............................................................................28

7.2    Acceptance by Unimpaired Classes..................................................29

| | | | |
|---|---|---|---|
| 7.3 | Elimination of Vacant Classes | | 29 |
| 7.4 | Nonconsensual Confirmation | | 29 |
| 7.5 | Revocation of the Plan | | 29 |
| SECTION VIII | MEANS OF IMPLEMENTATION OF THE PLAN | | 29 |
| 8.1 | Regulatory Settlements | | 29 |
| 8.2 | Transactions on the Effective Date | | 30 |
| 8.3 | Reorganization of FairPoint; Continuation of Businesses | | 30 |
| 8.4 | Reorganized FairPoint's Obligations Under the Plan | | 31 |
| 8.5 | New Organizational Documents | | 32 |
| 8.6 | New Board | | 32 |
| 8.7 | Officers of Reorganized FairPoint | | 34 |
| 8.8 | Operations of FairPoint Between Confirmation and the Effective Date | | 34 |
| 8.9 | Revesting of Assets | | 34 |
| 8.10 | Dissolution of the Creditors' Committee | | 35 |
| 8.11 | Effectuating Documents; Further Transactions | | 35 |
| 8.12 | Preservation of Certain Causes of Action; Defenses | | 35 |
| 8.13 | Cancellation of Existing Securities | | 35 |
| 8.14 | Long Term Incentive Plan | | 36 |
| 8.15 | Success Bonuses | | 36 |
| 8.16 | Indemnification; Directors & Officers Insurance | | 36 |
| 8.17 | The Litigation Trust | | 37 |
| SECTION IX | DISTRIBUTIONS UNDER THE PLAN | | 38 |
| 9.1 | Distributions on Allowed Claims | | 38 |
| 9.2 | Date of Distributions | | 38 |
| 9.3 | Disbursing Agent | | 38 |
| 9.4 | Rights and Powers of Disbursing Agent | | 39 |
| 9.5 | Fees and Expenses of Disbursing Agent | | 39 |
| 9.6 | Delivery of Distributions | | 39 |
| 9.7 | Unclaimed Distributions | | 40 |
| 9.8 | Distribution Record Date | | 40 |

| | | |
|---|---|---|
| 9.9 | Manner of Payment | 41 |
| 9.10 | Time Bar to Cash Payments by Check | 41 |
| 9.11 | No Fractional Distributions | 41 |
| 9.12 | Fractional Cents | 41 |
| 9.13 | Setoffs and Recoupment | 41 |
| 9.14 | Allocation of Plan Distributions Between Principal and Interest | 42 |
| 9.15 | Distributions After Effective Date | 42 |
| 9.16 | Interest on Claims | 42 |
| 9.17 | No Distribution in Excess of Allowed Amount of Claim | 42 |
| 9.18 | Limited Recoveries | 42 |
| 9.19 | Ordinary Course Post-Petition Liabilities | 42 |
| 9.20 | Payment of Taxes on Distributions Received Pursuant to the Plan | 43 |
| 9.21 | Estimation of Claims | 43 |
| 9.22 | Claims Reserves | 43 |
| 9.23 | Distributions from the Litigation Trust | 44 |
| SECTION X | DISPUTED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN | 44 |
| 10.1 | Objections | 44 |
| 10.2 | Adjustment to Certain Claims Without a Filed Objection | 45 |
| 10.3 | No Distributions Pending Allowance | 45 |
| 10.4 | Distributions After Allowance | 45 |
| 10.5 | Resolution of Administrative Expense Claims and Claims | 45 |
| 10.6 | Disallowance of Certain Claims | 45 |
| 10.7 | Indenture Trustee as Claim Holder | 46 |
| 10.8 | Offer of Judgment | 46 |
| 10.9 | Amendments to Claims | 46 |
| 10.10 | Claims Paid and Payable by Third Parties | 46 |
| SECTION XI | EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN | 47 |
| 11.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases | 47 |
| 11.2 | Inclusiveness | 47 |

11.3 Provisions Related to Cure Payments and Rejection Damages .......................... 48

11.4 Indemnification Obligations ................................................................. 49

11.5 Insurance Policies ............................................................................. 49

11.6 Benefit Plans .................................................................................. 49

11.7 Retiree Benefits .............................................................................. 50

11.8 Amended Collective Bargaining Agreements .................................................. 50

SECTION XII CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..................... 50

12.1 Conditions Precedent to Effectiveness ...................................................... 50

12.2 Waiver of Conditions ......................................................................... 51

12.3 Satisfaction of Conditions ................................................................... 51

SECTION XIII EFFECT OF CONFIRMATION ..................................................... 52

13.1 Binding Effect ................................................................................. 52

13.2 Discharge of Claims and Termination of Old FairPoint Equity Interests ............ 52

13.3 Discharge of Debtors ......................................................................... 52

13.4 Reservation of Causes of Action/Reservation of Rights .................................. 52

SECTION XIV EXCULPATION, RELEASE, INJUNCTION AND RELATED
PROVISIONS ................................................................. 53

14.1 Exculpation .................................................................................... 53

14.2 Releases ........................................................................................ 53

14.3 Avoidance Actions/Objections ............................................................... 54

14.4 Injunction or Stay ............................................................................ 54

14.5 United States Government Claims ............................................................ 55

SECTION XV RETENTION OF JURISDICTION ................................................. 55

SECTION XVI MISCELLANEOUS PROVISIONS .................................................. 57

16.1 Effectuating Documents and Further Transactions ........................................ 57

16.2 Withholding and Reporting Requirements ................................................... 57

16.3 Corporate Action .............................................................................. 57

16.4 Modification of Plan .......................................................................... 57

16.5 Revocation or Withdrawal of the Plan ...................................................... 58

16.6 Plan Supplement ............................................................................... 58

16.7    Payment of Statutory Fees ............................................................................ 58

16.8    Exemption from Transfer Taxes ................................................................... 59

16.9    Expedited Tax Determination ....................................................................... 59

16.10  Exhibits/Schedules ........................................................................................ 59

16.11  Substantial Consummation ........................................................................... 59

16.12  Severability of Plan Provisions .................................................................... 59

16.13  Governing Law .............................................................................................. 59

16.14  Conflicts ........................................................................................................ 60

16.15  Reservation of Rights .................................................................................... 60

16.16  Post Confirmation Reporting ........................................................................ 60

16.17  Notices ........................................................................................................... 60

**MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION OF FAIRPOINT COMMUNICATIONS, INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

FairPoint Communications, Inc. and its direct and indirect subsidiaries, as debtors[1] and Debtors-in-Possession, hereby respectfully propose the following Second Amended Joint Plan of Reorganization pursuant to the provisions of chapter 11 of the Bankruptcy Code:

**SECTION I**
**DEFINITIONS**

As used in the Plan, the following terms shall have the respective meanings specified below and be equally applicable to the singular and plural of terms defined:

1.1     "Ad Hoc Committee of Senior Noteholders" means the ad hoc committee of the holders of the Senior Notes represented in the Chapter 11 Cases by Stroock & Stroock & Lavan LLP.

1.2     "Adequate Protection Claims" means rights to adequate protection arising under the DIP Order.

1.3     "Administrative Expense Claim" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases Allowed under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code (other than Adequate Protection Claims), including, without limitation, (a) any actual and necessary costs and expenses of preserving FairPoint's Estates, (b) any actual and necessary costs and expenses of operating FairPoint's businesses, (c) indebtedness or obligations incurred or assumed by the Debtors-in-Possession during the Chapter 11 Cases, (d) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by FairPoint in the twenty (20) days immediately prior to the Petition Date and sold to FairPoint in the ordinary course of FairPoint's businesses, and (e) any Professional Fees, whether Allowed before or after the Effective Date. Any fees or charges assessed against the Estates of FairPoint under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 16.7 of the Plan.

1.4     "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.5     "Allowed" means, with reference to any Claim against FairPoint (including any Administrative Expense Claim), (a) any Claim that has been listed by FairPoint in the Schedules (as such Schedules may be amended by FairPoint from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not Disputed or contingent, and for which no contrary proof of Claim has been filed, (b) any timely filed proof of Claim as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit

---

[1] All of the debtors are identified on Exhibit A of the Plan.

recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order, (c) any Claim expressly allowed by a Final Order or under the Plan, or (d) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or the authority granted Reorganized FairPoint under Section 10.5 of the Plan; *provided, however,* that Claims temporarily allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims. Unless otherwise specified in the Plan or by order of the Bankruptcy Court, (i) an Allowed Administrative Expense Claim or an Allowed Claim shall not, for any purpose under the Plan, include interest on such Claim from and after the Petition Date, and (ii) an Allowed Claim shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

      1.6    "Amended Bylaws" means the second amended and restated bylaws of Reorganized FairPoint Communications, which shall be substantially in the form contained in the Plan Supplement.

      1.7    "Amended Certificate of Incorporation" means the ninth amended and restated certificate of incorporation of Reorganized FairPoint Communications, which shall comply with section 1123(a)(6) of the Bankruptcy Code and be substantially in the form contained in the Plan Supplement.

      1.8    "Avoidance Actions" means any and all avoidance and recovery actions under sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

      1.9    "Ballot" means the form or forms distributed to each holder of an Impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated an acceptance or rejection of the Plan.

      1.10    "Bankruptcy Code" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

      1.11    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

      1.12    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and the Local Bankruptcy Rules, as amended from time to time.

      1.13    "Bar Date" means, except as otherwise provided in section 502(b)(9) of the Bankruptcy Code, the date established by the Bankruptcy Court as the deadline for filing and serving upon FairPoint proofs of Claims.

      1.14    "Benefit Plans" means all employee benefit plans, policies and programs sponsored by FairPoint, including, without limitation, all incentive and bonus arrangements, medical and health insurance, life insurance, dental insurance, disability benefits and coverage,

leave of absence, savings plans, retirement pension plans (including, without limitation, the FairPoint Communications Northern New England Pension Plan for Management Employees and the FairPoint Communications Northern New England Pension Plan for Represented Employees) and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code).

1.15     "Business Day" means any day other than a Saturday, Sunday, or a "legal holiday" set forth in Bankruptcy Rule 9006(a).

1.16     "Cash" means legal tender of the United States of America.

1.17     "Cash Equivalent" means:

(a)     U.S. dollars and foreign currency received or exchanged into U.S. dollars within one hundred eighty (180) days;

(b)     securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof);

(c)     certificates of deposit and eurodollar time deposits;

(d)     repurchase obligations for underlying securities of the types described in clauses (b) and (c) above entered into with any financial institution;

(e)     commercial paper issued by a corporation rated at least "A-2" or higher from Moody's Investors Service, Inc. or Standard & Poor's Rating Services;

(f)     securities issued and fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, rated at least "A" by Moody's Investors Service, Inc. or Standard & Poor's Rating Services;

(g)     money market funds at least ninety-five percent (95%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (f) of this definition; or

(h)     Section 345 Securities.

1.18     "Cash Payment" has the meaning given such term in Section 5.4.2(c) hereof.

1.19     "Causes of Action" means any and all actions, causes of action, suits, controversies, rights, litigation, arbitration, proceeding, hearing, inquiry, audit, examination, investigation, complaint or charge, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act

or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases of FairPoint (including to the Effective Date), including, without limitation, the Avoidance Actions.

1.20    "Chapter 11 Cases" means the cases commenced under Chapter 11 of the Bankruptcy Code by FairPoint before the Bankruptcy Court, as referenced by lead Case No. 09-16335 (BRL).  Exhibit A sets forth a table of all of the FairPoint entities' names and case numbers.

1.21    "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code.

1.22    "Class" means a category of Claims or Equity Interests set forth in Section IV of the Plan.

1.23    "Collateral" means any property or interest in property of the Estates of FairPoint subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.24    "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket with respect to the Chapter 11 Cases.

1.25    "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan with respect to the Chapter 11 Cases, as such hearing may be adjourned or continued from time to time.

1.26    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

1.27    "Consenting Lenders" means, collectively, the Prepetition Credit Agreement Lenders that are party to the Plan Support Agreement.

1.28    "Contingent Claim" means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and FairPoint now or hereafter exists or previously existed.

1.29    "Convenience Claim" means any (a) FairPoint Communications Unsecured Claim in an amount equal to ten thousand dollars ($10,000.00) or less, and/or (b) Disputed FairPoint Communications Unsecured Claim that becomes an Allowed Unsecured Claim of ten thousand dollars ($10,000.00) or less with the consent of and in the amount agreed to by FairPoint.

1.30    "Creditors' Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.31    "Cure" means the Distribution of Cash, or such other property as may be agreed upon by the parties and/or ordered by the Bankruptcy Court, with respect to the assumption of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all accrued, due and unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties or ordered by the Bankruptcy Court, under such executory contract or unexpired lease.

1.32    "Debtors-in-Possession" means FairPoint in its capacity as debtors-in-possession in the Chapter 11 Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.33    "DIP Agent" means Bank of America, N.A., in its capacity as administrative agent under the DIP Facility, including any successor thereto appointed pursuant to Section 10.10 of the DIP Facility.

1.34    "DIP Facility" means that certain Debtor-in-Possession Credit Agreement, dated as of October 27, 2009 (as modified, amended, restated and/or supplemented from time to time prior to the date hereof), among FairPoint Communications and FairPoint Logistics, Inc., as borrowers, the DIP Lenders, and the DIP Agent, which provides for a revolving facility in an aggregate principal amount of up to seventy-five million dollars ($75,000,000.00), of which up to thirty million dollars ($30,000,000.00) is available for the issuance of letters of credit to third parties for the account of FairPoint.

1.35    "DIP Lenders" means the financial institutions party to the DIP Facility, as lenders.

1.36    "DIP Order" means the order entered on March 11, 2010, authorizing and approving the DIP Facility.

1.37    "Disallowed" means, with reference to any Claim, (a) a Claim, or any portion thereof, that has been disallowed by a Final Order, (b) a Claim, or any portion thereof, that is expressly disallowed under the Plan, or (c) unless scheduled by a Debtor-in-Possession as a fixed, liquidated, non-contingent and undisputed Claim, a Claim as to which a proof of Claim bar date has been established by the Bankruptcy Code, Bankruptcy Rules or Final Order but no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order.

1.38    "Disbursing Agent" means (a) Reorganized FairPoint Communications, pursuant to Section 9.3 hereof, (b) the Prepetition Credit Agreement Agent, pursuant to Section 9.6.2(a) hereof, or (c) the Indenture Trustee, pursuant to Section 9.6.3 hereof.

1.39    "Disclosure Statement" means that certain second amended disclosure statement relating to the Plan, including, without limitation, all exhibits and Schedules thereto, as the same may be further amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.40 "Disclosure Statement Approval Date" means the date on which the clerk of the Bankruptcy Court enters the Disclosure Statement Approval Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases approving the adequacy of the Disclosure Statement under section 1125 of the Bankruptcy Code.

1.41 "Disclosure Statement Approval Order" means the Order approving, among other things, the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, entered by the Bankruptcy Court on March 11, 2010.

1.42 "Disputed" means, with reference to any Claim, a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim.

1.43 "Distribution" means the distribution to be made in accordance with the Plan of, as the case may be: (a) Cash, (b) New Common Stock, (c) interests in the New Term Loan, (d) New Warrants, (e) Litigation Trust Interests (including distributions from the Litigation Trust) and/or (f) any other distributions to holders of Claims under the terms and provisions of the Plan.

1.44 "Distribution Date" means the earliest of the following dates that occurs after any Claim is Allowed: (a) the Effective Date, or as soon thereafter as is reasonably practicable, (b) a Subsequent Distribution Date, or (c) a Final Distribution Date.

1.45 "Distribution Record Date" means, with respect to any Claim other than a Class 4 Prepetition Credit Agreement Claim, the date that is twenty (20) days before the first day of the Confirmation Hearing, as originally scheduled by the Bankruptcy Court in the Disclosure Statement Approval Order. The Prepetition Credit Agreement Agent shall have the right to establish a Distribution Record Date with respect to Class 4 Prepetition Credit Agreement Claims.

1.46 "DTC" means The Depository Trust Company.

1.47 "Effective Date" means, with respect to each entity listed on Exhibit A, a Business Day selected by FairPoint, on or after the Confirmation Date, on which the conditions precedent to the effectiveness of the Plan specified in Section 12.1 of the Plan shall have been satisfied or waived as provided in Section 12.2 of the Plan; *provided that*, each Effective Date shall occur on the same Business Day unless the Lender Steering Committee consents otherwise with respect to a particular entity listed on Exhibit A (which consent shall not be unreasonably withheld, conditioned or delayed).

1.48 "Equity Interest" means, as of the Petition Date, any capital stock or other ownership interest in FairPoint, whether or not transferable, and any option, call, warrant or right to purchase, sell or subscribe for an ownership interest or other equity security in FairPoint, including, but not limited to, (a) the Old FairPoint Equity Interests and (b) the Subsidiary Equity Interests.

1.49 "Estate" means the estate of any entity included within the definition of "FairPoint" in the Chapter 11 Cases that was created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

1.50 "Executive Agreements" means, collectively, the employment agreements between FairPoint Communications and David L. Hauser, Peter G. Nixon, Shirley J. Linn, Jeffrey Allen and Susan L. Sowell, respectively, as in effect on October 25, 2009.

1.51 "FairPoint" means, collectively, FairPoint Communications, Inc., BE Mobile Communications, Incorporated, Bentleyville Communications Corporation, Berkshire Cable Corp., Berkshire Cellular, Inc., Berkshire Net, Inc., Berkshire New York Access, Inc., Berkshire Telephone Corporation, Big Sandy Telecom, Inc., Bluestem Telephone Company, C & E Communications, Ltd., Chautauqua & Erie Communications, Inc., Chautauqua and Erie Telephone Corporation, China Telephone Company, Chouteau Telephone Company, Columbine Telecom Company, Comerco, Inc., Commtel Communications Inc., Community Service Telephone Co., C-R Communications, Inc., C-R Long Distance, Inc., C-R Telephone Company, El Paso Long Distance Company, Ellensburg Telephone Company, EllTel Long Distance Corp., Enhanced Communications of Northern New England Inc., ExOp of Missouri, Inc., FairPoint Broadband, Inc., FairPoint Carrier Services, Inc., FairPoint Communications Missouri, Inc., FairPoint Communications Solutions Corp. -- New York, FairPoint Communications Solutions Corp. – Virginia, FairPoint Logistics, Inc., FairPoint Vermont, Inc., Fremont Broadband, LLC, Fremont Telcom Co., Fretel Communications, LLC, Germantown Long Distance Company, GIT-CELL, Inc., GITCO Sales, Inc., GTC Communications, Inc., GTC Finance Corporation, GTC, Inc., Maine Telephone Company, Marianna and Scenery Hill Telephone Company, Marianna Tel, Inc., MJD Services Corp., MJD Ventures, Inc., Northern New England Telephone Operations LLC, Northland Telephone Company of Maine, Inc., Odin Telephone Exchange, Inc., Orwell Communications, Inc., Peoples Mutual Long Distance Company, Peoples Mutual Services Company, Peoples Mutual Telephone Company, Quality One Technologies, Inc., Ravenswood Communications, Inc., Sidney Telephone Company, ST Computer Resources, Inc., S T Enterprises, Ltd., ST Long Distance, Inc., St. Joe Communications, Inc., Standish Telephone Company, Sunflower Telephone Company, Inc., Taconic Technology Corp., Taconic TelCom Corp., Taconic Telephone Corp., Telephone Operating Company of Vermont LLC, Telephone Service Company, The Columbus Grove Telephone Company, The El Paso Telephone Company, The Germantown Independent Telephone Company, The Orwell Telephone Company, UI Communications, Inc., UI Long Distance, Inc., UI Telecom, Inc., Unite Communications Systems, Inc., Utilities, Inc., Yates City Telephone Company, and YCOM Networks, Inc.

1.52 "FairPoint Communications" means FairPoint Communications, Inc.

1.53 "FairPoint Communications Unsecured Claims" means any Unsecured Claims against FairPoint Communications, including, but not limited to, Senior Notes Claims.

1.54 "Final Distribution Date" means a date after (a) the deadline for FairPoint or Reorganized FairPoint to interpose objections to Claims has passed, (b) all such objections have been resolved by signed agreement with FairPoint or Reorganized FairPoint and/or a Final Order, as may be applicable, and (c) all Claims that are Contingent Claims or Unliquidated Claims have been estimated but, in any event, the Final Distribution Date shall be no later than thirty (30) days after such estimation has concluded, or such later date as the Bankruptcy Court may establish, upon request by Reorganized FairPoint, for cause shown.

1.55    "Final Order" means an order or judgment of the Bankruptcy Court that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be (but has not been) filed relating to such order shall not prevent such order from being a Final Order.

1.56    "Holders of Registrable Securities" has the meaning given such term in Section 6.3.2 hereof.

1.57    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.58    "Indemnified Persons" has the meaning given such term in Section 8.16 hereof.

1.59    "Indenture Dated March 31, 2008" means that certain Indenture, dated as of March 31, 2008, as amended, between Northern New England Spinco Inc. (a subsidiary of Verizon Communications Inc.) and U.S. Bank National Association, as trustee.

1.60    "Indenture Dated July 29, 2009" means that certain Indenture, dated as of July 29, 2009, between FairPoint Communications and U.S. Bank National Association, as trustee.

1.61    "Indenture Trustee" means the applicable indenture trustee for the Senior Notes.

1.62    "Indentures" means, collectively, the Indenture Dated March 31, 2008, and the Indenture Dated July 29, 2009.

1.63    "Independent Director" means a director who satisfies the independence requirements under Rule 303A.02 of the Listed Company Manual of the New York Stock Exchange, Inc.

1.64    "Initial Objection" has the meaning given such term in Section 10.1 hereof.

1.65    "Insurance Policy" means any policy of insurance under which FairPoint could have asserted or did assert, or may in the future assert, a right to coverage for any Claim, together with any other contracts which pertain or relate to such policy (including, by way of

example and not limitation, any insurance settlement agreements or coverage-in-place agreements).

1.66 "Insured Claim" means that portion of any Claim arising from an incident or occurrence that occurred prior to the Effective Date: (a) as to which any Insurer is obligated pursuant to the terms, conditions, limitations, and exclusions of its Insurance Policy, to pay any cost, expense, judgment, settlement, or contractual obligation with respect to FairPoint, or (b) that any Insurer otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable Insurance Policy.

1.67 "Insurer" means any Person that issued an Insurance Policy.

1.68 "Intercompany Claims" means any Claim against any entity included within the definition of "FairPoint" held by any other entity included within the definition of "FairPoint".

1.69 "Labor MOU" means that certain 2010 Memorandum of Understanding, dated February 1, 2010, by and between Northern New England Telephone Operations LLC and Telephone Operating Company of Vermont LLC, the two companies doing business as FairPoint Communications, and International Brotherhood of Electrical Workers, AFL-CIO Locals 2320, 2326, and 2327 and Communications Workers of America, AFL-CIO, attached hereto as Exhibit B.

1.70 "Legacy Subsidiary" means any direct or indirect subsidiary of FairPoint Communications that is not an NNE Subsidiary.

1.71 "Legacy Subsidiary Unsecured Claim" means any Unsecured Claim against any Legacy Subsidiary.

1.72 "Lender Steering Committee" means collectively, Bank of America, N.A., Angelo Gordon & Co., Paulson & Co., Inc., Lehman Brothers Holdings, Inc., CoBank, ACB and Wachovia Bank, N.A.

1.73 "Liabilities" mean any and all costs, expenses, damages, losses, penalties, fines, judgments, claims, obligations, demands, injuries, settlements, awards, fines, taxes, fees, indebtedness or other liabilities of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part on any act or omission or other occurrence arising or taking place prior to the Effective Date.

1.74 "Lien" has the meaning given such term in section 101(37) of the Bankruptcy Code.

1.75 "Litigation Trust" means the Person to be created on the Effective Date in accordance with Section 8.17 of the Plan and the Litigation Trust Agreement for the benefit of holders of Allowed Prepetition Credit Agreement Claims and Allowed FairPoint Communications Unsecured Claims.

1.76    "Litigation Trust Agreement" means the trust agreement, substantially in the form attached as Exhibit H.

1.77    "Litigation Trust Assets" means the Litigation Trust Claims, the Litigation Trust Funds and any other assets acquired by the Litigation Trust on or after the Effective Date pursuant to the Litigation Trust Agreement or the Plan.

1.78    "Litigation Trust Board" means the group of Persons approved prior to the Effective Date by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the Litigation Trust Agreement, who shall have the authority set forth in the Litigation Trust Agreement, consisting of two (2) Persons selected by the Lender Steering Committee and one (1) Person selected by the Creditors' Committee or, with the consent of the Lender Steering Committee, a group consisting of one (1) Person selected by the Lender Steering Committee and one (1) Person selected by the Creditors' Committee.

1.79    "Litigation Trust Claims" means the Claims and Causes of Action that are identified in the Litigation Trust Agreement as Litigation Trust Claims, but in no event shall a Litigation Trust Claim include any Claim or Cause of Action that is released pursuant to Section 14.2 of the Plan.

1.80    "Litigation Trust Funds" means Cash in an amount mutually agreeable to FairPoint or Reorganized FairPoint, as applicable, and the Lender Steering Committee, and which shall be used to fund the Litigation Trust in accordance with Section 8.17 of the Plan.

1.81    "Litigation Trust Interests" means the beneficial interests in the Litigation Trust to be deemed distributed to holders of Allowed Prepetition Credit Agreement Claims and Allowed FairPoint Communications Unsecured Claims.

1.82    "Litigation Trustee" means the Person, solely in its capacity as Litigation Trustee, approved prior to the Effective Date by the Bankruptcy Court to administer the Litigation Trust in accordance with the terms and provisions of Section 8.17 of the Plan and the Litigation Trust Agreement.

1.83    "Local Bankruptcy Rules" means the local bankruptcy rules for the Southern District of New York, as amended from time to time.

1.84    "Long Term Incentive Plan" means that certain management incentive plan for senior management and selected employees of FairPoint, providing incentive compensation in the form of stock options and restricted stock awards for the number of shares of New Common Stock set forth in Section 6.1.1(b). The Plan Supplement shall contain the terms of the Long Term Incentive Plan.

1.85    "Morgan Stanley Swap Agreement" means that certain ISDA Master Agreement, dated as of February 1, 2005, between FairPoint Communications and Morgan Stanley Capital Services Inc., including any confirmations issued thereunder and any and all supplements thereto.

1.86    "MPUC" means the Maine Public Utilities Commission.

1.87    "MPUC Regulatory Settlement" means the settlements and compromises by and among FairPoint, the Representative of the MPUC and the Maine Office of the Public Advocate as set forth on the regulatory settlement attached hereto as Exhibit D.

1.88    "New Board" means the board of directors of Reorganized FairPoint Communications.  Subject to Section 8.6.2, the proposed members of the New Board shall be identified in the Plan Supplement.

1.89    "New Common Stock" means the shares of common stock of Reorganized FairPoint Communications authorized to be issued pursuant to Section 6.1.1 of the Plan.

1.90    "New Credit Agreement" means that certain credit agreement regarding the New Revolver and the New Term Loan to be entered into on the Effective Date by and among FairPoint Communications, Inc., FairPoint Logistics, Inc., Bank of America, N.A., as administrative agent and as lender, the other lenders party thereto and the letter of credit issuers party thereto.

1.91    "New Organizational Documents" means the Amended Bylaws and Amended Certificate of Incorporation, collectively.

1.92    "New Revolver" means that certain post-consummation revolving credit exit facility, which shall assume all borrowings and extensions of credit under the DIP Facility on the Effective Date.  The terms of the New Revolver shall be contained in the Plan Supplement.

1.93    "New Term Loan" means that certain post-consummation one billion dollar ($1,000,000,000.00) senior secured term loan agreement to be entered into on the Effective Date, which shall be guaranteed by those subsidiaries of FairPoint Communications that have guaranteed repayment of the DIP Facility.  The New Term Loan shall be part of the Distribution under the Plan to the holders of Allowed Prepetition Credit Agreement Claims.  The terms of the New Term Loan shall be contained in the Plan Supplement.

1.94    "New Warrants" means those certain warrants to purchase up to seven million one hundred sixty four thousand eight hundred four (7,164,804) shares of the New Common Stock issued pursuant to Section 6.2 of the Plan, which warrants shall have the material terms set forth on Exhibit C hereto and be in substantially the form set forth in the Plan Supplement.

1.95    "NHPUC" means New Hampshire Public Utilities Commission.

1.96    "NHPUC Regulatory Settlement" means the settlements and compromises by and between FairPoint and staff advocates of the NHPUC (i) with respect to, among other things, service quality requirements, broadband commitments, expenditure commitments, financial commitments and management commitments and (ii) as set forth in further detail on the regulatory settlement attached hereto as Exhibit E.

1.97    "NNE Subsidiary" means, individually each of and collectively all of, FairPoint Logistics, Inc., Northern New England Telephone Operations LLC, Telephone Operating Company of Vermont LLC, and Enhanced Communications of Northern New England Inc.

1.98    "NNE Subsidiary Unsecured Claim" means any Unsecured Claim against the NNE Subsidiaries.

1.99    "Objection Deadline" has the meaning given such term in Section 10.1 hereof.

1.100   "Old FairPoint Equity Interests" means any instrument evidencing an ownership interest in FairPoint Communications, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.101   "Other Priority Claim" means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.102   "Other Secured Claim" means any Secured Claim other than a Prepetition Credit Agreement Claim.

1.103   "Person" means any individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, or any government or agency or political subdivision thereof, or any other form of legal entity.

1.104   "Petition Date" means October 26, 2009, the date on which FairPoint commenced its Chapter 11 Cases.

1.105   "Plan" means this second amended joint plan of reorganization, including, without limitation, the Plan Supplement and the exhibits and schedules hereto and thereto, as the same may be further amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.106   "Plan Supplement" means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan specified in Section 16.6 of the Plan.

1.107   "Plan Support Agreement" means that certain Plan Support Agreement, dated as of October 25, 2009, among FairPoint and the Consenting Lenders, as the same may be amended, modified or supplemented from time to time.

1.108   "Prepetition Credit Agreement" means that certain Credit Agreement, dated as of March 31, 2008, and amended as of January 21, 2009, among FairPoint Communications and Northern New England Spinco Inc., as borrowers, the Lender Steering Committee and the other lenders party thereto, the Prepetition Credit Agreement Agent, and certain other parties thereto, and all amendments, supplements, ancillary agreements (including, but not limited to, any and all notes, letters of credit, pledges, collateral agreements, intercreditor

agreements, Swap Agreements and hedging agreements), side letters, financing statements, and other documents related thereto.

1.109    "Prepetition Credit Agreement Agent" means Bank of America, N.A., as administrative agent and collateral agent (replacing Lehman Commercial Paper Inc. in both roles pursuant to the January 21, 2009 amendment to the Prepetition Credit Agreement) under the Prepetition Credit Agreement, and any successor administrative agent or collateral agent thereunder.

1.110    "Prepetition Credit Agreement Claim" means any Claim held by the Prepetition Credit Agreement Lenders and/or the Prepetition Credit Agreement Agent, and all other Claims against FairPoint arising under the Prepetition Credit Agreement in an amount equal to principal, plus interest (accrued through the Effective Date), and all other amounts due thereunder. Prepetition Credit Agreement Claims are Allowed Claims pursuant to the Plan, and shall be satisfied pursuant to the Plan without offset, defense, counterclaim, reduction or credit of any kind whatsoever.

1.111    "Prepetition Credit Agreement Lender" means each Person that is party to the Prepetition Credit Agreement, other than each applicable entity included in the definition of "FairPoint".

1.112    "Priority Tax Claim" means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.113    "Professional Fees" means any Claim of a professional retained in the Chapter 11 Cases, pursuant to sections 327, 328 and 1103 of the Bankruptcy Code or otherwise, for compensation or reimbursement of costs and expenses relating to services incurred prior to and including the Effective Date, when and to the extent any such Claim is Allowed by the Bankruptcy Court pursuant to sections 330, 331, 503(b) or 1103 of the Bankruptcy Code.

1.114    "Ratable Proportion" means, with reference to any Distribution on account of any Allowed Claim in any Class, the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims of the same Class, plus all Disputed Claims in such Class.

1.115    "Registration Rights Agreement" has the meaning given such term in Section 6.3.2 hereof.

1.116    "Regulatory Settlements" means, collectively, the MPUC Regulatory Settlement, NHPUC Regulatory Settlement and the VDPS Regulatory Settlement; *provided*, *however*, that if the MPUC Regulatory Settlement, NHPUC Regulatory Settlement or the VDPS Regulatory Settlement does not become final or is withdrawn in accordance with its terms, such Regulatory Settlement will be deemed removed from this definition of Regulatory Settlements.

1.117    "Reinstated" or "Reinstatement" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Subsidiary Equity Interest entitles the holder of such Claim or Subsidiary Equity Interest, or (b) notwithstanding any contractual provision or

applicable law that entitles the holder of such Claim or Subsidiary Equity Interest to demand or receive accelerated payment of such Claim or Subsidiary Equity Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Subsidiary Equity Interest as such maturity existed before such default; (iii) compensating the holder of such Claim or Subsidiary Equity Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law; (iv) if such Claim or such Subsidiary Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim or such Subsidiary Equity Interest (other than FairPoint or a current or former insider of FairPoint) for any actual pecuniary loss incurred by such holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Subsidiary Equity Interest entitles the holder of such Claim or Subsidiary Equity Interest.

1.118    "Released Parties" means (a) the current or former directors, officers, employees, Affiliates, agents, accountants, financial advisors, investment bankers, restructuring advisors, attorneys and representatives, and other professionals of or to FairPoint and the Debtors-in-Possession who served or were employed in such capacities after the Petition Date, and each of their respective agents and representatives, (b) the Prepetition Credit Agreement Agent, (c) Prepetition Credit Agreement Lenders, (d) the Consenting Lenders, (e) the Lender Steering Committee, (f) the DIP Agent, (g) the DIP Lenders, (h) Bank of America, in its capacity as Disbursing Agent, (i) the members of the Ad Hoc Committee of Senior Noteholders, and (j) for each of (b) through (i), their respective officers, directors, employees, Affiliates, agents, partners, members, representatives, employees, financial advisors, investment bankers, restructuring advisors, attorneys and other professionals; *provided, however,* if no Distributions are made on account of Class 7 FairPoint Communications Unsecured Claims in accordance with Section 5.7.2(b) of the Plan, then clause 1.109(i) shall be deemed to be deleted from this definition and the members of the Ad Hoc Committee of Senior Noteholders (and their respective officers, directors, employees, Affiliates, agents, partners, members, representatives, employees, financial advisors, investment bankers, restructuring advisors, attorneys and other professionals) shall not be included within this definition of Released Parties; *provided further,* that neither Verizon Communications Inc. nor any of its Affiliates as of January 15, 2007 or March 31, 2008 (other than any Affiliate that was merged into FairPoint Communications) shall be deemed a Released Party under the Plan.

1.119    "Reorganized FairPoint" means FairPoint on and after the Effective Date.

1.120    "Reorganized FairPoint Communications" means FairPoint Communications on and after the Effective Date.

1.121    "Reserve" has the meaning given such term in Section 9.21.

1.122    "Schedules" means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by

FairPoint under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the official bankruptcy forms in the Chapter 11 Cases, as the same may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rules 1007 and 1009. For the avoidance of doubt, Schedules do not include any schedules or exhibits to the Plan or the Plan Supplement.

1.123    "Section 345 Securities" means securities or instruments of any type permitted under Section 345 of the Bankruptcy Code.

1.124    "Secured Claim" means any Claim (a) reflected in the Schedules or upon a proof of Claim as a Secured Claim, which is secured by a Lien on Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, (b) a Prepetition Credit Agreement Claim, or (c) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.125    "Secured Tax Claim" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

1.126    "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.127    "Security" has the meaning given such term in section 101(49) of the Bankruptcy Code.

1.128    "Senior Notes" means, collectively, the 13 1/8 % Senior Notes due April 1, 2018 issued by FairPoint Communication under the Indenture Dated March 31, 2008, and the 13 1/8 % Senior Notes due April 2, 2018 issued by FairPoint Communications under the Indenture Dated July 29, 2009.

1.129    "Senior Notes Claims" means Claims arising under the Indentures. Senior Notes Claims are Allowed Claims under the Plan, and shall be satisfied pursuant to the Plan without offset, defense, counterclaim, reduction or credit of any kind whatsoever.

1.130    "Subordinated Securities Claim" means any Claim against FairPoint arising from rescission of a purchase or sale of a Security of FairPoint or an Affiliate of FairPoint, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

1.131    "Subsequent Distribution Date" means the twentieth day after the end of each calendar quarter after the occurrence of the Effective Date; provided, that the Subsequent Distribution Date with respect to a distribution from the Litigation Trust means the tenth Business Day after receipt thereof by the Disbursing Agent.

1.132    "Subsidiary Equity Interests" means any instrument evidencing an ownership interest in FairPoint (other than FairPoint Communications), whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such

interests, all as of the Effective Date. Each Subsidiary Equity Interest shall be deemed Allowed under the Plan.

1.133 "Success Bonuses" means cash bonuses payable as incentive compensation upon the Effective Date, determined in accordance with certain performance measures and subject to upward or downward adjustments to reflect when the Effective Date is achieved. The Plan Supplement shall contain additional information about the Success Bonuses.

1.134 "Swap Agreements" means the Morgan Stanley Swap Agreement and the Wachovia Swap Agreement.

1.135 "Tax Claim" means any Claim that is a Secured Tax Claim or a Priority Tax Claim.

1.136 "U.S. Trustee" means the United States Trustee appointed under section 591, title 28, United States Code to serve in the Southern District of New York.

1.137 "Unclassified Claim" means any Claim that is an Administrative Expense Claim or a Priority Tax Claim.

1.138 "Unimpaired" means, with respect to a Claim or Equity Interest, that such Claim or Equity Interest is not Impaired as a result of being either (a) Reinstated or (b) paid in full in Cash under the Plan.

1.139 "Unliquidated Claim" means any Claim, the amount of Liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

1.140 "Unsecured Claim" means any Claim against FairPoint other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Prepetition Credit Agreement Claim, Subordinated Securities Claim or Intercompany Claim.

1.141 "VDPS" means the Vermont Department of Public Service.

1.142 "VDPS Regulatory Settlement" means the settlements and compromises by and between FairPoint and VDPS (i) with respect to, among other things, service quality requirements, broadband commitments, capital investment commitments, financial commitments and management commitments and (ii) as set forth in further detail on the regulatory settlement attached hereto as Exhibit F.

1.143 "Voting Agent" means BMC Group, Inc.

1.144 "Wachovia Swap Agreement" means that certain ISDA Master Agreement, dated as of December 12, 2000, as amended and restated as of February 1, 2008, between FairPoint Communications and Wachovia Bank, N.A., including any confirmations issued thereunder and any and all supplements thereto.

## SECTION II
## INTERPRETATION OF PLAN

### 2.1 Application of Definitions; Rules of Construction; Computation of Time.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender. For purposes of the Plan, (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented and (c) unless otherwise specified, all references in the Plan to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Plan. The words "herein", "hereof", "hereto", "hereunder" and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A capitalized term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code or in the Exhibits hereto. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references to dollars means United States dollars. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 2.2 Relief Sought by Filing the Plan.

The filing of the Plan constitutes, among other things, a motion by FairPoint pursuant to Bankruptcy Rules 9019 to approve the settlement and comprise set forth in Section 8.1 of the Plan.

## SECTION III
## PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
## PRIORITY TAX CLAIMS AND OTHER UNCLASSIFIED CLAIMS

### 3.1 Administrative Expense Claims.

Except to the extent that any Person entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing Liabilities incurred in the ordinary course of business by the Debtors-in-Possession shall be paid in full and performed by the Debtors-in-Possession or Reorganized FairPoint, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other

documents relating to such transactions; *provided, further*, that, except as provided in Section 3.4 of the Plan, if any Administrative Expense Claim, including an ordinary course expense, is not billed or a request for payment is not made within sixty (60) days after the Effective Date, claims for payment of such Administrative Expense Claims shall be barred.

3.2     Adequate Protection Claims.

The Adequate Protection Claims of the holders of Prepetition Credit Agreement Claims shall be deemed satisfied in full by payments (if any) due and made pursuant to the DIP Order.

3.3     Priority Tax Claims.

Unless otherwise agreed to by the holder of an Allowed Priority Tax Claim and FairPoint or Reorganized FairPoint, as applicable, each holder of an Allowed Priority Tax Claim shall receive at the option of FairPoint or Reorganized FairPoint, as applicable, (a) on the Effective Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Allowed Priority Tax Claim, or (b) commencing on the Effective Date, or as soon thereafter as is reasonably practicable, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of FairPoint or Reorganized FairPoint, as applicable, to prepay the entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

3.4     Professional Compensation and Reimbursement Claims.

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim.  Reorganized FairPoint is authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

For purposes of the Plan, and in consideration of the services of the members of the Ad Hoc Committee of Senior Noteholders, FairPoint will reimburse the members of the Ad Hoc Committee of Senior Noteholders for the reasonable fees and expenses of their professionals, Stroock & Stroock & Lavan LLP and Moelis & Company, during the Chapter 11 Cases and up to the Effective Date (without the need to file a proof of Claim or fee application), subject to an aggregate cap of three million five hundred thousand dollars ($3,500,000.00), or

such higher number as shall be approved by the Lender Steering Committee, which approval shall not be unreasonably withheld or delayed; *provided, however*, if no Distributions are made on account of Class 7 FairPoint Communications Unsecured Claims in accordance with Section 5.7.2(b) of the Plan, then the members of the Ad Hoc Committee of Senior Noteholders shall not receive any reimbursement for professionals' fees and expenses.

For purposes of the Plan, and in consideration of the services of the Prepetition Credit Agreement Agent and each Consenting Lender holding greater than ten percent (10%) of the aggregate Prepetition Credit Agreement Claims on the date such Person became a Consenting Lender, FairPoint will reimburse such Persons for their reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel) to the extent that such fees and expenses are incurred in connection with the Plan Support Agreement, the Plan, the Chapter 11 Cases, and the transactions related thereto (without the need to file a proof of Claim or fee application).

Except as otherwise paid or payable pursuant to the order granting FairPoint's Motion Pursuant to Bankruptcy Code Sections 105(a) and 363(b) For Authorization to Reimburse Certain Regulatory Agency Expenses [Docket No. 685], and subject in all respects to the terms of Section 4.3 of the NHPUC Regulatory Settlement and Section 4.3 of the VDPS Regulatory Settlement, on the Effective Date FairPoint shall reimburse the reasonable out-of-pocket expenses and costs of the State of New Hampshire, the VDPS and the Vermont Public Service Board in connection with the Chapter 11 Cases.

As long as the Regulatory Settlement remains in effect in Maine, and subject in all respects to Section 4.4 of the MPUC Regulatory Settlement, on the Effective Date FairPoint shall reimburse the reasonable out-of-pocket expenses and costs of the MPUC and the Maine Public Advocate in connection with the Chapter 11 Cases.

3.5     Intercompany Claims.

At the election of FairPoint or Reorganized FairPoint, as applicable, or any Person holding such Claim, and in consultation with the Lender Steering Committee, Intercompany Claims shall be (a) released, waived and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended or (d) remain Unimpaired.

## SECTION IV
## CLASSIFICATION OF CLAIMS AND
## EQUITY INTERESTS

The following table (a) designates the Classes of Claims against, and Equity Interests in, FairPoint, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Plan and therefore are deemed to reject the Plan or are entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims and Equity Interests that are Unimpaired by the Plan and therefore are deemed to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Allowed Prepetition Credit Agreement Claims | Impaired | Yes |
| 5 | Legacy Subsidiary Unsecured Claims | Unimpaired | No (deemed to accept) |
| 6 | NNE Subsidiary Unsecured Claims | Unimpaired | No (deemed to accept) |
| 7 | FairPoint Communications Unsecured Claims | Impaired | Yes |
| 8 | Convenience Claims | Unimpaired | No (deemed to accept) |
| 9 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 10 | Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |
| 11 | Old FairPoint Equity Interests | Impaired | No (deemed to reject) |

## SECTION V
## TREATMENT OF CLAIMS AND
## EQUITY INTERESTS UNDER THE PLAN

5.1     Other Priority Claims (Class 1).

5.1.1     Impairment and Voting.

Class 1 is Unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.1.2     Distributions.

Unless otherwise agreed to by the holder of an Allowed Other Priority Claim and FairPoint or Reorganized FairPoint, as applicable, on the applicable Distribution Date, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim.

5.2     Secured Tax Claims (Class 2).

5.2.1     Impairment and Voting.

Class 2 is Unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.2.2    Distributions.

Unless otherwise agreed to by the holder of an Allowed Secured Tax Claim and FairPoint or Reorganized FairPoint, as applicable, on the applicable Distribution Date, each holder of an Allowed Secured Tax Claim shall receive, at the option of FairPoint or Reorganized FairPoint, as applicable, (a) Cash in an amount equal to such Allowed Secured Tax Claim or, (b) commencing on the applicable Distribution Date, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of FairPoint or Reorganized FairPoint, as applicable, to prepay the entire amount of the Allowed Secured Tax Claim.

5.3    Other Secured Claims (Class 3).

5.3.1    Impairment and Voting.

Class 3 is Unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.3.2    Distributions.

(a)    Unless otherwise agreed to by the holder of an Allowed Other Secured Claim and FairPoint or Reorganized FairPoint, as applicable, at the option of FairPoint or Reorganized FairPoint, as applicable, (i) on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, on the Distribution Date, or as soon thereafter as is reasonably practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on the Distribution Date, or as soon thereafter as is reasonably practicable.

5.4    Allowed Prepetition Credit Agreement Claims (Class 4).

5.4.1    Impairment and Voting.

Class 4 is Impaired by the Plan.  Each holder of an Allowed Prepetition Credit Agreement Claim is entitled to vote to accept or reject the Plan.

5.4.2    Distributions.

Each holder of an Allowed Prepetition Credit Agreement Claim shall receive the following, in full and complete satisfaction of such holder's Allowed Prepetition Credit Agreement Claim:

(a)     on the Effective Date, such holder's Ratable Proportion of the New Term Loan;

(b)     on the Effective Date, such holder's Ratable Proportion of forty-seven million two hundred forty-one thousand four hundred thirty-six (47,241,436) shares of the New Common Stock; *provided, however*, that if the Class of FairPoint Communications Unsecured Claims do not receive a Distribution under the Plan as provided in Section 5.7.2(b) of the Plan, each holder of an Allowed Prepetition Credit Agreement Claim shall receive its Ratable Proportion of fifty-eight million, four hundred eighty-four thousand five hundred eighty-seven (58,484,587) shares of the New Common Stock, subject to dilution from the securities to be issued under the Long Term Incentive Plan;

(c)     on the Effective Date, such holder's Ratable Proportion of Cash (the "Cash Payment") in an amount equal to all Cash and Cash Equivalents of Reorganized FairPoint on the Effective Date in excess of forty million dollars ($40,000,000.00) minus (1) Cash used to pay or reserved to pay Allowed Unsecured Claims, (2) Cash used to pay or reserved to pay Allowed Administrative Expense Claims, (3) Cash used to pay or reserved to pay Allowed Priority Tax Claims, (4) Cash used to pay or reserved to pay Allowed Other Priority Claims, (5) Cash used to pay or reserved to pay Allowed Secured Tax Claims, (6) Cash used to pay or reserved to pay Allowed Other Secured Claims, (7) subject to Section 3.4 of the Plan, Cash used to pay or reserved to pay the members of the Ad Hoc Committee of Senior Noteholders, the Prepetition Credit Agreement Agent, and each Consenting Lender holding greater than ten percent (10%) of the aggregate Prepetition Credit Agreement Claims on the date such Person became a Consenting Lender for their professionals' fees and expenses, (8) Cash used to pay or reserved to pay (i) service quality index penalties for the 2009 calendar year that are subject to the NHPUC Regulatory Settlement or the VDPS Regulatory Settlement, which Cash shall be computed by comparing FairPoint's 2010 service quality performance against the average service quality objectives for the period commencing January 1, 2010 and ending on the Effective Date; *provided*, that Cash shall be reserved only with respect to any such service quality objectives that are not being satisfied as of the Effective Date; *provided further*, that any Cash reserved pursuant to clause (i) and not required to be accrued at December 31, 2010 in accordance with U.S. generally accepted accounting principles shall be released from such Reserve and paid to the holders of Allowed Prepetition Credit Agreement Claims no later than March 31, 2011, and (ii) any amounts payable on or after the Effective Date pursuant to section 4.3 of the NHPUC Regulatory Settlement, section 4.3 of the VDPS Regulatory Settlement, or section 4.4 of the MPUC Regulatory Settlement, as the case may be; *provided*, that amounts reserved and not actually paid pursuant to any such provision shall be released from such Reserve and paid to the holders of the Prepetition Credit Agreement Claims no later than 180 days after the Effective Date, (9) Cash used to pay or reserved to pay Success Bonuses, (10) Cash used to pay or reserved to pay Cure for executory contracts and unexpired leases that are assumed pursuant to the Plan, and (11) the Litigation Trust Funds. Notwithstanding the foregoing, if the aggregate amount of Tax Claims against FairPoint Communications exceeds six million dollars ($6,000,000), such excess amount (or any portion thereof) shall be subtracted from the Cash Payment only if the Lender Steering Committee consents, after consultation with FairPoint, to the payment of such excess amount (or portion thereof) on the Effective Date;

(d)     on the Effective Date or as soon thereafter as is practicable, its Ratable Proportion of 55% of the Litigation Trust Interests; *provided, however*, that if the Class of FairPoint Communications Unsecured Claims does not receive a Distribution under the Plan as provided in Section 5.7.2(b) of the Plan, each holder of an Allowed Prepetition Credit Agreement Claim shall receive its Ratable Proportion of 100% of the Litigation Trust Interests;

(e)     on the applicable Distribution Date, if any, such holder's Ratable Proportion of Cash Distributions out of the Reserves that are no longer required to be reserved for the benefit of any Person other than holders of Allowed Prepetition Credit Agreement Claims; and

(f)     as provided in the Litigation Trust Agreement, such holder's Ratable Proportion of the Litigation Trust Funds.

5.5     <u>Legacy Subsidiary Unsecured Claims (Class 5)</u>.

5.5.1     <u>Impairment and Voting</u>.

Class 5 is Unimpaired by the Plan. Each holder of an Allowed Legacy Subsidiary Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.5.2     <u>Distributions</u>.

On the Distribution Date, each holder of an Allowed Legacy Subsidiary Unsecured Claim shall be paid an amount in Cash equal to one hundred percent (100%) of such holder's Allowed Legacy Subsidiary Unsecured Claim, in full and complete satisfaction of such holder's Claim.

5.6     <u>NNE Subsidiary Unsecured Claims (Class 6)</u>.

5.6.1     <u>Impairment and Voting</u>.

Class 6 is Unimpaired by the Plan. Each holder of an Allowed NNE Subsidiary Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.6.2     <u>Distributions</u>.

On the Distribution Date, each holder of an Allowed NNE Subsidiary Unsecured Claim shall be paid an amount in Cash equal to one hundred percent (100%) of such holder's Allowed NNE Subsidiary Unsecured Claim, in full and complete satisfaction of such holder's Claim.

5.7     FairPoint Communications Unsecured Claims (Class 7).

5.7.1     Impairment and Voting.

Class 7 is Impaired by the Plan.  Each holder of an Allowed FairPoint Communications Unsecured Claim is entitled to vote to accept or reject the Plan.

5.7.2     Distributions.

On the Distribution Date, each holder of an Allowed FairPoint Communications Unsecured Claim shall receive the following, in full and complete satisfaction of such FairPoint Communications Unsecured Claim:

(a)     if the Class of holders of FairPoint Communications Unsecured Claims votes to accept the Plan, each holder of an Allowed FairPoint Communications Unsecured Claim shall receive its Ratable Proportion of:

(i)     four million two hundred three thousand three hundred fifty-two (4,203,352) shares of the New Common Stock;

(ii)     the New Warrants, in the case of each of clauses (i) and (ii), subject to dilution from the securities to be issued under the Long Term Incentive Plan; and

(iii)     its Ratable Proportion of 45% of the Litigation Trust Interests; or

(b)     if (1) the Class of FairPoint Communications Unsecured Claims votes to reject the Plan, (2) the members of the Ad Hoc Committee of Senior Noteholders or its counsel objects to the Plan, (3) the members of the Creditors' Committee or its counsel object to the Plan or the Disclosure Statement as they relate to the treatment of Allowed FairPoint Communications Unsecured Claims or the Distributions to the holders of such Claims under the Plan (*provided*, that this clause (3) shall not be construed to preclude any such Persons from seeking to share with the holders of other Allowed Claims the proceeds, if any, of: (i) any cause of action brought on behalf of (or by) FairPoint against Verizon Communications Inc. and/or its affiliates arising from the agreement and plan of merger dated January 15, 2007 and the related transactions; and (ii) any cause of action brought on behalf of (or by) FairPoint against CapGemini U.S. LLC and/or its affiliates arising out of or related to the: (a) Master Services Agreement dated as of January 15, 2007, (b) Master Purchasing Agreement effective as of March 29, 2007, and/or (c) Information Technology Services Agreement effective as of January 30, 2009), or (4) the Indenture Trustee or its counsel objects to the Plan, then holders of FairPoint Communications Unsecured Claims shall not receive any Distributions under the Plan on account of their Claims.

5.8 Convenience Claims (Class 8).

5.8.1 Impairment and Voting.

Class 8 is Unimpaired by the Plan. Each holder of an Allowed Convenience Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.8.2 Distributions.

On the Distribution Date, each holder of an Allowed Convenience Claim shall be paid an amount in Cash equal to one hundred percent (100%) of such holder's Allowed Convenience Claim in full and complete satisfaction, settlement, release, and discharge of and in exchange for such holder's Claim.

5.9 Subordinated Securities Claims (Class 9).

5.9.1 Impairment and Voting.

Class 9 is Impaired by the Plan. Each holder of a Subordinated Securities Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

5.9.2 Distributions.

Each holder of an Allowed Subordinated Securities Claim will not receive or retain any interest or property under the Plan on account of such Allowed Subordinated Securities Claim. The treatment of Subordinated Securities Claims under the Plan is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

5.10 Subsidiary Equity Interests (Class 10).

5.10.1 Impairment and Voting.

Class 10 is Unimpaired by the Plan. Each holder of a Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.10.2 Distributions.

On the Effective Date, the Subsidiary Equity Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

5.11 Old FairPoint Equity Interests (Class 11).

5.11.1 Impairment and Voting.

Class 11 is Impaired by the Plan. Each holder of an Old FairPoint Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

5.11.2    Distributions.

On the Effective Date, the Old FairPoint Equity Interests shall be cancelled and the holders of the Old FairPoint Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Old FairPoint Equity Interests under the Plan.

5.12    Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims.

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is within FairPoint's self-insured retention. Amounts in excess of the applicable self-insured retention amount shall be recoverable only from the available Insurer and FairPoint shall be discharged to the extent of any such excess. Nothing in this Section 5.12 shall constitute a waiver of any Causes of Action or Liabilities that any Person may hold against any other Person, including, without limitation, FairPoint's Insurers.

5.13    Special Provision Regarding Unimpaired Claims.

Except as otherwise explicitly provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any rights, counterclaims or defenses that any of FairPoint or Reorganized FairPoint, as applicable, may have, whether at law or in equity, with respect to any Unimpaired Claim.

**SECTION VI**
**PROVISIONS REGARDING NEW COMMON STOCK AND**
**NEW WARRANTS DISTRIBUTED PURSUANT TO THE PLAN**

6.1    New Common Stock.

6.1.1    Authorization.

(a)    The Amended Certificate of Incorporation of Reorganized FairPoint Communications shall authorize the issuance of seventy-five million (75,000,000) shares of New Common Stock.

(b)    The seventy-five million (75,000,000) shares of New Common Stock that are authorized on the Effective Date shall be issued or reserved as follows:

(i)    in the event that the Class of FairPoint Communications Unsecured Claims accepts the Plan, (1) fifty-one million four hundred forty-four thousand seven hundred eighty-eight (51,444,788) shares of New Common Stock, in the aggregate, will be distributed to holders of Allowed Claims under Section 5.4 and Section 5.7 of the Plan and (2) seven million one hundred sixty-four thousand eight hundred four (7,164,804) shares of the New Common Stock will be reserved in connection with the New Warrants;

(ii)       in the event that the Class of FairPoint Communications Unsecured Claims does not receive a Distribution under the Plan on account of its claims, fifty-eight million four hundred eighty-four thousand five hundred eighty-seven (58,484,587) shares of New Common Stock, in the aggregate, will be distributed to holders of Allowed Claims under Section 5.4 of the Plan;

(iii)       in the event that the Class of FairPoint Communications Unsecured Claims accepts the Plan, six million two hundred sixty-nine thousand two hundred six (6,269,206) shares of New Common Stock will be issued or reserved in connection with the Long Term Incentive Plan; and

(iv)       in the event that the Class of FairPoint Communications Unsecured Claims does not receive a Distribution under the Plan on account of its claims, six million three hundred ninety-four thousand two hundred eleven (6,394,211) shares of New Common Stock will be issued or reserved in connection with the Long Term Incentive Plan.

(c)       On the Effective Date, in the event the Class of FairPoint Communications Unsecured Claims reject the Plan, holders of Allowed Class 4 Prepetition Credit Agreement Claims shall receive, and Reorganized FairPoint Communications shall issue, an aggregate of fifty-eight million four hundred eighty-four thousand five hundred eighty-seven (58,484,587) shares of New Common Stock in accordance with Section V hereof.  All such shares shall be deemed fully paid and non-assessable.

(d)       On the Effective Date, in the event the Class of FairPoint Communications Unsecured Claims accepts the Plan, holders of Allowed Class 4 Prepetition Credit Agreement Claims and holders of Allowed Class 7 FairPoint Communications Unsecured Claims shall receive, and Reorganized FairPoint Communications shall issue, an aggregate of fifty-one million four hundred forty-four thousand seven hundred eighty-eight (51,444,788) shares of New Common Stock in accordance with Section V hereof.  All such shares shall be deemed fully paid and non-assessable.

6.1.2       Par Value.

The New Common Stock shall have a par value of $0.01 per share.

6.2       New Warrants.

As provided in and subject to the conditions set forth in the Plan, including Section 5.7.2, Reorganized FairPoint Communications shall issue to each holder of an Allowed Class 7 FairPoint Communications Unsecured Claim, its Ratable Proportion of New Warrants.

6.3       Securities Law Matters.

6.3.1       Exemption from Securities Laws.

Except as otherwise provided herein, and to the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Common Stock, the Litigation Trust Interests and the New Warrants pursuant to

the Plan and any subsequent sales, resales, transfers, or other distributions of such New Common Stock, Litigation Trust Interests or New Warrants shall be exempt from registration under the Securities Act, any other federal or state securities law registration requirements, and all rules and regulations promulgated thereunder. Any such Securities issued to an "affiliate" of Reorganized FairPoint within the meaning of the Securities Act or any Person Reorganized FairPoint reasonably determines to be an "underwriter", and which does not agree to resell such securities only in "ordinary trading transactions," within the meaning of section 1145(b)(1) of the Bankruptcy Code shall be subject to such transfer restrictions and bear such legends as shall be appropriate to ensure compliance with the Securities Act.

### 6.3.2    Registration Rights Agreement.

On the Effective Date, Reorganized FairPoint Communications will enter into a registration rights agreement (the "Registration Rights Agreement") with each holder of greater than ten percent (10%), on a fully diluted basis, of the New Common Stock on the Effective Date (a "Holder of Registrable Securities"). The Holders of Registrable Securities shall be entitled to request an aggregate of two demand registrations; *provided*, that no such registration shall be demanded prior to the expiration of the date which is one hundred eighty (180) days following the Effective Date; *provided further*, that in no event shall Reorganized FairPoint Communications be obligated to effect more than two (2) demand registrations pursuant to all requests for demand registration. A form of the Registration Rights Agreement, including a form of shelf registration statement if necessary, will be included in the Plan Supplement.

### 6.3.3    Securities Exchange Listing.

Reorganized FairPoint Communications will use its reasonable best efforts to obtain a listing for the New Common Stock on one of the following national securities exchanges: (a) the New York Stock Exchange, Inc., (b) the Nasdaq Global Stock Market, or (c) any other comparable exchange.

## SECTION VII
## IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS AND
## EQUITY INTERESTS UNDER THE PLAN;
## ACCEPTANCE OR REJECTION OF THE PLAN

### 7.1    Voting of Claims.

7.1.1    Each holder of an Allowed Claim or the holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a), in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Section IV and Section V of the Plan, shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other applicable order of the Bankruptcy Court. Any Unimpaired Class of Claims and the Subsidiary Equity Interests shall be deemed to have accepted the Plan. Any Class of Claims and the Old FairPoint Equity Interests that will not receive or retain any property on account of such Claims or Equity Interests under the Plan shall be deemed to have rejected the Plan.

7.1.2    Each of Classes 4 and 7 is Impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, each of the Classes 9 and 11 is conclusively deemed to have rejected the Plan.

7.2    Acceptance by Unimpaired Classes.

Each of Classes 1, 2, 3, 5, 6, 8 and 10 is Unimpaired under the Plan and each such Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

7.3    Elimination of Vacant Classes.

Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 shall be deemed deleted from the Plan for purposes of voting on or rejection of the Plan, and for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

7.4    Nonconsensual Confirmation.

If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, FairPoint reserves the right to amend the Plan in accordance with Section 16.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to Impaired Classes of Claims that are deemed to reject the Plan, FairPoint shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

7.5    Revocation of the Plan.

Subject to Section 16.5 hereof, the Debtors-in-Possession may revoke and withdraw the Plan in its entirety at any time prior to entry of the Confirmation Order.  If the Plan is so revoked or withdrawn, then it shall be deemed null and void.

## SECTION VIII
## MEANS OF IMPLEMENTATION OF THE PLAN

8.1    Regulatory Settlements.  As provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the settlements and compromises set forth in the Regulatory Settlements, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and controversies resolved pursuant to the Regulatory Settlements.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the Regulatory Settlements reflected in the Plan are (i) in the best interest of FairPoint and its Estates, (ii) fair, equitable and reasonable, (iii) made in good faith and (iv) approved by the Bankruptcy Court.  Subject to obtaining the approval of the settlements reflected in the Plan by the Bankruptcy Court, on the

Effective Date, Reorganized FairPoint will take all actions necessary or reasonably required to effectuate such settlements and such settlements shall be binding on Reorganized FairPoint.

8.2     Transactions on the Effective Date.

(a)     On the Effective Date, the following shall be deemed to have occurred simultaneously:

(i)     the Amended Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware, and the New Organizational Documents shall become effective and binding upon Reorganized FairPoint Communications;

(ii)     the Old FairPoint Equity Interests shall be extinguished;

(iii)     Reorganized FairPoint Communications shall distribute the Cash Payment, New Common Stock, the New Warrants, if any, and the Litigation Trust Interests and shall enter into the New Credit Agreement;

(iv)     the capital structure of Reorganized FairPoint Communications as set forth in Sections V and VI shall be in effect; and

(v)     the New Board shall be installed without any further action.

(b)     On the Effective Date, the closing of the New Revolver shall be deemed to occur immediately after the New Board is in place and the events set forth in Section 8.2(a) have occurred.

8.3     Reorganization of FairPoint; Continuation of Businesses.

On and after the Effective Date, Reorganized FairPoint shall continue to engage in its respective businesses.  Except as otherwise provided in the Plan, FairPoint shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other legal entity, as the case may be, with all the powers of a corporation, limited liability company, partnership or other legal entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable entity included in the definition of "FairPoint" is incorporated or organized and pursuant to the respective certificate of incorporation and bylaws (or other organizational documents) in effect prior to the Effective Date, except with respect to the New Organizational Documents (or other organizational documents) that are amended by the Plan, the Plan Supplement or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. Notwithstanding the foregoing, but subject to the provisions of any applicable Regulatory Settlement, on or as of the Effective Date, or as soon as reasonably practicable thereafter, and without the need for any further action, Reorganized FairPoint may:  (a) cause any or all of Reorganized FairPoint to be merged into one or more of Reorganized FairPoint, dissolved or otherwise consolidated, (b) cause the transfer of assets between or among Reorganized FairPoint, or (c) engage in any other transaction in furtherance of the Plan.

8.4     Reorganized FairPoint's Obligations Under the Plan.

8.4.1     From and after the Effective Date, as set forth herein, Reorganized FairPoint shall perform the corresponding obligations under the Plan of its predecessor or predecessor-in-interest.  The Plan will be administered and actions will be taken in the name of FairPoint and Reorganized FairPoint through, in accordance with the terms hereof, Reorganized FairPoint.

8.4.2     From and after the Effective Date, Reorganized FairPoint shall, among other things:

(a)     administer the Plan and take all steps and execute all instruments and documents necessary to effectuate the Plan;

(b)     pursue (including, without limitation, prosecuting, enforcing, objecting, litigating, reconciling, settling, abandoning and resolving) all of FairPoint's retained Causes of Action, defenses and counterclaims;

(c)     reconcile Claims and resolve Disputed Claims, and administer the Claims allowance and disallowance processes as set forth in the Plan, including, without limitation, objecting, prosecuting, litigating, reconciling, settling and resolving Claims and Disputed Claims in accordance with the Plan;

(d)     make decisions regarding the retention, engagement, payment and replacement of professionals, employees and consultants;

(e)     administer the Distributions under the Plan, including (i) making Distributions in accordance with the terms of the Plan and (ii) establishing and maintaining the various Reserves;

(f)     exercise such other powers as necessary or prudent to carry out the provisions of the Plan;

(g)     invest any Cash pending Distribution;

(h)     file appropriate tax returns; and

(i)     take such other actions as may be necessary or appropriate to effectuate the Plan.

8.4.3     Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by Reorganized FairPoint (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by Reorganized FairPoint in the ordinary course of its respective businesses.

8.5    New Organizational Documents.

The New Organizational Documents shall be filed as part of the Plan Supplement and shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent required, to prohibit the issuance of nonvoting equity securities (other than any warrants and/or options) as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the New Organizational Documents, after the Effective Date, as permitted by applicable law.  Except as otherwise provided herein, the New Organizational Documents shall contain such indemnification provisions applicable to the officers, directors and employees of Reorganized FairPoint Communications and such other Persons as may, in the discretion of the New Board, be appropriate and permitted under applicable law.

8.6    New Board.

8.6.1    General.

(a)    On the Effective Date, each member of the existing board of directors of FairPoint Communications shall be deemed to have resigned.

(b)    On the Effective Date, the property, business and affairs of Reorganized FairPoint Communications and the other Reorganized FairPoint entities shall become the general responsibility of the New Board.  Simple majority rule shall govern all actions of the New Board.  A list setting forth the identities of the members of the New Board, to the extent available, shall be filed as part of the Plan Supplement or otherwise shall be identified in a submission to the Bankruptcy Court on or prior to the Effective Date.

8.6.2    Initial Number of Directors; Initial Composition.

(a)    Reorganized FairPoint Communications shall have a New Board, which shall initially consist of nine directors.

(b)    The initial composition of the New Board shall be determined as follows:

(i)    if the holders of the FairPoint Communications Unsecured Claims vote to accept the Plan, then (A) one member of the New Board shall be the chief executive officer of Reorganized FairPoint Communications, (B) seven members of the New Board shall be nominated by the Lender Steering Committee and (C) one member of the New Board shall be nominated by the steering committee of the Ad Hoc Committee of Senior Noteholders (in consultation with the Creditors' Committee and the other members of the Ad Hoc Committee of Senior Noteholders); *provided*, *however*, that in the event that a member of the New Board has not been nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan by the Plan Supplement filing deadline, then the Persons described therein shall lose their right to nominate a member of the New Board and the Lender Steering Committee shall have the right to nominate an additional member of the New Board; provided, further, that if the Lender Steering Committee determines not to nominate an additional member of the New Board then the number of directors on the New Board shall be reduced to eight and seven of such members of the New Board shall be nominated by the Lender Steering Committee; or

(ii)     if the holders of the FairPoint Communications Unsecured Claims reject the Plan, then (A) one member of the New Board shall be the chief executive officer of Reorganized FairPoint Communications, (B) any person previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan shall not be considered for nomination or election to the New Board, and (C) eight members of the New Board shall be nominated by the Lender Steering Committee; *provided*, *however*, that if the Lender Steering Committee determines not to nominate an additional member of the New Board to replace the individual previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan then the number of directors on the New Board shall be reduced to eight and seven of such members of the New Board shall be nominated by the Lender Steering Committee;

*provided,* that, in the event of either (i) or (ii) above, (1) the Lender Steering Committee shall consider residents of northern New England among the candidates considered for nomination to the New Board and (2) at least one of the members of the New Board nominated by the Lender Steering Committee shall be a resident of northern New England.

8.6.3     Reduction in Number of Directors.

(a)     The Lender Steering Committee shall have the option to reduce the number of members of the New Board they are entitled to nominate pursuant to Section 8.6.2(b)(i) or (b)(ii) above from seven or eight, respectively, to five.

(b)     In the event the Lender Steering Committee decides to reduce the number of members of the New Board they are entitled to nominate to five:

(i)     if the holders of the FairPoint Communications Unsecured Claims vote to accept the Plan, then the number of directors serving on the New Board shall be reduced from nine to seven and: (A) one member of the New Board shall be the chief executive officer of Reorganized FairPoint Communications, (B) five members of the New Board shall be nominated by the Lender Steering Committee, and (C) one member of the New Board shall be nominated by the steering committee of the Ad Hoc Committee of Senior Noteholders (in consultation with the Creditors' Committee and the other members of the Ad Hoc Committee of Senior Noteholders); *provided*, *however*, that in the event that a member of the New Board has not been nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan by the Plan Supplement filing deadline, then the Persons described therein shall lose their right to nominate a member of the New Board and the Lender Steering Committee shall have the right to nominate an additional member of the New Board; *provided*, further, that if the Lender Steering Committee determines not to nominate an additional member of the New Board then the number of directors on the New Board shall be reduced to six; or

(ii)     if the holders of FairPoint Communications Unsecured Claims vote to reject the Plan, then the number of directors serving on the New Board shall be reduced from nine to six and: (A) one member of the New Board shall be the chief executive officer of Reorganized FairPoint Communications, (B) any person previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan shall not be considered for nomination or election to the New Board, and (C) five members of the New Board shall be nominated by the Lender

Steering Committee; *provided*, *however*, that if the Lender Steering Committee determines not to nominate an additional member of the New Board to replace the individual previously nominated pursuant to Section 8.6.2(b)(i)(C) of the Plan then the number of directors on the New Board shall be reduced to five and four of such members of the New Board shall be nominated by the Lender Steering Committee.

### 8.6.4 Qualifications of Directors.

A supermajority of the directors initially serving on the New Board (whether pursuant to Section 8.6.2 or 8.6.3 above) shall be Independent Directors.

### 8.6.5 Term

Each member of the New Board shall hold office until the first annual meeting of the stockholders to be held following the one-year anniversary of the Effective Date and until his or her successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal. The directors who are elected at the annual meeting of the stockholders, and directors who are elected in the interim to fill vacancies and newly created directorships, shall hold office until their respective successors shall have been duly elected and qualified or until their earlier death, resignation or removal.

### 8.7 Officers of Reorganized FairPoint.

### 8.7.1 Generally.

The executive officers of FairPoint immediately prior to the Effective Date will serve as the initial officers of Reorganized FairPoint on and after the Effective Date. Such officers will serve in accordance with applicable non-bankruptcy law, any employment agreement with Reorganized FairPoint and, as appropriate, the New Organizational Documents or its existing articles of incorporation and bylaws.

### 8.7.2 Assumption of Executive Agreements.

On the Confirmation Date, and subject to the occurrence of the Effective Date, FairPoint shall be deemed to have assumed the Executive Agreements.

### 8.8 Operations of FairPoint Between Confirmation and the Effective Date.

FairPoint shall continue to operate as Debtors-in-Possession during the period from the Confirmation Date through and until the Effective Date.

### 8.9 Revesting of Assets.

Pursuant to section 1141(b) and (c) of the Bankruptcy Code, except as otherwise provided in the Plan, the property of the Estate and FairPoint shall revest in Reorganized FairPoint on the Effective Date of the Plan. From and after the Effective Date, Reorganized FairPoint may operate its respective businesses and may use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules and the

Bankruptcy Court. As of the Effective Date, all property of FairPoint and Reorganized FairPoint shall be free and clear of all Claims, Liens and interests, except as specifically provided in the Plan or in the Confirmation Order. Without limiting the foregoing, Reorganized FairPoint may, without application to or approval by the Bankruptcy Court, pay any reasonable fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Reorganized FairPoint may incur after the Effective Date.

8.10    Dissolution of the Creditors' Committee.

On the Effective Date, except as provided in this Section 8.10, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from or in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate, except for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

8.11    Effectuating Documents; Further Transactions.

The chairman of the board of directors, the president, the chief executive officer, the chief financial officer, the executive vice president and general counsel, the controller or any other appropriate officer of FairPoint or Reorganized FairPoint, as the case may be, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of FairPoint or Reorganized FairPoint shall be authorized to certify or attest to any of the foregoing, if necessary.

8.12    Preservation of Certain Causes of Action; Defenses.

Except as otherwise provided in the Plan, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized FairPoint, as successors-in-interest to FairPoint and its Estates, shall retain and may enforce FairPoint's Causes of Action that are property of FairPoint and its Estates (including Avoidance Actions), the Litigation Trust may enforce all rights to commence and pursue, as appropriate, any and all Litigation Trust Claims and Reorganized FairPoint shall retain and enforce all defenses and counterclaims to all Claims asserted against FairPoint and its Estates, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code. Reorganized FairPoint may pursue such Causes of Action (other than the Litigation Trust Claims), counterclaims and defenses, as appropriate, in accordance with its best interests, as determined by Reorganized FairPoint. As of the Effective Date, FairPoint and Reorganized FairPoint shall have assigned the Litigation Trust Claims to the Litigation Trust.

8.13    Cancellation of Existing Securities.

On the Effective Date, except as otherwise provided for herein, (a) all securities, equity interests, notes, bonds, indentures and other instruments or documents evidencing or creating any indebtedness, or obligation of FairPoint, including without limitation, the

Prepetition Credit Agreement, the Senior Notes and the Old FairPoint Equity Interests (except such equity interests, notes or other instruments evidencing indebtedness or obligations of FairPoint that are Reinstated under the Plan, including, without limitation, the Subsidiary Equity Interests) shall be as against FairPoint and its successors cancelled and extinguished, and (b) the obligations of FairPoint under any agreements, indentures, or certificates of designation governing any securities, equity interests, notes, bonds, indentures and other instruments or documents evidencing or creating any indebtedness, or obligation of FairPoint, including, without limitation, the Prepetition Credit Agreement, the Senior Notes and the Old FairPoint Equity Interests (except such equity interests, notes or other instruments evidencing indebtedness or obligations of FairPoint that are Reinstated under the Plan, including, without limitation, the Subsidiary Equity Interests), as the case may be, shall be fully released, terminated, extinguished and discharged; *provided, however*, that notwithstanding anything to the contrary in the Plan, the provisions of the Prepetition Credit Agreement governing the relationship between the Prepetition Credit Agreement Agent and the Prepetition Credit Agreement Lenders, including but not limited to those provisions relating to the rights of the Prepetition Credit Agreement Agent to expense reimbursement, indemnification and other similar amounts, shall not be affected by and shall survive the Plan, entry of the Confirmation Order and the occurrence of the Effective Date.

### 8.14    Long Term Incentive Plan.

On the Effective Date, Reorganized FairPoint shall be deemed to have adopted the Long Term Incentive Plan without any further action by FairPoint, Reorganized FairPoint, Reorganized FairPoint's shareholders or the New Board.

### 8.15    Success Bonuses.

On the Effective Date, Reorganized FairPoint shall be deemed to have adopted and authorized the Success Bonuses without any further action by FairPoint, Reorganized FairPoint, Reorganized FairPoint's shareholders or the New Board.

### 8.16    Indemnification; Directors & Officers Insurance.

Reorganized FairPoint shall assume all existing indemnification obligations of FairPoint in favor of the directors of FairPoint who held such position on June 1, 2009 and thereafter, and the officers of FairPoint listed on Exhibit G hereto (collectively, the "Indemnified Persons"), and the directors, officers and employees of Reorganized FairPoint on and following the Effective Date (whether such indemnification obligations are in FairPoint's charter, bylaws, contracts or otherwise); *provided* that Reorganized FairPoint's indemnification obligation to and for the benefit of the Indemnified Persons shall be limited in the aggregate to twenty million dollars ($20,000,000.00) with respect to any Claim asserted against such Indemnified Person that arose prior to the Effective Date.  In addition, following the Effective Date, Reorganized FairPoint shall purchase director and officer liability insurance for the directors and officers of Reorganized FairPoint on a going-forward basis (in the form and substance satisfactory to the New Board).  Nothing herein shall be deemed to affect any applicable insurance coverage.

8.17    <u>The Litigation Trust</u>.

(a)    On the Effective Date, FairPoint or Reorganized FairPoint, as the case may be, on its own behalf and on behalf of holders of Allowed Prepetition Credit Agreement Claims and Allowed FairPoint Communications Unsecured Claims shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Litigation Trust Agreement. FairPoint or Reorganized FairPoint shall transfer the Litigation Trust Assets to the Litigation Trust. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. Upon delivery of the Litigation Trust Assets to the Litigation Trust, Reorganized FairPoint shall be released from all liability with respect to the delivery of such distributions. Any recoveries on account of the Litigation Trust Claims shall be distributed to holders of the Litigation Trust Interests in accordance with the Plan and the Litigation Trust Agreement.

(b)    In connection with the transfer of the Litigation Trust Claims, any attorney-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) shall be transferred to the Litigation Trust and shall vest in the Litigation Trustee and its representatives. FairPoint or Reorganized FairPoint, as the case may be, and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges. The Confirmation Order shall provide that the Litigation Trustee's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of FairPoint's Estates.

(c)    If a Cash Payment is made on the Effective Date to the holders of Class 4 Prepetition Credit Agreement Claims under section 5.4.2(c) of the Plan, then the Litigation Trust Funds will be secured by all of the assets of the Litigation Trust and will be paid to the holders of the Prepetition Credit Agreement Claims before the holders of the Litigation Trust Interests receive any distributions on account of such interests. If, however, a Cash Payment is not made on the Effective Date to the holders of Class 4 Prepetition Credit Agreement Claims under section 5.4.2(c) of the Plan, then, notwithstanding anything in the Plan to the contrary, the Litigation Trust Funds (plus interest calculated at the prime lending rate as announced from time to time by Bank of America, N.A.) shall be repaid to Reorganized FairPoint before the holders of the Prepetition Credit Agreement Claims or Litigation Trust Interests receive any distributions on account of such interests and Reorganized FairPoint shall hold a valid, binding, continuing, enforceable, fully-perfected first priority, senior lien on, and security interest in, all Litigation Trust Assets until the Litigation Trust Funds have been repaid to Reorganized FairPoint.

(d)    The Litigation Trust shall be established for the sole purpose of liquidating the Litigation Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(e)    The transfer of the Litigation Trust Assets to the Litigation Trust shall be made, as provided herein, for the benefit of the holders of Allowed Prepetition Credit Agreement Claims and Allowed FairPoint Communications Unsecured Claims. Immediately thereafter, on behalf of the holders of Allowed Prepetition Credit Agreement Claims and

Allowed FairPoint Communications Unsecured Claims, FairPoint or Reorganized FairPoint, as the case may be, shall transfer such Litigation Trust Assets to the Litigation Trust in exchange for Litigation Trust Interests for the benefit of holders of Allowed Prepetition Credit Agreement Claims and Allowed FairPoint Communications Unsecured Claims in accordance with the Plan. Upon the transfer of the Litigation Trust Assets, FairPoint or Reorganized FairPoint, as the case may be, shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by Reorganized FairPoint and the Litigation Trustee shall be deemed to have been designated as a representative of Reorganized FairPoint pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of Reorganized FairPoint. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed to holders of Allowed Prepetition Credit Agreement Claims and Allowed FairPoint Communications Unsecured Claims (or FairPoint or Reorganized FairPoint, as applicable, as to the Litigation Trust Funds) consistent with the terms of the Plan and the Litigation Trust Agreement.

### SECTION IX
### DISTRIBUTIONS UNDER THE PLAN

9.1     Distributions on Allowed Claims.

Distributions with respect to holders of Allowed Claims shall only be made on a Distribution Date. All Allowed Claims held by a single creditor against a single entity within the definition of "FairPoint" shall be aggregated and treated as a single Claim against such entity. At the written request of Reorganized FairPoint or the Disbursing Agent, any creditor holding multiple Allowed Claims shall provide to Reorganized FairPoint or the Disbursing Agent, as the case may be, a single address to which any Distributions shall be sent.

9.2     Date of Distributions.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

9.3     Disbursing Agent.

Except as otherwise provided in Sections 9.6.2(a) and 9.6.3 of the Plan, all Distributions under the Plan shall be made by Reorganized FairPoint Communications as Disbursing Agent or such other Person designated by Reorganized FairPoint Communications as

a Disbursing Agent.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties.

9.4     Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  In furtherance of the rights and powers of the Disbursing Agent, the Disbursing Agent shall have no duty or obligation to make Distributions to any holder of an Allowed Claim unless and until such holder executes and delivers, in a form acceptable to the Disbursing Agent, any documents applicable to such Distributions.

9.5     Fees and Expenses of Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date, including reasonable fees and expenses of counsel, shall be paid in Cash by Reorganized FairPoint without further order of the Bankruptcy Court within twenty (20) days of receipt of an invoice by Reorganized FairPoint.  In the event that Reorganized FairPoint objects to the payment of such invoice for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by Reorganized FairPoint.

9.6     Delivery of Distributions.

9.6.1     Distributions to Last Known Address.

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of FairPoint or its agents, as applicable, unless FairPoint or Reorganized FairPoint have been notified in writing of a change of address by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  Nothing in the Plan shall require Reorganized FairPoint to attempt to locate any holder of an Allowed Claim.

9.6.2     Distributions to Prepetition Credit Agreement Agent.

(a)     The Prepetition Credit Agreement Agent shall be the Disbursing Agent for the holders of all Prepetition Credit Agreement Claims.  Accordingly, Distributions for the benefit of the holders of Prepetition Credit Agreement Claims (including distributions received from the Litigation Trust in respect of the Litigation Trust Funds or otherwise) shall be made to the Prepetition Credit Agreement Agent.  The Prepetition Credit Agreement Agent shall,

in turn, promptly administer the Distributions to the holders of Allowed Prepetition Credit Agreement Claims, in accordance with the Plan and the Prepetition Credit Agreement. The issuance and Distribution of the New Common Stock, the Litigation Trust Interests and Cash Payment to the Prepetition Credit Agreement Agent, and the issuance and execution and delivery of the New Term Loan shall be deemed a Distribution to the respective holders of Allowed Prepetition Credit Agreement Claims. Upon delivery of the Distributions required under the Plan as provided in this paragraph, Reorganized FairPoint shall be released of all Liability with respect to the delivery of such Distributions.

(b)     The Prepetition Credit Agreement Agent shall be exculpated by all Persons from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon it as Disbursing Agent under the Plan or any order of the Bankruptcy Court pursuant to or in furtherance of the Plan. No holder of a Claim or an Equity Interest or other party in interest shall have or pursue any Claim or Cause of Action against the Prepetition Credit Agreement Agent for making payments in accordance with the Plan or for implementing provisions of the Plan in its capacity as Disbursing Agent.

### 9.6.3     Distributions to Indenture Trustee.

The Indenture Trustee shall be the Disbursing Agent for the holders of all Senior Notes Claims. Accordingly, Distributions for the benefit of the holders of Allowed Senior Notes Claims (including distributions received from the Litigation Trust) shall be made to the Indenture Trustee. The Indenture Trustee shall, in turn, promptly administer the Distributions to the holders of such Allowed Senior Notes Claims, in accordance with the Plan and the applicable Indentures. The Indenture Trustee, in its capacity as Disbursing Agent, may transfer any such Distributions through the facilities of DTC or another third-party distribution agent. The issuance and Distribution of the New Common Stock and the New Warrants to the Indenture Trustee shall be deemed a Distribution to the respective holders of Allowed Senior Notes Claims. Upon delivery of the Distributions required under the Plan as provided in this paragraph, Reorganized FairPoint shall be released of all liability with respect to the delivery of such Distributions.

### 9.7     Unclaimed Distributions.

All Distributions under the Plan that are unclaimed for a period of one (1) year after Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in Reorganized FairPoint and any entitlement of any holder of any Claims to such Distributions shall be extinguished, discharged and forever barred.

### 9.8     Distribution Record Date.

The Claims register shall be closed on the Distribution Record Date, and any subsequent transfer of any Claim shall be prohibited. FairPoint and Reorganized FairPoint shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

9.9     Manner of Payment.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements; *provided*, *however*, that the Cash payment to the Prepetition Credit Agreement Agent in accordance with Section 9.6.2(a) of the Plan shall be made by wire transfer and the Cash Payment made to holders of Allowed Prepetition Credit Agreement Claims in accordance with Section 5.4.2(c) of the Plan shall be made by wire transfer.

9.10     Time Bar to Cash Payments by Check.

Checks issued by, or on behalf of, FairPoint or Reorganized FairPoint on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing directly to Reorganized FairPoint by the holder of the Allowed Claim with respect to which such check originally was issued on or before the later of the first anniversary of (a) the Effective Date and (b) the date on which the Claim at issue became an Allowed Claim. After such dates, all Claims in respect of void checks shall be extinguished, discharged and forever barred, and the proceeds of such checks shall revest in and become the property of Reorganized FairPoint.

9.11     No Fractional Distributions.

No fractional shares of New Common Stock or New Warrants for fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares or New Warrants for fractional shares. When any Distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of fractional shares of New Common Stock or New Warrants for fractional shares, the actual Distribution of such fractional shares shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number, with no further payment therefor. The total number of authorized shares of New Common Stock (including shares of New Common Stock issuable upon the exercise of New Warrants) to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

9.12     Fractional Cents.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down) with half cents or more being rounded up and fractions less than half of a cent being rounded down.

9.13     Setoffs and Recoupment.

FairPoint may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Causes of Action of any nature whatsoever that FairPoint may have against the applicable claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or

release by FairPoint or Reorganized FairPoint of any such Causes of Action they may have against such claimant.

9.14    Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

9.15    Distributions After Effective Date.

Distributions made after the Effective Date shall be deemed to have been made on the Effective Date.

9.16    Interest on Claims.

Except as specifically provided for in the Plan, the Confirmation Order or applicable law, interest shall not accrue on Claims, and no holders of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Except as expressly provided herein, no Prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

9.17    No Distribution in Excess of Allowed Amount of Claim.

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

9.18    Limited Recoveries.

Notwithstanding anything contained herein to the contrary, in the event that the sum of Distributions under the Plan, including Distributions from Litigation Trust Interests, are equal to or in excess of one hundred percent (100%) of any holder's Allowed Claim, then distributions from the Litigation Trust to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Litigation Trust Interests for and on behalf of holders of other Litigation Trust Interests and accordingly shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Litigation Trust Interests and the Bankruptcy Code.

9.19    Ordinary Course Post-Petition Liabilities.

Subject to Section 3.1 hereof and except as otherwise specifically provided for in the Plan, holders of Claims against FairPoint (other than Claims for Professional Fees) based on Liabilities incurred after the Petition Date in the ordinary course of FairPoint's businesses shall

not be required to file any request for payment of such Claims with the Bankruptcy Court.  Such Claims shall be assumed and paid by Reorganized FairPoint in the ordinary course of business of Reorganized FairPoint, in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to the transaction underlying such Claims, without any further action by the holders of such Claims.

9.20    Payment of Taxes on Distributions Received Pursuant to the Plan.

All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, taxes on account of such Distributions.

9.21    Estimation of Claims.

FairPoint or Reorganized FairPoint, as applicable, may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether FairPoint or Reorganized FairPoint, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, FairPoint or Reorganized FairPoint, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

9.22    Claims Reserves.

On the Effective Date, and after making all Distributions required to be made on the Effective Date under the Plan, Reorganized FairPoint Communications shall establish and maintain a separate reserve (each, a "Reserve") for each Class of Claims and Unclassified Claims, which Reserve shall be administered by Reorganized FairPoint Communications; *provided, however,* that nothing herein shall be deemed to require a Reserve with respect to Tax Claims against FairPoint Communications.  For the avoidance of doubt, a Reserve shall be established for all amounts referred to as "reserved" in clauses (1) through (10) in Section 5.4.2(c) of the Plan other than clauses (3) and (5) of Section 5.4.2(c) of the Plan.  To the extent that Reserves are established and maintained for the benefit of any holder of a Disputed Claim, such Reserves shall include an amount of New Common Stock, New Warrants and/or Cash, as the case may be, equal to the Distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the amount of the Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent

the maximum amount in which such Claim ultimately may become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized FairPoint.

All New Common Stock, New Warrants and Cash, as applicable, allocable to a Class of Claims or Unclassified Claims hereunder shall be distributed by Reorganized FairPoint to the relevant Reserve on the Effective Date. Cash held in Reserve shall only be invested in Section 345 Securities. Each Reserve shall be closed and extinguished by Reorganized FairPoint Communications upon its determination that all Distributions of New Common Stock, New Warrants, Litigation Trust Interests and Cash required to be made under the Plan (other than those Distributions required to be made to holders of Allowed Prepetition Credit Agreement Claims pursuant to Section 5.4.2(d)) have been made in accordance with the terms of the Plan. Upon closure of a Reserve, all New Common Stock, New Warrants and Litigation Trust Interests then held in such Reserve shall be subject to re-Distribution to the applicable Class, as appropriate, and all Cash shall be distributed pursuant to Section 5.4.2(d), all in accordance with the provisions of Section V of the Plan.

9.23    Distributions from the Litigation Trust.

Subject to 8.17(c), the Litigation Trustee shall deliver all Distributions to be made under the Litigation Trust in respect of the Litigation Trust Interests to the Disbursing Agent. Promptly after receipt of any such Distribution (x) in respect of the repayment of the Litigation Trust Funds, the Prepetition Credit Agreement Agent shall distribute the same to the holders of Prepetition Credit Agreement Claims (or to the Disputed Claims Reserve on behalf of holders of Disputed Claims that are Prepetition Credit Agreement Claims) and (y) in respect of distributions to holders of the Litigation Trust Interests, the Disbursing Agent shall distribute the same to the holders of the Litigation Trust Interests, in each case in accordance with the Plan.

**SECTION X**
**DISPUTED CLAIMS AND EQUITY INTERESTS**
**UNDER THE PLAN**

10.1    Objections.

As of and following the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against FairPoint may be interposed and prosecuted only by Reorganized FairPoint. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of: (a) one hundred eighty days (180) after the Effective Date or (b) such later date as may be fixed by the Bankruptcy Court (the "Objection Deadline"); *provided*, *however*, that with respect to Claims that, as of the Objection Deadline, are subject to a pending claim objection, contested matter, or adversary proceeding (an "Initial Objection") wherein Reorganized FairPoint's objection to such claim is ultimately denied, the Objection Deadline shall be extended to the later of sixty (60) days from the date on which (i) the Bankruptcy Court enters an order denying such Initial Objection or (ii) any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection; *provided further*, that with respect to Claims that (A) are filed (whether as an amended Claim, new Claim, or otherwise) after the

Effective Date and (B) that are not otherwise subject to adjustment, expunction or disallowance pursuant to Sections 10.2, 10.3, 10.5, 10.6 and 10.7 of the Plan, the Objection Deadline shall be one hundred eighty (180) days after the date on which such Claim was filed. Nothing herein shall affect FairPoint's or Reorganized FairPoint's ability to amend the Schedules in accordance with the Bankruptcy Code and the Bankruptcy Rules.

10.2    Adjustment to Certain Claims Without a Filed Objection.

Any Claim that has been settled, paid and satisfied, or amended and superseded, may be adjusted or expunged on the Claims register by Reorganized FairPoint without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, all Claims filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent Reorganized FairPoint elects to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

10.3    No Distributions Pending Allowance.

Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

10.4    Distributions After Allowance.

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, Distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

10.5    Resolution of Administrative Expense Claims and Claims.

As of and following the Effective Date, Reorganized FairPoint shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against FairPoint and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against FairPoint without approval of the Bankruptcy Court.

10.6    Disallowance of Certain Claims.

Any Claims held by Persons from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Persons may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Persons have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to FairPoint by such Person have been turned over or paid to Reorganized FairPoint.

10.7    Indenture Trustee as Claim Holder.

Consistent with Bankruptcy Rule 3003(c), Reorganized FairPoint shall recognize proofs of Claims timely filed by the Indenture Trustee in respect of any Claims under the Indentures. Accordingly, any Claim arising under the Indentures, proof of which is filed by the registered or beneficial holder of Senior Notes, shall be disallowed as duplicative of the Claim of the applicable Indenture Trustee, without any further action of the Bankruptcy Court.

10.8    Offer of Judgment.

Reorganized FairPoint is authorized to serve upon a holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the holder of a Claim must pay the costs incurred by Reorganized FairPoint after the making of such offer, Reorganized FairPoint is entitled to set off such amounts against the amount of any Distribution to be paid to such holder without any further notice to or action, order, or approval of the Bankruptcy Court.

10.9    Amendments to Claims.

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or Reorganized FairPoint and any such new or amended Claim filed without prior authorization shall be deemed disallowed in full and expunged without any further action.

10.10    Claims Paid and Payable by Third Parties.

A Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not FairPoint or Reorganized FairPoint. No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of FairPoint's Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of FairPoint's Insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged from the Claims register without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

## SECTION XI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## UNDER THE PLAN

11.1 <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.

11.1.1 <u>General</u>.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between FairPoint and any Person shall be deemed assumed by FairPoint as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (c) that is specifically designated as a contract or lease to be rejected on Schedules 11.1(A) (executory contracts) or 11.1(B) (unexpired leases), which schedules shall be contained in the Plan Supplement; *provided*, *however*, that FairPoint reserves the right, on or prior to the Effective Date, to amend Schedules 11.1(A) and 11.1(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be either assumed or rejected, respectively, as provided in such amended schedules, as of the Effective Date. FairPoint shall provide notice of any amendments to Schedules 11.1(A) and/or 11.1(B) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedules 11.1(A) or 11.1(B) shall not constitute an admission by FairPoint that such document is an executory contract or an unexpired lease or that FairPoint has any liability thereunder. For the purpose of the Plan, the various regulatory consent orders to which FairPoint was a party with the MPUC, the VDPS and the NHPUC on the Petition Date shall not be deemed to be executory contracts governed by Section XI of the Plan.

11.2 <u>Inclusiveness</u>.

Unless otherwise specified on Schedules 11.1(A) or 11.1(B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and all executory contracts or unexpired leases appurtenant to the premises thereof, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises and any other interests in real estate or rights <u>in rem</u> related to the premises thereof, in each case, without regard to whether such agreement, instrument or other document is listed on Schedules 11.1(A) or 11.1(B) of the Plan Supplement.

11.3    Provisions Related to Cure Payments and Rejection Damages.

11.3.1    Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions or rejections described in this Section 11.3 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or rejection of such executory contract or unexpired lease, including objecting to the Cure amount designated by FairPoint as payable in connection with an assumption, will be deemed to have consented to such assumption or rejection and agreed to the specified Cure amount.

(a)    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases.

All proofs of Claims arising from the rejection of executory contracts or unexpired leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon FairPoint or Reorganized FairPoint, as applicable, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order and (c) notice of an amendment to the schedule of rejected contracts.

Any Person that is required to file a proof of Claim arising from the rejection of an executory contract or an unexpired lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against FairPoint or Reorganized FairPoint or the Estate and their respective properties, and FairPoint and Reorganized FairPoint and the Estates and their respective properties shall be forever discharged from any and all Liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to permanent injunction.

(b)    Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan.

(i)    (A)    Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or as soon thereafter as is practicable.  At least twenty (20) days prior to the Confirmation Hearing, FairPoint shall provide notices of proposed assumption and proposed Cure amounts to be sent to applicable third parties, the Lender Steering Committee and the Creditors' Committee.  In the event that FairPoint does not propose a Cure amount to be sent to the applicable third party, the Cure amount for such third party's executory contract or unexpired lease shall be deemed to be zero dollars ($0.00).  Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related Cure amount must be filed, served and actually received by FairPoint at least ten (10) days prior to the Confirmation Hearing.  Any counterparty to an executory contract and unexpired lease that fails to object

timely to the proposed assumption or Cure amount will be deemed to have assented to such matters.

(B)     In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of Reorganized FairPoint or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption, unless otherwise agreed between FairPoint or Reorganized FairPoint, as the case may be, and the counter party to such executory contract or unexpired lease. If any objection to Cure is sustained by the Bankruptcy Court, FairPoint, in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

(ii)     Notwithstanding Section 11.3.1(b)(i) above, to the extent (A) FairPoint is a party to any contract, lease or other agreement providing for the purchase, by a third party, of access to FairPoint's facilities or services, (B) any such agreement constitutes an executory contract or unexpired lease and (C) such agreement (1) has not been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (2) is not subject to a pending motion for reconsideration or appeal of an order authorizing the assumption or rejection of such executory contract or unexpired lease, (3) is not subject to a motion to assume or reject such executory contract or unexpired lease filed on or prior to the Effective Date, or (4) is not identified for rejection on Schedules 11.1(A) or 11.1(B) of the Plan Supplement, then such agreement will be assumed as of the Effective Date by FairPoint, in accordance with the provisions and requirements of sections 365 of the Bankruptcy Code. No Cure shall be paid and no other form of refund or billing credit shall be given in connection with the assumption of such an agreement.

11.4     <u>Indemnification Obligations</u>.

Except as specifically set forth in Sections 8.13 and 8.16 hereof, as of the Effective Date, FairPoint and Reorganized FairPoint shall have no continuing indemnification obligations under any of its executory contracts.

11.5     <u>Insurance Policies</u>.

Unless specifically rejected by order of the Bankruptcy Court, all of FairPoint's Insurance Policies which are executory, if any, and any agreements, documents or instruments relating thereto, shall be assumed under the Plan. Nothing contained in this Section 11.5 shall constitute or be deemed a waiver of any Cause of Action that FairPoint or Reorganized FairPoint, as applicable, may hold against any Person, including, without limitation, the Insurer, under any of FairPoint's Insurance Policies.

11.6     <u>Benefit Plans</u>.

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, Reorganized FairPoint shall continue to honor, in the ordinary

course of business, the Benefit Plans of FairPoint entered into before or after the Petition Date and not since terminated.

        11.7      <u>Retiree Benefits</u>.

        On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized FairPoint shall continue to pay all retiree benefits of FairPoint (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the FairPoint entities had obligated themselves to provide such benefits and subject to the right of Reorganized FairPoint to modify or terminate such retiree benefits in accordance with the terms thereof.

        11.8      <u>Amended Collective Bargaining Agreements</u>.

        On the Effective Date, the collective bargaining agreements by and between Northern New England Telephone Operations LLC and Telephone Operating Company of Vermont LLC (the two companies doing business as FairPoint Communications) and International Brotherhood of Electrical Workers, AFL-CIO Locals 2320, 2326, and 2327 and Communications Workers of America, AFL-CIO shall be deemed automatically assumed, as amended by the Labor MOU.

## SECTION XII
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

        12.1      <u>Conditions Precedent to Effectiveness</u>.

        The Effective Date shall not occur, and the Plan shall not become effective with respect to a particular entity listed on Exhibit A, unless and until the following conditions are satisfied in full or waived in accordance with Section 12.2 of the Plan:

        (a)      the terms of the Plan, the Disclosure Statement and the Plan Supplement shall be reasonably satisfactory to the Lender Steering Committee;

        (b)      the Bankruptcy Court shall have entered the Confirmation Order which shall have become a Final Order;

        (c)      the treatment of inter-company claims and the assumption of post-reorganization operating contracts shall be reasonably satisfactory to the Lender Steering Committee;

        (d)      the conditions precedent to the effectiveness of the New Revolver shall have been satisfied or waived by the parties thereto and Reorganized FairPoint shall have access to funding under the New Revolver;

        (e)      the conditions precedent to the effectiveness of the New Term Loan shall have been satisfied or waived by the parties thereto;

(f)     all actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable and shall be reasonably acceptable to the Lender Steering Committee;

(g)     all authorizations, consents and regulatory approvals, rulings, letters, no-action letters, opinions or documents, if any, that are necessary to implement the Plan or that are required by the applicable FairPoint entity or applicable law, regulation or order, in connection with the consummation of the Plan shall have been obtained and not revoked (including any approvals required by the Regulatory Settlements);

(h)     the Labor MOU shall have been ratified by the applicable union membership; and

(i)     applicable regulatory approvals from the Federal Communications Commission and from state regulatory authorities in certain states in which the applicable FairPoint entity operates, including the approval of the change of control applications and the related Regulatory Settlements, shall have been obtained or the applicable FairPoint entity shall have obtained a ruling from the Bankruptcy Court to the effect that the state regulations requiring such regulatory approvals are pre-empted by the Bankruptcy Code.

12.2     Waiver of Conditions.

Each of the conditions precedent in Section 12.1 hereof may be waived, in whole or in part, by FairPoint, except with respect to the conditions precedent set forth in Sections 12.1 (a), (b), (c), (e), (f), (g), (h) and (i) which shall require the consent of the Lender Steering Committee (such consent not to be unreasonably withheld, conditioned or delayed).  Any such waivers may be affected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court.

12.3     Satisfaction of Conditions.

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in Section 12.1 hereof shall have not occurred or otherwise been waived pursuant to Section 12.2 hereof, (a) the Confirmation Order shall be vacated, (b) FairPoint and all holders of Claims and interests, including any Equity Interests, shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) FairPoint's obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against FairPoint or any other Person or to prejudice in any manner the rights of FairPoint or any Person in any further proceedings involving FairPoint.

# SECTION XIII
## EFFECT OF CONFIRMATION

13.1    Binding Effect.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, FairPoint and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

13.2    Discharge of Claims and Termination of Old FairPoint Equity Interests.

Except as provided in the Plan, the rights afforded in and the payments and Distributions to be made under the Plan shall terminate all Old FairPoint Equity Interests and shall discharge all existing Liabilities and Claims of any kind, nature or description whatsoever against or in FairPoint or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, on the Effective Date, all existing Claims against FairPoint and Old FairPoint Equity Interests shall be, and shall be deemed to be, released, terminated, extinguished and discharged, and all holders of such Claims and Old FairPoint Equity Interests shall be precluded and enjoined from asserting against Reorganized FairPoint, their successors and assigns and any of their respective assets or properties, any other or further Claim or Old FairPoint Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

13.3    Discharge of Debtors.

On the Effective Date, in consideration of the Distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Old FairPoint Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged FairPoint, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Old FairPoint Equity Interests, rights and Liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Old FairPoint Equity Interest in, FairPoint.

13.4    Reservation of Causes of Action/Reservation of Rights.

Except with respect to the Released Parties, nothing contained in the Plan shall be deemed to be a waiver or the relinquishment of any Causes of Action that FairPoint or Reorganized FairPoint, as applicable, may have or may choose to assert against any Person.

## SECTION XIV
## EXCULPATION, RELEASE, INJUNCTION
## AND RELATED PROVISIONS

14.1     <u>Exculpation</u>.

**None of FairPoint, the Debtors-in-Possession, the Reorganized Debtors, and the other Released Parties or the Litigation Trustee shall have or incur any liability for any Claim, Cause of Action or other assertion of Liability for any act taken or omitted to be taken in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, dissemination, implementation, approval, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided*, *however*, that the foregoing shall not affect the Liability of any Person resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, fraud, gross negligence, criminal conduct, breach of fiduciary duty (to the extent applicable) and *ultra vires* acts.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges and any other applicable law or rules protecting such Persons from liability.  Furthermore, this exculpation is not intended to violate any requirement of the New York Rules of Professional Conduct.**

14.2     <u>Releases</u>.

**Effective as of the date the Plan is confirmed, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, FairPoint, their respective Estates, Reorganized FairPoint and each Person who, directly or indirectly, has held, holds, or may hold Claims or Old FairPoint Equity Interest shall release, waive and discharge unconditionally and forever each of the Released Parties from any and all Claims, Causes of Action and Liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence:  (a) taking place before the Petition Date in connection with or relating to FairPoint; and (b) in connection with, related to, or arising out of FairPoint's Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided*, that the foregoing shall not operate as a waiver of or release from any Causes of Action resulting from the willful misconduct, fraud, gross negligence, criminal conduct, breach of fiduciary duty (to the extent applicable) and *ultra vires* acts of any Released Party; *provided further*, that solely with respect to any Person (other than FairPoint, their respective Estates, or Reorganized FairPoint) who does not vote to accept the Plan or who is not deemed to have accepted the Plan, the release by such Person of any of the Released Parties shall be solely to the extent that such Released Party would have a pre-Effective Date indemnification claim against FairPoint; *provided further*, that (i) the foregoing releases will not apply to**

obligations arising under the Plan, and (ii) the foregoing releases will not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan.  Furthermore, the foregoing releases are not intended to violate any requirement of the New York Rules of Professional Conduct.

For the avoidance of doubt, this Section 14.2 shall not limit the implementation of a Regulatory Settlement or, as to the business and activities of FairPoint as conducted on and after the Effective Date of the Plan, the application and enforcement of applicable law in the respective states for which there is a Regulatory Settlement (consistent with the provisions of the Regulatory Settlements) with respect to the regulation of FairPoint by any governmental unit of the respective states including, if applicable, the MPUC, VPSB and/or the NHPUC.

14.3     Avoidance Actions/Objections.

Other than any releases granted herein, by the Confirmation Order or by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, Reorganized FairPoint shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery Causes of Action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to FairPoint or a Debtor-in-Possession.

14.4     Injunction or Stay.

From and after the Effective Date, all Persons shall be permanently enjoined from commencing or continuing in any manner against FairPoint or Reorganized FairPoint, their successors and assigns, or the Litigation Trust, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, Liability, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the order confirming the Plan.

Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all Persons shall be precluded from asserting against FairPoint, the Debtors-in-Possession, FairPoint's Estates, Reorganized FairPoint, the Released Parties, the Litigation Trust and their respective assets and properties, any other Claims or Equity Interests in connection with, relating to or arising out of any documents, instruments, or any act or omission, transaction or other activity of any kind or nature relating to FairPoint that occurred before the Effective Date.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of any nature whatsoever, including, without limitation, any interest accrued on Claims from and after the Petition Date, against FairPoint or any of their respective assets, properties or Estates.  On the Effective Date, all such Claims against, and Equity Interests in, FairPoint shall be fully released and discharged.

For the avoidance of doubt, this Section 14.4 shall not limit the implementation of a Regulatory Settlement or, as to the business and activities of FairPoint as conducted on and after the Effective Date of the Plan, the application and enforcement

of applicable law in the respective states for which there is a Regulatory Settlement (consistent with the provisions of the Regulatory Settlements) with respect to the regulation of FairPoint by any governmental unit of the respective states including, if applicable, the MPUC, VPSB and/or the NHPUC.

14.5    United States Government Claims.

Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States against FairPoint, nor shall anything in the Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceeding against FairPoint for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States against FairPoint.  This paragraph, however, shall in no way affect or limit the discharge granted to FairPoint under sections 524 and 1141 of the Bankruptcy Code.

## SECTION XV
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters in connection with, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, to:

(a)    hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure amounts and Claims resulting therefrom;

(b)    determine any and all adversary proceedings, applications and contested matters;

(c)    hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(e)    enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)    issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)     consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)     hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, the Litigation Trust, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court; *provided*, *however*, that any dispute arising under or in connection with the New Credit Agreement shall be determined in accordance with the governing law designated by the New Credit Agreement;

(i)     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by FairPoint), prior to the Effective Date or request by Reorganized FairPoint after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

(j)     hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(k)     issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(l)     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     hear and determine any rights, Claims or Causes of Action held by or accruing to FairPoint pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n)     recover all assets of FairPoint and property of FairPoint's Estates, wherever located;

(o)     resolve any disputes regarding whether a Cause of Action constitutes a Litigation Trust Claim;

(p)     enforce the terms of the Litigation Trust Agreement and to decide any claims or disputes which may arise or result from, or be connected with, the Litigation Trust Agreement, any breach or default under the Litigation Trust Agreement, or the transactions contemplated by the Litigation Trust Agreement;

(q)     enter a final decree closing the Chapter 11 Cases; and

(r)     hear any other matter not inconsistent with the Bankruptcy Code.

# SECTION XVI
# MISCELLANEOUS PROVISIONS

16.1    <u>Effectuating Documents and Further Transactions</u>.

On or before the Effective Date, and without the need for any further order or authority, FairPoint shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Reorganized FairPoint is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

16.2    <u>Withholding and Reporting Requirements</u>.

In connection with the Plan and all instruments issued in connection therewith and distributed with respect thereto, any party issuing any instrument or making any Distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution. Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to refrain from making a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

16.3    <u>Corporate Action</u>.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of FairPoint's entities or Reorganized FairPoint, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general business law of the states in which FairPoint or Reorganized FairPoint is incorporated or organized, without any requirement of further action by the managers or directors of FairPoint or Reorganized FairPoint. On the Effective Date, or as soon thereafter as is reasonably practicable, Reorganized FairPoint shall, if required, file its amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each such Person is (or shall be) organized, in accordance with the applicable general business law of each such jurisdiction.

16.4    <u>Modification of Plan</u>.

Alterations, amendments or modifications of or to the Plan may be proposed in writing by FairPoint at any time prior to the Confirmation Date; *provided*, that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and FairPoint has complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before

substantial consummation; *provided*, that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan prior to any alteration, amendment or modification will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the holders of the Claims and subject to the consent of the Lender Steering Committee to any alteration, amendment or modification, which consent shall not be unreasonably withheld.

Prior to the Effective Date, FairPoint may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not materially change the treatment of holders of Claims or Equity Interests.

16.5     Revocation or Withdrawal of the Plan.

FairPoint reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. Subject to the foregoing sentence, if FairPoint revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against FairPoint or any other Person or to prejudice in any manner the rights of FairPoint or any Person in any further proceedings involving FairPoint.

16.6     Plan Supplement.

The Plan Supplement and the documents contained therein shall be filed with the Bankruptcy Court no later than five (5) days before the deadline for voting to accept or reject the Plan; *provided*, that the documents included therein may thereafter be amended and supplemented, prior to execution, so long as such amendment or supplement does not materially and adversely change the treatment of holders of Claims and subject to the consent of the Lender Steering Committee to any amendment or supplement, which consent shall not be unreasonably withheld. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

16.7     Payment of Statutory Fees.

On or before the Effective Date, all fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid in Cash. Following the Effective Date, all such fees shall be paid by the applicable entity included in the definition of "Reorganized FairPoint" until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

16.8     Exemption from Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the issuance of the New Common Stock, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

16.9     Expedited Tax Determination.

FairPoint and Reorganized FairPoint is authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, FairPoint for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

16.10    Exhibits/Schedules.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

16.11    Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

16.12    Severability of Plan Provisions.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, at the request of FairPoint, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

16.13    Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of New York without giving effect to its principles of conflict of law.

16.14    Conflicts.

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

16.15    Reservation of Rights.

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Cases are and will be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.

16.16    Post Confirmation Reporting.

Following confirmation of the Plan, Reorganized FairPoint shall file reports of its activities and financial affairs with the Bankruptcy Court, on a quarterly basis, within thirty (30) days after the conclusion of each such period; *provided* that Reorganized FairPoint's obligation to file such reports with the Bankruptcy Court shall terminate automatically upon the closing of the Chapter 11 Cases.  Any such reports shall be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee guidelines on such matters.

16.17    Notices.

All notices, requests and demands to or upon FairPoint must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided under the Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received during the normal business hours of FairPoint Communications (otherwise any such notice shall be deemed to have been received on the next Business Day) and telephonically confirmed, addressed as follows:

FAIRPOINT COMMUNICATIONS, INC.
521 E. Morehead Street, Ste. 500
Charlotte, NC 28202
Telephone:  (704) 344-8150
Facsimile:  (704) 344-1594
Attn:   Susan L. Sowell, Esq., Vice President and
          Assistant General Counsel

*with a copy to:*

*On behalf of FairPoint*

PAUL, HASTINGS, JANOFSKY & WALKER LLP
75 East 55th Street
New York, New York  10022
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Attn:   Luc A. Despins, Esq.
Attn:   James T. Grogan, Esq.

*with a copy to:*

*On behalf of the Administrative Agent for FairPoint's prepetition secured lenders:*

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022-3598
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8689
Attn:   Margot B. Schonholtz, Esq.
Attn:   Nicholas J. Cremona, Esq.

[*Signature Page Follows*]

Dated: March 10, 2010

Respectfully submitted,

**FairPoint Communications, Inc.**

(on behalf of itself and the other Debtors and
Debtors-in-Possession)

By: /s/ Shirley J. Linn, Esq._____
Name: Shirley J. Linn, Esq.
Title: Executive Vice President and General
Counsel

**Exhibit A**

<u>Name of FairPoint Entities and Case Numbers</u>

| DEBTOR NAME | CASE NUMBER |
|---|---|
| C & E COMMUNICATIONS, LTD. | 09-16333-BRL |
| BERKSHIRE NEW YORK ACCESS, INC. | 09-16334-BRL |
| FAIRPOINT COMMUNICATIONS, INC. | 09-16335-BRL |
| BE MOBILE COMMUNICATIONS, INCORPORATED | 09-16336-BRL |
| BENTLEYVILLE COMMUNICATIONS CORPORATION | 09-16337-BRL |
| BERKSHIRE CABLE CORP. | 09-16338-BRL |
| BERKSHIRE CELLULAR, INC. | 09-16339-BRL |
| BERKSHIRE NET, INC. | 09-16340-BRL |
| BERKSHIRE TELEPHONE CORPORATION | 09-16341-BRL |
| BIG SANDY TELECOM, INC. | 09-16342-BRL |
| BLUESTEM TELEPHONE COMPANY | 09-16343-BRL |
| COLUMBINE TELECOM COMPANY | 09-16344-BRL |
| COMERCO, INC. | 09-16345-BRL |
| COMMTEL COMMUNICATIONS INC. | 09-16346-BRL |
| COMMUNITY SERVICE TELEPHONE CO. | 09-16347-BRL |
| EL PASO LONG DISTANCE COMPANY | 09-16348-BRL |
| ENHANCED COMMUNICATIONS OF NORTHERN NEW ENGLAND INC. | 09-16349-BRL |
| EXOP OF MISSOURI, INC. | 09-16350-BRL |
| FAIRPOINT BROADBAND, INC. | 09-16351-BRL |
| FAIRPOINT CARRIER SERVICES, INC. | 09-16352-BRL |
| FAIRPOINT COMMUNICATIONS MISSOURI, INC. | 09-16353-BRL |
| FAIRPOINT COMMUNICATIONS SOLUTIONS CORP. – NEW YORK | 09-16354-BRL |
| FAIRPOINT COMMUNICATIONS SOLUTIONS CORP. – VIRGINIA | 09-16355-BRL |
| FAIRPOINT LOGISTICS, INC. | 09-16356-BRL |
| FAIRPOINT VERMONT, INC. | 09-16357-BRL |
| FREMONT BROADBAND, LLC | 09-16358-BRL |
| FREMONT TELCOM CO. | 09-16359-BRL |
| GTC COMMUNICATIONS, INC. | 09-16360-BRL |
| YCOM NETWORKS, INC. | 09-16361-BRL |
| UNITE COMMUNICATIONS SYSTEMS, INC. | 09-16362-BRL |
| THE EL PASO TELEPHONE COMPANY | 09-16363-BRL |
| ODIN TELEPHONE EXCHANGE, INC. | 09-16364-BRL |
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC | 09-16365-BRL |
| MJD SERVICES CORP. | 09-16366-BRL |
| GTC FINANCE CORPORATION | 09-16367-BRL |
| GTC, INC. | 09-16368-BRL |
| PEOPLES MUTUAL LONG DISTANCE COMPANY | 09-16369-BRL |
| PEOPLES MUTUAL SERVICES COMPANY | 09-16370-BRL |
| PEOPLES MUTUAL TELEPHONE COMPANY | 09-16371-BRL |
| RAVENSWOOD COMMUNICATIONS, INC. | 09-16372-BRL |
| YATES CITY TELEPHONE COMPANY | 09-16373-BRL |
| CHOUTEAU TELEPHONE COMPANY | 09-16374-BRL |
| CHAUTAUQUA AND ERIE TELEPHONE CORPORATION | 09-16375-BRL |
| CHINA TELEPHONE COMPANY | 09-16376-BRL |
| GITCO SALES, INC. | 09-16377-BRL |
| GIT-CELL, INC. | 09-16378-BRL |
| GERMANTOWN LONG DISTANCE COMPANY | 09-16379-BRL |
| FRETEL COMMUNICATIONS, LLC | 09-16380-BRL |
| ELLTEL LONG DISTANCE CORP. | 09-16381-BRL |
| ELLENSBURG TELEPHONE COMPANY | 09-16382-BRL |
| C-R TELEPHONE COMPANY | 09-16384-BRL |
| C-R LONG DISTANCE, INC. | 09-16386-BRL |
| C-R COMMUNICATIONS, INC. | 09-16387-BRL |
| MAINE TELEPHONE COMPANY | 09-16388-BRL |
| SUNFLOWER TELEPHONE COMPANY, INC. | 09-16389-BRL |
| MARIANNA AND SCENERY HILL TELEPHONE COMPANY | 09-16391-BRL |
| MARIANNA TEL, INC. | 09-16392-BRL |
| STANDISH TELEPHONE COMPANY | 09-16394-BRL |
| ST LONG DISTANCE, INC. | 09-16395-BRL |
| ST ENTERPRISES, LTD. | 09-16397-BRL |
| ST COMPUTER RESOURCES, INC. | 09-16398-BRL |
| SIDNEY TELEPHONE COMPANY | 09-16399-BRL |
| UTILITIES, INC. | 09-16400-BRL |
| TELEPHONE SERVICE COMPANY | 09-16401-BRL |
| MJD VENTURES, INC. | 09-16402-BRL |

| | |
|---|---|
| NORTHLAND TELEPHONE COMPANY OF MAINE, INC. | 09-16404-BRL |
| THE ORWELL TELEPHONE COMPANY | 09-16405-BRL |
| QUALITY ONE TECHNOLOGIES, INC. | 09-16406-BRL |
| TACONIC TECHNOLOGY CORP. | 09-16407-BRL |
| TACONIC TELCOM CORP. | 09-16408-BRL |
| TACONIC TELEPHONE CORP. | 09-16409-BRL |
| TELEPHONE OPERATING COMPANY OF VERMONT LLC | 09-16410-BRL |
| ORWELL COMMUNICATIONS, INC. | 09-16411-BRL |
| THE COLUMBUS GROVE TELEPHONE COMPANY | 09-16412-BRL |
| THE GERMANTOWN INDEPENDENT TELEPHONE COMPANY | 09-16413-BRL |
| UI COMMUNICATIONS, INC. | 09-16414-BRL |
| UI LONG DISTANCE, INC. | 09-16415-BRL |
| UI TELECOM, INC. | 09-16416-BRL |
| ST. JOE COMMUNICATIONS, INC. | 09-16423-BRL |
| CHAUTAUQUA & ERIE COMMUNICATIONS, INC. | 09-16424-BRL |

**Exhibit B**

<u>Labor MOU</u>

# TABLE OF CONTENTS

**Page**

I.      WAGES ................................................................................................................................... 1

II.      COST OF LIVING ADJUSTMENT (EXHIBIT G3) ............................................................. 1

III.      CORPORATE PROFIT SHARING (CPS) PLAN .................................................................. 2

IV.      401(K) PLAN ......................................................................................................................... 5

V.      JOINT COMMITTEE FOR OPERATIONAL SAVINGS ..................................................... 5

VI.      DURATION ............................................................................................................................ 7

VII.      CONDITIONS ........................................................................................................................ 7

VIII.      PENSION LUMP SUM CASHOUT ……………………………………………………………..8

**2010 MEMORANDUM OF UNDERSTANDING**
**BETWEEN**
**NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC**
**AND**
**TELEPHONE OPERATING COMPANY OF VERMONT LLC, THE TWO COMPANIES**
**D/B/A**
**FAIRPOINT COMMUNICATIONS**
**AND**
**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO**
**LOCALS 2320, 2326, and 2327**
**AND**
**COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO**

This Memorandum of Understanding ("MOU") is agreed to by and between the above-named Companies (herein the "Company" or "Companies," as context requires) and the International Brotherhood of Electrical Workers Locals 2320, 2326, and 2327 and Communications Workers of America AFL-CIO  (hereinafter the "Union") with respect to the following changes in the existing collective bargaining agreements. Unless noted specifically in this MOU, all other provisions of the existing agreements remain in force.

## I.      WAGES

The schedule of wage increases for the term of this Agreement shall be  amended as follows:

| Effective Date | Percentage Increase | Applied to: |
|---|---|---|
| Sunday, 8/7/11 | 3% | all steps of the basic wage schedules |
| Sunday, 8/5/12 | 3% | all steps of the basic wage schedules |
| Sunday, 8/4/13 | 3% | all steps of the basic wage schedules |

## II.      COST OF LIVING ADJUSTMENT      (EXHIBIT G3)

Section 1 of Exhibit G3 shall be amended as follows:

Effective  August 7, 2011 and August 5, 2012 and August 4, 2013, adjustments will be made in basic weekly rates in each wage schedule in accordance with the following:

(a)      the amount of the August 7, 2011 adjustment shall be: (i) one-half of the increase above four percent (4.0%) in the "CPI-W" (1982-84 =  100) for May 2011 over May 2009, applied to (ii) the scheduled rates in effect in each wage schedule on August 8, 2010, (iii) rounded to the nearest 50 cents.

(b)      the amount of the August 5, 2012 adjustment shall be: (i) one-half of the increase above two percent (2.0%) in the "CPI-W" (1982-84 =  100) for May 2012 over May 2011, applied to (ii) the scheduled rates in effect in each wage schedule on August 7, 2011, (iii) rounded to the nearest 50 cents.

(c) the amount of the August 4, 2013 adjustment shall be: (i) one-half of the increase above two percent (2.0%) in the "CPI-W" (1982-84 = 100) for May 2013 over May 2012, applied to (ii) the scheduled rates in effect in each wage schedule on August 5, 2012, (iii) rounded to the nearest 50 cents.

## III.  CORPORATE PROFIT SHARING (CPS) PLAN

The Corporate Profit Sharing Plan provision shall be deleted in its entirety and replaced with the following:

**Section 1.**          **Plain Purpose**.  The Corporate Profit Sharing Plan ("CPS") is designed to encourage and reward employees for their contribution to Company profits.

**Section 2.**          **Plan Years**.  The CPS will provide awards for results in calendar years 2010, 2011, 2012, and 2013 with awards payable in 2011, 2012, 2013, and 2014.  If earned, CPS Plan Distributions will be made for the full calendar year 2010, payable in 2011, despite the fact that the amendments to the CPS Plan by this MOU may not become effective until a date after January 1, 2010.

**Section 3.**          **Eligibility.**

(a)      Eligible Employees.  Full-time and part-time regular and temporary employees who are on the payroll for at least 90 days during an applicable Plan year will be eligible to receive a CPS Distribution to the extent earned and payable.  Employees who resign or are discharged for cause prior to December 31 of the Plan year forfeit their eligibility to receive a CPS Distribution.

(b)      Proration for Partial Years.  For an employee who is employed more than 90 days, but less than 12 months, of the Plan year, the employee's CPS Distribution will be prorated by twelfths to correspond to the number of months of participation during the Plan Year.  For purposes of proration, a month will be taken into account if the employee is actively participating on the first day of the calendar month.

(c)      Proration for Part-Time Employees.  CPS Distribution for each eligible part-time employee will be prorated as a percent of the normal workweek for a full-time employee in the same title.

**Section 4.**          **Time Worked and Leaves of Absence.**  The following will count as time on the payroll for CPS Distributions:

(a)      Absence attributable to approved sickness or accident disability up to accrued FMLA leave.

(b)      Departmental leave (up to 30 days).

(c)      Time that an employee is eligible to receive pay for Military Leave.

(d)     Up to 30 days for Anticipated Disability Leave and Child Care leave combined.

(e)     Up to 30 days for any other approved leave.

An employee shall not lose eligibility if, on December 31 of the applicable Plan Year, the employee is absent for one of the reasons stated in (a) through (e) above.

**Section 5.**     **Separations.**  An employee who is otherwise eligible for a CPS Distribution will not lose eligibility due to the following separations (so long as the employee has a period of at least 90 days of active participation during the Plan Year):

(a)     Retirement

(b)     Separation due to force surplus

(c)     Transfer (or a quit/hire, with a break not exceeding 30 days) to another company that participates in this Plan or to an affiliated company with a collectively bargained corporate profit sharing plan that is substantially similar to this Plan, and the employee is on the payroll of such company on December 31 of the same year

(d)     Death of the employee

(e)     Promotion to management, and the employee is on the payroll of the company in which he or she is employed as a manager on December 31 of the same year

An employee who is separated from the active payroll for the above reasons will receive a CPS distribution that shall be prorated as described in Section 3.

**Section 6.**     **CPS Distribution Calculations.**

(a)     Standard Award.  The CPS Distribution shall be as follows:

| CEO STI MEASURES | CEO STI PERFORMANCE | PERFORMANCE PERCENTAGE |
|---|---|---|
| MAXIMUM | 150% | 4.0% |
| | 140% | 3.4% |
| | 130% | 2.8% |
| | 120% | 2.2% |
| | 110% | 1.6% |
| PLAN | 100% | 1.0% |
| THRESHOLD | 50% | 0.5% |
| BELOW THRESHOLD | 0% | 0.0% |

(b)     Performance Percentage.  The actual CPS Distribution per eligible employee will be calculated by multiplying the eligible employee's annual earnings by a "Performance Percentage" for the Plan Year.  The "Performance Percentage" shall be based on the CEO STI Performance percentage that is applicable to the

short-term annual cash incentive award (the "STI" award) payable for that performance year to the Chief Executive Officer(s) of FairPoint Communications (the "CEO"). Awards will be interpolated on the scale above. For example, if the CEO STI Performance is equal to 105%, the performance would by ½ of the spread between 100% and 110%. Applying ½ to the corresponding spread between 1% and 1.6% in Performance Percentage would result in a payout of 1.3%.

(c)     Exceptions. No exceptions will apply, except in the circumstance where the Board of Directors approves payment under the management plan to all management plan participants at a level that otherwise was not earned. In such circumstances, eligible employees under the Union CPS plan will be treated similarly.

**Section 7.**     **Information Requests.**  The Company agrees to provide to the Union upon request publicly disclosed information about the STI compensation of the CEO.  The Company will also provide to the Union a summary of the total CPS distribution payments which eligible employees received under the plan.  This information will be provided as soon as practical following the end of the Plan Year.

**Section 8.**     **Payment of CPS Distributions.**  CPS Distributions, when earned, will be paid by separate payroll remittance (EFT or check) not later than March 15th of the year immediately following the Plan Year.  For eligible employees who are no longer employed at the time of payment, the Company will be deemed to have satisfied its obligation to pay the CPS award if it sends payment to the eligible recipient's last known address.  Each such payment shall be subject to the applicable federal withholding rate for non-recurring payments (currently, a 28% flat rate), and other applicable payroll taxes.

**Section 9.**     **Benefit-Bearing Treatment of CPS Distribution.**

When paid, a CPS distribution will be treated as eligible benefit-bearing pay solely for the following purposes:

(a)     The CPS distribution will be taken into account for purposes of the supplemental monthly Pension calculation under the qualified plan.

(b)     The CPS distribution shall be treated as eligible benefit-bearing pay which may be contributed to the qualified Savings and Security Plan according to the same contribution percentage (if any) as is in effect for regular wages at the time the CPS distribution is paid (and the same terms and conditions for pre-tax or after-tax treatment, and for qualifying for applicable Company matching contributions).

(c)     To the extent that an employee is eligible for the one-times-pay death benefit under the qualified pension plan (subject to applicable caps on such death benefit), the last CPS distribution paid to an employee prior to an employee's death shall be taken into account (to the extent it does not cause the death benefit to exceed the applicable cap).

(d)     The last CPS distribution paid to an employee prior to an employee's death shall be taken into account under the terms of the group term life insurance plan for active employees.

(e)     The CPS distribution may be taken into account for union dues to the extent determined appropriate by the union representing the employee.

CPS distributions will not be included in calculations for any other purposes.

**Section 10.**     **Grievances and Arbitration.**  The employee's employing company shall have the discretion to administer this Plan according to its terms.  The employing company's interpretations and determinations under this Plan shall be final and binding.  The employee's union representative may present grievances relating to matters covered by the Plan but neither the Plan nor its administration shall be subject to arbitration, except that the limited issue of an employee's eligibility to participate in a specific distribution under the Plan shall be arbitrable.  Any "make-whole" arbitration award (which reinstates an employee with full back pay) shall include any applicable CPS distribution for the Plan Year in which the employee had been separated from employment if the employee was otherwise eligible and did not otherwise receive a distribution for the applicable Plan Year.

## IV.     401(K) PLAN

1.      The FairPoint Communications Northern New England Savings and Security Plan for Associates (the "401(k) Plan") will be amended to provide for Company matching contribution in Company stock with no restrictions instead of cash, as soon as practicable.

2.      Participants in the 401(k) will be allowed to save the maximum amount allowed in the plan under IRS and DOL rules, as interpreted and applied by the Company Benefits Committee.

## V.     JOINT COMMITTEE FOR OPERATIONAL SAVINGS

1.      The parties mutually agree to pursue all ideas to reduce cost, improve revenue, and increase productivity, with a goal of achieving $25 million in annual ongoing savings as provided in #4 below.

2.      All ideas and agreements will be costed and projected savings (including net cost reductions, revenue improvements and/or productivity increases) will be determined by Company cost accountants or some other mutually agreed upon methodology subject to the approval of the Joint Leadership Committee.

3.      A Joint Leadership Committee will be established to oversee the development of ideas and implementation plans for achieving the savings objectives, and also track the implementation of the ideas and subsequent agreements to ensure the implementation and follow-through within the timeframes outlined below.

    a.     The Joint Leadership Committee of Union and Company leaders will meet within 30 days of this Agreement to organize, charter, monitor, approve recommendations, and resolve disputes.

    b.     During the 60 days subsequent to the initial Joint Leadership Committee meeting, the Joint Leadership Committee members will participate in training sessions designed and conducted by the independent third party referred to in section 3.f, below.  As appropriate, members of the joint labor-management task forces referred to in section 5, below, will also participate in training sessions during this initial 60 day period.

    c.     The Joint Leadership Committee will meet at least 1 day per month to carry out its duties.

    d.     All Joint Leadership Committee meetings will be thoroughly documented and the minutes and flip chart records will be recorded and preserved.  Summary minutes of the proceedings of the Joint Leadership Committee, upon approval by the Joint Leadership Committee, will be disseminated across FairPoint and its unions.

    e.     If Joint Leadership Committee approved initiatives require changes in the collective bargaining agreements in order to implement improvements, the Joint Leadership Committee will recommend relevant changes to the respective bargaining committees for the Unions and the Company, who will then agree on final language and approve the changes through Letters of Agreement in a timely manner.

      f.     Joint Leadership Committee will be trained, facilitated and advised by an independent third party approved by both parties.

4.     The parties will identify savings and develop implementation plans to achieve the annual ongoing savings within the following timeframes:

      a.     An initial $5,000,000 within 60 days of the completed training of the Joint Leadership Committee.

      b.     An additional $5,000,000 within 120 days of the completed training of the Joint Leadership Committee.

      c.     An additional $5,000,000 within 180 days of the completed training of the Joint Leadership Committee.

      d.     An additional $5,000,000 within 365 days of the completed training of the Joint Leadership Committee.

      e.     An additional $5,000,000 within a year and a half of the completed training of the Joint Leadership Committee.

      f.     Failure to meet target time frames will be addressed by the Joint Leadership Committee for purposes of dealing with the causes of the failure. If the Joint Leadership Committee cannot solve the causes of the delays, then the third party facilitator will conduct an assessment of the causes and provide the Joint Leadership Committee with the assessment and a set of recommendations about how best to resolve the differences and to meet the targets set forth in this agreement.

      g.     Cost reduction and revenue enhancement initiatives identified by the Company and disclosed at the first meeting of the Joint Leadership Committee will not be considered in calculating the achievement of the targets set forth in paragraphs 1 and 4 of this Article.V. .

5.     The work of developing ideas for improving operating performance and reducing costs to achieve the target savings will be done by joint labor management task forces comprised of union representatives, employees, and relevant-to-the-task-at-hand management from a cross-section of functions and levels in the organization.

      a.     The number of joint task forces will be determined by the Joint Leadership Committee based on the range of subjects, processes, and areas targeted for improvement and savings. The organization and scheduling of the task forces will be subject to meeting the needs of the business and requires the mutual agreement of the parties.

      b.     Membership for each task force will consist of 6 to 10 members, including labor and management.

      c.     At least 50 percent of the members of each task force will be labor representatives or bargaining unit members.

      d.     Members of the task forces will be selected by the respective parties in consultation with each other and the independent, third party facilitator, but the unions will select the members from labor and management will select its members. At least one labor member on each task force will be a union official.

      e.     The Joint Leadership Committee will charter each task force with:
          1.    Scope of work;
          2.    Performance objective;
          3.    Timetable;
          4.    Parameters;

      f.     Task force members will be paid according to normal contractual terms and scheduled accordingly;

      g.     All reasonable ideas will be thoroughly analyzed and explored.

      h.     All task force meetings and the analyses of each of the task forces will be thoroughly documented and the minutes, data, flip chart records will be recorded and preserved. Each task force will be provided with a resource to document the proceedings. Summary minutes of the

proceedings of each task force upon approval by the Joint Leadership Committee will be disseminated across FairPoint and its unions.

       i.     Each task force will develop recommendations and propose implementation plans which will be submitted to the Joint Leadership Team for approval within the timeframes outlined within this agreement

       j.     Each task force will be facilitated and advised by an independent, third party mutually agreed upon by both parties.

6.      The joint operating performance savings process will continue operating for the life of the existing Collective Bargaining Agreements, even after exceeding the targets set in this Agreement with the objectives of further improving operating performance, improving the competitiveness of the Company, and creating a collaborative, high engagement culture within the Company.

## VI.    <u>DURATION</u>

Subject to the changes reflected in this MOU, the parties' Collective Bargaining Agreements, including all MOUs, MOAs and Letters of Agreement attached to or related to such agreements, executed by and between the Unions and the Company (or its predecessors) (collectively, the "Collective Bargaining Agreement") shall remain in full force and effect, until 11:59 p.m. on August 2, 2014. Any provision of the Collective Bargaining Agreement with an expiration date of 11:59 p.m. on August 3, 2013 shall now expire at 11:59 p.m. on August 2, 2014, and any action required to be performed each year pursuant to the Collective Bargaining Agreement shall be performed until 11:59 p.m. on August 2, 2014.

## VII.    <u>CONDITIONS</u>

1.      Upon the Effective Date, the Company unconditionally waives any right to seek relief in any form pursuant to Section 1113 of the Bankruptcy Code and acknowledges that this agreement provides those necessary modifications in employee benefits and protections that are necessary to permit reorganization of the the Company. The Company will actively oppose any motion filed by any other party seeking relief in any form pursuant to Section 1113.

2.      Following membership ratification, this MOU will be submitted for review and approval to the Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") in which the Company's Chapter 11 case (09-16335) is currently pending. This MOU will become effective, final and binding upon the Company and the Unions, upon the date that the Order granting such Bankruptcy Court approval becomes final (the "<u>Effective Date</u>"). Once it becomes effective, this MOU will continue in full force and effect subject to the duration clause of the Agreements as modified by Article VI. of this MOU. If this MOU does not become effective and binding in accordance with this paragraph, then this MOU will be null and void and neither this MOU, nor any discussions concerning this MOU will be cited or referred to in any judicial, bankruptcy, administrative or arbitration proceeding.

3.      Any Plan of Reorganization proposed or supported by the Company shall provide for assumption by the Company of this MOU. The Unions shall support exclusively the Company's efforts to confirm a plan of reorganization with all vested parties, including the Public Utility Commissions in Maine, New Hampshire, and Vermont, so long as the terms thereof are not inconsistent with this MOU or the Collective Bargaining Agreements, as herein revised.

4.      The parties hereto each reserve all rights with respect to the proper jurisdiction(s) to resolve disputes, if any, arising under or related to this MOU.

5.      Upon the Effective Date, the Company and the Union immediately release each other from any and all claims, as that term is defined in Section 101(5) of the Bankruptcy Code, arising prior to the Effective Date, and shall take all necessary steps to withdraw, discontinue, or dismiss or cause the withdrawal, discontinuance or dismissal of any civil charges, complaints, suits or proceedings now pending at any stage, in state or federal court, or any administrative or regulatory body, State or Federal, which have arisen

prior to the Effective Date.  Nothing in this paragraph 5 shall be deemed to waive any  grievances and/or arbitrations filed prior to the signing of this MOU which are pending pursuant to the existing Collective Bargaining  Agreement


## VIII.    PENSION LUMP SUM CASHOUT.

The provisions for lump sum payout of the pension plan shall be amended as follows:

1.      An associate who separates from service during the periods November 1, 2004 to August 2, 2008, and January 1, 2009 to December 31, 2011, and January 1, 2013 to August 2, 2014, and only during those periods, with eligibility for a vested pension or a service pension, shall be eligible to receive his or her vested or service pension under the Pension Plan as a total lump-sum cashout.  The terms of the cashout programs during the periods November 1, 2004 to August 2, 2008, and January 1, 2009 to December 31, 2011, and January 1, 2013 to August 2, 2014 shall be the same as the terms of the cashout program set forth in the 2000 MOU, except that

(a)      The cashout programs shall provide for payment of a lump-sum cashout on a commencement date elected by the associate that occurs on or after the date the associate's written request is received by the Pension Plan administrator and that is either:
i.      the day following the associate's separation from service, or
ii.     the first day of any month following separation from service.

(b)      The calculation of a lump-sum cashout for an eligible associate who separates from service on or before August 2, 2014, shall be based on the largest of the amounts determined by the factors set forth in the Pension Plan on April 1, 2008, for the cashout trials in the 2000 MOU, in addition to any legally-mandated interest rate and mortality table set forth in section 417(e) of the Internal Revenue Code.

(c)      If the 30-year Treasury Bond rate ceases to be published before August 2, 2014 the parties will establish a joint committee which will review the historic relationship between the interest rates on 30-year Treasury Bonds and the interest rates on AAA Corporate Bonds and will agree on a factor which when applied to historic AAA Corporate Bond rates produces an interest rate equal to the historic 30-year Treasury Bond rate.  This rate will be made available as another calculation standard for lump-sum cashouts under the Pension Plan following the last publication date for the 30-year Treasury Bond rate. For this purpose, "historic" rates shall be equal to the average rates over the 3-year period that ends six months before the last date on which the U.S. Treasury Department publishes the 30-year Treasury Bond rate. (Example: If historic 30-year Treasury Bond rates equal 6% and historic AAA Corporate Bond rates equal 8%, then the factor would be 75%.  The new standard for calculating a lump sum would be 0.75 times the AAA Corporate Bond rate in effect on the lump sum commencement date.)

(d)      An associate who separates from service on or after October 1, 2003, and on or before November 30, 2003, and who elects to receive his vested or service pension as a total lump-sum cashout shall receive a lump sum equal to the greater of (i) the lump-sum cashout determined based on the PBGC or GATT basis (whichever is more favorable) applied to determine lump sums paid under the Pension Plan to associates separating from service during the third quarter of 2003 or (ii) the lump-sum cashout determined under the terms of the Pension Plan in effect on the associate's commencement date.

(e)      In the event of a surplus declaration during a period when the lump sum cash out is suspended, the suspension will be lifted for a 60-day period.

2.      *If an associate dies during employment on or after January 1, 2012, and on or before December 31, 2012, and after becoming vested under the Pension Plan, the associate's* beneficiary for the pre-retirement death benefit under the Pension Plan shall be eligible to receive payment of the death benefit as a total lump-sum cashout.  In addition, the pre-retirement death benefit paid to such beneficiary

shall equal the larger of (a) the lump-sum cashout that would have been paid to the associate if he or she had separated from service on the date of death and elected to receive payment on the beneficiary's commencement date (or, if the beneficiary is a spouse who elects an annuity, the actuarial equivalent of that lump sum in the form of a single life annuity), or (b) the pre-retirement death benefit otherwise payable to such beneficiary under the Pension Plan.

        3.        ***If an associate separates from service during employment on or after January 1, 2012, and on or before December 31, 2012 and after becoming vested under the Pension Plan***, due to his or her exhaustion of 52 weeks of sickness disability benefits and is eligible for a vested pension or a service pension under the Pension Plan, the associate shall be eligible to receive his or her vested pension or service pension (but not a disability pension) as a total lump-sum cashout.

        4.        For a cashout-eligible associate who has separated from service before death:

        (a)        If death occurs while the associate has in effect a valid election (with spousal consent) to receive a lump-sum cashout from the Pension Plan <u>and</u> before the commencement date specified in such election, the associate's beneficiary for the pre-retirement death benefit under the Pension Plan shall receive a death benefit equal to the larger of (i) the lump-sum cashout that would have been paid to the associate if he or she had survived until the elected commencement date, or (ii) the pre-retirement death benefit otherwise payable to such beneficiary under the Pension Plan.

        (b)        If death occurs (i) before the associate makes a valid election to commence payment of his or her vested or service pension (in any form) under the Pension Plan or (ii) while the associate has in effect a valid election to receive payment of his or her vested or service pension in a form of payment other than a lump-sum cashout <u>and</u> before the commencement date specified in such election, the associate's beneficiary for the pre-retirement death benefit under the Pension Plan shall receive a death benefit equal to the larger of (I) the lump-sum cashout that would have been paid to the associate if he or she had elected to receive payment on the beneficiary's commencement date (or, if the beneficiary is a spouse who elects an annuity, the actuarial equivalent of that lump sum in the form of a single life annuity), or (II) the pre-retirement death benefit otherwise payable to such beneficiary under the Pension Plan.

Tentatively Agreed to this 1st day of February, 2010.

FOR THE IBEW                    FOR THE COMPANY

/s/ Pete McLaughlin              /s/ Gary Garvey
Pete McLaughlin                 Gary Garvey
Chairperson,                    Senior Vice President, Human Resources
System Council T-9
Business Manager – Local 2327

/s/ Glenn Brackett
Glenn Brackett                  FOR THE CWA
Business Manager – Local 2320

                                    /s/ David Palmer
/s/ Mike Spillane                David Palmer
Mike Spillane                   CWA International Representative
Business Manager – Local 2326

                                      /s/ Don Trementozzi
                                    Don Trementozzi
                                    President – CWA Local 1400

**Exhibit C**

<u>New Warrants Term Sheet</u>

[Exhibit C to FairPoint Plan of Reorganization]

# Term Sheet Regarding Reorganized FairPoint Warrants
## to be issued
## Under the Plan of Reorganization

| | |
|---|---|
| Issuer | Reorganized FairPoint Communications, Inc. (the "Company" or "Reorganized FairPoint"). |
| Initial Holders | Holders of all unsecured claims. |
| Warrants | The Warrants will entitle the holders thereof to acquire up to seven million one hundred sixty four thousand eight hundred four (7,164,804) shares of New Common Stock, subject to dilution by the Long Term Incentive Plan and subsequent issuances of capital stock. |
| | The New Board shall authorize and reserve for issuance at all times an aggregate number of shares of New Common Stock equal to the aggregate number of Warrants. |
| Exercise Price per Warrant | Exercisable at a strike price equal to (a) (i) $2.3 billion minus (ii) the outstanding debt of Reorganized FairPoint at the Effective Date plus (iii) the Cash and Cash Equivalents of Reorganized FairPoint at the Effective Date, divided by (b) fifty two million five hundred forty one eight hundred ninety eight (52,541,898) shares of the New Common Stock. The strike price shall be subject to further adjustment in accordance with the anti-dilution provisions described below. |
| Expiration | The seventh anniversary of the Effective Date (the "Expiration Date"). |
| Exercise Date | Exercisable at any time, in whole or in part, prior to the Expiration Date. |
| Voting Rights | None, until exercised. |
| Dividends | None, until exercised. |
| | No restrictions on dividends or distributions by Reorganized FairPoint. |
| Anti-Dilution Provisions | The Exercise Price and the number of shares of New Common Stock issuable upon exercise of Warrants shall be subject to customary anti-dilution adjustment for stock distributions, stock splits, combinations or similar recapitalization transactions. |
| Reorganization Event | Upon a Reorganization Event (defined below) that is consummated prior to the Expiration Date, each Warrant will be exercisable into the right to receive the kind and amount of consideration to which such holder would have been entitled as a result of such Reorganization Event had the Warrant been exercised immediately prior thereto. |
| | A "Reorganization Event" shall mean any transaction (or series of transactions) in which Reorganized FairPoint enters into a transaction in exchange for their Warrants constituting (i) a |

[Exhibit C to FairPoint Plan of Reorganization]

| | |
|---|---|
| | consolidation or merger in which its New Common Stock is exchanged for securities of another entity, (ii) a reclassification of its New Common Stock into securities other than New Common Stock or (iii) any statutory exchange of the outstanding shares of New Common Stock for securities of another entity. |
| Transferability | The Warrants will not be subject to any contractual restrictions on transfer other than such as are necessary to ensure compliance with U.S. federal and state securities laws. |
| Treatment Under Section 1145 | The Warrants and New Common Stock issuable upon exercise will be offered and sold pursuant to Section 1145 of the Bankruptcy Code. |

[Exhibit C to FairPoint Plan of Reorganization]

**Exhibit D**

<u>MPUC Regulatory Settlement</u>

## Post Filing Regulatory Settlement · Maine

This Regulatory Settlement (the "Regulatory Settlement") represents the understandings reached among the representative of the Maine Public Utilities Commission (the "Commission") as the representative is described in the order of the United States Bankruptcy Court, Southern District of New York (the " Bankruptcy Court") entered on January 20, 2010 (the "Order") and subject to the terms of such Order (the "Representative"), the Maine Office of the Public Advocate (the "OPA") (the Representative and the OPA being referred to jointly herein as the "Regulatory Parties"), and FairPoint Communications, Inc. and Northern New England Telephone Operations LLC, d/b/a FairPoint Communications-NNE ("FairPoint"), together with the Regulatory Parties (the "Parties") in connection with the mediation ordered by the Bankruptcy Court, and which shall also apply in any change of control proceeding related to FairPoint's emergence from Chapter 11. This Regulatory Settlement is subject to and qualified by the Order. Without limiting the effect of that Order, the Representative only has authority to recommend matters for approval by the Commission, after notice and a hearing before the Commission in accordance with Maine law. Whenever this Regulatory Settlement states or indicates that the Representative agrees with and/or will recommend a particular proposal, or words to that effect or of similar import, such terms will not imply any greater authority in the Representative and all such terms shall mean only that the Representative will recommend a term or condition for approval and no such agreement and/or recommendation shall bind (a) the Commission or (b) the advisory staff of the Commission.

1. **Process Issues:**

   1.1. The Regulatory Parties will request that the Commission approve the terms set forth in this Regulatory Settlement with FairPoint, as discussed more fully below. FairPoint and the Regulatory Parties (collectively, "the Parties") agree that the Regulatory Settlement will be implemented through FairPoint's Chapter 11 Reorganization Plan (the "Plan") and through appropriate proceedings before the Commission, including, without limitation, any change of control proceeding. FairPoint acknowledges that a change of control proceeding will be filed with the Commission in conjunction with the application to approve this Regulatory Settlement. The Plan shall not alter or modify the terms of the Regulatory Settlement. The Parties agree further that the terms set forth in this Regulatory Settlement shall be the only terms sought by the Parties with respect to one another with respect to the Plan and its confirmation and any change of control or other appropriate proceeding and that such terms shall be binding on the Parties (subject to the reservations of rights set forth in Section 1.5), only once the terms of this Regulatory Settlement are approved by the Commission and upon the Effective Date of the Plan (as therein defined).

   1.2. The Regulatory Parties shall recommend that all regulatory approvals that will be requested of the Commission in connection with the Plan will be processed by the Commission contemporaneously with the Bankruptcy Court's consideration of the Plan and will be granted by the Commission substantially contemporaneous with (or in advance of) the Bankruptcy Court's confirmation of the Plan or such later date as may be agreed to by FairPoint and the Regulatory Parties. The Parties shall request and recommend that such approvals incorporate the terms of this Regulatory Settlement and not include additional substantive new conditions, other than the condition that the Commission's approval may be rescinded, after notice and opportunity to be heard, if the Bankruptcy Court's confirmation order alters any of the terms of the Regulatory Settlement. Subject to the right of the Parties under Section 1.4, the Parties shall not request that the Bankruptcy Court incorporate any provisions in the confirmation order that alter or modify the Regulatory Settlement, except upon the express written consent of all of the Parties, which consent shall not be unreasonably withheld. The requested approval will include approval for the change of control contemplated by the Plan which will occur on the Effective Date of the Plan.

   1.3. The Regulatory Parties will file a proposed procedural schedule for Commission approval. This procedural schedule shall recommend that any change of control and Regulatory

Settlement approval proceeding be concluded and be ripe for a Commission decision no later than 90 days from the date an application seeking approval of such change of control and Regulatory Settlement is filed, and such procedural schedule shall include the provision of notice of the proceedings in accordance with the rules of the Commission.

1.4.    The terms of this Regulatory Settlement may be voided, at the option of any Party, if the Commission has not issued a final order approving the Regulatory Settlement and the change of control within 120 calendar days from the date an application is filed, said approval being as described in Section 1.2. FairPoint and the Regulatory Parties shall use reasonable efforts to cooperate in the proceedings before the Commission, including in the preparation and timely filing of all required documents, exhibits, testimony and other supporting evidence, provided that neither the OPA nor the  Representative shall be required to prepare or present testimony, exhibits or other evidence, the Parties acknowledging that the OPA and the Representative may meet any obligations under this subparagraph by filing a brief or report with the Commission recommending approval of the Regulatory Settlement and the change of control provided for in the Plan, which brief or report shall be included in the record of the proceedings.

l.5.    Before filing the application, FairPoint will submit a request, which the Regulatory Parties will support, that the Commission waive Section 745 (Voluntary Dismissal) of its Rules of Practice and Procedure and order that FairPoint or the Regulatory Parties may withdraw from any proceeding seeking Commission approval of this Regulatory Settlement or change of control without prejudice and without the need for a Commission order allowing withdrawal if Commission approval has not been obtained within the time frame provided for in Section 1.4. If the request is filed by February 12, 2010 and is not granted by the Commission on or before February 25, 2010, FairPoint in its sole discretion may terminate this Regulatory Settlement.

The Commission, through its Bankruptcy Counsel's signing of this Regulatory Settlement, FairPoint and the Regulatory Parties expressly agree that (i) FairPoint's commencing or participating in any proceeding before the Commission will not be used in any way as an argument against FairPoint in any proceeding before the Bankruptcy Court in which FairPoint would seek a ruling from the Bankruptcy Court that any such Commission approval or Commission proceeding is pre-empted by the Bankruptcy Code, and that (ii) the Regulatory Parties and/or the Commission participating in any proceeding before the Bankruptcy Court, including seeking approval of this Regulatory Settlement or approval of the Plan, will not be used in any way as an argument against the Staff and/or the Commission in any subsequent proceeding before the Bankruptcy Court or that the Regulatory Parties and/or the Commission submitted to the Bankruptcy Court's jurisdiction and that any action by the Regulatory Parties and/or the Commission is pre-empted by the Bankruptcy Code.

1.6.    The Regulatory Parties will recommend, if requested by FairPoint, that any matters before the Commission to which FairPoint is a party and that are the subject of the terms and conditions of this Regulatory Settlement be temporarily suspended or adjourned pending the Commission's consideration of the approval of the Regulatory Settlement and the change of control provided for under the Plan.

2.    Issues Related to the Merger Conditions.  FairPoint will comply with the Commission's February 1, 2008 Order issued in Docket Nos. 2007-67 and 2005-155 and all stipulations and amended stipulations approved thereby and/or incorporated therein (collectively the "2008 Merger Order"), except as the terms and conditions of the Merger Order are expressly modified by this Regulatory Settlement, provided, however, that with respect to reimbursement claims of third parties arising under the Merger Order,  the Regulatory Parties will recommend that this Regulatory Settlement shall not affect the status of such claims under applicable bankruptcy law.  For the avoidance of doubt, nothing in this Regulatory Settlement is intended to preclude FairPoint from seeking an order from the Commission amending or modifying the Merger Order  in a proceeding other than the

proceeding to approve this Regulatory Settlement and its accompanying change of control proceeding.

2.1  The Commission and FairPoint agree to prepare and submit, and Bank of America, NA, as agent for the senior lenders (the "Agent") shall consent to, a joint consent order to the Bankruptcy Court which provides for implementation of the Service Quality Index ("SQI ") rebates for the 2008-2009 SQI year, effective for bills issued on or after March 1, 2010 over a twelve (12) month period.  However, if the Commission does not grant the approvals as described in, and in accordance with the process set forth in, Section 1 and if the Bankruptcy Court then, after notice and hearing (the "Injunction Hearing"), subsequently enters an injunction against implementation of and/or provides for reversal or rescission of the rebates for the 2008-2009 SQI year, then any rebates actually implemented by FairPoint pursuant to this provision shall be credited by FairPoint, dollar for dollar, against any subsequent SQI payments that are required to be paid by FairPoint, starting with the first invoices issued after the date of entry of the injunction by the Bankruptcy Court even if an appeal is taken by the Commission or any other party.

At the Injunction Hearing, the Commission and FairPoint may raise any legal or factual arguments in favor of, or in opposition to, such an injunction; provided, however, that the Commission will not raise the argument at the Injunction Hearing that the injunction should not issue because the claim, if any, represented by the rebates is otherwise payable at a specified percentage distribution provided under the Plan.  Nothing herein shall be construed as an admission by FairPoint, the Commission or the Agent as to the status of the rebates as a matter of applicable law or as a waiver of any claims or defenses. All appellate rights of FairPoint and the Commission are preserved, including as to any injunction entered as a result of the Injunction Hearing.  The Commission shall not, in any proceeding relating to the obligations of FairPoint under the Merger Order, argue that FairPoint's payment of the SQI penalties which became due after the Petition Date constitutes an admission by FairPoint that any of its obligations arising out of the 2008 Merger Order which became due after the Petition Date are entitled to be treated as an administrative expense.

The Parties agree that in effectuating any required SQI rebates in the form of bill credits to subscribers, for the 2008-2009 SQI Year and any subsequent SQI years, the only legend that must be provided in connection with such credits shall be a separate line item on the customer's bill or invoice next to the amount credited stating "Service Quality Rebate."  Other than the change in the legend described in the preceding sentence, and subject to the possible offset(s) described above, rebates for the 2009-2010 SQI year and any SQI rebates for subsequent periods shall be implemented in strict accordance with the Merger Order, the AFOR Order[1] and all relevant rules and orders of the Commission existing as of the date of this Regulatory Settlement. The Parties agree however that after the Effective Date, FairPoint may apply to the Commission for a waiver of or modification to such obligations.

2.2.  Except as set forth below, FairPoint will meet the initial 83% broadband build out commitment scheduled for April 1, 2010 by December 31, 2010.  This broadband buildout commitment and the broadband buildout commitments in Section 2.4 and otherwise referred to herein may be met by installation of DSL or any other broadband technology which provides a minimum upload speed of 512 kilobits and download speed of 1.5 megabits per second.

2.3.The Regulatory Parties shall recommend that the Commission consider price de-averaging notwithstanding the bar on such consideration during the five-year stay out period and will recommend that the Commission approve de-averaging, provided, however, that FairPoint agrees that (a) de-averaging will commence on January 1, 2011 if FairPoint is not in default under the Regulatory Settlement; and (b) during the two year period after any Commission

---

[1] The "AFOR Order" means and refers to the 1995 AFOR Order in Docket No. 1994-123
.

approval of de-averaging becomes effective, FairPoint shall not implement prices for broadband services in Maine that exceed 120% of the prices of FairPoint Telecom Group in Maine (Telecom Group) for equivalent services in FairPoint "classic" or "legacy" service areas. The Regulatory Parties understand and will advocate approval of this provision on the understanding that if FairPoint changes any of Telecom Group's prices during the term of this provision, there will be a corresponding change in the cap imposed by this provision. None of the Regulatory Parties will seek any form of price cap for broadband related services other than the provision set forth in this subparagraph.

2.4. FairPoint agrees that during the 5-year period beginning upon closing, FairPoint shall spend not less than the amount required to attain and shall achieve the broadband buildout requirements of 83% by December 31, 2010; 85% by July 31, 2012; and 87% by March 31, 2013. If FairPoint fails to achieve 83% by December 31, 2010, 85% by July 31, 2012 or 87% by March 31, 2013, it shall be required to achieve 90% by no later than March 31, 2014 in accordance with, and subject to, the applicable terms of the Merger Order. FairPoint further agrees that by March 31, 2013 it will achieve 82% for lines in UNE Zone 3. If FairPoint achieves the broadband build out requirements of up to 87%, as set forth in Section 2.4, on July 1, 2013 FairPoint will contribute $100,000 to Connect ME. Until FairPoint achieves all of the requirements of this paragraph, FairPoint shall file quarterly reports with the Commission regarding its broadband buildout activities containing the type of information required of Verizon under Section 3 of the Amended Stipulation of August 8, 2007 in Docket No. 2005-155. FairPoint shall inform the Commission in writing of its determination that all of the requirements in this paragraph have been met. Nothing herein shall prejudice the Commission with respect to a challenge to such determination and the Commission may, in its discretion, conduct proceedings to determine if, in fact, such requirements have been met.

2.5. FairPoint will have the option to resell terrestrial (non-satellite) based service providers' broadband service offerings to fulfill its broadband build out and/or service requirements as contained in the 2008 Merger Order, as herein modified, for the broadband buildout requirements beyond 85% provided that (a) the build out and/or services meet or exceed all requirements of the 2008 Merger Order as herein modified; (b) the resold services are purchased through and serviced by FairPoint; and (c) the Commission Staff, on delegated authority, approves the service provider(s) selected by FairPoint. The Commission Staff's approval process shall require that, upon written submission by FairPoint of the identity of the provider(s) the precise build out obligations and services to be provided by such provider and information regarding the capabilities and qualifications of the provider(s), (1) approval may not be unreasonably withheld by the Commission Staff, and (2) if the selection by FairPoint of a service provider(s) is not denied by Commission Staff within 30 calendar days of the date of the written submission by FairPoint, the selection by FairPoint shall automatically be approved.

3. The Representative will recommend that the Commission find that the financial conditions set forth in the Merger Order have been replaced by the terms of this Regulatory Settlement, satisfied, or have been otherwise rendered moot due to the deleveraging achieved through the Chapter 11 process. The Regulatory Parties will recommend that the Commission not impose affirmative or negative financial covenants in addition to those imposed in any loan or credit agreements or related documents executed by FairPoint in connection with the Plan, provided that such agreements are supplied to the Commission upon execution, as well as any subsequent amendments to such agreements or related documents. The Representative will recommend that such financial covenants not be considered separate financial covenants enforceable as such by the Commission, provided, however, that nothing herein shall limit the Commission's ability to investigate, at any time, the financial condition of FairPoint and to take action with respect thereto in accordance with Maine law and the rules and procedures of the Commission. FairPoint will inform the Commission, subject to a protective order reasonably acceptable to FairPoint to be entered in the change of control proceeding, of any substantive defaults under such loan or credit agreements, which defaults have

not been cured within any cure period provided under such agreements or waived by the applicable lender.

4. **Miscellaneous Matters**

4.1. FairPoint agrees to continue its search for a Chief Information Officer with a goal of having a Chief Information Officer in place by June 30, 2010.

4.2. The Plan shall provide for the appointment of a new Board of Directors for reorganized FairPoint consisting of a supermajority of newly appointed independent directors. The Plan shall further provide that the new Board of Directors will appoint a "regulatory sub-committee" (the "Regulatory Sub-Committee") which shall be charged with monitoring compliance with the 2008 Merger Order, as modified by this Regulatory Settlement, and all other regulatory matters involving the States of Vermont, New Hampshire and Maine. Either the Lead Director or the Independent Chair of the Board of Directors, at FairPoint's option, shall be available to voluntarily speak or meet with the Regulatory Parties at their reasonable request as appropriate and lawful.

4.3. Subject to the confidentiality provisions of the Bankruptcy Court's mediation order and, with respect to any financial advisors hired by the OPA or the Representative, if any, a confidentiality agreement deemed suitable by the Parties, FairPoint has provided the Regulatory Parties, their counsel and their financial advisors who have signed a confidentiality agreement with the Company's four-year business plan and supporting material that has been provided to major constituencies and parties-in-interest to the bankruptcy proceeding. The business plan and related proforma financials reflect operations over a four year planning period. The OPA's obligation to recommend the Regulatory Settlement is subject to the OPA's and the OPA's advisors' review of such information and their reasonable determination that such information supports the assumptions underlying the Regulatory Settlement, which review by the OPA shall be completed within thirty (45) days of the date hereof.

4.4. Upon the Effective Date of the Plan, FairPoint shall reimburse the Commission and the Maine Office of the Public Advocate for all of its actual reasonable out-of-pocket expenses and costs in connection with FairPoint's chapter 11 case, including without limitation, the reasonable fees and expenses of all professionals, including legal and financial advisors retained by the Regulatory Parties in connection with the chapter 11 cases or any proceeding before the Commission to approve the Regulatory Settlement and change in control provided under the Plan, plus any other direct costs reimbursable by FairPoint under applicable Maine law.

4.5. At least one board member of the revised FairPoint board will reside in a northern New England state.

4.6. FairPoint shall not agree to or accept any term in a proposed settlement with the Staff of the New Hampshire Public Utilities Commission, the New Hampshire Office of Consumer Advocate, or the Vermont Department of Public Service pertaining to the Plan or, if applicable, to any related approval for a change in control without offering the same term to the Regulatory Parties and/or in connection with the Regulatory Settlement, a change in control, or the approval of either by the Commission. FairPoint only shall be required to offer such term(s) to the Regulatory Parties in the event that such term(s) represent a material difference in the benefits of this Regulatory Settlement, on one hand, and the Regulatory Settlement effectuated in the jurisdiction of New Hampshire or Vermont (as the case may be), on the other hand, considering each such Regulatory Settlement in the aggregate. If FairPoint enters into a voluntary amendment to the Vermont or New Hampshire Regulatory Settlements, FairPoint will within one (1) business day provide a copy of the signed amendment to the Regulatory Parties.

4.7. Any management bonuses shall be based on a combination of EBITDAR (EBITDA plus restructuring costs) and service metrics and the weighting for each of these categories shall be computed and clearly stated for the incentive and bonus plans for each individual and for the company in total. Once established, FairPoint shall disclose such service metrics to the OPA and the Commission.

4.8. Subject to the terms set forth herein, the signatories agree to support this Regulatory Settlement and not to take any action in any forum or jurisdiction that would contradict or diverge from the terms set forth in this Regulatory Settlement for so long as this Regulatory Settlement is in force, unless the Regulatory Settlement is voided under Section 1.4 hereof or if any Party withdraws under Section 1.5.

This Regulatory Settlement has been duly executed as of this 9th day of February 2010.

**FAIRPOINT COMMUNICATIONS, INC.
NORTHERN NEW ENGLAND TELEPHONE
OPERATIONS LLC**


**By      /s/ Peter G. Nixon**
         **Peter G. Nixon**
         **President**


         **/s/ Amy Spelke**
**Amy Spelke, Representative of the Maine Public
Utilities Commission**


         **/s/ Robert S. Keach**
**Robert S. Keach, on behalf of the Maine Public
Utilities Commission and only with respect to the
reservation of rights set forth in Section 1.5, as
specified in such Section 1.5**

**MAINE OFFICE OF THE PUBLIC ADVOCATE**

By _____ /s/ Richard Davies _____

Name: Richard Davies _____

Title: Public Advocate _____

FEB. 10, 2010

**Exhibit E**

<u>NHPUC Regulatory Settlement</u>

**Post Filing Regulatory Settlement - New Hampshire**

## 1. Process Issues

1.1. The Staff Advocates of the New Hampshire Public Utilities Commission designated pursuant to RSA 363:32 (the "Staff Advocates") and FairPoint Communications, Inc. (together with its subsidiary Northern New England Telephone Operations LLC d/b/a FairPoint Communications - NNE, "FairPoint") (collectively, FairPoint and the Staff Advocates are "the Parties") will request that the New Hampshire Public Utilities Commission (the "Commission") approve this settlement with FairPoint, as discussed more fully below (the "Regulatory Settlement"). The Parties agree that the Regulatory Settlement will be implemented either under (i) FairPoint's Chapter 11 Reorganization Plan to be filed on February 8, 2010, as it may be subsequently amended (the "Plan") or (ii) a Bankruptcy Court approved settlement which is approved in connection with the Plan and which is incorporated into the order confirming such Plan ((i) or (ii) being referred to as the "Plan"), which will be filed by February 8, 2010, or such later date as may be necessary in FairPoint's good faith judgment, with the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Court"). The Parties agree further that the obligations set forth in this Regulatory Settlement shall be the only obligations sought by the Parties with respect to one another with respect to any change of control proceeding or with respect to the Plan, and that such obligations shall be binding on the Parties only once the terms of this Regulatory Settlement are approved by the Commission and upon the Effective Date of the Plan.

1.2. The Parties will request that the Commission issue all regulatory approvals that will be requested in connection with the Reorganization Plan, and that those approvals be granted by the Commission contemporaneously with (or in advance of) the Bankruptcy Court's Confirmation of the Reorganization Plan or such later date as may be agreed to by FairPoint and the Staff Advocates. Such approvals shall incorporate the terms of this Regulatory Settlement and will not include additional substantive new conditions. The requested approval will include, if applicable, approval for the change of control contemplated by the Plan, which change in control will occur upon the Effective Date of the Plan. In the event any material supplement or amendment to the Plan (an "Amendment") is filed with the Bankruptcy Court, then such Amendment shall be filed within one (1) business day thereafter electronically with the Commission with the necessary paper copies to be filed with the Commission within two (2) business days thereafter.

1.3. In furtherance of Commission approval of this Regulatory Settlement and any change in control, the Staff Advocates will file, within three (3) days of FairPoint's filing with the Commission of a complete application, a proposed procedural schedule for Commission consideration of this Regulatory Settlement and (if applicable) the request for approval of change of control. This procedural schedule shall propose that any transfer of control proceeding be concluded and be ripe for a Commission decision no later than 90 days from the date a complete application seeking approval of such transfer of control and this Regulatory Settlement is filed. The Staff Advocates shall provide a copy of the proposed

procedural schedule to FairPoint in advance of filing and shall consult with FairPoint with respect to the final proposed procedural schedule.

1.4.   Unless otherwise agreed to by the Parties, the terms of this Regulatory Settlement may be voided if the Commission has not issued a final order approving this Regulatory Settlement and, if applicable, the change of control within 120 calendar days from the date a complete application to change control is filed.  The Parties shall use reasonable efforts to cooperate in the approval proceeding before the Commission, including in the preparation and timely filing of all required documents, exhibits, testimony and other supporting evidence.  If the Commission has approved the Regulatory Settlement and change in control, subject to the Plan being subsequently confirmed, neither party may void the terms of the Regulatory Settlement or any approval of the change in control.

1.5.   FairPoint or the Staff Advocates may withdraw from any proceeding seeking Commission approval of this Regulatory Settlement or change of control without prejudice if Commission approval has not been obtained within the time frame provided for in Section 1.4.  The Parties agree that (i) FairPoint's commencing or participating in any proceeding before the Commission will not be used in any way as an argument against FairPoint in any proceeding before the Bankruptcy Court in which FairPoint would seek a ruling from the Bankruptcy Court that any such Commission approval or Commission proceeding is pre-empted by the Bankruptcy Code, and that (ii) the Staff Advocates and/or the Commission participating in any proceeding before the Bankruptcy Court, including seeking approval of this Regulatory Settlement or approval of the Plan, will not be used in any way as an argument against the Staff Advocates and/or the Commission in any other proceeding before the Bankruptcy Court, including that the Staff Advocates and/or the Commission submitted to the Bankruptcy Court's jurisdiction and/or that any action by the Staff Advocates and/or the Commission is pre-empted by the Bankruptcy Code.  In the event of a withdrawal by FairPoint or the Staff Advocates from this Regulatory Settlement or any Commission proceeding seeking approval of this Regulatory Settlement, the Staff Advocates reserve the right to oppose the relief sought by FairPoint in any such Bankruptcy Court proceeding and FairPoint reserves the right to oppose the Commission's jurisdiction with respect to approval of this Regulatory Settlement or (if applicable) any change in control.

1.6.   Because the settlement with FairPoint will be implemented through the Plan of Reorganization and the Commission's change of control order, the Parties will recommend that all pending dockets related to FairPoint be continued until either (i) a Party exercises its right to withdraw from the Regulatory Settlement or change in control proceedings in accordance with Paragraph 1.5 prior to Commission approval, or (ii) the Effective Date of the Plan.

2. **Issues Related to New Hampshire Merger Conditions.  FairPoint will meet the broadband build out requirements, the capital investment requirements, and the SQI service quality program requirements of the 2008  Order and the 2008 Settlement Agreement (as the order and agreement are defined in footnote 1), with the following modifications as set forth below:**

2.1.   SQI Penalties for the 2009 year will be deferred until December 31, 2010.  For the avoidance of doubt, the Parties agree that FairPoint has accrued $6,000,000 in SQI Plan penalties for

FairPoint's fiscal year ended December 31, 2009.  If FairPoint meets the service quality objectives for each performance area specified in Attachment 1 and as averaged over 12 calendar months ending on December 31, 2010, then SQI Plan penalties for 2009 will be waived.  If FairPoint meets the service objectives for some but not all of these performance areas as specified above, 2009 SQI Plan penalties will be reduced by 20 percent for each performance area specified in Attachment 1 for which FairPoint achieves the service objective averaged over 12 calendar months ending on December 31, 2010.

2.2.   FairPoint shall adhere to all SQI metrics during the 2010 year and all subsequent years, and FairPoint shall pay any SQI penalties which may become due and payable related to FairPoint's failure to meet such metrics during 2010 and all subsequent years.

2.3.   The FairPoint Quality of Service Commitment in Exhibit 3 attached to the 2008 Settlement Agreement[1] will be amended as follows:  (a) reference to DSL will be removed from Section 3.2; and (b) Section 4 will be clarified so that the New Hampshire penalty structure will be calculated as it is in Maine, using the percentage "not met" formulation.  For purposes of clarity, identical service quality performance in New Hampshire and Maine will accrue equivalent penalties for each corresponding period.  Notwithstanding anything in this Section 3.3 to the contrary, the Parties agree that FairPoint's total annual financial exposure to Service Quality penalties as set forth within the 2008 Settlement Agreement shall not exceed $12.5 million per year.  At the end of the five (5) year basic exchange retail rate stay-out period (as set forth within Section 8.1 of the 2008 Settlement Agreement), FairPoint shall be entitled to petition the Commission for a reduction in Service Quality penalties and revisions to the Service Quality standards.

2.4.   FairPoint's pricing obligations relating to stand-alone DSL services will terminate on April 1, 2011, but FairPoint will continue to provide stand-alone DSL service and FairPoint will continue to adhere to Verizon' s "for life" service offerings made as of March 31, 2008.

2.5.1.  Broadband build out commitments scheduled for April 1, 2010, will be retargeted for December 31, 2010.  FairPoint hereby confirms its commitment to spending on broadband build out a total of at least $56.4 million, and estimates an additional $10.5 million is necessary to achieve 95% availability.

2.5.2  FairPoint will adhere to the broadband coverage percentages and the minimum capital commitment ($285.4 million) resulting from the 2008 Order, provided that all capital expenditures for New Hampshire, measured in accordance with United States Generally Accepted Accounting Principles and consistent with capital expenditures reflected in FairPoint's audited financial statements, are counted towards the minimum capital commitment of $285.4 million to be spent by March 31, 2013.

2.5.3  FairPoint may count, and therefore reduce, its other expenditure commitment of $65M ("OEC") by (1) amounts of up to $10.5 million to the extent such amounts exceed $56.4 million to achieve 95% broadband availability and are actually expended; and (2) $4.5 million of capital expenditures already expended in excess of amounts estimated to develop the next

---

[1] See Settlement Agreement filed with the Commission January 23, 2008 (the "2008 Settlement Agreement"), incorporated by reference and approved by Order Approving Settlement Agreement With Conditions, Order No. 24,823, dated February 25, 2008, as subsequently amended  (the "2008 Order").

generation network.  For the avoidance of doubt,  and subject to verification through a reconciliation of FairPoint's NH 2009 capital expenditures to the consolidated capital expenditures in its 2009 audited financial statements, aggregate capital expenditures of $157.6 million have been spent by FairPoint through December 31, 2009, against the minimum capital commitment of $285.4 million.

2.5.4. $10 million of the OEC shall be reallocated to and spent on recurring maintenance capital expenditures on or before March 31, 2013, resulting in a dollar for dollar reduction to the OEC and an increase in the minimum capital commitment to $295.4 million.

2.5.5 FairPoint shall have from April 1, 2010 to March 31, 2015 to meet the remaining balance of the OEC (e.g. $40 million if the full $10.5 million referred to in Paragraph 2.5.3 is spent), which shall be spent on "network enhancing activities" identified in Attachment 2, which include but are not limited to the physical extension of network facilities or coverage, changes to existing network facilities to improve quality of service (e.g., increase redundancy, reduce latency), and any network enhancements related to the development and launch of new products and services.  All capital expenditures associated with such network enhancing activities shall count toward the remaining balance of the OEC set forth in the provisions of Section 2 hereof.  In addition, for those network enhancing activities set forth in Attachment 2 to this Regulatory Settlement involving Video or IPTV deployment, FairPoint may count toward the  remaining balance of the OEC all capital expenditures incurred plus operating costs, consistent with FASB Statement No. 51, for customer premise equipment, installation labor at customer premises, and IT development solely incurred in connection with a video product.

2.6   FairPoint will have the option to resell terrestrial (non-satellite) based service providers' broadband service offerings in order to fulfill FairPoint's broadband build out and/or service requirements  with respect to the last eight percent (8%) of FairPoint's broadband availability requirements as contained within the 2008 Settlement Agreement, provided that the services meet or exceed all requirements of the 2008 Order, and the resold services are purchased through and serviced by FairPoint.

2.7   If broadband milestone penalties are due and owing in excess of $500,000, the penalties shall be retained by FairPoint and, subject to the approval of the Commission for a particular project(s), FairPoint shall, within three years of the date of the penalty, invest or expend those penalty amounts in FairPoint's network, such to be in addition to any otherwise required capital expenditures; provided, however, that the first $500,000 of such penalties (in the aggregate, and not annually) shall be paid to the New Hampshire Telecommunications Planning and Development Fund in accordance with paragraph 3.9 of the 2008 Settlement Agreement and the 2008 Order.

3.      **Financial Conditions**

3.1    The Financial Conditions set forth in Section 2 of the 2008 Settlement Agreement have been replaced by the terms of this Regulatory Settlement, satisfied, or have been otherwise rendered moot due to the deleveraging achieved through the Chapter 11 process.

**4.    Miscellaneous Matters**

4.1. FairPoint agrees to continue its search for a Chief Information Officer with a goal of having a Chief Information Officer in place by June 30, 2010.

4.2. The Plan shall provide for the appointment of a new Board of Directors for reorganized FairPoint  consisting of a supermajority of newly appointed independent directors.  The Plan shall further provide that the new Board of Directors will appoint a "regulatory sub-committee" (the "Regulatory Sub-Committee") which shall be charged with monitoring compliance with the 2008 Order, as modified by this Regulatory Settlement, and all other regulatory matters involving the States of Vermont, New Hampshire and Maine.  Either the Lead Director or the Independent Chair of the Board of Directors, at the Company's option, shall be available to voluntarily speak or meet with the Staff or the Commission where appropriate and lawful.

4.3.  Subject to Bankruptcy Court approval, during and solely in furtherance of the process of negotiating the terms of this Regulatory Settlement and any proceedings to obtain approval thereof, and no less frequently than monthly through and ending on the ninety-first (91st) day after the Effective Date of the Plan, FairPoint shall reimburse the State of New Hampshire for all of its actual reasonable out-of-pocket expenses and costs in connection with FairPoint's chapter 11 case and post-petition regulatory proceedings, including without limitation, the reasonable fees and expenses of all professionals, including legal and financial advisors retained by the State in connection with the chapter 11 cases, plus any other direct costs reimbursable by FairPoint under applicable New Hampshire law.  In addition, the State's pre-petition out-of-pocket costs, fees, and expenses, up to $50,000, shall be deemed allowed under the terms of the Plan and, as part of this Regulatory Settlement, shall be paid in full on the Effective Date of the Plan.  For the purpose of clarity, any request made within the time set forth herein shall be deemed timely notwithstanding that Bankruptcy Court approval may require additional time.

4.4.  At least one member of the revised FairPoint Board of Directors will reside in a northern New England state.  In addition, FairPoint will maintain a state president who shall provide a senior regulatory presence in New Hampshire able to reasonably respond to various future FairPoint based Commission dockets or regulatory issues relating to telecommunications..

4.5.  FairPoint shall not agree to or accept any term in a proposed settlement with the Maine Public Utilities Commission, the Maine Office of Public Advocate, the Vermont Department of Public Service or the Vermont Public Service Board pertaining to the Plan or, if applicable, to any related approval for a change in control without offering the same term to the Staff Advocates and/or the Commission in connection with the Regulatory Settlement, a change in control, or the approval of either by the Commission.  FairPoint only shall be required to offer such term(s) to the Staff Advocates or the Commission in the event that such term(s) represent a material difference  in the benefits of this Regulatory Settlement, on one hand, and the regulatory settlement effectuated in the jurisdiction of Vermont or Maine (as the case may be), on the other hand, considering each such Regulatory Settlement in the aggregate.

4.6.  Any management bonuses shall be based on a combination of EBITDAR (EBITDA plus restructuring costs) and service quality metrics goals, and the weighting for each of these categories shall be computed and clearly stated for the incentive and bonus plans for each individual and for the company in total.  It is the Staff Advocates' expectation that compliance with service quality metrics shall be afforded significant consideration in the weighting of those categories.

4.7. The Parties agree to support this Regulatory Settlement and the application for a change of control and not take any action in any case or proceeding involving FairPoint that would breach or violate the terms set forth in this Regulatory Settlement for so long as this Regulatory Settlement is in force.

4.8. For a period of two (2) years following the Effective Date of the Plan, FairPoint shall not pay any dividends during any period of time while FairPoint is in breach of any of the material terms of this Regulatory Settlement, but such dividend restriction shall apply only for so long as FairPoint has not cured any such material breach(es).  For the avoidance of doubt and for example purposes only, in the event FairPoint fails to achieve the material requirements of the SQI Plan metrics or broadband availability requirements as set forth in this Regulatory Settlement and FairPoint pays any penalty related to such failure when due, FairPoint shall be deemed to be in compliance with this Regulatory Settlement.

4.9. As of the date hereof, FairPoint represents that it intends for the "New Term Loan Agreement" and the "New Revolving Facility" (collectively with all related loan documents, the "New Credit Agreements") to contain substantially the same material terms and conditions as contained in the Plan Support Agreement on file with the Bankruptcy Court as of October 26, 2009.  Copies of the New Credit Agreements will be filed with the Bankruptcy Court as part of the Plan Supplement and the Commission pursuant to Section 1.2 hereof.  The New Credit  Agreements will provide that Northern New England Telephone Operations LLC (or its successors or assigns, if any) shall not guarantee or otherwise be liable for, nor shall any of its assets be mortgaged or pledged (excluding only the membership interests of Telephone Operating Company of Vermont LLC) to secure, the obligations of FairPoint thereunder.

This Regulatory Settlement has been duly executed as of this 5th day of February 2010.

FAIRPOINT COMMUNICATIONS, INC. & NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC

By:_____/s/ Peter G. Nixon_____

Name: Peter G. Nixon

Title: President

NEW HAMPSHIRE PUBLIC UTILITIES COMMISSION

STAFF ADVOCATES

By:_____/s/ Kathryn M. Bailey_____

for  Name:  F. Anne Ross, Esq.

Title:    General Counsel & Staff Advocate

Attachment 1:  Key Service Quality Metrics Measured in 2010

for Purposes of Waiving 2009 SQI Penalties

| SQI Metric | 2010 Benchmark |
|---|---|
| % Installation Appointments Met | 90% |
| % Installation Service Orders Met within 30 days | 95% |
| Customer Trouble Reports Rate per 100 lines-Network | 1.12 |
| % OOS Troubles Cleared in 24 hours (excluding Sunday) | 87% |
| % Repair Commitments Met | 89% |

Attachment 2

Authorized Network Enhancing Activities


Expansion of fiber to the premises network


Fiber deployment and expansion of capacity


Softswitch deployment


New products and services for:

      Video/IPTV

      VoIP

      Carrier Ethernet Services


Other investments presented to the Staff and approved by the Commission as appropriate

## Memorandum of Understanding between FairPoint and
## the New Hampshire Office of the Consumer Advocate

This Agreement is entered into by and between FairPoint Communications, Inc. (together with its subsidiary Northern New England Telephone Operations LLC d/b/a FairPoint Communications - NNE, "FairPoint") and the New Hampshire Office of the Consumer Advocate ("OCA").

WHEREAS, on February 5, 2010, the Staff Advocates of the New Hampshire Public Utilities Commission designated pursuant to RSA 363:32 (the "Staff Advocates") and FairPoint entered into a Regulatory Settlement that will be filed with the New Hampshire Public Utilities Commission (the "Commission").

WHEREAS, pursuant to RSA 363:28, the OCA has the right to appear, and take positions on behalf of residential ratepayers, before the Commission.

WHEREAS, the OCA has reviewed the Regulatory Settlement.

WHEREAS, in consideration of the commitments made by FairPoint in the Regulatory Settlement, the New Hampshire Office of the Consumer Advocate will not oppose the Regulatory Settlement and will not advocate that third parties oppose the Regulatory Settlement or the relief requested from the Commission pursuant to the terms of the Settlement.

This Agreement has been duly executed as of this 5th day of February 2010.


FAIRPOINT COMMUNICATIONS, INC.
& NORTHERN NEW ENGLAND
TELEPHONE OPERATIONS LLC



By:____/s/ Peter G. Nixon_____
Name: Peter G. Nixon
Title: President


NEW HAMPSHIRE OFFICE OF THE
CONSUMER ADVOCATE



By:____/s/ Meredith A. Hatfield_____
Name: Meredith A. Hatfield, Esq.
Title:  Consumer Advocate

**Exhibit F**

VDPS Regulatory Settlement

**Post Filing Regulatory Settlement - Vermont**

1. **Process Issues:**

   1.1. The Department of Public Service ("DPS") will use reasonably practicable efforts to request that the Public Service Board (the "Board") approve this settlement with FairPoint Communications, Inc. and its subsidiary, Telephone Operating Company of Vermont LLC (collectively, "FairPoint"), as discussed more fully below (the "Regulatory Settlement").  FairPoint and DPS (together, "the Parties") agree that the Regulatory Settlement will be implemented either through (i) FairPoint's Chapter 11 Reorganization Plan or (ii) a Bankruptcy Court approved settlement which is approved by and as part of the Reorganization Plan confirmation process and pursuant to the order confirming such plan ((i) or (ii) being referred to as the "Plan"), which will be filed by February 8, 2010, or such later date as may be necessary in FairPoint's good faith judgment, with the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Court").  Subject to Section 1.2, the Parties agree further that the obligations set forth in this Regulatory Settlement shall be the only obligations sought by the Parties with respect to one another with respect to any change of control proceeding and that such obligations shall be binding on the Parties only once the terms of this Regulatory Settlement are approved by the Board and upon the Effective date of the Plan.

   1.2. All regulatory approvals by the Board that will be requested in connection with the Reorganization Plan will be granted, if at all,  by the Board contemporaneously with (or in advance of) the Bankruptcy Court's Confirmation of the Reorganization Plan or such later date as may be agreed to by the Parties.  Such approvals, if granted, shall incorporate the terms of this Regulatory Settlement and will not include additional substantive new conditions (subject to the last two sentences of this Section 1.2).  The requested approval will include, if applicable, approval for the change of control contemplated by the Plan and which will occur upon the Effective Date of the Plan.  In connection with such approvals, FairPoint agrees to file testimony with the Board as to its service quality remediation efforts.  The Parties reserve the right to

address before the Board matters relating to FairPoint's testimony regarding service quality remediation, including whether plans for further remediation are appropriate.

1.3.  In furtherance of Board approval of this Regulatory Settlement, the Parties will file a proposed procedural schedule for Board approval.  This procedural schedule shall propose that any transfer of control proceeding be concluded and be ripe for a Board decision no later than 90 days from the date an application seeking approval of such transfer of control is filed.

1.4. The terms of this Regulatory Settlement shall be voidable if the Board has not issued a final order approving, if applicable, the change of control within 120 calendar days from the date an application to change control is filed unless otherwise agreed to by the Parties.  The Parties shall use reasonably practicable efforts to cooperate in the approval proceeding before the Board, including in the preparation and timely filing of all required documents, exhibits, testimony and other supporting evidence.  In the event any material supplement or amendment to the Plan (an "Amendment") is filed with the Bankruptcy Court, then such Amendment shall be simultaneously filed within one (1) business day thereafter electronically with the Board, with the necessary paper copies to be filed with the Board within two (2) business days thereafter.

1.5.  Either of the Parties may withdraw from any proceeding seeking Board approval of this Regulatory Settlement or change of control without prejudice if Board approval has not been obtained within the time frame provided for in Section 1.4.  The Parties expressly agree that (i) FairPoint's commencing or participating in any proceeding before the Board will not be used in any way as an argument against FairPoint in any subsequent proceeding before the Bankruptcy Court in which FairPoint would seek a ruling from the Bankruptcy Court that any such Board approval or Board proceeding is pre-empted by the Bankruptcy Code, and that (ii) DPS participation in any proceeding before the Bankruptcy Court, including seeking approval of this Regulatory Settlement or approval of the Plan, will not be used in any way as an argument against DPS or the State of Vermont in any subsequent proceeding before the Bankruptcy Court or that DPS submitted to the Bankruptcy Court's jurisdiction and that any action by DPS, the Board or the State of Vermont is pre-empted by the Bankruptcy Code.  In the event of a withdrawal by FairPoint or the DPS from this Regulatory Settlement or any Board proceeding seeking approval of this Regulatory Settlement, the DPS reserves its right to oppose the relief sought by FairPoint in any such Bankruptcy Court proceeding and FairPoint reserves the right to

oppose the Board's jurisdiction with respect to approval of this Regulatory Settlement or a change in control.

1.6. Because the settlement with FairPoint will be implemented through the Plan of Reorganization and the Board's change of control order, the Parties will recommend that all pending dockets related to FairPoint be continued until either (i) a party exercises its right to withdraw from the Regulatory Settlement or change in control proceeding in accordance with Section 1.5 prior to Board approval,  or (ii) the Effective Date of the Plan; provided however that all post-petition payments due under the PAP shall be brought up to date, and going forward, made on a timely basis.

2. **Issues Related to Vermont Merger Conditions.  FairPoint will meet the broadband build out requirements, the capital investment requirements, and the SQRP service quality program requirements of the 2008 Merger Order and/or the 2008 Settlement Agreement (as each term is defined in footnote 1[1]), with the following modifications as set forth below:**

2.1. SQRP penalties for the 2008 and 2009 year will be deferred until December 31, 2010.  If FairPoint meets the service objectives for each performance area included in Attachment 1, averaged over 12 calendar months ending on December 31, 2010, then SQRP penalties for the 2008 and 2009 years will be waived.  If FairPoint fails to meet the baseline for the performance areas included in Attachment 1 hereto, the 2008 and 2009 SQRP penalties will be affected as follows:  for each performance area for which FairPoint achieves the service objective averaged over 12 calendar months ending on December 31, 2010, the 2008 and 2009 penalties will be reduced by 10%.   FairPoint shall adhere to all SQRP performance areas during the 2010 year and shall pay any SQRP penalties which may become due and payable related to FairPoint's failure to meet performance areas during 2010.

2.2. The DPS will request that the Board allow it to withdraw its petition and recommend to the Board that the revocation or modification of the CPG in Vermont, Docket 7540, be withdrawn and closed; provided, however, that Reorganized FairPoint shall comply with the terms of this

---

[1] "2008 Merger Order" means and refers to the February 15, 2008 ORDER RE: MODIFIED PROPOSAL IN Docket number 7270.  "2008 Settlement Agreement" means and refers to that certain Stipulation Among FairPoint, Verizon New England Inc. and the DPS, dated January 8, 2008.

Regulatory Settlement and shall otherwise comply with all applicable Vermont state laws and regulations.

2.3. The broadband milestone penalties contained in the 2008 Merger Order, if any, will not be enforced prior to June 30, 2011, provided that (a) FairPoint files with the Board, DPS and/or any other appropriate regulatory body: (i) a broadband permitting and construction plan by May 1, 2010; and (ii) all necessary permit applications prior to October 1, 2010; and (b) undertakes all commercially practicable efforts to implement the plan. The broadband permitting and construction plan shall at a minimum identify tower sites and set a schedule for permitting and construction. The broadband permitting and construction plan shall also identify planned broadband service areas not dependent on tower construction. FairPoint shall share search ring and structure requirements upon request with tower owners and developers and solicit bona fide offers to provide suitable tower collocations or development on commercially reasonable terms within the timeframe required to meet its requirements under this Regulatory Settlement. For every 30-day delay, or portion thereof, in the issuance of tower permits timely filed by October 1, 2010, with a complete application and pursued with commercially reasonable efforts by FairPoint or a tower developer under contract with FairPoint, but not issued prior to January 1, 2011, FairPoint will be allowed a 30-day delay in build out of that site.

2.4. For those exchanges in which FairPoint had committed to make broadband available to 100% of the access lines pursuant to the 2008 Merger Order, FairPoint will build out to 95% of those lines within the timeframe indicated in Section 2.3 above; and, with respect to the remaining 5% of lines within those exchanges, FairPoint will deploy broadband to any requesting customer using an extended service interval of 90 days from the date of receipt of an order from that customer, provided such order is made no sooner than June 30, 2011. Should FairPoint fail to meet the 90 day extended service interval for any such customer, FairPoint shall waive one month of service charges for each 30 days (or fraction thereof) beyond the 90 day interval. FairPoint agrees to use commercially reasonable efforts to notify customers in the affected exchanges not served by the 95% coverage requirement of such service availability, including providing written notice by June 30, 2011, to those customers. Such notice shall include information about how to request broadband service from FairPoint and explain the extended service interval. FairPoint shall file with the DPS by June 30, 2011, an

electronic listing of FairPoint customer addresses in Vermont which do not yet have FairPoint broadband service available within a normal service interval.

2.5. FairPoint will request that a docket be opened by the Board to authorize FairPoint to invest Federal High Cost Universal Service funds (estimated to be $7,000,000 in 2009) for three consecutive years to upgrade local loop plant and infrastructure (including facilities between central offices and remote terminals) through projects which may reasonably be expected to improve network reliability and service quality. FairPoint may expend these funds in those exchanges which have been identified for 100% broadband availability and, to the extent permitted under the FCC rules, invest in network infrastructure which would also support build-out of the remaining 5% broadband availability. FairPoint will review its request with the DPS prior to filing it with the Board to seek input and support, which will not unreasonably be withheld. Twelve months subsequent to Board approval of such a request made pursuant to this section or June 30, 2011, whichever is later, the extended service interval described in Section 2.4 above shall no longer be applicable and FairPoint shall provide broadband within a normal service interval to any customer within the exchanges in which it has committed that it will make broadband available to 100% of the access lines pursuant to the 2008 Merger Order.

2.6. FairPoint will have the option to resell terrestrial (non-satellite) based service providers' broadband service offerings in order to fulfill FairPoint's broadband build out and/or service requirements as contained within the 2008 Merger Order[2], provided that the services meet or exceed all requirements of the 2008 Merger Order, as modified herein, and the resold services are purchased through and serviced by FairPoint.

2.7. Nothing in this Regulatory Settlement shall prevent FairPoint from proposing to the DPS or the Board modifications to the broadband build out commitment provided for herein that meet the objectives of the 2008 Merger Order broadband commitments, as modified herein, while reducing FairPoint's expenditures. The DPS shall consider such proposals and nothing in this Regulatory Settlement shall prevent the DPS from making any recommendation regarding whether or not, in its sole but reasonable discretion, permitting such modifications promote the general good of the State of Vermont.

---

[2] See February 15, 2008 ORDER RE: MODIFIED PROPOSAL IN Docket Number 7270.

2.8. If broadband milestone penalties are due and owing, then they shall be deposited into an escrow account, with FairPoint and the DPS each receiving copies of the monthly statements from the escrow agent, and shall be used to reimburse FairPoint for costs incurred by FairPoint for additional network projects completed within 18 months of the date of the penalty. Such additional network projects shall be subject to the approval of the DPS without regard to their revenue-generating potential for FairPoint and shall consist of increases in broadband speeds, the closure of additional gaps in broadband availability, or some combination thereof.

**3. The financial conditions set forth below from the 2008 Merger Order have been replaced by the terms of this Regulatory Settlement, satisfied, or otherwise rendered moot due to the deleveraging achieved through the Chapter 11 process:**

3.1. Requirement to pay the higher of $45,000,000 annually, or 90% of annual Free Cash Flow toward permanent reduction of the Term Loans.

3.2. Requirement for FairPoint to reduce debt by $150 million by December 31, 2012, based on Leverage Ratio.

3.3. Limitation on payment of dividends based on Leverage and Interest Coverage Ratios.

3.4. Requirement to repay outstanding borrowings ahead of dividends based on Leverage and Interest Coverage Ratios.

**4. Miscellaneous Matters**

4.1. FairPoint agrees to continue its search for a Chief Information Officer with a goal of having a Chief Information Officer in place by June 30, 2010.

4.2. The Plan shall provide for the appointment of a new Board of Directors for reorganized FairPoint consisting of a supermajority of newly appointed independent directors. The Plan shall further provide that the new Board of Directors will appoint a "regulatory sub-committee" (the "Regulatory Sub-Committee") which shall be charged with monitoring compliance with the 2008 Merger Order, as modified by this Regulatory Settlement, and all other regulatory matters involving the States of Vermont, New Hampshire and Maine. Either the Lead Director or the Independent Chair of the Board of Directors, at the Company's option, shall be available to voluntarily speak or meet with the DPS at a mutually convenient time.

4.3. Subject to Bankruptcy Court approval, during and solely in furtherance of the process of negotiating the terms of this Regulatory Settlement and any proceedings to obtain approval thereof, and no less frequently than monthly through and ending on the ninety-first (91st) day after the Effective Date of the Plan, FairPoint shall reimburse the DPS and the Board for all of its actual reasonable post-petition out-of-pocket expenses and costs in connection with FairPoint's chapter 11 case, including without limitation, the reasonable fees and expenses of all professionals, including legal and financial advisors retained by the DPS and the Board in connection with the chapter 11 cases, plus any other direct costs reimbursable by FairPoint. In addition, the DPS and Board's pre-petition out-of-pocket costs, fees and expenses up to $144,000.00, shall be deemed allowed under the terms of the Plan, and, as part of this Regulatory Settlement, shall be paid in full on the Effective Date of the Plan.

4.4. At least one board member of the revised FairPoint board will reside in a northern New England state. In addition, FairPoint will maintain a state president who shall provide a senior regulatory presence in Vermont able to reasonably respond to various future FairPoint based dockets or regulatory issues relating to telecommunications.

4.5. FairPoint shall not agree to or accept any term in a proposed settlement with the Maine Public Utilities Commission, the Maine Office of Public Advocate, the New Hampshire Consumer Advocate or the New Hampshire Public Utilities Commission pertaining to the Plan or, if applicable, to any related approval for a change in control without offering the same term to the DPS and/or Board in connection with the Regulatory Settlement, a change in control, or the approval of either by the Board. FairPoint only shall be required to offer such term(s) to the DPS or the Board in the event that such term(s) represent a material difference in the benefits of this Regulatory Settlement, on one hand, and the regulatory settlement effectuated in the jurisdiction of New Hampshire or Maine (as the case may be), on the other hand, considering each such Regulatory Settlement in the aggregate.

4.6. Any management bonuses shall be based on a combination of EBITDAR (EBITDA plus restructuring costs) and service metrics goals and the weighting for each of these categories shall be computed and clearly stated for the incentive and bonus plans for each individual and for the company in total.

4.7. For a period of two (2) years following the Effective Date of the Plan, FairPoint shall not pay dividends during any period of time while FairPoint is in material breach of this Regulatory Settlement, but such dividend restriction shall apply only for so long as FairPoint has not cured

said material breach.  For the avoidance of doubt and for example purposes only, in the event FairPoint fails to achieve the material requirements of the SQRP metrics or broadband availability requirements as set forth in this Regulatory Settlement and FairPoint pays any penalty related to such failure when due, FairPoint shall be deemed to be in compliance with this Regulatory Settlement.

4.8. The signatories agree to support this Regulatory Settlement and the application for a change in control and not take any action in any case or proceeding involving FairPoint that would breach or violate the terms set forth in this Regulatory Settlement for so long as this Regulatory Settlement is in force or until the regulatory approvals set forth in Section 1.2 are received.

4.9.  It is a condition precedent to the Regulatory Settlement that the DPS shall receive and find acceptable, in its sole but reasonable discretion, the business plan including financial information, projections and planning assumptions demonstrating Reorganized FairPoint's ability to meet its obligations under this Regulatory Settlement and its feasibility to operate as a going concern over the long term in a manner consistent with Vermont utility regulation.  The DPS must exercise its rights under this section within 60 days of the date of the final execution of the Regulatory Settlement.

This Regulatory Settlement has been duly executed as of this 5th day of February 2010.

FAIRPOINT COMMUNICATIONS, INC. & Telephone Operating Company of Vermont LLC

By:_____/s/ Peter G. Nixon_____

Name: Peter G. Nixon.

Title: President

Vermont Department of Public Service

By:_____/s/ David O'Brien_____

Name:  David O'Brien

Title:    Commissioner

Attachment 1

1. Network Trouble Report Rate
2. % Residence Troubles Not Cleared in 24 Hours
3. % Business Troubles Not Cleared in 24 Hours
4. % Calls Not Answered in 20 Seconds, Residence
5. % Calls Not Answered in 20 Seconds, Business
6. Repair Centers – Busy Rate
7. Repair Centers - % Calls Not Answered in 20 Seconds
8. % Installation Appointments Not Met – Company Reasons
9. Installation Orders Held – Residence & Business – Miss Install Rate
10. Installation Orders Held – Residence & Business – Average Delay Days

**Exhibit G**

Officer List

**Officer List**

Alfred C. Giammarino

Brian M. Lippold

D. Brett Ellis

David L. Hauser

Gary C. Garvey

James K. Weigert

Jeffrey W. Allen

Lisa R. Hood

Peter G. Nixon

Rose B. Cummings

Shirley J. Linn

Susan L. Sowell

Thomas E. Griffin

Vicky L. Weatherwax

**Exhibit H**

<u>Litigation Trust Agreement</u>

[TO COME]