1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-16335(BRL)

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   FAIRPOINT COMMUNICATIONS, INC., et al.,

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              October 20, 2010

19              10:22 AM

20

21   B E F O R E:

22   HON. BURTON R. LIFLAND

23   U.S. BANKRUPTCY JUDGE

24

25

1

2    HEARING re FairPoint's Second Motion Pursuant To Bankruptcy

3    Code Section 1121(d) For Extension Of Exclusivity.

4

5    HEARING re FairPoint Communication's Motion for Authorization

6    to Assume Agreement, as Amended, With Nitel, Inc. Pursuant To

7    Bankruptcy Code Sections 105(a) and 365 and Bankruptcy Rule

8    6006.

9

10   HEARING re Debtors' Motion for Order, Pursuant to Bankruptcy

11   Code Section 105(a) and Federal Rule of Bankruptcy Procedure

12   Rule 9019, for an Order Authorizing Settlement of Certain

13   Estate Claims Against Verizon Wireless Regarding E-911 Service.

14

15   HEARING re FairPoint's First Omnibus Motion to Estimate the

16   Maximum Allowed Amount of Proofs of Claim Pursuant to

17   Bankruptcy Code Sections 105(a) and 502(c).

18

19   HEARING re Motion To Reconsider And Vacate Pursuant To 11

20   U.S.C. Sections 105, 502(j) And Bankruptcy Rule 9024 filed by

21   City of Claremont.

22

23   HEARING re FairPoint's Second Omnibus Motion to Estimate the

24   Maximum Allowed Amount of Proofs of Claim Pursuant to

25   Bankruptcy Code Sections 105(a) and 502(c).

1

2    HEARING re FairPoint's Motion for Entry of Order Pursuant To

3    Bankruptcy Rule 2004 Authorizing Discovery from segNET

4    Technologies, Inc. and segTEL, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Penina Wolicki

1

2   A P P E A R A N C E S :

3   PAUL, HASTINGS, JANOFSKY & WALKER LLP

4           Attorneys for Debtor

5           75 East 55th Street

6           First Floor

7           New York, NY 10022

8

9   BY:   LUC A. DESPINS, ESQ.

10          JAMES T. GROGAN, ESQ.

11

12  QUINN EMANUEL URQUHART & SULLIVAN, LLP

13          Conflicts Counsel for Debtors-in-Possession

14          51 Madison Avenue

15          22nd Floor

16          New York, NY 10010

17

18  BY:   BENJAMIN I. FINESTONE, ESQ.

19

20  MCLANE, GRAF, RAULERSON & MIDDLETON

21          Attorneys for Debtor

22          900 Elm Street

23          Manchester, NH 03101

24

25  BY:   SCOTT HARRIS, ESQ.

1

2   ANDREWS KURTH LLP

3         Attorneys for the Creditors' Committee

4         450 Lexington Avenue

5         New York, NY 10017

6

7   BY:   JEREMY RECKMEYER, ESQ.

8

9   PERKINS COIE LLP

10        Attorneys for segTEL and segNET

11        1120 N.W. Couch Street, Tenth Floor

12        Portland, OR 97209

13

14  BY:   JEANETTE THOMAS, ESQ.

15

16

17  KELLEY DRYE & WARREN LLP

18        Attorneys for One Communications

19        101 Park Avenue

20        New York, NY 10178

21

22  BY:   JASON R. ALDERSON, ESQ.

23

24

25

1

2   WAYNE GREENWALD, P.C.

3          Attorneys for Isidoro Flores

4          475 Park Avenue South

5          26th Floor

6          New York, NY 10016

7

8   BY:   ROCHELLE WISEBERG, ESQ.

9

10  NIXON PEABODY LLP

11         Attorneys for Hinsdale, Salem, Seabrook, Raymond and

12         Newmarket

13         900 Elm Street

14         Manchester, NH 03101

15

16  BY:   DANIEL SKLAR, ESQ.

17

18  DONAHUE, TUCKER & CIANDELLA, PLLC

19         Attorneys for Hinsdale, Salem, Seabrook, Raymond and

20         Newmarket

21         Water Professional Building

22         225 Water Street

23         Exeter, NH 03833

24

25  BY:   ROBERT CIANDELLA, ESQ.

1

2    NEW HAMPSHIRE ATTORNEY GENERAL'S OFFICE

3          Attorneys for City of Concord

4          33 Capital Street

5          Concord, NH 03301

6

7    BY:   JAMES W. KENNEDY, III, ESQ.

8

9    KRAVET & VOGEL, LLP

10         Attorneys for the City of Claremont

11         1040 Avenue of the Americas

12         Suite 1101

13         New York, NY 10018

14

15   BY:   DONALD J. KRAVET, ESQ.

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  FairPoint Communications.

3       (Pause)

4          MR. GROGAN:  Good morning, Your Honor.  James Grogan

5    from Paul Hastings on behalf of FairPoint.  Your Honor, we have

6    a rather long docket this morning.  Mr. Finestone from Quinn

7    Emanuel only has one matter, and so with Your Honor's

8    permission, I'd ask that his matter go forward at the

9    beginning, and then he can go ahead and leave.

10         THE COURT:  Sure.

11         MR. FINESTONE:  Good morning, Your Honor.  Benjamin

12   Finestone, Quinn Emanuel Urquhart & Sullivan.  We're conflicts

13   counsel to the debtors-in-possession.  We have -- we're

14   presenting today the debtors' motion seeking approval of an

15   agreement with the debtors on one side and Verizon Wireless on

16   the other side, relating to so-called E-911 service charges.

17   The motion was filed on September 7th --

18         THE COURT:  What letter is that in your tab?

19         THE CLERK:  Judge, it's number 3 in the uncontested.

20         THE COURT:  They're not numbered.  They're by the

21   alphabet.

22         MR. GROGAN:  Just a second, Your Honor.  Your Honor

23   it's number 3.

24         MR. FINESTONE:  Number 3 in the binder.

25         THE COURT:  Got it.

1          MR. FINESTONE:  The --

2          THE COURT:  By the way, now with the two binders, you

3     exceed Weil Gotshal.

4          MR. GROGAN:  I knew that was coming, Your Honor.

5          MR. FINESTONE:  Your Honor, this 9019 motion was filed

6     on September 7th, and the objection deadline passed on the 22nd

7     of September.  There are no objections filed.

8          E-911 or enhanced 911 services describe services that

9     automatically convey to the service provider the location of

10    the individual dialing for emergency 911 assistance.  It also

11    automatically routes those calls to the appropriate response

12    center.  Wireless service providers, such as FairPoint on the

13    one side and Verizon Wireless on the other side, provide these

14    services to each other's customers and then bill each other for

15    reimbursement of those services, as the operative agreements

16    may provide.

17         The claims that are the subject of this settlement

18    agreement were claims for services provided by former Verizon

19    entities that were the subject of the spinoff and merger

20    transaction, now FairPoint entities.  Services were provided to

21    customers of an entity called RCC Atlantic that subsequently

22    was merged into Verizon.  So when all is said and done, these

23    are claims for services provided to customers of Verizon

24    affiliates by certain of the debtors.

25         Per the debtors' books and records, the gross amount

1  of these claims is 1.4 million dollars.  Verizon has several --

2  Verizon disputes the amount of those charges as well as any

3  liability for those charges.  Verizon's disputes are twofold;

4  primarily they dispute that the governing interconnection

5  agreements between the service providers provide for E-911

6  services for the billing and reimbursement of E-911 services,

7  and they also dispute the amount.  And admittedly, some of

8  these charges go back prior to 2006.

9        The agreement that we're asking the Court to approve

10  today provides for a payment of 984,000 dollars to the estates.

11  This amount reflects -- represents seventy percent of the gross

12  amount.  The debtors submit that in view of Verizon's disputes

13  to the charges and to the liability in the first instance, as

14  well as the inherent risky nature of litigation, that this

15  seventy-percent payment indicates that this settlement is in

16  the estate's best interests, fair and equitable, and within the

17  range of reasonableness.

18        One other point I'd like to note.  The agreement does

19  contain releases.  They're narrowly tailored.  They're mutual.

20  And they relate only to the E-911 services that are the subject

21  of this agreement.  Importantly, the agreement doesn't release

22  any of the estate's claims that are being retained by the

23  debtors or that are being transferred -- to be transferred to

24  the litigation trust for the benefit of the creditors.

25        We have shared this agreement with the counsel for the

1    secured lenders as well as the unsecured creditors' committee,

2    and they don't object to the agreement.  In light of the

3    circumstances and the amount of consideration to be paid to the

4    estates, we'd ask the Court to approve the settlement

5    agreement.

6           THE COURT:  Does anyone want to be heard?

7           The settlement agreement does appear more than

8    cosmetically to be fair and reasonable under the circumstances.

9    It avoids litigation and does result in a substantial income

10   into the estate.  The application is granted.

11          MR. FINESTONE:  Thank you, Your Honor.

12          THE COURT:  You got an order?

13          MR. FINESTONE:  I have a form of order and a disk, if

14   I may approach?

15          THE COURT:  I'll entertain it.  I've approved the

16   order.

17          MR. GROGAN:  Your Honor, the next matter that we would

18   like to take up, because we have a number of opposing counsel

19   here today, is the first omnibus motion to estimate proofs of

20   claim.  That is at binder -- it's at number 4 in our binder.

21   And the subject matter -- before I do that, Your Honor, I

22   apologize.  I do have a couple of guests here with me today

23   that I wanted to introduce to Your Honor.  We have here today

24   with me Susan Sowell, FairPoint's vice president and assistant

25   general counsel.  And then also, assisting me with the argument

1    today on the first omnibus motion to estimate is Scott Harris,

2    who is an attorney from McLane, Graf, Raulerson & Middleton in

3    New Hampshire, and he will be arguing a section of our argument

4    on New Hampshire law.

5            Your Honor, the first omnibus motion to estimate

6    addresses a number of real property tax claims that were filed

7    by municipalities in the state of New Hampshire.  The Court's

8    already considered this as an initial matter and entered an

9    order by default with respect to claims filed by towns who did

10   not object to the motion.

11           Presently, there are eight towns who have filed

12   objections.  Of those, today we are taking up our motion with

13   respect to seven of those towns.  They are the Town of

14   Claremont, Town of Concord, Hinsdale, Newmarket, Raymond, Salem

15   and Seabrook.

16           There's also Town of Conway.  Conway is in a slightly

17   different procedural posture.  The issue -- there's really two

18   issues with Conway which we will take up with Your Honor at a

19   future date.  One is the appropriate valuation for the real

20   property tax.  And the second is the fact that the Court in

21   Conway, violated the automatic stay by adjudicating the case

22   before it in December of 2009, after the company filed for

23   bankruptcy.

24           There's an ongoing debate with counsel for Conway as

25   to whether or not the automatic stay applies, which somewhat

1    relates to these other towns.  But given the fact that the

2    fundamental equal protection issue doesn't apply to Conway, we

3    thought it better to just put that off to the next hearing, and

4    we'll deal with the seven towns today, who are squarely, in our

5    view, violating the equal protection clause.

6          Your Honor, just for background, Town of Claremont

7    also has a slightly unique posture in the sense that Claremont

8    did not actually timely respond to the motion.  And so, Your

9    Honor's initial order granting our motion to estimate fixed the

10   allowed amount of their claim at $1,062.30.  They have filed a

11   motion to reconsider and vacate that prior order.  And, Your

12   Honor, if I may, I'll take that up first as part of our

13   argument, and then flow into the remainder of the issues that

14   are raised by the towns.

15         Your Honor, on the motion for reconsideration, I think

16   it's well-established, and we've cited the authorities in our

17   brief, that there are three factors that apply when deciding a

18   motion to reconsider the expungement or disallowance of a proof

19   of claim:  whether the default was willful; whether the movant

20   has a meritorious defense; and the level of prejudice that may

21   inure to the nondefaulting party if the relief is granted.

22         Your Honor in opposition -- or in support of their

23   motion to vacate, the Town has proffered the declaration of the

24   City Attorney for the Town of Claremont.  Nothing in the

25   declaration suggests that the town maintains the kind of mail

1    processing procedures that would give rise to rebuttable

2    evidence that the presumption of receipt has occurred.  When we

3    mailed the motion to the proper address -- I don't think that's

4    contested -- it was not returned undeliverable.  All that's at

5    issue here is their word that they didn't get it.  And it's

6    well-established that you can't just -- you cannot just file a

7    declaration saying I didn't get the motion, so the Court should

8    vacate its prior order adjudicating the claim.

9            Your Honor, I think also, if reconsideration is

10   allowed in a case like this, it will open Pandora's Box to the

11   reconsideration of more than 6,000 claims that Your Honor has

12   already ruled on.  We have filed almost seventy omnibus

13   objections to claims.  The claims process is well underway.

14   It's very important to the ultimate success of this case.  And

15   to allow parties-in-interest to come back to court and just

16   simply say I didn't get what the debtor sent me would be

17   tremendously prejudicial to the company.

18           In addition, Your Honor, we don't think Claremont has

19   a meritorious defense.  This is the same issue that every town

20   has raised.  They have various nuanced arguments as to why they

21   don't fall within the clear precedent of the New Hampshire

22   Supreme Court in Rochester.  Rochester clearly said that a town

23   that wants to impose a real property tax on the dirt in the

24   right-of-way that is used by some party, whether it's FairPoint

25   or an electric company or a cable company or a water company,

1    they have to tax every party in the right-of-way.

2          What the towns do is they want to say well -- in

3    Claremont's case they say we tax every party except the

4    electric company, but we don't have to tax the electric company

5    because the tax that we charge to FairPoint is under 72:23 of

6    Revised Statutes Annotated, and we can tax the electric company

7    under 72:8 of the New Hampshire Statutes.  This was the exact

8    issue in Rochester.  The Supreme Court of New Hampshire has

9    already said you cannot tax an electric company under 72:8 and

10   satisfy the equal protection requirements.  You have to tax the

11   electric company under 72:23.

12         Now, the town says, but we do tax under 72:23.  And

13   they filed a bunch of bills where Your Honor can look at the

14   valuation -- and there's a category that says "Land" and beside

15   land it says "Zero dollars".  That means they're not taxing the

16   electric company for the land.  So, Your Honor, they cannot --

17   they have no defense.  They are squarely within the New

18   Hampshire Supreme Court precedent.

19         The other towns raise additional arguments as well

20   which I'll take up in turn.  They're largely procedural.  First

21   of all they challenge the appropriateness of estimation.  Your

22   Honor, I think, based on the New Hampshire Supreme Court

23   precedent here, it's clear that there is a state law

24   contingency that must be met before the town can impose the

25   tax.  And that contingency is that they apply the tax

1  Constitutionally by assessing it against each of the parties

2  that use the right-of-way.

3        The Supreme Court established that contingency in

4  2007.  The towns still have not taxed each of the parties in

5  the right-of-way.  They have all these arguments as to why they

6  don't have to.  But in our view, they still have not met the

7  condition precedent to imposing the tax on FairPoint.

8  Therefore, the claims are still contingent.  Once they start

9  assessing tax against ComCast, then I think our argument that

10  these are contingent go away.  But for right now, these are

11  contingent claims.  The Supreme Court said here's the

12  conditions to imposing this tax.

13        Your Honor, they also attack Your Honor's -- the

14  propriety of having Your Honor actually rule on these claims.

15  Claims adjudication, as Your Honor is well aware, is a core

16  function of bankruptcy courts.  And the towns argue that you

17  should abstain because issues of state law predominate.  That's

18  really not the case.  The Supreme Court of New Hampshire has

19  already established the precedent that defines the parameters

20  of applying this tax.  The towns don't meet those parameters.

21  Your Honor can read Rochester, apply New Hampshire law, and

22  determine that the tax is not owed.  There is no need to defer

23  to further state court litigation here.

24        In addition, the -- I think the other factors -- and

25  we go through all of them in our brief -- I won't belabor the

1   point, but I think each of the factors that are considered by

2   Courts in connection with abstention, weigh against applying --

3   weigh against this Court abstaining.  Here, as I mentioned,

4   this is a core proceeding.  The convenience of the parties, I

5   think, is also a significant factor to consider.  Your Honor,

6   we have seven towns here, each of which has a separate tribunal

7   that we would have to go litigate these claims in.  These state

8   courts are burdened with hundreds of cases.  We've pointed out

9   in our brief, one of them has actually apologized because they

10  can't even put us on the docket until sometime in 2011, and

11  that's for motions for summary judgment.  God only knows when

12  we would get to the trial.

13          So, Your Honor, we would have significant delay

14  getting these cases heard in state court.  We'd have to do it

15  seven different times.  It's going to multiply the cost

16  exponentially.  Whereas here, we can handle these claims all at

17  once.  It's a single legal issue.

18          Your Honor, also the towns challenge the fact that the

19  automatic stay applies.  I don't think that's debatable.  They

20  cite to a First Circuit case, Hague v. United States.  But I

21  think any close reading of Hague reveals that the First Circuit

22  had a case in front of it where the taxpayer-debtor was

23  actually suing the government for damages.  That's simply not

24  the case here.  This taxpayer is not seeking damages.  It has

25  brought these abatement petitions to the superior courts in New

1    Hampshire as a defensive measure, as essentially an objection

2    to the tax claims.  That's the same thing we're doing here.

3           We do not think we owe the tax, and the only remedy

4    for relief from the tax assessment is to petition the superior

5    court to abate the tax.  This is no different than any other

6    proof of claim in bankruptcy where the taxing authority is

7    trying to collect money.  And that's the kind of thing that

8    Section 362 was meant to stay.  I don't think any of their

9    arguments controvert that simple axiomatic fact.

10           Your Honor, Concord has also raised the issue of

11   judicial estoppel.  There's really no grounds for judicial

12   estoppel here, because there was never any sort of a ruling in

13   state court that affected any of the rights of the parties.

14   And nobody's ever taken an inconsistent position.

15           And then, Your Honor, the remainder of the issues are

16   really more on the equal protection rights themselves.  I'm

17   going to defer to Mr. Harris and he's going to address those

18   briefly for Your Court (sic), and then we'll hand it off to the

19   taxing authorities for their rebuttal.  Thank you, Your Honor.

20           MR. HARRIS:  May it please the Court.  My name is

21   Scott Harris.  I'm with the law firm of McLane, Graf, Raulerson

22   & Middleton in Manchester, New Hampshire, and I have been

23   invited here to discuss with you the equal protection aspect of

24   the debtors' contentions in this matter.  The reason being, is

25   that I have had the pleasure of litigating this exact issue for

1    the past fifteen years, first on behalf of Verizon, and now on

2    behalf of FairPoint.

3              What I'd like to do, Your Honor, is first just briefly

4    underscore the issue that counsel has raised about the

5    difficulty of having these matters heard in a timely fashion up

6    in our state court in New Hampshire.  I'd like to give you a

7    little bit of background about the statutory framework and why

8    the --

9              THE COURT:  Did you handle the Rochester case?

10             MR. HARRIS:  I did, Your Honor.

11             THE COURT:  How long did that take?

12             MR. HARRIS:  Well, we went to the Supreme Court three

13   times.  The litigation started in 1996.

14             THE COURT:  Okay.  Enough.

15             MR. HARRIS:  It was tried twice and it took years for

16   each one of those rehearings.

17             But especially in this day and age, Your Honor, it's

18   difficult to get civil matters heard in New Hampshire, because

19   our courts are severely underfunded.  Our supreme court has

20   curtailed jury trials.  A third of the jury trials are gone.

21   Courts are closing several days during the week.  The clerk's

22   offices have got to close in order to get paperwork out.  They

23   are weeks and sometimes months behind in getting orders issued.

24   The National Council of Courts down in Williamsburg, Virginia

25   that studies these matters, says that we ought to have

1    somewhere between twenty-five and twenty-eight superior court

2    judges.  We have sixteen.  And that was at last count.

3            So the ability to get a matter heard, not only just

4    based on the history of this particular litigation, but going

5    forward, it will be years before we can dispose of these

6    issues.  And so the idea of having the economy of this Court,

7    is one that's very attractive to the debtor in this matter.

8            Your Honor, in terms of the statutory scheme that

9    brings us here that tees up the issue of equal protection.  In

10   New Hampshire, as I suppose in most states around the country,

11   the public ways are dedicated to use for public purpose.  And

12   since the late 1800s, one of the public purposes was the use by

13   the public ways of the electric, gas and other utility-like

14   companies.

15           Now, fast forward to the 1990s and what you would have

16   confronted in 1990 was the taxation of the personal property of

17   all of the entities in the public ways by the state of New

18   Hampshire.  It was an ad valorem personal property tax.  But in

19   1991, what the legislature said was, we're not going to tax the

20   personal property of the telephone company anymore, because to

21   tax the land-line business is unequal and unfair and bad public

22   policy, because right now we have out-of-state wireless

23   companies coming in and they're not paying a facilities-based

24   tax, because they're not based in our state.

25           And so what the legislature said was, we're going to

1    exempt the telephone company from paying this facilities tax,

2    the tax on the poles, the wires, the conduit, things like that,

3    for so long as there's a communications excise tax that's paid

4    equally by all telecommunications providers.  So what happened

5    then, Your Honor, is that the local municipalities decided that

6    this was a revenue source that they could now tap, because now

7    that the state was going to be imposing the communications

8    excise tax on the consumers, there was no longer an equivalent

9    tax on the facilities imposed against the telephone companies.

10        So the first effort of the municipalities was to say

11   those poles, wires and conduit, they're fixtures to the real

12   estate, so you owe us a real estate tax.  And our Supreme

13   Court, in a case that's not even mentioned in our pleadings --

14   it was the Franklin case -- said, poles and wires are not

15   fixtures.  They aren't taxed as real estate.  So what the

16   municipalities then did, Rochester in particular, is they

17   looked to a section of the statute, 72:23.

18        Now, 72:23 is an exemption statute.  It exempts from

19   taxation all governmentally-owned property.  So that, for

20   example, if in Manchester there is a -- or in Franconia there

21   is a ski resort that's leased out by the town, that underlying

22   property would be exempt because it's governmentally-owned.

23        What the legislature said was if the governmentally-

24   owned property is used or occupied by an entity other than the

25   government, that entity has got to pay the tax.  And that makes

1   good sense, and it works well, if you have, for example, a

2   concession stand that's operating on governmental property.

3   Because you can go to the private market and you can say what

4   would a concession stand like this be worth as real estate.

5   Because it's a real estate tax that would be imposed.  And what

6   72:23 says is when you lease out the property, when you let

7   others use governmental property you've got to impose the tax

8   that would otherwise be due.

9           So in the case of a taco stand or a stand in the

10  forest serving the ski slopes, you can figure out what that tax

11  would be.  What the Rochester did, though, said the telephone

12  company, and only the telephone company, is using and occupying

13  the public ways and so ought to pay a tax on that.

14          So we now have been at it for fifteen years, and we'll

15  be at it probably for another fifteen years trying to figure

16  out what is it that that real estate is worth, the real estate

17  that's used and occupied, because we only use it to the extent

18  it's a public use.  But, nonetheless, that's the Rubicon that

19  we face.

20          But what happened in the latter part of this

21  litigation is that we said to the courts and the courts agreed

22  with us, and, frankly, we thought that this issue was over with

23  with the Supreme Court's decision in 2008, we said if you're

24  going to impose a real estate tax against the telephone company

25  for its use and occupation of the public ways you've got to do

1    the same thing for all of those that make a similar, if not

2    identical, use and occupation of that real estate, of that

3    ground in the public ways.  Those include the electric company,

4    the gas company and the cable television company.

5         In fact, the cable television company makes the exact

6    same use as we do, just at a different level, because they

7    attach to the poles that the electric and telephone company

8    puts in the grounds, they use our conduit.  They pay a fee for

9    that, but the fee is limited to the cost to actually put the

10   pole in the ground or the conduit in the ground or the pole up

11   in the air.  There's no pass-through tax.

12        And there's a very extensive analysis at Exhibit H to

13   tab A where our Superior Court addressed that very issue.

14   Because that's one of the first things that the towns started

15   to say when they tried to bob and weave around the Supreme

16   Court's ruling.  The Supreme Court's ruling was if you're going

17   to impose a real estate tax against the telephone company you

18   have got to impose that exact same tax against the electric and

19   gas company.

20        And the argument that the municipality was raising at

21   the time was they said well, we pay a facilities tax going back

22   to the 1990s.  The same tax that we were exempt from they said

23   we pay that.  And so we shouldn't have to pay the tax on the

24   ground.  And the Court said paying a facilities tax, paying a

25   tax based on personal property is not paying a real estate tax.

1      So the Supreme Court of New Hampshire, which is

2   controlling and binding on this issue, has said if you don't

3   impose the real estate tax equally you don't impose it at all.

4   And the Rochester at the time said well, that's not fair; what

5   you should do is you should make the others pay more.

6      And if you look at the New Hampshire Supreme Court

7   decision citing Allegheny Pittsburgh, the U.S. Supreme Court

8   case that addressed similar circumstances, what the courts have

9   said is that's not how it's going to work.  You're not going to

10  remit the taxpayer to having to go and fight to have the other

11  guy's tax raised.  If a municipality, if the governmental

12  taxation authority is not going to impose the tax fairly, it's

13  not going to impose it at all.

14      So now most of the towns that are here today, Your

15  Honor, would say well, the only one we're not taxing is the

16  cable television company, and we have good reasons for that.

17  We think that they're really a good public player, they sponsor

18  our ball teams, they pay us the franchise fees, et cetera, et

19  cetera.

20      That doesn't cut it, Your Honor.  Because the rational

21  distinction that they would have to prove is that there is some

22  different use that they're making of the public ways of the

23  real estate than what the telephone company is.

24      If their argument were to prevail you can say in the

25  City of New York there's a real estate tax that's imposed, but,

1     you know, this restaurant here, they sponsor ball teams, they

2     pay a heck of a lot of rooms and meals tax, we don't think that

3     they should have to be burdened by this real estate tax.

4     That's exactly what the towns are saying vis-a-vis cable

5     television.

6            We thought that the New Hampshire Supreme Court had

7     put an end to that.  To the extent that they raise that

8     argument, we then had that very same argument raised by Conway.

9     You'll see, again, at  Exhibit H to tab A that the Superior

10    Court made short work of that.  And said that's not what the --

11    that's not what the Supreme Court had said.  It's not like

12    being, you know, a little bit less in violation of the equal

13    protection.  If you're going to impose this tax you're going to

14    do it on everybody.

15           So we think that the issue has been decided by New

16    Hampshire Supreme Court.  We think the argument that the

17    municipalities are now raising doesn't have any logical or

18    legal supportability to it.  And so we -- we're asking the

19    Court to -- in this process to determine their liability to be

20    zero.

21           With that, unless the Court has any questions, I'll --

22           THE COURT:  No, thank you.

23           MR. GROGRAN:  Your Honor, I think we'll turn it over

24    to the towns if they have any arguments.

25           MR. SKLAR:  Good morning, Your Honor.  Daniel Sklar,

1    with the law firm of Nixon Peabody, Manchester, New Hampshire

2    office.  And I'm here this morning with my co-counsel, Mr.

3    Ciandella.  We are here on behalf of our version of the Five

4    Towns:  Hinsdale, Salem, Seabrook, Raymond and Newmarket.

5           As debtor did, we would like to also proceed in a

6    somewhat bifurcated, but efficient, manner, to avoid

7    repetition.

8           I'd like to be able to address the 502(c) technical

9    bankruptcy questions or issues.  Mr. Ciandella would then, as

10   Mr. Harris did, discuss the Rockingham (sic) precedent.  And,

11   lastly, Mr. Kennedy, who is here on behalf of Concord, would

12   just like to cover those issues which are unique to the City of

13   Concord.

14          Just to add a little bit to the factual background,

15   Your Honor.

16          The Town of Hinsdale has filed a proof of claim for

17   taxes assessed for the four years in question, '05 through '09,

18   in the amount of 118,000 dollars.  There are five users of the

19   right-of-way they tax for them.  They do not tax Comcast as Mr.

20   Ciandella will discuss.

21          Salem, New Hampshire has a claim of 230,626 dollars.

22   They tax six of the seven users of the right-of-way.  The

23   exception, again, being Comcast.

24          Raymond, New Hampshire, Your Honor, has filed a proof

25   for 128,390 dollars.  They also tax everybody but Comcast.

1      Seabrook, New Hampshire has a claim for 55,000

2  dollars.  Also taxing everybody but Comcast.

3      And, lastly, is Newmarket, with a claim of 13,600.

4  They also tax all but Comcast.

5      One point I -- I don't know if I necessarily dispute,

6  but I think there's a point of clarification.  The litigation

7  is not pending in eight different courts, they are pending in

8  three different courts.  Most of them are in Rockingham County.

9  There are a couple in Merrimack County and one in Cheshire

10  County.  But for the most part the cases are all pending and

11  have been consolidated in Rockingham County.

12      In addition, as you've heard already, what we're

13  dealing with here are issues of New Hampshire --

14      THE COURT:  I would take it Comcast has an interest in

15  this litigation?

16      MR. SKLAR:  They should.  They definitely should, but

17  they haven't picked up on it yet.

18      The basis for the debtors' request for estimation of

19  the claims, Your Honor, arises under Section 9.22 of the plan.

20  In that provision they are required to escrow or to reserve

21  funds against disputed claims, which is what we maintain these

22  are; disputed claims.

23      And the issue is, under that section they have to

24  reserve either the amount of the claim, the amount that the

25  claim is estimated by -- the lesser of, or the amount that this

1    claim is estimated by, or the amount that we might agreed to,

2    which is a point I'd like to come back to in a little bit.

3        But the issue then is whether or not escrowing the

4    aggregate amount of some 540,000 dollars is burdensome to the

5    estate, or unreasonable to the estate, on a worst case basis,

6    and whether or not allowing this -- these matters to proceed in

7    the Superior Court in Rockingham, especially where we have

8    actually been given a trial date in November, next month, if we

9    wish to avail ourselves of it, causes undue delay to the

10   estate.

11       Your Honor, 502(c) has a two-part standard for

12   estimation for purposes of allowance.  First, it has to be a

13   contingent or unliquidated claim.  And, secondly, the

14   liquidation of that claim by other means has to result in an

15   undue burden, delay to the estate.

16       As much as they keep saying it, I don't think anybody

17   really thinks that a tax claim, a bill, assessment lawfully

18   issued in accordance with the statute is a contingent or

19   unliquidated claim.

20       As they mention in their reply brief, the debtor

21   states the towns don't tax all the users.  Accordingly,

22   FairPoint disputed the tax assessment for the prior years.  And

23   as I noted under Section 522 of the plan dealing with disputed

24   claims this all is brought about by the necessity to calculate

25   what they need to reserve under that section.

1    The code does not define contingent, nor does it

2   define liquidated or unliquidated.  But the debtor would have

3   you believe that somehow until the Supreme -- until we tax

4   Comcast these claims are contingent.  But then at Section 87 of

5   their omnibus reply they correctly note that we cannot go back

6   and assess Comcast for 2005 and 2006.  That's not legally

7   permissible under New Hampshire taxing scheme.  You have to

8   tax -- the tax assessor for each municipality has to tax,

9   effective as of April 1st of each year, and if that's not done

10   there's no going back and fixing it later.

11    So there's no way that it could be contingent -- these

12   claims could be contingent based on our taxing Comcast

13   retroactively for those years, because it's not legally

14   permissible, and they acknowledge that fact.

15    And, again, that's contingency.  The other prong is

16   liquidation of it.  The claim has been -- is a liquidated

17   claim.  I mean, an equal protection argument is not going to

18   determine the amount of the claim.  That's a yes or no.  It's a

19   total claim or zero, if the tax assessor violated the equal

20   protection clause.  So to say that this claim is unliqiudated

21   also is, I think, a bit of a stretch.

22    And, again, here what's rather unique is the policy

23   behind all of this.  In addition to rapid admin -- or efficient

24   administration of the estate, is to give the Court the

25   information it needs to confirm a plan and determine

1  feasibility, in particular.

2      This has already been done.  That part of this case

3  and the confir -- the bifurcated confirmation process you have

4  already confirmed the plan as far as feasibility is concerned.

5  It's now just waiting on the Vermont Public Service Board to

6  satisfy that last contingency to phase II of the confirmation

7  process.

8      So it's not even -- I mean, you've already had to have

9  taken that into consideration at the time they -- the first

10  confirmation order was entered.

11      But it is clear, Your Honor, that these are disputed

12  claims.  They say they're disputed claims, it's for disputed

13  reserve, and I -- I take some guidance from the Adelphia case,

14  where Judge Gerber basically said, or exactly said, "I cannot

15  agree that any time one disputes an otherwise liquidated claim,

16  or asserts a counterclaim, that makes that claim unliquidated.

17  When it is time to determine the allowance of the DIP claim

18  we'll have to do it the normal way, which is by litigation."

19  That's where we are.

20      The question is do we litigate it here or are we going

21  to litigate it somewhere else?  But I don't think it's

22  appropriate at this time, for various reasons, to deal with it

23  on the basis of claims estimation.  And I don't think that's

24  what it was meant to be.

25      And the other aspect, they keep saying -- Mr.

1    Ciandella will get to it -- but they keep saying the Supreme

2    Court has said that you have to tax everybody.  And, in fact,

3    that's not what they said.  They said you don't have to tax

4    everybody as long as you have -- you can satisfy the rational

5    basis test.  And we think we can satisfy it, and that's the nub

6    of the dispute.

7           Secondarily, or subsequently, under 502(c) is the

8    issue of undue delay.  The fact of the matter is, Your Honor,

9    while I couldn't find any case law in point, I think you'd have

10   to agree that the debtor has some minimal duty to try to

11   mitigate against undue delay.  We have been afforded

12   opportunity in the Rockingham County Superior Court to get on

13   the docket relatively soon.  We are agreeable to let Seabrook

14   be the test case, and be bound by the outcome of that case.  We

15   are willing to do a lot of things to try to expedite this

16   process.

17          The debtors' response appears to be gee, I don't know

18   how long it's going to take you to get relief from the

19   automatic stay.  And that should take two seconds.  We should

20   do it by agreement, and it should be over with.  It shouldn't

21   have -- I mean, it's kind of a straw man to say that we have to

22   come before this -- should have to come.  I mean, yes,

23   technically, that's what would have to be done.  But in order

24   to avoid an undue delay I don't think it's -- there's anything

25   policywise that would mitigate against putting some duty on the

1　debtor to try to avoid having to go to estimation.  That should

2　be something -- a tool of last resort under the circumstances.

3　And it's just not happened here.

4　　　　We need to get this resolved, and we need to get it

5　resolved quickly.  But you're dealing with New Hampshire

6　constitutional issues, and New Hampshire tax law issues, and

7　notions of New Hampshire property law, you know, and taxing a

8　leasehold interest on exempt public property.  This is not

9　simple stuff to begin with.

10　　　　But the state has a very compelling interest in

11　controlling and creating some uniformity here and dealing with

12　these issues.  And I think that needs to be taken into

13　consideration.

14　　　　On the point of abstention, Your Honor, the rule's a

15　little different in the First Circuit.  I understand what the

16　rule is in this circuit.  And I understand you get the check

17　every month, you should exercise the jurisdiction that's

18　conferred on you, that's the deal.

19　　　　And as the Court said in Metromedia, the rule -- "A

20　federal court should exercise the jurisdiction conferred upon

21　it absent a compelling reason not to do so."  I get it.

22　That's -- and I don't disagree with it, actually.

23　　　　But in Metromedia Judge Hardin did abstain on a 505(a)

24　basis, which is similar to what's before the Court this

25　morning; and did it on the basis of the Supreme Court's opinion

1    in Arkansas Corporation.  That basically said that there's a

2    national policy of federal non-interference with the taxing

3    powers of the states.  That's squarely what we're dealing with

4    here.  And I think it's important for the Court to take into

5    consideration that federal policy that in these situations,

6    again, only as a matter of last resort, should federal courts

7    get involved in the taxing power of the states.

8         And I think that -- you know, there's a twelve-factor

9    test, the seven-factor test, when you cut through all of

10   that -- those issues, I think this is what it comes down to,

11   especially in the Second Circuit.  The same with non-statutory

12   abstention, which we also raised.

13        But, lastly, for my section, Your Honor, I also want

14   to just point out that even though we raised it, and they filed

15   a fifty-page reply brief and so forth, to their credit, in a

16   2.7 billion dollar case, they have not alleged, asserted or

17   claimed that escrowing 500,000 dollars, or reserving 500,000

18   dollars is going to put any type of burden-- unreasonable

19   burden on the debtor.

20        And at the end of the day, I think, when we -- the

21   Court can resolve the issue on that basis, I think that's where

22   the balancing of the equities should come out.

23        We will get to it.  You know, plans are confirmed all

24   the time where things happen in the future based on the outcome

25   of litigation post-confirmation.  Again, we are prepared -- the

1  towns, like the court system, are seriously underfunded.  This

2  is big money to them, it's very important to them, but we can't

3  spend that much and more in legal fees fighting about it.

4  We've got to be efficient.  We've got to get it done

5  expeditiously.  And I think, you know, we're committed to doing

6  that.

7       And relatively speaking, the burden on FairPoint for

8  reserving that type of money is not -- at least not significant

9  enough to warrant a sentence in any of their pleadings.  And I

10  think that the Court can take that into consideration as well.

11       THE COURT:  Thank you.

12       MR. SKLAR:  Thank you, Your Honor.

13       MR. CIANDELLA:  Good morning, Your Honor.  I'm Rob

14  Ciandella of Donahue, Tucker & Ciandella in Exeter and

15  Portsmouth, New Hampshire.

16       Your Honor, the Rochester case does not dictate the

17  result of the equal protection claims that are before this

18  Court.  Rochester case is not some ball that you roll onto a

19  field and the game is over, it's simply not so.

20       The  Rochester holding is not that as a precondition

21  to taxing any user of the right-of-way, you have to tax all

22  users of the right-of-way.

23       In Rochester the Supreme Court said "Municipalities

24  can selectively tax users of the right-of-way as long there is

25  a rational basis for that selection."  There are two key

1    elements of Rochester, one of which I've touched on, that

2    demonstrate why Rochester does not dictate the result here.

3         The first is that in Rochester, as Mr. Harris said,

4    Verizon was the only user of the right-of-way that was taxed,

5    they were singled out.  So it's as if all the lawyers before

6    you, Your Honor, Rochester picked Mr. Sklar and said only you

7    pay the tax.  The cases that are here are exactly the opposite,

8    the inverse.  All of the users, all of these lawyers who are

9    going to pay the tax except one; Comcast, the cable company.

10   All five towns, it's just Comcast.

11        The second key element is the element I just

12   described, that Rochester, why it doesn't dictate is that in

13   Rochester what the Supreme Court said even in that extreme

14   circumstance where only one user was singled out that could

15   meet the equal protection clause of the New Hampshire

16   constitution if it met the rational basis test.  And the

17   language of the Court is, and it's on page 630 of the New

18   Hampshire opinion report the words of the New Hampshire Supreme

19   Court are these.  And, again, this is in the context where they

20   selected a single user and ignored the others.

21        The Supreme Court said, "There is no equal protection

22   violation, however, if the city's selective taxation is

23   reasonably related to a legitimate state interest."  And that's

24   the rational basis test in New Hampshire as in other

25   jurisdictions, as to the lowest constitutional standard.

1        And what the Supreme Court went on to say is that

2   FairPoint -- in that case it was Verizon.  But what FairPoint

3   would have to prove is that the selection -- and, again, this

4   is in the context of a single -- a singling-out of one user

5   that the -- Verizon had to provide that the selection was

6   arbitrary or without some reasonable justification, or our

7   Supreme Court invoked the federal standard; it said "That

8   Verizon had to negative every conceivable basis which might

9   support the selection, whether or not the basis has a

10  foundation in the record."

11       So Rochester, the facts are completely opposite,

12  inverse, of the facts here.  One user singled out in Rochester,

13  here all users are taxed except one.  And our court has said in

14  the more draconian circumstance is there a rational basis?

15       In Rochester what the Court said, and it's, again,

16  it's a short opinion, the Court said in that case the city did

17  not offer any rational basis for why it singled out one user of

18  the right-of-way and ignored the others for purposes of

19  taxation.  There's language and the Court says, "The city

20  offers no rational basis."

21       Here, again, it's the opposite.  The towns have put

22  in -- the five towns have put into the record facts which

23  answer the question why.  What is the rational basis?

24       And I'd like to use Seabrook as an example.  This is

25  one of the five towns, Your Honor.  Seabrook is a town of about

1    10,000 people right at the Massachusetts border.  In Seabrook

2    there is -- Your Honor probably knows, there's a 1200 megawatt

3    nuclear power facility.  It's the last one constructed in the

4    U.S., came online about thirty years ago.  And that plant in

5    this small town imposes significant emergency planning

6    responsibilities on the town.

7         Now, the cable operator, Comcast, provides two very

8    important emergency management functions for the town.  One, it

9    built a separate network for the town.  A fiber-rich network

10   that connects all the town buildings, the satellite that

11   allows -- it's really the backbone of the town's emergency

12   management system.

13        Two, within the franchise agreement between the town

14   and the cable operator there's a provision that specifically

15   allows the town to nominate two town officials who can override

16   the programming on the cable system.  And the language of the

17   agreement is, "That those officials are given control of all

18   channels for a limited period of time for the purpose of

19   transmitting instruction to viewers."

20        So this is a key element of the town's emergency

21   management plan.  And so whereas Rochester offered no reason

22   for singling out Verizon in that case, in Seabrook's case,

23   they're taxing all users, all the lawyers here, except for one,

24   to Comcast, and it's a rational basis test.  And I've just

25   given you one example of why we think Seabrook will meet that

1  rational basis test.

2       The cable operator in Seabrook does other things.

3  They provide franchise fees, they provide a public educational

4  and governmental access programming.  They provide Internet to

5  the libraries and schools.  But they provide this core

6  emergency management function, which is central to Seabrook's

7  government -- town government responsibility.

8       So Seabrook has a legitimate government interest, a

9  rational basis for selecting -- not selecting, singling out

10  Verizon or FairPoint but for deciding not to tax Comcast for

11  using the right-of-way.

12       So I guess our view, Your Honor, is that Rochester is

13  not some bell that ends all of the contest on this question.

14  All five towns taxed all users of the right-of-way and since

15  the New Hampshire Supreme Court said even in the dramatic

16  circumstance where a single user is chosen -- picked out among

17  five or six users of the right-of-way, 'we're only going to tax

18  you,' even in that circumstance, the Supreme Court said that's

19  not an automatic violation of the equal protection clause.

20  The question is, is there a rational basis for that selection.

21  In our circumstance, we've taxed everybody except Comcast and

22  we have a rational basis for that decision.

23       THE COURT:  Thank you.

24       MR. KENNEDY:  Good morning, Your Honor.  My name is

25  Jim Kennedy; I'm counsel for the City of Concord which is New

1    Hampshire's great capital city.  I brought with me today Kathy

2    Temchack, who is the city's assessor, and who actually assessed

3    the use and occupancy of FairPoint's -- and their predecessor,

4    Verizon's, use and occupancy of the right-of-way.

5          It looks as though we skipped over Claremont, that was

6    addressed first, but I expect that we'll get back to them at

7    the end here.  I expect that they'll have something to say

8    about this 422,000 dollar claim that was estimated at zero

9    shortly.

10         But our claim, Your Honor, has -- raises five points.

11   Our objection to their motion estimate raises five points and

12   Mr. Sklar and Mr. Ciandella have certainly spoken to the bulk

13   of those points.  Certainly under 502(c), this is not a

14   contingent claim.  I mean, this isn't like an oil spill out in

15   the gulf waiting to see if the oil's going to hit Pensacola.

16   And this isn't an old asbestos type claim finding out if

17   there's going to be a future injury.  This is a tax that was

18   actually assessed.  There's no contingency whatsoever about

19   this claim.

20         It's also liquidated.  We know exactly what Kathy

21   Temchack and her predecessor taxed FairPoint and/or Verizon for

22   its use and occupancy of the right-of-way.  And Mr. Sklar aptly

23   pointed to the Adelphia case citing that we don't estimate

24   liquidated claims.

25         Also, with respect to -- looking at 502(c), with

1  respect to undue delay. There certainly is no undue delay with

2  the City of Concord. Even when the -- FairPoint filed this

3  motion to estimate, which was most shocking to the City of

4  Concord, quite frankly, given the stage of litigation in

5  Merrimack County Superior Court when they filed this in June.

6  Your Honor, this past summer, we were on schedule for summary

7  judgment motions to be filed in Merrimack County Superior Court

8  and on trial for a final hearing on the merits next month. And

9  so we've agreed, during the pendency of this litigation, to

10  continue and continue and the Court has accommodated our

11  request to continue but certainly there's no undue delay here.

12  The court in Merrimack County is ready, willing and able to

13  hear our case upon our notice. And we've filed those motions

14  with the court, respectively.

15       Also, Your Honor, this is not a jury trial case.

16  While Mr. Harris is correct that there's been some delay with

17  respect to jury trials, there's been virtually no delay with

18  respect -- at least in Merrimack County, I've experienced no

19  delay with respect to bench law -- or cases presented to the

20  court, which this is set for. And so undue delay is not there.

21       Also, with respect to the reserve. This city filed

22  205 some odd thousand dollars worth of claims in FairPoint; I

23  understand this to be a 2.7 billion dollar reorganization. And

24  so it's a most de minimis amount of money that we're talking

25  about with respect to the City of Concord. And while it's de

1    minimis in the context, I must say to FairPoint -- have a 2.7

2    billion dollar reorganization, it's a lot of money to the

3    citizens of Concord, New Hampshire, who rely on taxation for

4    the services that the city provides.  That's real money to the

5    budget of the City of Concord.

6         With respect to abstention, I'll just merely reiterate

7    and certainly adopt the points, again, that Mr. Sklar related.

8    This is a pending action in Merrimack County Superior Court.

9    We've had dates on the docket, we've continued dates on the

10   docket; we have not agreed that the automatic stay applies.

11   The Court ruled that that issue is moot and we are ready to

12   proceed.

13        And certainly it's an issue of constitutional state

14   law, Your Honor, and I'll get to those points in just a minute

15   with respect to Rochester.  I've got a few points that I'd like

16   to make there too in addition to what my brother New Hampshire

17   lawyers have made as well.  But certainly it's an import of New

18   Hampshire state law and you asked the question, Your Honor, of

19   Mr. Sklar, what does Comcast have to think about this?  And

20   certainly Comcast has a lot to think about this.  They're the

21   one entity that certainly the City of Concord didn't tax; none

22   of the entities here taxed.  And, interestingly, Claremont

23   taxes Comcast's use and occupancy of the right way but

24   certainly I question whether the doctrine of res judicata would

25   apply in the context of an order coming from this Court and the

1    application of that to Comcast and if that's going to settle

2    this very unsettled law up in the state of New Hampshire.

3            This is not a case, Your Honor -- and I'll get to in a

4    minute, and certainly Mr. Ciandella raised it quite clearly,

5    that Rochester is not a controlling factor here.  At all.  The

6    facts are completely opposite and opposed, at least with

7    respect to the intricate facts of taxation as appeared in

8    Rochester.

9            And one other point I'd like to raise, Your Honor,

10   with respect to the Rochester case and the fifteen years that

11   Mr. Harris spent litigating that.  And by the way, he did a

12   wonderful job giving the historical context of the case and we

13   wholeheartedly agree with the history that he provided.

14   However, the issue that's before the Court, the fundamental

15   issue of equal protection, wasn't brought to the Supreme Court

16   and the Supreme Court actually issued a decision in 2007.  So

17   it actually rendered that decision very quickly.  As the Conway

18   court -- in North Conway, which is not a precedential decision,

19   expedited a decision in that case most rapidly.  And I would

20   expect only the same at a Merrimack County Superior Court and

21   Judge McNamara, who sits there, I would expect would be very

22   judicious and expedential (ph.) in rendering a decision for the

23   City of Concord in this case as well.

24           But certainly getting to the merits.  And that's the

25   equal protection argument, the state constitutional law

1    arguments that you've heard about.  And this is not Rochester,

2    okay?  In Rochester the tax assessor singled out one person.

3    And you've heard this over and over again; I don't want to

4    reiterate it.  But it's fundamentally Your Honor, if you own a

5    home here in New York City and the assessor says 'I'm only

6    taxing you and I'm not going to tax the ten million or however

7    many other million have residence in the city, I'm only taxing

8    you', then you have an equal protection claim.  You're going to

9    go to the court and say 'it's unfair, unequal treatment; I

10   don't want to pay taxes'.  And the court's going to say, as

11   they did in Rochester, 'okay, you don't have to pay taxes'.

12        But what's going on here, Your Honor, is we're taxing

13   everyone in the right-of-way but for a cable provider.  And

14   certainly I adopt what Mr. Ciandella has said with respect to

15   the rational basis not to tax that cable provider.  But

16   however, even if a court were to find that we are required to

17   tax the cable provider, the remedy is not to give FairPoint,

18   and all the other public utilities, a free ride.  You don't

19   give FairPoint a free ride of paying no tax because we failed

20   to tax one person.

21        Going back to the example of your home in the city,

22   Your Honor, if the city taxes you as well as everyone but fails

23   to tax your neighbor, so they fail to tax one other person

24   similarly situated to you in the entire city, they fail to tax

25   you, then what does that mean?  It's not going to mean that --

1    or they fail to tax your neighbor.  It doesn't mean that you

2    don't have to pay taxes and that everyone else in the city

3    doesn't have to pay taxes; it's an error of judgment.  And you

4    get that precedent from the New Hampshire Supreme Court, from

5    the United States Supreme Court; error of judgment doesn't

6    result in giving everyone a free ride not to pay taxes.

7          And certainly the result -- going to the remedy here,

8    even if we're required to judge Comcast, the New Hampshire

9    Supreme Court said that the remedy is prospective.  Okay?  You

10   bring everyone up -- where the error was you bring that person

11   up to be taxed.

12         So if Comcast is required to be taxed, and we're

13   taxing everyone else in the right-of-way, then you tax Comcast.

14   But you don't give all the other public utilities in the city

15   or the state a free ride for not -- taxing there.  So that's

16   the remedy there, Your Honor.  It's very important here.  So

17   that goes to the estimation at zero -- even if there is an

18   equal protection argument, they're not going to not have to pay

19   taxes.  This is not Rochester.

20         Rochester singled out one person, one entity, and

21   didn't tax any other similarly situated entities.  Here we're

22   taxing everyone but, perhaps, maybe there was an error of

23   judgment, at the worst, or we have a rational basis at the

24   other end.  So either way, rational basis or error of judgment

25   does not result in no taxation for FairPoint.  They will still

1    have to pay taxes.  And, quite frankly, under the New Hampshire

2    Constitution, cited in my memorandum, Your Honor, you'll see

3    that it violates the New Hampshire Constitution not to tax

4    FairPoint.  Because not taxing FairPoint means that you disrupt

5    the disproportionality of the taxation within the

6    municipality -- within the city.  And disrupting the

7    disproportionality is unconstitutional.  It's basically saying

8    'okay, citizens of Concord, we're not going to require

9    FairPoint to pay 200 and some odd thousands -- dollars this

10   year in taxes; we're going to disburse that all among you'.  So

11   they get a free ride because there was an error of judgment or

12   there wasn't a rational basis.  That's not the way it works.

13   The taxation remains with FairPoint; they're going to be --

14   they are absolutely liable for that taxation, notwithstanding a

15   rational basis or error of judgment.

16          With respect to the judicial estoppel agreement, Your

17   Honor, we've raised that showing the import and the

18   significance of this case to the City of Concord.  As I

19   mentioned, 205,000 dollars is a lot of money for the city and

20   we were expeditiously litigating this case and expecting and

21   prepared for summary judgment in July of this summer.  It was

22   moved forward; we had filed motions to continue in the Superior

23   Court.  Again, the city was objecting that the automatic stay

24   applies because this was not an action against the debtors that

25   is required under 362.  This was an action brought by debtor

1   against the City of Concord.  And certainly under New Hampshire

2   law, it's the debtor that has the burden of proof in tax cases.

3          And so under the doctrine of judicial estoppel, we had

4   filed these motions to continue.  The Court ordered that the

5   automatic stay was moot.  We also saw, this past summer, an

6   extension for the 1452 filing, on behalf of FairPoint, to be

7   able to extend that period and we were assuming that it was

8   going to be a 1452 proceeding to remove the -- certainly remove

9   the state court proceeding to the New Hampshire Federal Court

10  where we would have an opportunity to object and then

11  potentially down here to this court.

12         This estimation certainly also goes to due process.  I

13  mean, estimating these claims at zero would certainly violate

14  the city's due process right to adjudicate the meritorious

15  issue presented in this case.  And we believe that we have a

16  solid case, wholly different -- absolutely different from the

17  City of Rochester.  The facts are different, the remedy's

18  different and ultimately it doesn't mean that FairPoint gets a

19  free ride on taxation.  They will have to pay taxes.

20         THE COURT:  Thank you.

21         MR. KRAVET:  Good morning, Your Honor.  Donald Kravet,

22  with Kravet & Vogel, LLP, counsel for the City of Claremont.

23         Your Honor, Claremont is differently situated than the

24  five towns and Concord for this reason:  Claremont taxes

25  everyone.  I mean everyone.  They tax the two utilities and

1    they tax the two cable providers, including Comcast.  So even

2    under the debtor's reading of the Rochester case, we pass

3    muster.  Everyone is treated equally; everyone is taxed.

4            In response to that argument, Your Honor, what the

5    debtor says is 'well, but you don't tax the electric companies

6    for right-of-way; you just tax them under a different

7    provision'.  But that actually is wrong.  That's factually

8    inaccurate.  The City of Claremont taxes utilities under a

9    provision with respect to infrastructure but separate and apart

10   taxes the utilities under the provision at issue here with

11   respect to right-of-way.

12           Now, Mr. Grogan earlier made reference to an exhibit

13   that is in the docket and before Your Honor and he said 'if you

14   take a look at it, you'll see that there's a land value

15   assessment and a building value assessment but there's no use

16   value assessment', meaning they don't tax for use.  But if you

17   actually turn to the very next page of the exhibit, Your Honor,

18   what you'll see is a supplemental warrant.  And that

19   supplemental warrant, that has a city right-of-way tax and a

20   very substantial number there for the tax.  So if you look at

21   one document you see zero, but if you turn the very next page

22   you'll see that, in fact, we do tax for right-of-way for use

23   tax.

24           The other issue that was raised this morning, Your

25   Honor, by the debtor, was that this is an application by

1    Claremont for -- to reconsider.  And that's because Claremont

2    did not receive a copy of the debtor's motion seeking to

3    estimate its claim.

4           Now, Mr. Grogan said that the only thing that

5    Claremont has done in support of its motion to reconsider is to

6    deny receipt of the debtor's motion.  And if that were

7    accurate, Your Honor, I would agree with Mr. Grogan that the

8    motion to reconsider would not be valid.  But, in fact, we have

9    done more than that and Mr. Grogan did not mention that also in

10   the record and before Your Honor is an affidavit submitted by

11   Pamela Dyer (ph.) and it is Ms. Dyer's job to receive and sort

12   and distribute the mail.  And what Ms. Dyer testifies to is

13   precisely the exact methodology that she uses in receiving the

14   mail and in sorting the mail and in distributing the mail.  And

15   the case law tells us that testimony denying receipt in

16   combination with evidence of the standardized procedures for

17   processing mail will rebut the presumption of receipt upon

18   mailing.

19          The presumption of receipt upon mailing is just that,

20   it's a presumption, it is rebuttable, and under the applicable

21   case law it is our submission, Your Honor, that we have

22   successfully rebutted that presumption.  With respect to the

23   issues of abstention and the issues of delay and the issues of

24   estimation, I will rely on the arguments that were made by

25   prior counsel.

1          Thank you.

2          THE COURT:  Thank you.

3          MR. GROGAN:  Your Honor, James Grogan, again, for

4    FairPoint.

5          Your Honor, I'll start with arguments made by Mr.

6    Sklar for the five towns.  Your Honor, on the estimation point,

7    nothing says that 502(c) is a tool of last resort.  502 governs

8    claims, generally.  502(a) says that a claim is deemed allowed

9    unless a party-in-interest, like FairPoint, objects.  502(b)

10   provides grounds for objections.  502(c) says that if a claim

11   does not fall within (b), then you can ask for estimation.  And

12   the claim is objectionable under (b) if it's not contingent or

13   you can object under (b) on grounds other than the fact that

14   it's contingent.  And then (c) covers situations where the

15   claim is contingent.

16         Here, the Supreme Court has laid out a clear

17   framework, as I said before, for how this tax is supposed to be

18   applied constitutionally in New Hampshire.  It's no different

19   than if we had a contract which says that FairPoint owes X

20   dollars upon the fulfillment of the following three conditions:

21   notice of the bill, the stated amount and a due date.  Here we

22   have, you know, some conditions:  the tax has to be assessed

23   and it has to be assessed against each of the parties in the

24   right-of-way.  There are five known parties using the right-of-

25   way; they don't tax all of them.  So until they tax each of the

1  parties, the tax is not properly assessable.

2      Now, putting that aside, I think all of these

3  arguments about the process are really -- they're missing the

4  point.  Each of these taxing authorities has gotten all the due

5  process that they're entitled to under bankruptcy law and Rule

6  9014.  We served this objection on -- rather served this motion

7  on each of the towns.  They had plenty of notice; we gave them

8  more than thirty days' notice of the initial hearing.  They

9  responded all of their substantive arguments have been

10  presented to this Court; the parties have fully briefed the

11  issues.  Basically what they're saying is that we need to

12  change the title of our initial submission.  Instead of saying

13  "Motion to Estimate", we need to say "Motion to Disallow", re-

14  file it, come back in another thirty days and go through this

15  whole circus again.  It seems like a complete waste of time.

16      Everybody has had all the due process that they're

17  entitled to with notice and an opportunity to be heard.  We've

18  submitted probably more than a thousand pages of briefs and if

19  nothing else, the clerk could just consider this as our

20  objection to the claims.

21      Rule 9005 clearly says that anything of this nature is

22  nothing more than harmless error and, in fact, in In re Medium

23  (ph.), Judge Drain did exactly the same thing when somebody was

24  objecting as to whether or not it should be an adversary

25  proceeding and he just said 'well, okay, I'm going to apply

1   part 7 of the rules because we're not going to make the debtor

2   keep re-filing papers to suit everybody's desires on what the

3   title should be'.

4          Second, the towns argued that we just hadn't done this

5   enough in state court so we should go to Rockingham County

6   Court and then there could be this efficient process where we

7   get a final ruling and then everybody's going to agree to that.

8   Well, we should go to the county for Concord and everybody's

9   going to agree to whatever Concord does.  Remember, we already

10  did this in Conway.  So the county court for Conway already

11  considered the exact same issue that each of these towns has:

12  do they have to tax Comcast?  And the court in Conway said yes.

13  The debtors don't owe anything because you don't tax Comcast.

14         So if all we need is one State Superior Court to go

15  ahead and rule on whether Rochester governs here, we have it.

16  Conway did it, it's in our briefs; we submitted a copy of the

17  decision.  Each of the towns is right and it rules against them

18  so there's not a -- why do we need Rockingham or Concord to do

19  the same thing that Conway did?

20         Next, the towns argue that you're getting involved in

21  the taxing power of the states.  It's not the case.  Every

22  party comes to this court with some underlying state law of

23  right, whether it's contract or tax or something else that

24  arises under state law.  We're not asking Your Honor to

25  determine what the New Hampshire Supreme Court would rule if it

1   had an opportunity to say 'does equal protection require them

2   to tax all the parties using the right-of-way'.  We already

3   have the ruling.  Your Honor just needs to apply settled state

4   law as determined by both Rochester and Conway.  And the towns

5   are just arguing as to why none of these other decisions apply.

6   But the fact of the matter is they do apply; they're square on

7   point.  This is the same tax in the same -- it's just different

8   towns that we would be arguing res judicata except for the fact

9   that it's different parties.

10       Next is in Concord they say that they only -- the

11  difference between them and Rochester is that they only tax --

12  in Rochester, the town was only taxing one party and in

13  Concord, they tax all but one.  This is really just an argument

14  that they're not quite as discriminatory as Rochester was.  But

15  that doesn't cure the constitutional defect identified by the

16  Supreme Court.  The Supreme Court didn't say -- didn't make the

17  test 'well, if you tax some percentage of the parties in the

18  right-of-way, you get a free pass on the ones you don't tax'.

19  In fact, the statute, 72:23, if you read the statue, it says

20  that the tax shall apply to all parties in the right-of-way.

21       At one time I guess Concord had kind of backed off of

22  this.  They made the argument that what "party" really means is

23  "utility" and Comcast isn't a utility.  But these are just

24  silly arguments.  They have to tax, under the statute, all

25  parties in the right-of-way.

1        Next Concord makes the argument that there is no

2   action again the debtor.  That's ridiculous.  They want --

3   these terms want hundreds of thousands of dollars from the

4   debtor.  It is an action against the debtor and, in fact, today

5   there's a Supreme Court case -- U.S. Supreme Court, which is

6   binding here, Raleigh v. Illinois Department of Revenue, 530

7   U.S. 1522.  It's a 2000 decision.  Justice Souter said

8   "Consider the case where tax litigation involving a state and a

9   debtor taxpayer is pending when the taxpayer files for

10  bankruptcy.  The automatic stay applies."  That should conclude

11  the matter.

12        Now, Your Honor, there was also another reference by

13  Claremont to its rebuttable presumption of receipt.  Your

14  Honor, this -- the key case here is STN Enterprises and what

15  the court said was you have to look at the procedures that the

16  claimant actually employed.  And it needs to be procedures that

17  are like a business, such as a log of all the mail that comes

18  in on a daily basis and then you can actually go back and you

19  can check the record and see whether or not this particular

20  item of mail was actually received.  And if it doesn't appear

21  in the log on any day within the range of receipt, then you

22  know that the package didn't arrive.

23        There's no log here; this is just their word against

24  ours.  Our claims and noticing agent says they sent it to the

25  town and the town is saying 'we never got it'.  There's nothing

1    else here; just their word against ours.  That's not the kind

2    of thing that the case law says justifies a denial of the

3    presumption of receipt.

4         Your Honor, Claremont also raised the argument that

5    their taxation of the infrastructure satisfies 27:23.  And on

6    that point, I'm going to hand the podium over to Mr. Harris and

7    he'll take Your Honor through the tax bills and explain exactly

8    what's going on.

9         MR. HARRIS:  Just very briefly, Your Honor, I'm sure

10   you've heard quite a bit about this.

11        I do want to respond to Concord's notion that it would

12   be violative of the New Hampshire Constitution not to strike

13   this tax.  Because that's exactly what the court did in

14   Rochester, it struck the tax and it was not concerned that the

15   disproportionality in the community was somehow going to be

16   affected.  The reason being is this is in part a little bit

17   coercive to say to the municipalities 'if you're going to

18   impose a tax, you're going to do it equally' and the idea that

19   they can just single out, now, one that they're going to give a

20   tax break to doesn't achieve the ends of proportionate

21   taxation.  Instead, it violates the systematic unequal taxation

22   that caused the New Hampshire Supreme Court and the U.S.

23   Supreme Court in the Allegheny Pittsburgh case to strike the

24   tax.

25        THE COURT:  Did Verizon have to pay the tax in

1    Rochester?

2          MR. HARRIS:  No, ultimately the Supreme Court in New

3    Hampshire struck all ten years that were then pending and

4    Rochester hasn't been seen since.

5          THE COURT:  I understood that.  Okay.

6          MR. HARRIS:  Your Honor, in terms of this idea that

7    Claremont is taxing everyone, well, they are taxing everyone

8    but they're taxing the electric and gas companies under 72:8.

9    The reason -- the way you can tell that, Your Honor, whether it

10   be in the supplemental bills or the original bills, if you take

11   a look at the supplemental declaration of Colleen Penacho,

12   she's got Exhibits 15 through -- it looks like 20, and that

13   appears -- Exhibit D, Your Honor.  Take a look at the third

14   page in, the first exhibit, it's Exhibit 15.  And if you look

15   over at the right-hand side of it, the note "Appraisal

16   Building, Appraised X/F Value (BLDG), Appraisal OB Building".

17   Now, that's very significant for purposes of New Hampshire

18   taxation because every year when the tax is imposed the

19   assessors have got to submit a warrant, under oath, and one of

20   the things that they have to do is they have to distinguish

21   between the land value that they're taxing and the building

22   value that they're taxing.

23          We confronted this throughout the Rochester case and I

24   believe that it's -- that this exact issue is enshrined in the

25   Rochester decision.  And what happened in Rochester was that

1  the city argued 'we are taxing the rights of way' and they

2  pointed to a tax card just like this.  And they told us that we

3  were receiving the same tax building as their -- the way that

4  they nominate the facilities; the facilities are taxed under

5  72:8.  The land, if you'll look across there, "Special Land

6  Value, Zero".  So it's apparent when you look through these and

7  the special warrants that the -- that electric and gas

8  companies are being taxed for their building.

9        In other words, they're being taxed under 72:8 and the

10  Court need look no further than the New Hampshire Supreme Court

11  case which says specifically 72:8 has got nothing to do with

12  the real-estate tax.  The real-estate tax that's being imposed

13  under 72:23 is not being imposed against the electric and gas

14  companies.

15        Bringing Your Honor to the closing point, and that is,

16  is that the municipalities argue 'we have a rational basis as

17  to why we can single Comcast out now for special treatment'.

18  They don't have that, Your Honor.  What they have is an

19  argument justifying their unequal allocation.  And it's not my

20  words, Your Honor, it's the words of Judge Rand (ph.), who was

21  the judge in the Conway case, and he specifically says

22  "Although making this good faith argument, the court finds that

23  the town has not asserted a legitimate governmental interest

24  that was furthered by its disparate treatment."

25        The reason being, Your Honor, is that the tax here is

1    a tax against real estate.  Any rational basis -- any rational

2    distinction would have to start with why it is that the

3    telephone company's use and occupation of the real estate is

4    different than the others.  And they can't do that, Your Honor.

5    In fact, the taxation, the unequal administration of the tax

6    against Comcast, has the exact same infirmities of taxing the

7    electric and gas companies under 72:8.

8         Certainly there are reasons that the town has for

9    singling the telephone company out.  Those reasons are not a

10   rational basis, though, under the taxation scheme.

11        So with that, Your Honor, I'll close.

12        THE COURT:  Thank you all.

13        While I will say decision reserved, I do want to point

14   out that I find the Rochester case is controlling and binding

15   and cuts across all of the issues here for determination.

16        With respect to the request for reconsideration and

17   vacating, I will deal with that in an opinion.  However, I do

18   find that the grounds for vacature of the default do not really

19   exist.  Nevertheless, even if I were to continue -- consider

20   the matter on the merits, I don't think that the merits are

21   demonstrated here.  But I will issue opinions with respect

22   to -- on the five sisters and the other motion as well in due

23   course.

24        Thank you all.

25        (Recess from 11:46 a.m. to 12:23 p.m.)

1          THE COURT:  Be seated, please.

2          MR. DESPINS:  Good afternoon, Your Honor.  Luc Despins

3     with Paul Hastings on behalf of FairPoint.  With your

4     permission, if we could take one of the matters out of order,

5     which is the motion to extend exclusivity, it's not opposed,

6     and that way it probably could save a few dollars for the

7     estate by leaving the courtroom after we address that motion.

8     And also, I would give the Court an update on the case,

9     generally, as part of that motion.  If that's acceptable --

10          THE COURT:  Go ahead.

11          MR. DESPINS:  -- okay.  Your Honor, on August 20th we

12    filed a motion to extend our exclusive right to file a plan and

13    to solicit acceptances to that plan and to extend that period,

14    the first period to file a plan till October 22nd.  Now, that

15    motion was adjourned several times, which is why you may

16    wonder, you know, we're here on the 20th, and we will need to

17    file another motion to extend exclusivity, and we will do so.

18    But that motion was filed, essentially, to preserve the status

19    quo.  It's not opposed by anyone.  And let me give the Court an

20    update on the case.

21          You'll recall that in June, Vermont -- the Board of

22    Vermont denied approval of the regulatory settlement.  And in a

23    lengthy opinion which Your Honor has, the Board criticized

24    several elements, one of them being the financial forecast that

25    the company had prepared.  As a result of that decision, the

1    company went back to the drawing board and prepared a bottoms-

2    up forecast, and there were some complicating factors there,

3    including the fact that we had a new CFO that joined in July; a

4    new CEO that joined in late August.  But that effort --

5              THE COURT:  But they got the same old counsel.

6              MR. DESPINS:  That's true.  I don't prepare forecasts,

7    but okay.

8              So what the company did is prepare that forecast.  And

9    as a result of that effort, the company concluded that it

10   needed to get some modifications to the exit credit facility,

11   the one where the secured lenders modified, and modified in two

12   ways.  One, a general relaxation or loosening of the covenants.

13   And also -- under that exit facility.  And also, changing the

14   amortization schedule so that there would be pay-downs that

15   were scheduled under the original facility that would be pushed

16   back to later, in the later years.

17             And so therefore the company engaged the steering

18   committee in negotiation -- the steering committee of secured

19   lenders, represented by Willkie Farr, engaged them in a

20   negotiation which just concluded four or five -- four days ago

21   or so.  And that led to us filing with the SEC through an 8-K

22   filing, which Your Honor was sent a copy of, a new letter

23   supporting a revised plan.  And attached to the letter is a

24   term sheet with the principal terms of that revised plan.

25             The good news is that the banks did not insist on a

1    reduction or change in the distributions going to unsecured

2    creditors.  So despite the concessions that they're making,

3    they did not ask for that.  And therefore, that should make the

4    process much easier.

5           The game plan is, now that we're armed with that

6    agreement, we're going to file, we believe, sometime later

7    today, a renewed motion -- that's not the technical term, but

8    essentially it is a renewed motion -- with the Vermont Board,

9    to get approval of the regulatory settlement, armed with the

10   new forecast and this agreement with the banks.

11          We are asking the Ver -- we will ask the Vermont Board

12   for expedited consideration of that application.  We are

13   hopeful that they will grant the expedited consideration and

14   the ultimate approval of the settlement.  But that's within

15   their jurisdiction.  And we will have to wait to see how it

16   plays out.  If, in fact, they do approve it, then we will come

17   back to this Court as soon as possible to conclude phase 2 of

18   the confirmation process; phase 1 having taken place in May of

19   this year.  And we're hopeful, at that point, that the Court

20   would confirm the plan.  But that's premature in terms of

21   consideration by the Court.

22          So that's where we are.  We are filing a motion to

23   extend exclusivity, yet another one, in a few days.  And we

24   will ask for exclusivity to be extended through the end of

25   January.  The motion that's before Your Honor today is really

1      to maintain the status quo so that there's no gap in the

2      exclusivity period.  So I don't know if --

3             THE COURT:  Does anyone want to be heard with respect

4      to the current motion?

5             MR. RECKMEYER:  Hi.  Jeremy Reckmeyer, Andrews Kurth,

6      on behalf of the creditors' committee.  We have no objection to

7      the motion to extend exclusivity, but just wanted to note that

8      with respect to the matters filed in the 8-K with the SEC, the

9      letter agreement and the term sheet, we weren't provided with a

10     preview of any of that information, and we're still digesting

11     it to see whether or not we're, I guess, okay with the terms in

12     the term sheet.  Thank you.

13            THE COURT:  With respect to the current motion, the

14     application is granted.

15            MR. DESPINS:  Thank you, Your Honor.  And would just

16     point out that from their point of view -- and of course they

17     have to do their own due diligence on that -- but this should

18     be good news in the sense that there's no grab by the banks of

19     their distribution, which is, I think, a favorable outcome from

20     their point of view.  But they'll have to determine that for

21     themselves.  Thank you, Your Honor.

22            THE COURT:  Mr. Grogan?

23            MR. DESPINS:  May I be excused, Your Honor?

24            THE COURT:  Yes.

25            MR. DESPINS:  Thank you.

1        MR. GROGAN:  Thank you, Your Honor.  James Grogan,

2   again, for FairPoint.  Your Honor, the next matter we were

3   going to take up is item 6 in the binder; FairPoint's second

4   omnibus motion to estimate maximum amount of proofs of claim.

5   And the particular claim at issue was filed by Mr. Isidoro M.

6   Flores.

7        Your Honor, the parties have submitted their briefing

8   on the issue.  Just by way of background, Mr. Flores was hired

9   by FairPoint at the age of fifty-nine on December 7, 2007.  He

10  was hired as a project lead for what FairPoint refers to as its

11  broadband network group.  And he accepted that offer of

12  employment.  In June of 2008, Mr. Flores was reassigned from

13  being a project lead for the broadband network group, so that

14  he was assigned primarily to work on methods and procedures

15  within broadband.

16       On March 31, 2009, approximately a year and a half

17  after he was hired, he was laid off as part of a cost reduction

18  that FairPoint underwent by eliminating staffing.  Mr. Flores

19  was sixty years old at the time he was laid off.  Your Honor,

20  he was not fired for cause.  But he was an at-will employee

21  under state law and according to the terms of his employment

22  agreement.

23       He nevertheless filed a complaint with the New

24  Hampshire Human Rights Commission after his employment was

25  terminated.  That complaint was filed on August 31, 2009.  And

1  he alleged that he was discriminated against on the basis of

2  his age under the Federal Age Discrimination and Employment Act

3  and the New Hampshire Human Rights Act, which, incidentally, he

4  used the same standards for a cause of action.

5      Your Honor, as we've stated in our briefing, we don't

6  think that Mr. Flores has alleged --

7      THE COURT:  Before you get to that, is there anybody

8  here on his behalf?

9      MS. WISEBERG:  Most certainly.

10     MR. GROGAN:  There is, Your Honor.

11     THE COURT:  Okay, good.  Good thing.

12     MS. WISEBERG:  Good afternoon, Your Honor.  Rochelle

13 Wiseberg.

14     MR. GROGAN:  Your Honor, we don't think he's alleged

15 facts which are sufficient under the applicable case law and

16 the statute to prove that he was fired as the Supreme Court

17 said, because of his age.  He has to show but-for causation.

18 But for the fact he was sixty years old, he would not have been

19 fired by FairPoint.

20     Now the facts that he alleges are essentially that at

21 an engineering forum, FairPoint's former CEO used the phrase

22 "Old Bell Head" in general.  It was not directed at Mr. Flores,

23 it was just a general term.  In fact that is a term of art used

24 in the telecommunications industry.  It refers back to the fact

25 that AT&T used to operate through what it called its "Bell

1    operating companies".  And so Bell Head is simply somebody who

2    has experience within telephone companies.  They're sometimes

3    conferred to what are called "netheads" or people who have

4    experience with Internet protocols and Internet networking.  It

5    has nothing to do with an animus toward older workers.  In

6    fact, sixty-three percent of FairPoint's workers are at least

7    forty years-old, and would be within the provisions of the

8    ADEA.

9            In addition, the case law is clear that when you hire

10   an older worker like Mr. Flores, who was fifty-nine, and then

11   he loses his job within a short time frame -- we're talking

12   about one year -- there is a strong presumption that the fact

13   that he was a sixty year-old man was not the cause of his

14   termination.  It's been well-reported that FairPoint has been

15   undergoing significant financial distress coming out of the

16   Verizon merger.  This bankruptcy was filed within approximately

17   one year following the merger.  FairPoint's largest cost item

18   is employees.

19           And further, if you look at the employee cost as a

20   whole, a significant portion of the employee cost are unionized

21   labor.  Within the CBA, there are significant restrictions in

22   FairPoint's ability to just lay off unionized workers.  So that

23   leaves, as a subset of people who are legitimately available

24   for a cost reduction, individuals who are exempt, non-

25   represented employees.

1    Now, what FairPoint did, like any business that is

2    undergoing financial distress, it looked at these employees for

3    possible duplications of effort.  And in the context of

4    FairPoint's business, it had a methods and procedures group

5    that was under its networking support organization.  That

6    group, headed by Terrance Horton, who's mentioned in the Human

7    Rights Commission report that the claimant has submitted, was

8    sixty-one years old.  So when, by eliminating Mr. Flores'

9    position within methods and procedures under broadband, they

10   just were able to combine those functions with the methods and

11   procedures group within networking.  And that was the economic

12   reason behind the consolidation.

13   There is no fact in any of Mr. Flores' submissions or

14   in the Human Rights Commission report, for that matter, that is

15   sufficient to show under the case law that there was an animus

16   toward older workers.  They cite to -- apart from the reference

17   to "Old Bell Head", which has nothing to do with age, they also

18   cite to this LinkedIn profile.  And that is not a -- that's

19   simply not a FairPoint sponsored site.  It's no different than

20   Facebook.  We don't have anything to do with LinkedIn.  And to

21   go onto the LinkedIn profiles and just add up the age of the

22   people who participate in LinkedIn and then create an average,

23   is evidence of nothing except how old the people are who like

24   LinkedIn and work at FairPoint.

25   So, Your Honor, essentially, I'd ask the Court to

1  estimate the claim at zero dollars, because he hasn't proven

2  what he has to prove under the ADEA to state a claim for age

3  discrimination.  Thank you, Your Honor.

4       MS. WISEBERG:  Good afternoon, Your Honor.  Rochelle

5  Wiseberg.  I'm with the firm of Wayne Greenwald, P.C., of

6  counsel.

7       First off, Your Honor, I believe my colleague -- my

8  New Hampshire colleague was here before the Court early on in

9  August.  And at that time, Your Honor held in abeyance any

10 decision regarding this matter, pending a resolution by the New

11 Hampshire Commission of Human Rights.  What my colleague failed

12 to mention was, in fact, the Human Rights Commission did find,

13 and I quote, "The investigation assigned to the above-

14 referenced charge has made a finding of probable cause to find

15 age discrimination in employment."

16      There has been a finding.  And Your Honor specifically

17 asked that this matter not go forward prior to that decision

18 being rendered.  It has been rendered.  No briefing schedule

19 has been conducted at this time, despite what my colleague has

20 stated.  In fact, nothing has gone on.  There were, apparently,

21 some level of negotiations regarding how to proceed with this

22 matter, because obviously, as Your Honor is aware, this man is

23 not a man of means, and we have a large corporation on the

24 other side, attempting to ride roughshod.

25      The New Hampshire Human Rights Commission was very

1    specific in their findings.  They did in fact state that the

2    "Old Bell Head" term, which is derogatory, and witnesses for

3    Mr. Flores said that, in fact, that's how they understood it as

4    well.  Moreover there was testimony given.  There were facts

5    set forth -- and I can hand up a copy of the decision by the

6    New Hampshire Commission of Human Rights, if Your Honor cares

7    to review it -- which will, in fact, disavow all the statements

8    that have just been made by counsel.

9          We ask that at this time that the claim be estimated

10   at, at least a million dollars.  The basis for our calculation

11   is statutory, amounting to at least 600,000 in back pay, plus

12   additional benefits, compensatory damages and punitive damages,

13   which at this point, have not been decided.

14         In terms of timing, this matter can be heard by the

15   Human Rights Commission within the next few months.  There is a

16   briefing schedule already there.  Moreover, if Your Honor feels

17   it is appropriate, we can make a motion to lift the automatic

18   stay and proceed in New Hampshire to bring this matter to

19   conclusion and to get an amount that would be utilized in the

20   proceeding.

21         I also want to mention to the Court that there is a

22   250,000 dollar deductible, which means that in reality,

23   FairPoint is only responsible for 250,000 dollars' worth of the

24   claim.  The balance being picked up by the insurance company.

25   As I understand it, FairPoint is self-insured and there's a

1    250,000 dollar deductible.

2         I know you're reviewing -- may I hand up the New

3    Hampshire Human Rights decision?

4         MR. GROGAN:  I think it's in the binder.

5         THE COURT:  I think I already have it.  I've just been

6    looking at it.

7         MR. GROGAN:  It was attached as an exhibit.

8         THE COURT:  Yes, I have it.

9         MS. WISEBERG:  Okay.  Moreover, there is one mention

10   in the pleadings that there's a certain standard that's being

11   followed by the Supreme Court, the Gross decision.  In fact,

12   the Human Rights Commission has disavowed the decision by Gross

13   and has, in writing, stated that they are not going to be

14   following that standard.

15        We ask the Court to either sua sponte allow a lifting

16   for the stay and allowing us to proceed up in New Hampshire, or

17   in the alternative, to have a claim estimated at a million

18   dollars.

19        MR. GROGAN:  Your Honor, on her last -- my opponent's

20   last point, I'd just ask to be given an opportunity to respond

21   to the lift stay motion, rather than having that heard on an

22   oral basis.  So if she could -- if she wants to file one, we'll

23   certainly take that up at a future hearing and deal with

24   whether there's cause.  But taking it up just sort of ad hoc

25   like this is inappropriate.

1        Your Honor, on the other points she raised.

2    Everybody's sympathetic to the fact that job losses in a

3    bankruptcy context, or when a company is headed toward

4    bankruptcy, are never positive.  They're never something

5    anybody enjoys.  These are unfortunate, difficult consequences

6    of a company in financial distress.  But putting aside the sort

7    of he-said-she-said aspect of this, there are legal standards

8    which apply to govern the rights and remedies of a party who

9    has been laid off.  And regardless of whether they're in --

10        THE COURT:  Haven't they been construed by the New

11   Hampshire Commission?

12        MR. GROGAN:  The New Hampshire Commission --

13        THE COURT:  And that's sort of fact-intensive among

14   reasons, and I don't have any counter from you.  It's all legal

15   argument that you're giving me at this point in time, legal

16   argument that's been construed by the New Hampshire Commission.

17   And I just wonder, since there is a question as to whether or

18   not this should be the subject, in some form of a lift stay,

19   for example, to let that process continue; or to deal with the

20   claims on the merits, which I think you're seeking to do at

21   this point in time, more than just merely estimating.

22        MR. GROGAN:  Well, Your Honor, I --

23        THE COURT:  Much as the -- that's much of the argument

24   you made in connection with the prior motion.  Hey, it makes no

25   difference whether we deal with this under claims estimation or

1    as a claims allowance.

2         MR. GROGAN:  Your Honor, I have my declarant here with

3    me, Mr. Medina, who we submitted his declaration.  I'm happy to

4    proffer that as evidence.  We can make him available for cross-

5    examination by opposing counsel.  But the fact -- we put facts

6    into evidence that this was not a termination based on age.  I

7    mean, he -- the New Hampshire Commission, frankly I just think

8    got it wrong.  They misinterpreted the term "Old Bell Head".

9    It's not something that has any indicia of age animus by the

10   company.  I've also offered you exhibits from journals that use

11   the term for the Verizon CEO.  It's certainly not derogatory.

12   Mr. Medina --

13        THE COURT:  Well, I don't know that it's derogatory.

14   One of my very close friends I've always referred to as a Bell

15   Head, but --

16        MR. GROGAN:  You know -- would you like me to put Mr.

17   Medina on and we'll let him testify?

18        MS. WISEBERG:  Your Honor, with all due respect, Mr.

19   Medina's testimony is not going to be sufficient, because I

20   want to cross-examine all the other witnesses that were

21   involved in New Hampshire.  I have my witness here.  He can

22   most certainly do so.  There are witnesses up in New Hampshire

23   that testified, and we obviously would like to bring them down.

24   I think it's cost prohibitive to do all that.

25        This is not something where Mr. Medina can give all

1   the answers, because he's not -- he was not the person who was

2   man on point.  He was not involved in all aspects of Mr. -- of

3   my client's --

4           THE COURT:  He can testify as to the contents of his

5   affidavit.

6           MR. GROGAN:  Sure.

7           MS. WISEBERG:  But that -- Your Honor, I ask that we

8   be given sufficient time to prep for this, because this is --

9           THE COURT:  You have a witness here as well.

10          MS. WISEBERG:  Yes.  But the fact that --

11          THE COURT:  That's all the ingredients for a trial.

12          MS. WISEBERG:  Right.  But Your Honor, the fact still

13  remains that we have a right to brief this.  It was not

14  briefed.  Your Honor specifically said in August that you were

15  waiting for a decision from the Human Rights Commission.

16          THE COURT:  That's the only new entry into this

17  controversy is that decision.

18          MS. WISEBERG:  And the Human Rights --

19          THE COURT:  But other than that, I'm prepared to go

20  forward.

21          MR. GROGAN:  Okay.

22          THE COURT:  But I think that both sides should have an

23  opportunity.  And if there is the issue with respect to the

24  findings of the commission, then perhaps your adversary is

25  right.  It should be briefed.  And if you're going to play in

1    the sandbox of 362, deal with that as well.  Or maybe that's a

2    preliminary issue.

3            MS. WISEBERG:  We'd like to make a motion to lift the

4    stay.  So, you know, I would like to do that as well, being

5    given all these options.  This is not an issue to be resolved

6    today.

7            MR. GROGAN:  Your Honor, going through the lift-stay

8    factors, we've got a quarter million dollar self-insured

9    retention.  So this is not something we would have dollar-one

10   insurance.  We're out of pocket.  We're here for trial today on

11   this matter.  This has been lingering out there for literally

12   months now.

13           THE COURT:  I will agree with you on that.

14           MR. GROGAN:  There's no reason to be going back and

15   forth.  It's just ramping up the cost by going back to the

16   State of New Hampshire now.

17           MS. WISEBERG:  I disagree.  I think that there are

18   numerous witnesses that would be better testifying in New

19   Hampshire; the people that are the little people who can

20   testify as to the facts, and which the Human Rights Commission

21   relied upon.

22           THE COURT:  Well, I'll deal with the lift stay aspect,

23   frankly, because there has been so much in the way of pleadings

24   placed before this Court, every issue has been raised.  And to

25   the extent that there are factual issues here, and the

1    applicable law being easy to apply with respect to the facts

2    here, I will deny the lift-stay request if it's just been made

3    orally.  But I will open the --

4           MS. WISEBERG:  We would like to come in by motion.

5    I'm advising the Court that's something we'd like to do.  We've

6    made every effort to reach an amicable resolution.  Obviously,

7    under 408 --

8           THE COURT:  You could have made that motion

9    previously.  What I have before me, as I've indicated, is a

10   rather comprehensive set of pleadings.  And if you want an

11   opportunity to have a trial with your witnesses, I'm granting

12   you that opportunity.  Get an adjourn date.

13          MR. GROGAN:  Okay.  To come back for live testimony?

14          THE COURT:  Yes, for live testimony.

15          MR. GROGAN:  Okay.  All right, Your Honor, we'll

16   confer with chambers and --

17          THE COURT:  Fine.

18          MR. GROGAN:  -- take it up.  Thank you, Your Honor.

19          MS. WISEBERG:  Thank you, Your Honor.

20          THE COURT:  Who was your witness, by the way?

21          MS. WISEBERG:  My client.

22          THE COURT:  What?

23          MS. WISEBERG:  My client.

24          MR. GROGAN:  You know --

25          MS. WISEBERG:  He's come all the way down from New

1    Hampshire, Your Honor.

2              THE COURT:  Good.

3              MR. GROGAN:  I'm okay doing this now.

4              MS. WISEBERG:  I'm not.

5              THE COURT:  Well, she's not.

6              MS. WISEBERG:  I'm not.

7              MR. GROGAN:  Okay.  All right.

8              MS. WISEBERG:  I'll consult with my colleague and make

9    sure that we have an agreeable date with the Court.

10             THE COURT:  Sure.

11             MS. WISEBERG:  I appreciate your time, Your Honor.

12   Thank you.  May I be excused?

13             THE COURT:  Yes.

14             MR. GROGAN:  All right.  Your Honor, I think the next

15   item we have is -- the next contested matter is actually my

16   Rule 2004 motion to take discovery from segNET and segTEL.

17   That's actually number 11 in the binder.

18             Your Honor, just for background, segNET and segTEL are

19   compe -- well, segTEL is a competitive local exchange carrier;

20   segNET is an Internet service provider.  Both of them purchased

21   services from FairPoint.  segTEL would purchase services from

22   FairPoint under contracts and tariffs, as would segNET.

23             Your Honor, they filed claims -- if you'd just take

24   the aggregate amount of the claims, and just add up what's in

25   the proof of claims, they're more than five million dollars.

1  The claimants have now said, we agree that a portion of the

2  claim actually is just -- are disputed invoices that FairPoint

3  sent us.  We don't want to pay FairPoint this money, so we put

4  it into our proof of claim.  It's not as if we're asking for

5  payment of this.  But that still leaves about three and a half

6  million dollars that they actually want to collect from the

7  estate.

8         We disagree with everything in the proofs of claim.

9  There's no point of agreement.  The claims are things like --

10  they want damages for failure to provide access to manhole

11  breakouts.  They want damages for failure to provide access to

12  central offices.  They want damages for any competitive

13  conduct, discriminatory pricing.

14         So the Rule 2004 motion was targeted on these

15  allegations, simply to identify where's the contract where

16  FairPoint promised to give you unfettered access to the central

17  office?  Where's the piece of paper that says that you're going

18  to have access to the manhole breakout?  And if they have none,

19  then we have a right to obtain that information through the

20  discovery process.  And then we'll come back as promptly as

21  possible and bring that to Your Honor's attention with our

22  objection to their claim.

23         Their response seems to be, Your Honor, our claims are

24  beyond scrutiny, because you have our word that we're owed

25  three and a half million dollars, and our word is our bond.

1    Well, that isn't good enough.  I mean, we have a statutory duty

2    as debtors-in-possession to investigate and object to claims

3    that are improper.  And there is zero evidence at this point

4    that supports the damages that these two claimants are trying

5    to collect.

6          Now, Your Honor, there is some debate in the papers

7    themselves as to whether or not they actually gave us evidence.

8    Now, what they gave us was basically a spreadsheet with billing

9    disputes.  These are -- they make much about the fact that they

10   gave us thousands and thousands of data points.  All of this

11   paper is simply -- it identifies a FairPoint bill -- this is

12   FairPoint's claims against them -- and then it says that the

13   description is, we disagree with the charge.  So they write,

14   FairPoint billed $10.66 for this particular circuit, and they

15   say that the charge should have been $6.00.  This isn't

16   evidence of their claim.

17         Your Honor, I have all of this, if Your Honor would

18   like to look at it, for in camera review.  It was submitted to

19   us on a confidential basis, so we haven't put it into the

20   record.  But this is the thousands of line items of information

21   that we received.  And then in addition to that, the only other

22   thing we received was basically their own internal notes as to

23   why they're owed all of these millions of dollars.

24         FairPoint sent some correspondence over saying tell us

25   whether or not you've submitted any documentation regarding

1    failure to convert T1s to UNIs; segNET wants 58,888 dollars for

2    this.  And so segNET comes back with a self-serving statement

3    that we gave this information previously.  I mean, it's just --

4    it's not useful at all.  There's no contract; there's no

5    written document; there's no promise; there's no e-mail,

6    nothing which ever says that FairPoint hereby promises to pay

7    segNET 58,880 dollars if it fails to convert a T1.  And there's

8    no statutory duty to do any of this either.

9         So you know, Your Honor, we just intend to take the

10   discovery.  We're not going to dally about it.  Nothing in the

11   discovery request was abusive or overbearing.  It was targeted

12   for the allegations in the proof of claim.  If they have no

13   evidence, then counsel to segNET and segTEL can just simply

14   stipulate on the record that this set of documents that I have

15   here is all that there is, and we will proceed with our

16   objection on that basis.

17        Your Honor, I'll turn it over to counsel for the

18   claimants.

19        MS. THOMAS:  Good afternoon, Your Honor.  Jeanette

20   Thomas from Perkins Coie, here on behalf of segTEL and segNET

21   Technologies, Inc.

22        Your Honor, I think that what we need to do is first

23   sort of level set where we are with this hearing.  And I think

24   that unfortunately, much of what has proceeded before me in

25   this Court, that we're talking about a procedural question

1    here.  And the question is whether 2004 is the appropriate

2    methodology for the debtors to get the discovery.  I note that

3    the debtors --

4         THE COURT:  I tend to go beyond the procedure and get

5    to the merits of the controversy.  And I will tell you that I

6    am and I have been, for thirty-plus years, disturbed over the

7    license that's taken with respect to the filing of claims.  And

8    there's a legend -- and I've looked at it twenty years ago, and

9    I don't imagine it's changed -- at the bottom of every proof of

10   claim which refers to Title 18 (152)(4) which should be

11   cautionary and get people to be very precise with the filing of

12   a claim; just what the claim is all about.  And whether that

13   legend is still there on the particular proof of claim or form

14   that you used, it makes no difference, because Title 18 is

15   still there.

16        And the point that I'm trying to make is, we shouldn't

17   have to go through all of this process to find out what you're

18   really asking for in a proof of claim.  And I'm constrained,

19   based upon what I looked in physically as the size of the claim

20   that you filed, without any real roadmap, as I understand it.

21   I look at that, and I'm constrained as a matter of policy, to

22   allow the 2004 to go forward and just see if we can get right

23   to the heart of what you're really asking for.

24        MS. THOMAS:  Your Honor, I don't disagree that the

25   underlying proof of claim needs to be addressed.  I will tell

1    you that in fact, we did provide --

2          THE COURT:  In my mind --

3          MS. THOMAS:  -- a roadmap.

4          THE COURT:  -- will a 2004 examination cut to the

5    chase and get everybody to understand what the real claim was

6    all about, or won't it?  And I see here that it probably will.

7    It should cut away a lot of, let's call it -- I won't use the

8    term garbage, perhaps, because I see a lot of that in a lot of

9    the proofs of claim that come in here.

10         MS. THOMAS:  I understand that, Your Honor.  I mean, I

11   do understand that.  I don't think that that's the case here.

12   And we're not opposed to discovery.  I mean, what the motion

13   failed to address was that we had been engaged in an informal

14   discovery process, and we provided this information.  And Mr.

15   Grogan can take issue with what we provided.  But his client

16   never came back and asked us for more.  And I would posit that

17   to the extent that you are saying that, look, under tariff,

18   you're allowed to charge me X dollars, and you charged me Y

19   dollars, what evidence am I going to prove for that?  I mean

20   the tariff says X and you charged Y.

21         I mean, it's a matter of a legal analysis of looking

22   at the bills, looking at the law and understanding them.  It's

23   not, like Mr. Grogan suggested --

24         THE COURT:  Ultimately, I'm going to be the trier of

25   the facts, and if you're going to leave all of that to me, you

1   do that at your peril.  I'm allowing the examination to go

2   forward.

3          MS. THOMAS:  Your Honor, I mean, I guess my -- our

4   point was not --

5          THE COURT:  If you can't comply, if unreasonable

6   questions are asked, you can always come back.  We have a

7   procedure for that.  But I don't find enough here to, in

8   advance, quash the examination that's being requested.

9          MS. THOMAS:  It seems to me that the more appropriate

10   means of doing this is pursuant to --

11          THE COURT:  The motion is granted.

12          MR. GROGAN:  Thank you, Your Honor.

13          MS. THOMAS:  Your Honor --

14          THE COURT:  Next time, come up with a five-page proof

15   of claim.

16          MS. THOMAS:  -- Your Honor, we have -- each proof of

17   claim is five pages long.  It is particularly -- we have fifty

18   subparts in our proof of claim.

19          THE COURT:  Oh.

20          MS. THOMAS:  Each one, with a specified dollar amount,

21   down to the penny.  I mean, it's not like we didn't spend --

22          THE COURT:  I'm not like the Bank of America that can

23   pass on all those documents in a hairsbreadth.

24          MS. THOMAS:  But it's not like we filed a proof of

25   claims that said we're owed X dollars and didn't support

1  anything.

2        THE COURT:  I've just ruled.  If you want to take me

3  up on appeal, please do.

4        MS. THOMAS:  That's not my point, Your Honor.  My

5  point was that the proofs of claim that we filed actually

6  provided --

7        THE COURT:  The application is granted.

8        MS. THOMAS:  I understand.

9        THE COURT:  Okay.

10        MS. THOMAS:  Your Honor, in my motion I had also -- in

11  my reply I had a request for appointment of a mediator to

12  resolve these issues.  These parties are --

13        THE COURT:  The issues on discovery?

14        MS. THOMAS:  On the claims themselves actually.  And I

15  understand that the debtors now oppose that motion and they've

16  raised the procedural argument that I needed to give twenty-one

17  days.  And that being aside, when they filed the estimation --

18        THE COURT:  Let's get through the discovery process

19  and then --

20        MR. GROGAN:  Yes, what are we --

21        THE COURT:  -- when everything is narrowed down, I

22  might consider whether or not a mediator is appropriate.

23        MR. GROGAN:  Thank you, Your Honor.  Your Honor, the

24  remainder of the items on the docket are uncontested, so it

25  should be fairly brief from this point forward.

1      Your Honor, going back to number 2 on the agenda, we

2  had filed a motion for authorization to assume -- I'm sorry, I

3  cut off my own microphone.  We had filed a motion to assume a

4  contract that FairPoint has with Nitel Inc.  That was filed at

5  docket number 1788.  No responses were received.

6      Your Honor, this motion deals with a contract that is

7  very important to the business.  It's a networking contract

8  that FairPoint uses to build out its communication systems.

9  The motion is actually the product of a significant negotiation

10  between the parties.  Nitel has agreed to a large reduction in

11  the actual cure amount that would be paid.  It's come down by

12  about 30,000 dollars.  We've also gotten pricing concessions on

13  a going-forward basis.

14      So, Your Honor, we think that this is a good result,

15  and we'd ask the Court to approve the assumption of the

16  contract.

17      THE COURT:  Anyone want to be heard?  Your application

18  is granted.  There's no response.

19      MR. GROGAN:  Thank you, Your Honor.  Your Honor, the

20  next item we have is the claim of the Bucks.  This actually is

21  a -- it was subject to our second omnibus motion to estimate.

22  We have resolved that claim.  We have an agreed order.  It was

23  claim number 7922.  It was filed against Telephone Operating

24  Company of Vermont.  The agreement between the parties provides

25  that this claim will be allowed as a 43,000 dollar general

1    unsecured claim.  The Bucks had one other claim which will be

2    expunged.  Your Honor, I think this is pretty straightforward.

3    We'd ask you to enter the order allowing that claim at 43,000

4    dollars.  It would be treated as a Class 6 claim, by the way,

5    for purposes of the plan against Telephone Operating Company of

6    Vermont.

7            THE COURT:  Does anyone want to be heard?  There's no

8    response.  The application is granted.

9            MR. GROGAN:  Thank you, Your Honor.

10       (Pause)

11           MR. GROGAN:  Your Honor, the next item is number 7 in

12   the binder -- number 7 on the agenda.  Your Honor, this is --

13   we've resolved an objection that we had filed to claims filed

14   by several affiliates of One Communications:  Choice One

15   Communications of Maine, Inc.; Choice One of New Hampshire,

16   Inc.; Conversant Communications of Maine LLC; Conversant

17   Communications of New Hampshire LLC; CTC Communications Corp.;

18   and Lightship Telecom LLC.

19           Your Honor, in the aggregate, these claims were

20   actually the largest unsecured disputed claims that we have.

21   We have resolved them, and we think it's a very favorable

22   result for the estate.  So we have a stipulated order to hand

23   up.  I'll run through the provisions of the stipulation.  I

24   think counsel for One Communications and its affiliates is also

25   here and I'll let him say anything at the end that he wants to

1  add.

2          THE COURT:  That's kind of you.

3          MR. GROGAN:  Your Honor, the stipulated order provides

4  that One Communications will actually pay FairPoint 3,784,282

5  dollars.  The resolution of claims is effective for basically

6  disputes -- billing disputes and other invoiced amounts through

7  August 1 of 2010.  Now, there's a toggle in the stipulation,

8  because we have some concern regarding One Communications'

9  financial soundness, I'll say.  The 3.78 million is actually

10  going to -- there will be an initial installment, but then we

11  had to put them on payment terms.  So what we negotiated as a

12  protection for the estate, in case there's a default or a

13  bankruptcy or whatever by some of these affiliates of One

14  Communications, is that if they don't pay all the money due

15  when its due, the Court's order here, the stipulated order,

16  will actually be treated as a judgment for the full amount of

17  FairPoint's original asserted claims against One

18  Communications.

19          That judgment could then be brought back to this Court

20  for execution against One Communications.  And the releases

21  that we are giving them from our action -- for our claims

22  against them, will not go into effect until all the money has

23  been indefeasibly paid to FairPoint.  And we actually put that

24  at ninety-two days after we get the last check, so that we are

25  protected from any potential preference that they may allege if

1    they wind up going into a Chapter 11 or Chapter 7.

2           So it's just some added protections that we built in

3    for the estate.  One Communications agreed to that.  So other

4    than that, I think the rest of the terms are fairly standard.

5    Assuming they pay everything when due and as they've promised

6    to do, they will get their release as of August 1st.  They

7    will, at that point, have a zero balance on all accounts with

8    FairPoint.  So I don't know if counsel for One wants to add

9    anything.

10          MR. ALDERSON:  Just real quickly.  Mr. Gro -- I'm

11   Jason Alderson, Kelley Drye on behalf of One Communications.

12   He mentioned the deemed judgment in the full amount of

13   FairPoint's claims against One.  I just wanted to add that in

14   provision 11, the deemed judgment, if you will, can only be

15   enforced up to 4.684 million and change.  Just a point of

16   clarification I wanted to add.  Thank you.

17          THE COURT:  Thank you.

18          MR. GROGAN:  Okay.  Your Honor, unless you have any

19   questions or --

20          THE COURT:  Does anyone want to be heard?  The

21   application is granted.

22          MR. GROGAN:  Thank you, Your Honor.  Your Honor, the

23   next item that we have, TD Bank, item number 9.  Just for

24   clarification, I think there was actually a little mistake in

25   the agenda.  Item 8 actually is not going forward.  It should

1  have been moved to the adjourned items, because all of those

2  matters are adjourned.  So we'll move to item 9.

3        We had filed an objection to claims filed by one of

4  our claimants, TD Bank.  TD Bank, it's effectively customer

5  claims.  They were asserting their right to some credits on

6  their bills.  We've worked through the billing disputes with

7  them and we have an agreed order to hand up.  The proofs of

8  claim at issue are claim numbers 4817, 4818 and 4819.  Each of

9  those was filed in the amount of $837,915.49.

10        According to the stipulation or the agreed order,

11  we're going to issue a new billing credit on an account that TD

12  Bank maintains with FairPoint, in the amount of $345,460.52.

13  We're also -- TD Bank has also agreed to release payment holds

14  that it was -- that it had applied to FairPoint's current

15  billing cycle.  So hopefully, they will begin paying all the

16  amounts that they owe when due and as due, going forward.

17        And that is -- that's the sum total of that agreement.

18  There's no releases.  It's just purely a resolution of the

19  customer accounts.

20        THE COURT:  The application -- the stipulation and

21  agreed order is approved.

22        MR. GROGAN:  Thank you, Your Honor.  Your Honor the

23  next item on is the objection to claims filed by Ronco.  That

24  was at the sixty-fourth omnibus objection to claims, docket

25  number 1440.  Your Honor, this is a very straightforward

1　resolution of that claim objection.  They had several claims

2　that were duplicative:  claim numbers 5794, 5795, 5913, 5914,

3　5926 and 5954.  All of those are disallowed and expunged.

4　Proof of claim number 5896 will remain and that'll be treated

5　as a general unsecured claim in Class 6 against Northern New

6　England Telephone Operations.  And it will be reduced from

7　$50,704.96 to $20,000.

8　　　　　Your Honor, unless you have any questions, we have an

9　agreed order to that effect.

10　　　　　THE COURT:  I have none.  The order is approved.

11　　　　　MR. GROGAN:  Thank you, Your Honor.  Your Honor, let

12　me just go through my notes real quick, but I think that

13　concludes our presentation.

14　　　　　THE COURT:  Do you have orders with --

15　　　　　MR. GROGAN:  I do, Your Honor.

16　　　　　THE COURT:  -- respect to each of the applications

17　I've approved?

18　　　　　MR. GROGAN:  Let me just check.  I might have to

19　submit -- let me confer with my lawyer real quick.

20　　　　(Pause)

21　　　　　MR. GROGAN:  Okay.  Your Honor, I'll need to submit an

22　order to chambers for segTEL and --

23　　　　　THE COURT:  I think you already have one on segTEL.

24　　　　　MR. GROGAN:  Well, I think there was one attached to

25　the motion.  Oh, it's up there?

1          THE COURT:  Yes.

2          MR. GROGAN:  Okay.  I wasn't aware of it.  Okay.  The

3     rest of them should be here.

4          THE COURT:  Unless that's your adversary's submission?

5          (Pause)

6          THE COURT:  Check with chambers on it.

7          MR. GROGAN:  Okay.  All right, Your Honor.  I think

8     that concludes our hearing.  Thank you.

9          THE COURT:  Thank you all.

10         (Whereupon these proceedings were concluded at 1:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           I N D E X

3

4                                RULINGS

5                              Page      Line

6   Settlement Agreement with 11        10

7   Verizon Approved

8   Debtor's motion to extend 61        14

9   exclusivity, granted

10  Debtors' Motion for Order 80        1

11  Pursuant To Bankruptcy

12  Rule 2004 Authorizing

13  Discovery from segNET

14  Technologies, Inc. and

15  segTEL, Inc., granted

16  Debtors' Motion to        82        18

17  Approve Assumption of

18  Nitel Contract, granted

19  Bucks' claim of 43,000    83        8

20  dollars is allowed

21  Stipulation with One      85        21

22  Communications is

23  approved

24  The agreed order with TD  86        21

25  Bank is approved

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _____

9    PENINA WOLICKI

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  October 28, 2010

17

18

19

20

21

22

23

24

25