Michael L. Schein  (MS 0241)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York  10019
Tel:  (212) 407-7700
Fax:  (212) 407-7799

Jonathan T. Cain (JC 2363), *admitted pro hac vice*
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
701 Pennsylvania Ave., NW, Suite 900
Washington, DC  20004
Tel:  (202) 434-7300
Fax:  (202) 434-7400

*Attorneys for the Universal Service Administrative Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| FAIRPOINT COMMUNICATIONS, INC., *et al.*, | ) | Case No. 09-16335 (BRL) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**MOTION OF THE UNIVERSAL SERVICE ADMINISTRATIVE COMPANY
TO REFER TO THE FCC ALL ISSUES REGARDING DEBTORS'
ENTITLEMENT TO HIGH COST PROGRAM SUPPORT PAYMENTS**

The Universal Service Administrative Company ("USAC"), by and through its undersigned counsel, hereby files this motion (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, referring to the Federal Communications Commission (the "FCC") all issues regarding the entitlement of the above-captioned debtors (the "Debtors") to retain certain High Cost Program support payments (as defined below) pursuant to the FCC's primary jurisdiction to regulate High Cost Program support.  In support hereof, USAC states as follows:

<u>**JURISDICTION**</u>

1.      This Court has non-exclusive jurisdiction over the adjudication of USAC's claims in this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The statutory predicate for the relief sought herein is section 105(a) of the Bankruptcy Code.

2.      As further detailed below, the FCC has primary jurisdiction over the Debtors' entitlement to retain certain High Cost Program support payments received from USAC pursuant to 47 U.S.C. § 254 and the regulations codified at 47 C.F.R. subparts C, D, J and K.

<u>**BACKGROUND**</u>

A.      <u>**USF Contribution Obligations**</u>

3.      Pursuant to Section 254 of the Communications Act of 1934, as amended (the "Communications Act"), Congress directed the FCC to promulgate regulations to provide for funding for telecommunications universal service support mechanisms.  47 U.S.C. § 254.

4.      Congress also authorized the FCC to "make such rules and regulations . . . as may be necessary in the execution of its functions."  47 U.S.C. § 154(i).  This includes regulation of universal service.  <u>Rural Telephone Coalition v. FCC</u>, 838 F.2d 1307, 1311 (D.C. Cir. 1988). In accord with the mandate of Congress in the Communications Act, the FCC promulgated a comprehensive scheme of detailed regulations governing the collection of funds for universal service support and their disbursement to telecommunications carriers and others entitled to receive them in furtherance of the purposes set forth by Congress.  47 C.F.R. Part 54

5.      The FCC designated USAC, a Delaware not-for-profit corporation, to be the permanent administrator of the federal Universal Service Fund (the "<u>USF</u>").  47 C.F.R. § 54.701(a).  As such, USAC administers the USF pursuant to FCC regulations and applicable FCC orders. <u>Id.</u>, § 54.702(b).  USAC has no authority to promulgate, waive or interpret unclear FCC regulations governing the USF and its support programs.  <u>Id.</u>, § 54.702(c).  It is not a

NEWYORK/#248439.4

governmental agency, nor instrumentality of the United States. If questions concerning USAC's authority under FCC rules arise, they must be referred to the FCC for determination. Id. In fact, since directing the creation of USAC in 1997, the FCC has engaged in numerous administrative rulemakings governing how USAC is to administer the universal service programs and has issued more than 2,000 orders concerning the interpretation and application of the universal service rules.[1]

B.  **High Cost Program**

6.     Pursuant to section 254(b)(3) of the Communications Act, Congress instructed the FCC to establish a universal service support program to ensure the delivery of affordable telecommunications services to consumers in high-cost areas. In fulfilling Congress' directive, the FCC established the "High Cost Program" (from which USAC's Audit Claims (as defined below) arise).[2]

7.     The High Cost Program, administered by USAC, is designed to ensure that consumers in all regions of the nation have access to and pay rates for telecommunications services that are reasonably comparable to those services provided and rates paid in urban areas.[3] To accomplish this goal, USAC disburses High Cost Program support payments to carriers that have been designated as "eligible telecommunications carriers" ("ETCs") by a state commission or the FCC in accordance with Subpart F of the FCC's Part 36 rules and Subpart D of the FCC's

---

[1]  Determined by visiting the FCC's electronic document filing system web site, http://fjallfoss.fcc.gov/edocs_public/, and entering docket number 96-45, the FCC's general docket number for universal service appeals and other administrative decisions concerning universal service.

[2]  See Universal Service Order, 12 FCC Rcd at 8781, 8792-93, 8888-951, ¶ 2, ¶ 26, ¶¶ 199-325 (1997).

[3]  See http://www.universalservice.org/hc/about/default.aspx for a more detailed description and application of the High Cost Program and its requirements.

NEWYORK/#248439.4

Part 54 rules to cover a portion of such carriers' costs to provide telephone service in high-cost areas of the country. 47 C.F.R. § 54.201.

8.     Carriers seeking benefits under the High Cost Program (which include several of the Debtors) are required to periodically submit to USAC, among other things, detailed and component-specific filings, line count data and cost-related information. USAC processes and analyzes the information filed by carriers and other information specified in the applicable regulations to, among other things, calculate support amounts, make demand projections and disburse funds to carriers eligible under each of the several components of the High Cost Programs.[4] The FCC authorized USAC to verify the data provided in connection with the disbursements made to the carriers under the High Cost Programs, including carrier reported amounts, carrier eligibility data and carrier certifications. 47 C.F.R. § 54.707.

9.     The methodologies for calculating, verifying and disbursing High Cost Program payments consists of a series of complex algorithms and formulas, developed pursuant to FCC regulations and approved by the FCC, that measure, among other things, a carrier's investment in equipment and other costs of providing service, line count data and revenue information, all of which must be certified by the carrier for truth and accuracy. See 47 C.F.R. §§ 54.301-.311, 54.800-.807 and 54.900-.902. Such certifications are required to ensure, among other things, that the support disbursed by USAC will be used for legally authorized purposes and to guard against waste, fraud and abuse of the High Cost Program by carriers.

10.     Fifty-three (53) of the Debtors in this proceeding are ETCs of the High Cost Program. Of those, and as discussed more fully below, seventeen (17) were subject to High Cost Program audits conducted by USAC at the direction of the FCC's Office of Inspector General

---

[4] 47 C.F.R. §§ 36.601-.605, 54.301-.311, 54.800-.809 and 54.901-.904.

(the "OIG").  <u>See</u> Affidavit of David Ziebarth, sworn to on November 18, 2010 (the "<u>Ziebarth</u> <u>Aff.</u>", ¶ 3)

C.     **High Cost Program Audits**

11.     47 U.S.C. § 220(c) grants the FCC the authority to access, inspect, examine and audit all accounts, records and correspondence kept or required to be kept by a carrier.  To that end, the FCC authorized USAC to "audit contributors and carriers reporting data to [USAC]," from which "[USAC] shall establish procedures to verify discounts, offsets and support amounts provided by the universal service support programs, and may suspend or delay discounts, offsets, and support amounts provided to a carrier if the carrier fails to provide adequate verification of discounts, offsets, or support amounts provided upon reasonable request, or  if directed by the [FCC] to do so."  47 C.F.R. § 54.707.  The primary purposes of such audits are to (a) ensure compliance with FCC rules and USF program requirements, (b) recover funds improperly paid to carriers as a result of rules violations by carriers, (c) ensure equitable contributions to the USF and (d) prevent, detect and deter waste, fraud and abuse.

12.     USAC conducts targeted and random audits through the assistance of its Internal Audit Division, the FCC's OIG and engagement of outside audit firms.  USAC audits various types of carriers to, among other things, examine a carrier's compliance with High Cost Program eligibility requirements, confirm the accuracy of its data submissions and overall compliance with program rules promulgated by the FCC.  <u>See</u> 47 C.F.R. §§ Part 54, Subparts C, D, J and K; Part 36, Subpart F and Part 32, Subpart B.

13.     When selected for a High Cost Program audit, USAC issues an audit announcement letter that, among other things, (a) details the purpose and scope of the audit, (b) identifies the personnel who will be performing the audit, (c) requests certain carrier data and

identifies the date upon which such data is due and (d) seeks to establish a time period to perform fieldwork testing.[5]

14.    At the conclusion of the fieldwork, USAC's audit division reviews the audit file to ensure that work papers are properly documented and that conclusions and recommendations reached by the auditor (e.g., material noncompliance, material weaknesses, recovery amounts due) are properly supported.  For any exceptions noted, a detail exception worksheet (a "DEW"), containing background information, the audit step(s) performed and the exception(s) (and basis) noted, is prepared and forwarded to the carrier for review and opportunity to respond.

15.    If the carrier disputes the exception set forth in the DEW, a detailed written explanation is required.  If the auditor concurs with such explanation, the exception is waived.  If the exception remains, the DEW, together with the carrier's response(s), are incorporated into the audit report and forwarded to USAC's High Cost Program management.  Management then evaluates the audit findings, together with any associated carrier and auditor responses, prepares a response to address the exception and notes any corrective action necessary.

16.    All of the responses are incorporated into the audit report, and the report is submitted to USAC's Board of Directors for approval.  The Board may direct USAC management to reassess any aspect of the audit report prior to it becoming final.  Once approved, USAC and the carriers are obligated to implement the actions identified in the report, which can include recovery of improperly disbursed funds received by the carrier and implementation of

---

[5]  Attached to the Ziebarth Aff. as Exhibit 2 is a true and correct copy of an audit announcement letter that was sent by USAC to one of the Debtors in respect of the High Cost Program audits.

improved protocols by the carrier.[6]  Both the carrier and the FCC receive copies of the final audit report.

17.     With respect to the Debtors, seventeen (17) audits were conducted by USAC, sixteen (16) of which resulted in the determination that recovery from those Debtors was required in the amount of $3,066,172 in improperly disbursed funds under the High Cost Program.[7]  Each audited Debtor received a copy of its final audit report,[8] together with a recovery notification letter from USAC that summarized the results of the audit, including the amount, process and timing of the High Cost payment recovery.[9]  The letter also informed each Debtor that they had the right to appeal the decision, either to USAC or directly to the FCC, and provided information about perfecting the appeal.

18.     In the instant case, the Debtors appealed to USAC fifteen (15) of the High Cost Program audit determinations.[10]  In each of their appeals, the Debtors repeatedly challenged the "reasonableness" of the determinations made by the auditors and their allegedly inconsistent application of FCC rules.  The Debtors also asserted that "in many instances the rules are ambiguous at best, leaving the door open for varying interpretations."  Appeal Letters at p. 2. Because of such alleged ambiguities, the Debtors argued that allowing auditor "judgment" to control, where different auditors are involved, results in inconsistent decisions to the detriment of

---

[6]  Carriers are disbursed High Cost Program funds based on information submitted to USAC and certified by the carrier as being true and accurate under penalty of perjury.  Carriers provide such information on FCC and U.S. Office of Management and Budget (OMB) approved forms.

[7]  Attached to the Ziebarth Aff. as Exhibit 1 is a table listing the High Cost Program audits conducted by USAC that are final and comprise the fourteen (14) Audit Claims.

[8]  Attached to the Ziebarth Aff. as Exhibit 3 is a true and correct copy of a final audit report sent by USAC to an audited Debtor in respect of the High Cost Program audits.

[9]  Attached to the Ziebarth Aff. as Exhibit 4 is a true and correct copy of a recovery notification letter sent by USAC to an audited Debtor in respect of the High Cost Program audits.

[10]  Attached to the Ziebarth Aff. as Exhibit 5 are true and correct copies of 15 Letters of Appeal and Required Responses to Findings (the "Appeal Letters") filed by the Debtors in respect of the High Cost Program audits.

NEWYORK/#248439.4

the carrier. In each of their appeals, the Debtors requested that USAC use its knowledge and expertise to "clarify their position on the issue[s] to remove doubts and inconsistencies." <u>Id.</u>

D.  **<u>Carrier Appeals</u>**

19.  Generally, carriers can request a review of any decision by USAC in connection with billing, collections and/or disbursements of the USF and its universal service support programs. 47 C.F.R. § 54.719. Appeals may be made either to USAC (§§ 54.719(a), (b)) or directly to the FCC (§ 54.719(c)). If a carrier appeals to USAC and is dissatisfied with the result, it may further appeal the matter to the FCC within 60 days of USAC's decision on the appeal. <u>Id.</u>, §§ 54.720(d), (e); 54.722. In fact, prior to any decision by USAC, a carrier may instead choose to appeal directly to the FCC. <u>Id.</u> In such circumstances, USAC moots the appeal pending before it since that appeal would be pending before the FCC.

20.  The FCC reviews all USF-related appeals *de novo*. <u>Id.</u>, § 54.723. Once the administrative appeals process has run its course, however, the exclusive avenue for judicial review is the United States Court of Appeals. 47 U.S.C. § 402; 28 U.S.C. § 2342(1).[11] In fact, section 405 of the Communications Act prohibits judicial review of an issue upon which the FCC has had no opportunity to pass. 47 U.S.C. § 405. Such administrative review requirements are jurisdictional. <u>See</u> <u>Richman Bros. Records, Inc. v. FCC</u>, 124 F.3d 1302, 1303 (D.C. Cir. 1997) ("We conclude that § 5(c)(7) of the Communications Act, 47 U.S.C. § 155(c)(7), precludes the court from exercising jurisdiction"); <u>Core Comms. Inc. v. FCC</u>, 455 F.3d 267, 276 (D.C. Cir. 2006) (section 405 precludes jurisdiction to review issues not first presented to the FCC).

---

[11]  Under no circumstances does federal statute or regulation provide for an appeal from either USAC or the FCC to a bankruptcy court.

NEWYORK/#248439.4

21.     In instances where an appeal asserts an error by USAC, USAC will seek to resolve the matter fairly and appropriately.  USAC considers such requests for review as an opportunity to ensure its processes are equitable and efficient.  In the case of High Cost Program appeals, High Cost Program management reviews all letters of appeal and responds in writing once the USAC appeals committee (comprised of three (3) USAC senior executives) has reached its decision.  The decision either grants the appeal or explains why the appeal was denied.

22.     As noted above, after the Petition Date the Debtors appealed to USAC fifteen (15) of the USAC Board approved audit determinations.  Eight (8) of those appeals were filed between September 14, 2009 and December 22, 2009, two (2) were filed on February 8, 2010 and five (5) were filed on April 19, 2010.

23.     On August 11, 2010, September 20, 2010 and September 23, 2010, USAC issued three (3) decisions with respect to five (5) of the Debtors' audit appeals (the "Appeal Decisions").[12]  The Appeal Decisions affirmed the correctness of the audit determinations and the amounts the appealing Debtors owed in repayments to the USF for funds those Debtors obtained under the High Cost Program in violation of program rules.  After receiving a letter from Debtors' counsel contending that issuing the Appeal Decisions constituted a violation of the automatic stay (a contention USAC disputes), USAC deferred issuing decisions on the balance of the appeals.

E.     **USAC's Proofs of Claims**

24.     On or about March 18, 2010 (as amended thereafter), USAC filed fourteen (14) proofs of claims, in various fixed-dollar amounts, on account of amounts due and owing by

---

[12]  Attached to the Ziebarth Aff. as Exhibit 6 are true and correct copies of three (3) Appeal Decisions issued by USAC.

certain of the Debtors in respect of the High Cost Program audits (collectively, the "Audit Claims").[13]

F.      **Debtors' Estimation Motion**

25.     On June 15, 2010, the Debtors filed a motion (Dkt. No. 1474) initially seeking, pursuant to 11 U.S.C. §§ 105(a) and 502(c), to estimate and cap the maximum allowed amounts of all of USAC's claims filed against the Debtors (the "Estimation Motion").  In response to USAC's objection filed on July 8, 2010 (Dkt. No. 1604), the Debtors also sought to determine the allowed amounts of USAC's claims pursuant to section 502(b) of the Bankruptcy Code (the "Claims Dispute").  In both cases, the Debtors' relief turns on the interpretation, modification and/or waiver of the FCC's High Cost Program rules.

**RELIEF REQUESTED**

26.     By this Motion, USAC requests that the Bankruptcy Court defer to the primary jurisdiction of the FCC the determination of all issues regarding compliance with and recovery of High Cost Program support raised by the Debtors' appeals and USAC's Audit Claims, which issues are within the FCC's province, expertise and control pursuant to the FCC's exclusive grant by Congress of authority to regulate universal service and its support programs.

**ARGUMENT**

A       **This Court Should Defer To FCC's Primary Jurisdiction To
        Determine The Merits Of Debtors' Disputes Over The Audit Claims**

27.     The Debtors seek to evade the administrative appeal process they initiated by asking this Court, through the Claims Dispute, to intervene on those issues, which are within the

---

[13]  Attached to the Ziebarth Aff. as Exhibit 7 is a table listing the 14 Audit Claims that are the subject of this Motion.

FCC's exclusive authority to regulate universal service.[14]  For the reasons set forth below, this Court should invoke the doctrine of primary jurisdiction, refer all issues regarding compliance with and recovery of support payments under the High Cost Program to the FCC, and allow the pending appeals to follow the course of administrative adjudication that the Debtors elected.

28.    The doctrine of primary jurisdiction "is concerned with 'promoting proper relationships between the court and administrative agencies charged with particular regulatory duties.'"  <u>Ellis v. Tribune Television Co.</u>, 443 F.3d 71, 81 (2d Cir. 2006) (citing <u>United States v. W. Pac. R.R. Co.</u>, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).  It is designed to "allocate initial decisionmaking responsibility between courts and agencies and to ensure that they 'do not work at cross-purposes.'"  <u>Id.</u> at 81 (citing <u>Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.</u>, 84 F.3d 91, 97 (2d Cir. 1996)).  Its rationale is to maintain "uniformity in the regulation of an area entrusted to a federal agency. . ." and to "guard against the 'hazard of forbidden judicial intrusion into the administrative domain.'"  <u>Id.</u> at 82, 91 (citations omitted).

29.    The Second Circuit's inquiry has focused on four factors:

(a)    whether the question at issue is within the conventional experience of judges or whether the question involves technical or policy considerations within the agency's particular field of expertise;

(b)    whether the question at issue is particularly within the agency's discretion;

(c)    whether there is a substantial danger of inconsistent rulings; and

(d)    whether a prior application to the agency has been made.

---

[14] Even if the Debtors had not filed their appeals with USAC and had, hypothetically, only filed their Motion for Estimation, applicable law, as discussed herein, would require the same outcome – i.e., that the FCC determine the proper interpretation of the rules it promulgates.

Ellis, 443 F.3d at 82-3 (citing Nat'l Commc'ns Ass'n, Inc. v. AT&T Co., 46 F.3d 220, 222 (2d Cir. 1995)) ("AT&T").

30.     While some courts have also balanced the potential advantages of applying the doctrine against the judicial costs of potential delay (AT&T, 46 F.3d at 223), the Second Circuit in Ellis recently held that "such considerations of judicial economy should ***not*** be considered because 'the Supreme Court has consistently held that there are only two purposes to consider in determining whether to apply the primary jurisdiction doctrine – uniformity and expertise – and 'the Supreme Court has never identified judicial economy as a relevant factor.'" Ellis, 443 F.3d at 90 (citation omitted) (emphasis added).

31.     Here, the four factors articulated by the Second Circuit in Ellis and AT&T, as well as judicial economy considerations, even if considered, compel this Court to find that primary jurisdiction referral is required with respect to all of the issues affecting USAC's Audit Claims.

**The Issues Are Squarely Within The FCC's Field of Expertise**

32.     The first factor is whether the question(s) at issue is within the conventional experience of judges, in this case the Bankruptcy Court, or whether it involves technical or policy considerations within the FCC's expertise. In the instant case, the questions at issue center on the interpretation and application of FCC rules and regulations, including the calculation of cost sharing and cost recovery aspects of interstate telecommunications. As demonstrated below, these issues should be left in the first instance to the administrative agency with the expertise in this area of financial regulation of the telecommunications industry – the FCC.

33.     At its core, the Claims Dispute is a challenge to the interpretation of the FCC's rules and regulations relating to the High Cost Programs and the "reasonableness" of the

determinations made by auditors engaged by USAC to apply those rules. Courts have consistently held, including courts in this District, that "reasonableness" determinations involving FCC rules and regulations are "inherently a discretionary question within the [FCC's] purview." Niehaus v. AT&T Corp., 218 F.Supp.2d 531, 537 (S.D.N.Y. 2002) (invoking primary jurisdiction and referring matter to FCC); Telstar Resource Group, Inc. v. MCI, Inc., 476 F.Supp.2d 261, 271-72 (S.D.N.Y. 2007) (finding claims alleging "unreasonable" practices under Communications Act and related rules are within the primary jurisdiction of FCC) (citations omitted) ("Telstar"); In re USF Telephone Billing Practices Litigation, 300 F.Supp.2d 1107, 1152-53 (D. Kansas 2003) (invoking primary jurisdiction over disputes involving USF assessment and recovery practices, including "reasonableness" determinations) ("USF Telephone").

34.     As described above and acknowledged in their Appeal Letters, the Debtors repeatedly challenged the "reasonableness" of determinations made by USF auditors, including their interpretation of FCC rules. The Debtors also argued that such rules are ambiguous at best, are subject to varying interpretation and require the expertise and knowledge of USAC (and thus the FCC) to clarify and resolve. These issues clearly "raise technical questions with which the FCC is unquestionably more familiar than federal courts." Telstar, 476 F.Supp.2d at 272; Niehaus, 218 F.Supp.2d at 537 (where claims involved numerous highly technical questions, FCC deferral was required); Self v. BellSouth Mobility, Inc., 111 F.Supp.2d 1169, 1172-73 (N.D. AL 2000) (primary jurisdiction referral to FCC warranted where disputes involved how USF program payments and costs should be calculated and recovered).

35.     As described above, the applicable FCC regulations describe a detailed, line-by-line procedure for calculating High Cost Program support amounts that requires extensive and

detailed financial data from each Debtor. See, e.g., 47 C.F.R. § 54.301. The FCC rules also require the use of national data collected from all interstate carriers in order to perform the calculations. See 47 C.F.R. § 54.800. Thus, applying these rules correctly requires both extensive knowledge of the regulations themselves and the availability of carrier data not otherwise accessible to this Court. Only the FCC has both the statutory authority and the technical expertise to properly evaluate the Debtors' dispute of the auditors' and USAC's proper application of FCC rules in auditing the Debtors' compliance with FCC promulgated rules.

36. Accordingly, because the issues raised in the Claims Dispute involve technical and policy considerations that fall squarely within the FCC's expertise, this factor weighs in favor of deferring to the FCC to resolve.

### The Audit Issues Are Squarely Within the FCC's Discretion

37. The second factor, whether the issues are particularly within the FCC's discretion, also militates in favor of invoking primary jurisdiction.

38. Stripped of its rhetoric, the Debtors' challenges to USAC's Audit Claims are attempts to have this Court choose between the FCC's interpretation of its rules and regulations and the interpretations advanced by the Debtors. Adjudication of such disputes lie well within the FCC's realm of authority and judgment. See USF Telephone, 300 F.Supp.2d at 1152 ("The FCC administers the USF program, it has been involved in ongoing rulemaking proceedings regarding carriers' USF assessment and recovery practices, and it has exercised its regulatory powers to audit carriers' USF collections.")

39. As described above, USAC is the appointed permanent administrator of the USF. 47 C.F.R. § 54.701(a). As such, USAC is responsible for "billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service

-14-

support funds." Id. at § 54.702(b). The FCC, and not USAC, has sole authority to issue rules and orders and to make policy with respect to federal universal service and its programs, and USAC is prohibited by rule from making its own interpretations of such regulations. Id. at § 54.702(c). Any and all policies, questions and interpretations must be referred to the FCC. Id. As such, any appeals regarding USAC's calculations, billing, collection and/or distribution of program payments, including any audits thereof, must go through the appropriate FCC channels for review and consideration. Id. at § 54.719(c).

40.     As the Second Circuit in NextWave made clear, it is not for a bankruptcy court to make such decisions, especially where doing so conflicts with FCC decisions made in the exercise of its authority to regulate universal service. See In re NextWave Personal Comm., Inc., 200 F.3d 43, 58 (2d Cir. 1999) ("NextWave I") ("It is not this Court's task to choose which among several competing interpretations best serves the stated regulatory purpose…."). Rather, substantial deference should be given to the FCC's interpretation of its own regulations, and unless a different reading is compelled by its plain language, controlling weight should be given since the FCC is best qualified to interpret its own regulations and decisions. Id. ("We must give substantial deference to an agency's interpretation of its own regulations.") (citations omitted); see also Ellis, 443 F.3d at 86-7 (citing to NextWave I in finding support for, and being instructive in favor of, this factor).

41.     Here, the FCC has set forth precise instructions regarding the calculation and implementation of the various USF programs, including the High Cost Program. In so doing, the FCC has determined what best serves the USF. To the extent that unintended results were generated by application of such rules and methodologies, the Debtors' remedies lie either before the FCC or with the exclusive jurisdiction of the U.S. Court of Appeals. 47 C.F.R. § 54.719.

Such frustrations should not require the FCC, through its USF administrator, to defend its regulatory calculus in this Court. Rather, it is for the court with the power to review the FCC's decisions and actions to say if they are arbitrary or otherwise. See In re NextWave Personal Comm., Inc., 217 F.3d 125, 135 (2d Cir. 2000) ("NextWave II") ("FCC need not defend its regulatory calculus in the bankruptcy court.").

42. While USAC calculates and collects a carrier's obligations under the USF programs, it does so purely in a ministerial capacity and in furtherance of the FCC's exercise of its regulatory authority. Such actions, even where they take the form of a financial obligation - in this case the Debtors' audit recovery claims – are still inherently regulatory. NextWave II, 217 F.3d at 131, 135 ("We thus held that even where the regulatory conditions imposed on a license take the form of a financial obligation, the bankruptcy and district courts lack jurisdiction to interfere in the FCC's allocation.").

43. Accordingly, the FCC is best situated to handle these issues, and therefore this factor weighs in further deference to the FCC's judgment.

### There Exists a Substantial Risk of Inconsistent Rulings

44. The third factor, whether there exists a substantial risk of inconsistent rulings, is most critical here and strongly favors FCC referral.

45. In all of their appeals, the Debtors contend that the FCC rules are "ambiguous at best," subject to "varying interpretations" and are being applied inconsistently among the various auditors. It logically follows, therefore, that there exists a substantial risk of inconsistent rulings if the FCC is not permitted to use its knowledge and expertise to clarify the correct interpretation of these rules in order to remove any doubts and inconsistencies. Moreover, since USAC has no authority to promulgate, waive or interpret unclear FCC regulations governing the USF and its

-16-

support programs (<u>see</u> 47 C.F.R. § 54.702(c)), then if Debtors believe, as they contend, that the FCC rules are ambiguous, the Debtors must bring their concerns to the FCC.

46.     Determinations concerning the correct application of FCC rules should remain subject to a uniform body of federal law.  Staying all action on USAC's Audit Claims until the FCC has ruled on such issues is essential to maintaining the uniformity of these programs throughout the United States.  <u>Telstar</u>, 476 F.Supp.2d at 272 (preventing FCC from clarifying its regulations could have national ramifications and lead to inconsistent rulings); <u>see also</u> <u>USF Telephone</u>, 300 F.Supp.2d at 1153 (citing <u>Access Telecomms v. Southwestern Bell Tel. Co.</u>, 137 F.3d 605, 608 (8th Cir. 1998) ("recognizing that the doctrine of primary jurisdiction is designed to, among other things, 'promote uniformity and consistency within the particular field of regulation.'").  Allowing different interpretations of the FCC's rules to apply among states or federal court districts is directly contrary to the requirement imposed by Congress that costs of universal service be "equitable and non-discriminatory."  47 U.S.C. § 254(b)(4).

47.     Additionally, it is not necessary to prejudge the outcome of the Court's or the FCC's review of the audits to conclude that appealing the audit findings to this Court presents a substantial risk of inconsistent rulings.  Any determination by this Court concerning the application of the FCC's universal service rules will, unless and until successfully appealed, constitute the law in this district only.  If that determination differs in any way from the current interpretations of the relevant rules promulgated by the FCC, then telecommunications carriers in this district will operate under different rules than their counterparts in other districts.  These differing interpretations will necessarily result in differing levels of universal service financial support for telecommunications carriers.  Such a result will be directly contrary to the plain

language of the statute that costs imposed upon telecommunications carriers for universal service be "equitable and non-discretionary." 47 U.S.C. § 254(b)(4). On the other hand, the FCC's determination of those same questions will be issued in the form of an order that will both resolve the current dispute and govern USAC's future administration of the universal service programs nationwide, thereby preserving equitable and non-discretionary treatment of telecommunications carriers throughout the United States.

48.      Accordingly, the risk of inconsistent rulings is high if the FCC does not rule on these issues.

### Applications to USAC Are Pending

49.      The final factor – prior application to the agency – also compels deferring to the FCC on primary jurisdiction grounds. As this Court is aware, the Debtors have appealed to USAC all of the High Cost Program audits, and decisions on three (3) of those appeals have been made by USAC. The debtors chose not to appeal these decisions to the FCC, which they were entitled to do under 47 C.F.R. § 54.719(c) within the 60-day regulatory deadline imposed by the FCC under 47 C.F.R. § 54.720(a). As for the balance of the audit appeals, they remain pending before USAC for decision, subject to the Debtors' right to redirect those appeals directly to the FCC. In such circumstances, courts have strongly favored deferral to the administrative agency overseeing the adjudicative proceeding. Ellis, 443 F.3d at 89 (finding where prior application to agency has been made, factor supports primary jurisdiction); Telstar, 476 F.Supp.2d at 272 (citing Ellis for same).

50.      In fact, the Honorable Judge Gerber, in his Bench Decision dated September 30, 2009, while refusing to invoke primary jurisdiction on materially different facts, stated that "[i]f there were an adjudicative proceeding already before the FCC when the Debtors'

chapter 11 cases were filed, I might well give *serious consideration to deferring to the FCC*." (emphasis added).  In re DBSD North America, Inc., Bankr. S.D.N.Y. at p. 13 (September 30, 2009).[15]

51.     The Debtors have indisputably initiated an administrative appeal process that may ultimately lead to a decision by the FCC on the merits of those appeals.  47 C.F.R. § 54.719. That the Debtors chose to commence their administrative appeal process with USAC, and not the FCC, was their decision, and unhappy with the decisions on the first of their appeals, the Debtors seek to forum shop through the filing of their Estimation Motion and the commencement of the Claims Dispute.[16]  The doctrine of primary jurisdiction was developed to prevent such results.

52.     Accordingly, given that all four factors warrant referral to the FCC of the issues raised in the Claims Dispute, this Court should invoke primary jurisdiction to permit the FCC to properly address them.  At the same time, this Court should stay any efforts by the Debtors to estimate, cap, allow or disallow any of the Audit Claims pending such determination.[17]

---

[15]  Although that decision was affirmed by the District Court, see In re DBSD North America, Inc., 427 B.R. 245 (S.D.N.Y. 2010), it is factually distinguishable from this case and the issues before this Court for the following reasons:  (a) the issue to be decided in that case was not one that was within the special expertise of the FCC – namely whether there was joint and several liability of the debtors; (b) the FCC was engaged in future rulemaking and not the adjudication of the meaning or application of existing rules or orders, (c) there was no risk of inconsistent rulings since any decision by the FCC would not be retroactively applied to that case and (d) there were no adjudicative proceedings pending.

[16] The Debtors' forum shopping is clearly evidenced by their failure to further appeal to the FCC the three appeal decisions already issued by USAC.  *See supra* ¶ 49.

[17]  With respect to the issue of judicial economy, were this Court required to consider the advantages of deferral as against the costs and risks of delay, such consideration further compels invoking primary jurisdiction.  As the Court is aware, the Debtors' pending plan of reorganization pays unsecured claims like USAC's in full in cash and has been conditionally approved.  Thus, allowing the FCC to address matters that are squarely within its jurisdiction and expertise and that directly affect USAC's Audit Claims will not complicate or delay the administration of the Debtors' bankruptcy cases or confirmation of such plan, nor will it upset the reasonable expectations of unsecured creditors.  Moreover, the costs of inconsistent decisions, in terms of confusion and delay in the administration of bankruptcy cases generally, can be avoided if the FCC is allowed to articulate decisions on the correct interpretation of its rules and regulations so that they can be applied uniformly throughout the United States.  See also Ellis, 443 F.3d at 90 (judicial economy, even if considered, supports primary jurisdiction where the issue(s) "involves highly complicated factual and policy disputes that the FCC is uniquely well-situated to address.")

NEWYORK/#248439.4

## RESERVATION OF RIGHTS

53.     USAC reserves its rights to raise at the hearing on this Motion any other grounds and/or responses to the relief sought in this Motion, including, without limitation, any objection filed by the Debtors and/or any other party in interest.

## NO NOVEL ISSUES, PRIOR REQUESTS

54.     USAC respectfully requests that this Court waive and dispense with the requirement set forth in Rule 9013-1(b) of the Local Bankruptcy Rules that any motion filed shall have an accompanying memorandum of law.  This Motion does not raise any novel issues of law.  Accordingly, USAC submits that a waiver of the Rule 9013-1(b) requirement is appropriate in this circumstance.

55.     Other than raising primary jurisdiction as a defense to the relief sought by the Debtors in their Estimation Motion, no prior request for such relief has been made by USAC in this Court or any other court.

## NOTICE

56.     Notice of this Motion has been served upon (a) the Debtors and their counsel, (b) those parties provided for pursuant to the case management order dated November 18, 2009, (c) those parties that have requested service of papers in accordance with Bankruptcy Rule 2002 and (d) the Office of the United States Trustee.  USAC submits that such notice satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

## CONCLUSION

WHEREFORE, for the foregoing reasons, USAC respectfully requests this Court (i) to invoke primary jurisdiction so that the FCC, the federal entity with the expertise and discretion granted by Congress under the Communications Act, can in the first instance address

those issues raised in respect of USAC's Audit Claims that center around the interpretation and application of the FCC's rules and regulations, and (ii) to grant such other and further relief as this Court deems just and equitable.

Dated: New York, New York
      November 24, 2010

*Attorneys for the Universal Service*
  *Administrative Company*

VEDDER PRICE P.C.

By: ____*/s/ Michael Schein*_____
    Michael L. Schein (MS-0241)

1633 Broadway, 47th Floor
New York, New York 10019
Tel: (212) 407-7700
Fax: (212) 407-7799

  -and-

Jonathan T. Cain (JC 2363)
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
701 Pennsylvania Ave., NW, Suite 900
Washington, DC 20004
Tel: (202) 434-7300
Fax: (202) 434-7400